UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

*********************************************
Jonathan Leite,                             *
        Plaintiff                           *
                                            *
        v.                                  *       Civil No. 15-cv-00280-PB
                                            *
Matthew Goulet *et al.*,                    *
        Defendants                          *
*********************************************

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

This case arises out of an inmate-on-inmate assault that took place on the afternoon of

Friday, August 24, 2012 in the "F Block" upper housing unit at the Northern New Hampshire

Correctional Facility ("NCF"). Plaintiff, Jonathan Leite, an inmate who was serving three to

eight years for robbery, a suspended sentence for first degree assault and criminal restraint, and

one-and-a-half to three years for witness tempering (Ex. B-3, Leite Face Sheet),[1] claims that

NCF corrections personnel violated his Eighth and Fourteenth Amendment rights by

inadequately monitoring his housing unit, thus failing to protect him from harm. ECF Doc. 4.

While not a separate claim formulated in the complaint, Plaintiff also asserts that

corrections officers violated his constitutional rights by delaying his medical treatment. *Id.*, ¶¶

15, 16; Ex. A, *Depo. of Jonathan Leite*, at 273.

Plaintiff originally brought his one count 42 U.S.C. §1983 complaint against 52 different

current or former corrections officers[2] (ECF Doc. 1), but subsequently amended the complaint to

include fourteen defendants; specifically naming Matthew Goulet, Elmer Van Hoesen, Michael

---

[1] Exhibits are referred to as "Ex."
[2] This was approximately 50 percent of the uniformed corrections officers employed at NCF in 2012.

Beaton, Lynn McLain, Heather Marquis, Trevor Dube, Rhianne Snyder, Eddy L'Heureux, Jeffrey Smith, Dwane Sweatt, Yair Balderrama, Robert Morin, Ejike Esobe, and Kathleen Bergeron ("Defendants"). ECF Doc. 4. The complaint does not, however, articulate or identify any specific conduct or failure on the part of any particular individual defendant, but rather, aggregates their conduct, treating them as fungible.

Defendants are entitled to summary judgment where the entirety of Plaintiff's case is built on conclusory allegations, unsupported speculation and hyperbole. Likewise, no genuine issue of material fact exists as to Defendants' alleged deliberate indifference as Plaintiff's limited evidence necessitates the drawing of improbable inferences by this Court.

Plaintiff cannot produce sufficient evidence for a reasonable jury to conclude that any Defendant knew of, yet consciously disregarded, an excessive or obvious risk to Plaintiff's safety or medical needs. Mere negligence in conducting rounds or "sufficiently monitoring" a unit is insufficient to show deliberate indifference as a matter of law.

Finally, Defendants are entitled to qualified immunity. This doctrine protects government officials from liability "insofar as their conduct does not violate a clearly established . . . constitutional right of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

## II.  STATEMENT OF UNDISPUTED FACTS

### A.  General Information Regarding NCF

NCF in Berlin, New Hampshire is a general population prison for male offenders operated by the New Hampshire Department of Corrections ("DOC") that houses approximately 640 inmates. Ex. B, *Aff. of Jeffery Smith*, ¶6. The mission is to provide a safe and secure

environment that challenges individuals housed in the facility to personally grow and develop responsible decision making. *Id.*

In 2012 DOC maintained operations at NCF on a 24 hour a day, seven day a week basis using approximately 110 uniformed corrections officers and other non-uniformed staff. *Id.* at ¶7. These correctional officers enforce discipline, orderly behavior, safety and security at the facility. *Id.* They do so by performing security tasks such as body searches, observing resident behavior throughout the facility, conducting count to ensure physical presence and wellness of inmates, and conducting rounds to observe living areas for safety, security and sanitation. *Id.*; Ex. C, *Aff. of Kathleen Duchesne*, ¶¶2, 6-8.[3]

Housing at NCF is divided into two units, the lower housing unit and the upper housing unit. Ex. B, ¶ 9. Both housing units consist of four housing blocks each, with Alpha through Delta on the lower unit, and Echo through Hotel on the upper. *Id.* In 2012 each block had approximately 60 to 80 inmates housed in cells or on day room bunks. *Id.* Inmates housed on "day room" bunks did not have an assigned cell, but lived in bunks out in the open area that was used as the common area for all inmates on the block. *Id.*

Supervision of inmates occurs through observation of where inmates live, work, and recreate. Ex. B, ¶33. Inmates have direct access to staff which enhances security and helps to resolve issues at the lowest level. *Id.* Direct supervision includes rounds of housing blocks. Officers do not maintain a constant physical presence on the housing blocks throughout the day. *Id.* Rather, officers walk the units periodically, using their senses to observe the behavior and conduct of offenders. Ex. C, ¶12.

---

[3] In 2012, Officer Duchesne's last name was Bergeron, thus she is referred to throughout this memorandum as Officer Bergeron.

Rounds of the housing blocks were to be conducted at least hourly in 2012, using staggered times so that inmates are less able to predict when officers might enter a particular housing block. Ex. B, ¶34; Ex. C, ¶7. Rounds require officers to walk through the unit checking for sanitation issues, potential disciplinary violations, as well as security or safety threats. Rounds do not require an officer to open the inmates' cell doors, walk into a cell to verify a sleeping inmate is in the correct bunk, or to identify inmates by name. Ex. C, ¶7; Ex. B-10, *Depo. of Jeffrey Smith*, at 75-76 ("[I]t's not until count that you're actually identifying inmates and making sure they're all in their proper cells."), 80; Ex. L, *Depo. of Scott Lambertson*, at 43-44 (glancing in window is appropriate on rounds). If, however, there is an obvious infraction, *i.e.* that an inmate is easily observed to be out of place (*i.e.* more than two inmates in a cell bunked only for two),[4] or there is evidence of another infraction or observable safety concern, the officer will correct the issue or call for assistance or a response team. Ex. B-10 at 75-80; Ex. C, ¶¶6-7. It is not abnormal or unusual for inmates to sleep during the day. Ex. B-10 at 76-77; Ex. D-1, *Depo. of Lynn McLain*, at 30-31.

Counts and census checks allow for around the clock accountability of all residents. There are emergency counts, census counts and scheduled counts. Ex. B-9, *PPD 5.30*, at 2. In 2012 there were at least four formal counts required during every 24-hour period. *Id.*; Ex. B, ¶ 32. Three of those counts required inmates to stand so that an officer could place a face with a name and bunk. For assistance with this task officers use a count sheet, which notifies the officer as to which inmates are presently assigned to what cell/bunk. Ex. B-9 at 2-3; Ex. C-3, *Depo. of Kathleen Duchesne*, at 35-38; *see* Ex. B-1, *F-block Count Sheet*; *see* Ex. B-10 at 80. It is during a standing count that officers verify the physical presence and identity of an inmate by directly observing them. In this way, officers can also assess the physical well-being of each inmate. Ex.

---

[4] This is referred to as cell-hopping.

B-10 at 76; Ex. B-9 at 2-3; Ex. I-1, *Depo. of Trevor Dube*, at 21. A census count is also taken daily to verify the presence of inmates assigned to work, school, recreation, or other activities that occur off of the housing units. Ex. B-9 at 2-3. Again, during a count, an officer must physically identify each inmate, unlike a round where an officer is not required to physically see that each inmate is present. Ex. B, ¶ 32; Ex. B-9 at 2-3. Also during any count, unlike a round, the officer must see bare skin, movement of the inmate, or be able to directly talk to and hear from the inmate. Ex. B-9, PPD 5.30 (D) subpar. 4.

Many inmates' housing assignments change frequently, as well. Ex. L at 13-14; Ex. G-1, *Depo of Dwane Sweatt*, at 17 (inmates move every day). Thus, an inmate assigned to one cell or unit for a morning count may be moved to another cell or to an entirely different unit by the evening. Ex. C-3 at 35-38; Ex. I-1 at 20.

