UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE



*****************************************
| Jonathan Leite,          | * |
|    Plaintiff | * |
|                          | * |
| v.                       | * Civil No. 15-cv-00280-PB |
|                          | * |
| Matthew Goulet *et al.*, | * |
|    Defendants | * |
|                          | * |
*****************************************

## AFFIDAVIT OF JEFFREY SMITH

I, Jeffrey Smith, upon oath do hereby depose and state as follows:

1. I am currently employed by the New Hampshire Department of Corrections ("DOC") as the current Chief of Security at the Northern New Hampshire Correctional Facility ("NCF") in Berlin, New Hampshire. I have been employed by the DOC since 2002. I make this affidavit based on my personal knowledge.

2. On August 24, 2012, following a medical emergency on second shift involving inmate Jonathan Leite, who, at that time, lived on the NCF housing unit known as F-block, I reviewed video of footage of F-block taken earlier that day. I reviewed the video via NCF's digital video recording system. While viewing the video, I observed inmate Leite emerge from Cell 9 on F-block. I then immediately determined the identities of the inmates residing in Cell 9 at that time; these were inmates Ryan Elliot and Jonathan Gelinas. Attached as Exhibit B-1 to this affidavit is a DOC count sheet for F-block from August 24, 2012, which indicates that the occupants of Cell 9 on that date were Elliot and Gelinas, and that Gelinas was assigned to the bottom bunk (09 01B).

1

3. According to DOC records and my own observations, inmate Gelinas is a white male with brown hair. He is 73 inches in height and weighs approximately 190 pounds. Attached as Exhibit B-2 to this affidavit is a true and accurate copy of the DOC Face Sheet of inmate Gelinas.

4. According to DOC records and my own observations, former inmate Jonathan Leite is a white male with brown hair. He is 72 inches in height and, at the time of his incarceration, weighed approximately 190 pounds. Attached as Exhibit B-3 to this affidavit is a true and accurate copy of the DOC Face Sheet of former inmate Leite.

5. According to DOC records and my own observations, former inmate Ryan Elliot is a white male with brown hair. He is 70 inches in height and, at the time of his incarceration, weighed approximately 190 pounds. Attached as Exhibit B-4 to this affidavit is a true and accurate copy of the DOC Face Sheet of former inmate Elliot.

6. NCF is a general population prison for male inmates in New Hampshire that houses approximately 640 offenders. The facility's mission is to provide a safe and secure environment that challenges inmates to grow personally and to develop responsible decision making.

7. In 2012 DOC maintained operations at NCF on a 24 hour a day, seven day a week basis using approximately 110 uniformed staff members. These correctional officers enforce discipline, orderly behavior, safety and security at NCF. They do so by performing security tasks such as body searches, observing resident behavior throughout the facility, and conducting count to ensure physical presence of inmates and conducting rounds to observe living areas for safety, security and sanitation.

8. Officers are assigned to specific posts within the facility. Assignments are not static and an officer may not be assigned the same position/post on a daily, weekly, or monthly basis. In other words, officers may be assigned to a control room, such as CP4 or CP5 on one day, upper housing on the next day, and lower housing on the third day. Officers do not get to choose their "preferred" assignments; some officers, however, may be assigned more often to one location over another.

9. F-block (also referred to as Fox block) at NCF is one of eight housing units that make up the areas that are referred to as "upper housing" and "lower housing." Lower housing consists of housings units A, B, C, and D ("Alpha" through "Delta"). Upper housing consists of housing units E, F, G, and H ("Echo" through "Hotel"). The industries area of NCF is also considered part of upper housing. Each of these eight housing units houses approximately 60 to 80 inmates. That number fluctuates depending upon the number of physical cells on the unit, which house from 60 to 68 inmates per unit, and how many inmates reside in the dayroom bunks within the unit at that point in time. The count sheet referenced above reflects that on August 24, 2017, F-block housed 69 inmates. *See* Ex. B-1. Inmates housed on "day room" bunks in the housing units did not have an assigned cell but lived out in the open area that was used as the common area for all inmates on the block. Offenders at NCF were also housed in reception, the infirmary and the gym.

10. On August 24, 2012, the facility operated three shifts. I was a sergeant at NCF on that date working second shift. I was serving as the second shift, Shift Commander as it was a day off for my superior, the second shift lieutenant. Attached as Exhibit B-5 is the Shift Commander's Log from August 24, 2012. This log reflects that on first shift Sergeant Goulet served as Shift Commander and Sergeant VanHoesen served as Assistant Shift Commander. It

3

similarly reflects that I served as Shift Commander on second shift with Sergeant Sweatt as my Assistant Shift Commander.

