UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

*******************************************
Jonathan Leite,  
   Plaintiff

v.     Civil No. 15-cv-00280-PB

Matthew Goulet *et al.*,  
   Defendants
*******************************************

## AFFIDAVIT OF LYNN MCLAIN

I, Lynn McLain, upon oath do hereby depose and state as follows:

1. I am currently employed by the New Hampshire Department of Corrections ("DOC") as a corrections officer at the Northern New Hampshire Correctional Facility ("NCF") in Berlin, New Hampshire. I have been employed for the past 14 years. I make this affidavit based on my personal knowledge.

2. A DOC shift log for August 24, 2012 reflects that I worked in CP5, which is short for control point 5, during first shift on August 24, 2012. *See* Exhibit B-6 to the Affidavit of Jeffrey Smith, Upper Housing Shift Log.

3. CP5 is a control room that is used to operate all doors within the upper housing and industries area. This is a large area of the prison that includes a long corridor, a stairwell, four inmate housing units, office areas, and the entire industries area of the prison, which contains the shops that many inmates work in, such as the furniture shop.

4. CP5 also has two video monitors that the officer assigned to that post uses to pull-up live video of the many cameras that capture, the stairwell, the industries area, and the inmate

1

housing units. In 2012 there were at least 12 camera views that the CP5 operator could pull up on either of the two monitors in that control room.

5. These video monitors as well as all of the automated doors in the area of the prison covered by CP5 are controlled by a touch screen. The CP5 operator uses the touch screen to select which camera to view and what particular door to open. As a CP5 officer I would typically have one video monitor showing the hallways. This would allow me to see hallway and stairway foot traffic.

6. As stated, the touch-screen control panel in CP5 permits the user to either lock or unlock every cell in the each of the four housing units (E, F, G, and H) as well as each entry way to the unit and various other entry and exit points in the general area of the CP5 corridor. When an inmate or staff member seeks entry past a locked point in that area of the prison, including the industries area where many inmates work daily, then the CP5 officer must "pop" or unlock that door. Before the CP5 officer unlocks a door, the officer uses the video monitor to view who is seeking to pass through the locked point. Visually confirming who is requesting to enter or leave a prison unit or access another area of the prison is essential to ensure proper safety and security.

7. When an inmate or staff member pushes a button indicating their intent to get through a locked point, a beeping will occur in the control room to indicate to the CP5 officer that a determination needs to be made as to whether or not to unlock the applicable entry point and permit the inmate or staff member to pass. Similarly, when an inmate pushes the "call button" on their housing unit to contact CP5, one of the two video monitors in CP5 is automatically transferred away from whatever the CP5 operator is viewing at the time and shows the inmate or other personnel who is seeking to enter or exit the unit.

8. The CP5 officer is also responsible for paging both inmates and staff members to have them move from the housing units or offices to other points within the prison. For instance, if an officer wants to speak with an inmate off the unit, or the inmate's presence is requested in medical, industries, education, visits or elsewhere the CP5 officer receives a phone call requesting the inmate, then the CP5 officer then pages the unit to get the inmate's attention, the inmate hits the call button to respond, and at that point the CP5 officer must unlock the unit door to permit the inmate's passage. Additionally, in each instance in which an inmate's presence is requested off the unit, the CP5 officer also needs to call and get permission from the movement officer prior to permitting the inmate to leave the unit. The CP5 officer facilitates numerous similar staff and inmate movements through these locked points during the course of the shift. Thus, officer in the control booth often does not have the ability to view activity on the housing units via video for uninterrupted minutes of time.

9. If the officer operating CP5 does have time during which he or she is not opening doors, answering phones, or paging individuals, the officer will monitor the four inmate housing units applicable to CP5. Due to the fact that the corridor is often busy, the officer operating CP5, including myself when I work in CP5, tends to keep one of the two video monitors on that hallway. The other video monitor is then used to scroll or "toggle" through the camera views showing the four housing units one at a time. In 2012, these four housing units each had two stationary cameras—one at each side of the unit. This meant that there were 8 camera views of housing units that I would scroll through when watching the housing units from CP 5. These cameras on the housing units show the units' dayrooms but does not show the inside of the inmates cells, closets or the bathrooms. During the day, I would also have to scroll through the cameras showing the industries area of the prison. Additionally, I use the video monitors to

watch inmate movements through the corridor and to view the officers as they conduct their rounds.

10. In 2012 CP5 was staffed by only one officer at a time. This remains the case today.

11. On August 24, 2012, I had no knowledge that Mr. Leite was in any danger of being assaulted or that there was any specific risk of harm to this inmate. At no point on or before August 24, 2012 was I informed by Mr. Leite or any other individual of a potential threat to Mr. Leite or any other inmate on F-block that day.

12. During first shift of August 24, 2012, I did not observe any activity on F-block that made me question the safety of the inmates residing there. Had I seen any such activity I would have reported it to the unit officers.

13. I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Date: October 12, 2017     /s/ Lynn McLain_____
                            Lynn McLain