Volume: 1
                              Pages: 1-64
                             Exhibit: 1

         UNITED STATES DISTRICT COURT 

         DISTRICT OF NEW HAMPSHIRE

Case No. 15-CV-00280-PB

- - - - - - - - - - - - - - - - - - - - - x

JONATHAN LEITE,

                    Plaintiff,

      v.

MATTHEW GOULET, et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - x


            DEPOSITION OF MICHAEL COTE

              September 20, 2017

            12:01 p.m. to 1:57 p.m.

         NORTHERN NH CORRECTIONAL FACILITY

              138 East Milan Road

              Berlin, New Hampshire



      Reporter:  Celeste A. Quimby, LCR No. 17

Page 2

                              I N D E X

WITNESS:      Michael Cote

EXAMINATION:                                          Page

              By Mr. King                               4


EXHIBITS FOR IDENTIFICATION:

Cote               Description                         Page

Exhibit 1      State police investigative
               file                                     6







(Exhibit scanned/e-mailed to counsel; original
returned to Mr. King.)

Page 3

A P P E A R A N C E S

For the Plaintiff:

        DOUGLAS, LEONARD & GARVEY, P.C.
        By: Benjamin T. King, Esq.
            Megan E. Douglass, Esq.
        14 South Street, Suite 5
        Concord, NH  03301
        (603) 224-1988
        benjamin@nhlawoffice.com
        mdouglass@nhlawoffice.com

For the Defendants:

        NEW HAMPSHIRE DEPARTMENT OF JUSTICE
        OFFICE OF THE ATTORNEY GENERAL
        By: Lynmarie C. Cusack, Esq.
            Francis K. Fredericks Jr., Esq.
        33 Capitol Street
        Concord, NH  03301
        (603) 271-3658
        lynmarie.cusack@doj.nh.gov
        francis.fredericksjr@doj.nh.gov


                  STIPULATIONS

     It is agreed that the deposition shall be
taken in the first instance in stenotype and when
transcribed may be used for all purposes for which
depositions are competent under the Federal Rules
of Civil Procedure.

     Notice, filing, caption, and all other
formalities are waived.  All objections except as
to form are reserved until the time of trial.

     It is further agreed that if the deposition
is not signed within thirty (30) days after
submission to counsel, the signature of the
deponent is waived.

Page 4

MICHAEL COTE
having been duly sworn by the reporter,
was deposed and testified as follows:

**EXAMINATION**

**BY MR. KING:**

Q.  Please state your name for the record.

**A.  My name is Michael Cote, C-o-t-e, the spelling on my surname.**

Q.  You are employed with the New Hampshire State Police; is that correct?

**A.  That's correct.  I've been employed with the Department of Safety of New Hampshire State Police since December of 2004.**

Q.  What is your current position title?

**A.  I'm currently a patrol supervisor, a sergeant with the state police.  I've been in this capacity since July 22nd of last year.**

Q.  For a period of time during your employment with the New Hampshire State Police, were you a detective?

**A.  I was, from December of 2010 until my promotion date I just gave you.**

Q.  So from December of 2010 until July 22nd

Page 5

of 2016 or July 21st of 2016, you were a detective; is that correct?

**A.  Yes, that's correct.**

Q.  And what were your job responsibilities as a detective with the New Hampshire State Police?

**A.  I wore many hats.  I was -- obviously, one, I was a state police liaison to the Northern Correctional Facility.  I was a board of directors member for the Child Advocacy Center.  I was an investigator for Coos County and there -- during multiple times during that tenure, I worked for the Major Crime Unit in homicide.**

Q.  You investigated the assault upon Jonathan Leite that occurred here at the Northern New Hampshire Correctional Facility on August 24th, 2012, right?

**A.  I did.**

Q.  How did you come to investigate that assault?

**A.  Well, as I mentioned, one of the hats that I did wear during that tenure was the liaison from the Department of Corrections to the state**

1 police. So basically I'm the investigator
2 assigned here in a state police capacity.
3     I was notified by Department of
4 Corrections personnel obviously of the assault.
5 Everything I do for the most part, I did, during
6 that time was past tense, assaults, et cetera.
7 Obviously I'm not here while -- most of the time
8 while they occur. So I was notified of the
9 assault and conducted the investigation from there
10 forward.
11 Q.   And you created a file as part of doing
12 that investigation, right?
13 A.   Correct.
14     MR. KING: Could you mark this, please.
15     (Discussion off the record.)
16     (Cote Exhibit 1 marked
17     for identification.)
18 Q.   Sir, in just a minute I'm going to hand
19 you a stack of documents that we've marked as Cote
20 Exhibit 1, and the first sheet of the stack of
21 documents is titled Office of the County Attorney
22 Felony Case Referral Sheet, and the last sheet of
23 the stack of documents contains photos of an

1 inmate named Ryan John Elliott. And I'm going to
2 ask you if this stack of documents that we're
3 marking as Cote Exhibit 1 contains your file
4 pertaining to the state police investigation of
5 the assault upon Jonathan Leite that occurred
6 August 24th, 2012, excluding Jonathan Leite's
7 medical records.
8 A.   These are 29.
9     MS. CUSACK: The other thing that I
10 removed --
11     THE WITNESS: Are the sections?
12     MS. CUSACK: No, the NCIC reports --
13     THE WITNESS: Okay.
14     MS. CUSACK: -- for each individual,
15 because they are not producible. So it's the
16 criminal history for each of those individuals.
17 We took those out, right?
18     MR. FREDERICKS: Yes. I forgot about
19 that.
20     MS. CUSACK: So I -- so because we can't
21 share them with anybody.
22     MR. KING: Okay.
23     MS. CUSACK: That's not --

1 A.   Okay. So I see up to -- there's a
2 syllabus here that goes from 1 to 29. That's
3 Section 23. Let me just look at what is 24
4 through 29, because I don't know. Criminal
5 history and medical records.
6     So there's your answer. It's all here,
7 from what I can tell, excluding the documents that
8 you have been advised are not here.
9 Q.   BY MR. KING: So Exhibit 1 to your
10 deposition consists of the state police file of
11 your investigation of the assault upon Jonathan
12 Leite that occurred here on August 24th, 2012,
13 excluding medical records and criminal history
14 records; is that correct?
15 A.   Yes. Again, I didn't produce this
16 record, so I'm going off that it's all here. I
17 have no reason to believe it is not.
18 Q.   All right. Can you go to Section 3 of
19 the file, sir.
20 A.   What's the document headed?
21 Q.   It's an August 29th, 2012, --
22 A.   Section 3?
23 Q.   Yes.

1 A.   Got it right here.
2 Q.   Got it. Very good. Section 3 of Exhibit
3 1 contains a document that you prepared, correct?
4 A.   Yes.
5 Q.   And it is a report of your interview of
6 an inmate by the name of Ryan Elliott pertaining
7 to the August 24th assault on Jonathan Leite,
8 right?
9 A.   Yes.
10 Q.   And did you prepare this report as part
11 of an activity that you regularly conducted as a
12 detective with the New Hampshire State Police?
13     MR. FREDERICKS: Objection to form. Go
14 ahead.
15 A.   An activity? I guess I do a narrative
16 report on all my interviews. So the answer would
17 be, yes, I did a narrative on my interview.
18 Q.   And doing narratives on people you
19 interviewed in connection with criminal
20 investigations was something that you regularly
21 did as a detective with the New Hampshire State
22 Police, right?
23 A.   Yes.

1 Q. And is this document that we're looking
2 at, the narrative that you prepared of Ryan
3 Elliott, is this the type of document that you
4 would prepare to do a narrative of your interview?
5 A. That's correct. It's called a DSSP
6 Continuation of Investigation Form 102.
7 Q. Okay. And so you spoke with Ryan Elliott
8 in a room here at the Northern New Hampshire
9 Correctional Facility on August 29th, 2012, at
10 approximately 9:25 in the morning, right?
11 A. Yes.
12 Q. And how did you document what he told you
13 when the interview was occurring, if at all?
14 A. I would have taken notes.
15 Q. Handwritten notes?
16 A. Yes.
17 Q. And then what would you do with those
18 handwritten notes?
19 A. Once a narrative is completed, all of the
20 notes are destroyed, and this becomes the formal
21 record of the interview, just like every other
22 case.
23 Q. Now, if you look at the top of this

1 document, the narrative of the interview with Ryan
2 Elliott, it says date of report, August 24th,
3 2012. That's not the date of this report. That's
4 the date that the crime was reported; is that
5 right?
6 A. That's correct. The report date of the
7 crime is the case number, everything, the town,
8 everything goes back to the original date. And
9 for the most part, when you conduct this many
10 interviews or this many dockets, the header really
11 doesn't change. It's the same case. Does that
12 makes sense to you?
13 Q. Yes. So when would you have prepared
14 this type of written narrative?
15 A. Well, according to the bottom, if it's
16 accurate, October 9th, 2012.
17 Q. So did you preserve your handwritten
18 notes of the August 29th, 2012, interview until
19 October 9th, 2012, when you typed up this
20 Continuation of Investigation Report form, after
21 which you would have destroyed your handwritten
22 notes?
23 A. I would say, yes, and that's the date of

1 the completion. I may start a report on a
2 different day, but the day I actually finish it is
3 the day that I use as the day of completion, if
4 that make sense.
5 Q. Yes.
6 A. If I get pulled away to handle something
7 else, obviously the report's not complete. I
8 don't finish out, sign it, do everything until I'm
9 done.
10 Q. Right. So according to your narrative
11 of your interview with Ryan Elliott, Mr. Elliott
12 told you that he had left the cell -- strike that.
13 Have you had the opportunity to review
14 this narrative, sir?
15 A. I'm looking at it right now.
16 Q. Why don't you take a look at it and let
17 me know when you're finished with it.
18 A. (Peruses document.) Okay.
19 Q. Thank you. Inmate Elliott resided in the
20 cell where Jonathan Leite was assaulted on August
21 24th, 2012; is that correct?
22 A. That's what I'm reading here. I don't
23 remember off memory who his roommate was. But

1 that's what I'm reading here, yes.
2 Q. Well, do you recall that two inmates by
3 the name of Ryan Elliott and Johnathan Gelinas
4 resided in the cell where Jonathan Leite was
5 assaulted?
6 A. I think so. Because I remember Gelinas
7 being charged with a conspiracy in this, and I
8 remember his -- the overt act that we charged him
9 with. So I believe he was one of the ones that,
10 you know, resided in the cell.
11 Q. All right.
12 A. As far as Elliott, I'm going there. I'm
13 saying yes, but...
14 Q. Yup. So Inmate Elliott told you that he
15 was away from the cell when the assault occurred;
16 is that right?
17 A. Yes.
18 Q. And then Inmate Elliott told you that
19 when he returned to the cell, something had
20 happened. Jonathan Leite was puking all over the
21 place; is that right?
22 A. That's correct.
23 Q. In your investigation of this assault,

1 did you learn what happened to the vomit evidence?
2    MR. FREDERICKS: Objection to form. Go
3 ahead.
4 A.  Not specifically the vomit. I mean there
5 was definitely some falsification of physical
6 evidence that occurred in the cleanup of the
7 entire cell. Vomit, blood, this, that. I don't
8 know where it went. You know, I mean obviously I
9 wasn't there.
10 Q.  Right. I know that. I appreciate that.
11 A.  Got to answer the question correctly,
12 right?
13 Q.  Yes. Yeah. What, if anything, did you
14 learn about the falsification of physical evidence
15 in connection with this investigation?
16 A.  Obviously the cleanup occurred, because
17 it was not -- I know from the rounds sheet and
18 everything else and the videos that -- and the
19 course of conduct that happens in a correctional
20 facility, the inmates -- excuse me, correctional
21 staff do rounds. And therefore, this was picked
22 up relatively quickly, to leave no evidence for
23 this crime to be discovered.

1 Q.  And by your testimony, are you stating
2 that the next instance when rounds were done on F
3 block, the corrections officer doing the rounds
4 should have looked into this particular cell?
5    MR. FREDERICKS: Objection to form. You
6 can answer.
7 A.  Do they look in every cell on every
8 round? I don't know. I don't work for the
9 Department of Corrections, sir.
10 Q.  Right. Right. Okay. If we could turn
11 to Section 9 of the report -- of the file rather.
12 A.  Okay.
13 Q.  Section 9 of the file is a narrative of
14 an October 4, 2012, interview that you conducted
15 of an inmate by the name of Paul Alfeo; is that
16 correct?
17 A.  Yes.
18 Q.  And this narrative was prepared, like
19 the previous narrative we looked at, as part of
20 activity that you regularly conducted as a
21 detective with the New Hampshire State Police,
22 right?
23 A.  Yes.

