UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE

*********************************************
Jonathan Leite,                              *
                                             *
              Plaintiff                      *
                                             *
v.                                           *     Case No. 1:15-cv-00280-PB
                                             *
Corrections Officers Matthew Goulet,         *
Elmer Van Hoesen, Michael Beaton, Lynn McLain,*
Heather Marquis, Trevor Dube, Rhianne Snyder, *
Eddy L'Heureux, Jeffrey Smith, Dwane Sweatt,  *
Yair Balderrama, Bob Morin, Ejike Esobe, and  *
Kathy Bergeron                               *
                                             *
              Defendants                     *
*********************************************

## MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COMES the plaintiff, Jonathan Leite, by and through his attorneys, Douglas, Leonard & Garvey, P.C., and respectfully submits this Memorandum of Law in Support of his Objection to the Defendant's Motion for Summary Judgment, stating as follows:

## Introduction

Jonathan Leite entered the custody of the New Hampshire Department of Corrections on or about December 31, 2011, a fully functional man, the father of two (2) children, who ran his own residential construction business. When Mr. Leite left the custody of the New Hampshire Department of Corrections in January of 2014, he suffered from severe injuries (including a traumatic brain injury and PTSD) resulting from a brutal assault he suffered at the hands of other inmates on August 24, 2012. Mr. Leite's injuries from the prison assault have proven so severe that the Social Security Administration has awarded him disability benefits, and his expert Dr. Albert M. Drukteinis has opined that the effects of Mr. Leite's traumatic brain injury are

1

permanent, that he will need psychiatric medication and mental health treatment indefinitely, and that the prognosis for him to enter the workforce is "guarded," with no likelihood that he would ever be able to return to work in the residential construction trade at the level at which he functioned before his incarceration.

Mr. Leite has alleged two (2) theories of liability arising under 42 U.S.C. §1983 against the defendant correctional officers. He alleges deliberate indifference to his serious medical needs against the defendants Bergeron, Dube, Esobe and McLain based on their conduct contributing in whole or in part to a delay of 2.5 hours between the time of the assault and the time correctional officers finally procured Mr. Leite medical attention. He further alleges that the defendant McLain is liable under Section 1983 for failure to protect him from an assault by other inmates. Summary judgment is unwarranted on these claims and should be denied.

**Facts**

**Mr. Leite Suffered Serious Harm At The Hands Of Inmates While Incarcerated On August 24, 2012, Suffering A Traumatic Brain Injury That Would Render Him Totally Disabled And Dependent On Social Security Disability Benefits.**

Mr. Leite became incarcerated on "F Block" in the Northern New Hampshire Correctional Facility (NCF) on or about July 16, 2012. Exhibit A, Defendant Jeffrey Smith's Answers to Plaintiff's Second Set of Interrogatories at #4. Mr. Leite occupied the same bunk in "F Block" (Dayroom Bunk 1T) from July 16, 2012, through August 24, 2012, when he suffered the brutal beating causing severe and disabling injuries that is the subject of this action. Id. The beating occurred in Cell 9 of "F Block." Mr. Leite was not an occupant of Cell 9 on August 24, 2012, or at any other time. "There were only two occupants in F-Block Cell 9 from June 1, 2012, to August 24, 2012," inmates named Johnathan Gelinas and Ryan Elliott. Id. at #3.

Mr. Leite entered Cell 9 at 2:39 p.m. and did not exit the cell until 4:20 p.m. Mr. Leite

was within Cell 9 for this entire 1-hour-and-41 minute time period.  Exhibit B, Jeffrey Smith deposition dated 8/30/17 at pp. 62-63.  Within Cell 9 Mr. Leite suffered a brutal, life-altering assault at the hands of inmates.  *See* Exhibit C, Johnathan Gelinas deposition at pp. 7-10.  The assault caused Mr. Leite to suffer "numerous contusions, and a head injury with skull and facial fractures, and intracranial bleeding."  Exhibit D, Expert Disclosure of Dr. Albert M. Drukteinis dated 5/11/17 at p. 2.  When correctional officers finally got Mr. Leite medical attention at 5:11 p.m. (approximately 2 hours and 30 minutes after he suffered the assault), he was brought to the emergency room via Berlin EMS to Androscoggin Valley Hospital where he was diagnosed with "head injury; subdural hematoma."  Id. at p. 6.  Mr. Leite was airlifted to Dartmouth Hitchcock Medical Center (DHMC), where he presented "awake, but confused and inappropriate in responses."  Id. at p. 7.  DHMC doctors diagnosed Mr. Leite with a right parietal bone fracture, a right cephalohematoma, a right parietal hematoma, a right temporal bone fracture, a right zygomatic bone fracture, a right sphenoid fracture, and a subarachnoid hemorrhage.  Id.  Mr. Leite exhibited "confusion, impaired mental status, and difficulty answering questions" throughout his 2-week stay at DHMC.  Id.  From DHMC Mr. Leite was transferred to Catholic Medical Center, where he was hospitalized for eight (8) additional days for further management and care.  Id. at p. 8.

Dr. Drukteinis will testify that the assault has caused Mr. Leite to suffer from PTSD and Mild Neurocognitive Disorder secondary to the Traumatic Brain Injury that Mr. Leite suffered due to the assault.  Id. at p. 22.  The assault also aggravated Mr. Leite's Anxiety Disorder, Depressive Disorder and Personality Disorder.  Id. at p. 22.  Mr. Leite was released from incarceration in January of 2014, but he has been unable to return to his pre-assault career as a residential contractor.  The Social Security Administration has determined that Mr. Leite is

totally disabled, and Mr. Leite's "attempts at working in his previous trade have been unsuccessful because of his mental disorders caused or aggravated by the assault on 8/24/12," as Dr. Drukteinis has opined.  Id. at p. 23.  Dr. Drukteinis has determined that "[t]he effects of [Mr. Leite's] TBI are permanent" and that "the prognosis for Mr. Leite to re-enter the workforce is guarded, and never at the level that he worked in his trade."  Id.

As stated above, Mr. Leite was in Cell 9—a cell assigned not to him but to Johnathan Gelinas and Ryan Elliott—from 2:39 p.m. until 4:20 p.m.  Following the assault, Inmate Gelinas put Mr. Leite in Mr. Gelinas' bed.  Exhibit C at p. 8.  Although Mr. Leite was in Mr. Gelinas' bed, Mr. Leite was "awake," Inmate Gelinas testified.  Id. at p. 10.  Mr. Leite was not coherent after the assault, however.  "[H]e was dizzy, disoriented," Inmate Gelinas testified.  Id. at p. 8.  Mr. Leite "wasn't aware of his surroundings that much."  Id. at p. 10.

**Video Monitoring At The Time of the Assault Captured Obvious Suspicious Activity That The Defendant McLain Failed to Identify, Leading To A Failure To Prevent The Assault, Interrupt It, Or Come To Mr. Leite's Aid In The Immediate Aftermath Of It.**

The defendant McLain was working in CP-5 on August 24, 2012, from 7:00 a.m. until 3:00 p.m.  Exhibit E, Lynn McLain deposition at pp. 4-5.  The defendant McLain's job required her to watch two (2) monitor screens.

> Q.     So you described for me the working environment of CP-5.  You're sitting down; is that right?
>
> A.     Yes.
>
> Q.     And you're watching two monitor screens?
>
> A.     Yes.

