Volume: 1
Pages: 1-85
Exhibits: 1-5

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Case No. 15-CV-00280-PB

- - - - - - - - - - - - - - - - - - - - - x

JONATHAN LEITE,

        Plaintiff,

    v.

MATTHEW GOULET, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF JEFFREY SMITH

August 30, 2017

10:32 a.m. to 12:33 p.m.

NORTHERN NH CORRECTIONAL FACILITY

138 East Milan Road

Berlin, New Hampshire

Reporter: Celeste A. Quimby, LCR No. 17

Page 2

```
 1            I N D E X
 2
 3   WITNESS:     Jeffrey Smith
 4
 5   EXAMINATION:                          Page
 6             By Mr. King                   4
 7             By Ms. Cusack                75
 8             By Mr. King                  79
 9
10
11   EXHIBITS FOR IDENTIFICATION:
12   Smith        Description            Page
13   Exhibit 1    Jeffrey Smith Answers to
14                Interrogatories          12
     Exhibit 2    Incident Report          19
15
16   Exhibit 3    Coulombe Investigation Report  42
17   Exhibit 4    Shift Log 8/24/12        44
18   Exhibit 5    8/24/12 Safety and Sanitation
                  Inspection Report        63
19
20
21   (Exhibits scanned/e-mailed to counsel; originals
22   returned to Mr. King.)
23
```

Page 3

```
 1   A P P E A R A N C E S
 2   For the Plaintiff:
 3       DOUGLAS, LEONARD & GARVEY, P.C.
         By: Benjamin T. King, Esq.
 4       14 South Street, Suite 5
         Concord, NH  03301
 5       (603) 224-1988
         benjamin@nhlawoffice.com
 6       mdouglass@nhlawoffice.com
 7   For the Defendant:
 8       NEW HAMPSHIRE DEPARTMENT OF JUSTICE
         OFFICE OF THE ATTORNEY GENERAL
 9       By: Lynmarie C. Cusack, Esq.
             Francis K. Fredericks Jr., Esq.
10       33 Capitol Street
         Concord, NH  03301
11       (603) 271-3658
         lynmarie.cusack@doj.nh.gov
12       francis.fredericksjr@doj.nh.gov
13   Also Present:
14       Jonathan Leite
15
16            STIPULATIONS
17       It is agreed that the deposition shall be
     taken in the first instance in stenotype and when
18   transcribed may be used for all purposes for which
     depositions are competent under the Federal Rules
19   of Civil Procedure.
20       Notice, filing, caption, and all other
     formalities are waived.  All objections except as
21   to form are reserved until the time of trial.
22       It is further agreed that if the deposition
     is not signed within thirty (30) days after
23   submission to counsel, the signature of the
     deponent is waived.
```

Page 4

```
 1   JEFFREY SMITH
 2   having been duly sworn by the reporter,
 3   was deposed and testified as follows:
 4       EXAMINATION
 5   BY MR. KING:
 6   Q.  Please state your name for the record.
 7   A.  Jeffrey Smith.
 8   Q.  Who is your employer?
 9   A.  The State of New Hampshire.
10   Q.  Where are you employed?
11   A.  At the Northern Correctional Facility
12   here in Berlin, New Hampshire.
13   Q.  And how long have you been employed at
14   the Northern New Hampshire Correctional Facility?
15   A.  Since 2002.
16   Q.  What is your current position title?
17   A.  My current title is chief of security.
18   Q.  Was that a title that Scott Lambertson
19   held in 2012?
20   A.  Yes.
21   Q.  How long have you held the position of
22   chief of security?
23   A.  Since December of 2015.
```

Page 5

```
 1   Q.  What are your job responsibilities as
 2   chief of security?
 3   A.  I oversee approximately 90 officers that
 4   are below me in rank.  A lot of it is just the
 5   general security and safety of the inmates and
 6   overseeing the staff.  I am the assistant warden
 7   when the warden is away.  One of my biggest
 8   responsibilities is just basic compliance with the
 9   policies, in addition to like inmate jobs and
10   other functions.  But a lot of it is — a lot of
11   it gets filtered through me.  When there's issues
12   it heads to me, and then it goes to the warden.
13   I'm kind of like the second in command here.
14   Q.  What do you do on a daily basis to ensure
15   the safety and security of the inmates?
16   A.  Well, like I mentioned, a lot of it is
17   compliance.  It's about ensuring that staff are
18   following the policies that are in place.  And
19   then if there's anything that's unclear — which
20   I've been doing for the last year and a half.  And
21   if there's anything unclear, I've been putting it in
22   writing, like kind of making it very clear what
23   expectations are, so there's no — I want to avoid
```

Page 6

1 as much gray areas as possible. If anyone thinks
2 they -- they're not sure what to do in a certain
3 situation, I'll put it in writing and say here's
4 some direction for you.
5 Q. Okay. Before you were the chief of
6 security, what position title did you have?
7 A. Sergeant.
8 Q. And you were a sergeant on or about
9 August 24th, 2012; is that correct?
10 A. Yes. Yeah. I was on the second shift,
11 the 3 p.m. to 11 p.m. shift as the assistant chief
12 commander, as a sergeant.
13 Q. What were your job responsibilities as
14 shift commander?
15 A. Not --
16 MS. CUSACK: Objection to form. Go
17 ahead. He said he was the assistant chief
18 commander.
19 MR. KING: Okay.
20 A. Yeah. To clarify, the night of that
21 incident I was shift commander because the
22 lieutenant, who is the actual shift commander for
23 second shift, was on his days off.

Page 7

1 Q. All right.
2 A. So when he's on his days off, I fill in
3 as shift commander. But when he's here, I'm the
4 assistant shift commander.
5 Q. Well, what were your job responsibilities
6 as assistant shift commander?
7 A. Well, like I stated, I fill in as shift
8 commander on the weekends when the shift commander
9 himself is on his days off. Otherwise, a lot of
10 it was -- the assistant shift commander is
11 generally the movement officer, the person that
12 stays in the hallway and monitors the movement for
13 feedings and going out to the yard, the general
14 movements during the -- inside the facility.
15 Going to the medical center. So the assistant
16 shift commander kind of controls that movement,
17 tells the control room, all right, go ahead and
18 begin the movement or end the movement, and calls
19 the inmates down to eat at certain times, make
20 sure there's not too many in the chow hall at one
21 time. And a lot of -- it's busy. It's a lot of
22 movement going on. So that's the main role, is
23 controlling that movement. And then beyond that

Page 8

1 was helping out with the -- on the staff side,
2 helping out with schedules. So I do a lot of that
3 with setting up the schedules with staff for the
4 days coming up.
5 Q. Okay. Who assigned responsibilities for
6 doing rounds on August 24th, 2012?
7 A. The -- like recalling exactly on that
8 day?
9 Q. Um-hum.
10 A. No. As the assistant shift commander, I
11 probably assisted Lieutenant Newton at the time
12 creating the schedule. He reviews the schedule
13 and approves the schedule. So ultimately the
14 shift commander is responsible for who works in
15 what post that day.
16 Now, coming into -- as a shift commander
17 that night, I do have the ability to move people
18 around. So, yes, I guess it would fall to me that
19 night as far as who works in what post. If
20 there's overtime, things can get moved around. If
21 someone calls in sick, things can get moved
22 around.
23 Q. Okay.

Page 9

1 A. It can -- yeah.
2 Q. Now, as the chief of security now, are
3 you familiar with the responsibilities that a
4 correctional officer has in connection with doing
5 rounds?
6 A. Yes.
7 Q. Have those responsibilities changed at
8 all since August 24th, 2012?
9 A. No.
10 Q. Okay. What are a correction officer's
11 responsibilities in connection with doing rounds?
12 A. They -- by policy, they have to do one
13 round an hour.
14 Q. Has that changed since August of 2012?
15 A. No. We have -- internally, between the
16 warden and I, we ask that staff do additional
17 rounds, but that's above and beyond the policy.
18 That's just kind of we want the staff to be more
19 random and like don't make -- don't be so
20 predictable, try to get back in there. But the
21 policy itself hasn't changed since 2012.
22 Q. And what should a corrections officer
23 doing rounds do?

Leite v.
Goulet

Jeffrey Smith
August 30, 2017

Page 10

Page 12

1 A.  They -- the big thing is since it's --
2 since they're only in there for a few minutes,
3 because they're trying to hit all the units, is a
4 lot of it is determining the attitude on the
5 block, if things are normal or abnormal.
6 Q.  Um-hum.
7 A.  And that's what we teach the new officers
8 when they're hired is being able to get that
9 feeling.  So the first thing you do when you walk
10 in is, like, what's the tension on the block?  Is
11 everyone staring at me, or are they just doing
12 their own thing generally?  If everyone's staring
13 at the officer, then you have that feeling like
14 something is odd.  Why are they all concerned that
15 I just walked on the block?
16 If everything is normal, they'll be
17 playing cards.  They'll be watching TV.  They'll
18 be sleeping.  They'll be being normal.
19 So that's the first thing you do, is
20 gauge a temperature sort of of the room.  And then
21 you -- you're supposed to look through every cell
22 and walk by the cells and just make sure that
23 infractions aren't taking place.  They look for

1 night shift.  That was from 2014 until I was
2 promoted.  I was assigned to upper housing, so
3 then, yes, that was part of my daily duties.  When
4 I was an assistant shift commander, my only duties
5 as far as rounds were assisting the shift
6 commander as his designee doing the facility
7 rounds that are daily.  So I wasn't responsible
8 for doing — as far as procedure and policy, I
9 wasn't responsible for doing housing unit rounds,
10 unless I was just assisting, like helping out.
11     MR. KING:  Would you mark this.
12     (Discussion off the record.)
13     (Smith Exhibit 1 marked
14     for identification.)
15 Q.  We've marked as Exhibit 1 your
16 interrogatory answers in this matter.  Do you
17 recognize them?
18 A.  Yes.
19 Q.  Could you take a look at your answer to
20 Interrogatory Number 4 or read the question and
21 answer.
22 A.  (Peruses document.)  Yup.
23 Q.  All right.  You say in your answer that

1 violations of procedure and --
2 Q.  So a corrections officer doing rounds
3 should at a minimum look into every cell, right?
4 A.  They should, right.  That's the standard
5 that, as chief of security now, I've put on the
6 staff, saying like you guys need to look in the
7 cells when you do rounds.
8 Q.  Is that a standard that existed in August
9 of 2012?
10 A.  Honestly, off the top of my head, I'm not
11 sure if that is a written policy or if that's
12 just -- I'm not sure if that's actually the
13 current PPD.
14 Q.  Okay.  All right.  Well, you told me that
15 you were chief of security December -- beginning
16 December of 2015, and before that you were
17 sergeant?
18 A.  Yeah.
19 Q.  How long were you a sergeant?
20 A.  Since 2008.
21 Q.  As a sergeant, were you ever personally
22 responsible for doing rounds?
23 A.  Only for a brief period when I was on the

1 rounds are not scheduled to occur at any
2 particular time?
3 A.  The shift commander's rounds.
4 Q.  Oh, the shift commander's rounds?
5 A.  (Nods head affirmatively.)
6 Q.  Oh, okay.  But rounds were supposed to
7 occur every hour, right?
8 A.  Yeah, for the staff that are in charge of
9 the housing units.
10 Q.  And if I understood your answer
11 correctly, one of your responsibilities was to
12 perform rounds, but you could delegate the task of
13 performing rounds to corrections officers?
14 A.  Yup.  There's a separate policy outside
15 of the one for the staff that are monitoring the
16 housing units for the shift commander.  The shift
17 commander or a designee have to do unannounced
18 rounds.  It's also for like three purposes, and we
19 have to do unannounced rounds at every shift.  And
20 so either the shift commander or the assistant
21 shift commander during that shift can -- you know,
22 they can -- the shift commander can do half,
23 depending on how busy they are, and then designate

