UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * *  *
                          *
JONATHAN LEITE,           * Case No.
            Plaintiff,    * 1:15-cv-00280-PB
                          *
       v.                 * Volume: 1
                          * Pages: 1-49
CORRECTIONS OFFICERS MATTHEW GOULET,* Exhibit: 1
ELMER VAN HOESEN, MICHAEL BEATON,   *
LYNN MCLAIN, HEATHER MARQUIS,       *
TREVOR DUBE, RHIANNE SNYDER, EDDY   *
L'HEUREUX, JEFFREY SMITH, DWANE     *
SWEATT, YAIR BALDERRAMA, BOB MORIN, *
EJIKE ESOBE, AND KATHY BERGERON,    *
            Defendants.   *
                          *
* * * * * * * * * * * *  *
```

DEPOSITION OF LYNN McLAIN

Deposition taken by counsel at the
Northern Correctional Facility, 138
East Milan Road, Berlin, New Hampshire,
on Friday, September 1, 2017, from
10:05 a.m. to 11:48 a.m.

Court Reporter:
Karen L. Leach, LCR No. 38
(RSA 310-A:179)

Page 2

```
 1              I N D E X
 2
 3  WITNESS:    Lynn McLain
 4
 5
 6  EXAMINATION BY:                          Page
 7        Mr. King                              4
 8        Ms. Cusack                           43
 9        Mr. King                             45
10
11
12              INDEX TO EXHIBITS*
13  Description                              Page
14  McLain
15  Exhibit 1   8/24/12 Shift Log               5
16
17
18  NOTE:  Exhibit returned to Attorney King.
19
```

Page 3

```
 1  APPEARANCES:
 2
 3  For the Plaintiff:
        DOUGLAS, LEONARD & GARVEY, P.C.
 4      By: Benjamin King, Esq.
            -and-
 5      Megan E. Douglass, Esq.
        14 South Street, Suite 5
 6      Concord, NH 03301
        Phone: 603.224.1988
 7      E-Mail: Benjamin@nhlawoffice.com
                Mdouglass@nhlawoffice.com
 8
 9  For the Defendant:
        NEW HAMPSHIRE DEPARTMENT OF JUSTICE
10      OFFICE OF THE ATTORNEY GENERAL
        By: Francis K. Fredericks, Jr., Esq.
11          -and-
        Lynmarie C. Cusack, Esq.
12      33 Capitol Street
        Concord, NH 03301
13      Phone: 603.271.3658
        E-Mail: Francis.fredericksjr@doj.nh.gov
14              Lynmarie.cusack@doj.nh.gov
15              STIPULATIONS
16    It is agreed that the deposition shall be taken
    in the first instance in stenotype and when
17  transcribed may be used for all purposes for which
    depositions are competent under the Federal Rules of
18  Civil Procedure.
       Notice, filing, caption and all other formalities
19  are waived.  All objections except as to form are
    reserved and may be taken in court at time of trial.
20     It is further agreed that if the deposition is
    not signed within thirty (30) days after submission to
21  counsel, the signature of the deponent is waived.
```

Page 4

1 LYNN McLAIN,
2 having been duly sworn by Ms. Leach,
3 was deposed and testified as follows:
4 EXAMINATION
5 BY MR. KING:
6 Q. Please state your full name for the record.
7 A. Lynn McLain.
8 Q. Who is your employer, Ms. McLain?
9 A. The prison. This prison. The correctional
10 facility. The state.
11 Q. Okay. So you're employed here at Northern
12 New Hampshire Correctional --
13 A. They.
14 Q. -- Facility?
15 A. Yes.
16 MS. CUSACK: I'm just going to remind you to
17 wait until he finishes his question, then you can
18 answer.
19 THE WITNESS: Okay.
20 Q. MR. KING: How long have you been employed
21 at the Northern New Hampshire Correctional Facility?
22 A. 14 years.
23 Q. What title do you currently hold?

Page 5

1 A. CO.
2 Q. Were you also a CO on or about August 24,
3 2012?
4 A. Yes.
5 Q. In your 14 years being employed here at the
6 Northern New Hampshire Correctional Facility, have you
7 held any title other than CO?
8 A. No.
9 Q. To whom did you report on August 24, 2012?
10 A. Sergeant -- Lieutenant Boula (ph).
11 MR. KING: Let's mark this.
12 (McLain Exhibit 1 was
13 marked for identification.)
14 Q. BY MR. KING: Showing you a document that
15 we've marked as McLain Exhibit 1, this is a shift log
16 for August 124, 2012, correct?
17 A. Yes.
18 Q. And this reflects that on the first shift on
19 August 24, 2012, you were assigned to CP-5, --
20 A. Yes.
21 Q. -- right?
22 And the first shift runs from seven in the
23 morning until three in the afternoon?

Page 6

1 A. Yes.
2 Q. Were you working alone in CP-5 from seven in
3  the morning until three in the afternoon?
4 A. Yes.
5 Q. Before August 24, 2012, had you ever worked
6  in CP-5?
7 A. Yes.
8 Q. What are the job responsibilities of someone
9  working in CP-5?
10 A. Monitoring the hall, upper industries which
11  is behind me. I'm facing forward. Four blocks, Echo,
12  Fox, Golf and Hotel. I monitor the stairs. I have
13  access to watch the stairs. I have a door that goes
14  into -- gets into the elevator where inmates that are
15  handicapped use the elevator. The phone, people call
16  me all the time asking me to page inmates to go to
17  either health services or to the office or wherever
18  they need to be.
