1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE


```
*  *  *  *  *  *  *  *  *  *  *  *  *
                                    *
JONATHAN LEITE,                     * Case No.
                        Plaintiff,  * 1:15-cv-00280-PB
                                    *
             v.                     * Volume: 1
                                    * Pages: 1-77
CORRECTIONS OFFICERS MATTHEW GOULET,* Exhibits: 1-5
ELMER VAN HOESEN, MICHAEL BEATON,   *
LYNN MCLAIN, HEATHER MARQUIS,       *
TREVOR DUBE, RHIANNE SNYDER, EDDY   *
L'HEUREUX, JEFFREY SMITH, DWANE     *
SWEATT, YAIR BALDERRAMA, BOB MORIN, *
EJIKE ESOBE, AND KATHY BERGERON,    *
                        Defendants. *
                                    *
*  *  *  *  *  *  *  *  *  *  *  *  *
```


DEPOSITION OF TIMOTHY COULOMBE


Deposition taken by counsel at the
New Hampshire Department of Justice,
Office of the Attorney General, 33
Capital Street, Concord, New Hampshire,
on Monday, August 28, 2017, from
10:16 a.m. to 12:50 p.m.



Court Reporter:
Karen L. Leach, LCR No. 38
(RSA 310-A:179)

Page 2

```
 1              I N D E X
 2
 3   WITNESS:   Timothy Coulombe
 4
 5
 6   EXAMINATION BY:                      Page
 7          Mr. King                         4
 8          Mr. Fredericks                  72
 9
10
11          INDEX TO EXHIBITS*
12   Description                          Page
13   Coulombe
14   Exhibit 1  Incident Report dated 8/24/12      8
15   Exhibit 2  Continuation of Investigation Report
16              dated 12/13/12                    11
17   Exhibit 3  Upper Housing Shift Log 8/24/12   18
18   Exhibit 4  24-Hour Unit/Area Rounds Log 8/24/12  42
19   Exhibit 5  Upper Housing Shift Change marked
20              for 8/24/12                        60
21
22
23   NOTE:  Exhibits returned to Attorney King.
```

Page 3

```
 1   APPEARANCES:
 2
 3   For the Plaintiff:
         DOUGLAS, LEONARD & GARVEY, P.C.
 4       By: Benjamin King, Esq.
                 -and-
 5       Megan E. Douglass, Esq.
         14 South Street, Suite 5
 6       Concord, NH 03301
         Phone: 603.224.1988
 7       E-Mail: Benjamin@nhlawoffice.com
                 Mdouglass@nhlawoffice.com
 8
 9   For the Defendant:
         NEW HAMPSHIRE DEPARTMENT OF JUSTICE
10       OFFICE OF THE ATTORNEY GENERAL
         By: Francis K. Fredericks, Jr., Esq.
11                -and-
         Lynmarie C. Cusack, Esq.
12       33 Capitol Street
         Concord, NH 03301
13       Phone: 603.271.3658
         E-Mail: Francis.fredericksjr@doj.nh.gov
14               Lynmarie.cusack@doj.nh.gov
15
     Also Present:  Jonathan Leite
16                  Jack Becker, Intern
17              STIPULATIONS
         It is agreed that the deposition shall be taken
18   in the first instance in stenotype and when
     transcribed may be used for all purposes for which
19   depositions are competent under the Federal Rules of
     Civil Procedure.
20       Notice, filing, caption and all other formalities
     are waived.  All objections except as to form are
21   reserved and may be taken in court at time of trial.
         It is further agreed that if the deposition is
22   not signed within thirty (30) days after submission to
     counsel, the signature of the deponent is waived.
23
```

Page 4

1    TIMOTHY COULOMBE,

2    having been duly sworn by Ms. Leach,

3    was deposed and testified as follows:

4    **EXAMINATION**

5    **BY MR. KING:**

6 Q.  Please state your name for the record.

7 A.  **Timothy Coulombe.**

8 Q.  And where do you reside, Mr. Coulombe?

9 A.  **In Berlin, New Hampshire.**

10 Q.  Could you give me a physical address,

11   please?

12    **MR. FREDERICKS:** Can we -- yeah.  We

13   typically with corrections officers in these types of

14   cases we just go through counsel, and if you need to

15   contact him, we can work that out, but we don't like

16   giving their actual addresses out.

17    **MR. KING:** Oh, okay.

18 Q.  BY MR. KING:  Who is your employer?

19 A.  **The Department of Corrections.**

20 Q.  How long has the Department of Corrections

21   been your employer?

22 A.  **Just passed 19 years in July.**

23 Q.  What is your present job title?

Page 5

1 A.  **Internal affairs investigator.**

2 Q.  For how long have you been an internal

3   affairs investigator?

4 A.  **Just about 14 years.**

5 Q.  Okay.  Has your title changed at all during

6   this time period?

7 A.  **Yes, there was a restructuring.  We were**

8   **rank and file.  I went from corporal to internal**

9   **affairs investigator.  Exact same job just change in**

10   **job title and pay.**

11 Q.  Okay.  What are the job responsibilities

12   associated with being an internal affairs

13   investigator?

14 A.  **There's many.  We are a liaison to outside**

15   **law enforcement agencies.  We investigate crimes that**

16   **happen behind the walls.  We help out providing**

17   **information with the security staff.  We monitor phone**

18   **calls.  I'm sure there's -- there's more in our job**

19   **description, but the majority of it is that.**

20 Q.  So there is a job description --

21 A.  **Correct.**

22 Q.  -- for an internal affairs investigator?

23 A.  **Yes.**

Page 6

1  Q.  Okay.  As of -- so as of August 24, 2012,
2  you were an internal affairs investigator at that
3  time, right?
4  A.  I don't remember if I was still a corporal
5  or internal affairs, but I was in that position, same
6  position.
7  Q.  Your job responsibilities were those of an
8  internal affairs investigator?
9  A.  Correct.
10  Q.  Okay.  Who was your supervisor on August 24,
11  2012?
12  A.  Investigator Dan Hammer.  Again he may have
13  been a sergeant at the time.  I don't know what date
14  that changed over.
15  Q.  What's his last name?
16  A.  Hammer, H-a-m-m-e-r.
17  Q.  Is Investigator Hammer still your
18  supervisor?
19  A.  Yes, he is.
20  Q.  Okay.  Are you acquainted with a gentleman
21  by the name of Scott Lambertson?
22  A.  He's retired.  He was the captain, prior
23  captain, at the Northern Correctional Facility.

Page 7

1  Q.  Okay.  And Captain Lambertson was employed
2  with the Department of Corrections on August 24, 2012,
3  right?
4  A.  Yes.
5  Q.  Okay.  Was he the chief of security --
6  A.  That's correct.
7  Q.  -- at the prison?
8  A.  Yes.
9  Q.  Let me finish the question before you
10  answer.
11  A.  Sorry.
12  Q.  So he was the chief of security at Northern
13  New Hampshire Correctional Facility on August 24,
14  2012, right?
15  A.  Yes.
16  Q.  What were the job responsibilities of the
17  chief of security, if you know?
18  A.  I don't know.
19  Q.  Okay.  Now, do you know if Mr. Lambertson is
20  still in the area if he's retired?
21  A.  I believe so.
22  Q.  All right.  When were you first notified
23  about the assault on Jonathan Leite?

Page 8

1  A.  I'd have to look at my report.  I know I
2  received a phone call and I was out of the area, but I
3  don't remember the exact time.
4  Q.  All right.  A phone call was from whom?
5  A.  I don't know.  I would assume a shift
6  commander.
7      MR. KING:  Can we mark this?
8      (Coulombe Exhibit 1 was
9      marked for identification.)
10  Q.  BY MR. KING:  I'm going to show you a
11  document that we've -- we've marked as Coulombe
12  Exhibit 1.  I'm just going to ask you to -- to look at
13  it and tell me whether you've seen this document
14  before.
15  A.  Okay.
16      (Witness perusing document.)
17  A.  I would assume I've seen that.  It would be
18  part of my case file.
19  Q.  BY MR. KING:  All right.  Well, the document
20  reflects that a Sergeant Jeff Smith called you and
21  left a message at 8:15 p.m. on August 24, 2012; is
22  that correct?
23  A.  Yes, that's what this says.

Page 9

1  Q.  Okay.  Do you recall receiving that message?
2  A.  I do.  I believe I received it the following
3  day.  I was on my way out of town, and the message
4  popped up.
5  Q.  All right.  Do you recall what the substance
6  of the message was?
7  A.  Again I would be assuming that he was
8  telling me that this happened.  There was an assault
9  that happened.
10  Q.  All right.  Now, you ultimately prepared an
11  investigation report that we're going to review
12  relative to the assault on Jonathan Leite, right?
13  A.  This case was taken over by state police.
14  So I assisted the trooper in preparing this eventual
15  report for criminal prosecution.
16  Q.  Okay.  Okay.  Were you given an assignment
17  to investigate anything --
18      MS. CUSACK:  Your client's here.
19      MR. KING:  May we suspend for a moment?
20      MS. CUSACK:  Sure.
21      MR. FREDERICKS:  Sure.
22      (Short recess was taken.)
23      (Jonathan Leite arrives.)

Page 10

1 Q. BY MR. KING: So did anyone give you an
2 assignment of what you were supposed to do with
3 respect to investigating the assault on Jonathan?
4     MR. FREDERICKS: Objection to form. Go
5 ahead.
6 A. I don't remember if it was assigned to me or
7 if I just took the case and started working on it.
8 That's normal for our office. If you're available to
9 work on something and you start on it, then you
10 usually take it.
11 Q. I see. All right. So did anyone assist you
12 in your investigation of the assault on Jonathan
13 Leite?
14 A. Yes.
15 Q. Who?
16 A. Detective Mike Cote.
17 Q. And with what organization is Detective Cote
18 affiliated?
19 A. New Hampshire State Police.
20 Q. To your knowledge, does he remain affiliated
21 with the New Hampshire State Police?
22 A. Yes, he does.
23 Q. And where is he stationed if you know?