Movement inside the facility is also regulated and happens on a daily basis. Movement occurs in one of three ways: during scheduled mass movements, under staff escort, or on an unescorted movement, such as to a visit. Mass movement occurs at dining times, work movements, yard movements, and special events. Ex. B-9, at IV(A). Movement for visits requires the front door officer to sign in a visitor and then call the control room to page the inmate to the visiting room. Once the inmate is paged the inmate leaves his housing unit only when permission is obtained by the relevant control room from the movement officer to open the housing unit doors. Ex. G, *Aff. of Dwane Sweatt*, ¶ 4. The inmate will then walk down the corridor, unescorted, to the visiting room where Central Control then unlocks the doors to allow the inmate into the visiting area. *Id.* The inmate next proceeds to the visiting room officer and hands the officer his inmate identification card and from there proceeds to sit with his visitor. *Id.* An inmate does not have private time with an officer prior to a visit. *Id.*

The facility uses closed circuit video in order to view movements, housing units, work spaces, yards, and other areas of the prison. Ex. B, ¶ 15. Video monitors are located in control rooms, also known as "control points (CP)." "CP 5" is the control room which takes live video feed from the upper housing units, the upper hallways, and the entire industries area. Ex. B, ¶¶ 15-17; Ex. B-10 at 46-47; Ex. D, *Aff. of McLain,* ¶3; Ex. D-1 at 6-7. "CP 4" is used to monitor the lower housing units and the surrounding area. Ex. B, ¶15. "Central control" has video feed from the outside perimeter, the yard, and all other areas within the prison. *Id.*

In 2012, CP5 was staffed by one officer who had access to two video monitors and more than 12 camera views. Ex. D, ¶¶4, 10. Each housing unit had two fixed camera angles that allowed visuals of that unit's "dayroom" area. Ex. B, ¶16; Ex. B-10 at 49-50; Ex. D-1 at 10. The cameras at that time could not pan into any cell. Ex. B, ¶16. As such, there were many "dead areas" in the facility. *Id.* In 2012, inmates were generally aware that that the interior of their cells were not observable on camera. *Id.* Their cells have large doors that would plainly obscure the stationary camera's view, and there were no cameras in the cells. *Id.*

Officers assigned to CP5 in 2012 were only able to pull up one camera at a time on each video monitor. Ex. D-1 at 7. Typically, officers would have one monitor observing hall movement and would toggle through the housing units' dayrooms using the second monitor, one camera view at a time, as time allowed. Ex. B-10 at 47-51; Ex. D-1 at 6-9, 37-38. Officers assigned to CP5 are unable to focus solely on observing housing units during their shift, as their attention is often drawn from the monitors given the responsibilities of opening doors, monitoring movements, taking phone calls, and relaying information to other officers. Ex. B-10 at 77-79 ("when you have moment of free time, when you're not opening a door . . . you can

cycle through the cameras and determine if anything is out of the ordinary."); Ex. D, ¶¶3-10; Ex. D-1 at 6-9; Ex. K-1, *Aff. of Ejike Esobe*, at 12; Ex. B, ¶17.

For instance, in 2012 the touch-screen control panel in CP5 permitted the user to either lock or unlock every single cell in the each of the four housing units as well as each entry way to the unit and various other entry and exit points in the general area of the CP5 corridor. Ex. D, ¶6. When an inmate or staff member seeks entry past a locked point in that area of the prison, including the industries area where many inmates work daily, then the CP5 officer must "pop" or unlock that door. *Id.*; Ex. D-1 at 41. When an inmate or staff member pushes a button indicating their intent to get through a locked point, a beeping will occur in the control room to indicate to the CP5 officer that a determination needs to be made as to whether or not to unlock the applicable entry point and permit the inmate or staff member to pass. Ex. D, ¶6; Ex. D-1 at 44.

When inmates push the "call button" on their housing unit to contact CP5, one of the two video monitors in CP5 is automatically pulled away from whatever the CP5 operator is viewing at the time and shows the inmate who is seeking assistance. Ex. D, ¶7; Ex. D-1 at 37. The CP5 officer is also responsible for paging both inmates and staff members to have them move from the housing units or offices to other points within the prison. Ex. D, ¶7. For instance if an officer wants to speak with an inmate off the unit, or the inmate's presence is requested in medical, industries, or education, the CP5 officer receives a phone call requesting the inmate. The CP5 officer then pages the unit to get the inmate's attention, the inmate hits the call button to respond, and at that point the CP5 officer must unlock the unit door to permit the inmate's passage after obtaining final permission from the movement officer. *Id.* The CP5 officer facilitates numerous similar staff and inmate movements through locked points during the course of the shift. Ex. D, ¶

8. Thus, officers in the control booth often do not have the ability to view housing unit activity for uninterrupted minutes of time. *Id.*; Ex. D-1 at 37-38; Ex. B, ¶ 17; *see* Ex. B-10 at 79.

Additionally, the facility was extremely busy on Friday afternoons in 2012 because inmate visits were occurring, and the inmates' movements to and from these visits, in addition to the regular inmate movements, medicine calls, and shift change resulted in increased traffic around the facility. Ex. B, ¶¶21-22. Shift change occurs right around 3:00 p.m. with an officer replacing the officer in CP5 likely between 2:50 and 3:00 pm. Ex. B, ¶21; Ex. D-1 at 44. Moreover, there were mass movements that occurred at approximately 14:20 and 15:30 hours on a daily basis. *See* Ex. B-11, *CP5 Log*, *Aug. 24, 2012*.

Officers are assigned to specific posts within the facility on a daily basis. Assignments are not static, and an officer may not be assigned the same position/post on a daily, weekly or monthly basis. Ex. B, ¶8. In other words, officers may be assigned to a control room on one day, upper housing on the next day, and lower housing on the third day. *Id.* Officers do not get to choose their "preferred" assignments; some officers, however, may be assigned more often to one location over another. *Id.*

NCF, like other prisons, houses dangerous individuals. *See* Ex I, *Aff. of T. Dube*, ¶5; Ex I-1 at 28. Officers cannot fully guarantee that the prison will be safe, as assaults and fights do happen. Ex. K, at 71. Often-times officers are also faced with inmates attempting to hide the fact that they have been assaulted or that an assault has taken place. Ex. C, ¶18; Ex. A at 191("we would never in a million years do anything wrong on the unit in front of the cameras…"); Ex. H at 6 ("everything is done to hide it from the cops"). Although officers conduct safety and security checks, including rounds and counts to ensure appropriate behavior, no officer can predict an assault without some particular indicator that a risk exists. *See* Ex. I, ¶¶ 5-8.

If an inmate feels unsafe or believes he is in danger, protective custody is available for that inmate. *Id.* Protective custody is an administrative process where an inmate who reports that he is in fear for his safety is immediately removed from an area and then a hearing is held to determine the appropriate housing assignment. Ex. I-1 at 40-41; Ex. I ¶¶6-8; *see* Ex. A at 270-71. When specific knowledge of a threat or specific risk of harm is known regarding a particular inmate from one or more other inmates, the facility also uses "keep separates" which indicates that those inmates cannot be housed together. Ex. I, ¶¶5-8. A generalized risk of assault, that befalls all inmates, would not require a keep separate to be initiated, nor would it automatically result in the protective custody process being initiated. Ex. I, ¶8.

**B. Specific NCF Information Relative to August 24, 2012 and the Assault**

On Friday, August 24, 2012, Plaintiff was assigned to the Upper Housing Unit, F Block in the Dayroom, Bunk 1, top bunk. Ex. B-1. He had been assigned to that bunk since July 16, 2012. Ex. B-12, *Corrected Ans. to Smith 2nd Interrogs.* at No. 4. Plaintiff had no keep separates, had never requested protective custody, and further had no known particularized risk of harm that was associated with his housing assignment. Ex. C, ¶¶29-30; Ex. I, ¶¶6-9; Ex. A ("Q: Did you ever tell anyone at NCF at any time that you were concerned about your safety? A: No.").

The facility operated its three shifts, with regular Friday activities occurring, including visiting hours, in which Plaintiff participated. Ex. B, ¶¶ 10, 22-23. Defendants Goulet and Van Hosen served as the shift commander and assistant shift commander, respectively, on first shift. Ex. B-5, *Shift Command. Log*; Ex. E, *Aff. of Elmer Van Hoesen*, ¶ 1; Ex. E-1, *Ans. to Van Hoesen Interrogs.* at No. 4; Ex. F, *Ans. to Goulet Interrogs.*, at No. 6. Defendant Goulet finished his shift at 1400 hours (2:00 pm), before the assault took place. Ex. F. at No. 4, 6; Ex. B-10 at 16 (explaining shift commanders arrive and leave one hour before the standard shift commences).