11. As far as unit level staff, the upper housing log, corrections officers Trevor Dube, Rhianne Snyder, Eddie L'Heureux, and Lynn McLain worked the upper housing unit on first shift, with McLain working the CP5 control room. Attached as Exhibit B-6 is the Upper Housing Shift Log from August 24, 2012 and the NCF First and Second Shift Logs. Corrections officers Trevor Dube, Kathleen Bergeron (now Duchesne) and Ejike Esobe worked second shift, with Esobe working in CP5.

12. The rounds log for August 24, 2012 reveals that rounds or a count were completed during every hour of the day. Attached as Exhibit B-7 is a true and accurate copy of the Upper Housing Rounds Log from August 24, 2012.

13. The first notification that I received of an incident involving Jonathan Leite on August 24, 2012 was hearing that a medical emergency was declared over the radio. At that point, as shift commander, my task was to gather information on this incident, and then to plan Mr. Leite's hospital transport, which involved determining which staff member(s) would escort Mr. Leite to the hospital and then determine coverage for the staff members who were pulled from their posts to participate in the hospital transport.

14. Once the hospital transport plan for Mr. Leite was finalized, I went to the DVR room to view video footage of F-block to try and determine what happened to Mr. Leite.

15. The facility observes movements, housing units, work areas, yards, and other areas of the prison through closed circuit video. "CP5" is the control room that has video feed from the upper housing units, the upper hallways, and the industries area. "CP4" is used to monitor the lower housing units and the area surrounding the lower housing units. "Central

control" has video feed from the outside perimeter, the yard, and all other areas within the prison. Although the officers in these control rooms can view certain video footage, they do not have access to audio of the housing units. Attached as Exhibit B-11 is a true and accurate copy of the CP5 Shift Log for August 24, 2012.

16. In 2012, CP5 was staffed by one officer who had access to two video monitors and more than 12 camera angles. Each housing unit had two fixed camera angles that allowed visuals of the "dayroom" area. The cameras at that time could not pan into any cell. As such, there were many "dead areas" in the facility. In 2012, NCF inmates were generally aware that the interior of their cells were not observable on camera. Their cells have large doors that would plainly obscure the stationary camera's view and there were no cameras in the cells.f

17. Officers assigned to CP5 are unable to focus solely on observing housing units during their shift, as their attention is often drawn from the monitors given the responsibilities of opening doors, monitoring movements, taking phone calls, relaying information to other officers.

18. As I stated previously, while viewing the video I observed Mr. Leite exit Cell 9 on F-block and be assisted to his bunk by another inmate.

19. Based on my viewing of this footage, I ordered that staff search Cell 9. This search was for drug/alcohol-related contraband as initial the initial report that I received from staff was a belief that this was a drug overdose.

20. As I closely viewed the video footage further that evening, I determined that Mr. Leite entered Cell 9 after 2:30 and before 3:00, the very end of first shift.

21. Shift change is a very busy time at NCF. During this time period outgoing staff are providing briefings to incoming staff as the incoming staff are assuming their duties. Shift change is an especially busy period for the officers operating the control rooms—*i.e.* Central

Control, CP4, and CP5—because there is increased foot traffic in the halls, which requires the officers in control rooms to watch all hall movement and to control the opening and closing of the facility's doors. Shift change occurs right around 3:00 p.m. with an officer replacing the officer in CP5 typically 10 or so minutes prior to 3:00 p.m.

22. Additionally, the facility was extremely busy on Friday afternoons in 2012 given inmate visits and all other inmates' movements around the facility including medication calls, school and work movements.

23. On September 5, 2012, I conducted further review of the video footage from F-block on the afternoon of August 24, 2012. On this date I spent several hours reviewing the video footage. My review included viewing the entirety of the event—*i.e.* from Mr. Leite's return to F-block from a visit that afternoon until staff discovered that he was having difficulty standing for the next standing count.

24. While reviewing the video of F-block in its entirety I did not see any dereliction of duty on the part of the unit officers completing their rounds on F-block, nor did I see any fabrication of rounds. Had I see any violation of DOC policy or any other misconduct on the part of the unit staff on F-block, I would have reported it to my superiors.

25. In addition to reviewing the video footage, I also captured certain segments of the footage off of the DVR system by downloading clips from the two different camera angles. My aim in downloading the video footage was to provide the video clips to the DOC's Investigations Bureau to assist the investigators with identifying the individuals who attacked Mr. Leite.