1 Q.  And I'm going to give you -- please
2 review your narrative of the report of Inmate
3 Alfeo and tell me when you've finished reviewing
4 it.
5 A.  (Peruses document.) Okay.
6 Q.  Do you remember how you came to interview
7 Mr. Alfeo?
8 A.  I don't.
9 Q.  Mr. Alfeo told you that when the assault
10 occurred, he was seated directly outside Cell
11 Number 9 where the assault occurred, right?
12 A.  Yes.
13 Q.  And he told you that while he was seated
14 there, he began hearing grunts and things like
15 someone was getting the hell beat out of them,
16 right?
17 A.  Correct.
18 Q.  And Mr. Alfeo further told you that the
19 assault on Jonathan Leite lasted for what seemed
20 like ten minutes, right?
21 A.  Correct.
22 Q.  And Inmate Alfeo told you that he knew
23 that Jonathan Leite was really hurt because he

1 heard it, right?
2 A.  Correct.
3 Q.  Then Inmate Alfeo told you that after the
4 beating, he saw Jonathan Leite lying face down on
5 the floor of the cell, right?
6 A.  Yes.
7 Q.  Mr. Alfeo went on to tell you that
8 Jonathan Leite's body was positioned with his feet
9 closest to the toilet and his head towards the
10 outside wall, right?
11 A.  Yes.
12 Q.  Inmate Alfeo told you that he believed
13 that Jonathan Leite was dying or dead already in
14 the immediate aftermath of the assault, right?
15 A.  That was his thought process, yes.
16 Q.  And then Inmate Alfeo told you in the
17 interview that he later saw Jonathan Leite on his
18 bunk in the dayroom, right?
19 A.  Yes.
20 Q.  And Mr. Alfeo told you that Jonathan
21 Leite was not moving at all when he was lying in
22 the bunk; is that right?
23 A.  Yup.

1 Q. And then finally, Inmate Alfeo told you
2 that the assault on Jonathan didn't come to light
3 until Mr. Leite was later told to stand for count
4 by correctional officers, right?
5 A. Correct.
6 Q. Why don't we go on to Section 10 of the
7 file. And Section 10 of the file is a narrative
8 of an October 4, 2012, interview that you and
9 Investigator Coulombe conducted of an inmate named
10 Joseph Broyer pertaining to the August 24th, 2012,
11 assault on Jonathan Leite, right?
12 A. Yes.
13 Q. And I'd like to give you the opportunity
14 to review this narrative, and when you're finished
15 reviewing it, let me know.
16 A. (Peruses document.) Okay.
17 Q. You prepared the narrative --
18 A. Yes.
19 Q. -- of your interview with Joseph Broyer
20 as part of activities that you regularly conducted
21 as a detective with the New Hampshire State
22 Police, right?
23 A. Yes.

1 Q. And does your narrative accurately
2 reflect what Joseph Broyer told you?
3 A. Yes. There was also a recording with
4 this one.
5 Q. Are there recordings of all the
6 interviews?
7 A. Just the ones I say see attached
8 recording. Some inmates will not let me record
9 them. Obviously we're in prison. Some people
10 don't want to go on the record.
11 MR. KING: Off the record.
12 (Discussion off the record.)
13 Q. Back on the record. If we look at the
14 narrative of the interview of Paul Alfeo --
15 A. What number was that?
16 Q. -- which we just discussed.
17 MS. CUSACK: 9.
18 Q. That was 9, sir.
19 A. Yes.
20 Q. The end of your narrative says, "See the
21 recording for further details."
22 So the interview of Paul Alfeo would have
23 been recorded; is that correct?

1 A. Yes.
2 Q. And is that recording preserved?
3 A. I assume it is part of the file.
4 Q. So it still exists; is that right?
5 A. It does.
6 MS. DOUGLASS: Can I interrupt for just a
7 second? Can you and I talk briefly?
8 MR. KING: Yeah. May we take a brief
9 break?
10 MS. CUSACK: All right. We'll leave.
11 (Recess taken.)
12 Q. BY MR. KING: We already established,
13 sir, that Mr. Elliott told you that when he
14 returned to the cell that day, he observed
15 Jonathan Leite, quote, puking all over the place?
16 A. Yes.
17 Q. Do you recall that?
18 A. Yes.
19 Q. Yes. Did you make a factual finding in
20 your investigation that Jonathan had vomited all
21 over Cell Number 9?
22 MR. FREDERICKS: Objection to form. Go
23 ahead.

1 A. No. Again, there's no evidence for me
2 to take in as far as evidence in the cell.
3 Q. Um-hum.
4 A. It was cleaned up.
5 Q. Okay. Going back to Number 9, your
6 interview of Paul Alfeo, did you make any finding
7 as to how long the assault on Jonathan Leite
8 happened based on what Mr. Alfeo told you?
9 A. I actually couldn't, because inmates were
10 all guessing. They were guessing on time. As
11 we've gone through some of the narratives here,
12 you hear two or three minutes. You hear ten
13 minutes. They're guessing and telling me what
14 they believe is based on what they're hearing. So
15 they're guessing, which is -- there's no way that
16 I could make a finding on that.
17 Q. Okay. All right. Now, before we took
18 that brief break, you were -- you had reviewed
19 your narrative of the interview of Joseph Broyer,
20 right?
21 A. Yes.
22 Q. And you told me that you prepared this
23 narrative as part of an activity you regularly

1 conducted as a detective at the New Hampshire
2 State Police, right?
3 A. Yes.
4 Q. Now, do you have any understanding of the
5 practice that's described here about ingesting
6 Suboxones and then vomiting them up in the prison?
7 Is that something that happens in correctional
8 facilities?
9 A. Yes. I've investigated inmates for doing
10 this.
11 Q. Okay. So tell me what inmates do with
12 respect to Suboxone, if you don't mind.
13 A. Seems to be the choice or the drug of
14 choice here at this facility, at least during the
15 time frame that we're talking about. Today I
16 don't know, but during that time. It comes in
17 from an outside visit a lot of times. They meet
18 with somebody, usually a girlfriend, somebody that
19 they meet with. There's -- that person cheeks the
20 drugs, and it's usually wrapped two or three times
21 in a balloon or a glove of a finger that's cut
22 off, and they pass it through a kiss to the
23 inmate. The inmate then swallows it. The inmate

1 then vomits it up later on on the unit, and
2 it's -- now it's in the housing unit.
3 Q. Okay.
4 A. And it's also, you know, taken in from
5 outside rectally by other inmates but -- you know,
6 in the same capacity. But as far as it being
7 ingested, that's the way it comes in.
8 Q. Okay. So the drug, is it in a pill form?
9 A. Pills or strips.
10 Q. And it remains intact after it's ingested
11 so it can be vomited up?
12 A. That's correct. So it's -- it's bound
13 two or three times, different layers, as insurance
14 if you will, each layer being, you know, if you --
15 one balloon.
16 Q. Oh, one. Oh.
17 A. Tie it, cut it; another balloon, tie it,
18 cut it, opposite way, and then back and forth,
19 back and forth. And they have, you know, like I
20 say red, green, blue, whatever. They tie it up so
21 there's three different balloons. And then the
22 pills or the strips are either -- they're in
23 either cellophane or tinfoil before they're

1 ballooned up, if you will. And then they puke
2 them up.
3 Q. And then the Suboxone is shared amongst
4 the inmates; is that right?
5 MR. FREDERICKS: Objection to form. Go
6 ahead.
7 Q. In your experience.
8 A. It can be sold I guess maybe would be a
9 better word than shared. I mean whether somebody
10 chooses to give some rather than sell it, --
11 Q. All right.
12 A. -- I don't know.
13 Q. Okay. Inmate Broyer told you that before
14 the assault happened, he knew that there was going
15 to be what he thought was going to be a fight
16 there; is that right?
17 A. Yes.
18 Q. Did you gain an understanding of how
19 Inmate Broyer suspected that there would be a
20 fight in Cell Number 9?
21 A. No. Well, actually, if I read on in that
22 narrative, it does tell -- it says that they
23 thought that Jonathan Leite was going to be

1 bringing back drugs from a visit and he said he
2 should be -- oh, hold on. He had inquired if
3 Inmate Leite was supposed to be bringing back some
4 drugs from the unit from another inmate. The
5 inmate replied he should be but he won't have it
6 for long. Someone is going to take it from him.
7 So he's inferring that there's going to
8 be -- someone is going to try to take Jonathan
9 Leite's drugs after this visit. So my
10 understanding, from reading this narrative, is
11 that's -- he knows that Inmate Leite will not give
12 the drugs willingly, so there will be a fight.
13 Q. Now, as part of your investigation, did
14 you -- you learned that Inmate Leite was tested
15 for drugs when he was hospitalized at Androscoggin
16 Valley Hospital and later at Dartmouth-Hitchcock,
17 right?
18 MR. FREDERICKS: Objection to form. You
19 can answer.
20 A. I know it's common practice, but I don't
21 know. I don't remember. I mean there was medical
22 records that I would have to review to say what
23 was in his sytem. I don't know.

1  Q.  Well, do you recall that the original
2  suspicion of Northern New Hampshire Correctional
3  Facility personnel was that Jonathan's symptoms
4  were attributable to drugs?
5  A.  I think so.
6  Q.  And later, after medical examination, it
7  was determined that the symptoms were not
8  attributable to drugs but were in fact
9  attributable to an assault, right?
10 A.  Yes.  Although, like we previously said,
11 if the drugs were ingested in a balloon, it would
12 not be in his system.  You realize that, right?
13 Q.  I was going to ask you that question.
14 A.  Okay.  You're going to ask me that
15 question.
16 Q.  All right.  If the drugs were ingested in
17 a balloon, would they appear on a drug test?
18 A.  They would not.  Because again, he
19 wouldn't feel the effects of them.  They're bound
20 in latex three -- two, three, four layers deep.
21 Which is why it's safe to do.  Just like people
22 coming in over the border do it this way too on
23 airplanes.  I mean it's a common practice of

1  smuggling, if you will.
2  Q.  But those drugs eventually would have
3  been passed through a bowel movement; is that
4  right?
5      MR. FREDERICKS: Objection to form.  You
6  can answer.
7  A.  It would come out one of two ends.
8  Q.  All right.
9  A.  How's that?  I don't know which way,
10 vomited or defecated.
11 Q.  Understood.  Turning back to the
12 narrative of Inmate Broyer.  Inmate Broyer told
13 you that after the assault, Inmate Gelinas and an
14 inmate by the name of Nicholas Quimby brought a
15 sharpened piece of a metal fan which had been
16 hidden in the unit; is that right?
17 A.  Yes.
18 Q.  Did you ever determine where that
19 sharpened piece of a metal fan was hidden?
20 A.  No.
21 Q.  Did you know through your experience as
22 the state police liaison to the Northern New
23 Hampshire Correctional Facility where inmates on F

1  block would hide weapons such as that?
2  A.  No.  I don't know where it was.  It was
3  never found.  I didn't learn this until October
4  4th, and the assault occurred obviously months
5  before.  So I mean it would be relevant to believe
6  that that was no longer on F block after an
7  assault like that.
8  Q.  Right.  Did you ever learn in connection
9  with your duties as a state police liaison to the
10 Northern New Hampshire Correctional Facility that
11 inmates would hide objects that could be used as
12 weapons in the mop closet on F block?
13 A.  It's possible.  Anywhere, you know, would
14 be a better answer.  Could hide them anywhere.
15 Q.  But had you learned that the mop closet
16 was a popular place for hiding objects that could
17 be used as weapons?
18 A.  I can't say a popular place.  I don't
19 know.  I mean I've never charged anybody with the
20 crime of hiding a shank here.  So I wouldn't know
21 if they hide them in the mop closet or under their
22 bed or where.  I would say that, you know, a
23 general -- I know, just through being a liaison

1  here, that a lot of people don't want to get
2  caught with things that are directly under their
3  control, so a common area is a better hiding spot.
4  Q.  I see.  All right.  Inmate Broyer told
5  you that Inmate Quimby had placed a sharpened
6  metal to Jonathan Leite's throat and forced him to
7  drink yellow cleaning solution?
8  A.  Yes.
9  Q.  Did you have an understanding as to
10 whether yellow cleaning solution was kept on F
11 block?
12 A.  I believe they're packets that are
13 different colors, so there's some -- I know that
14 just from being on the housing units.  There's
15 different colors.  Whether or not it was yellow on
16 F block, I don't know.
17 Q.  Yellow --
18 A.  They have cleaning supplies, obviously,
19 to clean the unit.
20 Q.  All right.  And those cleaning supplies
21 are kept where or were kept where in August of
22 2012?
23      MR. FREDERICKS: Objection to form.  You

1 can answer.

2 A. I would have to speak generally that I
3 know they have to get them from a controlled area,
4 so a correctional member would have to give some
5 to the cleaners. How many they're allowed to keep
6 on a unit or where, you'd have to ask somebody in
7 Corrections.

8 Q. I'll represent to you that Inmate Garcia
9 was a cleaner, so he would have had access to this
10 cleaning solution if he were a cleaner?

11 A. I believe so.

12 Q. Do you know whether those cleaners were
13 kept in the mop closet?

14 A. I don't know. Especially not on that one
15 day. Whether there any in there, I don't know.

16 Q. And you told me that where the interviews
17 are recorded, the recordings are part of the state
18 police file?

19 A. If they're recorded. There is a
20 recording if it says it on the report.

21 Q. Back in 2012 in what form were those
22 recordings kept?

23 A. What do you mean?

1 Q. I mean cassette tape, disk?

2 A. No, a disk, CD.

3 Q. All right.

4 A. Yeah. They're burned to a CD.

5 Q. And if we look at Section 11 of your
6 report.

7 A. Yup.

8 Q. Section 11 of your report is a narrative
9 of an interview that you conducted with Nicholas
10 Quimby?

11 A. That's correct.

12 Q. And you prepared this narrative in the
13 course of activity regularly conducted as a
14 detective with the state police, right?