Id. at p. 7.  One video screen usually shows the hallway leading to the housing blocks.  Id. at pp. 7-8.  The second video screen shows the activities occurring in E Block, F Block, G Block and H

Block.  Id. at p. 8.  The officer working in CP-5 may only view one (1) housing block at a time on the second video screen, so the officer must "toggle through" the blocks.  Id. at pp. 7, 8-9. The defendant McLain testified that her practice is to watch a block for two (2) minutes then "toggle through" to the next block, unless suspicious activity is occurring on a certain block, in which case she "may watch that block for five minutes or so."  Id. at pp. 9-10.

Between 2:41 p.m. and 2:57 p.m. on August 24, 2012, the video monitoring of "F Block" captured substantial evidence that suspicious activity was occurring in Cell 9.  The defendant McLain would have seen these signs of suspicious activity when she "toggled through" to "F Block" while monitoring the residential blocks during this time period.

Video footage that the defendant McLain would have seen if she were watching "F Block" between 2:41 p.m. and 2:45 p.m. depicts a lot of inmates hanging around Cell #9 and at least a couple of inmates entering the cell.  Exhibit F, Timothy Coulombe deposition at p. 49.[1] The sight of a lot of inmates clustering around a cell is a cause for concern that should elicit a correctional officer response, as Internal Affairs Investigator Coulombe acknowledged in his deposition.

> Q.      If you had been conducting video monitoring of a cell block and you saw a lot of inmates hanging around a certain cell, would that have caused you concern?
>
> A.      Yes, we would have sent somebody in for that….

Id. at p. 49.  The suspicious activity observable in the vicinity of Cell 9 beginning at 2:41 p.m. should lead a jury to conclude that the assault on Mr. Leite began at or about that time.

Video footage that the defendant McLain would have seen if she were watching "F

---

[1] Timothy Coulombe is an Internal Affairs Investigator with the New Hampshire Department of Corrections. Exhibit F at pp. 4-5.  Mr. Coulombe investigated the assault on Jonathan Leite.  Id. at pp. 11-12.  As part of Mr. Coulombe's investigation, he reviewed video of activities on "F Block" occurring on August 24, 2012, between 2:30 p.m. and 3:00:20 p.m.  Id. at p. 22.  The video reviewed by Investigator Coulombe after the events of August 24, 2012, was the video that would have been showing live to the defendant McLain in CP-5 on August 26, 2012, when she "toggled through" to video of "F Block" during that time period.  Exhibit B at p. 54.

Block" between 2:47 p.m. and 2:57 p.m. depicts "confusion around cell #9," as well as several inmates entering and exiting Cell 9.  Id. at Ex. 2 at 000778.  This video would also warrant a correctional officer monitoring the video to investigate, as Internal Affairs Investigator Coulombe testified.

> Q.      …if the monitoring were being conducted and a corrections officer did observe several inmates entering and exiting particular cell during a short period of time, would that in your experience give cause [for] concern warranting some sort of investigation into what's going on?
>
> A.      Yes, it would.

Id. at pp. 51-52.

The defendant McLain watched the video footage during her deposition and testified regarding such video, agreeing that the video of "F Block" between 2:39 p.m. and 2:57 p.m. on August 24, 2012, depicted suspicious activity warranting a correctional officer response.

> Q.      Now you've been watching the video from 2:39 to 2:42:24; is that right, Officer McLain?
>
> A.      Yes.
>
> Q.      And have you observed any activity that would cause you any concern?
>
> A.      It looks like there was an awful lot of milling around down here…[a]round Cell 9.
>
> Q.      If you had observed inmates milling around Cell 9 as depicted in the video, would that cause you any concern?
>
> A.      I would have started watching it for a while.

Exhibit E at pp. 14-15.

The defendant McLain then testified as follows, after watching video footage between 2:42 p.m. and 2:45 p.m.

> Q.      …So over the course of those three minutes from approximately 2:42 to 2:45:15, you've observed a lot of inmates milling around in the vicinity of Cell 9;

is that correct?

A.      Yes.

Q.      …And if you had observed such activity on the monitor, would that have caused you any concern?

A.      Yes.

Q.      I would have called the office and said maybe you'd better do a round.

Id. at pp. 15-16.  The defendant McLain added that what a correctional officer should have done observing the activity on "F Block" between 2:39 p.m. and 2:45 p.m. was as follows: "Call the office where the officers are, the ones that would be doing rounds normally, and say, 'You better go check out Fox Block.  There's a lot of activity going on around Cell 9.'"  Id. at p. 18.

The defendant McLain then viewed, and testified regarding, video footage of abundant suspicious activity in the vicinity of Cell 9 on "F Block" occurring between 2:45:09 p.m. and 2:57:12 p.m.  Id. at pp. 16-26.

Q.      So, Officer McLain, we've just viewed video footage of "F Block" from Camera Angle 30 on August 24, 2012, between approximately 2:41 p.m. and 2:57 p.m.; is that correct?

A.      Yes.

Q.      And during that approximately 16-minute period, there are several inmates entering and exiting Cell 9, right?

A.      Yes.

Q.      And there are periods in that 16-minute period where there are several inmates clustered around Cell 9; is that right?

A.      Yes.

Id. at p. 26.  The defendant McLain acknowledged that a correctional officer perceiving such suspicious activity as depicted in the 16 minutes of video footage between 2:41 p.m. and 2:57 p.m. should have called the office to have other correctional officers report to the scene to find

out what was happening.  Id. at pp. 26-27.

**Correctional Officers Doing Rounds Must Look In Every Cell To Ensure Inmate Safety And Correct Rule Infractions.**

The defendant Smith acted as the Shift Commander at NCF on August 24, 2012, from 2:00 p.m. through 10:00 p.m.  Exhibit B at p. 6 ("the night of that incident I was shift commander…."); Id. at p. 16 ("It's 2:00 to 10:00 was my shift, because the shift commander comes in an hour early.").  The defendant Smith is now the Chief of Security for NCF and is familiar with the responsibilities that a correctional officer has in connection with doing rounds. Id. at p. 9.

The responsibilities that a correctional officer has in connection with doing rounds have not changed in any way since August 24, 2012, the defendant Smith testified.  Id.  Correctional officers entering a block to do rounds should first "determin(e ) the attitude on the block."  Id. at p. 10.  Next, the correctional officer is "supposed to look through every cell and walk by the cells and just make sure that infractions aren't taking place."  Id.  The defendant Smith testified that it is important to correctional officers to look into every cell while doing rounds "to make sure that there's no cell hopping going on."  Id. at p. 36.  Cell hopping occurs where an inmate steps over the threshold of the door to a cell not assigned to him.  Id. at p. 39.  Corrections officers must also look in the cells during rounds to make sure inmates are not tattooing each other, using drugs or fighting.  Id. at pp. 76, 80.  **"[T]he main practice is [to] make sure everybody is alive."**  Id. at p. 80. (emphasis supplied).

A properly done round of a housing block should take a corrections officer between three (3) or four (4) minutes to complete on the short end, and 15 minutes on the long end, according to the defendant Smith.  Id. at p. 71 ("a proper round could take three or four minutes and then if—depending if they stop and talk to inmates or do a cell search or if they do more, they could

be in there for 15 minutes.").

It is "definitely dereliction of duty" for a correctional officer to do rounds without looking in cells. Id. at p. 68. Indeed, the correctional officers deposed in this case were in general agreement as to their knowledge that looking in each cell when doing rounds is essential to protect inmate health and safety.