1  their assistant shift commander to finish the
2  rounds. As long as a supervisor conducts the
3  rounds every shift, that meets the policy.
4  Q. Okay.
5  A. So like I -- as I stated in my answer
6  here, I — when I was shift commander that night,
7  I didn't personally do a walk-through on that
8  block.
9  Q. So as long as a supervisor conducts a
10 round during --
11 A. Yeah. I'm not sure of the schedules, so
12 either another sergeant was the assistant, my
13 assistant shift commander, that night or a
14 corporal. So as long as they -- one of them did
15 that round, it would meet the policy requirement
16 for the shift commander to do an unannounced round
17 every shift. It wouldn't be on that -- that form
18 (indicating).
19 Q. It wouldn't be on this form (indicating)?
20 A. No.
21 Q. All right.
22     MS. CUSACK: And just for the record, the
23 form that you're looking at was what we marked in

1  Tim Coulombe's deposition as I think it was 3.
2     MR. FREDERICKS: 4.
3     MS. CUSACK: 4.
4     MR. KING: Okay.
5     MS. CUSACK: Which is the rounds log.
6  Q. BY MR. KING: So the unannounced round is
7  not recorded on the rounds log?
8  A. It's from PPD 1.38. It's a separate form
9  that the shift commander has that keeps track of
10 their unannounced rounds for the shift. That each
11 housing area has a round sheet similar to that one
12 that you have on top there (indicating). That's
13 the 24-hour round sheet for the area supervisor to
14 fill out, ensuring that they're doing their rounds
15 too.
16 Q. What is the document that we would need
17 to look at to determine who did the unannounced
18 rounds on August 24th, 2012?
19 A. Oh, it's like -- it's from policy PPD
20 1.38. I think it's Attachment 5. I'm not sure
21 off the top of my head.
22 Q. Have you at any point determined who
23 conducted the unannounced rounds on August 24th,

1  2012, on F block?
2  A. I haven't myself, no.
3  Q. But you did not conduct the unannounced
4  rounds on August 24th, 2012?
5  A. No. I know for a fact that I did not go
6  into that block that night.
7  Q. And during the period from 3:00 to 11:00
8  on August 24th, 2012, how frequently would
9  unannounced rounds have to have been conducted?
10     MS. CUSACK: Objection to form. Go ahead
11 and answer.
12 A. It's 2:00 to 10:00 was my shift, because
13 the shift commander comes in an hour early. Once
14 like the unannounced -- as long as you hit each
15 area on the form once, that meets the
16 requirement --
17 Q. All right.
18 A. -- during the eight-hour shift.
19 Q. And you don't know when that unannounced
20 round occurred on August 24th, 2012?
21 A. No.
22     MS. CUSACK: Objection to form. Go
23 ahead.

1  A. I haven't seen the form, so I'm not sure
2  of the exact time that it was conducted.
3  Q. Okay. And you don't know who conducted
4  it?
5  A. I do not.
6     MS. CUSACK: Again, objection to form.
7  Go ahead and answer.
8  A. If we had the roster, it would be the
9  person listed as the assistant shift commander
10 that night.
11 Q. All right. I'll look for that during a
12 break.
13     But during the period when you were a
14 sergeant between 2008 and 2015, nevertheless from
15 time to time you would do rounds, right?
16 A. Yup. Yup. I would, yeah. If I was
17 there to assist with count or after chows, I'd go
18 talk and visit and do my -- like if I was doing --
19 if I was assisting Lieutenant Newton, the shift
20 commander, I would do — as his designee, I would
21 be doing rounds on the units. So, yeah, I would,
22 yup.
23 Q. And when you were doing rounds, you would

Page 18

1  look into every cell, right?
2  A.  Yes.
3  Q.  How did you learn that there had been an
4  assault on Jonathan Leite on August 24th, 2012?
5  A.  I believe it was a medical emergency was
6  declared over the radio.
7  Q.  What did you do in response to the
8  medical emergency?
9  A.  Well, I was the shift commander, and I
10  believe I was in the operations room right here.
11  So at first, a lot of it is -- I'm trying to think
12  if I actually went down to central or not to see
13  if they could see what was going on.  But a lot of
14  it is planning on the transport that was going to
15  happen, looking at the schedule and seeing who I
16  could use for the transport.  And then a lot of it
17  is notifications, notifying the chain of command
18  above me if they need to know.
19      But initially we have a response team set
20  up to go to that area.  So as shift commander,
21  there's not really a whole lot I can do
22  immediately, because I'm pretty much waiting for
23  the information to come in, to see what I can do

Page 19

1  to assist.  Or if staff need direction, that would
2  be my role.  So, yeah, within like the first
3  couple minutes, I'm listening on the radio and
4  trying to gather the intel as it comes in.
5      MR. KING:  Mark that.
6      (Discussion off the record.)
7      (Smith Exhibit 2 marked
8      for identification.)
9  Q.  Sir, I've handed you a copy of the
10  incident report that you prepared in connection
11  with the August 24th, 2012, assault on Mr. Leite,
12  and have you reviewed this recently?
13  A.  Yeah.
14  Q.  Okay.  Now, you reviewed video of F
15  block, right?
16  A.  Yes.
17  Q.  Where did you go to review the video?
18  A.  I believe at the time it was in -- down
19  in Education down the hall.  We had a room set up.
20  Well, at the time there were certain cameras that
21  were -- the DVR that actually recorded the video
22  was -- some of them were located in central, but
23  for all the housing units, that DVR was located

Page 20

1  down in Education.  So -- so, yeah, once the --
2  once the transport was all set up to get Mr. Leite
3  to the hospital, my next job was to try to figure
4  out what happened, to look at the DVR system,
5  so -- and to kind of explain how -- like during an
6  incident, everyone's very busy, when there's a
7  medical run of any sort, any kind of transport.
8  Because the facility still has to function.  You
9  know, people still need to get their meds or if
10  they haven't eaten yet and we still have this
11  incident to take care of.
12      So as far as who would be available to
13  actually go down -- step away from their post and
14  go down and spend the time to review video, it was
15  me.  Like I was -- once I knew the transport was
16  all set, now I could go down to the video room and
17  review the video and have that time.
18  Q.  Right.  Okay.  And do you have any
19  independent recollection of the video you
20  reviewed?
21  A.  I've seen it recently.
22  Q.  Oh, you have?
23  A.  Yeah.

Page 21

1  Q.  All right.  Tell me what you've seen
2  recently.
3  A.  In the video that --
4  Q.  Yes.
5  A.  I was reviewing what was downloaded, the
6  clips that were submitted as part of the trial for
7  the attackers.
8  Q.  Okay.  In your review of the video that
9  you did recently, did you see the footage where
10  Mr. Leite leans over his bunk and vomits on the
11  floor?
12  A.  No.
13  Q.  Now, if -- in your incident report you
14  write that you did see such footage, correct?
15  A.  Yup.
16  Q.  Do you remember what time in the video
17  that happened where Mr. Leite leaned over and
18  vomited?
19  A.  No.
20  Q.  Have you seen that footage at any other
21  time other than when you reviewed it here?
22  A.  No.  No.
23  Q.  Do you know what has happened to that

Page 22

1  video footage of Mr. Leite vomiting?
2      MS. CUSACK: I'm going to object to the
3  form. Go ahead.
4  A. That -- to clarify, when I was reviewing
5      the video, nothing was downloaded that day. That
6      was -- I was at the DVR, and my job was to go to
7      the point where Mr. Leite was discovered in the
8      count and kind of pretty much watch the video
9      backwards, just to kind of figure out where did he
10     come from, who was involved.
11 Q.  Right.
12 A.  At the time we thought it was, you know,
13     a possible overdose at the time. So we were just
14     trying to figure out what happened. So, you know,
15     we backed it up and saw, oh, it's Cell 9 he came
16     from. Okay. Then I would -- like pretty much
17     live as it's going on, I'm calling over the radio,
18     it's Cell 9. Go see if there's anything in Cell
19     9. I wasn't downloading any video on that day.
20 Q.  All right.
21 A.  That's -- to actually download and
22     preserve video is very time-consuming, as I
23     described. Like as the shift commander, I'm the

Page 23

1      only person that can go down and actually spend
2      the time to watch this video live in real time.
3      And to now on top of that download it would have
4      taken another hours of, you know, time.
5          So, you know, time was critical at that
6      point when Mr. Leite's at the hospital and now
7      getting flown to Dartmouth. I didn't have time to
8      actually download and preserve anything on that
9      night. I was just watching it live -- or not
10     live, but watching on a DVR to gather more intel
11     on what occurred.
12     MS. CUSACK: I just want to clarify.
13 When you used the word "live" a few times, you
14 mean when you were after the event watching the
15 clips?
16     THE WITNESS: Yes.
17     MS. CUSACK: Or not clips, but watching
18 the stream?
19     THE WITNESS: Yeah, watching it off the
20 recorded DVR. Yeah, sorry, not live, but watching
21 it as opposed to downloading it and watching it on
22 a remote computer somewhere else.
23     MR. KING: I understand.

Page 24

1      THE WITNESS: Yeah.
2  Q.  BY MR. KING: In August of 2012, whose
3  responsibility was it at the Northern New
4  Hampshire Correctional Facility to download and
5  preserve video?
6  A.  I'm not sure.
7  Q.  How would we find that out?
8  A.  I don't believe there's any policies at
9      the time that actually -- any written policies
10     that said this person is responsible for
11     downloading video.
12 Q.  Okay.
13 A.  So it would be the call of either the
14     investigators or the chief of security at the time
15     if that was going to occur.
16 Q.  So when -- strike that. During your
17 tenure as chief of security, have any incidents
18 occurred at the facility where you want video
19 preserved of the incidents?
20 A.  Yes.
21 Q.  What have you done to ensure the
22 preservation of video?
23     MS. CUSACK: I'm going to object to the

Page 25

1      form of the question, and subsequent -- and just
2  put on the record as well that subsequent to 2012
3  and policies and procedures that may be in effect
4  in 2017 or '16 when Sergeant Smith -- or, excuse
5  me, Captain Smith became chief of security are not
6  relevant to the case and not going to lead to the
7  discovery of admissible evidence. You're talking
8  what happens now as opposed to what happened in
9  2012, but go ahead and answer.
10     MR. KING: I didn't -- okay. I didn't
11 ask any question about policy. I asked what
12 Sergeant Smith as the chief of security has done
13 to ensure the preservation of video after
14 incidents have occurred in the facility where you
15 want the video preserved.
16     MS. CUSACK: And again, my same
17 objection, but you can go ahead and answer.
18 A.  I myself have put out a memo specifically
19     on reviewing video and downloading and preserving
20     video, and I've made it very clear that
21     investigators are the only ones that are allowed
22     to download and collect evidence, video evidence.
23     Staff are allowed to go in as long as they're

Page 26

1   assisted by a supervisor, at least a corporal
2   level. They can review video on the DVRs. But to
3   actually download it and take it off the DVRs
4   like -- not take it off, but to copy it off the
5   DVRs is only done by the investigators.
6   Q. Okay. So if you want video preserved of
7   a certain incident, do you instruct the
8   investigator --
9   A. Yes.
10  Q. -- to have it preserved?
11  A. Yup.
12      MS. CUSACK: You need to wait for him to
13  finish his question.
14      THE WITNESS: Sorry.
15      MS. CUSACK: Because the stenographer
16  needs to --
17      THE WITNESS: Oh. Sorry also.
18      MS. CUSACK: That's okay.
19  Q. BY MR. KING: When Scott Lambertson was
20  the chief of security, do you know what he did to
21  preserve video of incidents?
22  A. No.
23  Q. Do you have any understanding of what the

Page 27

1   protocol was for preserving video of incidents in
2   2012?
3   A. I -- my role as far as reviewing, that
4   was kind of standard. As far as reviewing video
5   the night, obviously I want to know what happened.
6   As far as my role in downloading video, that was
7   my own initiative. That wasn't me following a
8   procedure or anything.
9   Q. Well, why did you make that initiative
10  regarding preserving video?
11  A. Because I wanted to know who attacked
12  Mr. Leite.
13  Q. Yeah.
14  A. It was kind of frustrating that we
15  possibly didn't have the correct inmates
16  identified. So, yeah, I was -- I'm not sure of
17  the dates, but it was like a week or week and a
18  half later that it was like, I'm going to go back
19  and look at that video. I want to know who did
20  that. So that was my own initiative, to go back
21  and review more, like spend that time to go
22  through and start looking at the video again.
23  Q. I don't think my question was clear. You