19 Q. Whenever you're finished your answer, just
20  let me know. I just don't want to interrupt you.
21 A. Okay. I'm thinking.
22 Q. Okay.
23 A. And, of course, I'm -- I have two monitors.

Page 7

1  One monitor I keep on the hallway. The other monitor
2  I keep on the blocks.
3 Q. And when you say the blocks, are you
4  referring to Echo Block, Fox Block, Golf Block and
5  Hotel Block?
6 A. Yes, and I can only see one at a time.
7     MS. CUSACK: Were you finished with your
8  list by the way?
9     THE WITNESS: Oh, I probably forgot
10  something but --
11 Q. BY MR. KING: What is Industries Block? Is
12  it -- is it a block, or what is it?
13 A. No. No. The inmates go there. On one side
14  they make furniture. They do different jobs, and then
15  the other part of it the inmates make anything like
16  hobby crafts, ceramics. They build things.
17 Q. So you described for me the working
18  environment of CP-5. You're sitting down; is that
19  right?
20 A. Yes.
21 Q. And you're watching two monitor screens?
22 A. Yes.
23 Q. And one monitor screen is always showing the

Page 8

1  hallway?
2 A. Not always, but I would say 90 percent of
3  the time.
4 Q. Okay. What hallway is it showing 90 percent
5  of the time?
6 A. It's the hallway leading to the blocks.
7 Q. Okay. And the other ten percent of the time
8  what is that monitor depict?
9 A. Oh, sometimes I use it so I can have two
10  things up at once other than the hallway, but usually
11  it doesn't last long because every time someone pushes
12  a button and I hit where the button is, it makes that
13  screen go off, and I just go back to the hall. It's
14  hard not to have it on the hall all the time.
15 Q. Okay. And the monitor that is not depicting
16  the hall depicts the activity that is going on in the
17  housing blocks, E, F, G and H, right?
18 A. Yes.
19 Q. Do you have any protocol for what housing
20  block you're watching at any given time?
21 A. No. No, I toggle through. I toggle through
22  the blocks, and there is a possibility that someone
23  may call me and say, "You want to keep an eye on this

Page 9

1  block a little more today? There might be something
2  going on," but I never stay on one block. You have to
3  watch them all.
4 Q. Do you remember the pattern you followed for
5  following block activity on August 24, 2012?
6     MS. CUSACK: Objection to form. Go ahead.
7  You can -- you can answer the question.
8     THE WITNESS: Oh, okay.
9 A. No.
10 Q. BY MR. KING: Okay.
11 A. No.
12 Q. What do you habitually do when you're
13  working in CP-5 with respect to toggling through the
14  blocks and monitoring the activity in the four
15  different housing blocks?
16 A. It's random. I don't ever follow any
17  certain pattern or anything.
18 Q. Well, do you -- once you decide to watch a
19  certain block, do you tend to watch it for a certain
20  period of time?
21 A. If there seems to be activity going on that
22  might not be the norm, I may watch that block for five
23  minutes or so. If not, I just toggle through, and I

Page 10

1 may stay on a block for only two minutes. When I get
2 to the block and everything looks normal, I go on to
3 another block.
4 Q. When you decide to watch a certain block, do
5 you have one or more camera angles to choose from?
6 A. At that time?
7 Q. Yes.
8 A. We only had two stationary cameras in each
9 block. So one would be facing towards the back of the
10 block and the other one would be facing towards the
11 front.
12 Q. And on or about August 24, 2012, when you
13 decided to view a certain block, would you view it
14 from both camera angles or only one?
15 A. You can only do it with only one at a time.
16 Q. So if you decided to view a certain block,
17 would you view it from one camera angle, then from
18 another, or would you only view it from one camera
19 angle, then proceed to another block?
20     MS. CUSACK: I'm going to object to the
21 form, but go ahead.
22 A. I always do both. I look at one camera, and
23 then I do the other one.

Page 11

1 Q. BY MR. KING: Okay. Okay.
2     MR. KING: Off the record.
3     (Discussion off the record.)
4 Q. BY MR. KING: So we are going to be showing
5 you some video that was recorded at Northern New
6 Hampshire Correctional Facility of F Block beginning
7 at 2:38 p.m. on August 24, 2012.
8 A. Okay.
9 Q. Okay.
10    MR. KING: Off the record.
11    (Discussion off the record.)
12    MS. CUSACK: Just for the record, we are
13 watching a video that in the upper left-hand corner
14 says Channel 29 08/24/2012, and it's starting at 1437.
15 You hit play there.
16    MR. KING: Yes.
17    (Video played.)
18 Q. BY MR. KING: Did you see anything in that
19 video from the angle that you just observed between
20 2:38:37 and 2:38:56 that caused you any concern?
21 A. No.
22 Q. All right. Would you like to see it again?
23 A. Yes.

Page 12

1     MR. KING: Okay.
2     (Video played.)
3 Q. BY MR. KING: Okay. Now, we are going to
4 show you a different video, Ms. McLain, from a
5 different camera angle also occurring on August 24,
6 2012. We are beginning at 2:38:08, and I guess we are
7 proceeding from Camera Angle 30.
8     (Video played.)
9     MS. CUSACK: It's kind of hard to see.
10 Q. BY MR. KING: Okay. Did you see anything in
11 that footage that caused you any concern? We are now
12 -- see if I can stop it.
13 A. There seems to be activity right here just
14 so.
15    MS. CUSACK: For the record when you pointed
16 to "right here," can you describe -- just describe
17 what you mean by "right here?"
18    THE WITNESS: I don't know. It just looks
19 like the inmates.