Page 11

1 A. Troop F.
2 Q. What was the first thing you did with
3 respect to investigating the assault on Mr. Leite?
4 A. Once I received the call, I called Detective
5 Cote right off because I wasn't around. When I got
6 back to the facility, I would have to look back at my
7 reports.
8 Q. Certainly.
9     MR. KING: Let's mark this.
10     (Coulombe Exhibit 2 was
11     marked for identification.)
12 Q. BY MR. KING: I've shown you a document
13 marked Coulombe 2, and feel free to look through it.
14 A. Okay.
15 Q. And just tell me if this represents a true
16 and accurate copy of your investigation report into
17 Mr. Leite's assault?
18     (Witness perusing document.)
19 A. Yes, this is.
20 Q. BY MR. KING: Okay. When you began your
21 investigation, what were your objectives?
22 A. To find out what happened. To find the
23 truth.

Page 12

1 Q. To find out who assaulted Jonathan?
2 A. Yes. Sorry.
3 Q. All right. Did your investigation at all
4 entail an inquiry into what, if anything, the
5 correctional officers could have done to prevent this
6 assault?
7 A. No.
8 Q. When there are -- strike that.
9     Have you investigated other assaults at
10 correction facilities besides the assault on Jonathan
11 Leite?
12 A. Yes, I have.
13 Q. How many such assaults have you
14 investigated?
15 A. I'd be guessing a number.
16 Q. I don't want you to guess, but can you
17 provide me an estimate?
18 A. 40.
19 Q. All right.
20 A. Again guessing.
21 Q. Well, we don't -- we don't want you to
22 guess, but the way -- the way I always explain this to
23 deponents is I'm not -- I don't want a guess because

Page 13

1 that doesn't help anyone, but I'm entitled to your
2 best estimate. So, for example, if I asked you what
3 time a certain conversation occurred and you don't
4 remember the specific time but you remember that the
5 conversation occurred in the morning as opposed to the
6 afternoon, then because you have that memory you would
7 give me I don't know the specific time, but it
8 happened in the morning. So your -- your best
9 estimate but not -- not just a guess.
10 A. Are you looking for cases that were criminal
11 cases, or cases that were handled administratively?
12     MR. FREDERICKS: He asks the questions.
13 Just --
14 Q. BY MR. KING: Yeah. Just I'll ask the
15 question again.
16 A. Okay.
17 Q. As an internal affairs investigator, how
18 many inmate-on-inmate assaults resulting in injury to
19 an inmate requiring hospitalization have you
20 investigated?
21 A. I don't know.
22 Q. All right.
23 A. Many. Many. Several. I could look at my

Page 14

1  — in my history in my system, and I would be able to
2  tell you. Without looking at that, I would be
3  guessing because we prosecute so many different crimes
4  that I wouldn't be able to recall a specific number.
5  Q. Certainly. Have all your investigations
6  involved the Northern New Hampshire Correctional
7  Facility, or have you investigated inmate-on-inmate
8  assaults at other correctional facilities?
9  A. They've been at the Northern Correctional
10  Facility. Sometimes inmates move between facilities
11  after it happens, but the assaults are all at the
12  Northern Correctional Facility.
13  Q. Okay. In any of your investigations into
14  inmate-on-inmate assaults that have resulted in
15  hospitalization of an inmate, have you ever made
16  inquiry into any actions that correctional officers
17  could have taken to prevent the assault?
18  A. That's not part of our investigations, so
19  no.
20  Q. Okay.
21  A. We would conduct them as a criminal
22  investigation.
23  Q. Are there guidelines that you follow in

Page 15

1  conducting your investigation?
2  A. There is no written guideline.
3  Q. At any point in time, have you undergone
4  training into how to conduct an investigation?
5  A. We've received training in several different
6  aspects, yes.
7  Q. Please describe for me the areas in which
8  you've received training?
9  A. Interview and interrogation, evidence
10  collection, Prison Rape Elimination Act, sexual
11  assault training, report writing.
12  Q. Has anyone ever communicated to you that
13  investigating what corrections officers could have
14  done, if anything, to prevent an assault is not an
15  appropriate area of inquiry for your investigation?
16  A. No.
17  Q. No. So you told me that your objective in
18  performing the investigation was to identify who
19  assaulted Jonathan Leite, right?
20  A. Yes.
21  Q. Okay. Did you have any other objectives in
22  your investigation?
23  A. No.

Page 16

1  Q. All right. So is it fair to say that
2  identifying who assaulted Jonathan Leite was the sole
3  objective of your investigation?
4  A. Yes. It was taken on as state police — or
5  state police had taken it on to prosecute this as a
6  criminal case. When state police come in, we assist
7  them.
8  Q. Did you interview people in connection with
9  your investigation of the assault on Mr. Leite?
10  A. I'd have to look back in my reports.
11  (Witness perusing document.)
12  A. Yes, we interviewed Mr. Leite with Detective
13  Cote.
14  Q. BY MR. KING: Okay.
15  A. It may not be in my reports. I could have
16  sat in with others with Detective Cote, but they
17  wouldn't be in my report. They would be in his
18  reports.
19  (Witness perusing document.)
20  Q. BY MR. KING: So just let me know when
21  you're finished answering my question.
22  A. Uh-huh.
23  (Witness perusing document.)

Page 17

1  A. I'm just looking to see if I had any other
2  interviews in these reports. I don't remember any
3  others in here, but I believe there was some other
4  interviews done with — by Detective Cote. I don't
5  know if I was present for them or not.
6  Q. BY MR. KING: Okay.
7  A. Or all of them or not.
8  Q. But you were present for the interview of
9  Jonathan Leite?
10  A. Correct.
11  Q. Okay. And you don't remember being present
12  for any other interview in connection with the
13  investigation of the assault on Mr. Leite?
14  A. I would assume if Detective Cote did
15  interviews at the prison, I was there, but I don't
16  have a report in front of me right now to —
17  Q. Understood. Understood.
18  All right. So your — your report begins
19  with a description that Officer Kathy Bergeron is
20  conducting a facility count of the inmates in F Block
21  at approximately 5:08 p.m. on August 24, 2012, and she
22  approaches Jonathan Leite and says, "Leite, what is
23  up? You don't stand for count anymore?" Correct? Is

1 that the way --

2 A. That's correct.

3 Q. Okay. What is the source of your

4 information to make that description?

5 A. This was a summary of Officer Kathy

6 Bergeron's incident report.

7 Q. Okay. Did you ever speak to Kathy Bergeron

8 with regard to the events of August 24, 2012?

9 A. I don't recall.

10 MR. KING: Mark this.

11 (Coulombe Exhibit 3 was

12 marked for identification.)

13 Q. BY MR. KING: And before I get to this

14 Exhibit 3, do you have any documents of -- of the

15 conversations that -- or communications in which you

16 participated connected with your investigation of the

17 assault on Jonathan Leite?

18 A. Whatever I have was put together and

19 combined into one criminal report with Detective Cote.

20 Q. Okay. All right. And that report to which

21 you're referring is a different report from this

22 investigation report?

23 A. This -- these are parts of that

1 investigation report.

2 Q. Okay.

3 A. These were filled in as we were working the

4 case together and all combined. So this is a part of

5 that finished criminal case file.

6 Q. All right. And where would that finished

7 criminal case file be today?

8 A. It would either be at major crimes or the

9 county attorney's office I would assume have a copy of

10 it because they prosecuted these individuals.

11 Q. Okay.

12 A. The Coos County Attorney.

13 Q. If we look -- so you've told me that your

14 description of what Officer Kathy Bergeron did at

15 approximately 5:08 p.m. on August 24, 2012 is derived

16 from her incident report, right?

17 A. Correct.

18 Q. And then you proceed to describe what

19 Sergeant Dwayne Sweatt --

20 A. Sweatt.

21 Q. -- Sweatt -- did after Kathy Bergeron called

22 to Mr. Leite, right?

23 A. Correct.

1 Q. Okay. And what was the source of your

2 description of what Sergeant Sweatt did?

3 A. That would either have been included on part

4 of Kathy Bergeron's incident report or a second

5 incident report written by Sergeant Sweatt.

6 Q. Okay. And on the next page of the report,

7 which is Bates stamped 768, you write that "at 5:45

8 p.m. Sergeant Smith reviewed the video on F Block,"

9 right?

10 A. Correct.

11 Q. And was the source of your statement there

12 Sergeant Smith's incident report that we earlier

13 marked at Exhibit 1?

14 A. That would be correct.

15 Q. Now, in connection with your investigation,

16 you reviewed video footage of F Block on August 24,

17 2012, right?

18 A. Yes.

19 Q. And you described your review of that video

20 footage on --

21 A. 777.

22 Q. -- Bates stamp 777 --

23 MR. FREDERICKS: Just let him --

1 Q. BY MR. KING: -- through 779 of Exhibit 2,

2 correct?

3 A. Yes.

4 Q. All right. Now, in -- if we look at Exhibit

5 1, Sergeant Smith describes his review of the video

6 footage, correct? Bates stamp 20 of Exhibit 1?

7 A. Yes, he did.

8 Q. And he -- Sergeant Smith writes, this is in

9 the fourth line down of his report describing his

10 review to the video footage, "Going back from the time

11 he was discovered during count, I saw a time where he

12 leaned over and vomited on to the floor."

13 A. Okay.

14 Q. Do you see that sentence?

15 A. Yes, I do.

16 Q. Now, in your review of the -- the video

17 footage of the incident, did you see video where

18 Jonathan Leite leaned over and vomited on to the

19 floor?

20 A. I don't believe so, but let me just look

21 through it.

22 (Witness perusing document.)