At approximately 1430 hours Plaintiff ended his visit and returned to F Block just before the busy1500 hour shift change. Ex. B, ¶¶20, 26; Ex. B-5. Defendants Jeffrey Smith and Dwane Sweatt served as shift and assistant shift commanders for the second shift. Ex B-5; Ex. G, ¶2. The shift commander's log, *inter alia*, shows a shift change at 1500 hours, and indicates that a number of inmates from the upper housing unit were in the yard at approximately 1530 hours. Ex. B-5; Ex. C, ¶14.

Defendants Dube, Snyder, L'Heureux and McLain all worked the upper housing unit on first shift, with McLain working the CP5 control room. Ex. B-6, *Upper Housing Shift Log/NCF Shift Logs*; Ex. B-11. Defendants Dube, Bergeron and Esobe all worked second shift, with Esobe manning CP5. *Id.* Exhibit B-6 reveals that on August 24, 2012, counts occurred at approximately 0200, 0400, 0700, 1130, 1700, 2030 and 2315 hours. The rounds log for August 24, 2012 shows that rounds or a count were completed during every hour of the day. Ex. B-7, *Rounds Log*.

The logs reveal that second shift Defendants Bergeron and Dube conducted the first upper housing unit round of their shift together at approximately 1545 hours on August 24, 2012, their second round at approximately 1650 hours, and a standing count, along with Defendant Sweatt and an Officer Watson, at 1700 hours. Ex. B-7, Ex. I, ¶3; Ex. C, ¶9. In August 2012, Bergeron had only completed rounds on F Block on two prior days, including just one round on August 19 and a number of rounds on August 20. Ex. C ¶6.

Video downloaded[5] after the incident confirms that the 1545 round was conducted with Officer Dube going to the mezzanine level of the tier and Officer Bergeron walking the lower

---

[5] Defendant Smith, as shift commander, reviewed video of the unit on the evening of August 24, 2012. Ex. B, ¶ 2. Video remains on the system for approximately 15 days before it is automatically written over. *See* Ex. S, *Poulin Depo,* at 7. Defendant Smith again reviewed video on September 5th and saved particular video clips he deemed necessary to identify those individuals involved in the assault. The saved clips involved portions of the time from when Plaintiff entered F Block at 1434 hours until he was seen coming out of cell 9, injured, at approximately 1620 hours. Ex. B, ¶¶23-30. Video clips of the subsequent 16:50 round and 17:00 count applicable to claims in this case were not saved at the time, as Defendant Smith did not believe they were necessary to the investigation. *Id.* at ¶30.

level of the tier at approximately 1540 hours. Ex. B-8, *Video Footage* (File 1); Ex. C, ¶¶9-12; Ex. I, ¶3. The video also confirms that at approximately 15:29:50 hours many F-Block inmates exit for the 1530 yard and general movement. Ex B-8, (File 1).

The video depicting the 1545 round shows Officers Dube and Bergeron entering F-block at approximately 15:40:18. Ex B-8 (File 1). Officer Dube is seen walking towards the staircase, and Officer Bergeron is seen passing the bathroom at the rear of the screen at approximately 15:40:25. *Id.* The video shows Bergeron looking at the bathroom as she passes by and then entering the mop closet at the back left of the screen at approximately 15:40:30. Ex. B-8, (File 1); Ex. C, ¶¶10-11. By 15:40:46, the video captures Officer Bergeron as she is passing by the stairwell and then further conducting her round past each cell. *Id.*

Officers do not enter cells during rounds unless there is a need to correct a situation or there appears to be an emergency. Ex. C, ¶ 12; Ex. D-1 at 30; Ex. G-1 at 16. If an inmate is seen moving, or there does not appear to be anything out of the ordinary, an officer will not necessarily enter a cell to check on a sleeping inmate during a round.  Ex. I-1 at 21-22; Ex. G-1 at 16. The manner in which a round is conducted changes with the circumstances encountered. Ex. L, at 51 (if the unit is largely empty "it could just be a glance."). Bergeron did not observe anything out of the ordinary during her 1540 round. Ex. C, ¶¶ 11-17, 23. Likewise, neither Dube nor Bergeron noticed anything out of the ordinary during their next round at approximately 1650 hours. Ex. C, ¶17; Ex. I, ¶¶ 3-4.

During the 1700 hour count, Bergeron recognized that there was a problem with Plaintiff when she asked him to stand for count. Ex. C, ¶ 25; Ex. C-3 at 9-11. As Bergeron approached Plaintiff's bunk, she inquired of him why he was not standing for count. When Plaintiff moved from his bunk to the floor Bergeron noticed him sway. *Id.* At the same time, Sweatt, who was

conducting the count with Bergeron, started to move to Plaintiff' s bunk when he heard Bergeron's inquiry, also recognized that something was not right with Plaintiff. Ex. C, ¶ 25; Ex. C-3 at 9-10; Ex. G-1 at 9-13.

Sweatt noticed blood on Plaintiff's mouth (G-1 at 12) when he was close enough to see, and called for first responders, and then for medical attention. *Id.*, at 10, 23. Given what he observed, Sweatt originally suspected that Plaintiff had overdosed on drugs. Ex. G-1 at 13. Sweatt called a medical emergency at approximately 1708 hours, with NCF medical personnel arriving by 1710 and Berlin emergency services personnel arriving at NCF by approximately 1721. Ex. B-5; Ex. C, ¶26; Ex. J-1. No patent signs of an assault were readily observable. Ex. C, ¶ 27; Ex. G-1 at 13 ("I didn't see any marks on his face."); Ex. J-1 at 2 (nursing note stating "no abrasions or signs of assault."). Even after it was determined that the assault took place in cell 9, no blood was found in that cell. Ex. C, at ¶28. Any signs of an assault were cleaned by the inmates. Ex. H, *Depo. of Jonathan Gelinas*, at 6-8. The inmates also attempted to make it appear normal when the officers came on the unit to do their rounds. *Id.* at 7 ("There wasn't any blood or any -- blood or anything around that could tip the cops off or anything like that. We cleaned the areas up, and just made it look like he was sleeping."). Vomit and/or blood was only observed on Plaintiff's bunk once the first responders were called. Ex. C-3, at 10-11, 23.

After Plaintiff was taken to Androscoggin Valley Hospital, Defendant Smith , as shift commander, initiated review of the recorded video to determine what happened to Plaintiff, still not knowing it was an assault. Ex. B, ¶¶2, 18. In reviewing video, Smith tracked Plaintiff's movements for the afternoon. *Id.* The video revealed that at approximately 1620 hours, only an hour before Berlin EMS arrived, Plaintiff stumbled out of cell 9 and was assisted to his bunk in the dayroom. Ex. B, ¶¶2, 28-29; Ex. B-8 (File 4). Cell 9 housed two other inmates, Jonathan

Gelinas, assigned to the bottom bunk; and Ryan Elliott, assigned to the top. Ex. B, ¶2. Plaintiff,

Elliot, and Gelinas are each white males with brown hair, between 70 and 73 inches tall and,

during the time, each weighed 190 pounds. Ex. B, ¶¶ 3-5; Ex. B-2, 3, 4 (DOC Face Sheets).

Video showed Plaintiff coming out of cell 9, approximately 40 minutes prior to count. In

reviewing the video further, Smith learned that at approximately 1430 hours Plaintiff left the

visiting room, and returned to F Block at approximately 14:34:23 hours. Ex. B, ¶26, B-8 (File 1).

Plaintiff is seen on video dropping an item in his bunk, changing his clothes, moving around the

dayroom and casually engaging with Gelinas at Plaintiff's dayroom bunk over the next

approximately five minutes. Ex. B, ¶28, Ex. B-8 (File 1). Plaintiff is then seen walking towards

and entering cell 9 at approximately 14:39:30. Ex. B, ¶ 27, B-8 (File 2). Plaintiff admits that

when he returned to the unit after his visit, he walked into cell 9 without "a worry in the world."

Ex. A at 203. Plaintiff explained that he really did not know why he was attacked, other than

possibly for sticking up for a younger inmate on one occasion.[6] *Id.* 194-203. He testified:

> I didn't run up any debts. I didn't have problems with anybody. I mean you can
> see I walked in the unit. Not a worry in the world. I mean you can watch any
> video from that unit, I've never, never, asked for help. Never looked like I needed
> help. I mean there was no reason for- for them to do what they did other than that.