26. Attached as Exhibit B-8 to this affidavit is a compact disk containing four video files. The first file ("File 1") consists of an approximately one-hour and forty-minute video of F-block from camera channel 29 that shows the unit from 2:34 pm to 4:14 pm (14:34:00 to

16:13:56) on August 24, 2012.  On this video, Mr. Leite can be seen entering the unit from the door in the back right of the screen at 14:34:24.  He is wearing his full dark green prison outfit and is carrying a white sheet of paper, and immediately walks to his bunk, which is the top bunk on the first set of bunk beds.  At 14:39:30 Mr. Leite can be seen standing on the side of his bunk bed toward the rear of the bunk.  He is wearing a white t-shirt and dark green pants.  At this time, he turns and walks off screen downward diagonal left into the area where Cell 9 is located.  During those 5 minutes Mr. Leite can be seen unconcernedly engaging with Inmate Gelinas.

27. The second video file ("File 2") consists of an approximately 26-minte video of F-block from camera channel 30 that shows the unit from 2:34 to 3:00 (14:34:24 to 15:00:20). This video shows Mr. Leite walking onto the unit at 14:34:24 from the bottom center of the screen wearing his full dark green prison uniform and holding a white sheet of paper.  This initial segment of File 2 is the same as that shown in File 1, only from another angle.  At 14:39:30, Mr. Leite can be seen standing on the side of his bunk bed toward the rear of the bunk.  At this time, Mr. Leite turns and walks upward diagonal right and enters Cell 9.

28. The third video file ("File 3") consists of an approximately two-minute video of F-Block from camera channel 30 that shows the unit from 4:20 pm to 4:22 pm (16:20:15 to 16:22:09) on August 24, 2012.  In this video, Mr. Leite can be seen emerging from Cell 9 wearing gray shorts with no shirt on.  Mr. Leite stumbles and then sits on the floor, after which another inmate assists Mr. Leite in getting to his bunk.  Once in his bunk, Mr. Leite moves some clothing out of the way and then lays down.

29. The fourth video file ("File 4") consists of an approximately 90-second video of F-Block from camera channel 29 that shows the unit from 4:20 pm to 4:21 pm (16:20:15 to

7

16:21:08). This video shows the same content as the initial segment of File 3, only from another angle.

30. I did not download video of the entire afternoon on F-block from both cameras. Rather, I downloaded the footage that I believed would best assist the investigators and the State Police in identifying the attackers and, potentially, prosecuting those individuals criminally.

31. DOC records reflect that corrections officer Kathy Bergeron (now Kathy Duchesne), along with Sergeant Sweatt, discovered that Mr. Leite was not well during the standing count that occurred on F-block at approximately 5:00 pm (17:00) on August 24, 2012. This is what is referred to as a formal or scheduled count. *See* Ex. B-1.

32. DOC Confidential Policy and Procedure Directive ("PPD") 5.30, subpart D establishes the DOC's policy regarding counts. Per this policy formal standing counts occur four times per day and require that each inmate is "out of bed and standing." *Id.* Exhibit B-9 to this affidavit is a true and accurate copy of the version of PPD 5.30 that was in effect in 2012, and is being provided under seal.

33. In addition to counts, supervision of inmates occurs through direct observation where inmates live, work and recreate. Inmates have direct access to staff which enhances security and helps to resolve issues at the lowest level. Direct supervision includes rounds of housing blocks. Officers do not maintain a constant physical presence on the housing block throughout the day. Rather, officers walk the housing units from time to time during the day using their senses to observe behavior and conduct of offenders.

34. PPD 5.30 also covers rounds. Rounds of the housing blocks were to be conducted at least hourly in 2012 using staggered times so that inmates are unable predict when officers

might enter a particular housing block. Rounds require officers to walk through the unit checking for sanitation issues, disciplinary violations, and safety or security threats.

35. On August 24, 2012, I had no knowledge that Mr. Leite was in any danger of being assaulted or that there was any specific risk of harm to this inmate. At no point on or before August 24, 2012 was I informed by Mr. Leite or any other individual of a potential threat to Mr. Leite.

36. As shift commander, I was I not responsible for monitoring F-Block by video on August 24, 2012. Nor was I responsible for hourly rounds through F-block. Although the shift commander is to complete one round of the entire prison per shift, this round is delegable, in whole or in part, to a designee. As such, I did not complete any round on F-block on August 24, 2012.

37. Lastly, I did not work in the visit room on August 24, 2012 and, therefore, I did not participate in any post-visit searches of inmates. Likewise, at no point did Mr. Leite inform me that he had a concern for his safety or the safety of any other inmate.

38. If I was made aware of a potential attack I would have taken steps to place an inmate in protective custody. In 2012, had I or anyone on my shift been made aware of a looming attack, appropriate steps would have been taken, including writing a report to document such information. No inmate or officer reported to me that there was a particularized or specific risk of violence on F Block on August 24, 2012. As stated, had such information had been reported it would have been documented in the Shift commander's log. It likewise would have been disseminated at any shift briefing. If an inmate was known by staff to be a target that inmate would be offered protective custody.

39. I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Date: October 12, 2017  /s/ Jeffrey Smith
Jeffrey Smith