15 A. Yes.

16 Q. And Inmate Quimby told you that in the
17 immediate aftermath of the assault, he observed
18 Jonathan Leite sleeping on the bottom bunk in Cell
19 Number 9, right?

20 A. Yes.

21 Q. And you learned in the course of your
22 investigation that Cell Number 9 was not Jonathan
23 Leite's residence, right?

1 A. That's correct. He was in the dayroom.

2 Q. Did you ever review video evidence as
3 part of your investigation?

4 A. I would say yes.

5 Q. Did you make any instructions or give any
6 instructions that video evidence should be
7 preserved?

8 A. No.

9 Q. Why not?

10 A. I work jointly with the Department
11 Corrections -- with the Department of Corrections.
12 They have investigators there. We've been working
13 jointly for -- since 2010 up until, again, last
14 year. I rely on them. They know what I need, and
15 they've never not given me what I needed. So I
16 don't sit there and baby-sit them.

17 Q. Okay. Your task in conducting this
18 investigation was to determine who assaulted
19 Jonathan Leite, right?

20 A. That's correct.

21 Q. Was your task in conducting this
22 investigation in any way to determine what
23 correctional officers could have done, if

1 anything, to prevent the assault on Jonathan
2 Leite?

3 A. Absolutely not.

4 Q. Did your investigation at all entail
5 determining whether correctional officers detected
6 the injuries that Jonathan Leite had suffered as
7 promptly as they should have?

8 A. Are you asking me my opinion?

9 Q. No, I'm not. I'm asking you if it was --

10 A. Well, I'm not a medical personnel, so I
11 guess you're asking me my opinion considering I
12 can't make a statement on that. How would I know?

13 Q. No, my question was, was it a -- and I
14 think you answered, but -- in performing this
15 investigation were you at all tasked with
16 determining whether correctional officers detected
17 the injuries to Jonathan Leite as promptly as they
18 could have?

19 A. No. I mean I was advised what they
20 found, what the inmates told me, and that was --
21 the inmates told me that it was detected during a
22 standing count. So that's my determination.

23 Q. Okay. Your investigation had nothing

1 whatsoever to do with evaluating correctional
2 officer conduct, right?
3 A. Sir, I don't police police departments,
4 the Department of Corrections or any other law
5 enforcement agency. I'm an investigator in that
6 time for the state police.
7    MR. KING: So I think if you could just
8 read back my question. I think the answer is yes,
9 but I don't want to put words in your mouth. So
10 could you just read back my question.
11    (Question read.)
12 A. I don't -- no, not any wrongdoing.
13 Q. Okay.
14 A. It seemed like a very vague question,
15 what you asked me, but...
16 Q. Well, let me try it again, because the
17 way you said no, it's going to create a confusing
18 answer on the record.
19 A. Can you be a little more specific in your
20 question?
21 Q. Your investigation didn't have anything
22 to do with evaluating correctional officer
23 conduct, correct?

1 A. Evaluating their conduct? I mean I never
2 found any wrongdoing in my investigation.
3 That's -- I guess that would be my answer. I
4 didn't -- I would think that I look at them. I
5 talk to them. I look at their reports. If there
6 was something that jumped out at me, I would have
7 to bring it to light. I never found that I guess
8 would be my answer.
9 Q. Okay.
10 A. (Flipping pages.)
11    MR. FREDERICKS: You can wait. He'll
12 tell you.
13    THE WITNESS: I'm just trying to keep up.
14 Q. Sir, in conducting your investigation,
15 did you ever determine whether one of the inmates
16 on F block at this time, August of 2012, went by
17 the nickname Pops?
18 A. Yeah, there was an old fellow. I don't
19 remember his name now, but I'm sure it's probably
20 in this report. But I think I do remember that.
21 Q. So if you look at Tab 15.
22 A. Okay. Yes, Mr. Johanan.
23 Q. Was Mr. Johanan the inmate who went by

1 the name of Pops or not?
2 A. Could be. I don't remember.
3 Q. All right.
4 A. I do remember he was an older gentleman.
5 You could tell from his 1936 birthday.
6 Q. Yes. Yes. And your narrative of your
7 interview of Edward Johanan accurately reflects
8 what Mr. Johanan told you on January 8, 2013; is
9 that correct?
10 A. It does, from what he told me. But
11 there's problems with Mr. Johanan as far as his
12 testimony being able -- being able to be
13 corroborated.
14 Q. Okay. What were those problems?
15 A. Well, Mr. Johanan came forward, if I
16 remember correctly, because he was holding heroin
17 or holding a narcotic, and subsequently came to us
18 and wanted to tell us what happened, because he
19 was looking at charges. If my memory serves me
20 correctly here, what he told me was fictitious
21 because it could never be collaborated on the
22 video. During the time of the assault, he was
23 never near the door of Jonathan Leite.

1 Q. Oh, all right.
2 A. So I think it was for his own saving
3 grace, if you will. This is my recollection.
4 Q. Okay. I'd like you to move forward
5 through the file to the incident report prepared
6 by Sergeant Smith.
7 A. How deep is that?
8 Q. Not that deep, so --
9    MR. FREDERICKS: I think you passed it.
10 Q. The first incident report we have was
11 prepared by Sergeant Smith. Then the next, we
12 have a statement from Kathleen Bergeron.
13 A. Okay.
14 Q. Then we have a responder report.
15 A. Okay. I have it.
16 Q. And immediately after that we have the
17 incident report prepared by Jeffrey Smith.
18 A. Okay.
19 Q. And if we look at the narrative on the
20 second page of then Sergeant Smith's incident
21 report. Review what Sergeant Smith wrote and let
22 me know when you're finished.
23 A. (Peruses document.) Okay.

1 Q. Sergeant Smith writes in his report that
2 he reviewed video footage of F block on August
3 24th, 2012, of activities occurring after the
4 assault, that he saw a time where Jonathan Leite
5 leaned over and vomited onto the floor.
6 Did you read that?
7 **A. I just read that, yes.**
8 Q. Have you ever seen such video footage?
9 **A. I don't think so.**
10 Q. Did you ever ask Sergeant Smith what
11 happened to that video footage?
12 **A. No.**
13 Q. Why not?
14 **A. Well, I mean I'm tasked with**
15 **investigating an assault that occurred in Cell**
16 **Number 9. I was -- what I, as an investigator, am**
17 **looking for is pretty -- it's like Dragnet; just**
18 **the facts, right? I'm looking at Cell Number 9,**
19 **what happened, who's involved with Cell Number 9.**
20 **Whether he vomited after or something, I don't**
21 **know. I mean it's -- what I'm looking for is to**
22 **identify who was coming in and out of that cell,**
23 **what cell it occurred in, who would have**

1 **knowledge, who do I need to be interviewing as an**
2 **investigator. Whether or not he vomited or not**
3 **due to an assault, Attorney King, it's kind of**
4 **irrelevant to me. All of his injuries will be**
5 **recorded in the medical records.**
6 Q. Okay. You told me a short while ago that
7 you had determined that Mr. Johanan, if that's how
8 you say his name, wasn't in the vicinity of the
9 cell when the cell -- wasn't in the vicinity of
10 the cell when the assault occurred; is that right?
11 **A. That's my recollection. I think there**
12 **was an issue with his testimony on the validity of**
13 **it. Because again, I think he was caught with**
14 **heroin, and this -- we could figure this out.**
15 Q. Can you look back, sir, at the -- we
16 haven't looked at this together yet, but it's at
17 the beginning of the state police file, the
18 Continuation of Investigation Report prepared by
19 Investigator Coulombe.
20 **MR. FREDERICKS:** In Section 2, right?
21 **MR. KING:** Yes.
22 **A. Okay.**
23 Q. And if we look at page 12 of the

1 investigation report.
2 **A. Okay.**
3 Q. All right. Well, actually let's start
4 looking at page 11 of the investigation report.
5 **A. Okay.**
6 Q. Page 11 of the investigation report
7 contains the beginning of Investigator Coulombe's
8 description of his review of video footage of F
9 block on August 24th, 2012, beginning at 2:30,
10 right?
11 **A. Yes.**
12 Q. If we look down at the bottom -- have you
13 seen this video footage yourself?
14 **A. I don't think I watched the whole thing.**
15 **I don't remember.**
16 Q. All right.
17 **A. I really don't remember. I may have.**
18 Q. This investigation report reflects that
19 Jonathan Leite entered Cell Number 9 at 2:39 and
20 48 seconds, right?
21 **A. Yes.**
22 Q. If we look, going onto the next page,
23 Investigator Coulombe first writes that over the

1 next three minutes a lot of inmates can be seen
2 hanging around Cell 9, right?
3 **A. What time?**
4 Q. Over -- the top of the page, he writes
5 that over the course of the next three minutes --
6 **A. Oh, yeah. Yes, yes, yes. Okay.**
7 Q. -- a lot of inmates are seen hanging
8 around Cell 9.
9 **A. Yes.**
10 Q. Did you look at this footage that he's
11 describing to determine who the inmates were?
12 **A. This is where my joint investigation with**
13 **the investigation unit is these guys know these**
14 **guys. An inmate in a jumpsuit, full of tattoos,**
15 **come on, I don't know them. These guys work with**
16 **these guys all the time. They were instrumental.**
17 **Because Mr. Leite was not helpful. He was not**
18 **coming to the table to help himself out with this**
19 **investigation whatsoever. I had to really weigh**
20 **on the investigations unit to give me people to**
21 **investigate, to talk to, to interview.**
22 Q. Okay. And this page 12 of Investigator
23 Coulombe's investigation report reflects that at

1 one point, 2:48, apparently Edward Johanan did
2 enter Cell Number 9, right?
3 **A. Yes, sir.**
4 Q. Okay. And he's in there for about four
5 minutes, according to the video, right?
6 **A. Yes, sir.**
7 Q. Did you make any factual finding pursuant
8 to your investigation of how long Jonathan Leite
9 was in that cell, Cell Number 9?
10 **A. I don't remember.**
11 Q. All right.
12 **A. I don't remember. I mean you can go from**
13 **here that -- you could surmise that inmate**
14 **leaving. He was assaulted. It took about two**
15 **minutes, and then -- and then he exits at 16:20.**
16 **So I mean I'm not going to do the math for us, but**
17 **it is what --**
18 Q. An hour and 40 minutes approximately he
19 was in the cell, right?
20 **A. When does he go in? I have my finger on**
21 **when he left.**
22 Q. He goes in at 2:39, and then he emerges
23 at 4:20.

1 **A. Yup.**
2 Q. And you didn't make any finding that he
3 left that cell at any point during that interval,
4 right?
5 **A. No.**
6 Q. I think you said -- you said something
7 about two minutes in your earlier testimony. What
8 were you referring to in making reference to a
9 two-minute time period?
10 **A. Where does he go in again? 2:39.**
11 Q. He goes in at 2:39.
12 **A. 45. So it means it's longer than that.**
13 **What is that? One inmate leaves Cell Number 9**
14 **with his shirt off, wipes his face with his shirt,**
15 **then walks up the stairs out of view of the**
16 **camera. I guess you could infer that that inmate**
17 **was involved.**
18 Q. So that's --
19 **A. Six minutes.**
20 Q. -- six minutes after Jonathan enters.
21 **A. Six minutes. Okay. My bad.**
22 Q. Thank you. And then --
23 **A. Although, sir, I think he goes in there,**

1 and then 14:41 these inmates come down from the
2 mezzanine. So that's four minutes, if one of
3 those inmates that's coming off the mezzanine is
4 the one leaving.
5 Q. Oh. We have Jonathan entering the cell
6 at 2:39, and then we have beginning from 2:41
7 approximately to 2:44, Investigator Coulombe is
8 describing a lot of inmates hanging around Cell
9 Number 9, right?
10 **A. Well, the next three minutes after -- I'm**
11 **reading it as after 14:41, in the next three**
12 **minutes there is a lot of inmates hanging around**
13 **there.**
14 Q. Fair enough. So that takes us to 2:45,
15 right?
16 **A. It does.**
17 Q. And then there's some more inmate
18 activity around Cell 9 that Investigator Coulombe
19 describes between 2:47 and 2:48, right?
20 **A. Yes.**
21 Q. And then between 2:48 and 2:56 or 2:49
22 and 2:57, we have several inmates entering and
23 exiting Cell Number 9?

1 MR. FREDERICKS: Objection to form. Go
2 ahead.
3 **A. I'm not following you here.**
4 Q. Okay.
5 **A. So 14:47 another inmate -- you're talking**
6 **14:47 and 19 seconds, another inmate enters Cell**
7 **9. '47:45 seconds an inmate exits Cell 9. At**
8 **14:48 an inmate exits Cell 9, walks over to**
9 **Leite's bunk, appears to grab some clothing and**
10 **bring it in Cell 9. Over the next three minutes**
11 **there seems to be confusion around Cell 9. The**
12 **same inmate who grabbed the clothing off Leite's**
13 **bunk exited Cell 9 again and went back to Leite's**
14 **bunk. This time he got some blankets and**
15 **something else out of the foot locker. You're**
16 **talking about that time frame?**
17 Q. Yeah.
18 **A. Yes.**
19 Q. And then I was bringing up that we had --
20 **A. With Johanan.**
21 Q. We had suspicious activity in the
22 vicinity of Cell 9 over the next eight minutes; is
23 that right?