The defendant McLain has worked as a corrections officer at NCF for 14 years (McLain deposition at p. 4) and testified as follows regarding what she as a corrections officer must do during rounds:

> Q.     …In your work as a corrections officer, have you ever had the responsibility to do rounds?
>
> A.     Many.
>
> Q.     When you do the rounds of a housing block, what do you do?
>
> A.     **You go from cell to cell and look in every single cell and just make sure everything is all right.**  You walk around the bloc, check everything out. Make sure everything is all right.

Exhibit E at p. 30 (emphasis supplied).  Looking in the cells is important because, as the defendant McLain explained, inmate-on-inmate violence usually occurs in the cells.

> Q.     …as you said the inmate-on-inmate violence to the extent it occurs usually happens in the cells?
>
> A.     Yes.

Id. at p. 43.

The defendant Dube has worked as a corrections officer at NCF for 11.5 years (Exhibit G, Trevor Dube deposition at p. 4) and testified as follows regarding what he as a corrections officer must do during rounds.

> Q.     When you do rounds, what do you do?

> A. **We make sure the inmates are safe, make sure we look in each cell to make sure the inmates—to the best of our ability the inmates that are in there are the right inmates.** If there's three inmates standing in one cell, we find out who the inmate is that doesn't belong there and get him out of there. ….

Exhibit G at p. 18 (emphasis supplied). The defendant Dube demonstrated subjective awareness of the need to ensure that inmates are safe during rounds, testifying that NCF "has a potential to be a dangerous place." Id. at p. 28. The defendant Dube testified of observing inmates who obviously have been beaten up, receiving reports from inmates that they have been beaten up, and occasions of "follow(ing) a blood trail and com(ing) to an inmate that got beat up." Id. at pp. 28-29.

The defendant Dube further testified regarding his awareness of the need for him as a correctional officer to check on an inmate lying down during the day.

> Q. If you're doing rounds and you look into a cell and you see an inmate lying down during the daytime, do you make any further inquiry to make sure the inmate is okay?
>
> A. Well, we make sure they're alive, which is a visual check. **We look in each cell**….

Id. at pp. 21-22 (emphasis supplied).

The defendant L'Heureux has worked as a corrections officer at NCF since June 2003 and testified as follows regarding what he as a corrections officer must do during rounds.

> Q. And when you do rounds, what do you do?
>
> A. We actually walk around the unit and go from cell to cell. **We're looking in the cells, number one, to see if they're safe, if those that are in there are safe and upright, if they're breathing, if they're not injured.** ….

Exhibit H at p. 5 (emphasis supplied). The defendant L'Heureux echoed the defendant Dube's testimony as to what he does as a corrections officer if he observes an inmate lying down in a cell during the day.

> Q.     …What if you do a round and someone is not upright, the person is lying down…what do you do, if anything?
>
> A.     **I would just go over and look at them physically and see if they're breathing.** If they're breathing and they don't look like they have any marks, they're usually all right.  They're usually sleeping.
>
> Q.     …But if you look into a cell during the daytime and you see someone not upright, lying down in a bed, you check on them?
>
> A.     **I always check on them, see if they're all right.  Yes, I'll look in.**

Id. at pp. 5-6 (emphasis supplied).

Sergeant Sweatt has worked as a corrections officer at NCF since October 2001 (Exhibit I, Dwane Sweatt deposition at p. 4) and testified as to what he as a corrections officer must do during rounds.

> Q.     …have you in your career in the Department of Corrections been responsible at points in time for doing rounds?
>
> A.     Every day.
>
> Q.     Tell me what's involved in doing a round of a housing block.
>
> A.     **You go in and just check to make sure everybody's being safe and—safety  sanitation, security.  That's what's involved.**
>
> Q.     **Do you look in every cell?**
>
> A.     **I do.**

Exhibit I at p. 15 (emphasis supplied).

The defendant Balderrama has worked as a corrections officer at NCF for 19 years (Exhibit J, Yair Balderrama deposition at p. 4) and likewise testified that corrections officers must look in every cell when doing rounds.

> Q.     So I think you told me that when you did rounds, you were supposed to look into every cell; is that right?
>
> A.     Yeah, you're supposed to.

Exhibit J at p. 20.

The Chief Security Officer at NCF at the time of Jonathan Leite's assault, Scott Lambertson (Exhibit K, Scott Lambertson deposition at p. 7), also testified about the importance of correctional officers looking into cells during rounds.

> Q.     When an officer is conducting rounds, is the officer expected to look inside cells?
>
> A.     Cells, yes.
>
> Q.     …What are they expected to look for when they look inside cells?
>
> A.     They're looking for safety, security, anything that may look unusual, cell-hopping.  Any inmate behavior that would be a violation of institutional rules.

Exhibit K at p. 16.

Moreover, Chief Security Officer Lambertson testified that inmate-on-inmate assaults at NCF were a fact of life in the prison that, in his view, correctional officers cannot prevent.  Id. at p. 20 (testifying that "assaults happen in the prison" and "officers can't prevent that from happening").

Internal Affairs Investigator Coulombe likewise testified as to his experience as a correctional officer, and to the need for correctional officers during rounds to look into cells and to check on inmates in dayroom bunks during rounds.

> Q.     And what were you supposed to do when you were doing rounds?
>
> A.     Just walk through the unit, make sure that no one was doing anything against the rules.
>
> Q.     …Does that entail looking in prisoners' cells?
>
> A.     Yeah.
>
> Q.     …Would that entail looking at bunks…in the day room?

A.       Yeah, if they were there.

Exhibit F at p. 40. Internal Affairs Investigator Coulombe testified that the purpose of a correctional officer looking into cells during rounds was to "make sure people aren't in there <u>fighting</u> or tattooing or anything out of the ordinary." <u>Id.</u> at pp. 40-41 (emphasis supplied).

The defendant Esobe, who worked at NCF as a correctional officer in 2012, testified that correctional officers were trained to look in all cells, and were to look into the bunks in the dayroom while doing rounds, to determine if anything is wrong so they can correct it.

Q.       When you received training in doing rounds, did you learn that while doing rounds you should look in every cell?

A.       We do that as well. ….

Exhibit L, Ejike Esobe deposition at p. 7.

Q.       When you were doing rounds during the day, would you check the bunks in the dayroom?

A.       Yes, we do look into the bunks and, yeah, we check the bunks, and what we look for is…if something is not right, then we can take care of it. That's what we do when we do rounds.

<u>Id.</u> at p. 8.

The defendant Esobe further explained the duties of a correctional officer doing rounds not just to walk past the dayroom bunks but to look in them.

Q.       …When you were doing rounds of a block such as ["F Block"] in 2012, would you walk past bunks…in the dayroom?

A.       Yeah. Not just walking past it. We check and we look in it. Yeah, we look in it just, like I said earlier, looking for something that is not right so we can correct it….

<u>Id.</u> at pp. 16-17.

      ***

Q.       If you were to detect an inmate sleeping on a bunk in the dayroom during

the day, would you take any steps to make sure the inmate was okay?

A.      If the inmate is sleeping, I will walk around him.  What am I checking?
I'm checking bloodstain, blood.  ….

<u>Id.</u> at p. 17.