Page 28

1   said that since you've been chief of security,
2   you've done a memo regarding the preservation of
3   video evidence, right?
4   A. Yes.
5   Q. Yes? What prompted you to do that memo?
6       MS. CUSACK: I'm going to object to the
7   form, but go ahead.
8   A. It kind of stemmed from control, the
9   control of evidence. It's the practice of having
10  someone on their own -- even though I had good
11  intent, my intent was like -- and I was -- you
12  know, wanted to know how this occurred. Now as a
13  chief of security, I look at that and go, I need
14  more control over -- or the investigators need
15  more control over their evidence, video evidence.
16  It's that thing of like we don't want something
17  from our DVR showing up on YouTube and not knowing
18  how it got there. Like we don't want to be
19  questioned, like, well, who was in there? Who
20  downloaded it and going, I don't know.
21  Q. Right.
22  A. So, yes, as chief of security, it was
23  like I need better control. We need to have an

Page 29

1   entry log of who's going into that room. If the
2   investigators download and preserve anything,
3   they need to log like what they're copying and for
4   what reason. There has to be a reason. I don't
5   want people just going in on their own. You know,
6   we still want the shift commander to be aware if
7   someone is going in there reviewing video, just so
8   it's cleaner for any kind of criminal case or
9   anything that might come out of -- anything that
10  has to do with video evidence.
11  Q. Right. So when you were reviewing the
12  video, you went back from 5:08 p.m., which is when
13  Jonathan was discovered at count, right?
14  A. Sorry. Is this referring to the night --
15  the night of the incident when I was reviewing
16  video?
17  Q. Yes. Yes.
18  A. I would assume -- off the top of my head,
19  I would assume I started at that point and went
20  backwards.
21  Q. Okay. What do you recall seeing?
22  A. Oh, I remember -- well, I remember him
23  coming out of the cell and stumbling and being

Page 30

1  assisted into his bunk. I'm not sure how long he
2  was laying there, but if you were (indicating Mr.
3  Leite) -- it looked like you were either passed
4  out or asleep, until discovered by the staff.
5      So I remember trying to figure out who
6  lived in that cell that you came from. And that
7  was I believe -- that's pretty much as far back as
8  I needed to go at that point, because once we
9  identified the cell that he came from and then
10  once I called Captain Lambertson, we decided
11  and -- oh, I'm sorry. Also, we were told that it
12  wasn't an overdose; it was an assault. Once we
13  got that information from the hospital, that kind
14  of changed the dynamics. Now it's a crime scene.
15  That's pretty much where at that point it kind of
16  gets handed over to the investigators. It's --
17  Q.  Sure.
18  A.  But our job is done. We've identified
19  the possible crime scene. Now, the investigators
20  are notified, and they take over as far as the
21  next steps.
22  Q.  One thing that you've omitted in your
23  description of your recollection is the vomiting

Page 31

1  incident.
2      MS. CUSACK: I'm going to object to the
3  form, but go ahead.
4  Q.  Do you -- do you remember today, in your
5  review of the video on August 24th, 2012, seeing
6  Jonathan vomit?
7  A.  Well, five years ago? It rings a bell,
8  yeah. I remember -- I would have, probably in
9  real time while reviewing that video on the DVR,
10  watched him on the bunk while -- before the staff
11  came through on that -- for that standing count,
12  watching to see if anyone else approached him,
13  tried to move him, if he was moving at all, to see
14  if any movement. So I don't remember the exact
15  things that happened, but I would have watched it,
16  yeah, that night.
17  Q.  Okay. And you reported that the vomit
18  landed on the floor, right?
19      MS. CUSACK: Object to the form. Go
20  ahead.
21  A.  If that's what I wrote. (Peruses
22  document.)
23  Q.  It's the fourth -- third -- fourth line

Page 32

1  down you write: Going back from the time he was
2  discovered during count, I saw a time when he
3  leaned over and vomited onto the floor.
4  A.  Yup.
5  Q.  Is that correct?
6  A.  Yup.
7  Q.  And did that accurately summarize what
8  you viewed at the time?
9  A.  Yup. I think I was -- my intention of
10  when I'm writing this is that he was motionless
11  except for this one time when he did lean over.
12  So I don't know if I was putting that in there
13  for -- like I didn't know if he was unconscious
14  the whole time or sleeping. Like he did move at
15  one point. It looked like he vomited onto the
16  floor at one point.
17  Q.  Okay.
18  A.  It was pretty much -- this was written
19  that same night, and I'm putting as many facts
20  down as possible of what I've seen to help, like
21  to help investigators.
22  Q.  Right.
23  A.  So as to the relevance of it at the time,

Page 33

1  I wasn't -- I wouldn't know, but it was like I
2  remember seeing that. I remember I added it to my
3  report.
4  Q.  I've asked you so many questions about
5  that because we don't seem to have that video that
6  you reviewed of that particular incident. And do
7  you know what may have happened to the video that
8  was recorded of F block between 4:25 p.m. and 5:08
9  p.m.?
10      MS. CUSACK: I'm going to object to the
11  form. Go ahead.
12  A.  If someone else downloaded it, I'm
13  unaware of it.
14  Q.  Okay.
15  A.  I didn't download that portion. Like
16  when I went back and downloaded clips to help
17  identify the attackers, I was downloading video
18  specifically for -- to identify. Like I was
19  looking at different angles and trying to match up
20  possible tattoos or any indicators, you know, hair
21  color, of the people that were associated with Mr.
22  Leite that night that were in the cell with him or
23  had been seen with him. So the clips -- they

Page 34

1 ended up being clips, but it was like -- it was
2 pretty much me trying to give it back to the
3 investigators going, here, here's a clip that I
4 got a good shot of this guy on the top mezzanine.
5 You can see him pretty well. Here's another clip
6 of -- got another person that was coming out.
7 Look, you can see another good shot of him here.
8     My intention wasn't to download the
9 entire event. My intention was to -- just purely
10 to identify the attackers or what I was doing for
11 downloading video.
12 Q. So the video clips that we have, you
13 downloaded; is that correct?
14 A. I'm unaware of all the evidence you have.
15 I honestly don't know if there's additional video
16 of what was submitted to you, but I know what I
17 downloaded and provided to you guys.
18 Q. So tell us the footage that you
19 downloaded.
20 A. Oh, well, there would be approximately
21 eight or so clips. I think the largest one was
22 about an hour and a half. We just reviewed it,
23 not recently. I believe that one went up to past

Page 35

1     4:00, but it was all focused on movement from the
2 cell, in and out of the cell, of trying to
3 identify the players that were involved. Like for
4 me at that time downloading video of him laying on
5 the bunk wouldn't solve who did it. Like it
6 wasn't really relevant to me to download that
7 portion.
8 Q. Right. What happened to the video that
9 wasn't downloaded?
10 A. Approximately 14 days gets saved on the
11 DVRs, and then there's only so much capacity and
12 it starts overwriting.
13 Q. So any video of the goings-on in F block
14 on August 24th, 2012, that wasn't downloaded
15 within approximately two weeks of that date is
16 lost; is that true?
17 A. Yes.
18 Q. All right. Is the video that you
19 produced in this case the same video that was
20 produced to the Major Crimes Unit?
21 A. Yes. Yeah.
22 Q. Okay.
23 A. Yeah, I do not have any additional video

Page 36

1 that wasn't submitted.
2 Q. Have you reviewed the video clips
3 recently?
4 A. Not in its entirety, no.
5 Q. Well, do you recall that your review of
6 the video showed Mr. Leite entering Cell 9 at
7 approximately 2:39 p.m.?
8 A. I haven't watched that portion lately,
9 no.
10 Q. Have you reviewed Investigator Coulombe's
11 investigation report on this matter?
12 A. Not recently, no.
13 Q. At any time have you?
14 A. At one point, yes, but not recently.
15 Q. Okay.
16     MS. CUSACK: Celeste, you doing okay?
17     (Reporter nods affirmatively.)
18 Q. Bear with me one moment. (Pause.) Going
19 back to a point we discussed earlier. Why is it
20 important for a corrections officer doing rounds
21 to look into every cell?
22 A. To look for infractions, to make sure
23 that there's no cell-hopping going on, make sure

Page 37

1 they're not -- obvious stuff; making sure they're
2 not smoking or -- there's various, numerous
3 infractions that they're always looking to make
4 sure everything's normal on the unit.
5 Q. Now, on August 24th, 2012, Cell Number 9
6 was occupied by Johnathan Gelinas and Ryan
7 Elliott; is that true?
8 A. I -- I'm unaware. I haven't looked at
9 the timeline in a while.
10 Q. Did you have any familiarity on August
11 24th, 2012, with Johnathan Gelinas?
12 A. I probably knew him by name, but I
13 wouldn't know what he looks like.
14 Q. So but what I'm -- before the attack
15 happened on Jonathan, were you familiar with Mr.
16 Gelinas?
17     MS. CUSACK: So when you just said
18 "Jonathan," you're talking about Mr. Leite, not
19 Gelinas?
20     MR. KING: Good point.
21 Q. Before the attack happened on Mr. Leite,
22 were you familiar with Mr. Gelinas?
23 A. I would say not really, no.

Page 38

1 Q. Before the attack happened on Mr. Leite,
2 were you familiar with a prisoner by the name of
3 Matthew Garcia?
4 A. I'm not sure how -- what's your
5 definition of "familiar"?
6 Q. Had you had interactions with him?
7 A. Not many, if at all.
8 Q. Okay.
9 A. As my role -- like, the officers that
10 work the housing units really get to know names to
11 faces. And my role as assistant shift commander
12 is just monitoring the chows and the hallway.
13 Unless I hear a name come up of someone got an
14 infraction or like -- I hear a lot of the names,
15 but at that role it's tough to pinpoint a lot of
16 familiarity because I wasn't in the -- I didn't
17 have a whole lot of personal dealings with a lot
18 of them.
19 Q. And you said one of the purposes of a
20 corrections officer looking into every cell during
21 rounds is to ensure that cell-hopping is not going
22 on, right?
23 A. Yup.

Page 39

1 Q. Was cell-hopping a defined term on August
2 24th, 2012?
3 A. Yes.
4 Q. Is there some written policy at the
5 Northern New Hampshire -- or was there some
6 written policy at the Northern New Hampshire
7 Correctional Facility pertaining to cell-hopping
8 on August 24th, 2012?
9 A. Yes. I believe at the time we had a memo
10 from our hearings officer, and it was for the
11 inmate population as well as staff, about just
12 defining it as stepping over the threshold of the
13 door is considered cell-hopping.
14 Q. Stepping over the threshold of what door?
15 A. Of the door to the cell.
16 Q. Oh, okay. Stepping over a threshold of a
17 door of a cell that is not assigned to --
18 A. Correct, sir. Yes.
19 Q. -- you? Okay. So at the time, August
20 24th, 2012, it was prohibited for one inmate to
21 visit another inmate in the latter inmate's cell?
22 A. Yes.
23 Q. And if an inmate were found to have

Page 40

1 engaged in cell-hopping, what were the
2 consequences, on August 24th, 2012?
3 A. It's a -- there's an infraction for being
4 out of place that it could fall under. So the
5 officer could have the option of issuing a
6 disciplinary report or they could issue a warning.
7 We have progressive discipline here, so if the --
8 if it isn't a -- we generally try to tell the
9 staff to start out with a verbal warning. Like if
10 they recognize it, to have them step out. And if
11 they continue to do the action, then that can lead
12 up to a D report, disciplinary report.
13 Q. And if an inmate were cited with an
14 infraction for cell-hopping in the August 2012
15 time period, what would have been the consequence?
16 A. The disciplinary report can be -- well,
17 it's read by a sergeant or higher, and they can
18 either be dismissed if they feel that it's --
19 well, not necessarily dismissed, but it can be
20 dropped to an incident report, which is zero
21 sanctions. It can be dropped to -- for B
22 write-ups, if it's a B write-up, if they charged
23 it as a mid-level D report, they can get sanctions

Page 41

1 up to 25 hours of extra duty or 25 days' loss of
2 recreation time. Canteen time. There's different
3 privileges that can be suspended for an amount of
4 days, based on if the inmate wants to plead
5 guilty; and if they don't want to plead guilty,
6 they can take it to a hearing.
7 So out of place for cell-hopping at the
8 time I believe was a mid-level B, a minor
9 infraction.
10 Q. And in that time period, in the August
11 2012 time period, how many inmates were cited for
12 cell-hopping on, say, a weekly basis?
13 A. I'm not sure of an estimate.
14 Q. Can you give me any range?
15 MS. CUSACK: I'm going to instruct you
16 not to guess.
17 A. Yeah, I would have -- it would be a guess
18 if I threw out -- I do not have any factual
19 information on how often cell-hopping was going on
20 at the time.
21 Q. Okay. So you have no sense in August of
22 2012 if cell-hopping were a frequent or infrequent
23 occurrence?