20    MS. CUSACK: I don't know where are you
21 pointing?
22    THE WITNESS: Oh, this cell here.
23 Q. BY MR. KING: Underneath the mezzanine?

Page 13

1 A. Yes.
2 Q. Underneath the stairs is where you're
3 pointing?
4 A. Yes. Yes.
5 Q. Do you know which cell that is?
6 A. Not right offhand. It would probably be --
7 I'm not sure.
8 Q. Would it be Cell 9?
9 A. I don't believe so.
10 Q. Okay.
11 A. I think Cell 9 is somewheres right here.
12 Q. I see. All right.
13    MS. CUSACK: When you just said "somewhere
14 right here," for the record you pointed down -- if
15 you're going down the steps walking straight ahead,
16 you pointed to like the second door in or third door
17 in?
18    THE WITNESS: I just know where Cell 9 is.
19 It's just hard seeing on here, but I believe ten would
20 be the very last one on this corner, and Cell 9 would
21 be the next over.
22 Q. BY MR. KING: Okay.
23 A. I'm just trying to figure out what cell

Page 14

1  number that one is.
2  MS. CUSACK: Under the stairs.
3  THE WITNESS: Yeah.
4  Q. BY MR. KING: Why don't we resume watching
5  the video.
6  MS. CUSACK: And you ended the clip at 14:39
7  and 18.
8  MR. KING: Yes. And now we are at 2:39:25
9  and proceeding.
10  (Video played.)
11  A. I think somebody went in Cell 9.
12  MS. CUSACK: For the record you just stopped
13  at 14:42:24.
14  MR. KING: Yes.
15  Q. BY MR. KING: Now, you've been watching the
16  video from 2:39 to 2:42:24; is that right, Officer
17  McLain?
18  A. Yes.
19  Q. And have you observed any activity that
20  would cause you any concern?
21  A. It looks like there was an awful lot of
22  milling around down here.
23  Q. Yes.

Page 15

1  MS. CUSACK: For the record, when you're
2  saying "down here," you -- you pointed to what area?
3  THE WITNESS: Around Cell 9.
4  Q. BY MR. KING: If had you observed inmates
5  milling around Cell 9 as depicted in the video, would
6  that cause you any concern?
7  A. I would have started watching it for a
8  while.
9  Q. Okay.
10  A. Yes.
11  Q. Okay. Keep watching here.
12  (Video played.)
13  Q. BY MR. KING: We've watched a little over
14  three minutes of -- of video from 2:41 to 2:45 and 15
15  seconds since -- since we last spoke; is that correct?
16  MS. CUSACK: I'm going to object. We
17  started the video at 14:42:24 and ended at 14:45:15
18  for the record.
19  Q. BY MR. KING: Okay. So over the course of
20  those three minutes from approximately 2:42 to
21  2:45:15, you've observed a lot of inmates milling
22  around in the vicinity of Cell 9; is that correct?
23  A. Yes.

Page 16

1  Q. Okay. And if you had observed such activity
2  on the monitor, would that have caused you any
3  concern?
4  A. Yes.
5  Q. What, if anything, would you have done?
6  A. I would have called the office and said
7  maybe you'd better do a round.
8  Q. Okay.
9  (Video played.)
10  Q. BY MR. KING: Now, we have stopped the video
11  at 2:45:54.
12  Officer McLain, did you just observe an
13  inmate emerge from Cell 9, walk towards the stairs
14  that lead to the upper tier of F Block and wipe his
15  face with a towel?
16  A. I missed it.
17  MR. KING: Okay. How do we rewind this?
18  Off the record.
19  (Discussion off the record.)
20  MS. CUSACK: For the record, we are starting
21  at 14:45:09.
22  (Video played.)
23  A. Yep, there is -- there he is with the towel.

Page 17

1  Q. BY MR. KING: Okay.
2  MS. CUSACK: Just for the record, when you
3  say, "there he is with the towel," I'm going to put on
4  the time.
5  MR. KING: Okay.
6  MS. CUSACK: It was 14 -- 14:45:43 when you
7  said, "There is he with the towel."
8  MR. KING: Okay.
9  Q. BY MR. KING: So, Officer McLain, you just
10  observed footage of an inmate exiting Cell 9, walking
11  towards the stairs that lead to the upper tier of F
12  Block and wiping his face with a towel; is that
13  correct?
14  A. Yes.
15  Q. If you had observed an inmate leave one cell
16  and walk up the stairs to the upper tier of the block,
17  would that have caused you any concern?
18  A. No.
19  Q. No?
20  A. Not necessarily because unfortunately the
21  inmates, they go up and down the stairs all the time.
22  They'll go up to talk to somebody, and I had -- that's
23  rather common.

Page 18

1 Q. All right. If -- if you had observed that
2 the inmate emerging from the cell and wiping his face
3 after having emerged after having witnessed -- strike
4 that. I'm going to say it again.
5     If you had observed an inmate exiting Cell 9
6 and walking towards the stairs after having observed
7 several inmates milling around Cell 9 for several
8 minutes, would that observation have caused you any
9 concern?
10 A. Yes, I would suspect there is a possibility
11 of something going on.
12 Q. Okay. And what would you do in that
13 circumstance?
14 A. I would just call the office.
15 Q. Okay. By call --
16 A. Call the office where the officers are, the
17 ones that would be doing rounds normally, and say,
18 "You better go check out Fox Block. There's a lot of
19 activity going on around Cell 9."
20 Q. Okay. Now, we're going to resume watching
21 the video of F Block on August 24, 2012, beginning at
22     2:46:57 from camera Angle 30.