23 A. No, I didn't.

Page 22

1  Q.  BY MR. KING:  You reviewed two video clips;
2  is that correct?
3  A.  Yes.
4  Q.  And one video clip begins at 2:30 p.m. and
5  ends at 3:00 p.m. and 20 seconds, correct?
6  A.  Correct.
7  Q.  And then you reviewed a second video clip
8  that began at 4:20 p.m. and 15 seconds, right?
9  A.  Correct.
10  Q.  And do you recall how long that second video
11  clip lasted?
12  A.  No, I don't, but it would be part of the
13  criminal case.
14  Q.  So if Sergeant Smith is reviewing video
15  going back from the time that Mr. Leite was discovered
16  during count, would you agree that that means that
17  Sergeant Smith was reviewing video that started at
18  5:08 p.m. and went back in time?
19      MR. FREDERICKS: Objection to form.
20  A.  Yeah, I would assume so.
21  Q.  BY MR. KING:  Okay.  That's because Jonathan
22  Leite is discovered during count at 5:08 p.m.
23  according to your investigation, right?

Page 23

1      MR. FREDERICKS: Objection to form.  You can
2  answer.  You can answer.
3      MR. KING: What's the basis of the form
4  objection?
5      MR. FREDERICKS: You're explaining -- you're
6  asking him to explain why Smith reviewed the video.
7      MR. KING: No, I didn't.  No, I disagree.
8      MR. FREDERICKS: Or why he reviewed it at
9  the time that he did.
10      MR. KING: Let me try this again.
11      MR. FREDERICKS: Sure.
12  Q.  BY MR. KING:  Jonathan Leite was discovered
13  during count by Kathy Bergeron at 5:08 p.m., right?
14  A.  Yes.
15  Q.  Okay.  In Exhibit 1, Sergeant Smith states
16  that he reviewed the video of the Leite incident going
17  back from the time he was discovered during count,
18  right?
19  A.  Yes.
20  Q.  Okay.  So does that indicate to you that
21  Sergeant Smith reviewed video going back from 5:08
22  p.m.?
23  A.  I would assume so, but he doesn't put a time

Page 24

1  in there.
2  Q.  Okay.  But the time Mr. Leite was discovered
3  during count was 5:08 p.m.?
4  A.  Correct.
5  Q.  All right.  And then Sergeant Smith writes
6  that he saw a time when Jonathan Leite leaned over and
7  vomited on to the floor, right?
8  A.  Correct.
9  Q.  And you have testified that you didn't
10  review any footage of Jonathan Leite vomiting on the
11  floor, right?
12  A.  Correct.
13  Q.  In fact, is it true that the video that you
14  reviewed of the second clip that begins at 4:20 p.m.
15  ended at approximately 4:25 p.m.?
16  A.  I don't know that.  We'd have to look at the
17  other file.
18  Q.  Okay.  You do note in your investigation
19  that there is a gap in video footage beginning at
20  three p.m. and ending at 4:20 p.m. and 15 seconds,
21  right?
22  A.  Yes.
23  Q.  Did you ever make any inquiry into why you

Page 25

1  weren't provided video footage of events in F Block
2  between 3:00 p.m. and 4:20 p.m.?
3  A.  Yes.
4  Q.  Who did you make the inquiry of?
5  A.  I would assume it was the electronics
6  technician who's in charge of maintaining the video
7  systems.
8  Q.  Who is is that?
9  A.  Yvon Poulin, Y-v-o-n.
10  Q.  I'm going to ask --
11      MS. CUSACK: Go ahead.  I was going to ask
12  is this a good time for a break.  I want to run out to
13  the bathroom.
14      MR. KING: Oh, that's fine.
15      MS. CUSACK: Okay.
16      MR. KING: I know where I am.
17      (Short recess was taken.)
18  Q.  BY MR. KING:  So before we broke, you were
19  -- you were telling me that you made inquiry of a
20  gentleman with respect to the -- the missing video
21  footage, right?
22  A.  Yes.
23  Q.  And who was that person?

Page 26

1 A. Yvon Poulin.

2 Q. How do you spell that name?

3 A. First name Yvon, Y-v-o-n. Last name Poulin,

4 P-o-u-l-i-n.

5 Q. And what was his title?

6 A. I think it's electronics technician.

7 Maintenance.

8 Q. Does he remain employed at Northern New

9 Hampshire Correctional Facility?

10 A. Yes, he does.

11 Q. And in the same position?

12 A. Yes.

13 Q. And what did you ask Mr. Poulin?

14 A. If there's any time that we have a problem

15 with the system, we ask him about it. I don't

16 remember specifics. If we were missing video, then we

17 would have asked him what happened or where is the

18 video or how can we get it. I said at the time that

19 we're investigating a criminal case. We obviously

20 want to have all the video we can. So I don't know.

21 Q. Did you ask Mr. Poulin why there was a gap

22 in video coverage between 3:00 p.m. and 4:20 p.m.?

23 A. I don't remember.

Page 27

1 Q. Do you remember anything that Mr. Poulin

2 told you relating in any way to the gap in video

3 coverage between 3:00 p.m. and 4:20 p.m.?

4 A. No.

5 Q. Do you have any understanding gleaned from

6 any source as to why there's a gap in video coverage

7 from 3:00 p.m. to 4:20 p.m.?

8 MR. FREDERICKS: Objection to form.

9 A. No.

10 MR. KING: What's basis for the objection,

11 Frank?

12 MR. FREDERICKS: Oh, correct. You're

13 assuming there's a gap in the video.

14 MR. KING: Well, I have --

15 MR. FREDERICKS: What we're talking about is

16 what he reviewed.

17 MR. KING: Yep. I've had communications

18 with your office in which I've addressed this gap in

19 video from three to 4:20 p.m., and your -- your

20 predecessor, Ken Sansone, has told me that we have all

21 the video footage, and there is a gap in coverage from

22 3:00 -- 3:00 and 4:20 p.m. Are you telling me that

23 there's additional video?

Page 28

1 MR. FREDERICKS: I think -- maybe we can go

2 off the record if you'd like.

3 MR. KING: Yeah. Yeah.

4 (Discussion off the record.)

5 MR. KING: Let's go back on. So yeah, I

6 have -- I'm happy to give you a copy of the video that

7 we have and that you provided, and you'll get us a

8 copy of the video that you just received on Friday.

9 MS. CUSACK: Yes.

10 MR. KING: Okay.

11 MS. CUSACK: Because I -- I kept saying to

12 everyone where is this 15 -- you know, 20 or 1420 to

13 1500. I've never seen that video. I've only see him

14 exiting the cell video, and finally our paralegal dug

15 around enough that she got it.

16 MR. KING: But you also have a -- even with

17 the video that you have, you have a gap between 4:03

18 and 4:20?

19 MR. FREDERICKS: I think that's correct.

20 MS. CUSACK: Yes.

21 MR. KING: And then you have another gap

22 from 4:25 on?

23 MS. CUSACK: I've never seen video from 4:20

Page 29

1 after.

2 MR. KING: All right. All right. Back on

3 record. Are we back on record?

4 THE REPORTER: Yes.

5 MR. KING: All right.

6 Q. BY MR. KING: Did you ever communicate

7 directly with Sergeant Smith regarding his review of

8 the video footage?

9 A. I don't remember.

10 Q. All right. Let's look at -- I realize this

11 was a while ago. I'm not trying to trip you up about

12 what you remember and what you don't remember. I'm

13 just trying to learn the facts here. So if we turn to

14 page 780 of the investigation report, Exhibit 2?

15 A. Yep.

16 Q. Just I'd say read this entry 780, 781 and

17 tell me if it refreshes your recollection as to

18 whether you spoke or communicated with Sergeant Smith

19 relating to his review of the video footage.

20 (Witness perusing document.)

21 A. Yes. Yes, I did.

22 Q. BY MR. KING: Did you communicate with him in

23 person or --

1 A. Yes.

2 Q. And what do you remember of that

3 conversation?

4 A. I remember those -- Sergeant Smith and

5 Lieutenant Newton talking about the assault. I'm

6 going off my report, and Sergeant Smith had offered to

7 take another look at it because he is better with the

8 video system than we were at the time. So I gave him

9 a copy of the notes that I had with the times of what

10 I saw and gave it to him to review again.

11 Q. Okay. And did you have further

12 communication with Sergeant Smith about his review of

13 the video footage?

14 A. I don't remember.

15 Q. All right. Did you ever make inquiry of

16 Sergeant Smith of why he had video footage depicting

17 Mr. Leite vomiting that you had not been able to

18 review?

19 A. I don't remember ever seeing anything about

20 him vomiting at all until I just saw this report.

21 Q. All right. Well, I believe you told me

22 earlier in the deposition that the incident report

23 that we've marked as Exhibit 1 was the source of your

1 description of Sergeant Smith reviewing the video on F

2 Block at approximately 5:45 as described on page 768

3 of the incident report, right?

4 A. Yes.

5 Q. Okay. So you had Sergeant Smith's incident

6 report in which he makes reference to the video

7 footage depicting Jonathan Leite leaning over and

8 vomiting?

9 A. Yes, I did have that report.

10 Q. Okay. Do you remember if you ever asked

11 Sergeant Smith why you had not been provided that

12 video footage?

13 A. No.

14 Q. Okay. Did you make a request for the video

15 footage?

16 A. No.

17 Q. No.

18 A. I -- I don't remember. The video is stored

19 in a control room. All the servers and everything are

20 in the control room, and different people have access

21 to go in there and review video and record video.

22 Q. And are you one of those persons that has

23 access to go into the control room and review video?

1 A. Yes.

2 Q. So is it your recollection that you -- when

3 you went into the control room and reviewed -- strike

4 that.

5 Is it your recollection that you went into

6 the control room and reviewed video of the August 24,

7 2012 incident?

8 A. Yes.

9 Q. And when you reviewed the video, the only

10 video available depicted events occurring between 2:30

11 and 3:00 p.m. and events occurring between 4:20 and

12 4:25 p.m.?

13 A. I don't want to say I assume. It must be

14 because that's all I documented. I don't remember

15 reviewing any other video.

16 Q. Okay. Did you ever communicate with anyone

17 other than Mr. Poulin with regard to the existence of

18 video coverage of F Block from 3:00 p.m. to 4:20 p.m.

19 and from 4:25 p.m. and beyond?

20 A. Could you say that again? I'm sorry.

21 Q. Let me -- let me break it up just to make it

22 easy.

23 Did you ever communicate with anyone other

1 than Mr. Poulin with regard to the existence of video

2 coverage of F Block between 3:00 p.m. and 4:20 p.m.?