Ex A, 203:18-204:1.

Inmate Gelinas explained that the assault took just minutes and occurred around the shift

change time, further indicating that he and others did everything they could to mislead the

officers about what transpired in the cell. Ex. H at 6-12.

It is only with detailed scrutiny of the video that the observer is able to discern the

relevant chain of events. *See* Ex. B-10 at 78-79. Although NCF has an officer assigned in CP5 or

in the central control room, those officers must be turned to the exact camera, the exact angle, at

---

[6] The criminal investigation into the assault posited that the assault occurred over a drug deal gone bad given inmate interviews which occurred after the assault. Ex. M, *Depo of State Trooper Michael Cote*, at 24-25.

the exact time and focusing at the exact location or individual to see any particular activities. An officer in a control room is unable to access the interior of a cell via video, and control room officers do not have access to audio of the housing units to accompany the video. Ex. B, ¶¶15-16.

Immediately after detecting that the incident occurred in cell 9, inmates Gelinas and Elliott were removed from the unit, pending an administrative review, the scene was secured, and a criminal investigation commenced. Ex. B-5; *see generally* Ex. M. Inmates Gelinas, Sean Lavallee and Matthew Garcia were charged with and pleaded guilty to the assault and conspiracy. Ex. M, at 58.

Plaintiff was later transferred from Androscoggin Valley Hospital to Dartmouth Hitchcock Medical Center, having suffered a skull fracture and hemorrhage. Ex J-1. Plaintiff claims he has no memory of the assault or the events immediately before it. Ex. A, 167, 193. At no time prior to the assault did Plaintiff indicate to any of the Defendants that he was in fear or that he had a particularized concern about his safety or the safety of others. Exs. B, ¶¶ 35-37; C, ¶¶ 29-31; D ¶11; E ¶5; G ¶6; I ¶8; K ¶5; N ¶5; O ¶5; P ¶4; Q ¶5; S ¶5. At no time during or after the assault did any inmate alert staff that Plaintiff was at of assault or had been injured.

### III.    LEGAL STANDARD

Summary judgment must enter "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial; a fact is "material" if it could sway the outcome under applicable law. *See Estrada v. Rhode Island*, 594 F.3d 56, 62 (1st Cir. 2010). In ruling on summary judgment, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-mov[ant]." *Id.*

The nonmoving party, however, cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data, instead "the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). That is the court may "ignore bald assertions, unsupported conclusions, and mere speculation." *Serapion v. Martinez*, 119 F.3d 982, 987 (1st Cir. 1997); *see also Sanchez-Rodriquez v. AT&T Mobility P.R., Inc*., 673 F.3d 1, 0 (1st Cir. 2012).

The non-moving party must "make a showing sufficient to establish the presence of [every] element essential to [its] case." *Celotex*, at 322. "Nevertheless, if the non-moving party's evidence is merely colorable, or not significantly probative, no genuine dispute as to material fact has been proved and 'summary judgment may be granted.'" *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986) (citations omitted).

## IV. DISCUSSION

### A. Summary Judgment is Appropriate on Plaintiff's Failure to Protect Claim and Failure to Timely Provide Medical Treatment because there is No Triable Issue Regarding Deliberate Indifference

The Eighth Amendment places a duty on prison officials to take steps to protect prisoners from violence "at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *see also Estelle v. Gamble*, 429 U.S. 97 (1976). Not every instance of inmate-on-inmate violence, however, translates into constitutional liability. *Farmer*, 511 U.S. at 834. The Constitution does not guarantee safe prisons, only that prisoners will be free from cruel and unusual punishment. *Adams v. Peters*, 1996 LEXIS 19479 at 3 (N.D. Ill. Dec. 30, 1996).

For both the failure to protect claim and the allegations of delayed medical care, liability attaches when an inmate shows that he is: (1) incarcerated under conditions posing a substantial

risk of harm, i.e. the claimed deprivation must be objectively serious; and (2) the relevant prison

official has a sufficiently culpable state of mind. *Farmer*, *supra*, at 834. That is a prison official

must be shown to have been deliberately indifferent to the Plaintiff's health or safety. *Id.*; *see*

*also Calderon-Ortiz v. Laboy-Alvarado*, 300 F.3d 60 (1st Cir. 2002) (attacks by other prisoners);

*Leavitt v. Corr. Med. Services*, 645 F.3d 484, 497 (1st Cir 2011) (inadequate or delayed medical

care), *citing Burrell v. Hampshire Cnty.*, 307 F.3d 1, 8 (1st Cir. 2002)). To prove a prison official

violated the Eighth Amendment, an inmate "must meet both [the] objective and subjective

criteria." *Surprenant v. Rivas,* 424 F.3d 5, 18 (1st Cir. 2005) (citation omitted).

Here, Plaintiff has no evidence that any of the named defendants were deliberately

indifferent to his safety or his medical needs. "Deliberate indifference is characterized by

obduracy or wantonness, not inadvertence or good faith error." *Whitley v. Albers*, 475 U.S. 312,

319 (1986). The undisputed evidence reveals that no individual defendant gratuitously allowed

Plaintiff to be beaten by other inmates on August 24, 2012. In fact, Plaintiff even admits that he

did not need to be protected. Ex. A at 273. The event occurred at an extremely busy time in the

facility, during shift change, and no officer could have inferred that a particular inmate posed a

substantial threat of harm to Plaintiff. Likewise, the undisputed evidence reveals that no

individual defendant knew of and simply disregarded Plaintiff's medical condition after the

unanticipated and unknown assault. Inmate Gelinas, for example, explained that, following the

assault, he put Plaintiff on the bed, that "he looked just like a sleeping inmate," and that there

was "nothing to tip off anybody that he was in danger or anything like that." Ex H, at 8.

For liability to attach Plaintiff must show more than simple negligence in the actions of

the 14 named individual State Defendants. *Whitley*, 475 U.S. at 319 (liability cannot be

predicated solely on negligence, "more than ordinary lack of due cure for the prisoner's interests

or safety" is required). Here, Plaintiff has put forth no evidence suggesting that Defendants acted wantonly or with criminal recklessness when performing their duties on August 24, 2012.

Defendants' activities must each be analyzed separately, despite Plaintiff's attempt to characterize all of the named officers as a single actor. "It is axiomatic that the liability of persons sued in their individual capacities under §1983 must be gauged in terms of their own actions." *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999). "[O]nly those individuals who participated in the conduct that deprived the plaintiff of his rights can be held liable." *Velez-Rivera v. Agosto-Alicea*, 437 F.3d 145, 156 (1st Cir. 2006).

For purposes of the undisputed facts, the DOC's records form a more accurate presentation of what transpired than Plaintiff's bald allegations. Plaintiff cannot simply rest on plausibility at this stage of the lawsuit. There is insufficient evidence as a matter of law to suggest that any of the defendants had the subjective culpability required under the deliberate indifference standard. Without such evidence, no genuine issue of material fact exists as to this element of Plaintiff's Eighth Amendment claim, and summary judgment is warranted.

### 1. Supervisory Defendants

Plaintiff has brought this §1983 claim violations against supervisors Matthew Goulet, Elmer Van Hoesen, Jeffrey Smith and Dwane Sweatt. His complaint, however, does not suggest or even hint at what these individuals did or did not do to violate his rights. A review of the records demonstrates these four individuals served in supervisory roles on August 24, 2012. Ex B, ¶10; Ex. B-5. Each was a either the shift commander or assistant shift commander and none were directly responsible for monitoring the housing units. Ex. B, ¶¶10-11; Ex. B-5; Ex. E, ¶2; Ex. F at No. 6; Ex. G, ¶2; Ex. B-10 at 7-8. While these individuals had responsibility for the operations of the shifts to which they were assigned, there is no allegation specific to any

individual supervisor defendant, let alone evidence that they were recklessly or callously indifferent to supervising F Block, or the unit officers assigned to upper housing on August 24, 2012 between the hours of 1439 and 1700.