1 A. Yes.

2 Q. So in that time interval, 2:39 to 2:56 or

3    2:57, we can agree that the assault is going on at

4    some point during that period between 2:39 and

5    2:57, right?

6 A. Well, I would say -- I would say 2:41 and

7    2:45, which is --

8 Q. How do you -- I'm sorry. How do you know

9    that the assault still isn't ongoing when the

10   inmate leaves his cell with the shirt off --

11   leaves the cell with his shirt off?

12 A. Could it have continued?

13 Q. Yes.

14 A. Well, I guess it could have. But based

15   on the investigation and its totality, we find

16   out, we believe that -- we come to the conclusion

17   that Inmate Leite was hit from behind. So that

18   would be one of the inmates coming in from the

19   mezzanine and -- because he wouldn't have been

20   facing his attacker, right? So the other inmates

21   put it between -- depending on who you talk to,

22   from two to ten minutes, right? You're at -- I

23   mean I guess the best way to surmise what I'm

1   trying to say is I think the brunt of the injury

2   occurred within the first two minutes. By Leite's

3   own statements, he was hit from behind. It was on

4   his second interview, with a gentleman from your

5   office I believe, he was hit from behind. It was

6   like the lights went out, so which leads me to

7   believe that the majority of the assault occurred

8   within the first two minutes of this.

9 Q. Oh, let's not move on from that report

10   just yet. On page 12 of the investigation report

11   prepared by Investigator Coulombe, it indicates

12   that the video clip ended at 3:00 and 20 seconds.

13 A. Okay.

14 Q. Did you ever make inquiry into the

15   existence of any video footage between 3:00 and

16   4:20?

17 A. No. Again, I -- in my mind, I had made

18   the conclusion that the assault occurred during

19   the time we spoke about.

20 Q. But wouldn't you have wanted that video

21   footage to determine what inmates did what with

22   the physical evidence related to the assault?

23 A. You could never tell that from the video.

1 Q. Why not?

2 A. Have you seen the video?

3 Q. I haven't seen the video that doesn't

4   exist.

5 A. It's pretty --

6    MS. CUSACK: Well, hold on here. You

7   have seen video after 15:00. You've showed it to

8   nine or ten other witnesses. So to try to at

9   least confuse this witness about other video not

10   existing, I think that is just wrong. And if

11   there's a question, ask him the question. Don't

12   try to indicate that there's no video that exists

13   after 15:00, because you know as well as I do that

14   there is and that you have seen it and that at

15   least ten other witnesses have been shown that

16   video.

17    MR. KING: Okay.

18    MS. CUSACK: It might not be ten, but...

19   (Pause.)

20    MS. CUSACK: Can we take a break?

21   (Recess taken.)

22 Q. BY MR. KING: Back on the record. Was

23   there any video evidence maintained in the state

1   police file?

2 A. There was video.

3 Q. And --

4    MS. CUSACK: You got those clips.

5    MR. KING: Was the video that was

6   contained in the state police file the video that

7   was supplied to us?

8    MS. CUSACK: Yes.

9    MR. KING: Okay.

10    MS. CUSACK: We represented that to you

11   on the record at one point as well in I can't

12   remember whose depo.

13 Q. BY MR. KING: Do you know who made the

14   decision as to what video evidence to download

15   here and what video evidence not to download?

16 A. I would think Sergeant Smith. He was in

17   charge of doing that. I'm going off recollection.

18 Q. All right. And you just -- if you

19   reviewed video evidence in connection with your

20   investigation, you just reviewed the video

21   evidence that Sergeant Smith supplied you; is that

22   correct?

23 A. Yes. We looked at the time again that

1  the assault was -- that I figured it had occurred,
2  that the investigation led us to believe it
3  occurred, and I relied heavily on them, like I
4  said before, to identify those inmates coming in
5  and out of that cell during that time.  I have no
6  way -- I built this case without your client, and
7  he didn't help me, didn't help himself.  I had to
8  put this case together with those investigators
9  and identifying what we saw on the video.
10  Q.  All right.  Now, I'd like to go further
11  into your file into some handwritten notes that
12  are contained here, handwritten notes that appear
13  to be from inmates.
14      Okay.  We're looking at a note that
15  says:  Investigation, you got the wrong guys.
16  Lavallee, Garcia are the the you want and piss
17  test them.  They're dirty.  F block for the
18  beating.
19      Do you know how this note came to be in
20  the file?
21  A.  Off memory.
22  Q.  Yeah.
23  A.  I think this was just thrown in a request

1  slip box.  I think.
2  Q.  Okay.
3  A.  Can't remember exactly.  I think that
4  question could probably more accurately be known
5  by the Department of Corrections personnel, but
6  that's my recollection.
7  Q.  Did you ever find out who wrote the note?
8  A.  No.
9  Q.  Now, the next document is another
10  handwritten note that appears to be from an
11  inmate.  Yes?
12  A.  Yes.
13  Q.  I'll just give you the opportunity to
14  read it over.
15  A.  (Peruses document.)  There's a lot of
16  words I can't make out here:  Something isn't
17  right there so -- what?  So far we -- the fourth
18  or fifth line down there.  Fifth line down.
19      MR. FREDERICKS:  Just read it the best
20  you can and then let him know.
21  A.  (Peruses document.)
22  Q.  I believe, sir, it says:  Something isn't
23  right there so for me to not get injured or worse,

1  you cannot tell anyone about this or future head's
2  up.
3      Sound like I read that correctly?
4  A.  I think so, yeah.
5  Q.  I'm not going to ask you about that
6  sentence.  The next sentence I am going to ask you
7  about, the inmate writes:  F block is becoming
8  more violent because nothing is being done when
9  someone gets robbed or beaten.
10      And I cannot read the next word.  I don't
11  know if you can, sir.
12  A.  I don't know.
13      MS. CUSACK:  Badly.
14  Q.  Badly.
15  A.  Badly.
16  Q.  Let's just stop there and let me ask you,
17  in the course of your investigation, did you learn
18  that in the time period leading up to August 24th,
19  2012, F block had become a more violent place?
20  A.  No.
21  Q.  Did you undertake any investigation into
22  whether the inmate's allegation that F block was
23  becoming more violent was true?

1  A.  No, I wouldn't have.  I mean I've not
2  been alerted of any crime.
3  Q.  Hmm?
4  A.  I would not have, because I was not
5  alerted of any crime.
6  Q.  I see.  How did this note come to be
7  included in the state police's file?
8  A.  Again, I don't know.  This was -- it's in
9  this trio I would say of request slips, so I would
10  again imagine that it came in the same way.
11  Q.  And you don't know who authored the note?
12  A.  No.  It could be the same person, for all
13  I know.
14  Q.  Well, the writing doesn't look similar,
15  does it?
16  A.  Well, I'm not -- I'm definitely not a
17  handwriting expert for the FBI.  However, I would
18  say that this person (indicating) probably tried
19  to make their writing as generic as possible and
20  the big words.
21  Q.  Yeah.  Did you ever find out whether
22  there were people who were designated as
23  confidential informants on F block on August 24th,

1 2012?
2    MR. FREDERICKS: Objection to form. Go
3 ahead.
4 A. Well, what do you mean by a confidential
5 informant? People that came and spoke with me
6 even though they don't want to go on record?
7 Because everybody's outlined that's in that
8 capacity.
9 Q. All right. And the reason why I asked
10 the question is you'll see in the last line of
11 this note that you were just looking at: I must
12 have your word as a man that my name as your CI
13 will never be divulged. So --
14 A. Yeah. I don't know, sir.
15 Q. All right.
16 A. I never had any CIs, quote, unquote,
17 here.
18 Q. All right. If we look at the next inmate
19 request slip, that's to a Lieutenant Massey?
20 A. Yes, he was here during that time. And
21 his wife was too.
22 Q. He's not here anymore?
23 A. I think they're both retired.

1 Q. And the next document in the file is an
2 Inmate Visitation Log. Do you have any idea, sir,
3 why an officer signs off on certain inmate visits
4 but not on others?
5 A. Not a clue.
6 Q. All right. It does seem that in the
7 visits from 12:40 on August 24th, 2012, on through
8   14:20, it looks like the same signature. Do you
9 know whose signature that is on the right-hand
10 side of the page besides, for example, the inmate,
11 E. Allen?
12 A. Does it say Watson? Or Winter? I don't
13 know. I know they have a Watson here. I'm just
14 kind of going off...
15 Q. All right. You know there is a Watson
16 here?
17 A. But I don't know, I mean.
18 Q. All right.
19 A. Can't tell you any better than you can
20 probably.
21 Q. Okay. In August of 2012 did you know
22 there to be gang activity at this facility?
23 A. Yes.

1 Q. Were you familiar with a gang called the
2 Brothers of White Warriors?
3 A. Yes.
4 Q. What sort of activity would those gangs
5 engage in --
6    MR. FREDERICKS: Objection to form.
7 Q. -- at the facility?
8    MR. FREDERICKS: Sorry. Objection to
9 form.
10 Q. To your knowledge.
11 A. They're all the same. Gangsters,
12 Disciples, BOWW, FCC, they're all running drugs.
13 But they all cross paths. You can get a Blood and
14 a Supremacist working together to get drugs. It's
15 nothing like you've ever seen in your life.
16 It's -- they're all about their gang until it
17 becomes drugs, and then they work together. It's
18 weird.
19 Q. In the August of 2012 time period, did
20 the gangs fight one another or...
21 A. Not any formal fights that I've
22 investigated. In this prison I'm sure there's a
23 couple black guys out there, but not that I've

1 investigated.
2 Q. So the gangs were organized for purposes
3 of smuggling drugs in here?
4 A. That's a big thing. I mean that's where
5 the money comes from.
6 Q. Yeah. All right. You mentioned earlier
7 in your deposition testimony that in addition to
8 interviewing the inmates, you spoke with
9 corrections officers in connection with doing your
10 investigation?
11 A. That's correct. Corporal Coulombe, the
12 guys that were working this case together.
13 Absolutely. And you can -- on almost all these
14 interviews, you can identify the other corrections
15 employee with me.
16 Q. Right. But did you, for example,
17 interview Kathy Bergeron who was doing rounds on
18 August 24th, 2012, in the afternoon?
19 A. They formally as part of -- they formally
20 submit a report to me. There was no verbal --
21 there's no audio. There's no recording. They
22 submit a -- some of the reports we've been talking
23 about on what they observed and what they didn't.

Page 58

1    It becomes part of the file. They give a written
2  narrative. So I don't write down what they tell
3  me, and they write it down themselves.
4  Q. So there is -- Exhibit 1 does contain a
5  statement from Kathy Bergeron, and that's what you
6  would have received from her and relied upon?
7  A. If there's a statement in here from Kathy
8  Bergeron, it would have been her statement.
9  Q. Okay. All right.
10    MR. KING: Okay. Off the record.
11    (Discussion off the record.)
12  Q. Back on the record. Did you make any
13  factual findings resulting from your investigation
14  into the assault on Jonathan Leite?
15    MR. FREDERICKS: Objection to form. Go
16  ahead.
17  A. I indicted three people, and they all
18  pled out for these charges of first-degree assault
19  and conspiracy to commit the crime of.
20  Q. Okay. So what -- can you just tell me
21  what findings you made as a result of your
22  investigation?
23  A. That -- off memory, that Johnathan

Page 59

1  Gelinas, it happened in his cell. He had an overt
2  act of something like this (demonstrating).
3  Q. Sir, the record isn't going to reflect
4  what you just did.
5  A. Okay. Moving my hand around my face in
6  like a motion, horizontal motion.
7  Q. A slicing motion?
8  A. Slicing motion. Okay.
9  Q. Yeah.
10  A. And that Matthew Garcia and Sean Lavallee
11  entered his cell, that Jonathan Leite wasn't
12  assigned to but was in, and assaulted him.
13  Q. Okay.
14  A. That was definitely the finding.
15  Q. Okay. And do you know what the sentence
16  is that each defendant served as a result of this?
17  A. I don't have the mittimuses here.
18  Q. I'm sorry, what did you say?
19  A. I do not have the mittimus --
20  Q. All right.
21  A. -- here. I don't know.
22  Q. Okay.
23  A. They're at the County Attorney's Office

Page 60

1  I'm sure.
2  Q. Are the interview recordings and the
3  video footage kept separately from the paper file
4  or are they all in one file?
5  A. I don't know how they get archived. I'm
6  not the keeper of the records. I would submit the
7  file. I'd put together a file, submit it to the
8  County Attorney's Office. In there, there would
9  have been a binder or in this case, definitely
10  with the medical records, two, maybe three, at
11  least two, and there would have been plastic
12  sleeves that would have held everything that was
13  not paperwork.
14  Q. And where is the file pertaining to your
15  investigation physically kept now?
16  A. It's archived at state police
17  headquarters.
18  Q. Is that in Concord?
19  A. It is.
20  Q. All right.
21  A. I'm told minus the medical records, which
22  I may -- it was a stack this high (indicating). I
23  may not have archived the medical records. Those

Page 61

1  may have just gone, for the purposes of time, to
2  the prosecutor.
3  Q. Understood.
4    MR. KING: All right. I don't have
5  anything further. Thank you.
6    MS. CUSACK: Thank you.
7    MR. FREDERICKS: All set.
8    (Deposition concluded at 1:57 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

CERTIFICATE OF WITNESS

I, Michael Cote, have read the foregoing
transcript of deposition taken on Wednesday,
September 20, 2017, at the Northern NH
Correctional Facility, Berlin, New Hampshire, and
do hereby swear/affirm it is an accurate and
complete record of my testimony given under oath
in the matter of Leite v. Goulet, et al.,
including any and all corrections that may appear
on those pages denoted as "Corrections."