The defendant Bergeron herself demonstrated consciousness of the importance of looking in each cell while doing rounds where she testified, "I always aim to look into every cell." Exhibit M, Kathleen Duchesne deposition at p. 6.[2]  The defendant Bergeron described what she is supposed to do during a round as follows: "I look throughout the unit.  I look for sanitation.  I look to make sure the inmates appear safe.  I—I just look for the safety of all the unit—the unit and for the safety of the inmates when I'm doing a round."  <u>Id.</u> at pp. 5-6.  Ensuring inmate health is a primary purpose for looking into each cell, as the defendant Bergeron acknowledged in her deposition.  <u>Id.</u> at p. 6 ("I'm looking to make sure that the inmates are well….").  The defendant Bergeron further acknowledged the importance of looking into each cell to verify that inmates are not cell-hopping and that inmates are in cells where they belong.

Q.      …So do you when you're doing rounds ever look to see that the right inmates are in the right cell?

A.      That is what I—that is what I do, yes.

<u>Id.</u> at p. 7.

**<u>A Jury Could Find That The Defendant Bergeron Breached Her Duty To Look In Cells Including Cell 9 During The 3:40 P.M. Round, Culpably Ignoring A Substantial Risk Of Serious Harm To Inmates Such As Mr. Leite And Resulting In The Severely Injured Jonathan Leite Remaining Undetected By Correctional Officers, Leading To An Additional 90-Minute Delay In Getting Mr. Leite Emergency Medical Care.</u>**

Despite the defendant Bergeron's knowledge that she should look into each cell during rounds, the evidence supports that she habitually did not do so and did not do so when she

---

[2] The defendant Bergeron is now known as Kathleen Duchesne.

conducted a round of "F Block" beginning at 15:40:18 on August 24, 2012.

Before August 24, 2012, Mr. Leite personally observed the defendant Bergeron doing rounds. Exhibit N, Jonathan Leite deposition excerpt (September 26, 2017) at p. 282. Mr. Leite testified that it was the defendant Bergeron's "normal practice" to do rounds without looking into cells. Id. at p. 283. Mr. Leite described the defendant Bergeron's approach to doing rounds as "the quicker you can get off the block, the better…." Id. at pp. 282-83.

Construing the facts in the light most favorable to Mr. Leite, and drawing all reasonable inferences from such facts in Mr. Leite's favor, a jury could reasonably find that the defendant Bergeron failed to look into Cell 9 when she did her round of the lower tier of F Block beginning at 15:40:18 on August 24, 2012. The defendants Dube and Bergeron entered "F Block" to do rounds at 15:40:18 on August 24, 2012. Exhibit O, Affidavit of Megan E. Douglass, Esquire. "F Block" has two (2) levels with half the cells on one level and the other cells on a mezzanine. Exhibit B at p. 69. The dimensions of the lower tier of "F Block" on August 24, 2012, were 80'11" X 29'11". Exhibit A at #2. The defendant Dube did rounds on the upper tier of "F Block" for the round beginning at 15:40:18, while the defendant Bergeron did rounds on the lower tier, where Cell 9 is (the cell in which Jonathan Leite lay disoriented with a severe head injury at the time). Exhibit M at p. 13.

Video of the round shows that the defendant Bergeron was on the lower tier of "F Block" for a mere 47 seconds. Exhibit O. The defendant Bergeron blitzed through her round even though no other exigencies occurred at NCF that day that would have warranted her racing through her round to attend to them. On the shift log for these rounds, correctional officers indicated that all was clear. Ex. F at p. 35 ("10-79 is the code of all clear."). The Chief of Security at NCF at the time, Scott Lambertson, further testified that he knew of no reason why

the defendant Bergeron would have had to race through her round on August 24, 2012.

> Q.    You're not aware of any situation, emergency or non-emergency, on 8/24/12 which would have caused Kathy Bergeron and Trevor Dube to rush through rounds that day?

> A.    I'm not aware of anything like that, no.

Exhibit K at p. 59.

The defendant Bergeron entered the block at 15:40:18 and walked off camera at 15:41:05 (47 seconds). Exhibit O. When the defendant Bergeron walked off camera, she exited "F Block" via the back door, as she testified at her deposition.

> Q.    So on the video from Camera Angle 29, we observed you walking up the row of cells on the wall to the right of the door where you enter F Block. Where would you have gone after you walked up that row of cells?

> A.    I would imagine that I went through the back door.

Exhibit M at p. 27.

During the defendant Bergeron's 47-second round of "F Block," the defendant Bergeron traveled over 110 feet, walking approximately 29'11" from the entrance to "F Block" right to the wall along which there is a line of cells, then walking the 80'11" distance of the wall past the cells to an exit from "F Block." Exhibit A at #2 (stating that the dimensions of the lower tier of "F Block" on August 24, 2012, were 80'11'' X 29'11"). The defendant Bergeron therefore traveled an average of approximately 2.34 feet per second during the round (110 feet/ 47 seconds = 2.34 feet/second). At this rate the defendant Bergeron spent just a hair over a second in front of Cell 9. Each cell door is 2.5 feet wide. Id. at #5. The defendant Bergeron therefore passed by Cell 9 in approximately 1.07 seconds, the time it would take for her to travel 2.5 feet while walking at a rate of 2.34 feet per second. This is consistent with the video footage of the round showing the defendant Bergeron striding briskly past 7-9 cells in 36 seconds, walking past the

cells—and the wall space between the cells—in this 36-second time period.

> Q.      …we did establish that over a 36-second span, you walked past 7-9 cells; is that right?
>
> A.      That's what it appears from what I see there.

Exhibit M at p. 17.

A jury could reasonably infer that the defendant Bergeron did not even bother looking in Cell 9 when she conducted the 3:40 p.m. round. It cannot be determined from the video evidence produced by the defendants whether or not the defendant Bergeron looked in the cells during the 3:40 p.m. round. As Chief of Security Lambertson testified following his review of video footage of the defendant Bergeron's round: "There's no way of telling if the officer looked into that cell or not, any of those cells. The mezzanine is blocking her head half the way. I can't see what she's looking at or doing." Exhibit K at p. 76.

A jury could reasonably infer, however, that the defendant Bergeron failed to look in the cells (including cell 9) first from the speed with which the defendant Bergeron conducted the round. Given that the defendant Bergeron spent only about 1.07 seconds in front of Cell 9, she hardly took sufficient time to look inside the cell, determine if anyone was there who did not belong, and assess the health and welfare of the inmates in the cell.

A jury could further infer that the defendant Bergeron did not bother looking in Cell 9 during the 3:40 p.m. round because if she had done so she would have detected Mr. Leite—who did not belong in Cell 9—within. The defendant Bergeron knew Mr. Leite well, as she admitted in her deposition.

> Q.      …Were you familiar with Jonathan Leite as of August 24, 2012?
>
> A.      I did know Inmate Leite just because I used to work in visits a lot. Because I worked in visits, I would see him in there.

Exhibit M at p. 29. In fact, Mr. Leite had long been familiar to the defendant Bergeron because he met her during his first incarceration at NCF. Exhibit N at p. 282. Mr. Leite saw the defendant Bergeron "regularly" during his first incarceration at NCF. Id.