Page 42

1  **MS. CUSACK:** Objection to the form. Go
2  ahead.
3  **A.  The only thing I could tell you is the**
4  **D reports that are written and are -- either an**
5  **inmate pleads guilty or -- for being out of place**
6  **could be looked up.  We have archives of tickets,**
7  **of the D reports themselves, that were written.**
8  **But it would be an out-of-place ticket, so it**
9  **could be someone going to the chow hall at the**
10 **wrong time.  So it would be hard to actually say**
11 **how many times was -- in 2012, like how many -- it**
12 **would be tough to actually get a factual number.**
13 Q.  But one of the purposes for having
14 corrections officers do rounds is to ensure that
15 cell-hopping is not going on, right?
16 A.  Yes.  Yup.
17     **MR. KING:** Could we mark this.
18     (Discussion off the record.)
19     (Smith Exhibit 3 marked
20     for identification.)
21 Q.  I'm not going to ask you about this whole
22 report, sir, but what we've marked as Exhibit 3 in
23 your deposition is Mr. Coulombe's investigation

Page 43

1  report relating to the assault on Jonathan Leite,
2  and if you'd look through this and just tell me if
3  you've seen the document before, if you reviewed
4  it before.
5  **A.  I believe I've seen this before, but I**
6  **don't — I've never actually read it.  It's pretty**
7  **lengthy.**
8  Q.  Could you look at page 777 of the
9  document, please.
10 A.  (Peruses document.)
11 Q.  And at page '77, Investigator Coulombe
12 describes what occurred in the video clips that he
13 was provided.  Do you see that?
14 A.  Yes.
15 Q.  Yes?  So if you look at the bottom of the
16 page, towards the bottom of the page, at 2:38 p.m.
17 there's a reference to Gelinas making a slicing
18 motion from left to right across his neck two
19 times.  Do you see that?
20 A.  Yes.
21 Q.  Do you recall viewing Gelinas do that on
22 the video?
23 A.  Yes.

Page 44

1  **MS. CUSACK:** And just to be clear,
2  you're talking when he reviewed it after the
3  incident itself?
4  **MR. KING:** Oh, yes.  Yes.
5  A.  Yeah, that was a week and a half or later
6  when I was trying to figure out the players and
7  the identity of the attackers.
8  Q.  Would this video of Gelinas making the
9  slicing motion from left to right across his neck
10 two times have been available to Northern New
11 Hampshire Correctional Facility personnel at the
12 time Gelinas was doing that?
13 A.  Yes.
14 Q.  Okay.
15     **MR. KING:** Would you mark that.
16     (Smith Exhibit 4 marked
17     for identification.)
18     **MR. KING:** We're going to take a quick
19     break.
20     **MS. CUSACK:** Okay.
21     (Recess taken.)
22     (Mr. Leite left.)
23 Q.  BY MR. KING:  Back on the record.  We've

Page 45

1  marked as Exhibit 4 in your deposition a shift log
2  for August 24th, 2012.  Yes?
3  A.  Yes.
4  Q.  Okay.  And does this reflect that
5  Corrections Officer Lynn McLain was responsible
6  for the video monitoring of F block between 2:30
7  and 3 p.m.?
8  **A.  That would be part of her duties, not her**
9  **only duty.**
10 Q.  Yes.
11 **A.  There was various numerous cameras to**
12 **watch, plus the movements and controlling the**
13 **doors and answering the phone or looking --**
14 **there's most — three sides, our windows, in that**
15 **control room, so you have to watch behind you too.**
16 **It's a busy post.**
17 Q.  How many cameras are there to watch?
18     **MS. CUSACK:** Objection to form.
19     **MR. KING:** Well, he said there are many
20 cameras to watch, and I asked him how many.  So
21 what's the form objection?
22     **MS. CUSACK:** The form objection is I
23 don't -- are you talking about just in upper

Page 46

1   housing?  Are you talking -- I'm not sure -- I'm
2   not sure what you're talking about.
3        MR. KING:  Okay.
4        MS. CUSACK:  Maybe he is, but --
5        MR. KING:  All right.
6        MS. CUSACK:  I just need to know to be
7   specific.
8   A.   I can -- I can break it down a little
9   bit --
10  Q.   Okay.
11  A.   -- for you to give you an explanation of
12  the post.
13  Q.   Yes.  And we're talking about Correction
14  Officer McLain's post at CP-5?
15  A.   CP-5, yeah.
16  Q.   Yes.
17  A.   So CP-5 doesn't have access to all the
18  cameras, like -- like the DVR where the video's
19  being recorded.  Obviously all the cameras are
20  being recorded there.  But the posts are specific
21  to the areas they're responsible for.  So CP-5
22  would have the four upper units, the four upper
23  housing units, the corridor for upper corridor,

Page 47

1   the stairwell, all of upper industries behind
2   them.  That would be that area that CP-5 can
3   monitor.
4   Q.   Okay.
5   A.   A number, I don't know off the top of my
6   head.
7   Q.   All right.  But the camera depicting --
8   strike that.  The footage depicting Gelinas
9   slicing across his throat from left to right would
10  have been visible to the corrections officer
11  stationed at CP-5 at the time Gelinas was doing
12  that?
13  A.   That's -- well, if they were on that one
14  angle, that perfect angle, and witnessing that
15  incident.  That would be kind of a needle in a
16  haystack sort of situation.  But they have two
17  monitors in there, so they have to be able to
18  switch the view.  They try to keep one camera on
19  the corridor, because they have to control the
20  doors for the housing units, so they need to
21  verify the inmates are -- the inmates that are at
22  the doors.  So the other camera, if they have --
23  if they're not currently doing something like

Page 48

1   controlling -- pushing buttons and -- they flip
2   through the cameras and try to monitor to the best
3   of their ability the housing units.
4        So you saying that like did they --
5   should they have seen that one instant of that
6   slicing motion, that would be like if they had the
7   camera at the time on F block on that angle,
8   because there's two cameras in there at that time,
9   they would have to catch it right at that moment.
10  Q.   So on August 24th, 2012, are you telling
11  me that there were only two video screens
12  depicting the housing blocks in CP-5?
13       MS. CUSACK:  Objection to form.  Go
14  ahead.
15  A.   I wouldn't say depicting, like.  They
16  could possibly bring up that shot, that angle,
17  that you're talking about.  It would be that one,
18  and the main control room has access to all the
19  cameras.
20  Q.   Okay.
21  A.   For the live viewing.
22  Q.   All right.  Forgive me if I'm dense.  I
23  want to spend some time with this because I really

Page 49

1   don't understand.  Perhaps it will be helpful for
2   us to see CP-5, if that were possible.
3        MS. CUSACK:  Well, today it's different
4   than it was in 2012, but --
5        MR. KING:  Okay.
6        MS. CUSACK:  I mean...
7        MR. KING:  All right.  So I'll just ask
8   more questions.
9   Q.   If I'm sitting in CP-5 on August 24th,
10  2012, how many video screens am I looking at?
11  A.   Three in total.  You have two for the
12  camera systems and then one big monitor for the
13  touch for controlling doors.  It's all -- it's not
14  physical buttons.  It's a touch-screen monitor for
15  controlling the doors and call boxes and that
16  sort.
17  Q.   Okay.  So I'm only looking at two video
18  screens --
19  A.   Right.
20  Q.   -- that depict the housing units; is that
21  right?
22  A.   Yes.  The touch-screen monitor is not --
23  doesn't show any video on that one.

Page 50

1 Q. And those -- through those two video
2 screens, the person sitting in CP-5 is supposed to
3 monitor how many housing blocks?
4 A. They're -- they oversee four housing
5 units.
6 Q. And those housing units were E block, F
7 block, G block and H block; is that right?
8 A. Correct.
9 Q. And how many camera angles did each
10 housing unit have?
11 A. Two at the time.
12 Q. So is it fair to say that the person
13 working in CP-5 can look at, at any given time,
14 two of eight possible camera angles on two video
15 screens?
16 A. They can choose -- yeah, they have the
17 freedom to choose what those monitors show, yeah.
18 They're not -- none of them are fixed where you
19 have no control of them. You have one control
20 panel in front of them that you select -- like the
21 monitors are numbered, so say nine and ten. So
22 you'd have to say monitor nine. Now I have
23 control of that monitor, and you can either flip

Page 51

1 through, like, say, next and just go through in
2 sequential order, or you can type in the specific
3 camera that you want to look at. And then if you
4 want to switch to the next one, you have to
5 actually go, like, monitor ten. Okay, now I have
6 control of that monitor, and then you can start
7 switching. So it's kind of one at a time that you
8 can change the shot that you're looking at.
9 Q. In 2012 was there any guideline about how
10 often the person working in CP-5 should adjust the
11 camera angle that he or she was looking at?
12    MS. CUSACK: I'm going to object to the
13 form. Go ahead.
14 A. No, there wasn't any -- there was no
15 specific instructions on that.
16 Q. In 2012 was the person working in CP-5
17 supposed to rotate in any way the angles being
18 monitored?
19 A. There was no specific procedure on how
20 often they changed the camera. There's nothing
21 written like that.
22 Q. So the person sitting in CP-5 could have
23 monitored an angle in Echo block and an angle in

Page 52

1 Golf block for the entirety of his or her shift
2 and that would have been fine?
3    MS. CUSACK: Objection to the form. Go
4 ahead.
5 A. Well, part of the post orders is being
6 alert and doing your -- well, like I was
7 describing, the numerous things they could be
8 doing in there to the best of their ability.
9 Q. Yes.
10 A. So if someone did just leave two camera
11 angles the entire shift, I would say that was some
12 dereliction of duty going on there. But that
13 would be me speaking as my current position as far
14 as what I expect of the staff to do in their
15 control rooms.
16 Q. Right. Back on August 24th, 2012, was
17 any documentation kept of the areas of the
18 facility that the person working in CP-5 did
19 monitor during his or her shift?
20 A. Could you repeat that question again?
21 Q. Certainly. So Officer -- Corrections
22 Officer McLain is working from 7 to 3 in CP-5 on
23 August 24th, 2012. Would he or she have kept a

Page 53

1 record of the areas of the prison that she
2 monitored via video monitoring during his or her
3 shift?
4 A. No, there would be no record of that.
5 Q. Okay.
6    MS. CUSACK: I -- never mind. I think
7 what you're trying to ask is if there is a log of
8 what camera gets brought up at what time?
9    MR. KING: Yeah.
10    MS. CUSACK: Is that what you're trying
11 to --
12    MR. KING: Um-hum.
13    MS. CUSACK: And the answer to that is?
14    THE WITNESS: No, there isn't.
15 Q. BY MR. KING: Okay. And if you look at
16 the investigation report --
17 A. Yup.
18 Q. -- that we've marked as Exhibit 3; is
19 that right? At page 777 through 779.
20 A. Yeah. The timeline?
21 Q. The timeline of the video, yes.
22 A. Yeah.
23 Q. All the video that is described at 777 --