23     (Video played.)

Page 19

1 Q. BY MR. KING: Did I -- did you just see
2 another inmate exit Cell 9?
3 A. Yes, I did.
4 Q. And at 2:47:45, did you just see another
5 inmate exit Cell 9?
6 A. I saw -- yes, I did.
7     (Video played.)
8 Q. BY MR. KING: All right. I am stopping the
9 video at 2:48:21.
10     Officer McLain, did you just see an inmate
11 exit Cell 9 and walk towards a bunk in the foreground
12 of the video and is now gathering some clothes?
13     MS. CUSACK: I'm going to object to the
14 form. Go ahead.
15 A. No, I did not see anybody gathering clothes.
16 I must be concentrating more on -- I didn't see him
17 gather any clothes.
18 Q. BY MR. KING: All right.
19 A. Okay.
20     MS. CUSACK: Are you --
21 A. No pointing.
22     MS. CUSACK: Just for the record, right,
23 Attorney King pointed out to --

Page 20

1     MR. KING: Okay. Is it still running?
2 Okay.
3 Q. BY MR. KING: It's now 14:48:35 we started
4 at. I -- I paused the video at 2:48:45.
5     Officer McLain, did you just observe an
6 inmate walk from the direction of the bunk and return
7 to Cell 9 and reenter Cell 9??
8 A. No.
9 Q. No.
10     MR. KING: Off the record.
11     (Discussion off the record.)
12 Q. BY MR. KING: Now, we're going to watch the
13 video again beginning at 2:47 and 17 seconds on August
14 24, 2012, from Camera Angle 30.
15     (Video played.)
16 Q. BY MR. KING: Officer McLain, did you just
17 observe an inmate over the -- from 2:48 to
18 approximately 2:48:47 exit Cell 9 go to a bunk, get
19 some clothes and then return to Cell 9?.
20 A. Yes, I did.
21 Q. Okay. And if you had observed such activity
22 in the context of the activity around Cell 9 that
23 we've observed over the course of the past several

Page 21

1 minutes going back to 2:42, would that have caused you
2 any concerns?
3 A. Yes.
4     MS. CUSACK: I'm going to object to the
5 form. Go ahead.
6 Q. BY MR. KING: And what would you have done
7 if you had observed such activity?
8 A. I would have made a phone call.
9 Q. Okay. I'm going to resume watching the
10 video at 2:48:47.
11     (Video played.)
12 Q. BY MR. KING: Going to 2:50:27, did you just
13 see another inmate enter Cell 9?
14 A. Yes.
15 Q. At approximately 2:50 and 46 seconds, did
16 you just see at least one other inmate enter Cell 9?
17 A. No.
18 Q. No.
19 A. May I just make a comment?
20 Q. Yes.
21 A. My eyes keep fluctuating like I was looking
22 at all these people on the stairs, the inmates on the
23 stairs. It's probably why I missed it.

Page 22

1  Q. Okay.
2     (Video played.)
3  A. Yep. I see an inmate going in.
4  Q. BY MR. KING: Well, we are just past 2:51,
5     and you testified that you just saw another inmate
6     enter Cell 9, right?
7  A. Yes. Yes.
8     (Video played.)
9  Q. BY MR. KING: We just passed 2:51:35. Did
10    you just see get another inmate enter Cell 9?
11 A. Yes.
12    (Video played.)
13 Q. BY MR. KING: At 2:51:42 did you just see an
14    inmate enter Cell 9 and another inmate come out?
15 A. Yes.
16    (Video played.)
17 Q. BY MR. KING: At -- at 2:51:56, did you just
18    see another inmate exit Cell 9?
19 A. Yes.
20    (Video played.)
21 Q. BY MR. KING: At 2:52:37 did you --
22    approximately, did you just see another inmate exit
23    Cell 9?.

Page 23

1  A. Yes.
2     (Video played.)
3  Q. BY MR. KING: At 2:52:42 or 43
4     approximately, did you see yet another inmate exit
5     Cell 9?
6  A. Yes.
7     (Video played.)
8  Q. BY MR. KING: At 2:53:37 and 38, did we just
9     see another inmate enter Cell 9 and another inmate
10    exit it?
11 A. Yes.
12    (Video played.)
13 Q. BY MR. KING: And a few seconds later, did
14    you see two more inmates exit Cell 9?
15 A. No.
16 Q. No. Okay.
17    (Video played.)
18 Q. BY MR. KING: What did you see?
19 A. I saw this inmate here. Looks like he came
20    out. I'm not --
21 Q. Sorry.
22 A. Honestly, no. I think my eyes are getting
23    -- like I'm watching too hard.

Page 24

1  Q. So you saw one additional inmate exit Cell
2     9; is that correct?
3  A. Yes.
4  Q. All right.
5     MR. KING: What did I just do?
6     MS. CUSACK: Need help?
7     MR. KING: I didn't go back, did I.
8     MS. CUSACK: Yes.
9     MR. KING: I did?
10    MS. CUSACK: Yep.
11    MR. KING: Off the record.
12    (Discussion off the record.)
13    MR. KING: So because I mistakenly rewound
14    the video, we are going to resume watching it at
15    2:52:35.
16    (Video played.)
17 Q. BY MR. KING: And at approximately 2:53:45,
18    did you see two additional inmates exit Cell 9?
19 A. I saw one go in and one go out.
20    (Video played.)
21 Q. BY MR. KING: Okay. Now, at 2:53:55 to
22    2:54:07, did you see any other activity around Cell 9?