3 A. No, I don't remember.

4 Q. Okay. If you had communicated with anyone

5 with regard to the existence of video coverage between

6 3:00 p.m. and 4:20 p.m., with whom would you have

7 communicated?

8 A. My supervisor.

9 Q. Okay. Did you ever communicate with anyone

10 regarding video coverage of F Block from 4:25 p.m. and

11 beyond on August 24, 2012?

12 A. I don't remember that either.

13 Q. But if you would have communicated with

14 someone, you would have communicated with your

15 supervisor?

16 A. Yes.

17 Q. All right. Do you recall whether you ever

18 spoke with Sergeant Sweatt about the events of August

19 24, 2012?

20 A. I don't.

21 Q. Okay. Let's look at Exhibit 3. Are you

22 familiar with this type of document, Exhibit 3?

23 A. Yes.

Page 34

1 Q. What does Exhibit 3 depict?
2 A. The rounds and counts of the upper housing
3 staff for a day, a 24-hour period.
4 Q. Does it depict the rounds that were
5 scheduled to occur on F Block on August 24, 2012?
6 A. It doesn't specifically say on this. If you
7 look at the top, it says Echo, Fox, Golf, Hotel and
8 Industries shift logs. Those are the areas that those
9 people are responsible to do rounds in. It doesn't
10 specifically say what unit they're on.
11 Q. Okay. What is the term "movement mate"
12 mean?
13 A. I believe it's every hour that movement is
14 open movement for inmates to leave their unit and go
15 to another location in the prison where they have
16 business to conduct, whether it be work or yard or
17 chapel, library, anything like that.
18 Q. Okay.
19 A. It's a general inmate movement.
20 Q. Okay. And do you have an understanding of
21 what the term rounds 10 through 79 means?
22 A. Yes.
23 Q. What does it mean?

Page 35

1 A. Rounds means they've conducted their rounds
2 walking through all of the units, and 10-79 is the
3 code of all clear. The radio call -- radio code.
4 Q. How long does it take to perform rounds of
5 -- this is of E Block, F Block, G Block, H Block and I
6 Block; is that correct?
7 MR. FREDERICKS: Objection to form.
8 A. I Block, you're referring to Industries.
9 It's not a housing unit.
10 Q. BY MR. KING: Oh, all right.
11 A. It's an area where they have a furniture
12 shop, refinishing, hobby craft and that type of stuff.
13 Q. All right.
14 A. And I don't know how long that it would take
15 for them to do a round in there.
16 Q. Well, you see here a notation that rounds
17 were done at 3:45 p.m., right?
18 A. Correct.
19 Q. Does that mean that rounds were begun or
20 rounds were completed at 3:45 p.m.?
21 A. I don't know that. I haven't been a floor
22 walker -- an officer walking on the floor and doing
23 rounds for 15 years.

Page 36

1 Q. All right.
2 A. I don't know the specifics of what their
3 duties are and how long it takes them and how they
4 document it.
5 Q. Okay. Does this document indicate that
6 Correctional Officer Dube and Correctional Officer
7 Kathy Bergeron were responsible for doing the rounds
8 on F Block during the second shift?
9 A. Yes.
10 Q. What is OIC stand for?
11 A. Officer in charge.
12 Q. What is CP-5 stand for?
13 A. It's Control Point 5. There are different
14 control rooms throughout the facility that open doors
15 and monitor movement.
16 Q. Okay. Does this document indicate that
17 Corrections Officer Esobe was responsible for video
18 monitoring of F Block?
19 MR. FREDERICKS: Objection to form.
20 A. If -- yeah, CP-5, like I said, they open
21 doors, and they do have monitors in their control
22 rooms, yes.
23 Q. BY MR. KING: All right. So at CP-5, the

Page 37

1 monitors in the control rooms include monitors of F
2 Block?
3 A. Yes.
4 Q. And this document, Exhibit 3, indicates that
5 Corrections Officer Esobe was stationed at CP-5 during
6 the second shift, right?
7 A. Yes.
8 Q. Okay. And this document indicates that
9 Corrections Officers Dube and Kathy Bergeron would
10 have conducted the rounds that included going through
11 F Block at 3:45 p.m., right?
12 A. Correct.
13 Q. How frequently are rounds supposed to be
14 conducted at --
15 MR. FREDERICKS: Objection to -- sorry.
16 Q. BY MR. KING: How frequently are rounds
17 supposed to be conducted at the Northern New Hampshire
18 Correctional Facility on August 24, 2012, if you know?
19 A. I don't know.
20 Q. Okay. In your experience, would it be
21 expected for no rounds to occur between -- of F Block
22 between 6:30 in the morning and 3:45 in the afternoon?
23 A. Could you say that again? I'm sorry.

Page 38

1 Q. Certainly. Let's -- let's -- does this
2 document reflect that no rounds were conducted of F
3 Block between 6:30 in the morning and 3:45 in the
4 afternoon?
5 A. Yes, but there's another -- I believe
6 there's another sheet that is specific to rounds.
7 This is a shift log.
8 Q. Okay.
9 A. Some people do put rounds in their shift
10 log, but there is another sheet that they -- the
11 officers -- they used to have to sign off anyway that
12 showed that they did rounds at certain times. They're
13 documented every -- every hour or in an hour time
14 frame or approximate hour time frame when they did
15 rounds.
16 Q. Okay.
17 A. And I don't see that.
18 Q. Okay. At -- how long have you been employed
19 by New Hampshire Department of Corrections?
20 A. 19 years.
21 Q. And you have been an internal affairs
22 investigator for 14 of those years?
23 A. Correct.

Page 39

1 Q. Right. Was there ever a point in time where
2 you did rounds?
3 A. Yes.
4 Q. What period of time was that?
5 A. Been from 1998 until I want to say 2001.
6 Different times because different positions that I was
7 in during those times didn't require me to do rounds.
8 If I was in a control room, I was in charge of the
9 main control room in Concord. I wouldn't do rounds
10 there. I worked in the canteen. I didn't do rounds
11 there, and I worked in the mail room at the Northern
12 Correctional Facility, and I didn't do rounds there.
13 Q. Right. Right. Okay. But at -- at various
14 points in time between 1998 and 2003, you performed
15 rounds?
16 A. Yes.
17 Q. Is that true?
18 All right. During that period of time when
19 you were performing rounds, what procedures, if any,
20 was a correctional officer supposed to follow in
21 connection with performing rounds?
22 A. You were required to do one round per hour
23 and not at the same time to try to stagger it.

Page 40

1 Q. And what were you supposed to do when you
2 were doing rounds?
3 A. Just walk through the unit, make sure that
4 nobody was doing anything against the rules.
5 Q. Okay. Okay. Does that entail looking in
6 prisoners' cells?
7 A. Yeah.
8 Q. All right. Would that entail looking at
9 bunks on the -- in the day room?
10 A. Yeah, if they were there.
11 Q. Okay. Inmates do not usually sleep on bunks
12 in the day room during daytime hours; is that true?
13 A. No. Inmates sleep all different times of
14 the day.
15 Q. Okay. Well, that wasn't quite -- quite what
16 I asked you.
17 Is it --- is it your experience that inmates
18 would typically sleep on a bunk in the day room during
19 daytime hours?
20 A. Yeah, that's not uncommon.
21 Q. All right. So when you were doing
22 rounds and you would look in prisoners' cells, what --
23 what would you be looking for?

Page 41

1 A. Just to see if -- make sure people aren't in
2 there fighting or tattooing or anything out of the
3 ordinary.
4 Q. Okay. Are you familiar with the term cell
5 hopping?
6 A. Yes.
7 Q. What does cell hopping mean?
8 A. When an inmate goes into another inmate's
9 cell that's not assigned to him.
10 Q. In the time when you were a correctional
11 officer performing rounds, did you discover incidents
12 of cell hopping?
13 A. When I was doing it, it wasn't -- it wasn't
14 an issue. It wasn't a rule I guess you could say. In
15 the -- in the general population units that I was in,
16 it wasn't a rule. It was more NCF started doing it up
17 here, but when I worked in the -- the general
18 population units in Concord, it wasn't -- it wasn't a
19 rule. It may have been rule, but it wasn't one that
20 was enforced.
21 Q. All right. Do you have any understanding of
22 what the punishment would have been for finding that
23 an inmate had engaged in cell hopping at the Northern

Page 42

1  New Hampshire Correctional Facility on or about August
2  24, 2012?
3  A. It would be a disciplinary report. I don't
4  know the severity of it.
5  Q. Okay. Let me ask you then and then maybe
6  we'll -- we can make some copies because I didn't
7  bring copies of this document. You were telling me
8  earlier that there was a specific document that
9  pertained to rounds, right?
10  A. Yes.
11  Q. Is this that document?
12  A. Yes, it is.
13      MR. KING: Okay. Off the record.
14      (Discussion off the record.)
15      (Coulombe Exhibit 4 was
16      marked for identification.)
17  Q. BY MR. KING: Okay. We're looking at
18  Exhibit 4, which pertains to rounds done, including
19  rounds done on F Block on August 24, 2012, right?
20  A. Correct.
21  Q. Okay. And does this indicate -- this
22  indicates that Corrections Officers Dube and Kathy
23  Bergeron did rounds at 3:45 p.m.?