The limits of supervisory liability are well-defined in the First Circuit, and cannot be "predicated upon a theory of *respondeat superior*." *Gutierrez-Rodriquez v. Cartagena,* 882 F.2d 553, 562 (1st Cir 1989). Rather, supervisors can be held liable for the conduct of those they supervise only upon an affirmative link between their acts and those of the offending employee. *Voutour v. Vitale*, 761 F. 2d 812, 820 (1st Cir. 1985). This affirmative link requires that the supervisors' conduct be "inexorably" tied to the purported constitutional violation, or that the supervisor was a "prime mover behind" the allegedly unconstitutional conduct. *See Maldonado v. Fontanes*, 568 F.3d 263, 275 (1st Cir. 2009); *Camilo-Robles v. Zapata,* 175 F.3d 41, 43–44 (1st Cir. 1999). A supervisor, to be liable for their own acts or omissions, must have shown reckless or callous indifference to the constitutional rights of others. *Gutierrez-Rodriquez*, 882 F.2d at 562.

The video evidence and DOC documents reveals that at approximately 1439 hours Plaintiff headed towards cell 9, entered it shortly thereafter,[7] exited that cell at approximately 1620 hours, and was determined to need medical services just after 1700 hours. Ex. B, ¶¶26-29; Ex. B-8 (Files 1-4). The facts also reveal DOC medical personnel arrived by 1710 (Ex. J-1), that EMS was on prison grounds by 1721 (Ex. B-5) and on F Block by 1730 hours (Ex. J-1). The evidence, likewise, demonstrates that the measures which are in place for safety and security were exercised, in that rounds, count and other normal daily operations occurred on August 24, 2012. *See generally* Ex. B; Ex. B-1; Ex. B-5 through B-8.

---

[7] Plaintiff confirms, however, that he had no idea why he entered the cell, Ex. A at 194, 203. He was not preventing some other adverse act from occurring. *Id.* The criminal investigation also could not determine how long the actual assault occurred. Ex. M at 21. Inmate Gelinas, however, described the assault as being relatively brief. Ex. M at 7.

### a. First Shift Supervisory Defendants

Defendant Matthew Goulet, the Shift Commander for first shift, was not even on duty when the assault or discovery of Plaintiff in an injured state occurred. Ex. F at No. 6. Defendant Goulet's day ended at 1400 hours. *Id.* There is no fact that suggests any event having bearing on this case even occurred until 1430 hours or later. As a result there is no evidence that Goulet had subjective knowledge that an assault would occur, or that he was deliberately indifferent to any known risk that Plaintiff would otherwise be subjected to a substantial risk of serious harm after his shift ended.

Defendant Elmer Van Hoesen ended his day at 1500 hours. As the first shift Assistant Shift Commander he had no role in monitoring activities in the upper housing unit during second shift. Ex E, ¶2. Van Hoesen had made rounds of the facility early in the day and participated in no further rounds after 0800 hours. *Id.* Moreover, Van Hoesen had no knowledge of a particularized risk of substantial harm to Plaintiff. *Id.* at ¶5. He was, likewise, not involved in activities associated with the visiting room. *Id.* at ¶3. Had Defendant Van Hoesen known or been informed that a safety or security threat was present he would have offered protective custody to that inmate. *Id.* at ¶5.

### b. Second Shift Supervisory Defendants

Defendants Dwane Sweatt and Jeffrey Smith served as the assistant shift and shift commander on second shift on August 24, 2012. Ex. B, ¶10; Ex. G, 2. Neither individual had personal knowledge that there was a potential issue relative to violence on F Block or of a particularized nature to Plaintiff or any other individual. Ex. B, ¶¶ 35, 37-38; Ex. G, ¶ 6. Neither individual conducted rounds or conducted activities in central command or CP5. Ex. G-1 at 15;

Ex. G, ¶5; Ex., B ¶36. Neither individual was involved in any visiting room activities. Ex. B, ¶37; Ex. G, ¶3.

A mere failure to perceive a significant risk does not satisfy the knowledge requirement of deliberate indifference. *See Cavanagh v. Taranto*, 95 F.Supp. 3d 220, 237 (D. Mass. 2015). Plaintiff's contention that he provided vague information about a potential threat to a different inmate to an unidentified officer who searched him after the conclusion of his visit at approximately 1430 hours likewise does not implicate any of the supervisory staff. First, even if Plaintiff's tenuous version[8] of this disclosure is credited, there is no evidence that such information made it from the unnamed officer to a supervisor, or to anyone else. Second, a conclusory allegation that the defendants should have been aware, but failed to take proper measures, is insufficient evidence of deliberate indifference. *See e.g. Adekoya v. Holder*, 751 F. Supp. 2d 688, 697 (S.D.N.Y. 2010) (finding conclusory allegations that defendant was aware of medical needs and failed to provide care insufficient even on motion to dismiss).

Defendant Sweatt conducted count with Officer Bergeron at approximately 1700 hours and together they discovered that Plaintiff needed medical attention. Ex. G, ¶7; Ex. G-1 at 9, 13; Ex. C, ¶25; Ex. C-3 at 9-11. At no time prior to that discovery did anyone alert either Sweatt or Smith to the fact that Plaintiff needed medical attention. Defendant Smith first became aware of an issue with Plaintiff when he heard the medical emergency declared over the radio, at which time he started planning for a hospital transport. Ex. B, ¶13.

---

[8] Plaintiff, at his deposition, for the first time ever, disclosed that he told an unnamed officer who was searching him immediately after his visit that ended at 1430 hours that there was chatter on the unit which indicated "there was going to be a problem." Ex. A. at 150. Plaintiff had never before disclosed this conversation; not in his complaint, not in any interview he had with State Police or DOC investigators and not in any grievance or inmate request slip that might have been filed after the event. It is the only aspect of the Afternoon of August 24, 2012 that Plaintiff claims to remember with any specificity. Ex. A at 193-95. Plaintiff's version of this event was not only vague but inconsistent throughout the deposition . Compare Ex. A, at150-53, 155-58, 160-62 with Ex. A at 203.

The fact that Plaintiff was found during count also shows that the procedures utilized by the facility appropriately detected an issue. The purpose of standing count is to ensure inmates are accounted for and not injured. Ex. B, ¶32; Ex. B-9; Ex. C, ¶7. Within minutes of observing Plaintiff and recognizing something was amiss, medical personnel were on the scene. Ex B-5; J-1. Sweatt immediately called first responders and next called a medical emergency. Ex. G-1 at 9-13; Ex. C-1 at 11.

There is simply no evidence that Smith or Sweatt acted with deliberate indifference, wantonness, or a callous disregard for Plaintiff's safety or health on the afternoon and early evening of August 24, 2012. *Gutierrez-Rodriquez*, 882 F.2d at 562. Nor is there any evidence suggesting that these supervisors' conduct is "inexorably" linked to the constitutional violation of a subordinate, or that they were "prime mover[s] behind" a constitutional violation. *Maldonado*, 568 F.3d at 275; *Camilo-Robles v. Zapata,* 175 F.3d at 43–44. Therefore, Plaintiff has failed to raise a genuine issue of material fact regarding the necessary "affirmative link" between the upper unit housing staff or the central control staff and the alleged Eighth Amendment violations. Thus, Defendants Goulet, Van Hoesen, Sweatt and Smith are entitled to summary judgment in their favor.

### 2. Control Room Defendants

An officer tasked with monitoring video of inmate activity is not deliberately indifferent to an inmate's health or safety simply because they failed to detect an indication of such a circumstance that was available on video. To be deliberately indifferent an officer must have a subjective understanding that a substantial risk to inmate safety exists, and then, notwithstanding that awareness, must act unreasonably in the course of performing her duties, such that the risk is left knowingly unabated. *Burrell*, 307 F.3d at 8. In the context of officers with access to video or

other control-room view of inmate activity, it is well-established that simply missing potential signals of an inmate altercation does not equate to deliberate indifference, even in situations where the officer is neglecting their duties, which is also not supportable on this record.