_____
Michael Cote
STATE OF _____
COUNTY OF _____

Subscribed and sworn to before me this _____ day
of _____, 2017.

_____
Notary Public_____J.P._____
My Commission Expires:_____

CORRECTION AND SIGNATURE PAGE
**DEPOSITION:** Michael Cote
**DATE OF DEPOSITION:** September 20, 2017
PAGE LINE    NOW READS    SHOULD READ
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____

Dated this _____ day of _____, 2017.

_____
Michael Cote

C E R T I F I C A T E

I, Celeste A. Quimby, a Licensed Court
Reporter of the State of New Hampshire, do hereby
certify that the foregoing is a true and accurate
transcript of my stenographic notes of the
deposition of Michael Cote, who was first duly
sworn, taken at the place and on the date
hereinbefore set forth.

I further certify that I am neither attorney
nor counsel for, nor related to or employed by any
of the parties to the action in which this
deposition was taken, and further that I am not a
relative or employee of any attorney or counsel
employed in this case, nor am I financially
interested in this action.

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
DIRECTION OF THE CERTIFYING REPORTER.

CELESTE A. QUIMBY, LCR No. 17

## A

**able (2)**
36:12,12
**Absolutely (2)**
33:3;57:13
**access (1)**
30:9
**according (3)**
11:15;12:10;42:5
**accurate (2)**
11:16;62:7
**accurately (3)**
19:1;36:7;51:4
**act (2)**
13:8;59:2
**activities (2)**
18:20;38:3
**activity (9)**
9:11,15;15:20;21:23;
31:13;44:18;45:21;55:22;
56:4
**actually (4)**
12:2;21:9;24:21;40:3
**addition (1)**
57:7
**advised (2)**
8:8;33:19
**Advocacy (1)**
5:10
**aftermath (2)**
17:14;31:17
**afternoon (1)**
57:18
**Again (12)**
8:15;21:1;26:18;32:13;
34:16;39:13;43:10;45:13;
47:17;49:23;53:8,10
**agency (1)**
34:5
**ago (1)**
39:6
**agree (1)**
46:3
**ahead (7)**
9:14;14:3;20:23;24:6;
45:2;54:3;58:16
**airplanes (1)**
26:23
**al (1)**
62:9
**alerted (2)**
53:2,5
**Alfeo (16)**
15:15;16:3,7,9,18,22;17:3,
7,12,16,20;18:1;19:14,22;
21:6,8
**allegation (1)**
52:22
**Allen (1)**
55:11
**allowed (1)**

30:5
**almost (1)**
57:13
**Although (2)**
26:10;43:23
**amongst (1)**
24:3
**Androscoggin (1)**
25:15
**answered (1)**
33:14
**anymore (1)**
54:22
**apparently (1)**
42:1
**appear (3)**
26:17;50:12;62:10
**appears (2)**
45:9;51:10
**appreciate (1)**
14:10
**approximately (3)**
10:10;42:18;44:7
**archived (3)**
60:5,16,23
**area (2)**
29:3;30:3
**around (7)**
41:2,8;44:8,12,18;45:11;
59:5
**assault (36)**
5:14,20;6:4,9;7:5;8:11;
9:7;13:15,23;16:9,11,19;
17:14;18:2,11;21:7;24:14;
26:9;27:13;28:4,7;31:17;
33:1;36:22;38:4,15;39:3,10;
46:3,9;47:7,18,22;50:1;
58:14,18
**assaulted (5)**
12:20;13:5;32:18;42:14;
59:12
**assaults (1)**
6:6
**assigned (2)**
6:2;59:12
**assume (1)**
20:3
**attached (1)**
19:7
**attacker (1)**
46:20
**Attorney (2)**
6:21;39:3
**Attorney's (2)**
59:23;60:8
**attributable (3)**
26:4,8,9
**audio (1)**
57:21
**August (20)**
5:16;7:6;8:12,21;9:7;
10:9;11:2,18;12:20;18:10;
29:21;35:16;38:2;40:9;

52:18;53:23;55:7,21;56:19;
57:18
**authored (1)**
53:11
**away (2)**
12:6;13:15

## B

**baby-sit (1)**
32:16
**back (15)**
11:8;19:13;21:5;23:18,19;
25:1,3;27:11;30:21;34:8,10;
39:15;45:13;48:22;58:12
**bad (1)**
43:21
**Badly (3)**
52:13,14,15
**balloon (5)**
22:21;23:15,17;26:11,17
**ballooned (1)**
24:1
**balloons (1)**
23:21
**based (3)**
21:8,14;46:14
**basically (1)**
6:1
**beat (1)**
16:15
**beaten (1)**
52:9
**beating (2)**
17:4;50:18
**become (1)**
52:19
**becomes (3)**
10:20;56:17;58:1
**becoming (2)**
52:7,23
**bed (1)**
28:22
**began (1)**
16:14
**beginning (4)**
39:17;40:7,9;44:6
**behind (3)**
46:17;47:3,5
**Bergeron (4)**
37:12;57:17;58:5,8
**Berlin (1)**
62:6
**besides (1)**
55:10
**best (2)**
46:23;51:19
**better (4)**
24:9;28:14;29:3;55:19
**big (2)**
53:20;57:4
**binder (1)**
60:9

**birthday (1)**
36:5
**black (1)**
56:23
**blankets (1)**
45:14
**block (14)**
15:3;28:1,6,12;29:11,16;
35:16;38:2;40:9;50:17;52:7,
19,22;53:23
**blood (2)**
14:7;56:13
**blue (1)**
23:20
**board (1)**
5:9
**body (1)**
17:8
**border (1)**
26:22
**both (1)**
54:23
**bottom (3)**
11:15;31:18;40:12
**bound (2)**
23:12;26:19
**bowel (1)**
27:3
**BOWW (1)**
56:12
**box (1)**
51:1
**break (3)**
20:9;21:18;48:20
**brief (2)**
20:8;21:18
**briefly (1)**
20:7
**bring (2)**
35:7;45:10
**bringing (3)**
25:1,3;45:19
**Brothers (1)**
56:2
**brought (1)**
27:14
**Broyer (9)**
18:10,19;19:2;21:19;
24:13,19;27:12,12;29:4
**brunt (1)**
47:1
**built (1)**
50:6
**bunk (6)**
17:18,22;31:18;45:9,13,
14
**burned (1)**
31:4

## C

**called (2)**
10:5;56:1

came (6)
16:6;36:15,17;50:19;
53:10;54:5
camera (1)
43:16
can (24)
8:7,18;15:6;20:6,7;23:11;
24:8;25:19;27:6;30:1;34:19;
35:11;39:15;41:1;42:12;
46:3;48:20;51:20;52:11;
55:19;56:13;57:13,14;58:20
capacity (4)
4:17;6:2;23:6;54:8
Case (8)
6:22;10:22;11:7,11;50:6,
8;57:12;60:9
cassette (1)
31:1
caught (2)
29:2;39:13
CD (2)
31:2,4
cell (50)
12:12,20;13:4,10,15,19;
14:7;15:4,7;16:10;17:5;
20:14,21;21:2;24:20;31:18,
22;38:15,18,19,22,23;39:9,
9,10;40:19;41:2,8;42:2,9,9,
19;43:3,13;44:5,8,18,23;
45:6,7,8,10,11,13,22;46:10,
11;50:5;59:1,11
cellophane (1)
23:23
Center (1)
5:10
certain (1)
55:3
CERTIFICATE (1)
62:1
cetera (1)
6:6
change (1)
11:11
charge (1)
49:17
charged (3)
13:7,8;28:19
charges (2)
36:19;58:18
cheeks (1)
22:19
Child (1)
5:10
choice (2)
22:13,14
chooses (1)
24:10
CI (1)
54:12
CIs (1)
54:16
clean (1)
29:19

cleaned (1)
21:4
cleaner (2)
30:9,10
cleaners (2)
30:5,12
cleaning (5)
29:7,10,18,20;30:10
cleanup (2)
14:6,16
client (1)
50:6
clip (1)
47:12
clips (1)
49:4
closest (1)
17:9
closet (4)
28:12,15,21;30:13
clothing (2)
45:9,12
clue (1)
55:5
collaborated (1)
36:21
colors (2)
29:13,15
coming (6)
26:22;38:22;41:18;44:3;
46:18;50:4
Commission (1)
62:23
commit (1)
58:19
common (3)
25:20;26:23;29:3
complete (2)
12:7;62:8
completed (1)
10:19
completion (2)
12:1,3
concluded (1)
61:8
conclusion (2)
46:16;47:18
Concord (1)
60:18
conduct (5)
11:9;14:19;34:2,23;35:1
conducted (9)
6:9;9:11;15:14,20;18:9,
20;22:1;31:9,13
conducting (3)
32:17,21;35:14
confidential (2)
53:23;54:4
confuse (1)
48:9
confusing (1)
34:17
confusion (1)

45:11
connection (5)
9:19;14:15;28:8;49:19;
57:9
considering (1)
33:11
consists (1)
8:10
conspiracy (2)
13:7;58:19
contain (1)
58:4
contained (2)
49:6;50:12
contains (4)
6:23;7:3;9:3;40:7
Continuation (3)
10:6;11:20;39:18
continued (1)
46:12
control (1)
29:3
controlled (1)
30:3
Coos (1)
5:11
Corporal (1)
57:11
CORRECTION (1)
63:1
Correctional (17)
5:9,16;10:9;14:19,20;
18:4;22:7;26:2;27:23;28:10;
30:4;32:23;33:5,16;34:1,22;
62:6
Corrections (13)
5:23;6:4;15:3,9;30:7;
32:11,11;34:4;51:5;57:9,14;
62:10,11
correctly (4)
14:11;36:16,20;52:3
corroborated (1)
36:13
COTE (9)
4:1,7;6:16,19;7:3;62:3,14;
63:2,23
C-o-t-e (1)
4:7
Coulombe (7)
18:9;39:19;40:23;44:7,18;
47:11;57:11
Coulombe's (2)
40:7;41:23
count (2)
18:3;33:22
County (5)
5:11;6:21;59:23;60:8;
62:16
couple (1)
56:23
course (5)
14:19;31:13,21;41:5;
52:17

create (1)
34:17
created (1)
6:11
Crime (8)
5:13;11:4;7:14;23;28:20;
53:2,5;58:19
criminal (4)
7:16;8:4,13;9:19
cross (1)
56:13
current (1)
4:14
currently (1)
4:15
CUSACK (15)
7:9,12,14,20,23;19:17;
20:10;48:6,18,20;49:4,8,10;
52:13;61:6
cut (3)
22:21;23:17,18

## D

Dartmouth-Hitchcock (1)
25:16
date (8)
4:22;11:2,3,4,6,8,23;63:3
Dated (1)
63:20
day (8)
12:2,2,3,3;20:14;30:15;
62:18;63:20
dayroom (2)
17:18;32:1
dead (1)
17:13
December (3)
4:13,21,23
decision (1)
49:14
deep (3)
26:20;37:7,8
defecated (1)
27:10
defendant (1)
59:16
definitely (4)
14:5;53:16;59:14;60:9
demonstrating (1)
59:2
denoted (1)
62:11
Department (8)
4:12;5:23;6:3;15:9;32:10,
11;34:4;51:5
departments (1)
34:3
depending (1)
46:21
depo (1)
49:12
deposed (1)

4:3
**deposition (6)**
8:10;57:7;61:8;62:4;63:2,
3
**described (1)**
22:5
**describes (1)**
44:19
**describing (2)**
41:11;44:8
**description (1)**
40:8
**designated (1)**
53:22
**destroyed (2)**
10:20;11:21
**details (1)**
19:21
**detected (3)**
33:5,16,21
**detective (9)**
4:20;5:2,5;9:12,21;15:21;
18:21;22:1;31:14
**determination (1)**
33:22
**determine (6)**
27:18;32:18,22;35:15;
41:11;47:21
**determined (2)**
26:7;39:7
**determining (2)**
33:5,16
**different (5)**
12:2;23:13,21;29:13,15
**directly (2)**
16:10;29:2
**directors (1)**
5:9
**dirty (1)**
50:17
**Disciples (1)**
56:12
**discovered (1)**
14:23
**discussed (1)**
19:16
**Discussion (3)**
6:15;19:12;58:11
**disk (2)**
31:1,2
**divulged (1)**
54:13
**dockets (1)**
11:10
**document (14)**
8:20;9:3;10:1,3,12;11:1;
12:18;16:5;18:16;37:23;
51:9,15,21;55:1
**documents (5)**
6:19,21,23;7:2;8:7
**done (4)**
12:9;15:2;32:23;52:8
**door (1)**