Moreover, a jury could infer that the defendant Bergeron would have detected Mr. Leite during the 3:40 p.m. round if she really had bothered to look within Cell 9 because she knew that Mr. Leite did not belong in Cell 9. As stated above, from June 1, 2012, through the date of the assault, the occupants of Cell 9 remained unchanged; they were Johnathan Gelinas and Ryan Elliott. Exhibit A at #3. From July 16, 2012, through the date of the assault, Mr. Leite was assigned to the same dayroom bunk, Dayroom Bunk 1T. Id. at #4. The defendant Bergeron had performed count on "F Block" twice only four (4) days prior to August 24, 2012. The defendant Bergeron performed count on "F Block" on August 20, 2012, at 5:00 p.m. and again at 8:30 p.m. Exhibit P, Count Sheets Completed By The Defendant Bergeron on August 20, 2012. When a correctional officer performs an inmate count, the officer has a count sheet. Exhibit M at p. 38. The count sheet identifies the inmates residing on the block together with each inmate's cell or bunk assignment. Id. at pp. 35-36. So, as recently as four (4) days before the assault, the defendant Bergeron had verified on two (2) separate occasions that Mr. Leite was at his dayroom bunk to which he was assigned, and that Johnathan Gelinas and Ryan Elliott were in Cell 9 where they were assigned. A jury can infer from this fact that the defendant knew where Mr. Leite belonged and where he did not belong.

A jury could therefore reasonably infer that the defendant Bergeron failed to look into Cell 9 during the 3:40 p.m. round because if she had done so she would have discovered Mr. Leite in Cell 9, determined that he was cell-hopping, and made further inquiry which would have led her to discover that Mr. Leite was severely injured and in need of emergency medical

attention. Such an inference would find support in reasonable factual findings that the defendant Bergeron knew Mr. Leite well and knew that he did not belong in Cell 9 from the fact that she had done count on "F Block <u>twice</u> only four (4) days earlier. Moreover, if the defendant Bergeron had spoken to Mr. Leite when she passed him in Cell 9 she would have immediately discovered that he was in need of emergency medical attention because he was "dizzy" and "disoriented" and "wasn't aware of his surroundings very much," as Inmate Gelinas testified.

Mr. Leite did not emerge from Cell 9 until 4:20 p.m. Based on the defendant Smith's review of the video monitoring of "F Block," Mr. Leite remained within Cell 9 from 2:39 p.m. when he entered the cell and 4:20 p.m. Exhibit B at pp. 62-63. As soon as Mr. Leite emerged from Cell 9, his legs immediately gave out and he fell to the ground, as the video evidence demonstrates. Exhibit F at p. 52. Mr. Leite then moved to his hands and knees to stabilize himself before attempting to stand. <u>Id.</u> at Ex. 2 at 000778. At this point, as Internal Affairs Investigator Coulombe describes the video evidence, Inmate Gelinas emerged from Cell #9, pulled Mr. Leite to his feet, and walked Mr. Leite to his bunk in the dayroom. <u>Id.</u> Mr. Leite "then [began] to climb up onto the top bunk as [Inmate Gelinas] remain(ed) near him to ensure he ma(de) it onto the bunk," as the video evidence depicts. <u>Id.</u> at Ex. 2 at 000778-000779.

For knowledge of the events occurring on "F Block" between approximately 4:25 p.m. and 5:08 p.m., the trier of fact will have only the defendants' deposition testimony because the defendant Smith failed to preserve the video evidence of this time period. The defendant Smith was the individual who selected the video footage of "F Block" activity on August 24, 2012, to download and thereby preserve.

> Q.      You were the person who made the decision as to which video footage of the occurrences on F block on August 24, 2012, to preserve, right?
>
> A.      Right. ….

Exhibit Q, Jeffrey Smith deposition dated 12/4/17 at p. 40. The defendant Smith elected not to download or preserve video depicting activities in "F Block" between approximately 4:25 p.m. and 5:08 p.m. (when Mr. Leite was found during count).

> Q. …And do you know what may have happened to the video that was recorded of F block between 4:25 p.m. and 5:08 p.m.?
>
> ***
>
> A. I didn't download that portion. ….

Exhibit B at p. 33. At the time, video of activities occurring at NCF not downloaded within approximately 14 days gets overwritten and lost. Id. at p. 35.

The defendant Smith's job the night of the incident was to review the video evidence, starting at the time correctional officers discovered that Mr. Leite had a medical emergency (5:08 p.m.) and going backwards. Id. at p. 22. In reviewing this video evidence that is now lost, the defendant Smith observed Mr. Leite lying "motionless on his top bunk" and at one point leaning over his bunk "and vomit(ing) onto the floor." Id. at pp. 31 and 32 and Ex. 2 at 000020 ("Going back from the time he was discovered during count, I saw a time where [Mr. Leite] leaned over and vomited onto the floor. Other than that, [Mr. Leite] was laying motionless on his top bunk.").

The defendant Esobe was stationed in CP-5 from 3:00 p.m. until 11:00 p.m. on August 24, 2012, with the same responsibilities that the defendant McLain owed from 7:00 a.m. to 3:00 p.m., including the responsibility to perform video monitoring of the residential blocks "E Block," "F Block," "G Block," and "H Block." Exhibit F at pp. 36-37 and Ex. 3. Mr. Leite was lying motionless in his bunk during this time period, bleeding and vomiting, for approximately 47 minutes, from 4:21 p.m. until 5:08 p.m., when the defendant Bergeron called him to stand for

count and Sergeant Sweatt observed Mr. Leite with blood coming out the right side of his mouth and running down his face, as described below. Because the defendant Smith failed to download video from 4:25 p.m. through 5:08 p.m., the jury will not be able to see what the defendant Esobe was seeing on his monitor in CP-5. Yet, the jury can infer that, for over 40 minutes, the motionless and bleeding Mr. Leite was visible on the video screen depicting "F Block" that the defendant Esobe was tasked with watching, yet the defendant Esobe took no action to get Mr. Leite help. Exhibit R, Ejike Esobe's Answers to Interrogatories at #7 (stating that he was not involved in discovering Mr. Leite or getting him medical treatment after the assault).

While Mr. Leite lay bleeding in his bunk, the defendants Bergeron and Dube performed another round of "F Block" at approximately 4:50 p.m. and again failed to discover the severely injured Mr. Leite. *See* Exhibit Q at p. 28. Because the defendant Smith failed to preserve video of the activities on "F Block" during this time period, no video exists of this round having happened, as the defendant Smith has conceded in deposition.

> Q.     …just for purposes of clarification, you decided not to download footage depicting the 4:50 p.m. round, right?
>
> A.     Correct.

Id. at pp. 49-50.

The defendant Bergeron testified, however, that approximately one (1) week after the assault on Jonathan Leite she viewed video of herself performing the 4:50 p.m. round. Exhibit M at p. 31. The defendant Bergeron described the video she saw as follows.

> Q.     So what do you recall…the video of doing rounds at 4:50 depicted?
>
> ***
>
> A.     All that I remember, and like I said this was five years ago, I don't know who the inmates were, but prior to me doing a round, two inmates came out of a cell with inmate Leite and like helped him get on top of his bunk, and then I came

in and do a round and walked by that dayroom bunk. Again everything appeared fine when I walked in, you know.

Id. at pp. 32-33.

Of course, everything was not fine. At or about the time the defendant Bergeron walked past Mr. Leite's bunk, Mr. Leite was lying in his bunk in vomit and blood[3], and he had vomited on the floor, as the defendant Smith saw in the video. Once again the defendant Bergeron was derelict in her performance of the round, and this time the defendant Dube was as well. The defendant Bergeron would have discovered the severely injured Mr. Leite, and would presumably have acted to get him the emergency medical care he urgently needed, if she had only checked his bunk rather than just walking past it. Yet, the defendant Bergeron failed to check Mr. Leite's bunk during the 4:50 p.m. round, resulting in further delay in getting him the emergency medical care he desperately needed.