Page 54

1   777 through 779 would have been available to
2   Northern New Hampshire Correctional Facility
3   personnel at the time the incidents depicted were
4   occurring, right?
5  A. Well, it was recorded, so there wasn't --
6   yeah, there was a specific camera angle recording
7   that time. But as far as if the staff member was
8   viewing at that specific angle at that time would
9   be --
10  Q. I understand.
11  A. It would be kind of a -- I have no idea
12  what camera they were looking at.
13  Q. But my question was, the video was
14  available to --
15  A. Yeah.
16  Q. -- corrections officers
17  contemporaneously, right?
18  A. Yeah. There are no cameras being
19  recorded that aren't available to the staff to
20  view in real time.
21  Q. And between 2:30 and 3:00, the
22  responsibility for viewing that video in CP-5
23  would have been with Corrections Officer McLain,

Page 55

1   right?
2      MS. CUSACK: Objection. Go ahead.
3  A. Could you repeat the question?
4  Q. Certainly. The person responsible for
5   video monitoring of F block between 2:30 and 3
6   p.m. was Corrections Officer McLain, correct?
7  A. I would have to look at the CP-5 log, if
8   we have that. This is the upper housing log.
9   Officer McLain was assigned to that post. But if
10  she was using the bathroom, another officer could
11  have been in there relieving her briefly. So she
12  was assigned to the post, but if she was in there
13  at that time, I wouldn't know specifically if
14  that's -- the log would probably give a better
15  indication exactly.
16  Q. Okay. What log is that that you're
17  referring to that would give a better indication
18  of who was doing video monitoring in CP-5 between
19  2:30 and 3?
20  A. It looks exactly like this, but it's for
21  that control room.
22      MS. CUSACK: And for the record, you --
23  when you said "it looks exactly like this," you

Page 56

1   were pointing to Exhibit 4.
2  A. The -- yeah, sorry. Exhibit 4. The
3   structure of the form, not the content. It
4   looks -- it's set up the same way, but it has --
5   each post has a round sheet similar to this.
6  Q. All right. And in addition to being
7   available to the person working in CP-5, the video
8   footage of the events occurring between 2:30 and 3
9   p.m. in Cellblock F would have been available to
10  the person working in the main control room,
11  right?
12  A. Yes, and Control Room 4 as well.
13  Q. Oh. Does this document that we marked as
14  Exhibit 4 indicate that no one was working in
15  Control Room 4 on the first and second shift or...
16  A. No, they don't log it on this form.
17  Since this is the upper housing -- to kind of
18  explain how we're -- this (indicating) is the
19  upper housing shift log, so they put in CP-5 for
20  first and second shift, because it's operating.
21  On third shift, in the middle of the night, there
22  is no Control Room 5. It's only Control Room 4.
23  They monitor all eight units. So that's why they

Page 57

1   just put CP-4 there. So on the lower housing
2   shift log, they would indicate who was in Control
3   Room 4, because that's the --
4  Q. Okay.
5  A. -- control room. So when CP-5 is
6   running, you got an officer who's in the control
7   room for CP-4 watching the four lower units. They
8   have the physical ability to monitor the cameras
9   upstairs, but their responsibility is the lower
10  units when CP-5 is running. So they would be
11  watching out for Alpha, Bravo, Charlie, Delta and
12  the surrounding area. And then Control Room 5 is
13  watching the four upper units on their cameras.
14  Q. All right. Thank you. And the person in
15  the main control room has access to --
16  A. All of them.
17  Q. -- all the video?
18  A. Yeah. They could physically pull up --
19  type in any camera number and bring it up in
20  central control.
21  Q. How many people work in central control
22  at one time?
23  A. Two.

Page 58

1  Q.  Are we able to determine who was working
2  in central control on August 24th, 2012?
3  A.  I'd have to look at the logs.  I believe
4  that was determined based on the shift log that
5  showed all the staff members working that night.
6  Q.  Okay.  If you had been monitoring video
7  of F block activity and you had seen an inmate
8  slicing his hand from left to right across his
9  throat, would that have caused you concern?
10 A.  Me personally?
11 Q.  Yes.
12 A.  If I happened to catch that motion?
13 Q.  Yes.
14 A.  Personally, I would probably pause to see
15 what would follow that up.  It wouldn't be a cause
16 to like activate the response team or anything
17 like that, but...
18 Q.  All right.
19 A.  The inmates horseplay.  They joke around.
20 They're always doing stuff.  So just making a
21 motion, you know, they could be describing
22 something they saw on a TV show.  They could be —
23 so it wouldn't be too unusual.

Page 59

1  Q.  Okay.  If you had been monitoring video
2  footage and you saw a lot of inmates clustering
3  around a particular cell, would that have caused
4  you concern?
5  A.  Yes, that would be definitely something
6  to pause and watch a little bit more to see why
7  they were all clustered around a cell, yup.
8  Q.  If you had been monitoring video footage
9  of a certain cellblock and you saw several inmates
10 entering and exiting a particular cell over the
11 course of a short period of time, what would you
12 have done in response to reviewing such footage?
13 A.  Well, the inmates are allowed to enter
14 and leave their cells at will.  So just seeing
15 someone enter and leave a cell wouldn't be
16 unusual.  If you — so that alone, just seeing
17 someone walking in and out of a cell, wouldn't be
18 unusual at all.
19 Q.  Maybe I misspoke in my question.  I said
20 if -- I meant to ask you if you were reviewing
21 video footage and you saw several --
22 A.  Several?  Okay.
23 Q.  -- different inmates.

Page 60

1  A.  So you know for sure that it's more than
2  just the two that live in there?
3  Q.  Yes, entering and exiting a certain cell
4  over the course of a few minutes.  Would that
5  cause you concern?
6  A.  Yes.  Yeah.
7  Q.  And what would you do in response?
8  A.  So again, me personally, if I was in the
9  control room and saw that there were multiple
10 inmates in a cell and they were cell-hopping,
11 breaking an infraction, I would notify the housing
12 team to go into that unit to see what's going on.
13 Q.  If you look at 777 and 778, a video clip
14 is described there that begins at 2:30 p.m. and
15 ends at 3:00 p.m.; is that correct?
16 A.  Could you repeat that again, please?
17 Q.  Certainly.  The video clip that is
18 described, beginning on page '77 and ending
19 towards the bottom of 778, describes a video clip
20 that depicts activity in F block between 2:30 p.m.
21 and 3:00 p.m. on August 24th, 2012, correct?
22 A.  Correct.
23 Q.  Do you know why the video clip ends at

Page 61

1      3:00?
2  A.  No.
3  Q.  Are you the person who decided to
4  download the clip between 2:30 and 3?
5      MS. CUSACK: I'm going to object to the
6  form.  Go ahead.
7  A.  I'm going to assume that there is no
8  additional video.  I'm unaware if there is
9  additional video.  If that is true, that what I
10 supplied is the only video, then, yes, it would
11 have been me that downloaded it.
12 Q.  Okay.  Do you know why you stopped
13 downloading at 3:00?
14     MS. CUSACK: Objection to the form.  Go
15 ahead.
16 A.  Oh, recalling -- I don't recall off the
17 top of my head why I would have picked that
18 specific time.  Since, like I had mentioned
19 earlier, my intent was to point out — point out
20 interesting things that happened that might
21 indicate who the attackers were.  So if nothing
22 occurred for several minutes, I probably just
23 decided to stop the video at that point because

1 nothing is happening, and then continue on where
2 something did happen, that someone else stepped
3 out or whatever may have happened afterwards.
4 Q. You did see on the video as described by
5 Investigator Coulombe at the bottom of 778 that
6 Mr. Leite exited Cell 9 at 4:20 p.m., right?
7 A. Yes.
8 Q. Did you make any determination as to
9 whether Mr. Leite was in Cell 9 the entire time
10 between 2:39 p.m. when he entered and 4:20 p.m.
11 when he exits?
12 A. Yup. I believe that was part of my —
13 this was like a week and a half after the incident
14 when I was looking at the video and downloading it
15 and giving it to Investigations.
16 Yeah, that was part of my trying to
17 figure out what happened, was realizing at that
18 point that he had been in there for a lengthy —
19 what you just said, from 2:30 to 4:20.
20 Q. So you did determine that --
21 A. Yeah.
22 Q. -- Mr. Leite was in Cell 9 between 2:39
23 p.m. when he entered and 4:20 p.m. when he exited?

1 A. Yes.
2 MR. KING: Mark that.
3 (Smith Exhibit 5 marked
4 for identification.)
5 Q. Now, we've marked as Exhibit 5 the rounds
6 log that was done on August 24th, 2012?
7 A. Yup.
8 Q. Yes?
9 A. That's the rounds log, yup.
10 Q. And this reflects that -- or this Exhibit
11 5 reflects that a round was done by Corrections
12 Officer Dube and Corrections Officer Kathy
13 Bergeron at 3:45 p.m., right?
14 A. Yes.
15 Q. And have you reviewed video footage that
16 depicts Officer Bergeron walking past Cell 9 at
17 approximately 3:41 p.m.?
18 A. I don't recall.
19 Q. Did you make any inquiry of Officer Dube
20 as to what he did during his round that was
21 designated to occur at 3:50?
22 A. I don't recall.
23 Q. You don't?

1 MS. CUSACK: Objection to form. 3:50?
2 MR. KING: Yeah.
3 THE WITNESS: Or the --
4 MR. KING: I'm sorry, 3:45.
5 MS. CUSACK: 3:45.
6 Q. BY MR. KING: I misspoke. 3:45. So did
7 you make any inquiry of Officer Dube as to what he
8 did during his 3:45 round?
9 A. No, I don't recall that.
10 Q. Did you make any inquiry of Corrections
11 Officer Bergeron as to what he did during his 3:45
12 round?
13 A. No.
14 MS. CUSACK: She.
15 Q. She.
16 A. She.
17 Q. Okay. But during the 3:45 round one of
18 them should have looked in Cell 9, right?
19 A. That would have been part of their
20 duties. If they did, I'm not sure.
21 Q. All right. If a corrections officer is
22 doing a round and discovers vomit on the floor in
23 the dayroom, does that prompt a duty to do further

1 inquiry?
2 A. If -- yeah, if they do see that, that's
3 considered hazardous waste. So, yeah, they would
4 definitely be instructing another inmate to clean
5 that up.
6 Q. All right.
7 A. They wouldn't just walk by vomit on the
8 floor.
9 Q. But would the correction officer doing
10 the round have any duty to find out what happened,
11 why someone vomited there?
12 A. Yeah, I would hope so. I hope they would
13 look into if someone is sick or why; why -- where
14 did this come from. That would be normal.
15 Q. Okay. Were you one of the persons who
16 assigned Officers Dube and Bergeron to walk
17 through F block on August 24th, 2012?
18 MS. CUSACK: Objection. Go ahead.
19 A. Well, as far as I was the shift commander
20 and I ultimately was responsible for where
21 everyone worked, what posts they were assigned to,
22 then yes.
23 Q. Well, if I could just direct you to your

Page 66

1  interrogatory answers.
2      MS. CUSACK: It's Exhibit 1.
3      THE WITNESS: Yeah.
4  Q.  If you could look at Number 6, sir,
5  Answer 6.  You write there:  Lieutenant Scott
6  Newton and myself were the DOC employees
7  responsible for assigning staff to walk through
8  and monitor F block on August 24th, 2012, in
9  accordance with DOC training and policy.
10 A.  Yup.
11 Q.  Is that an accurate statement?
12 A.  Yeah.  It goes along with what I was
13 saying earlier, that I would create schedules.
14 Lieutenant Newton would approve them.  Then if I
15 was the shift commander that shift, like on this
16 case because it was on the weekend, or if he was
17 on vacation or whatnot, then, yes, as the shift
18 commander, that would be my role as far as
19 officially assigning where people worked that
20 night.
21 Q.  Okay.
22 A.  It would be my final say going into the
23 start of the shift.