23 A. Inmates coming out.

Page 25

1     (Video played.)
2  Q. BY MR. KING: At 2:54:13 to 2:54:25 did you
3     see any further activity in the vicinity of Cell 9?
4  A. I saw two inmates going in, and I saw one --
5     before the two inmates going in, one kind of looked
6     like he was looking in.
7  Q. All right.
8     (Video played.)
9  Q. BY MR. KING: Now, at 2:54:49 to where I
10    have stopped it at 2:54:56, did we see one inmate
11    appearing -- appearing to be staring into Cell 9?
12 A. Yes.
13    MS. CUSACK: Objection to the form, but go
14    ahead.
15    (Video played.)
16 Q. BY MR. KING: At 2:55:33 approximately, are
17    you -- did you just see another inmate enter Cell 9?
18 A. Yes.
19    (Video played.)
20 Q. BY MR. KING: Stopping it at 2:56:32, have
21    you seen any other inmates enter or exit Cell 9?
22 A. Yes.
23 Q. How many?

Page 26

1 A. I saw one come out and walk towards the
2 garbage can, and I saw another one come out.
3    (Video played.)
4 Q. BY MR. KING: Okay. I am stopping the video
5 at 2:57:12.
6    So, Officer McLain, we've just viewed video
7 footage of F Block from Camera Angle 30 on August 24,
8 2012, between approximately 2:41 p.m. and 2:57 p.m.;
9 is that correct?
10 A. Yes.
11 Q. And during that approximately 16-minute
12 period, there are several inmates entering and exiting
13 Cell 9, right?
14 A. Yes.
15 Q. And there are periods in
16 that 16-minute period where there are several inmates
17 clustered around Cell 9; is that right?
18 A. Yes.
19 Q. So if on August 24, 2012, you had observed
20 the -- the activity that's depicted in this 16 minutes
21 of video, what, if anything, would you have done?
22 A. I definitely would have called.
23 Q. Whom would you have called?

Page 27

1 A. I would have called the office.
2 Q. Okay. And -- I'm sorry.
3 A. If I -- if I would have actually, you know,
4 seen anything happen, I would have called central for
5 first responders.
6 Q. Right.
7 A. But I would have called the office for them
8 to go check what was going on.
9 Q. Okay. What is the office?
10 A. The sergeant's office.
11 Q. Okay. Now, as a corrections officer, how --
12 how frequently are you responsible for video
13 monitoring?
14    MS. CUSACK: Objection to form. Go ahead.
15 Q. BY MR. KING: How frequently -- strike that.
16 A. I don't understand the --
17 Q. How frequently do you -- do your job
18 responsibilities entail working in a section of the
19 prison such as CP-5 monitoring housing block activity
20 via video?
21    MS. CUSACK: Objection to form. Go ahead.
22    MR. KING: What is the objection?
23    MS. CUSACK: The objection is you're

Page 28

1 characterizing it in a certain way. I'm objecting to
2 the form, and I'm allowing her to answer.
3    MR. KING: All right.
4 A. All right. Now I'm still confused.
5 Q. BY MR. KING: Okay.
6 A. Can you repeat the question?
7 Q. Yes, I can.
8    As of August 24, 2012, how often did your
9 job responsibilities involve working in CP-5?
10 A. Oh, a lot.
11 Q. All right. All right. Was there ever a
12 circumstance when you did observe activities on the
13 video monitors that caused you concern and prompted
14 you to call the sergeant's office?
15 A. I know I have. I couldn't give you any idea
16 when or --
17 Q. Understood. On how many such -- on how many
18 occasions do you estimate have you observed activity
19 on the video monitors while working in CP-5 that has
20 caused you concern leading you to call the sergeant's
21 office?
22 A. That's a difficult one for me to answer.
23 Not that often. I guess I can't remember, but I

Page 29

1 definitely have made phone calls saying you better go
2 check this out or --
3 Q. Can you recall any specific occasion in
4 which you've been working in CP-5 and you have
5 observed activity on the monitors depicting the
6 housing blocks that has caused you concern leading you
7 to contact the sergeant's office?
8    MS. CUSACK: I'm going to object to the
9 form. It's been asked and answered, but go ahead.
10    MR. KING: It has not been asked, and I -- I
11 asked in her work could -- the previous question had
12 to do with how many occasions.
13    MS. CUSACK: You can go ahead and answer.
14 A. No.
15 Q. BY MR. KING: No.
16 A. No, I don't recall anything specific.
17 Q. Okay. So is your testimony that you cannot
18 recall a single specific instance in which you have
19 been working in CP-5 and have observed activity on the
20 monitors depicting the activity in the housing blocks
21 that has caused you concern leading you to contact the
22 sergeant's office?
23 A. Like I said, I know I have, but I cannot

Page 30

1  remember specifically what it was or what -- you know.
2  Q. All right. All right. In your work as a
3  corrections officers, have you ever held -- strike
4  that.
5     In your work as a corrections officer, have
6  you ever had the responsibility to do rounds?
7  A. Many.
8  Q. When you do rounds of a housing block, what
9  do you do?
10 A. You go from cell to cell and look in every
11 single cell and just make sure everything is all
12 right. You walk around the block, check everything
13 out. Make sure everything is all right.
14 Q. If you're doing rounds during the daytime
15 and you see an inmate lying down in a bed in a cell,
16 do you do any further inquiry to make sure the
17 inmate's okay?
18 A. No.
19 Q. No.
20 A. This is -- inmates lay down all day long. I
21 mean some of them are very lazy I mean, bored,
22 whatever. It's so common them laying down all the
23 time. You -- you'd have to go and look at each one of

Page 31

1  them to see if they're breathing, and no, that is not
2  a common practice.