Page 43

1  A. Yes, it does.
2  Q. Okay. And then the rounds that immediately
3  preceded that occurred at 2:15 p.m.; is that right?
4  A. Yep, that's what's on there. Yes. Sorry.
5  Q. All right. Okay. So the round that
6  occurred at 3:45 p.m. occurred while Jonathan was
7  being assaulted in the cell?
8      MR. FREDERICKS: Objection to the form.
9  Q. BY MR. KING: Is that correct?
10  A. Yeah, it appears so.
11  Q. All right. Jonathan enters the cell at 2:39
12  p.m., right? I'm not -- that's on page 777.
13  A. Yep. Yep. I have it up here. I'm looking
14  at the timing. So yes, the round began or ended --
15  like I said, I don't know how they did it. They were
16  doing a round or they noted at 1545, and if he entered
17  the cell --
18  Q. And if we look at Exhibit 1, we have the
19  notation there for the round that occurred at 1545,
20  rounds 10-79.
21  A. I'm seeing a different -- sorry.
22  Q. All right.
23  A. I'm looking -- if it was done at 1545 on

Page 44

1  this report, Jonathan entered the cell at 1439. So
2  it's not the same time the round -- that you were
3  referring to. The round you were referring to was
4  1545.
5  Q. Yes.
6  A. So now it's an hour later. So it wasn't at
7  the time that he was being assaulted in the cell.
8  We're off by an hour.
9  Q. Well, let's -- the video footage reflects
10  that Jonathan entered the cell at 2:39 p.m.
11  A. Correct.
12  Q. The video footage further reflects that
13  Jonathan did not exit the cell until 4:20 p.m., right?
14  A. Correct.
15  Q. Do you have any information that Jonathan
16  left the cell at any time between 2:39 p.m. and 4:20
17  p.m.?
18  A. No. The times I was mistaken from the
19  beginning of the video, not when he was in the cell.
20  Q. Okay.
21  A. That was my confusion. I apologize.
22  Q. Okay. So at 3:45 p.m. when rounds were
23  being conducted, your review of the video footage

Page 45

1  indicates that Jonathan was in the cell at that time,
2  right?
3  A. Yes. I don't remember him coming out any
4  other time from the video that I reviewed that he was
5  outside of that cell until 1620 or whatever when he
6  came out.
7  Q. Not to belabor this point too much, but
8  Jonathan enters the cell at 2:39 p.m., right?
9  A. Yes.
10  Q. He leaves the cell at 4:20 p.m., right?
11  A. Yes.
12  Q. And we don't have any video footage
13  depicting Jonathan leaving the cell at any time
14  between 2:39 p.m. and 4:20 p.m., right?
15  A. Not that I'm aware of.
16  Q. Okay. And during that time period
17  specifically at 3:45, between 2:39 p.m. and 4:20 p.m.,
18  Officers Dube and Bergeron conducted rounds, right?
19  A. Yes.
20  Q. And the code that they entered on Exhibit 1,
21  round 10-79, indicates that all was clear, right?
22  A. Right. I have Exhibit 3 on that.
23  Q. I'm sorry. Thank you.

Page 46

1 A. But yes, that -- that is correct. Round
2 10-79 at 1545.
3 Q. And you've told me the 10-79 means all
4 clear, right?
5 A. Correct.
6 Q. Okay. Now, in your review of the video
7 footage, you saw an inmate by the name of Johnathan
8 Gelinas make a slicing motion from left to right
9 across his neck while turning his back to Leite at
10 2:38 p.m.?
11 A. Yes.
12 Q. Yes. What, if anything, did you interpret
13 that slicing motion across the neck to mean?
14 A. Could have been he's all done or it's time.
15 It could have been any type of set-up. It could be
16 there's nothing. There's many different things it
17 could have been.
18 Q. Okay. Now, was the video of Mr. Gelinas
19 making a slicing motion from left to right across his
20 neck available to any correction officer at the time
21 the incident happened?
22        MR. FREDERICKS: I will object to the form
23 on that, but go ahead.

Page 47

1 A. At the time it happened, no.
2 Q. BY MR. KING: No. Could you explain?
3      This is what I'm asking. If we -- we have
4 video depicting Mr. Gelinas make a slicing motion left
5 to right across his neck while turning away from Leite
6 at 2:38 p.m. on August 24, 2012, right?
7 A. Yes.
8 Q. At 2:30 p.m. on August 24, 2012, could a
9 corrections officer conducting video monitoring of F
10 Block seen Johnathan Gelinas making that slicing
11 motion from left to right across his neck?
12 A. Yes, he could have if the camera was on. I
13 thought you were referring to the officers on the
14 unit.
15 Q. Okay.
16 A. In the control room, there's a couple
17 monitors, and again I don't know the sequence here.
18 May be better to ask somebody that deals with the
19 housing, but they can have up to four or they could in
20 previous years have up to four cameras on one monitor.
21 I don't know if they're set to rotate. I don't know
22 if they're on constant on one unit or not. There's
23 different settings that they could do. So I don't

Page 48

1 know the specifics of what --
2 Q. Okay.
3 A. -- was on the monitors in that control room.
4 Q. Yep. If you had been conducting video
5 monitoring of a cell block and you saw an inmate make
6 a slicing motion from left to right across his neck,
7 do you believe it would be appropriate to make inquiry
8 as to what was going on?
9 A. Yes.
10 Q. What would you have done?
11 A. I would have notified the officers on the
12 floor and had them go into that unit and do a round.
13 Q. And Mr. Gelinas made that slicing motion
14 from left to right across his neck two times, correct?
15 At or about 2:38?
16 A. Yes.
17 Q. And the second time he does it you say he's
18 hiding behind a laundry cart obstructing any possible
19 view from Leite?
20 A. Correct.
21 Q. If you'd been conducting video monitoring of
22 the cell block and you had seen an inmate hiding
23 behind a laundry cart and making that motion slicing

Page 49

1 across the neck left to right, would that have caused
2 you concern.
3 A. I would have done the same thing. Had an
4 officer go in there and do a round and see what's
5 going on.
6 Q. Okay. Now, you note between 2:41 and 2:45
7 at least a couple of inmates enter Cell 9, and a lot
8 of inmates can be seen hanging around Cell 9, right?
9 A. Yes.
10 Q. If you had been conducting video monitoring
11 of a cell block and you saw a lot of inmates hanging
12 around a certain cell, would that have caused you
13 concern?
14 A. Yes, we would have sent somebody in for that
15 as well.
16 Q. Okay. Now, at 2:48 p.m. you see inmates who
17 are not Jonathan Leite grabbing clothing off of
18 Jonathan Leite's bunk and grabbing possessions out of
19 Jonathan Leite's foot locker, correct?
20 A. Yes.
21 Q. If you were conducting video monitoring of a
22 cell block and you observed an inmate taking
23 possessions off another inmate's bunk and foot locker,

Page 50

1  would that have caused you certain?
2  A.  Not necessarily. You wouldn't typically
3  know if it was -- me, I wouldn't know.
4  Q.  Okay.
5  A.  It depends -- I think you'd have to ask that
6  officer.
7  Q.  Okay.
8  A.  I don't know because it's not uncommon for
9  inmates to grab something or put something on somebody
10  else's bunk.
11  Q.  Okay. All right. That's fine.
12      Then you note that over the next eight
13  minutes several inmates enter and exit Cell No. 9,
14  right?
15  A.  Yes.
16  Q.  If you had been conducting video monitoring
17  of a cell block and you see several inmates enter and
18  exit the cell over a period of time, such as eight
19  minutes, would that have caused you concern?
20  A.  Yes, but the officer that is conducting
21  video monitoring is in that control room and he's not
22  solely looking at the camera. There could be
23  movements going on. Any time an inmate walks up and

Page 51

1  pushes a call button to -- to ask for their door to be
2  opened, the cameras in the control automatically
3  change to that location. So that officer that's
4  tasked with opening all those doors also has the
5  monitors. There his -- he doesn't have constant
6  surveillance looking at those monitors. He has other
7  duties that he has to do in the control room. They
8  may not see the people going in and out, you know.
9  They may see one guy here or there, but they may not
10  see a big group.
11  Q.  Okay.
12  A.  Again I'm not in that control room, but I do
13  know that's how it works. When somebody pushes a
14  button, the camera automatically changes and goes to
15  that location.
16  Q.  Understood. And that's helpful, but my --
17  but my question is if -- if the -- if the monitoring
18  were being conducted and a corrections officer did
19  observe several inmates entering and exiting a
20  particular cell over a short period of time, would
21  that in your experience give cause to concern
22  warranting some sort of investigation into what's
23  going on?

Page 52

1  A.  Yes, it would.
2  Q.  All right. Thank you.
3      Now, you go on to note that at 4:20 Jonathan
4  exited Cell No. 9 wearing only gray shorts and socks,
5  right?
6  A.  Yes.
7  Q.  And you note the clothing because Jonathan
8  was wearing different clothing at 2:39 when he entered
9  the cell, right?
10  A.  Correct.
11  Q.  He's wearing a white T-shirt, long green
12  pants, socks and shoes when he enters the cell. Then
13  when he leaves, he's wearing much less, right?
14  A.  Yes.
15  Q.  Okay. And the video does depict Jonathan's
16  legs giving out and him falling to the ground?
17  A.  Yes, it does.
18  Q.  If you had been conducting video monitoring
19  of a cell block and you observed an inmate coming out
20  of a cell and falling immediately to the ground, would
21  you have conducted an inquiry?
22  A.  Yes.
23  Q.  What would you have done?