For example in *Tuttle v. Christie*, 2015 U.S. Dist. LEXIS 168314 (D.N.H. Nov. 10, 2015) the inmate plaintiff alleged that the New Hampshire State Prison officer responsible for monitoring three housing unit from the "CCU control room" was "reading or asleep" when an assault occurred during out-of-cell time. *Id.* at 3-4. The Court granted summary judgment to the defendant officer, explaining that:

> Even if the court were to assume that the defendant was sleeping or reading during the altercation, summary judgment on the Eighth Amendment claim would be proper because the record is devoid of any facts suggesting that the defendant was subjectively aware that Etienne (or any other inmate on the tier in CCU) presented a danger to Tuttle prior to the altercation. *See Shorter v. Russell*, 2014 U.S. Dist. LEXIS 169517, at *8, 2014 WL 6909026, at *4 (D.S.C. Nov. 19, 2014) ("[T]he allegation that Officer Russell was sleeping while the rape took place and failed to make his rounds, at best, shows negligence, which is not actionable under 42 U.S.C. § 1983.")[.]

*Id.* at 6-7 (some internal citation omitted).

Here, Plaintiff alleges that the officers in CP5 on both first and second shift (Defendants McLain and Esobe, respectively) were deliberately indifferent to his safety simply because they did not observe certain claimed indicators that Plaintiff alleges should have alerted them to the fact that something on was wrong on F block. But, as in *Tuttle*, *supra*, Plaintiff neither has nor can point to any evidence that McLain or Esobe had any actual information suggesting that Plaintiff was subjected to a heightened state of risk on August 24, 2012. Significantly, Plaintiff has no evidence establishing that McLain or Esobe were actually viewing video of F-block at the times in question.

As both defendants explained in their depositions, operating CP5 involves far more than viewing one or two inmate housing units. Ex. K-1 at 12; Ex. D-1 at 37-38; *see also* Ex. B, ¶15-21. CP5 serves as the means of permitting staff and inmates through all locked points within the upper housing unit and industries area. Ex. D, ¶3. Further, it is undisputed that the attack on Plaintiff occurred in a cell, that the stationary cameras present in F-block in 2012 could not see inside the unit's individual cells, and that the control rooms do not have audio of the housing units accompanying the video feed. Ex B, ¶16. Under such circumstances, courts have granted summary judgment when the plaintiff points to no evidence suggesting that these individuals had a subjective understanding that a threat existed at a particular time.

For example, in *Counterman v. Warren Cty. Corr. Facility*, 2005 U.S. Dist. LEXIS 41863 (D.N.J. Jan. 27, 2005), the district court granted summary judgment to correction officer defendants where:

> [the] control officer ha[d] numerous responsibilities other than watching the over thirty security monitors located there, . . . includ[ing]: responding to internal radio traffic in the facility; opening and closing the secured doors and gates of the facility upon request of WCCF staff; monitoring the fire and other alarms; responding to outside radio traffic related to the transport of prisoners; and physically monitoring the hallway adjacent to center control. . . .

*Id.* at 42. The *Counterman* court explained that summary judgment was also appropriate because:

> [T]he undisputed evidence with respect to what is actually visible on the H-Block security monitors, tend[ed] to show that neither the shower incident or the August 17, 2002 incident would have been visible to the central command officer. Specifically, the housing block monitors are stationary, *i.e.* they do not have the ability to pan or zoom. The H-Block monitor, in particular, is focused on the trustee block's day room and does not have a view of the inmates' shower area or the interior of inmates' cells.

*Id.* at 43.

Here, Plaintiff does not dispute the fact that the cameras would not have captured the assault itself. Ex. B, ¶16. He argues, however, that there were signals available to the CP5 officers on August 24, 2012 that something was happening on F block. As to first shift, these claimed signs consist of periods where inmates were loitering around cell 9 and then sporadically entering and existing cell 9 in the approximately fifteen minutes following the assault. *See generally* Am. Compl. But there is no evidence establishing, or even suggesting, that McLain was viewing the video of F-block when these signs were available, or that, had she observed <u>some</u> of this activity, that it would have actually alerted her to the fact that there was a potential problem on the unit. As one court explained in granting summary judgment to a control room officer in an inmate-on-inmate assault case:

> Maybe a careful control booth officer, even while monitoring all four quadrants of Echo pod from the control room, should have seen inmates ominously congregating and then repeatedly peeking into Godfrey's cell. Perhaps that officer should have reacted to Hylton's yelling threats and making aggressive gestures toward Godfrey's door. <u>Again, Godfrey presents no evidence that Bratton actually observed all that the camera captured</u> . . . .

*Godfrey v. Russell*, 2015 U.S. Dist. LEXIS 128280 at 61-62 (W. Va. Sept. 24, 2015).

As McLain explained in her deposition, even if she were viewing F block at various points during this time period, in order to see each instance of congregation around or entrance into cell 9 she would have had to: a) focus her attention exclusively on one housing unit for many minutes; 2) concentrate directly on a single cell (cell 9) for that entire time span; and c) not had any interruption, despite working in the busy control room. *See* Ex. D-1 at 38 ("There is no way that I can—I would have never watched for 16 minutes like that unless I knew that something was wrong, but even if I tried to, I wouldn't be able to . . . ."); *see also* K-1 at 13 ("You can't just stay or pause the camera in one place for so long because you're going to miss something, if something happening on camera two while you were busy for a person on camera

one. So you just have to move it around."), 24-25. It is undisputed that the video monitors in CP5 change automatically when call buttons are pushed in various locations throughout the CP5 area. Ex D-1 at 37 ("There are call buttons being pushed all the time, and every time a button is pushed, the camera changes. Let's say I'm looking at a particular block and somebody comes along and pushes a button in another block, the camera goes to that block.").

As Captain Smith explained, the reason that he was able to notice and document that there were indicators of an assault in cell 9 on August 24, 2012 was because he studied the video footage for hours after the fact. He testified:

> [Y]ou'd have to sit there and watch one inmate out of all the other things going on in that shot and watch that guy. That's why it's advantageous to take the time like I did that -- in September to -- <u>when you know an incident occurred</u>, to take the time to go and watch quietly hours of video, with no interruptions. You don't have to worry about buzzers going off, the phone ringing, the – that's the best time to really get the full picture, like I said, going backwards in time and then watching. It's – that's how you get the detail. Like when I was monitoring in September, I was looking for Inmate Leite the moment he walked in that unit and each -- where he went and the people he interacted with and the cells he went to. That was the best time to get those details. To do that live in a control room would be practically impossible.

Ex. B-10 at 78-79 (emphasis added). This is especially the case when an incident takes place at a time of the day that is particularly busy for the control room operators, such as during shift change. Ex. B, ¶ 21 ("Shift change is an especially busy period for the officers operating the control rooms . . . ."). Thus, no reasonable jury could find that McLain had the requisite subjective understanding that an assault was taking place in cell 9 on F block, as there is no evidence indicating that there was a problem on F block and that McLain, despite an <u>actual awareness</u> of this issue, deliberately chose not to take any action. Ex. D, ¶¶ 11-12.

Additionally, under no circumstances can it be said that there is evidence that McLain failed to protect Plaintiff from the assault itself. It is established that Plaintiff voluntarily entered

the cell where the assault took place.[9] McLain would have had to have known immediately that Plaintiff was at risk upon entry into the cell were she to send officers into F-block with sufficient time to break up the assault. Indeed, Plaintiff acknowledges that staff could not have protected him from the assault itself as it was an entirely unanticipated event. *See* Ex A at 272-73; *see Burrell*, 307 F.3d at 9 (granting summary judgment where inmate was assaulted upon voluntarily entering prison cell, explaining "there was no basis for [officers] to predict Burrell would walk into the lion's den and be mauled."). Likewise, Plaintiff was never concerned about his own safety. *Id.* at 270-71; 273 ("I didn't need protecting").

Similarly, as to second shift, Plaintiff will likely argue that Esobe failed to see Plaintiff emerge from cell 9, fall to the floor, and then be helped to his bunk by another inmate. But this occurrence, in its entirety, took just 34 seconds. Ex B-8, File 3. Consequently, it cannot be said that this event would have been obvious to the second shift CP5 officer, who, as explained above, was responsible not only for periodically viewing all four of the upper housing units, but also answering phone calls, opening doors, and paging inmates and staff. Esobe testified that he had no knowledge that there was a risk of harm to any inmate on F-block on August 24, 2012, and that he did not see anything on the video monitors that day that made him question the safety of the inmates on that unit. Ex K, ¶6. Consequently, Plaintiff has failed to demonstrate that a genuine issue of material fact exists as to the subjective awareness of Defendants Esobe and McLain and, therefore, these individuals are entitled to summary judgment.