36:23
**DOUGLASS (1)**
20:6
**down (7)**
17:4;40:12;44:1;51:18,18;
58:2,3
**download (2)**
49:14,15
**Dragnet (1)**
38:17
**drink (1)**
29:7
**drug (3)**
22:13;23:8;26:17
**drugs (15)**
22:20;25:1,4,9,12,15;26:4,
8,11,16;27:2;56:12,14,17;
57:3
**DSSP (1)**
10:5
**due (1)**
39:3
**duly (1)**
4:2
**during (14)**
4:18;5:11,12,22;6:5;
22:14,16;33:21;36:22;43:3;
46:4;47:18;50:5;54:20
**duties (1)**
28:9
**dying (1)**
17:13

## E

**earlier (2)**
43:7;57:6
**Edward (2)**
36:7;42:1
**effects (1)**
26:19
**eight (1)**
45:22
**either (2)**
23:22,23
**Elliott (13)**
7:1;9:6;10:3,7;11:2;12:11,
11,19;13:3,12,14,18;20:13
**else (1)**
12:7;14:18;45:15
**emerges (1)**
42:22
**employed (2)**
4:9,11
**employee (1)**
57:15
**employment (1)**
4:19
**end (1)**
19:20
**ended (1)**
47:12
**ends (1)**

27:7
**enforcement (1)**
34:5
**engage (1)**
56:5
**enough (1)**
44:14
**entail (1)**
33:4
**enter (1)**
42:2
**entered (2)**
40:19;59:11
**entering (2)**
44:5,22
**enters (2)**
43:20;45:6
**entire (1)**
14:7
**Especially (1)**
30:14
**established (1)**
20:12
**et (2)**
6:6;62:9
**evaluating (1)**
34:1,22;35:1
**even (1)**
54:6
**eventually (1)**
27:2
**everybody's (1)**
54:7
**evidence (14)**
14:1,6,14,22;21:1,2;32:2,
6;47:22;48:23;49:14,15,19,
21
**exactly (1)**
51:3
**EXAMINATION (2)**
4:4;26:6
**example (2)**
55:10;57:16
**excluding (3)**
7:6;8:7,13
**excuse (1)**
14:20
**Exhibit (6)**
6:16,20;7:3;8:9;9:2;58:4
**exist (1)**
48:4
**existence (1)**
47:15
**existing (1)**
48:10
**exists (2)**
20:4;48:12
**exited (1)**
45:13
**exiting (1)**
44:23
**exits (3)**
42:15;45:7,8

**experience (2)**
24:7;27:21
**expert (1)**
53:17
**Expires_ (1)**
62:23

## F

**face (3)**
17:4;43:14;59:5
**facilities (1)**
22:8
**Facility (11)**
5:9,16;10:9;14:20;22:14;
26:3;27:23;28:10;55:22;
56:7;62:6
**facing (1)**
46:20
**fact (1)**
26:8
**facts (1)**
38:18
**factual (3)**
20:19;42:7;58:13
**Fair (1)**
44:14
**falsification (2)**
14:5,14
**familiar (1)**
56:1
**fan (2)**
27:15,19
**far (5)**
13:12;21:2;23:6;36:11;
51:17
**FBI (1)**
53:17
**FCC (1)**
56:12
**feel (1)**
26:19
**feet (1)**
17:8
**fellow (1)**
35:18
**Felony (1)**
6:22
**fictitious (1)**
36:20
**fifth (2)**
51:18,18
**fight (4)**
24:15,20;25:12;56:20
**fights (1)**
56:21
**figure (1)**
39:14
**figured (1)**
50:1
**file (24)**
6:11;7:3;8:10,19;15:11,
13;18:7,7;20:3;30:18;37:5;

39:17;49:1,6;50:11,20;53:7;
55:1;58:1;60:3,4,7,7,14
**finally (1)**
18:1
**find (3)**
46:15;51:7;53:21
**finding (6)**
20:19;21:6,16;42:7;43:2;
59:14
**findings (2)**
58:13,21
**finger (2)**
22:21;42:20
**finish (2)**
12:2,8
**finished (4)**
12:17;16:3;18:14;37:22
**first (5)**
6:20;37:10;40:23;47:2,8
**first-degree (1)**
58:18
**Flipping (1)**
35:10
**floor (2)**
17:5;38:5
**following (1)**
45:3
**follows (1)**
4:3
**foot (1)**
45:15
**footage (9)**
38:2,8,11;40:8,13;41:10;
47:15,21;60:3
**forced (1)**
29:6
**foregoing (1)**
62:3
**forgot (1)**
7:18
**form (17)**
9:13;10:6;11:20;14:2;
15:5;20:22;23:8;24:5;25:18;
27:5;29:23;30:21;45:1;54:2;
56:6,9;58:15
**formal (2)**
10:20;56:21
**formally (2)**
57:19,19
**forth (2)**
23:18,19
**forward (3)**
6:10;36:15;37:4
**found (4)**
28:3;33:20;35:2,7
**four (3)**
26:20;42:4;44:2
**fourth (1)**
51:17
**frame (2)**
22:15;45:16
**FREDERICKS (19)**
7:18;9:13;14:2;15:5;

20:22;24:5;25:18;27:5;
29:23;35:11;37:9;39:20;
45:1;51:19;54:2;56:6,8;
58:15;61:7
**full (1)**
41:14
**further (4)**
16:18;19:21;50:10;61:5
**future (1)**
52:1

## G

**gain (1)**
24:18
**gang (3)**
55:22;56:1,16
**gangs (3)**
56:4,20;57:2
**Gangsters (1)**
56:11
**Garcia (3)**
30:8;50:16;59:10
**gave (1)**
4:22
**Gelinas (4)**
13:3,6;27:13;59:1
**general (1)**
28:23
**generally (1)**
30:2
**generic (1)**
53:19
**gentleman (2)**
36:4;47:4
**gets (1)**
52:9
**girlfriend (1)**
22:18
**given (2)**
32:15;62:8
**glove (1)**
22:21
**goes (5)**
8:2;11:8;42:22;43:11,23
**good (1)**
9:2
**Goulet (1)**
62:9
**grab (1)**
45:9
**grabbed (1)**
45:12
**grace (1)**
37:3
**green (1)**
23:20
**grunts (1)**
16:14
**guess (8)**
9:15;24:8;33:11;35:3,7;
43:16;46:14,23
**guessing (4)**

21:10,10,13,15
**guys (7)**
41:13,14,15,16;50:15;
56:23;57:12

## H

**Hampshire (15)**
4:9,12,19;5:5,16;9:12,21;
10:8;15:21;18:21;22:1;26:2;
27:23;28:10;62:6
**hand (2)**
6:18;59:5
**handle (1)**
12:6
**handwriting (1)**
53:17
**Handwritten (7)**
10:15,18;11:17,21;50:11,
12;51:10
**hanging (4)**
41:2,7;44:8,12
**happened (8)**
13:20;14:1;21:8;24:14;
36:18;38:11,19;59:1
**happens (2)**
14:19;22:7
**hats (2)**
5:7,21
**head (1)**
17:9
**headed (1)**
8:20
**header (1)**
11:10
**headquarters (1)**
60:17
**head's (1)**
52:1
**hear (2)**
21:12,12
**heard (1)**
17:1
**hearing (2)**
16:14;21:14
**heavily (1)**
50:3
**held (1)**
60:12
**hell (1)**
16:15
**help (3)**
41:18;50:7,7
**helpful (1)**
41:17
**hereby (1)**
62:7
**heroin (2)**
36:16;39:14
**hidden (2)**
27:16,19
**hide (4)**
28:1,11,14,21

**hiding (3)**
28:16,20;29:3
**high (1)**
60:22
**himself (2)**
41:18;50:7
**history (3)**
7:16;8:5,13
**hit (3)**
46:17;47:3,5
**Hmm (1)**
53:3
**hold (2)**
25:2;48:6
**holding (2)**
36:16,17
**homicide (1)**
5:13
**horizontal (1)**
59:6
**Hospital (1)**
25:16
**hospitalized (1)**
25:15
**hour (1)**
42:18
**housing (2)**
23:2;29:14
**How's (1)**
27:9
**hurt (1)**
16:23

## I

**idea (1)**
55:2
**identification (1)**
6:17
**identify (3)**
38:22;50:4;57:14
**identifying (1)**
50:9
**imagine (1)**
53:10
**immediate (2)**
17:14;31:17
**immediately (1)**
37:16
**incident (4)**
37:5,10,17,20
**included (1)**
53:7
**including (1)**
62:10
**indicate (1)**
48:12
**indicates (1)**
47:11
**indicating (2)**
53:18;60:22
**indicted (1)**
58:17

**individual (1)**
7:14
**individuals (1)**
7:16
**infer (1)**
43:16
**inferring (1)**
25:7
**informant (1)**
54:5
**informants (1)**
53:23
**ingested (4)**
23:7,10;26:11,16
**ingesting (1)**
22:5
**injured (1)**
51:23
**injuries (3)**
33:6,17;39:4
**injury (1)**
47:1
**inmate (50)**
7:1;9:6;12:19;13:14,18;
15:15;16:2,22;17:3,12,16;
18:1,9;22:23,23,23;24:13,
19;25:3,4,5,11,14;27:12,12,
13,14;29:4,5;30:8;31:16;
35:23;41:14;42:13;43:13,
16;44:17;45:5,6,7,8,12;
46:10,17;51:11;52:7;54:18;
55:2,3,10
**inmates (27)**
13:2;14:20;19:8;21:9;
22:9,11;23:5;24:4;27:23;
28:11;33:20,21;35:15;41:1,
7,11;44:1,3,8,12,22;46:18,
20;47:21;50:4,13;57:8
**inmate's (1)**
52:22
**inquired (1)**
25:2
**inquiry (1)**
47:14
**instance (1)**
15:2
**instructions (2)**
32:5,6
**instrumental (1)**
41:16
**insurance (1)**
23:13
**intact (1)**
23:10
**interrupt (1)**
20:6
**interval (2)**
43:3;46:2
**interview (23)**
9:5;17;10:4,13,21;11:1,
18;12:11;15:14;16:6;17:17;
18:8,19;19:14,22;21:6,19;
31:9;36:7;41:21;47:4;57:17;

60:2
**interviewed (1)**
9:19
**interviewing (2)**
39:1;57:8
**interviews (5)**
9:16;11:10;19:6;30:16;
57:14
**into (6)**
15:4;47:14;50:11,11;
52:21;58:14
**investigate (2)**
5:19;41:21
**investigated (4)**
5:14;22:9;56:22;57:1
**investigating (1)**
38:15
**investigation (41)**
6:9,12;7:4;8:11;10:6;
11:20;13:23;14:15;20:20;
25:13;31:22;32:3,18,22;
33:4,15,23;34:21;35:2,14;
39:18;40:1,4,6,18;41:12,13,
19,23;42:8;46:15;47:10;
49:20;50:2,15;52:17,21;
57:10;58:13,22;60:15
**investigations (2)**
9:20;41:20
**investigator (13)**
5:11;6:1;18:9;34:5;38:16;
39:2,19;40:7,23;41:22;44:7,
18;47:11
**investigators (2)**
32:12;50:8
**involved (2)**
38:19;43:17
**irrelevant (1)**
39:4
**issue (1)**
39:12

## J

**January (1)**
36:8
**Jeffrey (1)**
37:17
**job (1)**
5:4
**Johanan (9)**
35:22,23;36:7,8,11,15;
39:7;42:1;45:20
**John (1)**
7:1
**Johnathan (2)**
13:3;58:23
**joint (1)**
41:12
**jointly (2)**
32:10,13
**Jonathan (37)**
5:15;7:5,6;8:11;9:7;
12:20;13:4,20;16:19,23;

17:4,8,13,17,20;18:2,11;
20:15,20;21:7;24:23;25:8;
29:6;31:18,22;32:19;33:1,6,
17;36:23;38:4;40:19;42:8;
43:20;44:5;58:14;59:11
**Jonathan's (1)**
26:3
**Joseph (4)**
18:10,19;19:2;21:19
**July (3)**
4:17,23;5:1
**jumped (1)**
35:6
**jumpsuit (1)**
41:14

## K

**Kathleen (1)**
37:12
**Kathy (3)**
57:17;58:5,7
**keep (2)**
30:5;35:13
**keeper (1)**
60:6
**kept (7)**
29:10,21,21;30:13,22;
60:3,15
**kind (2)**
39:3;55:14
**KING (17)**
4:5;6:14;7:22;8:9;19:11;
20:8,12;34:7;39:3,21;48:17,
22;49:5,9,13;58:10;61:4
**kiss (1)**
22:22
**knew (2)**
16:22;24:14
**knowledge (2)**
39:1;56:10
**known (1)**
51:4
**knows (1)**
25:11

## L

**last (4)**
4:17;6:22;32:13;54:10
**lasted (1)**
16:19
**later (5)**
17:17;18:3;23:1;25:16;
26:6
**latex (1)**
26:20
**Lavallee (2)**
50:16;59:10
**law (1)**
34:4
**layer (1)**
23:14