The defendant Dube was also derelict in the 4:50 p.m. round by failing to detect the severely injured Mr. Leite. Given the defendant Bergeron's testimony that she performed rounds on the lower tier of "F Block" during the 4:50 p.m. round, a jury will infer that the defendant Dube performed rounds on the upper tier. Sergeant Sweatt performed count on the upper tier approximately eighteen (18) minutes later, and as he descended the stairs from the upper tier to the lower tier, Mr. Leite was clearly visible to Sergeant Sweatt, lying on his bunk on his back, with blood coming out the right side of his mouth and running down his face. Exhibit I at p. 12 and Ex. 1 at 000018. Given that Sergeant Sweatt readily saw the injured Mr. Leite and promptly went to him to make inquiry, a jury could reasonably infer that the defendant Dube also saw the

---

[3] A jury may reasonably infer that there would have been blood on Mr. Leite's bunk during the 4:50 p.m. round given that Sergeant Sweatt observed Mr. Leite at 5:08 p.m. laying on his back with blood coming out of the right side of his mouth and running down his face. Exhibit I at pp. 11-12. A jury may further reasonably infer that there was vomit on the bed during the 4:50 p.m. round because the defendant Smith observed Mr. Leite vomit over the side of his bunk during this time period (Exhibit B at Ex. 2 at 000020), and correctional officers observed both blood and vomit on Mr. Leite's bunk after the medical emergency was declared. Exhibit M at pp. 10-11.

bleeding Mr. Leite as he descended the same stairs after doing the 4:50 p.m. count of the upper tier of "F Block" but did nothing.

At approximately 5:08 p.m., Sergeant Duane Sweatt and the defendant Bergeron were performing count on "F Block." Exhibit I at pp. 6-7 and Ex. 1. Sergeant Sweatt finished the top tier count and started to walk down the stairs to the lower tier. Id. at Ex. 1 at 000018. As he did so, he heard the defendant Bergeron say, "Are you going to get up for count?" Sergeant Sweatt looked over and observed Mr. Leite lying on his bunk with "blood or [what] appeared to be blood coming out the right side of his mouth and running down his face." Id. at p. 12 and Ex. 1 at 000018. Sergeant Sweatt explained his observation of the blood at his deposition as follows:

> Q.    …Was blood seeping out of the right side of the mouth? Is that—or was it dried blood, or was blood coming out of his mouth?
>
> A.    **It looked like it was just running out down across his face** (indicating), **because he was laying on his back**.

Id. at pp. 11-12 (emphasis supplied.

Importantly, Sergeant Sweatt could see Mr. Leite clearly from the top mezzanine. Id. at p. 10 ("Well, I could see him right from the top mezzanine. I can look right down at him.") Sergeant Sweatt finished descending the stairs and went to Mr. Leite, where he observed that "it was blood that was on [Mr. Leite's] face and his skin was very pale." Id. Sergeant Sweatt promptly observed that Mr. Leite "just wasn't coherent." Id. at p. 9. Mr. Leite told Sergeant Sweatt that he had lost consciousness, leading Sergeant Sweatt to declare a medical emergency at 5:11 p.m. Id. at 10-11 and Exhibit S (Responder Report). Berlin EMS arrived at NCF at 5:21 p.m. and left NCF premises to transport Mr. Leite to Androscoggin Valley Hospital at 5:46 p.m. by which time three (3) hours had elapsed since the assault. Exhibit S. After Sergeant Sweatt called the medical emergency, correctional officers looked at Mr. Leite's bunk and saw vomit

and blood.  Exhibit M at pp. 10-11.

A two-and-a-half hour delay occurred between the time Mr. Leite suffered the assault and the time correctional officers finally got him medical care.  A jury can reasonably infer that the assault on Mr. Leite began at 2:41 p.m., given the suspicious activity in the vicinity of Cell 9 beginning at that time.  Sergeant Sweatt did not call the medical emergency until 5:11 p.m., shortly after which nursing staff applied oxygen to Mr. Leite.  Exhibit T, Nursing Intervention Report.  When nursing staff began treating Mr. Leite, "[h]is blood pressure was low (100/60) and his oxygen saturation was 73% (normal greater than 90%)."  Exhibit U, Albert M. Drukteinis Supplemental Expert Report dated September 26, 2017 at p. 1.  Mr. Leite "was hypoxic (oxygen deprived) and this was further evidenced by his feet being ashen and cold."  Id.

Based in part on these findings, the plaintiff's expert Dr. Drukteinis will testify that in his opinion "the delay in early emergency intervention and management of Mr. Leite with prompt identification of the TBI, together with the delay in oxygen administration, and maintenance of blood pressure as well as fluids and electrolytes, resulted in a lost opportunity for mitigating the extent of [Mr. Leite's] damage from TBI."  Id. at p. 2.

The plaintiff learned for the first time at the September 15, 2017, deposition of former Chief of Security Lambertson that NCF is supposed to conduct a "serious incident review" after an incident such as the assault on Mr. Leite.  Exhibit K at p. 36.  The New Hampshire Department of Corrections has adopted a Policy and Procedure Directive titled Quality Assurance Serious Incident Review mandating a Serious Incident Review "to inquire into the facts and circumstances of any serious incident" such as the serious injury that Mr. Leite suffered while in the custody of the Department of Corrections.  Exhibit Q at Ex. 2.  Despite the mandate, the Department of Corrections performed no Serious Incident Review regarding the assault on

Mr. Leite.  Id. at p. 38.

**Argument**

**Standard of Review**

Summary judgment is only appropriate where "the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56 (a).  "Importantly, in deciding summary judgment, the court 'views all facts and draws all reasonable inferences in the light most favorable to the non-moving' party."  Taylor v. eCoast Sales Solutions, Ltd., 2014 DNH 164, 3.

**Claims for Deliberate Indifference to Serious Medical Needs Against Defendants Bergeron, Dube and Esobe.**

"The Eighth Amendment prohibits 'cruel and unusual punishments,' and 'it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'"  Giroux v. Somerset County, 178 F.3d 28, 31 (1st Cir. 1999) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)).  "Prison officials have a duty to 'provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must take reasonable measures to guarantee the safety of the inmates.'"  Giroux, 178 F.3d at 31.  "That duty has its origin in the forced dependency of inmates: 'Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.'"  Id. (quoting Farmer, 511 U.S. at 833).

The Eighth Amendment therefore proscribes "deliberate indifference to [the] serious medical needs of prisoners [as] constitut(ing)…unnecessary and wanton infliction of pain…."

Estelle v. Gamble, 429 U.S. 97, 104 (1976). "To succeed on a claim of deliberate indifference based on inadequate **or delayed** medical care," a plaintiff must also satisfy a 2-part test. Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015) (emphasis supplied).

First, the plaintiff must prove a "serious medical need." Id. "[A] serious medical need is 'one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. at 78-79.

Second, "a plaintiff must show that prison officials possessed a sufficiently culpable state of mind, namely one of deliberate indifference to an inmate's health or safety." Id. "A deliberate intent to harm is not required," however, because deliberate indifference can be established by a showing of "wanton disregard sufficiently evidenced by denial, **delay**, or interference with prescribed health care." Lopes v. Riendeau, 177 F.Supp.3d 634, 658 (D.Mass. 2016) (emphasis supplied); *accord* Reaves v. Dep't of Correction, 195 F.Supp.3d 383, 416 (D.Mass. 2016) ("Subjective intent is often inferred from behavior, and a deliberate intent to harm is not required.").