Page 67

1  Q.  Did you undertake any inquiry into what,
2  if anything, corrections officers could have done
3  to prevent the attack on Mr. Leite or to -- well,
4  strike that.  So just as I asked.
5  A.  Did I -- I'm sorry.  Repeat, please.
6  Q.  Did you undertake any inquiry into what
7  correction officers might have done to prevent the
8  attack on Mr. Leite?
9  A.  I -- when I was reviewing the video, I
10 didn't see anything, any dereliction of duty, any
11 fabrication of rounds, any -- anything that stood
12 out when I was reviewing that video.  So there was
13 nothing -- if I had seen something, standard
14 procedure would have been for me to document it,
15 bring it up to my shift commander.  It would have
16 been dealt with at an administrative level as far
17 as discipline and review.  I didn't review any --
18 I didn't see anything.  So as far as I know, there
19 was no further review done.
20 Q.  Okay.  Was the only review -- you did a
21 review on September 5th -- strike it.
22     Do you know if you ever reviewed camera
23 angle 29 depicting video footage of F block

Page 68

1  between 2:20 p.m. and 4:03 p.m.?
2  A.  I would have to say, yes, I would have
3  reviewed that as part of going through,
4  determining the events, the timeline of what
5  happened and who was involved.
6  Q.  And you don't recall that video depicting
7  Officer Bergeron walking past cells without
8  looking in them?
9  A.  I -- like I said, if I had seen that, I
10 would have reported it to -- up my chain of
11 command, because that would have been definitely
12 dereliction of duty and some negligence.  So we
13 have a duty to report, as part of our policies, so
14 that would definitely stand out to me while
15 watching -- reviewing video and watching staff do
16 their rounds, so because like -- since I can't
17 have that photographic memory of exactly what I
18 was looking at.
19 Q.  Right.
20 A.  The fact that I didn't do any paperwork
21 means the round was done successfully to -- it was
22 done by proper procedure.
23 Q.  Okay.  But you don't know, sitting here

Page 69

1  today, if you reviewed that video footage of
2  Officer Bergeron doing the round, the 3:45 round?
3  A.  I know that I reviewed hours of video
4  going back to -- I think he was coming back from a
5  visit originally when he first came onto the unit.
6  Q.  Yup.
7  A.  So I would have -- on September 5th, the
8  date that I went back and looked at the video, I
9  would have looked at everything, trying to figure
10 out the timeline.  And so in those courses, then
11 I'd have to honestly say, yes, I would have seen
12 the staff going in and doing their rounds.  But if
13 they had done something against policy, I would
14 have reported it.
15 Q.  Okay.  Now, F block has two levels; is
16 that correct?
17 A.  Yeah, lower -- lower tier, half the
18 unit -- half the cells are on one level, and the
19 other half are on a mezzanine.
20 Q.  And when -- so two officers go in and do
21 rounds at any given time; is that right?
22 A.  Yup, they do rounds in pairs.
23 Q.  Does one -- is one officer responsible

1    for one tier and the other officer responsible for
2    the other tier?
3    A.  That's generally how they do it.  They
4    split up or they — one person takes the lower.
5    One person takes the upper.  They always try to be
6    at least visually or within sound of each other.
7    They're not -- they don't do rounds like standing
8    next to each other.
9    Q.  How long should it take, if a round is
10   done properly, to do a round of a given tier?
11   A.  That's pretty subjective.  Personally, my
12   standard that I'd like to see staff do is to go
13   through — like I said, they want -- I want them
14   to check the cells.  Now, could they stop and do a
15   cell search?  That would take more time.  Could
16   they stop and if an inmate asked them a question,
17   and that might take more time to do a round.
18   There's a lot of variables.  Like they might want
19   to search the bathroom or they might go in and
20   then try to throw the inmates off and go right
21   back in, but just walk through.  Like they met
22   their criteria.  They've done their one round the
23   hour, but they want to come in and do a random,

1    like maybe we'll catch them like cell-hopping on
2    this next one type of thing, and they'll go and
3    cut through.  So they've already checked the cells
4    that hour, but they do a quick one just to throw
5    them off.  So, yeah, a proper round could take
6    three or four minutes and then if — depending if
7    they stop and talk to inmates or do a cell search
8    or if they do more, they could be in there for 15
9    minutes.
10  Q.  All right.  So you told me that you were
11   a sergeant between 2008 and 2015, right?
12  A.  Yup.
13  Q.  Prior to being a sergeant, what role did
14   you have?
15  A.  Corporal before that.
16  Q.  And what are the job responsibilities of
17   corporal?
18  A.  Not as intensive as sergeant because as a
19   corporal, you can't be a shift commander.  You can
20   be the person that runs the movement in the
21   hallway.  You generally work in one of the housing
22   areas.  You could be -- like we have, say, the
23   lower housing.  You could be the officer in

1    charge, the OIC, of that area.  Generally
2    corporals work under sergeants.  So you might have
3    a sergeant that's responsible for the lower
4    housing units and a corporal who's their assistant
5    sort of that helps with many of the aspects of the
6    job.
7    Q.  Okay.  And how long were you a corporal?
8    A.  About three years.
9    Q.  That takes you back to 2005?
10  A.  Yup.
11  Q.  And before being a corporal, what were
12   you?
13  A.  An officer.
14  Q.  And you were an officer from 2002 to
15   2005?
16  A.  Yeah.
17  Q.  And before 2002, how were you employed?
18  A.  Where was I employed before that?
19  Q.  How were you employed?
20  A.  I worked for the U.S. Forest Service as
21   a back country ranger.
22  Q.  What's your educational background?
23  A.  I went to Sir Sandford Fleming College in

1    Lindsay, Ontario; two-year diploma in fish and
2    wildlife technician, and I took a third-year
3    option in natural resources law enforcement.
4    Q.  In the August of 2012 time period was F
5    block any more violent than other housing blocks
6    in this facility?
7    A.  It was a general population unit, so
8    they're -- everyone's -- they're considered a C3,
9    the minimum general population classification.
10   I'm not sure if you're familiar with our --
11  Q.  I'm not.  I'm not.
12  A.  -- classification levels.  We have C1
13   through C5.  C5 is the maximum security, which are
14   down in the Concord prison.  We have C1's, which
15   are the inmates that live at the halfway houses.
16   C2's are minimum security.  We have C2's here in
17   our gym dorm.  C2's are the ones that, if
18   approved, they're able to work outside the fence
19   line, maintain the grounds.
20          C3 is the largest of the classification.
21   That's our general population.  C4 is closed
22   custody where they -- usually due to disciplinary
23   history, they eventually get upgraded, or due to

Page 74

1  an incident they may get upgraded. They're not
2  quite maximum security, but they are limited.
3  Their movements are more restricted.
4      So at NCF we have -- I'm not even sure of
5  our count at the time, but at NCF we have about 50
6  C2's, and everyone else is a C3. So outside of
7  specific housing units that might be assigned as a
8  program unit, they're general population. They're
9  mixed.
10 Q. Okay. Did you have any familiarity with
11 Jonathan Leite before August 24th, 2012?
12 A. Actually, I remember looking in the
13 incident report log. There was one incident where
14 he got into a -- there was -- oh, he -- it was
15 like a fake fight that happened on a block where
16 staff — I forget the — there was one incident
17 that was pretty noteworthy that I remembered the
18 name Leite. I wasn't involved in it myself. It
19 was one of those things that you read in a
20 briefing; that he had gotten into a horseplay
21 fight that was supposed to distract staff, and
22 that was like, oh, I now know that name. So I
23 can't say that I had any personal interactions

Page 75

1  with Leite, but the name was familiar.
2  Q. Okay.
3      MR. KING: All right. Thank you for your
4  time, sir.
5      THE WITNESS: Oh, you're welcome.
6      MS. CUSACK: I do have a couple questions
7  for you, --
8      THE WITNESS: Okay.
9      MS. CUSACK: -- Captain Smith.
10     EXAMINATION
11     BY MS. CUSACK:
12 Q. You and Attorney King have spent some
13 time talking about rounds. Is an officer required
14 completing a round required to open a cell door to
15 look in?
16 A. No.
17 Q. When they are looking into the cell,
18 describe what they're -- what you would expect
19 them to be looking at?
20 A. They're looking for anything out of the
21 ordinary. And we talked about cell-hopping. So
22 something out of the ordinary would be if they saw
23 three inmates in a cell, obviously that's --

Page 76

1  something's going on in there. There's someone in
2  there that's not supposed to be in there.
3      But generally, you're just looking to
4  make sure they're not tattooing each other,
5  they're not using drugs, they're not -- various
6  infractions. So it's not until a count that
7  you're actually identifying inmates and making
8  sure they're all in their proper cells and they're
9  all healthy and able to stand. That's why it's
10 called a standing count. And those are done
11 generally twice a shift.
12 Q. What, if anything, is a corrections
13 officer supposed to be looking at as far as
14 identifying an inmate in a particular cell?
15 A. During a round?
16 Q. Yes.
17 A. How would they identify them?
18 Q. Are they asking to see an ID?
19 A. No. No.
20 Q. If they see someone in a bed, what --
21 A. Them sleeping during the day is
22 absolutely normal. So if you went by a cell and
23 saw an inmate laying on a bed, that would be

Page 77

1  normal.
2  Q. You and Attorney King had also spent some
3  time talking about what an individual in a CP or
4  the bubble would see on video. If an officer in
5  the bubble in CP-5 had a screen of a hallway up,
6  could they be also looking at the same time at
7  Echo and Fox on a different screen?
8  A. No.
9  Q. So they can only look at one other unit
10 at a time?
11 A. Yeah, so --
12 Q. And can they pull up two views at that
13 time in that same unit?
14 A. If they have one on the hallway, no.
15 Q. If --
16 A. There'd be only one other monitor that
17 could be used. Like I said, generally the normal
18 thing is to keep one monitor on the hallway
19 because you want to control -- making sure staff
20 versus inmates. You always want to identify,
21 before you allow someone into a unit, what their
22 purpose is and where they're going. So one
23 generally stays on the corridor. The question was

Page 78

1  do they have the ability to change them? Yes,
2  there is definitely the ability. But general
3  practice is one stays on the corridor. One is the
4  one that you use to -- when you have a moment of
5  free time, when you're not opening a door, that
6  you can cycle through the cameras and determine if
7  anything is out of the ordinary.
8  Q. And to see if someone is cell-hopping,
9  how long would one need to look at a particular
10 screen?
11 A. That would -- depending on the
12 circumstance, it could take some time. You'd have
13 to -- if you saw one person exiting a cell, that
14 would be normal. Now, if you saw them exit a cell
15 and then go into another cell, then you could
16 probably determine that they had been cell-hopping
17 either when they left the cell or the one they
18 just entered. So that would be unusual. But
19 you'd have to sit there and watch one inmate out
20 of all the other things going on in that shot and
21 watch that guy. That's why it's advantageous to
22 take the time like I did that -- in September to
23 -- when you know an incident occurred, to take the

Page 79

1  time to go and watch quietly hours of video, with
2  no interruptions. You don't have to worry about
3  buzzers going off, the phone ringing, the --
4  that's the best time to really get the full
5  picture, like I said, going backwards in time and
6  then watching. It's -- that's how you get the
7  detail. Like when I was monitoring in September,
8  I was looking for Inmate Leite the moment he
9  walked in that unit and each -- where he went and
10 the people he interacted with and the cells he
11 went to. That was the best time to get those
12 details. To do that live in a control room would
13 be practically impossible.
14   MS. CUSACK: One second. (Conferring.)
15 All right. That's all I have. Thank you.
16   MR. KING: I have a few follow-up.
17   FURTHER EXAMINATION
18   BY MR. KING:
19 Q. Are the corrections officers who are
20 doing rounds of the F block supposed to know who
21 is assigned to which cell?
22 A. At count time they have a count sheet,
23 and they have to ensure that the inmates are in