3  Q. Okay. Well, I'll represent to you that one
4  of your fellow corrections officers told me that if
5  the inmate is not upright, he checks to see if the
6  inmate is breathing and is okay. That's -- that's not
7  a practice that you follow?
8  A. No.
9  Q. All right.
10 A. I had my understanding that that would
11 happen like on a night shift maybe if you know they're
12 looking in with a flashlight and they're kind of
13 looking to see if they can see movement or their chest
14 rising or something.
15 Q. Okay. But you do -- when you're doing
16 rounds, you look into each and every cell, right?
17 A. Yes. Correct.
18 Q. And what observations might you make in a
19 cell that would cause you concern to do further
20 inquiry?
21 A. Well, if had you three inmates in a cell,
22 definitely there is a problem.
23 Q. Okay.

Page 32

1  A. Because that means one of them is cell
2  hopping.
3  Q. Okay.
4  A. Which they're not allowed to.
5  Q. All right. And anything -- I'm sorry. I
6  didn't mean to --
7  A. Oh, sorry.
8  Q. -- interrupt you.
9  A. I mean naturally if you see some -- anything
10 out of the ordinary.
11 Q. Is there anything else that you can think of
12 other than more than two inmates in a cell that would
13 cause you concern leading you to do -- leading you to
14 do further inquiry?
15 A. Yeah, I mean sometimes if you're walking by
16 a cell and very quickly they're trying to hide
17 something, then you're going to go in and search and
18 see what they're trying to hide. They do many, many
19 things in the cells. Tattooing. I mean many things.
20 Q. All right. Can you give me some examples?
21 A. Well, they possibly could be having sex.
22 Like I said, tattooing, smoking, drugs. So you're
23 looking for all these things. Smell. When you do --

Page 33

1  when you're in a block, naturally if you smell
2  something, you're going to go search it out, you know,
3  such as smoke or --
4  Q. Sure.
5  A. -- cigarettes.
6  Q. Okay. Back on August 24, 2012, when you
7  were working on CP-5, at that time did you maintain
8  any logs of your activities during your shift?
9  A. Yes.
10 Q. And what was that log called?
11 A. I just call it the CP-5 log. A log like
12 this.
13    MS. CUSACK: You -- just for record, when
14 you say like that, you pointed to Exhibit 1?
15    THE WITNESS: Yes.
16 A. Just the top is different. That's all
17 because you don't have all these names up there.
18    MR. KING: Off the record.
19    (Discussion off the record.)
20 Q. BY MR. KING: Do you know where the CP-5 log
21 would be kept?
22 A. No, I don't know where they bring it when --
23 I mean when I'm done, I bring the log -- well, I

Page 34

1 worked on second shift for a year. I bring the log
2 down to CP-4, and they turn it into the office at the
3 end of the day.
4 Q. Okay.
5 A. I don't know where it goes from there.
6 Q. All right. So at that time when you
7 completed a CP-5 log, you brought it to CP-4?
8 A. No.
9 Q. No.
10 A. I take that back.
11 Q. Okay.
12 A. I'm confusing my shifts. That was on first
13 shift. On first shift, no, the log would have been --
14 it stays there because then second shift comes in and
15 they continue that log. So it's -- it's second shift
16 at the end of his shift that he would have taken the
17 log out.
18 Q. All right. And do you know what happened to
19 the CP-5 log then after second shift?
20 A. No.
21   MR. KING: Off the record.
22   (Discussion off the record.)
23   MR. KING: Back on the record.

Page 35

1   We propounded document production in this
2 case to which we believe a CP-5 log for August 24,
3 2012, could have been responsive. We don't believe
4 that a CP-5 log has been produced. So on the record
5 today we are requesting that the defendants produce a
6 copy of the CP-5 log for August 24, 2012.
7   MS. CUSACK: And we have indicated that we
8 will provide a CP-5 log. I don't know that it would
9 have been responsive as Attorney King indicates. I
10 don't know what you asked for that -- that might have
11 triggered a search for that particular item.
12   MR. KING: Okay. Off the record.
13   (Discussion off the record.)
14   MR. KING: Back on the record.
15 Q. BY MR. KING: In the August 2012 time
16 period, did the Northern New Hampshire Correctional
17 Facility have any sorts of policies or procedures
18 relating to preventing inmate assaults? I'm not
19 talking about sexual assault. I'm talking about
20 inmate assault, physical assault.
21 A. I just know that like there is policies just
22 to say, you know, we're looking after the inmates for
23 their safety. I couldn't tell you what it says. I

Page 36

1 know there is policies.
2 Q. All right. Let me word it another way.
3   In the August 2012 time period, are you
4 aware of any policies or procedures adopted by the
5 Northern New Hampshire Correctional Facility designed
6 to prevent violence by inmates upon other inmates?
7 A. The only way I know how to answer is that's
8 by monitoring and doing the rounds. Like I said, I
9 know there is policies, but I couldn't tell you word
10 for word what they say.
11 Q. Do you know what their titles are?
12 A. No. I'm terrible. I -- I don't recall
13 policy numbers and --
14 Q. Before August 24, 2012, or on or before
15 August 24, 2012, had you received any training on
16 procedures designed -- designed to prevent inmate
17 violence upon other inmates?
18 A. I've gone to many training classes. I don't
19 recall anything special on that other than make sure
20 we are always vigilant and watching and looking for
21 different things out of the ordinary.