Page 53

1  A.  If an inmate came out and stumbled and fell
2  to the ground, I would have called a response team for
3  that because it could have been a medical emergency.
4  Q.  Okay. What is the response team?
5  A.  It's first responders. People assigned to
6  the shift in areas where they can leave their post
7  immediately and respond to anywhere throughout the
8  facility to maintain order.
9  Q.  Okay. Let's say a correction officer is
10  observing this happen at 4:20 in the afternoon, an
11  inmate exiting the cell having his legs give out and
12  falling to the ground, and the corrections officer
13  called the response team. How quickly would the
14  response team have been on the scene?
15  A.  Usually within a minute or two.
16  Q.  Okay.
17  A.  Depends where they are in the facility.
18  Q.  The video goes on to depict inmate Gelinas
19  holding Mr. Leite up and walking him back to his bunk,
20  right?
21  A.  Yes.
22  Q.  If you had been conducting video monitoring
23  of a cell block and you observed another inmate

Page 54

1 holding a particular inmate up and walking him back to
2 his bunk, would that have caused you some concern?
3 A. Yes.
4 Q. What would you have done?
5 A. I would have called somebody to go in there.
6 Q. Okay. And then the video further depicts
7 Mr. Leite attempting to climb over the edge of the
8 bunk, and he stops and looks as though he's going to
9 fall backwards on to the floor, right?
10 A. Correct.
11 Q. If you had observed that through video
12 monitoring, would that have caused you some concern?
13 A. Yes.
14 Q. And what would you have done?
15 A. I would have called somebody in there as
16 well for that.
17 Q. And the same question with regard to the
18 last fact that's alleged, which is the video depicts
19 another inmate coming along and just pushing Jonathan
20 on to the -- the bunk, right?
21 A. Yes, that's what it says.
22 Q. Yes. And if you had been a corrections
23 officer conducting video monitoring that -- that

Page 55

1 revealed that, would you have taken some response?
2 A. That -- I guess I would have to review the
3 video again on that one. It might be just horseplay.
4 Somebody walking by and pushing him.
5 Q. All right.
6 A. It depends. I'd have to look at the video
7 again to say for sure.
8 Q. Fair enough.
9 Did you ever communicate with -- forgive me
10 if I've already asked you this. I just want to tie
11 things up.
12 Did you ever communicate with Kathy Bergeron
13 relating in any way to the rounds that she conducted
14 on August 24, 2012?
15 A. I don't remember.
16 Q. All right. Did you ever communicate with
17 Corrections Officer Dube regarding the rounds that he
18 conducted on August 24, 2012?
19 A. I don't remember that either.
20 Q. Okay. Is that something that you would have
21 done in connection with an investigation such as this?
22 A. Yes, but I don't remember speaking with
23 them.

Page 56

1 Q. All right. And did you tell me earlier that
2 all the documents you generated in connection with
3 this investigation would have gone into the -- the
4 major crimes file?
5 A. Yes.
6 Q. All right. Can you describe for me the
7 results of your investigation?
8 A. I believe -- well, actually I know that
9 there was three people that were charged criminally
10 for it, and they pled out to whatever their sentences
11 were given --
12 Q. Okay.
13 A. -- in the criminal case.
14 Q. And were those three people Matthew Garcia,
15 Sean Lavallee and Johnathan Gelinas?
16 A. Yes, they were.
17 MR. KING: Off the record.
18 (Short recess was taken.)
19 Q. BY MR. KING: Are you aware of whether the
20 Northern New Hampshire Correctional Facility has any
21 policies relating in any way to the retention of video
22 of the cell blocks, preservation or retention of
23 video?

Page 57

1 A. No.
2 Q. You're not aware?
3 A. I'm not aware of any.
4 Q. All right. When there is an incident such
5 as this where there is a concern that criminal conduct
6 may have happened in the -- in the prison, does any
7 protocol go into effect -- go into effect with respect
8 to preserving video of the incident?
9 A. When an investigator comes in if we knows
10 it's going to be or assume it's going to be a criminal
11 case and that part of that does have video, we go and
12 secure that video now.
13 Q. Okay. Okay. Did you secure video in this
14 case?
15 A. I don't remember how I got the video, but I
16 did have the video. I don't remember if I was --
17 specifically went into the room or if it was burned by
18 my supervisor or Sergeant Smith had burned it. I
19 don't remember, but I know that it was reviewed in
20 there.
21 Q. All right. But your investigation report
22 reflects that you don't review the video until
23 September 5, right?

1  A.  If that --
2  Q.  Just take your time and look at it.  I don't
3  want you to guess.
4      (Witness perusing video.)
5  A.  Yes.
6  Q.  BY MR. KING:  Okay.  So is there any
7  protocol in effect that you're aware of relating in
8  any way to the preservation of the video between the
9  time of the incident and the time that you as the
10 investigator get to go in there and review it --
11 A.  No.
12 Q.  -- and secure it?
13 A.  Not aware of that.
14 Q.  Okay.  We know that you reviewed video, and
15 we know that Sergeant Smith reviewed video, right?
16 A.  Yes.
17 Q.  In connection with investigating the assault
18 on Mr. Leite, did anyone else review video footage?
19     MR. FREDERICKS:  Objection to form.
20 Q.  BY MR. KING:  That you're aware of?
21 A.  Detective Cote would have.
22 Q.  Okay.  Anybody else that you're aware of?
23 A.  Not that I'm aware of.

1  Q.  All right.  What does PAR mean?
2  A.  Pending administrative review.
3  Q.  And what happens when an inmate is placed on
4  pending administrative review status?
5  A.  They're taken out of the population and
6  housed in the reception area or possibly in a medical
7  area, somewhere out of the population, while either a
8  unit investigation is done, or it could be that they
9  were going to be upgraded to a higher classification.
10 There are several reasons that somebody could be put
11 on pending -- pending administrative review.
12 Q.  And in this case, two inmates were placed on
13 pending administrative review shortly after the --
14 Jonathan was taken away to the hospital.  Is that
15 true?
16 A.  I don't remember that.
17 Q.  Okay.  Do you recognize this document which
18 was Bates stamped one in the defendant's production in
19 this case?
20 A.  Yes.
21 Q.  And does that document indicate that two --
22 two inmates were placed on pending administrative
23 review for assaulting Jonathan Leite?

1  A.  Yes, it does.
2  Q.  Okay.  And one of them is inmate Gelinas?
3  A.  Correct.
4  Q.  Do you know who the other inmate is?
5  A.  I don't remember that name.
6  Q.  All right.  Does this document Bates stamped
7  one that we'll --
8      MR. KING:  Let's mark this as an exhibit.
9  I'll get copies later.
10     (Coulombe Exhibit 5 was
11     marked for identification.)
12 Q.  BY MR. KING:  Show you a document that we've
13 marked as Coulombe 5.  Does this document indicate
14 that the same corrections officer was the officer in
15 charge for both the first shift and the second shift?
16 A.  Yes, it does.
17 Q.  Is that unusual your experience?
18 A.  No.
19 Q.  No.  Okay.  What time does or at least on
20 August 24, 2012, what time does first shift begin?
21 A.  0700 hours.
22 Q.  And when does it end?
23 A.  1500.

1  Q.  And second shift begins at 15 -- 1500?
2  A.  Yep.
3  Q.  And goes until?
4  A.  2300.
5  Q.  So it's not uncommon for corrections
6  officers to work a 16-hour day?
7  A.  Not at all.
8  Q.  All right.  What exhibit is the round one?
9  A.  Four.
10 Q.  All right.  We talked about how Corrections
11 Officers Dube and Kathy Bergeron did rounds at 3:45
12 p.m., right?
13 A.  Yes.
14 Q.  Okay.  Exhibit 4 also reflects that
15 Corrections Officers Kathy Bergeron and Dube did
16 rounds at 4:50 p.m., right?
17 A.  Yes.
18 Q.  All right.  And that's also -- sorry.
19 That's also reflected on Exhibit 3, right?
20 A.  Yes, it is.
21 Q.  And once again we have the notation for the
22 4:50 rounds round 10-79.  That means all clear, right?
23 A.  Yes, it does.

Page 62

1 Q. All right. Now, we've talked about how the
2 video you and I reviewed doesn't include any coverage
3 between 3:00 p.m. and 4:20 p.m., right?
4 A. Correct.
5 Q. If we had that video, would -- would you
6 expect that the video would demonstrate the officers
7 conducting the rounds?
8 A. Yeah, if it was at that times. Yes.
9 Q. All right. And the same is true of the
10 rounds occurring at 4:50 p.m., if we had the video of
11 the cell block at or about that time, it should depict
12 the officers conducting the rounds, right?
13 A. Correct.
14 Q. And at least according to Sergeant Smith's
15 review of the video at some time between 4:25 p.m. and
16     5:08 p.m., Jonathan Leite leaned over his bunk and
17 vomited on to the floor, right?
18 A. He doesn't put a time.
19 Q. I understand that but --
20 A. But --
21 Q. But going --
22 A. Yes.
23 Q. Sergeant Smith says going back from the time

Page 63

1 he was discovered during count, and we know that time
2 is 5:08 p.m., right?
3 A. Yes.
4 Q. And you have reviewed video footage
5 depicting Jonathan getting into the bunk at some point
6 between 4:20 p.m. and 4:25 p.m., right?
7 A. Yes.
8 Q. And Jonathan's discovered in the bunk at
9     5:08 p.m., right?
10 A. Correct.
11 Q. So we know he's in the bunk between 4:25
12 p.m. and 5:08 p.m., right?
13 A. Yes.
14 Q. So is it fair to say that that incident
15 where Jonathan leaned over and vomited on to the floor
16 occurred at some point between 4:25 p.m. and 5:08
17 p.m.?
18 A. Yes, it is.
19 Q. All right. And if you had been a
20 corrections officer conducting rounds, and you
21 discovered that an inmate had -- you discovered vomit,
22 would that have caused you concern?
23 A. Yeah, I would have checked with the inmates

Page 64

1 in the area, make sure they were okay.
2 Q. Okay. Okay. So is it your recollection
3 that you didn't get the original voicemail or you
4 didn't review the original voicemail from Sergeant
5 Smith until the morning of August 25, 2012?
6 A. I believe so, and I think I put it in here
7 in this report.
8 Q. All right.
9 A. Yes. At 12:30 on August 25 is when I
10 received the message that he left for me the night
11 before.
12     MS. CUSACK: Ben, how much longer do you
13 think you have?
14     MR. KING: Not long.
15 Q. BY MR. KING: When you received that
16 voicemail message, you contacted Detective Cote,
17 right?
18 A. Correct.
19 Q. And did you issue any orders with regard to
20 -- to preservation of evidence in any way?
21 A. No.
22 Q. Okay. Is that not something that -- that
23 you would do as an investigator?

Page 65

1 A. If I was going in and responding to the
2 facility, then I would, but where I called Detective
3 Cote, this became a major crimes case file, and they
4 take control of the case.
5 Q. Okay. So if anyone had ordered preservation
6 of evidence, you would expect that would be Detective
7 Cote?
8 A. Yes.
9     MR. KING: All right. Okay. Let me take a
10 moment and speak to Megan and Jonathan.
11     MR. FREDERICKS: Sure.
12     (Short recess was taken.)
13 Q. BY MR. KING: You testified earlier in the
14 deposition that different people have access to the
15 video in the control room, right?
16 A. Yes.
17 Q. On August 24, 2012, in that August 2012,
18 September 2012 time period, who would have been the
19 persons who had access to the video in the control
20 room?
21 A. At that time it could be -- I believe it was
22 corporals and above could go in and review the video,
23 so any corporal, any sergeant, any lieutenant and the

Page 66

1 captain.