Finally, Plaintiff sues Defendants Balderrama, Morin, Marquis and Beaton who worked in the NCF Central Control room on August 24, 2012. Although Central Control has access to all of the facility's cameras, the officers operating Central Control, are chiefly "focused on the

---

[9] Entering a cell that is not one's own or "cell-hopping" is prohibited conduct at NCF that is punishable by a disciplinary violation. Ex. B-10 at 39-40.

overall operation of the facility with special emphasis on monitoring and assisting those individuals entering and exiting the prison, the perimeter of the prison, and the frequent staff and inmate movements throughout the area of the prison surrounding Central Control." Ex. N, *Aff. of R. Morin*, ¶ 3; Ex. O, *Aff. of Y. Balderrama*, ¶ 3-4; Ex. P, *Aff. of M. Beaton* ¶ 3; Ex. Q, *Aff. of H. Marquis* ¶ 3. Indeed, officers in Central Control are responsible for a vast variety of tasks, including verification of all individuals entering the facility, providing body alarms to these individuals, collecting and issuing all of the keys for the entire facility, completing weapon inventories, monitoring and coordinating transports in and out of the facility, receiving inmate counts from all areas of the prison and contacting the Concord facility to compare the count numbers, responding to fire alarms, water valve alarms, multiple perimeter alarms, completing maintenance notifications and report, and much more. Ex. O at 7-13.

Defendants Morin, Balderrama, Beaton and Marquis affirmed, under oath, that monitoring the video footage of the inmate housing units was not their only focus while working central control, and that they did not observe any video footage of F-block on August 24, 2012 that caused them any concern for the safety of the inmates within that unit. Exs. O ¶ 4; N ¶ 4; P ¶ 3; Q ¶¶ 3-4. Plaintiff has not pointed to any evidence plausibly supporting even an inference to the contrary. Consequently, no reasonable juror could find that Balderrama, Morin, Beaton or Marquis had a subjective understanding of a risk of harm to plaintiff on August 24, 2012. Summary judgment in favor of these individuals is therefore appropriate.

### 3. Housing Unit Defendants

Plaintiff next asserts that officers abdicated their duties by not monitoring inmates and completing "appropriate walk-throughs" because, if they had, they "would have discovered the assault . . . and could have put a stop to it." ECF Doc. 4, ¶¶15, 20, 21. Plaintiff also complains

that but for the allegedly inadequate "walk-throughs," officers would have been able to come to his aid and ensure that he received medical attention in a timely fashion. *Id.*, ¶16. Such allegations do not rise to the level of an Eighth Amendment violation without more. Here, Plaintiff cannot establish the requisite showing.

Defendants Snyder, L'Heureux, Dube, and Bergeron were assigned to the upper housing unit as unit staff. Defendants Snyder and L'Heureux served on first shift with Dube, who also was the OIC for second shift, along with Defendant Bergeron. Ex. B, ¶11; Ex. B-6; Ex. C, ¶5; Ex. I, ¶2; Ex. H, ¶2; Ex. R *Aff. of R. Snyder*, ¶2.

The Upper Housing Post required officers to conduct rounds and count at various times during the day. Ex. B, ¶¶32-34; Ex. B-9; Ex. C, ¶¶5-9. DOC records reflect that there was at least one round conducted during every hour of the day on August 24, 2012, through which officers evaluated the living quarters of inmates for safety, security and sanitation. Ex. B, ¶12; Ex. C, ¶¶6-7; Ex. B-7; Ex. C-3 at 5; Ex. L at 9; Ex. G-1 at 15; Ex. B-10 at 9. Rounds do not require an officer to verify the physical presence of the inmates, nor do they require an officer to enter a cell to wake a sleeping inmate. Ex. C, ¶21; Ex. B-10 at 11; Ex I-1 at 22; Ex. B-9. As such, officers completed all rounds. Ex. B-7.

The post also requires officers to conduct counts. Ex. C, ¶¶6, 7. A standing count, which occurs at least 3 times a day, requires inmates to be upright and identified by name, ID number, and bunk. Ex. C, ¶7; Ex. B-9; Ex. C-3 at 7. All appropriate counts were conducted on August 24, 2012. Ex. B-7; Ex. B-1. Some of the purposes of a count include making sure that each inmate is safe, capable of standing and engaging, and that there are no marks on individuals or signs of assault or illness. Ex. I-1 at 21; Ex. B-9.

Snyder and L'Heureux completed their shifts at 1500 hours, and walked their last round in F Block at approximately 1415 hours. Ex H ¶2; B-7. Neither Snyder nor L'Heurex had any involvement with the visiting room or with monitoring the unit via video feed. Ex. H, ¶¶3-5; Ex. R, ¶3. Likewise, neither Snyder nor L'Heurex had any information that there was a potential serious threat to an inmate's safety on F Block on August 24, 2012. Ex. H, ¶6; Ex. R, ¶¶4-5. As such, there is no evidence that either could have been deliberately indifferent to Plaintiff as the events relevant to this case did not occur until the very end of their shift, after they had completed their required 1400 hour round, and as they were likely on their way out of the facility. Ex. B-7 (reflecting the 1415 round). No evidence exists that these two first shift officers could have suspected that there was a plot of violence underway. *See Godrey*, *supra*, at 63. Even Plaintiff concedes that when he walked back on the unit at approximately 1434 hours he did "not [have] a worry in the world." Ex. A at 203:20. It is not sufficient that an officer "should have been aware of the existences of the excessive risk." *See Beers-Capitol v. Whetzel*, 256 F. 3d 120 144 (3rd Cir. 2001). Merely because an officer is on-duty does not provide the requisite evidence needed to permit an inference of actual knowledge. *Counterman*, *supra*, at 28. There simply is no evidence from which a reasonable jury could conclude that these individuals acted with deliberate indifference to Plaintiff's safety, accordingly the court should grant summary judgment to Defendants Snyder and L'Heurex.

The same is true with regard to Defendants Bergeron and Dube. Plaintiff's claims amount to nothing more than an allegation that had these officers completed more thorough walkthroughs of F Block, they would have been aware that he was injured. *See* Ex A, 272-73. Plaintiff contends that at least Officer Bergeron when completing her 1540 hour round should have recognized "his battered" body in a cell he did not belong in, and in not doing so, she was

deliberately indifferent. *Id.* at 273. Officer Dube conducted the round on the top floor of F Block during that particular round, and thus did not pass by cell 9. Ex. I, ¶3. Both he and Officer Bergeron indicate that had they observed something unusual doing the round, it would have been dealt with immediately. Ex. C, ¶12. 15- 17; Ex. I, ¶4.

Plaintiff's argument regarding Officer Bergeron is untenable. The issue in a deliberate indifference claim is not what an official should have known, but what the officer actually did know. *Counterman, supra*, at 31, *citing Beers*, 265 F.3d at 137 (citing *Farmer*, 511 U.S. at 837-38). Courts, for example, have determined that even <u>entirely missed rounds</u>, without more, cannot demonstrate a deliberate indifference to one's safety or health. For example, deliberate indifference cannot be established by merely alleging a corrections officer was not at his post. *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995) (finding officer's failure to check "bullpen" for two-and-a-half hours during which time plaintiff was beaten by other inmates did not "support the level of deliberate indifference and causal connection necessary to hold [the officer] personally responsible."); *Mosley v. Jarriel*, 2014 U.S. Dist. LEXIS 58139 at *45 (S.D. Ga. Mar. 4, 2014) (finding failure to follow rounds policy is negligence at most).

Deliberate indifference requires more than just negligence, or even gross negligence. *See Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir. 1988) (stating that negligence and gross negligence "do not establish a constitutional violation.") The First Circuit has compared deliberate indifference to criminal recklessness. *Giroux v. Somerset Cnty*, 178 F.3d 28, 32 (1st Cir. 1999) (requiring an actual, subjective appreciation of risk, a sufficiently culpable state of mind). Plaintiff is likely to argue that Bergeron completed her round too quickly and that had she actually looked into cell 9 she would have recognized Plaintiff was out of place, as she knew who he was. This contention also misses the mark.