**layers (2)**
23:13;26:20
**leading (1)**
52:18
**leads (1)**
47:6
**leaned (1)**
38:5
**learn (5)**
14:1,14;28:3,8;52:17
**learned (3)**
25:14;28:15;31:21
**least (4)**
22:14;48:9,15;60:11
**leave (2)**
14:22;20:10
**leaves (3)**
43:13;46:10,11
**leaving (2)**
42:14;44:4
**led (1)**
50:2
**left (3)**
12:12;42:21;43:3
**Leite (35)**
5:15;7:5;8:12;9:7;12:20;
13:4,20;16:19,23;17:4,13,
17,21;18:3,11;20:15;21:7;
24:23;25:3,11,14;31:18;
32:19;33:2,6,17;36:23;38:4;
40:19;41:17;42:8;46:17;
58:14;59:11;62:9
**Leite's (9)**
7:6;17:8;25:9;29:6;31:23;
45:9,12,13;47:2
**liaison (5)**
5:8,22;27:22;28:9,23
**Lieutenant (1)**
54:19
**life (1)**
56:15
**light (2)**
18:2;35:7
**lights (1)**
47:6
**line (4)**
51:18,18;54:10;63:4
**little (1)**
34:19
**locker (1)**
45:15
**Log (1)**
55:2
**long (3)**
21:7;25:6;42:8
**longer (2)**
28:6;43:12
**look (17)**
8:3;10:23;12:16;15:7;
19:13;31:5;35:4,5,21;37:19;
39:15,23;40:12,22;41:10;
53:14;54:18
**looked (4)**

15:4,19;39:16;49:23

**looking (9)**
10:1;12:15;36:19;38:17,
18,21;40:4;50:14;54:11

**looks (1)**
55:8

**lot (7)**
22:17;29:1;41:1,7;44:8,
12;51:15

**lying (2)**
17:4,21

## M

**maintained (1)**
48:23

**Major (1)**
5:13

**majority (1)**
47:7

**makes (1)**
11:12

**making (1)**
43:8

**man (1)**
54:12

**many (4)**
5:7;11:9,10;30:5

**mark (1)**
6:14

**marked (2)**
6:16,19

**marking (1)**
7:3

**Massey (1)**
54:19

**math (1)**
42:16

**matter (1)**
62:9

**Matthew (1)**
59:10

**may (7)**
12:1;20:8;40:17;60:22,23;
61:1;62:10

**maybe (2)**
24:8;60:10

**mean (20)**
14:4,8;24:9;25:21;26:23;
28:5,19;30:23;31:1;33:19;
35:1;38:14,21;42:12,16;
46:23;53:1;54:4;55:17;57:4

**means (1)**
43:12

**medical (10)**
7:7;8:5,13;25:21;26:6;
33:10;39:5;60:10,21,23

**meet (2)**
22:17,19

**member (2)**
5:10;30:4

**memory (4)**
12:23;36:19;50:21;58:23

**mentioned (2)**
5:21;57:6

**metal (3)**
27:15,19;29:6

**mezzanine (3)**
44:2,3;46:19

**MICHAEL (6)**
4:1,7;62:3,14;63:2,23

**might (1)**
48:18

**mind (2)**
22:12;47:17

**minus (1)**
60:21

**minute (1)**
6:18

**minutes (20)**
16:20;21:12,13;41:1,5;
42:5,15,18;43:7,19,20,21;
44:2,10,12;45:10,22;46:22;
47:2,8

**mittimus (1)**
59:19

**mittimuses (1)**
59:17

**money (1)**
57:5

**months (1)**
28:4

**mop (4)**
28:12,15,21;30:13

**more (6)**
34:19;44:17;51:4;52:8,19,
23

**morning (1)**
10:10

**most (3)**
6:5,7;11:9

**motion (4)**
59:6,6,7,8

**mouth (1)**
34:9

**move (2)**
37:4;47:9

**movement (1)**
27:3

**moving (2)**
17:21;59:5

**multiple (1)**
5:12

**must (1)**
54:11

## N

**name (10)**
4:6,7;9:6;13:3;15:15;
27:14;35:19;36:1;39:8;
54:12

**named (2)**
7:1;18:9

**narcotic (1)**
36:17

**narrative (29)**
9:15,17;10:2,4,19;11:1,
14;12:10,14;15:13,18,19;
16:2;18:7,14,17;19:1,14,20;
21:19,23;24:22;25:10;
27:12;31:8,12;36:6;37:19;
58:2

**narratives (2)**
9:18;21:11

**NCIC (1)**
7:12

**near (1)**
36:23

**need (2)**
32:14;39:1

**needed (1)**
32:15

**New (15)**
4:9,12,19;5:5,16;9:12,21;
10:8;15:21;18:21;22:1;26:2;
27:22;28:10;62:6

**next (14)**
15:2;37:11;40:22;41:1,5;
44:10,11;45:10,22;51:9;
52:6,10;54:18;55:1

**NH (1)**
62:5

**Nicholas (2)**
27:14;31:9

**nickname (1)**
35:17

**nine (1)**
48:8

**Northern (7)**
5:8,15;10:8;26:2;27:22;
28:10;62:5

**Notary (1)**
62:22

**note (7)**
50:14,19;51:7,10;53:6,11;
54:11

**notes (8)**
10:14,15,18,20;11:18,22;
50:11,12

**notified (2)**
6:3,8

**number (17)**
11:7;16:11;19:15;20:21;
21:5;24:20;31:19,22;38:16,
18,19;40:19;42:2,9;43:13;
44:9,23

## O

**oath (1)**
62:8

**Objection (13)**
9:13;14:2;15:5;20:22;
24:5;25:18;27:5;29:23;45:1;
54:2;56:6,8;58:15

**objects (2)**
28:11,16

**observed (3)**

20:14;31:17;57:23

**obviously (9)**
5:7;6:4,7;12:7;14:8,16;
19:9;28:4;29:18

**occur (1)**
6:8

**occurred (17)**
5:15;7:5;8:12;13:15;14:6,
16;16:10,11;28:4;38:15,23;
39:10;47:2,7,18;50:1,3

**occurring (2)**
10:13;38:3

**October (5)**
11:16,19;15:14;18:8;28:3

**off (18)**
6:15;8:16;12:23;19:11,12;
22:22;43:14;44:3;45:12;
46:10,11;49:17;50:21;55:3,
14;58:10,11,23

**Office (4)**
6:21;47:5;59:23;60:8

**officer (4)**
15:3;34:2,22;55:3

**officers (5)**
18:4;32:23;33:5,16;57:9

**old (1)**
35:18

**older (1)**
36:4

**Once (1)**
10:19

**one (17)**
5:8,21;13:9;19:4;23:15,
16;27:7;30:14;35:15;42:1;
43:13;44:2,4;46:18;49:11;
56:20;60:4

**ones (2)**
13:9;19:7

**ongoing (1)**
46:9

**onto (2)**
38:5;40:22

**opinion (2)**
33:8,11

**opportunity (3)**
12:13;18:13;51:13

**opposite (1)**
23:18

**organized (1)**
57:2

**original (2)**
11:8;26:1

**others (1)**
55:4

**out (18)**
7:17;12:8;16:15;27:7;
35:6;38:22;39:14;41:18;
43:15;45:15;46:16;47:6;
50:5;51:7,16;53:21;56:23;
58:18

**outlined (1)**
54:7

**outside (4)**

16:10;17:10;22:17;23:5
**over (12)**
13:20;20:15,21;26:22;
38:5;40:23;41:4,5;45:8,10,
22;51:14
**overt (2)**
13:8;59:1
**own (2)**
37:2;47:3

## P

**packets (1)**
29:12
**page (11)**
37:20;39:23;40:4,6,22;
41:4,22;47:10;55:10;63:1,4
**pages (2)**
35:10;62:11
**paper (1)**
60:3
**paperwork (1)**
60:13
**part (13)**
6:5,11;9:10;11:9;15:19;
18:20;20:3;21:23;25:13;
30:17;32:3;57:19;58:1
**particular (1)**
15:4
**pass (1)**
22:22
**passed (2)**
27:3;37:9
**past (1)**
6:6
**paths (1)**
56:13
**patrol (1)**
4:15
**Paul (4)**
15:15;19:14,22;21:6
**Pause (1)**
48:19
**people (8)**
9:18;19:9;26:21;29:1;
41:20;53:22;54:5;58:17
**performing (1)**
33:14
**period (5)**
4:18;43:9;46:4;52:18;
56:19
**person (3)**
22:19;53:12,18
**personnel (4)**
6:4;26:3;33:10;51:5
**pertaining (4)**
7:4;9:6;18:10;60:14
**Peruses (6)**
12:18;16:5;18:16;37:23;
51:15,21
**photos (1)**
6:23
**physical (3)**

14:5,14;47:22
**physically (1)**
60:15
**picked (1)**
14:21
**piece (2)**
27:15,19
**pill (1)**
23:8
**Pills (2)**
23:9,22
**piss (1)**
50:16
**place (5)**
13:21;20:15;28:16,18;
52:19
**placed (1)**
29:5
**plastic (1)**
60:11
**Please (3)**
4:6;6:14;16:1
**pled (1)**
58:18
**pm (1)**
61:8
**point (4)**
42:1;43:3;46:4;49:11
**Police (26)**
4:10,13,16,19;5:6,8;6:1,2;
7:4;8:10;9:12,22;15:21;
18:22;22:2;27:22;28:9;
30:18;31:14;34:3,3,6;39:17;
49:1,6;60:16
**police's (1)**
53:7
**Pops (2)**
35:17;36:1
**popular (2)**
28:16,18
**position (1)**
4:14
**positioned (1)**
17:8
**possible (2)**
28:13;53:19
**practice (3)**
22:5;25:20;26:23
**prepare (2)**
9:10;10:4
**prepared (12)**
9:3;10:2;11:13;15:18;
18:17;21:22;31:12;37:5,11,
17;39:18;47:11
**preserve (1)**
11:17
**preserved (2)**
20:2;32:7
**pretty (2)**
38:17;48:5
**prevent (1)**
33:1
**previous (1)**

15:19
**previously (1)**
26:10
**prison (3)**
19:9;22:6;56:22
**probably (4)**
35:19;51:4;53:18;55:20
**problems (2)**
36:11,14
**process (1)**
17:15
**produce (1)**
8:15
**producible (1)**
7:15
**promotion (1)**
4:22
**promptly (2)**
33:7,17
**prosecutor (1)**
61:2
**Public_JP_ (1)**
62:22
**puke (1)**
24:1
**puking (2)**
13:20;20:15
**pulled (1)**
12:6
**purposes (2)**
57:2;61:1
**pursuant (1)**
42:7
**put (4)**
34:9;46:21;50:8;60:7

## Q

**quickly (1)**
14:22
**Quimby (4)**
27:14;29:5;31:10,16
**quote (2)**
20:15;54:16

## R

**rather (2)**
15:11;24:10
**read (12)**
24:21;34:8,10,11;38:6,7;
51:14,19;52:3,10;62:3;63:4
**reading (4)**
12:22;13:1;25:10;44:11
**READS (1)**
63:4
**realize (1)**
26:12
**really (4)**
11:10;16:23;40:17;41:19
**reason (2)**
8:17;54:9
**recall (3)**

13:2;20:17;26:1
**received (1)**
58:6
**Recess (2)**
20:11;48:21
**recollection (4)**
37:3;39:11;49:17;51:6
**record (18)**
4:6;6:15;8:16;10:21;19:8,
10,11,12,13;34:18;48:22;
49:11;54:6;58:10,11,12;
59:3;62:8
**recorded (3)**
19:23;30:17,19;39:5
**recording (6)**
19:3,8,21;20:2;30:20;
57:21
**recordings (4)**
19:5;30:17,22;60:2
**records (10)**
7:7;8:5,13,14;25:22;39:5;
60:6,10,21,23
**rectally (1)**
23:5
**red (1)**
23:20
**reference (1)**
43:8
**Referral (1)**
6:22
**referring (1)**
43:8
**reflect (2)**
19:2;59:3
**reflects (3)**
36:7;40:18;41:23
**regularly (6)**
9:11,20;15:20;18:20;
21:23;31:13
**related (1)**
47:22
**relatively (1)**
14:22
**relevant (1)**
28:5
**relied (2)**
50:3;58:6
**rely (1)**
32:14
**remains (1)**
23:10
**remember (16)**
12:23;13:6,8;16:6;25:21;
35:19,20;36:2,4,16;40:15,
17;42:10,12;49:12;51:3
**removed (1)**
7:10
**replied (1)**
25:5
**report (29)**
9:5,10,16;11:2,3,6,20;
12:1;15:11;16:2;30:20;31:6,
8;35:20;37:5,10,14,17,21;

38:1;39:18;40:1,4,6,18;
41:23;47:9,10;57:20
**reported (1)**
11:4
**reporter (1)**
4:2
**reports (3)**
7:12;35:5;57:22
**report's (1)**
12:7
**represent (1)**
30:8
**represented (1)**
49:10
**request (3)**
50:23;53:9;54:19
**resided (3)**
12:19;13:4,10
**residence (1)**
31:23
**respect (1)**
22:12
**responder (1)**
37:14
**responsibilities (1)**
5:4
**result (2)**
58:21;59:16
**resulting (1)**
58:13
**retired (1)**
54:23
**returned (2)**
13:19;20:14
**review (7)**
12:13;16:2;18:14;25:22;
32:2;37:21;40:8
**reviewed (4)**
21:18;38:2;49:19,20
**reviewing (2)**
16:3;18:15
**right (93)**
5:17;6:12;7:17;8:18;9:1,8,
22;10:10;11:5;12:10,15;
13:11,16,21;14:10,12;15:10,
10,22;16:11,16,20;17:1,5,
10,14,18,22;18:4,11,22;
20:4,10;21:17,20;22:2;24:4,
11,16;25:17;26:9,12,16;
27:4,8,16;28:8;29:4,20;31:3,
14,19,23;32:19;34:2;36:3;
37:1;38:18;39:10,20;40:3,
10,16,20;41:2;42:2,5,11,19;
43:4;44:9,15,19;45:23;46:5,
20,22;49:18;50:10;51:17,
23;54:9,15,18;55:6,15,18;
57:6,16;58:9;59:20;60:20;
61:4
**right-hand (1)**
55:9
**robbed (1)**
52:9
**room (1)**