The United States Supreme Court explicated the deliberate indifference standard in Farmer v. Brennan. Deliberate indifference lies "between the poles of negligence at one end and purpose or knowledge at the other." Farmer, 511 U.S. at 835. "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842; *accord* Calderon-Ortiz v.LaBoy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002) ("under the second requirement of Farmer, plaintiffs must show (1) the defendant knew of (2) a substantial risk (3) of serious harm and (4) disregarded that risk".).

**"Whether a prison official had the requisite knowledge of a substantial risk is a**

question of **fact** subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (emphasis supplied). "For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, **or** expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." Id. at 842-43 (quotations omitted) (emphasis supplied).

The obligation for prison officials to avoid deliberate indifference to the serious medical needs of prisoners requires the prison officials to respond "reasonably to the risk." Lopes, 177 F.Supp.3d at 658.

### Genuine Issues of Material Fact Exist As To Whether The Defendants Bergeron, Dube and Esobe Were Deliberately Indifferent To Mr. Leite's Serious Medical Needs, Requiring Denial of Their Motions For Summary Judgment.

### Kathy Bergeron

The defendant Bergeron should face trial on Mr. Leite's claim against her of deliberate indifference based on delayed medical care.

The record contains ample evidence for a jury to find that the defendant Bergeron was subjectively aware of a substantial risk that inmates faced within their cells of serious harm requiring medical care or even mortal injury requiring medical care. The defendant Bergeron's deposition testimony reflected this subjective awareness where she testified that she looks in cells "to make sure that the inmates are well," (Ex. M at p. 6), "to make sure no one's hanging up" (Ex. M at pp. 17-18), "to make sure no one's on the floor," (Ex. M at p. 18), and "to make

sure that [the inmates] are breathing" (Ex. M at p. 19). A jury can infer the defendant Bergeron's subjective awareness of the risk of serious harm to inmates in cells not only from her own deposition testimony but from the fact that the risk was known and obvious to correctional officers, as demonstrated by the fact that each defendant correctional officer deposed in this case (as well as Chief of Security Lamberton) testified that correctional officers must look in each cell during rounds, together with the fact that NCF was "a dangerous place" where inmate-on-inmate assaults were commonplace (Ex. G at pp. 28-29, Ex. K at p. 20), and inmates were known to fight inside cells (Ex. G at p. 29, Ex. B at p. 80, Ex. E at p. 43).

A jury can find that the defendant Bergeron acted with wanton disregard to Mr. Leite's serious medical needs because she did not even bother to look inside Cell 9 during her 3:40 p.m. round —despite her own acknowledgment and the acknowledgment of all the defendant correctional officers deposed in this case that correctional officers must look inside every cell during rounds to ensure inmate health and safety. The inference that the defendant Bergeron did not bother to look inside Cell 9 is warranted by the speed of her round, at 47 seconds a fraction of the 3 minutes that Shift Commander Smith testified a round should take at a minimum, giving her barely a second in front of Cell 9 where Mr. Leite lay severely injured.

Dobson v. Magnusson, 923 F.2d 229 (1st Cir. 1990) in no way excuses the defendant Bergeron's "now you see me, now you don't" round. In Dobson, a correctional officer was distracted from doing check-ups because of two (2) other disturbances in the prison. Id. at 231. On the contrary, in this case, no other exigencies occurred in the prison that warranted either the defendant Bergeron or the defendant Dube racing through rounds, as Chief of Security Lambertson conceded.

> Q.     You're not aware of any situation, emergency or non-emergency, on
> 8/24/12 which would have caused Kathy Bergeron and Trevor Dube to rush

28

through rounds that day?

A.    I'm not aware of anything like that, no.

Ex. K at p. 59.

The inference that the defendant Bergeron did not bother to look in Cell 9 during her 3:40 p.m. round is further buttressed by Mr. Leite's testimony that he had observed her doing rounds and that it was the defendant Bergeron's "normal practice" not to bother looking in cells during her rounds.

A jury may also reasonably infer that the defendant Bergeron did not look in Cell 9 because she certainly would have detected the injured Mr. Leite if she had bothered to look in the cell, given that she knew him well and also knew from having performed count <u>twice</u> only four (4) days earlier that he lived in a dayroom bunk, not in Cell 9.

Furthermore, a jury may reasonably infer that the defendant Bergeron failed to look inside the cell to determine if Mr. Leite were safe because if she had done so and spoken to him, she would have immediately known that something was wrong, given Inmate Gelinas' testimony that Mr. Leite was "dizzy" and "disoriented" and "wasn't aware of his surroundings very much," and given Sergeant Sweatt's testimony that Mr. Leite "just wasn't coherent."

The record therefore contains ample evidence to support that the defendant Bergeron acted with wanton disregard to the serious medical needs of prisoners, and specifically here to the serious medical needs of Mr. Leite, where the facts and the inferences drawn from those facts favorable to Mr. Leite support that (1) the defendant Bergeron was subjectively aware of a substantial risk that inmates would suffer serious injuries requiring medical attention in their cells; (2) the defendant Bergeron admitted that she needed to look in the cells during rounds to make sure that inmates were well; (3) the defendant Bergeron's "normal practice"

notwithstanding her knowledge of the substantial risk of serious injury inmates faced in cells was not to look in the cells during her rounds; (4) the defendant Bergeron did not bother to look in Cell 9 or check on Mr. Leite's safety during her 3:40 p.m. round; and (5) the defendant Bergeron's failure to check in Cell 9 during her round, and her corresponding deliberate indifference to the serious health needs of any occupant within the cell such as Mr. Leite, led to an additional 90-minute delay in Mr. Leite getting the emergency medical treatment and oxygen that he desperately needed. The Court should therefore deny the defendant Bergeron summary judgment.

The Court should also deny the defendant Bergeron summary judgment on Mr. Leite's claim that she was deliberately indifferent do his serious medical needs based on her conduct during the 4:50 p.m. round. A jury may reasonably infer that Mr. Leite lay in his bunk with blood coming out of his mouth and running down his face when the defendant Bergeron performed the round. A jury may further reasonably infer that there was vomit around Mr. Leite, given the defendant Bergeron's admission that vomit as well as blood were found in Mr. Leite's bunk after Sergeant Sweatt called the medical emergency, and given the defendant Smith's testimony that he observed Mr. Leite vomiting onto the floor as he lay in his bunk. Despite the blood and vomit around Mr. Leite placing any person on notice that he had a serious medical need, the defendant Bergeron just walked past his bunk during the 4:50 p.m. round, resulting in further delay in getting Mr. Leite emergency medical attention and further oxygen deprivation to his brain. A jury can conclude from these facts and the reasonable inferences therefrom that the defendant Bergeron was deliberately indifferent to Mr. Leite's serious medical needs both during the 3:40 p.m. round and the 4:50 p.m. round.