Page 80

1  their proper cells that they're assigned to. They
2  have their IDs. They're standing. They face the
3  cell -- they face the door, sorry, so you have a
4  positive. They're not supposed to wear hats.
5  They're going to take them off.
6    During a round, no, you wouldn't know --
7  like I said, you're just looking for things that
8  are out of the ordinary during a round. You're
9  not -- two inmates in a cell would be normal
10 during a round. If the officer can -- sees two
11 faces and recognizes who they are and also knows
12 that that's not their cell, without a count sheet
13 in front of them, no. That would be a little
14 unusual unless you have a really good memory and
15 have worked that unit for years and, you know, you
16 really get to know the inmates. And that's tough.
17 That's tough to do, to have that all memorized
18 during a round. It's -- the main practice is
19 identify infractions, make sure that everybody is
20 alive. You know, like no one is fighting. No one
21 is doing drugs. You're just looking for abnormal,
22 unusual events when you're doing a round.
23 Q. Right. And if you have more than two

Page 81

1  inmates in a single cell, then that's an indicator
2  that cell-hopping is occurring, right?
3  A. Yes. Yeah. Yeah. Any time, yeah. If
4  you saw three inmates in a cell, that would
5  immediately make you stop and be like, all right,
6  who doesn't belong in here; get out. And you'd
7  get their ID and possibly issue them a
8  disciplinary report.
9  Q. And does -- did the policy that rounds
10 were supposed to be done every hour mean that no
11 more than one hour should pass without corrections
12 officers doing a round through the cellblock?
13 A. I believe it's written that it has to be
14 done within the hour. It's only -- and it might
15 be after 2012. It's only the, oh, one tier in
16 Concord that has a maximum security wing. I don't
17 think it's SPU 2. There's one -- only one tier in
18 New Hampshire where it's specifically written that
19 no more 30 minutes can pass between rounds. That
20 was due to case law. In general, rounds have to
21 be done sometime within the hour.
22 Q. Okay. The hour being the 2:00 hour, the
23 3:00 hour?

Page 82

1   A.  Yeah.  If you do one between 2:00 and
2  259, that meets criteria.  Then your next round
3  needs to be done between 3 and 3:59.  That's why
4  we -- like that's why the staff usually do more
5  than the minimum, because they don't want that
6  much time to go by.  But as long as they're
7  meeting that -- they're meeting the criteria if
8  they do like -- just like how the -- that's why
9  it's laid out like this (indicating).  Like if
10  they do one during 1300 to 1359, they write it in
11  that block and that meets the policy requirement.
12     MS. CUSACK: Just for the record, when
13  you said "laid out like this," you were referring
14  to Smith 5?
15     THE WITNESS: Oh.  Yes.
16     MS. CUSACK: Okay.
17     MR. KING: All right.  Thank you.
18     (Deposition concluded at 12:33 p.m.)
19
20
21
22
23

Page 84

1     CORRECTION AND SIGNATURE PAGE
2    **DEPOSITION:** Jeffrey Smith
3    **DATE OF DEPOSITION:** August 30, 2017
4  PAGE LINE    NOW READS     SHOULD READ
5  _____ ___ _____ _____
6  _____ ___ _____ _____
7  _____ ___ _____ _____
8  _____ ___ _____ _____
9  _____ ___ _____ _____
10  _____ ___ _____ _____
11  _____ ___ _____ _____
12  _____ ___ _____ _____
13  _____ ___ _____ _____
14  _____ ___ _____ _____
15  _____ ___ _____ _____
16  _____ ___ _____ _____
17  _____ ___ _____ _____
18  _____ ___ _____ _____
19
20  Dated this _____ day of _____, 2017.
21
22    _____
23    Jeffrey Smith

Page 83

1     CERTIFICATE OF WITNESS
2
3  I, Jeffrey Smith, have read the foregoing
4  transcript of deposition taken on Wednesday,
5  August 30, 2017, at the Northern NH Correctional
6  Facility, Berlin, New Hampshire, and do hereby
7  swear/affirm it is an accurate and complete record
8  of my testimony given under oath in the matter of
9  Leite v. Goulet, et al., including any and all
10  corrections that may appear on those pages denoted
11  as "Corrections."
12
13    _____
14    Jeffrey Smith
15  STATE OF _____
16  COUNTY OF _____
17
18  Subscribed and sworn to before me this _____ day
19  of _____, 2017.
20
21    _____
22  Notary Public_____ J.P._____
23  My Commission Expires:_____

Page 85

1      C E R T I F I C A T E
2    I, Celeste A. Quimby, a Licensed Court
3  Reporter of the State of New Hampshire, do hereby
4  certify that the foregoing is a true and accurate
5  transcript of my stenographic notes of the
6  deposition of Jeffrey Smith, who was first duly
7  sworn, taken at the place and on the date
8  hereinbefore set forth.
9    I further certify that I am neither attorney
10  nor counsel for, nor related to or employed by any
11  of the parties to the action in which this
12  deposition was taken, and further that I am not a
13  relative or employee of any attorney or counsel
14  employed in this case, nor am I financially
15  interested in this action.
16    THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
17  DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
18  ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
19  DIRECTION OF THE CERTIFYING REPORTER.
20
21
22
23     CELESTE A. QUIMBY, LCR No. 17

PLEASE CHECK EVERY ITEM THAT APPLIES      ONLY ONE INCIDENT REPORT PER INCIDENT IS REQUIRED

**GENERAL CATEGORY**

- [ ] 10 Reportable Observation
- [X] 11 Assault/Disturbance
- [X] 12 Injury/Accident
- [ ] 13 Use of Force
- [X] 14 Med/Dent/Mental Health
- [ ] 15 Escape, Escape Activity
- [ ] 16 Arrest
- [ ] 17 Alleged Crime,
       Offender or Employee
- [ ] 18 Hostage Situation
- [ ] 19 Haz-mat Situation
- [ ] 20 Lost Tool
- [ ] 21 Fire Alarm/Drill
- [ ] 22 Policy Variance
- [ ] 23 Safety Issue or
       Other Hazard
- [ ] 25 Employee Injury
- [ ] 26 Other

**STATE OF NEW HAMPSHIRE**
**Department of Corrections**
**Incident Report**
Side 1 of 2

[ ADM-34 ]

- [ ] Initial Report
- [X] Follow-up Report

*Page 1 of 2*

**ORIGINATING DIVISION**

- [ ] 50 Headquarters
- [ ] 51 NHSP-M
- [ ] 52 NHSP-W
- [ ] 53 LRF
- [ ] 54 Medical/Forensic Services
- [ ] 55 Community Corrections
- [ ] 56 Field Services
       D.O.: _____
- [X] 57 NCF

| Date of Incident | Time of Incident | Specific Location (facility, building, unit/cell etc.) |
|---|---|---|
| 8-24-12 | 1708 | NCF, D-Building, F-Block, Dayroom + cell #9 |

**PERSONS INVOLVED**

| | Last Name | First Name | | |
|---|---|---|---|---|
| 1. | Leite | Jonathan | [X] Resident # 86003   [ ] Staff | [ ] Probationer [ ] Visitor [ ] Parolee [ ] Other: |
| 2. | Gelinas | Jonathan | [X] Resident # 86728   [ ] Staff | [ ] Probationer [ ] Visitor [ ] Parolee [ ] Other: |
| 3. | E_____ | R_____ | [X] Resident # _____   [ ] Staff | [ ] Probationer [ ] Visitor [ ] Parolee [ ] Other: |
| 4. | | | [ ] Resident # _____   [ ] Staff | [ ] Probationer [ ] Visitor [ ] Parolee [ ] Other: |
| 5. | | | [ ] Resident # _____   [ ] Staff | [ ] Probationer [ ] Visitor [ ] Parolee [ ] Other: |

**PERSONS NOTIFIED**

| | Name | By Whom | Time | How Notified |
|---|---|---|---|---|
| 6. | Captain Lambertson | Sgt. J. Smith | 2000 | By phone |
| 7. | Tim Coulombe | Sgt. Smith | 2015 | By phone / left message |
| 8. | | | | |

**DIRECTIONS:** Complete all applicable sections below. If report of REPORTABLE OBSERVATION, PHYSICAL FORCE, MED / DENT / M.H., FIRE, or LOST TOOL, complete narrative section for all types of incidents.

**COMPLETE APPLICABLE AREAS (check applicable issues)**

**Rpt Obs**
- [ ] 101 Suspected/Actual Breach of Security
- [ ] 102 Suspected/Actual Drug/Alcohol Activity
- [ ] 103 Suspected/Actual Gang Activity
- [ ] 104 Newsworthy Events
- [ ] 105 Allegation of Misconduct by Employee
- [X] 106 Unusual Events, Circumstances
- [ ] 107 Event which if ongoing will result in more serious events

**Use of Force**

Type Force:
- [ ] 401 Deadly
- [ ] 402 Chemical
- [ ] 403 Physical
- [ ] 404 Impact Weapon

Medical Attention:
- Offered: [ ] Yes [ ] No
- Requested: [ ] Yes [ ] No
- Received: [ ] Yes [ ] No
- Declined: [ ] Yes [ ] No → How declined:

- e Clearly describe in narrative circumstances requiring force
- g List all individuals involved in the use of force in the section above, "Persons Involved" or in the narrative and attach statements from each to this report
- By whom; when: _____

**Medical / Dent / M.H.**

Medical Treatment:
- [X] 201 Assault—Injury
- [ ] 202 Assault—No Injury
- [X] 203 Emergency Resp., Life Threatening
- [ ] 204 Medical Tx, Non-life Threatening
- [ ] 205 Hunger Strike
- [ ] 206 Suicide or Attempt
- [ ] 207 Missing Medical Record
- [ ] 208 Inmate Non-Compliance with Diet
- [ ] 209 Other Dietary Issue
- [ ] 210 Death
- [ ] 211 Self-Harm
- [ ] 212 Unusual/Bizarre Inmate Behavior
- [ ] 213 Needlestick

Pharmacy/Medication Issues:
- [ ] 214 Patient Drug Misuse
- [ ] 215 Overdose
- [ ] 216 Drug Reaction
- [ ] 217 Expiration Date
- [ ] 218 Incorrect Dosage
- [ ] 219 Incorrect Amount
- [ ] 220 Incorrect Route
- [ ] 221 Incorrect Medication
- [ ] 222 Incorrect Patient

**Employee Injury**

e Provide in narrative section a full description of the incident (how injury occurred, including what the employee was doing at the time of the injury)

Date and Name of supervisor notified of injury: _____

Description of injury: _____

Was medical attention sought? [ ] No [ ] Yes, on Date: _____ Treatment Provider _____

TIME LOST FROM WORK:    Address: _____

How many days of work were missed as a result of the injury? _____

Is the employee expected to be on an extended disability (more than 14 days)? [ ] No [ ] Yes, probable length of disability is: _____

RETURN TO WORK:

Has the injured employee returned to work? [ ] No [ ] Yes, date and time of return: _____

Has sick leave time slip been submitted? [ ] No [ ] Yes

Δ π EXHIBIT 2
SMITH
Deponent
8-30-17   C4
Date _____ Rptr _____
WWW.DEPOBOOK.COM

REMINDER: SUPERVISOR MUST COMPLETE
SUPERVISOR ACCIDENT INVESTIGATION FORM

**Important: Continue to Side 2**

000019

**Fire**

**Property Damage:**
- [ ] 301 Prison Cell, Male
- [ ] 302 Prison Cell, Female
- [ ] 303 Minimum Security Facility
- [ ] 304 Psychiatric Facility
- [ ] 305 Vocational Training Area
- [ ] 306 Industries
- [ ] 307 Common Area
- [ ] 308 Trash Can
- [ ] 309 Office Space
- [ ] 310 Open Land, Field, Etc.
- [ ] 311 Other