22 Q. Okay. Yep. But you've told me that as of
23 August of 2012 the Northern New Hampshire Correctional

Page 37

1 Facility had essentially two procedures in place to
2 prevent inmate violence upon other inmates, and one
3 was rounds and --
4 A. Yes.
5 Q. -- and the other was video monitoring of the
6 housing blocks; is that correct?
7   MS. CUSACK: I'm going to object to form,
8 but go ahead.
9 A. That's correct.
10 Q. BY MR. KING: Okay.
11 A. May I add something?
12 Q. You may.
13 A. Okay. I never had the opportunity -- well,
14 yes, I did, but I didn't say it at the time of what --
15 how it really goes in there. There are call buttons
16 being pushed all the time, and every time a button is
17 pushed, the camera changes.
18   Let's say I'm looking at a particular block
19 and somebody comes along and pushes a button in
20 another block, the camera goes to that block. I am
21 constantly answering the phone. I am looking behind
22 me at upper industries. I am pull -- being pulled in
23 many directions.

Page 38

1    There is no way that I can -- I would have
2 never watched for 16 minutes like that unless I knew
3 something was wrong, but even if I tried to, I
4 wouldn't be able to. It's just busy, busy, busy. I
5 have hearings calling me and saying get me this
6 inmate. I have the office call me to get me this
7 inmate. Then I have to go to that block and push the
8 call button and call them. I have the stairway. I
9 have a slider next to me going into upper industries.
10 It's impossible to be watching four different blocks
11 all the time. Impossible.
12 Q. Okay.
13 A. There is 128 cells between the four blocks.
14 It's just -- it's impossible.
15 Q. Okay. Okay. And you have decided to
16 spontaneously give me this speech about your job
17 responsibilities that's not responsive to any question
18 that I've asked after we took a break and you met with
19 your attorneys from the Attorney General's Office; is
20 that correct?
21    MS. CUSACK: I'm going to object, but go
22 ahead and answer.
23 A. No because I thought about it before, and in

Page 39

1 the conversation back and forth, I just didn't feel
2 that I could say it at that particular time.
3 Q. BY MR. KING: I see. All right. You told
4 me earlier that you have been a corrections officer
5 for 14 years, right?
6 A. Yes.
7 Q. And when did you first start working in
8 sections of the prison, such as CP-5, where you were
9 responsible for watching monitoring of housing block
10 activity?
11 A. I can't give you an exact date, but we
12 switched jobs back then. When I first started, I
13 actually worked on the blocks with direct supervision.
14 I can't say, but I -- I have worked in CP-5 hundreds
15 of times.
16 Q. Okay.
17 A. I can honestly say that.
18 Q. Okay. Have you ever worked in CP-4?
19 A. Yes.
20 Q. And the job responsibilities are similar in
21 CP-4. You're just working -- watching different
22 housing blocks?
23 A. Right.

Page 40

1    MS. CUSACK: I'm going to object to form.
2 Wait until he finishes.
3    THE WITNESS: Sorry.
4 Q. BY MR. KING: I just asked you that the job
5 responsibilities in CP-4 are similar to those in CP-5,
6 correct?
7 A. Yes.
8    MS. CUSACK: Correct that's what you just
9 asked or correct that -- that the job duties are
10 similar?
11 Q. BY MR. KING: Correct that the job duties
12 are similar?
13 A. Yes, they're similar.
14 Q. Okay.
15 A. They're different, but they're similar.
16 Q. What are the differences?
17 A. Well, just the setup of everything. You
18 have a door behind you. You're popping all the time
19 for CP-4. It's very similar but --
20 Q. Okay.
21 A. -- a little different.
22 Q. Okay. Tell me, if you will, as of August
23 24, 2012, what the setup was in CP-5?

Page 41

1 A. What the setup was? It's the same way as it
2 is now other than now we have different cameras that
3 are much better.
4 Q. Okay.
5 A. But the setup like I said was you're talking
6 about just inside CP-5 just where I'm sitting in that
7 little bubble thing?
8 Q. Yes.
9 A. That setup?
10 Q. Yes.
11 A. Okay. Correct. In front of me I have a
12 control panel, and that's where it shows all the
13 different cells. So I can pop the different cells in
14 the interior and exterior doors going into the block.
15 And then to my left I have two monitors that I can
16 visually see what's going on, and like I said, one is
17 normally on the hall and the other one's used for the
18 blocks, and I'm not quite sure. Then I have my phone
19 to the right. I have windows going around three sides
20 of the bubble.
21    I'm not sure. What -- what are you looking
22 for.
23 Q. I'm just trying to get an understanding of

Page 42

1 your work station on August 24, 2012, because I've
2 never seen it.
3 A. Okay. Okay.
4 Q. So you have described it. Is there anything
5 that you have omitted that is important?
6 A. No.
7 Q. Okay. Can you remember any instance in
8 which you've been working in CP-5 or CP-4 and you have
9 detected via video monitoring either an inmate assault
10 or activity that suggested to you that inmates were
11 doing violence to one another?
12    MS. CUSACK: I'm going to object to form.
13 Go ahead.
14 A. Yes.
15 Q. BY MR. KING: How many such instances have
16 there been?
17    MS. CUSACK: I'm going to object. In what
18 time frame?