2 Q. Okay. Would -- let's see. Would Officers
3 Dube or Bergeron have been able to go in and review
4 the video?

5 A. Not that I'm aware of. They would have had
6 to have been with a supervisor, but I don't know if
7 they did or not.

8 Q. Okay. At this time, August 24, 2012, who
9 could have had the power to determine what was
10 recorded and what was not recorded?

11 MR. FREDERICKS: Objection to form.

12 A. At that time I think anybody could record
13 video. I don't think there was any restriction on it
14 at the time, which has been changed.

15 Q. BY MR. KING: Okay. So now only certain
16 people can record video?

17 A. Correct.

18 Q. At that time, August 24, 2012, did anyone
19 have the power to delete video?

20 A. No.

21 Q. No. Okay.

22 A. I don't know if the electronic technician
23 does or not, but staff, no.

Page 67

1 Q. Okay. If we look at -- find out what
2 exhibit it is.

3 A. What are we looking for?

4 Q. Sorry. I'm looking for the document Bates
5 stamped two. I know we marked it.

6 MR. FREDERICKS: No. 3.

7 MR. KING: Okay. No. 3. Great.

8 Q. BY MR. KING: Does Exhibit 3 indicate that
9 Corrections Officer McLain, which I believe is Lynn
10 McLain, was responsible for video monitoring of F
11 Block in the period running from 2:30 p.m. to 3:00
12 p.m.?

13 MR. FREDERICKS: Objection to the form.

14 A. Yes, she was assigned to CP-5, but again
15 it's not just video recordings. There's also a lot of
16 other duties that happen in that control room.

17 Q. BY MR. KING: Okay. Are you familiar with
18 what those duties are?

19 A. Like I explained earlier, the movements,
20 when inmates move back and forth, they push a button
21 on a call box and that brings the video monitor to
22 that location, and then that officer in the control
23 room is tasked with asking that inmate where they're

Page 68

1 going or what they're doing. Then they open that door
2 to the sally port, and a sally port -- are you aware
3 with a sally port?

4 Q. No.

5 A. It's -- it's like a vestibule. You have a
6 inmate housing unit. Then you have one door, and then
7 there's a probably ten-foot section, and then there's
8 another door so that it keeps the units contained. So
9 that officer has to pop open that inside door and
10 allow the inmates into that vestibule. Once that door
11 is secure behind them, then they open up the hallway
12 door for them to come out, and each unit has that. So
13 that officer in those control rooms opens all those
14 doors for inmates and staff.

15 Q. Okay. During the first shift, would anyone
16 other than Corrections Officer McLain have been
17 looking at video monitoring of F Block?

18 A. No, not specifically.

19 Q. Okay. And during the second shift, would
20 anyone other than Corrections Officer Esobe have been
21 looking at video monitoring of F Block?

22 MR. FREDERICKS: Can I do an objection and
23 just ask to be more clear with video monitoring? I

Page 69

1 just -- I think that would be helpful if you describe
2 what you meaning by video monitoring.

3 MR. KING: I mean watching the video that
4 was depicting what was going on in F Block.

5 MR. FREDERICKS: Do you understand?

6 THE WITNESS: Yeah.

7 MR. FREDERICKS: Okay.

8 Q. BY MR. KING: During second shift, would
9 anyone other than Corrections Officer Esobe have been
10 monitoring the video depicting the goings in F
11 Block?

12 A. No.

13 Q. In an earlier answer, you said not
14 specifically. Would anyone else have had access to
15 the video to --

16 A. Yes.

17 Q. -- what was going on in F Block?

18 A. Yes.

19 Q. Who else would have had access?

20 A. Whoever was assigned to the main control
21 room has access to all the cameras in the entire
22 facility.

23 Q. If we could just look the area round log?

Page 70

1  A.  These are both round logs, or this is a
2  shift report -- shift log, and this is the rounds log.
3  Q.  Right.  Right.  If you look at what we've
4  marked as Coulombe Exhibit 4, who would have had the
5  responsibility to make sure that this round log marked
6  as Exhibit 4 was accurate?
7  A.  It -- I would say security lieutenant.  He's
8  the one that signs off on them every day.
9  Q.  Is that Officer Durand?
10  A.  No.
11  Q.  No.
12  A.  Here it's Lieutenant Masse.
13  Q.  Oh, okay.  Is Lieutenant Masse still
14  employed at Northern New Hampshire Correctional
15  Facility?
16  A.  No, he works in the Concord facility.
17  Q.  What is his name?
18  A.  It's actually captain now, John Masse.
19  Q.  Okay.  In the August 24, 2012 time period,
20  was there any particular kind of prisoner who was
21  housed in F Block?
22  A.  By what do you mean?
23  Q.  Were the prisoners in F Block considered by

Page 71

1  the Northern New Hampshire Correctional Facility to be
2  more or less dangerous than prisoners in any other
3  block?
4  A.  I don't remember.  That's something that's
5  maintained by the housing staff.
6  Q.  All right.
7  MR. KING:  We'll be right back.
8  (Short recess was taken.)
9  Q.  BY MR. KING:  With respect to Exhibit 4, are
10  you familiar with the procedures for keeping the
11  records of such a document?
12  A.  No.
13  Q.  Okay.  Would it have been typical, for
14  example, for the officer in charge, Officer Dube, to
15  fill out the form and then sign off on it?
16  A.  Yeah, I suppose so.
17  Q.  Okay.  And are you familiar with any
18  procedures that the Northern New Hampshire
19  Correctional Facility had in place on or about August
20  24, 2012, to verify that the data entered on the area
21  rounds log was accurate?
22  A.  No, I don't know.
23  MR. KING:  All right.  Okay.  Thank you for

Page 72

1  your time.
2  THE WITNESS:  Yeah.  No problem.
3  MR. FREDERICKS:  I'm going to ask a few of
4  you.
5  THE WITNESS:  Yep.  Sure.
6
7  EXAMINATION
8  BY MR. FREDERICKS:
9  Q.  Could you turn to Bates page 777 of Exhibit
10  4 which is your --
11  MS. CUSACK:  Exhibit 2.
12  Q.  BY MR. FREDERICKS:  Excuse me.  Exhibit 2.
13  MR. FREDERICKS:  Thank you, Lyn.
14  Q.  BY MR. FREDERICKS:  -- the New Hampshire
15  Department of Corrections investigation report, on
16  that page is your review, your notes, based on your
17  review of watching the video footage, correct?
18  A.  Correct.
19  Q.  And when you walked through this -- these
20  notes with Attorney King, you mentioned that had you
21  seen some of this activity on video, you would have
22  notified staff to go in the unit and check it out,
23  correct?

Page 73

1  A.  Correct.
2  Q.  Do you think it was odd in this case that
3  during that time period an issue 1430 to about 1620
4  that someone with access to the video monitor did not
5  send one in -- send an officer in specifically to look
6  at this?
7  A.  No.
8  MR. KING:  Objection.
9  Q.  BY MR. FREDERICKS:  Why not --
10  MR. KING:  You can finish the question.
11  Q.  BY MR. FREDERICKS:  Why do you not think
12  that that was odd?
13  A.  Because these housing units, there's 60 to
14  70 inmates in a housing unit, and the officer in the
15  control room does not only have access to the video,
16  but he's also tasked with doing other things.  Inmates
17  do move around inside units quite a bit.  Go inside,
18  in and out of other cells.  Work around workout areas.
19  Walk to the phone.  So there's a lot of inmates moving
20  around.  I think if somebody was in a control room,
21  they'd have to be specifically watching that video to
22  see the things that we saw after looking at it.
23  Q.  And why wouldn't they be doing that?

Page 74

1 A. Because of the other --
2    MR. KING: Objection.
3 A. -- duties -- sorry.
4    Because of other duties in the control room
5 by opening doors and monitoring movement in the
6 hallways and opening other doors for staff and
7 inmates.
8    MR. FREDERICKS: Nothing further.
9    MR. KING: All right.
10   (The deposition was concluded
11    at 12:50 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23

Page 75

1    CERTIFICATE OF WITNESS
2
3 I, TIMOTHY COULOMBE, have read the foregoing
4 transcript of the deposition taken on Monday,
5 August 28, 2017, at the DEPARTMENT OF JUSTICE, OFFICE
6 OF THE ATTORNEY GENERAL, Concord, New Hampshire, and
7 do hereby swear/affirm it is an accurate and complete
8 record of my testimony given under oath in the matter
9 of TIMOTHY COULOMBE, including any and all corrections
10 that may appear on those pages so denoted as
11 "Corrections."
12
13
14    TIMOTHY COULOMBE
15 STATE OF
16 COUNTY OF
17
18 Subscribed and sworn to before me this      day
19 of            , 2017.
20
21
22    Notary Public       J.P.
23 My Commission Expires:

Page 76

1    CORRECTION AND SIGNATURE PAGE
2    DEPOSITION OF: TIMOTHY COULOMBE
3    DATE OF DEPOSITION: August 28, 2017
4 PAGE  LINE    NOW READS      SHOULD READ
5 ___  ___  _____  _____
6 ___  ___  _____  _____
7 ___  ___  _____  _____
8 ___  ___  _____  _____
9 ___  ___  _____  _____
10 ___  ___  _____  _____
11 ___  ___  _____  _____
12 ___  ___  _____  _____
13 ___  ___  _____  _____
14 ___  ___  _____  _____
15 ___  ___  _____  _____
16 ___  ___  _____  _____
17 ___  ___  _____  _____
18 ___  ___  _____  _____
19
20 Signed this ____ day of _____, 2017.
21
22    _____
23    TIMOTHY COULOMBE