First, no evidence suggests that Bergeron knew Plaintiff was in cell 9 and injured. Simply put, there is no culpable state of mind on the part of Bergeron. *See Giroux*, at 32. Such a culpable state of mind would exist if Bergeron did, in fact, see Plaintiff in the cell "crumpled" on the floor and then simply walked by. The evidence, however, demonstrates that such could not have been the case. Inmate Gelinas testified that he attempted to hide the fact that an assault occurred. Ex. H at 6-9. He stated:

> Well, afterward, I made it look like he was sleeping on my bed, like he was anybody else. There wasn't any blood or any – blood or anything around that could tip the cops[10] off or anything like that. We cleaned the areas up, and just made it look like he was sleeping. The cops did everything they were – they did their rounds. They talked to people on the unit that day. There's a health and welfare check they do every hour, and they couldn't have known anything was going on that day.

Ex. H, at 7. Inmate Gelinas reiterated, "everything was done to hide it from the cops" (*Id.* at 6); "every precaution was taken to—for the cops not to notice." *Id.* at 10-11. He says he "literally put him in bed. He looked just like a sleeping inmate." *Id.* at 8.

Completing a round too quickly also does not amount to deliberate indifference. *See e.g. Hadix v. Caruso*, 2009 U.S. Dist. Lexis 52884 at 19-20 (W.D. Mich. Mar. 31, 2009) (psychiatrist completing a round in a mental health unit on the weekend quicker than during the week did not amount to systemic deliberate indifference). It does not amount to the officer <u>consciously</u> disregarding a substantial risk of serious harm. A deficiency in recognizing Plaintiff was in a cell that he was not assigned to during a round would not even amount to negligence as it is not until a count that officers are to ensure that all inmates are accounted for by identity.

Officer Bergeron indicates that she did not observe anything out of the ordinary while she conducted her rounds. Ex. C, ¶17. There was no visible blood, vomit, puddles, piles of clothes or

---

[10] When asked to clarify who he meant by "cops" Inmate Gelinas indicated he was referring to Correctional officers. Ex. H at 12.

towels that would have been a cue to something amiss. *Id*. Inmates had already cleaned the scene. Ex. H at 6, 10. Furthermore, Bergeron had not conducted rounds on Upper Housing that month, with the exception of just two other days in August 2012. Ex. C, ¶6; Ex. C-1; Ex. C-2. Thus, she would not have been aware of any changes to inmates' cell assignments prior to her performing the count on the unit, which occurred at 1500 and was when she discovered Plaintiff's condition. Ex. C-3 at 30. Additionally, the two occupants of cell 9 and Plaintiff all had the same general physical appearance, making it difficult to distinguish one sleeping inmate from another. Exs. B ¶2; B-2, B-3, B-4. Finally, there was nothing to indicate that an inmate was in distress in a cell. Ex. C ¶21-24. Plaintiff was not on the floor and was lying on a bed, apparently asleep. *Id.*, Ex. H. Likewise, there were no outward signs of injury until Plaintiff was found during count. Ex. J-1; Ex H at 10.

Additionally, Defendant Smith relates that during his review of the entire time frame at issue he saw no dereliction of duty while unit officers completed their rounds of F Block. Ex. B ¶24.[11] He likewise saw that the rounds were completed. *Id.* B-8. Nothing in the record establishes that Bergeron declined to confirm a medical issue that she strongly suspected to exist. It would be entirely different had she and Sweatt done nothing when the risk was truly obvious, as it was when Plaintiff could not stand for count.

Both Defendants Dube and Bergeron conducted a second round at 1650 hours. The record is unclear as to who walked-through the dayroom portion of F Block and who walked through the mezzanine level. But again, neither Defendant Dube nor Bergeron had actual knowledge that someone was injured in the dayroom. *See generally* Ex. C; Ex. I.

Plaintiff, himself, has only challenged Officer Bergeron's actions on August 24, 2012. He first admits that no one could have done anything to protect him from the actual assault. Next,

---

[11] Inmate Gelinas's testimony also confirms that the rounds took place. Ex. H at 7.

when asked what factual information, aside from his allegations against Bergeron, did he possess indicating any other officer did something wrong, Plaintiff responded, "I don't." Ex. A at 277. As explained above, Plaintiffs challenge regarding Bergeron is insufficient as a matter of law.

Neither Dube nor Bergeron had actual knowledge of a significant risk of an assault or a subsequent injury prior to the 1700 count in which Bergeron and Sweatt found Plaintiff having difficulty standing. Likewise, there was insufficient information from which anyone could have drawn an inference that Plaintiff was in bed injured either in cell 9 or on his dayroom bunk. There is no evidence that establishes the actual knowledge necessary for a viable deliberate indifference claim. The pertinent time to determine the "relevant prison official's knowledge [is] the time in question, not with hindsight's perfect vision." *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998)). Because of this, summary judgment should be granted for Defendants Dube and Bergeron.

### B. The State Defendants are Entitled to Qualified Immunity

The doctrine of qualified immunity shields "[g]overnment officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It provides immunity from suit, not merely a defense to liability. *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009). The test to determine if such immunity applies is two pronged. It asks (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Id.* at 268-69 (*citing Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

The second prong of the test contains two parts: "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Mlodzinski v. Lewis*, 648 F.3d 24, 33 (1st Cir. 2011). The first part focuses on the clarity of the law at the time of the alleged civil rights violation, while the second part "focuses more concretely on the facts of the particular case." *Maldonado*, 568 F.3d at 269.

There is no doubt that a §1983 case imposes liability when the defendants act with deliberate indifference to a known constitutional right. But, immunity attaches if a reasonable officer would not have understood that his conduct violated the right. Here, no reasonable officer could believe that any of the conduct that occurred from 1430 hours to 1700 hours constituted deliberate indifference and therefore a violation of the Eighth Amendment. Plaintiff has indicated that there was nothing any officer could have done to protect him. The only claim he believes he has is against Officer Bergeron, for not conducting what he believes to be proper rounds. However, inadequate cell checks do not rise to Eighth Amendment violation, as the law existed in 2012. *See Dobson v. Magnusson*, 923 F.2d 229, 230 (1st Cir. 1991) (officer's failure to complete two regular cell checks could be considered "forgetful" or "faulty" but not "so faulty as to indicate indifference, deliberate or otherwise").

Even if another officer might conduct rounds differently than Officer Bergeron, by walking slower through the unit or more thoroughly inspecting every inmate, such behavior does not indicate that reasonable officers would believe a routine round through a half empty unit violates the law. *See e.g.* Ex. L at 51. Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)

34

(internal quotation marks and citations omitted). If <u>any</u> reasonable official could reasonably have believed — on the basis of the facts known at the time — "that no violation existed," the defendant official is entitled to immunity. *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 69 (1st Cir. 2002).

The question here is whether any reasonable officer in the position of each of the defendants would have reasonably believed that their actions, or inaction, which had to be willful, amounted to deliberate indifference to the serious risk that Plaintiff would be assaulted and then lay in a cell, after other inmates tried to hide the fact that he was assaulted.

The answer to that is no. The mere failure to perceive a risk does not satisfy the deliberate indifference standard. *See e.g.Cortez-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988). In the absence of actual knowledge, Plaintiff has not offered any admissible evidence that his risk was so obvious that the defendants' knowledge can be inferred.

Here, no reasonable officer could know that Plaintiff would be attacked, likewise no officer was willfully blind to the harm. The focus has to remain on what the officers knew and what they failed to do. As the record as demonstrated herein indicates, there was simply no knowledge and no failure. Thus, the State Defendants are entitled to qualified immunity.

Respectfully submitted,

MATTHEW GOULET, *ET AL*

By their attorneys,

GORDON J. MACDONALD
ATTORNEY GENERAL


Date:  October 13, 2017       /s/  Lynmarie C. Cusack
Lynmarie C. Cusack, NH Bar No. 11266
Senior Assistant Attorney General
Francis C. Fredericks, NH Bar No. 21161
Assistant Attorney General
Department of Justice
33 Capitol Street
Concord, NH  03301-6397
(603) 271-3650
lynmarie.cusack@doj.nh.gov


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 12th day of October 2017, via this court's ECF system, to Benjamin T. King, counsel of record for plaintiff Jonathan Leite.


/s/  Lynmarie C. Cusack
Lynmarie C. Cusack