10:8
**roommate (1)**
12:23
**round (1)**
15:8
**rounds (5)**
14:17,21;15:2,3;57:17
**running (1)**
56:12
**Ryan (7)**
7:1;9:6;10:2,7;11:1;
12:11;13:3

## S

**safe (1)**
26:21
**Safety (1)**
4:12
**same (7)**
11:11;23:6;45:12;53:10,
12;55:8;56:11
**saving (1)**
37:2
**saw (4)**
17:4,17;38:4;50:9
**saying (1)**
13:13
**Sean (1)**
59:10
**seated (2)**
16:10,13
**second (2)**
20:7;37:20;47:4
**seconds (4)**
40:20;45:6,7;47:12
**Section (11)**
8:3,18,22;9:2;15:11,13;
18:6,7;31:5,8;39:20
**sections (1)**
7:11
**seem (1)**
55:6
**seemed (2)**
16:19;34:14
**Seems (2)**
22:13;45:11
**sell (1)**
24:10
**sense (2)**
11:12;12:4
**sentence (3)**
52:6,6;59:15
**separately (1)**
60:3
**September (2)**
62:5;63:3
**sergeant (9)**
4:16;37:6,11,20,21;38:1,
10;49:16,21
**served (1)**
59:16
**serves (1)**

36:19
**set (1)**
61:7
**several (1)**
44:22
**shank (1)**
28:20
**share (1)**
7:21
**shared (2)**
24:3,9
**sharpened (3)**
27:15,19;29:5
**sheet (4)**
6:20,22,22;14:17
**shirt (4)**
43:14,14;46:10,11
**short (1)**
39:6
**showed (1)**
48:7
**shown (1)**
48:15
**side (1)**
55:10
**sign (1)**
12:8
**signature (3)**
55:8,9;63:1
**signs (1)**
55:3
**similar (1)**
53:14
**sit (1)**
32:16
**Six (3)**
43:19,20,21
**sleeping (1)**
31:18
**sleeves (1)**
60:12
**slicing (2)**
59:7,8
**slip (2)**
51:1;54:19
**slips (1)**
53:9
**Smith (8)**
37:6,11,17,21;38:1,10;
49:16,21
**Smith's (1)**
37:20
**smuggling (2)**
27:1;57:3
**sold (1)**
24:8
**solution (3)**
29:7,10;30:10
**somebody (4)**
22:18,18;24:9;30:6
**someone (4)**
16:15;25:6,8;52:9
**sorry (3)**

46:8;56:8;59:18
**sort (1)**
56:4
**Sound (1)**
52:3
**speak (1)**
30:2
**specific (1)**
34:19
**specifically (1)**
14:4
**spelling (1)**
4:8
**spoke (4)**
10:7;47:19;54:5;57:8
**spot (1)**
29:3
**stack (5)**
6:19,20,23;7:2;60:22
**staff (1)**
14:21
**stairs (1)**
43:15
**stand (1)**
18:3
**standing (1)**
33:22
**start (2)**
12:1;40:3
**state (27)**
4:6,10,12,16,19;5:5,8,23;
6:2;7:4;8:10;9:12,21;15:21;
18:21;22:2;27:22;28:9;
30:17;31:14;34:6;39:17;
48:23;49:6;53:7;60:16;
62:15
**statement (5)**
33:12;37:12;58:5,7,8
**statements (1)**
47:3
**stating (1)**
15:1
**still (2)**
20:4;46:9
**stop (1)**
52:16
**strike (1)**
12:12
**strips (2)**
23:9,22
**submit (1)**
57:20,22;60:6,7
**Suboxone (2)**
22:12;24:3
**Suboxones (1)**
22:6
**Subscribed (1)**
62:18
**subsequently (1)**
36:17
**suffered (1)**
33:6
**supervisor (1)**

4:15
**supplied (2)**
49:7,21
**supplies (2)**
29:18,20
**supposed (1)**
25:3
**Supremacist (1)**
56:14
**sure (3)**
35:19;56:22;60:1
**surmise (2)**
42:13;46:23
**surname (1)**
4:8
**suspected (1)**
24:19
**suspicion (1)**
26:2
**suspicious (1)**
45:21
**swallows (1)**
22:23
**swear/affirm (1)**
62:7
**sworn (2)**
4:2;62:18
**syllabus (1)**
8:2
**symptoms (2)**
26:3,7
**system (1)**
26:12
**sytem (1)**
25:23

**T**

**Tab (1)**
35:21
**table (1)**
41:18
**talk (4)**
20:7;35:5;41:21;46:21
**talking (4)**
22:15;45:5,16;57:22
**tape (1)**
31:1
**task (2)**
32:17,21
**tasked (2)**
33:15;38:14
**tattoos (1)**
41:14
**telling (1)**
21:13
**ten (6)**
16:20;21:12;46:22;48:8,
15,18
**tense (1)**
6:6
**tenure (2)**
5:12,22

**test (2)**
26:17;50:17
**tested (1)**
25:14
**testified (1)**
4:3
**testimony (6)**
15:1;36:12;39:12;43:7;
57:7;62:8
**therefore (1)**
14:21
**though (1)**
54:6
**thought (3)**
17:15;24:15,23
**three (13)**
21:12;22:20;23:13,21;
26:20,20;41:1,5;44:10,11;
45:10;58:17;60:10
**throat (1)**
29:6
**thrown (1)**
50:23
**tie (3)**
23:17,17,20
**times (4)**
5:12;22:17,20;23:13
**tinfoil (1)**
23:23
**title (1)**
4:14
**titled (1)**
6:21
**Today (1)**
22:15
**together (6)**
39:16;50:8;56:14,17;
57:12;60:7
**toilet (1)**
17:9
**told (30)**
10:12;12:12;13:14,18;
16:9,13,18,22;17:3,12,16,
20;18:1,3;19:2;20:13;21:8,
22;24:13;27:12;29:4;30:16;
31:16;33:20,21;36:8,10,20;
39:6;60:21
**took (3)**
7:17;21:17;42:14
**top (2)**
10:23;41:4
**totality (1)**
46:15
**towards (1)**
17:9
**town (1)**
11:7
**transcript (1)**
62:4
**tried (1)**
53:18
**trio (1)**
53:9

**true (1)**
52:23
**try (4)**
25:8;34:16;48:8,12
**trying (2)**
35:13;47:1
**turn (1)**
15:10
**Turning (1)**
27:11
**two (3)**
13:2;21:12;22:20;23:13;
26:20;27:7;42:14;43:7;
46:22;47:2,8;60:10,11
**two-minute (1)**
43:9
**type (2)**
10:3;11:14
**typed (1)**
11:19

**U**

**Um-hum (1)**
21:3
**under (3)**
28:21;29:2;62:8
**Understood (2)**
27:11;61:3
**undertake (1)**
52:21
**Unit (9)**
5:13;23:1,2;25:4;27:16;
29:19;30:6;41:13,20
**units (1)**
29:14
**unquote (1)**
54:16
**up (16)**
8:1;11:19;14:22;21:4;
22:6;23:1,11,20;24:1,2;
32:13;35:13;43:15;45:19;
52:2,18
**upon (4)**
5:14;7:5;8:11;58:6
**use (1)**
12:3
**used (2)**
28:11,17
**usually (2)**
22:18,20

**V**

**vague (1)**
34:14
**validity (1)**
39:12
**Valley (1)**
25:16
**verbal (1)**
57:20
**vicinity (3)**

39:8,9;45:22
**video (29)**
32:2,6;36:22;38:2,8,11;
40:8,13;42:5;47:12,15,20,
23;48:2,3,7,9,12,16,23;49:2,
5,6,14,15,19,20;50:9;60:3
**videos (1)**
14:18
**view (1)**
43:15
**violent (3)**
52:8,19,23
**visit (3)**
22:17;25:1,9
**Visitation (1)**
55:2
**visits (2)**
55:3,7
**vomit (3)**
14:1,4,7
**vomited (6)**
20:20;23:11;27:10;38:5,
20;39:2
**vomiting (1)**
22:6
**vomits (1)**
23:1

**W**

**wait (1)**
35:11
**walks (2)**
43:15;45:8
**wall (1)**
17:10
**Warriors (1)**
56:2
**watched (1)**
40:14
**Watson (3)**
55:12,13,15
**way (10)**
21:15;23:7,18;26:22;27:9;
32:22;34:17;46:23;50:6;
53:10
**weapons (3)**
28:1,12,17
**wear (1)**
5:22
**Wednesday (1)**
62:4
**weigh (1)**
41:19
**weird (1)**
56:18
**What's (1)**
8:20
**whatsoever (2)**
34:1;41:19
**White (1)**
56:2
**whole (1)**

40:14
**who's (1)**
38:19
**whose (2)**
49:12;55:9
**wife (1)**
54:21
**willingly (1)**
25:12
**Winter (1)**
55:12
**wipes (1)**
43:14
**within (2)**
47:2,8
**without (1)**
50:6
**WITNESS (5)**
7:11,13;35:13;48:9;62:1
**witnesses (2)**
48:8,15
**word (3)**
24:9;52:10;54:12
**words (3)**
34:9;51:16;53:20
**wore (1)**
5:7
**work (4)**
15:8;32:10;41:15;56:17
**worked (1)**
5:12
**working (3)**
32:12;56:14;57:12
**worse (1)**
51:23
**wrapped (1)**
22:20
**write (2)**
58:2,3
**writes (4)**
38:1;40:23;41:4;52:7
**writing (2)**
53:14,19
**written (2)**
11:14;58:1
**wrong (2)**
48:10;50:15
**wrongdoing (2)**
34:12;35:2
**wrote (2)**
37:21;51:7

---

### Y

**year (2)**
4:17;32:14
**yellow (4)**
29:7,10,15,17
**Yup (4)**
13:14;17:23;31:7;43:1

---

### 1

**1 (7)**
6:16,20;7:3;8:2,9;9:3;58:4
**1:57 (1)**
61:8
**10 (2)**
18:6,7
**102 (1)**
10:6
**11 (4)**
31:5,8;40:4,6
**12 (3)**
39:23;41:22;47:10
**12:40 (1)**
55:7
**14:20 (1)**
55:8
**14:41 (2)**
44:1,11
**14:47 (2)**
45:5,6
**14:48 (1)**
45:8
**15 (1)**
35:21
**15:00 (2)**
48:7,13
**16:20 (1)**
42:15
**19 (1)**
45:6
**1936 (1)**
36:5

---

### 2

**2 (1)**
39:20
**2:30 (1)**
40:9
**2:39 (7)**
40:19;42:22;43:10,11;
44:6;46:2,4
**2:41 (2)**
44:6;46:6
**2:44 (1)**
44:7
**2:45 (2)**
44:14;46:7
**2:47 (1)**
44:19
**2:48 (3)**
42:1;44:19,21
**2:49 (1)**
44:21
**2:56 (2)**
44:21;46:2
**2:57 (3)**
44:22;46:3,5
**20 (3)**
47:12;62:5;63:3
**2004 (1)**
4:13
**2010 (3)**

4:21,23;32:13
**2012 (24)**
5:17;7:6;8:12,21;10:9;
11:3,16,18,19;12:21;15:14;
18:8,10;29:22;30:21;35:16;
38:3;40:9;52:19;54:1;55:7,
21;56:19;57:18
**2013 (1)**
36:8
**2016 (2)**
5:1,1
**2017 (4)**
62:5,19;63:3,20
**21st (1)**
5:1
**22nd (2)**
4:17,23
**23 (1)**
8:3
**24 (1)**
8:3
**24th (13)**
5:17;7:6;8:12;9:7;11:2;
12:21;18:10;38:3;40:9;
52:18;53:23;55:7;57:18
**29 (3)**
7:8;8:2,4
**29th (3)**
8:21;10:9;11:18

---

### 3

**3 (3)**
8:18,22;9:2
**3:00 (2)**
47:12,15

---

### 4

**4 (2)**
15:14;18:8
**4:20 (2)**
42:23;47:16
**40 (1)**
42:18
**45 (1)**
43:12
**47:45 (1)**
45:7
**48 (1)**
40:20
**4th (1)**
28:4

---

### 8

**8 (1)**
36:8

---

### 9

**9 (29)**
15:11,13;16:11;19:17,18;

20:21;21:5;24:20;31:19,22;
38:16,18,19;40:19;41:2,8;
42:2,9;43:13;44:9,18,23;
45:7,7,8,10,11,13,22
**9:25 (1)**
10:10
**9th (2)**
11:16,19