### **Trevor Dube**

The defendant Dube should also face trial on Mr. Leite's claim against him for deliberate indifference based on delayed medical care. Construing the facts in the light most favorable to Mr. Leite, and drawing all reasonable inferences from those facts in Mr. Leite's favor, the defendant Dube would have seen Mr. Leite lying in his dayroom bunk with blood coming out the side of his mouth and running down his face when the defendant Dube descended the stairs from the upper tier of "F Block" to the lower tier while performing the 4:50 p.m. round. This is so because, when Sergeant Sweatt descended the same stairs approximately eighteen (18) minutes later Sergeant Sweatt testified that he could see Mr. Leite "right from the top mezzanine [and] could look right down at him." Sergeant Sweatt saw blood coming out of Mr. Leite's mouth as the Sergeant looked down at Mr. Leite while descending the stairs from the top mezzanine. Given that Mr. Leite remained motionless on his bunk between approximately 4:21 p.m. and 5:08 p.m. according to the defendant Smith's review of the video of that time period that the defendant Smith failed to preserve, a jury can reasonably infer that the defendant Dube saw the same sight when he descended the stairs at 4:50 p.m. as Sergeant Sweatt did when he descended the stairs at 5:08 p.m.—Mr. Leite lying motionless on his bunk with blood coming out of his mouth and running down his face. Despite the fact that the a jury may reasonably infer that the defendant Dube saw Mr. Leite obviously in serious medical need, the defendant Dube failed to do anything to procure Mr. Leite medical attention. Instead, the defendants Dube and Bergeron wrote "10-79" on their notes for the 4:50 p.m. round, indicating that all was clear. Ex. F at Ex. 3. From these facts and the reasonable inferences therefrom, a jury could find the defendant Dube deliberately indifferent to Mr. Leite's serious medical needs, such that the Court should deny the defendant Dube summary judgment.

**Ejike Esobe**

The defendant Esobe likewise faces triable issues of fact on whether he was deliberately indifferent to Mr. Leite's serious medical needs. As distinguished from the <u>Tuttle v. Christie</u> case relied on by the defendants, there is no allegation or evidence in this case that the defendant Esobe was not paying attention to the video monitoring when he sat in CP-5 between 4:20 p.m. and 5:08 p.m. on August 24, 2012. On the contrary, construing the facts in the light most favorable to Mr. Leite and drawing all reasonable inferences in his favor, the Court should presume that the defendant Esobe was watching the video monitoring diligently. The video monitoring during this period displayed abundant suspicious activity. Of course, there is the footage of Mr. Leite stumbling and collapsing after he exits Cell 9, then being "helped" to his bunk by inmates. But, beyond this footage, the defendant Smith has testified that there was approximately 43 minutes of footage of Mr. Leite lying motionless in his bunk and vomiting over the side of his bunk at one point, namely the footage occurring between 4:25 p.m. and 5:08 p.m. that was not preserved. The sight of an inmate lying utterly motionless would place a layperson on notice of a potential serious medical need, as would the sight of an inmate vomiting over the side of the bed.[4] Yet, the defendant Esobe did nothing to procure Mr. Leite medical attention. These facts would entitle a jury to find the defendant Esobe liable for deliberate indifference to a serious medical need, warranting denial of summary judgment.

### <u>Claims For Failure To Protect From Assault And Deliberate Indifference To Serious Medical Needs Against Defendant McLain.</u>

The Eighth Amendment also imposes a constitutional duty on prison officials "to guarantee inmates' safety from attacks by other inmates." <u>Calderon-Ortiz v. LaBoy-Alvarado</u>, 300 F.3d 60, 64 (1st Cir. 2002).

---

[4] We cannot know how long Mr. Leite leaned over his bunk vomiting because the defendant Smith did not preserve this video.

Courts analyze whether prison officials have violated this duty under a 2-part test. The plaintiff must first show that the deprivation suffered by him as a prisoner was "objectively, sufficiently serious." Calderon-Ortiz v. LaBoy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002). As was true in Calderon-Ortiz where the plaintiff alleged that he suffered sodomizing, Mr. Leite's satisfaction of this prong is patent and not in dispute. It is beyond dispute that Mr. Leite suffered a sufficiently serious deprivation where the defendant correctional officers' failure to protect him from assault, and failure to get him timely medical care, resulted in him suffering injuries including a traumatic brain injury requiring over three (3) weeks of in-patient hospitalization and leading to total disability within the meaning of the Social Security Act.

The second prong of the test requires the plaintiff show that the defendant correctional officers acted with deliberate indifference to inmate health or safety, meaning that the defendant correctional officer knew of a substantial risk of serious harm and disregarded that risk. Id.

Triable issues of fact exist on whether the defendant McLain knew of a substantial risk of serious harm and disregarded that risk, failing as a consequence to prevent or interrupt the assault on Mr. Leite, and failing as a consequence to procure him timely medical aid. The defendant was stationed in CP-5 between 2:39 p.m. and 2:57 p.m. with the responsibility to watch the video monitoring of the residential blocks, and again, as distinguished from the Tuttle case relied on by the defendants, there is no allegation or evidence that the defendant McLain was not watching the video. For summary judgment purposes, the Court should presume that she was diligently watching the video, toggling through the respective residential blocks as her job duties required.

The defendant McLain testified to her subjective awareness that inmate-on-inmate violence typically happens in the cells.

As the defendant McLain conceded in her deposition testimony, video of F Block as the

assault was occurring and in the immediate aftermath of it depicts sixteen (16) minutes of suspicious activity warranting a correctional officer response, including inmates clustering around Cell 9, several inmates entering and exiting Cell 9, and confusion in the vicinity of Cell 9. This is not suspicious activity that could blamelessly be ignored because it occurred in the blink of an eye. This is suspicious activity that occurred over a 16-minute period. Taking the facts in the light most favorable to Mr. Leite and drawing all reasonable inferences from them in his favor, the defendant McLain saw the suspicious activity when she was performing video monitoring on August 24, 2012, given her testimony that she would continually "toggle through" the four (4) residential blocks and watch at least two (2) minutes of footage at a time and sometimes five (5) minutes if she saw suspicious activity. Yet, the defendant McLain failed to take any action to send correctional officers to Mr. Leite's aid, effectively turning a blind eye to all the suspicious activity that unfolded before her. A jury could therefore find that the defendant McLain was both deliberately indifferent in failing to prevent or interrupt the assault and deliberately indifferent in failing to take action that would have led to Mr. Leite getting timely medical care. The Court should deny summary judgment with respect to the claims against the defendant McLain.

### Qualified Immunity Does Not Apply.

Qualified immunity only applies if the constitutional right at issue were not clearly established at the time of the violations complained of. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). The constitutional obligation not to be deliberately indifferent to an inmate's serious medical needs, and the constitutional obligation of prison officials to take reasonable measures to protect inmates from inmate-on-inmate assaults causing serious harm, were well-established in August of 2012. Qualified immunity therefore does not apply.

**Conclusion**

For the foregoing reasons, the Court should deny summary judgment as to the defendants Bergeron, Dube, Esobe and McLain. Based on the extensive pretrial discovery done, the plaintiff does not contest the entry of summary judgment against the other defendants.

<div style="margin-left: 40%">

Respectfully submitted,
JONATHAN LEITE
By his attorneys,
DOUGLAS, LEONARD & GARVEY, P.C.

</div>

Date: December 18, 2017          By:     /s/ Benjamin T. King
                                         Benjamin T. King, NH Bar #12888
                                         14 South Street, Suite 5
                                         Concord, NH 03301
                                         (603) 224-1988
                                         benjamin@nhlawoffice.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this date the foregoing was filed electronically via the CM/ECF system and will be sent electronically to the registered participants and via first class mail to the non-registered participants as identified on the Notice of Electronic Filing.

<div style="margin-left: 40%">

/s/Benjamin T. King
Benjamin T. King

</div>