**Ignition Factor**
- [ ] 312 Incendiary--not during civil disturbance
- [ ] 313 Incendiary--during civil disturbance
- [ ] 314 Suspicious--not during civil disturbance
- [ ] 315 Suspicious--during civil disturbance
- [ ] 316 Cutting/welding operations
- [ ] 317 Fuel spill
- [ ] 318 Combustible too close to heat of ignition
- [ ] 319 Part failure
- [ ] 320 Short circuit
- [ ] 321 Lack of Maintenance
- [ ] 322 Undetermined
- [ ] 323 Other

**Method of Alarm:**
- [ ] 324 Alarm System
- [ ] 325 Radio Report
- [ ] 326 Verbal Report
- [ ] 327 No Alarm Created

**Suppression:**
- [ ] 328 Self-extinguished
- [ ] 329 Makeshift aid
- [ ] 330 Portable Extinguisher
- [ ] 331 Automatic System
- [ ] 332 Standpipe Hose
- [ ] 333 Other

**Lost Tool**

Describe in Narrative:
- Tool Description
- Tool Classification
- Tool Markings

**Narrative (Who, what, where, when, why, how, contributing factors, action taken, etc.):**

I reviewed the video of the I/m Leite incident on F-Block. While I started, I asked Sgt. Sweatt over the net if this was an assault or drug related. He replied "I'm thinking it might be drug related now." Going back from the time he was discovered during count, I saw a time where he leaned over and vomited onto the floor. Other than that, he was laying motionless on his top bunk. It was at 1620 when I saw that he exited cell #9. He came out without his shirt on and immediately collapsed. The inmate who lives in cell #9, later identified as I/m Gelinas, was seen helping I/m Leite up and getting him into his dayroom bunk. At this time I notified the upper housing team to search cell #9 as I was still thinking that I/m Leite was under the influence of a drug or alcohol. That search came up negative and F-Block remained locked down. I finally allowed F-Block to go to chow as I tried to figure out when I/m Leite entered cell #9, I did see I/m E████ who also lives in cell #9, go in and out several times. It appears that I/m Leite went into the cell sometime at the end of 1st shift. I received a call from Ofc. Bergeron, who was at AVH with I/m Leite, stating that the inmate had been assaulted. I sent the order to detain I/m Gelinas and I/m E████ and put them on PAR status. I received another call from Ofc. Bergeron at 2000 stating that I/m Leite had a skull fracture and had to be air-lifted to Dartmouth-Hitchcock (cont.)

| Reporting Staff Member (PRINT) | Signature | Date Completed | Time Completed |
|---|---|---|---|
| Sgt. Jeff Smith | Sgt. J. Smith | 8-24-12 | 2204 |

| Approving Supervisor/OIC (PRINT) | Signature | Date Reviewed | Time Reviewed |
|---|---|---|---|
| Sgt. Jeff Smith | Sgt. J. Smith | 8-24-12 | 2204 |

**Distribution of All Reports (by Reporting Person):**
- [x] Investigations (Original)
- [x] Unit / Bureau Copy
- [x] Shift Commander / Supervisor / Regional Administrator
- [x] Lieutenant / Division Director

**Distributed to Others As Warranted (by Shift Commander / Supervisor / R.A.):**
1. Commissioner's Office (for Database Management)   3. _____
2. _____   4. _____

000020

PLEASE CHECK EVERY ITEM THAT APPLIES                                ONLY ONE INCIDENT REPORT PER INCIDENT IS REQUIRED

**GENERAL CATEGORY**

- [ ] 10 Reportable Observation
- [ ] 11 Assault/Disturbance ☒
- [ ] 12 Injury/Accident
- [ ] 13 Use of Force
- [ ] 14 Med/Dental/Mental Health ☒
- [ ] 15 Escape, Escape Activity
- [ ] 16 Arrest
- [ ] 17 Alleged Crime, Offender or Employee
- [ ] 18 Hostage Situation
- [ ] 19 Haz-mat Situation
- [ ] 20 Lost Tool
- [ ] 21 Fire Alarm/Drill
- [ ] 22 Policy Variance
- [ ] 23 Safety Issue or Other Hazard
- [ ] 25 Employee Injury
- [ ] 26 Other

### STATE OF NEW HAMPSHIRE
### Department of Corrections
## Incident Report
Side 1 of 2

[ADM-34]

- [ ] Initial Report
- [x] Follow-up Report

*Page 2 of 2*

**ORIGINATING DIVISION**

- [ ] 50 Headquarters
- [ ] 51 NHSP-M
- [ ] 52 NHSP-W
- [ ] 53 LRF
- [ ] 54 Medical/Forensic Services
- [ ] 55 Community Corrections
- [ ] 56 Field Services
  - D.O.
- [x] 57 NCF

---

**PERSONS INVOLVED**

| Date of Incident | Time of Incident | Specific Location (facility/building/unit/room) |
|---|---|---|
| 8-24-12 | 1708 | NcF, D-Building, F-Block, Dayroom + cell #9 |

| | Last Name | First Name | How Involved | |
|---|---|---|---|---|
| 1. | Leite | Jonathan | ☒ Resident # 86003 / [ ] Staff | [ ] Probationer [ ] Visitor / [ ] Parolee [ ] Other: |
| 2. | Gelinas | Jonathan | ☒ Resident # 80728 / [ ] Staff | [ ] Probationer [ ] Visitor / [ ] Parolee [ ] Other: |
| 3. | E_____ | R_____ | ☒ Resident # _____ / [ ] Staff | [ ] Probationer [ ] Visitor / [ ] Parolee [ ] Other: |
| 4. | | | [ ] Resident # _____ / [ ] Staff | [ ] Probationer [ ] Visitor / [ ] Parolee [ ] Other: |
| 5. | | | [ ] Resident # _____ / [ ] Staff | [ ] Probationer [ ] Visitor / [ ] Parolee [ ] Other: |

**PERSONS NOTIFIED**

| | Name | By Whom | Time | How Notified |
|---|---|---|---|---|
| 6 | Captain Lambertson | Sgt. J. Smith | 2000 | By phone |
| 7 | Tim Coulombe | Sgt. J. Smith | 2015 | By phone / left message |
| 8 | | | | |

---

**DIRECTIONS:** Complete all applicable sections below. If report of REPORTABLE OBSERVATION, PHYSICAL FORCE, MED / DENT / MH., FIRE, or LOST TOOL, complete narrative section on all types of incidents.

**Rpt Obs**
- [ ] 101 Suspected/Actual Breach of Security
- [ ] 102 Suspected/Actual Drug/Alcohol Activity
- [ ] 103 Suspected/Actual Gang Activity
- [ ] 104 Newsworthy Events
- [ ] 105 Allegation of Misconduct by Employee
- [x] 106 Unusual Events, Circumstances
- [ ] 107 Event which if ongoing will result in more serious events

**Use of Force**
Type Force:
- [ ] 401 Deadly
- [ ] 402 Chemical
- [ ] 403 Physical
- [ ] 404 Impact Weapon

Medical Attention:
- Offered: [ ] Yes [ ] No
- Requested: [ ] Yes [ ] No
- Received: [ ] Yes [ ] No
- Declined: [ ] Yes [ ] No → How declined: _____

- Clearly describe in narrative circumstances requiring force
- List all individuals involved in the use of force in the section above, "Persons Involved" or in the narrative and attach statements from each to this report.
- By whom, when: _____

**Medical / Dent / M.H.**
Medical Treatment:
- [x] 201 Assault—Injury
- [ ] 202 Assault—No Injury
- [x] 203 Emergency Resp., Life Threatening
- [ ] 204 Medical Tx, Non-life Threatening
- [ ] 205 Hunger Strike
- [ ] 206 Suicide or Attempt
- [ ] 207 Missing Medical Record
- [ ] 208 Inmate Non-Compliance with Diet
- [ ] 209 Other Dietary Issue
- [ ] 210 Death
- [ ] 211 Self-Harm
- [ ] 212 Unusual/Bizarre Inmate Behavior
- [ ] 213 Needlestick

Pharmacy/Medication Issues:
- [ ] 214 Patient Drug Misuse
- [ ] 215 Overdose
- [ ] 216 Drug Reaction
- [ ] 217 Expiration Date
- [ ] 218 Incorrect Dosage
- [ ] 219 Incorrect Amount
- [ ] 220 Incorrect Route
- [ ] 221 Incorrect Medication
- [ ] 222 Incorrect Patient

**Employee Injury**

- Provide in narrative section a full description of the incident (how injury occurred, including what the employee was doing at the time of the injury)

Date and Name of supervisor notified of injury _____

Description of injury _____

Was medical attention sought? [ ] No [ ] Yes, on Date: _____   Treatment Provider _____

**TIME LOST FROM WORK:**   Address: _____

How many days of work were missed as a result of the injury? _____

Is the employee expected to be on extended disability (more than 14 days)? [ ] No [ ] Yes, probable length of disability is _____

**RETURN TO WORK:**

Has the injured employee returned to work? [ ] No [ ] Yes, date and time of return: _____

Has sick leave time slip been submitted? [ ] No [ ] Yes

**REMINDER: SUPERVISOR MUST COMPLETE SUPERVISOR ACCIDENT INVESTIGATION FORM**

*Important: Continue to Side 2*

| | | | |
|---|---|---|---|
| **Property Damage:** | **Ignition Factor** | **Method of Alarm:** | **Suppression:** |

**Fire**

Property Damage:
- [ ] 301 Prison Cell, Male
- [ ] 302 Prison Cell, Female
- [ ] 303 Minimum Security Facility
- [ ] 304 Psychiatric Facility
- [ ] 305 Vocational Training Area
- [ ] 306 Industries
- [ ] 307 Common Area
- [ ] 308 Trash Can
- [ ] 309 Office Space
- [ ] 310 Open Land, Field, Etc.
- [ ] 311 Other

Ignition Factor:
- [ ] 312 Incendiary--not during civil disturbance
- [ ] 313 Incendiary--during civil disturbance
- [ ] 314 Suspicious--not during civil disturbance
- [ ] 315 Suspicious--during civil disturbance
- [ ] 316 Cutting/welding operations
- [ ] 317 Fuel spill
- [ ] 318 Combustible too close to heat of ignition
- [ ] 319 Part failure
- [ ] 320 Short circuit
- [ ] 321 Lack of Maintenance
- [ ] 322 Undetermined
- [ ] 323 Other

Method of Alarm:
- [ ] 324 Alarm System
- [ ] 325 Radio Report
- [ ] 326 Verbal Report
- [ ] 327 No Alarm Created

Suppression:
- [ ] 328 Self-extinguished
- [ ] 329 Makeshift aid
- [ ] 330 Portable Extinguisher
- [ ] 331 Automatic System
- [ ] 332 Standpipe Hose
- [ ] 333 Other

**Lock Tool**

Describe in Narrative:
- • Tool Description
- • Tool Classification
- • Tool Markings

**Narrative (Who, what, where, when, why, how, contributing factors, action taken, etc.):**

Medical Center. (Ofc. Chapman rode in the helicopter). I called Capt. Lambertson to advise him of the situation. After this, cell #9 in F-Block was treated as a crime scene and I called Tim Coulombe and left a message. The two PAR'd inmates already had their property bagged to be inventoried, so unfortunately the crime scene is already disturbed. #/M Grelinas & #/M E█████ are both currently housed & in HSC. End of report.

| Reporting Staff Member (PRINT): | Signature | Date Completed | Time Completed |
|---|---|---|---|
| Sgt. Jeff Smith | Sgt. J. Smith | 8-24-12 | 2204 |
| Approving Supervisor/OIC (PRINT): | Signature: | Date Reviewed: | Time Reviewed |
| Sgt. Jeff Smith | Sgt. J. Smith | 8-24-12 | 2204 |

Distribution of All Reports (by Reporting Person):
- [x] Investigations (Original)
- [x] Unit / Bureau Copy
- [x] Shift Commander / Supervisor / Regional Administrator
- [x] Lieutenant / Division Director

Distributed to Others As Warranted (by Shift Commander / Supervisor / R.A.):

1. Commissioner's Office (for Database Management)    3. _____

2. _____    4. _____