19    MR. KING: This is over the course of
20 Officer McLain's --
21    MS. CUSACK: Entire career?
22    MR. KING: Uh-huh.
23    MS. CUSACK: Okay.

Page 43

1 A. Not that many because they are very good at
2 hiding things. Typically if there is violence, it's
3 normally in the cells or where -- wherever they choose
4 to find a good place. The showers. So I haven't seen
5 that -- I have seen fights, fist fights and -- but as
6 far as to do with -- I have seen them in other places
7 like the yard, but in the actual blocks, I don't think
8 I recall them having physical fights out in the middle
9 of the block because they know they're going to be
10 probably caught. So it doesn't happen that often. I
11 mean there's stuff going on, but I don't see it with
12 the camera.
13 Q. BY MR. KING: Because as you said the
14 inmate-on-inmate violence to the extent it occurs
15 usually happens in the cells?
16 A. Yes.
17    MR. KING: Okay. Okay. I don't think I
18 have anything further. Thank you.
19    MS. CUSACK: I have one question.
20
21    EXAMINATION
22    BY MS. CUSACK:
23 Q. Is there a difference in the way that you

Page 44

1 watched the video today with the Attorney King asking
2 you questions and the way that you watch when you are
3 in CP-4 or CP-5?
4 A. Yes.
5 Q. What are they?
6 A. I mean when we were watching from your
7 laptop, that was very different than sitting in the
8 bubble. Like I say, I'm toggling through. I mean we
9 were just concentrating on this one thing and this one
10 cell, and also I'm being -- like I say, when I'm
11 toggling through and trying to watch things, I'm --
12 the phone's ringing.
13    Beeping. Beeping is another thing. You're
14 forever -- whenever somebody pushes a button, you hear
15 this beep, beep, beep. So you always have this
16 beeping going on. You're pushing the buttons. The
17 cameras are switching on you. It's entirely different
18 than watching on a laptop.
19 Q. When your shift ends at 1500, what time did
20 you typically leave the CP -- CP-5 or CP-4?.
21 A. Many times I'm leaving at five of three.
22 Normally the shift change isn't right on the dot.
23 They try to relieve you a little early.

Page 45

1    MS. CUSACK: Thank you.
2
3    FURTHER EXAMINATION
4    BY MR. KING:
5 Q. So if you were -- if you were relieved early
6 on August 24, 2012, Officer Esobe would have come in
7 for you?
8 A. Yes.
9 Q. And since we don't have the log of
10 activities, do you recall what record -- or what did
11 you record in the August 2012 time on the CP-5 log?
12 A. Similar to this. I don't put the rounds
13 because they write their rounds. I write down what
14 time the movements were. I write down what the chills
15 (ph) were, any activity like that. We don't -- there
16 is not a lot of stuff written on the round shift --
17 not the round sheet. This is the round sheet. I'm
18 getting confused. All on my CP-5 log.
19 Q. Yes.
20 A. Like I say, that's basically it.
21 Q. I'm sorry. I -- what is basically it? So
22 without -- without reference to that log in the August
23 2012 time period, what sort of activities would you

Page 46

1  record on your CP-5 log?
2  A. Medical calls, what time things happen.
3  Like I say, movements. What time the movements were.
4  What time count time was. Stuff like that.
5  MR. KING: Okay. Thank you.
6  THE WITNESS: You're welcome.
7  (The deposition was concluded
8  at 11:48 a.m.)

Page 47

1  CERTIFICATE OF WITNESS
2
3  I, LYNN McLAIN, have read the foregoing
4  transcript of the deposition taken on Friday,
5  September 1, 2017, at the NORTHERN NEW HAMPSHIRE
6  CORRECTIONAL FACILITY, Berlin, New Hampshire, and do
7  hereby swear/affirm it is an accurate and complete
8  record of my testimony given under oath in the matter
9  of LEITE v. GOULET, including any and all corrections
10 that may appear on those pages so denoted as
11 "Corrections."
12
13
14 _____
   LYNN McLAIN
15 STATE OF
16 COUNTY OF
17
18 Subscribed and sworn to before me this ____ day
19 of _____, 2017.
20
21
22 Notary Public      J.P.
23 My Commission Expires:

Page 48

1  CORRECTION AND SIGNATURE PAGE
2  DEPOSITION OF: LYNN McLAIN
3  DATE OF DEPOSITION: September 1, 2017
4  PAGE  LINE    NOW READS       SHOULD READ
5  ____  ____  _____   _____
6  ____  ____  _____   _____
7  ____  ____  _____   _____
8  ____  ____  _____   _____
9  ____  ____  _____   _____
10 ____  ____  _____   _____
11 ____  ____  _____   _____
12 ____  ____  _____   _____
13 ____  ____  _____   _____
14 ____  ____  _____   _____
15 ____  ____  _____   _____
16 ____  ____  _____   _____
17 ____  ____  _____   _____
18 ____  ____  _____   _____
19
20 Signed this ____ day of _____, 2017.
21
22 _____
23 LYNN McLAIN

Page 49

1  C E R T I F I C A T E
2
3  I, Karen L. Leach, a Licensed Court
4  Reporter, Shorthand and Notary Public of the State of
5  New Hampshire, do hereby certify that the foregoing is
6  a true and accurate transcript of my stenographic
7  notes of the deposition of LYNN McLAIN, who was first
8  duly sworn, taken at the place and on the date
9  hereinbefore set forth.
10     I further certify that I am neither attorney
11 nor counsel for, nor related to or employed by any of
12 the parties to the action in which this deposition was
13 taken, and further that I am not a relative or
14 employee of any attorney or counsel employed in this
15 case, nor am I financially interested in this action.
16     THE FOREGOING CERTIFICATION OF THIS
17 TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE
18 SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
19 AND/OR DIRECTION OF THE CERTIFYING REPORTER.
20
21
22
23           KAREN L. LEACH, LCR NH #38