Page 77

1        C E R T I F I C A T E
2
3       I, Karen L. Leach, a Licensed Court
4 Reporter, Shorthand and Notary Public of the State of
5 New Hampshire, do hereby certify that the foregoing is
6 a true and accurate transcript of my stenographic
7 notes of the deposition of TIMOTHY COULOMBE, who was
8 first duly sworn, taken at the place and on the date
9 hereinbefore set forth.
10       I further certify that I am neither attorney
11 nor counsel for, nor related to or employed by any of
12 the parties to the action in which this deposition was
13 taken, and further that I am not a relative or
14 employee of any attorney or counsel employed in this
15 case, nor am I financially interested in this action.
16       THE FOREGOING CERTIFICATION OF THIS
17 TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE
18 SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
19 AND/OR DIRECTION OF THE CERTIFYING REPORTER.
20
21
22
23       KAREN L. LEACH, LCR NH #38

| 1. CASE NO. | 2. INVESTIGATOR | 3. I.D. NO. | 4. TOWN OF INCIDENT | 5. TN. CD. | 6. DATE OF REPORT |
|---|---|---|---|---|---|
| MC12-13405 | T. Coulombe | | Berlin | | 8/24/12 |

**August 24, 2012**                                    **Approximately 1708 hrs**

On the above date and approximate time

Officer Kathy Bergeron
Northern Correctional Facility
Housing Officer
Second Shift

was conducting a facility count of the inmates in Fox Block. When she approached

LEITE, Jonathan
DOB: 11/14/1983
Inmate # 86003
Northern Correctional Facility
Fox Block Dayroom
Bunk #1 Top

She asked him "Leite, what is up, you don't stand for count anymore?" LEITE then lifted his head and jumped down to the floor for count. At the same time

Sergeant Dwayne Sweatt
Northern Correctional Facility
Housing Officer in Charge
Second Shift

had finished conducting a facility count on the top tier in Fox Block and overheard Officer K. Bergeron ask LEITE if he was going to get up for count. Sgt Sweatt observed LEITE lying on his bunk with what appeared to be blood coming out of the right side of his mouth and running down his face. LEITE got down off his bunk and Sgt. Sweatt confirmed that it was blood coming from his mouth and also observed that his skin was very pale. Sgt. Sweatt asked LEITE is he was OK and LEITE told him he was tired. LEITE was told to sit down and Sgt. Sweatt called for the First Response Team to secure the unit. He then asked LEITE if he had lost consciousness. LEITE stated that he did. At that point the situation was declared a medical emergency and Berlin EMS was called. Berlin EMS responded to the unit and took LEITE to the Androscoggin Valley Hospital. (Exhibit 1)

-End-

EXHIBIT
Coulombe
2
8/28/17  KLL
PENGAD 800-631-0989

| | Page 1 of 21 | SIGNED | DATE 12/13/12 |
|---|---|---|---|

DSSP 102 (Rev. 08/94)

000767

## NEW HAMPSHIRE DEPARTMENT OF CORRECTIONS
## CONTINUATION OF INVESTIGATION REPORT

| 1. CASE NO. | 2. INVESTIGATOR | 3. I.D. NO. | 4. TOWN OF INCIDENT | 5. TN. CD. | 6. DATE OF REPORT |
|---|---|---|---|---|---|
| MC12-13405 | T. Coulombe | | Berlin | | 8/24/12 |

<u>September 5, 2012</u>                                          <u>Approximately 0830 hrs</u>

On the above date and approximate time I reviewed the video of Fox Block from August 24, 2012 beginning at 1430 hours.

14:34:25 – LEITE entered Fox Block returning from his visit and mingled at the tables

14:35:52 – LEITE left the tables and went to his bunk in the dayroom

14:36:18 – LEITE searched through the laundry cart but didn't retrieve anything

14:36:36 – LEITE returned to his bunk

14:36:45 – LEITE began to change his clothing while standing next to the foot of his bunk

14:36:57 – Two inmates exit cell #9. One of them enters cell #7 and the other identified as

GELINAS, Jonathan
DOB: ▮▮▮▮▮
Inmate # ▮▮▮▮▮
Northern Correctional Facility
Fox Block
Cell #9 1B

walks over toward the laundry cart near LEITE's bunk.

14:37:35 – GELINAS walks over to LEITE's bunk and they engage in a conversation until 14:38:40.

14:38:53 – GELINAS retrieves some clothing from the laundry cart and throws it on the mezzanine out of view of the camera and starts walking back in the direction of the laundry cart. While walking back to the laundry cart he looks in the direction of LEITE then turns his back to LEITE and makes a slicing motion from left to right across his neck while facing the direction of where he threw the clothing. He then hides behind the laundry cart obstructing any possible view from LEITE and makes the same motion in the same direction a second time.

14:39:48 – LEITE enters cell #9 wearing a white T-shirt, long green pants, socks, and shoes

14:41:19 – Another inmate enters cell #9 and came from the mezzanine

14:41:34 – Another inmate enters cell #9 who also came from the mezzanine

| | | SIGNED | | DATE |
|---|---|---|---|---|
| | Page 11 of 21 | ~ Tim Mh | | 12/13/12 |

000777

| 1. CASE NO. | 2. INVESTIGATOR | 3. I.D. NO. | 4. TOWN OF INCIDENT | 5. TN. CD. | 6. DATE OF REPORT |
|---|---|---|---|---|---|
| MC12-13405 | T. Coulombe | | Berlin | | 8/24/12 |

Over the course of the next three minutes a lot of inmates can be seen hanging around cell #9.

14:45:40 – One inmate leaves cell #9 with his shirt off, wipes his face with the shirt, then walks up the stairs and out of view of the camera.

14:47:19 – Another inmate enters cell #9

14:47:45 – An inmate exits cell #9

14:48:02 – An inmate exits cell #9, walks over to LEITE's bunk and appears to grab some clothing and bring it back into cell #9. Over the next minute there seems to be confusion around cell #9 and the same inmate who grabbed some clothing off LEITE's bunk exited cell #9 again and went back to LEITE's bunk. This time he grabbed some blankets and something out of LEITE's foot locker.

Over the next eight minutes several inmates enter and exit cell #9

14:48:35 – Inmate



J██████ ██
DOB: ████
Inmate #██████
Northern Correctional Facility
Fox Block
Cell #11 1B

exits cell # 11 and enters cell #9

14:52:30 – Inmate J██████ exits cell #9 and walks back to cell #11 where he resides. He comes back out at 14:54:38 and looks into the window of cell #9 for approximately 20 seconds.

15:00:20 – Video clip ends.

There is a second video clip that begins at 16:20:15.

16:20:20 – LEITE exits cell #9 wearing only grey shorts and socks. He takes a few steps when his legs give out and he falls to the ground. LEITE moves to his hands and knees to stabilize himself then attempts to stand. As this is happening GELINAS comes out of cell #9 and helps LEITE up to his feet; holds him by the left arm and walks him back to his bunk in the dayroom. LEITE then begins to climb up onto the top bunk as GELINAS remains near him to ensure he

| | | SIGNED | | DATE |
|---|---|---|---|---|
| | Page 12 of 21 | ~Tim M██ | | 12\|13\|12 |

| 1. CASE NO. | 2. INVESTIGATOR | 3. I.D. NO. | 4. TOWN OF INCIDENT | 5. TN. CD. | 6. DATE OF REPORT |
|---|---|---|---|---|---|
| MC12-13405 | T. Coulombe | | Berlin | | 8/24/12 |

makes it onto the bunk. LEITE was climbing over the edge of the bunk when he stopped and it looked like he was going to fall backwards onto the floor. It was at that time that and unidentified inmate came down the stairs from the mezzanine, grabbed LEITE by the foot and pushed him onto his bunk then walked away.

(Exhibit 8)

-End-

| | | SIGNED | DATE |
|---|---|---|---|
| | Page 13 of 21 | Jim Mh | 12/13/12 |

|        | Third Shift              | First Shift      | Second Shift    |
|--------|--------------------------|------------------|-----------------|
| OIC    | Durand                   | CO Dube          | CO Dube         |
|        | M. Remillard / Beckwith  | CO Rh Snyder     | CO K Bergeron   |
|        |                          | CO E L'Heureux   |                 |
| CP-4   | Lamontagne               |                  |                 |
| CP-5   |                          | CO McLain        | CO Esobe        |

| Initials | Time  | Summary of events                          |
|----------|-------|--------------------------------------------|
| RD       | 0001  | Start of daily log.                        |
| RD       | 0015  | Rounds 10-79.                              |
| RD       | 0125  | Rounds 10-79.                              |
| RD       | 0150  | Lt. McFarland up for rounds.               |
| RD       | 0200  | Conducted count.                           |
| RD       | 0330  | Rounds 10-79.                              |
| RD       | 0400  | Conducted count.                           |
| RD       | 0408  | Upper units count cleared by central.      |
| RD       | 0510  | Rounds 10-79.                              |
| RD       | 0630  | Rounds 10-79.                              |
| TD       | 0705  | Conducted count.                           |
| TD       | 0716  | Upper units count cleared by central.      |
| TD       | 0720  | Shake done on Alpha block                  |
| TD       | 0920  | Movement                                   |
| TD       | 1020  | Movement                                   |
| TD       | 1115  | Movement                                   |
| TD       | 1130  | Conducted count.                           |
| TD       | 1153  | Upper units count cleared by central.      |
| TD       | 1200  | Chows                                      |
| TD       | 1320  | Movement                                   |
| TD       | 1420  | Movement                                   |
| TD       | 1545  | Rounds 10-79.                              |
| TD       | 1650  | Rounds 10-79.                              |
| TD       | 1700  | Conducted count.                           |
| TD       | 1734  | Upper units count cleared by central.      |
| TD       | 1805  | Rounds 10-79.                              |
| TD       | 1900  | Rounds 10-79.                              |
| TD       | 2030  | Conducted count.                           |
| TD       | 2041  | Upper units count cleared by central.      |
| TD       | 2120  | Movement                                   |
| TD       | 2200  | Lock down                                  |
| MR       | 2315  | Facility Count                             |
|          |       | END OF LOG                                 |

COPY

PENGAD 800-631-6989

EXHIBIT
Coulombe
3
8/28/17 KU