UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * *
                         *
JONATHAN LEITE,          * Case No.
              Plaintiff, * 1:15-cv-00280-PB
                         *
         v.              * Volume: 1
                         * Pages: 1-44
CORRECTIONS OFFICERS MATTHEW GOULET,* Exhibits: 1-2
ELMER VAN HOESEN, MICHAEL BEATON,   *
LYNN MCLAIN, HEATHER MARQUIS,       *
TREVOR DUBE, RHIANNE SNYDER, EDDY   *
L'HEUREUX, JEFFREY SMITH, DWANE     *
SWEATT, YAIR BALDERRAMA, BOB MORIN, *
EJIKE ESOBE, AND KATHY BERGERON,    *
                     Defendants.    *
                                    *
* * * * * * * * * * * * *
```

DEPOSITION OF TREVOR DUBE

Deposition taken by counsel at the
Northern Correctional Facility, 138
East Milan Road, Berlin, New Hampshire,
on Friday, September 1, 2017, from
12:00 p.m. to 1:20 p.m.

Court Reporter:
Karen L. Leach, LCR No. 38
(RSA 310-A:179)

Page 2

```
1                    I N D E X
2
3   WITNESS:    Trevor Dube
4
5
6   EXAMINATION BY:                          Page
7       Mr. King                              4
8       Mr. Fredericks                       39
9
10
11
12
13              INDEX TO EXHIBITS*
14  Description                              Page
15  Dube
16  Exhibit 1   24 Hr Unit/Area Rounds Log    4
17  Exhibit 2   8/24/12 Incident Report      22
18
19
20  NOTE:  Exhibits returned to Attorney King.
21
22
23
```

Page 3

```
1
2   APPEARANCES:
3
4   For the Plaintiff:
        DOUGLAS, LEONARD & GARVEY, P.C.
5       By: Benjamin King, Esq.
            -and-
6       Megan E. Douglass, Esq.
        14 South Street, Suite 5
7       Concord, NH 03301
        Phone: 603.224.1988
8       E-Mail: Benjamin@nhlawoffice.com
                Mdouglass@nhlawoffice.com
9
10  For the Defendant:
        NEW HAMPSHIRE DEPARTMENT OF JUSTICE
11      OFFICE OF THE ATTORNEY GENERAL
        By: Francis X. Fredericks, Jr., Esq.
12          -and-
        Lynmarie C. Cusack, Esq.
13      33 Capitol Street
        Concord, NH 03301
14      Phone: 603.271.3658
        E-Mail: Francis.fredericksjr@doj.nh.gov
15              Lynmarie.cusack@doj.nh.gov
16
                    STIPULATIONS
17      It is agreed that the deposition shall be taken
    in the first instance in stenotype and when
18  transcribed may be used for all purposes for which
    depositions are competent under the Federal Rules of
19  Civil Procedure.
        Notice, filing, caption and all other formalities
20  are waived. All objections except as to form are
    reserved and may be taken in court at time of trial.
21      It is further agreed that if the deposition is
    not signed within thirty (30) days after submission to
22  counsel, the signature of the deponent is waived.
23
```

Page 4

1  TREVOR DUBE,
2  having been duly sworn by Ms. Leach,
3  was deposed and testified as follows:
4  **EXAMINATION**
5  **BY MR. KING:**
6  Q. Please state your name for the record.
7  A. **Officer Trevor Dube.**
8  Q. And you are employed with the Northern New
9  Hampshire Correctional Facility; is that correct?
10 A. **That's correct.**
11 Q. How long have you been employed with the
12 Northern New Hampshire Correctional Facility?
13 A. **11 and a half years.**
14 Q. What is it your current position title?
15 A. **Officer.**
16 Q. Over the course of your 11 and a half years
17 here, have you held any other title other than
18 officer?
19 A. **Corrections officer trainee.**
20 Q. Okay. All right.
21    MR. KING: Can we mark this?
22    (Dube Exhibit 1 was
23    marked for identification.)

Page 5

1  Q. BY MR. KING: Sir, I'm showing you a
2  document that we've marked as Dube Exhibit 1, and it's
3  an area rounds log for August 24, 2012 for the upper
4  housing units and Industries; is that correct?
5  A. **It appears to be.**
6  Q. Now, does this document reflect that you
7  were doing rounds that included rounds of F block with
8  Officer Bergeron on August 24, 2012, at both 3:45 p.m.
9  and 4:50 p.m.?
10 A. **It appears that way, yes.**
11 Q. Now, when a document like this indicates
12 that rounds are done, for example, at 3:45 p.m., does
13 that indicate that the round was completed at 3:45
14 p.m. or not?
15 A. **I suppose it depends on who is filling out**
16 **the round sheet. When I fill it out, I put -- I**
17 **usually fill out when I'm leaving for the rounds at**
18 **the beginning of the round.**
19 Q. I see.
20 A. **Or -- or seeing as not all clocks are the**
21 **same, I usually round to the nearest five -- five**
22 **minutes, you know, five past, 10 past, 15 past. It**
23 **might not be -- rounds take a little while to do. So,**

Page 6

you know, I try to get as close as we can to the beginning of the round.

Q. So just to clarify, when you're doing a round and you're completing a round sheet, you record the time you begin the round?

A. Correct.

Q. All right. Did you record the rounds on the rounds sheet that we have marked as Exhibit 1?

A. No.

Q. Can you tell who did?

A. No.

Q. How would we determine who completed the rounds sheet if we wanted to know, if you know?

A. I don't know.

Q. All right. Well, how is it determined for any given day who is going to complete the round sheet?

A. Somebody that works in that area.

Q. In what area?

A. Whatever area the round sheet is going to. They have a round sheet for -- for each area in the facility. There is no specified person to fill it out.

Page 7

Q. So are you telling me that on August 24, 2012, you could have been the person that filled out the round sheet, but you were not?

A. Can you rephrase the question because I don't understand what you're asking?

Q. Okay. Well, Exhibit 1 reflects that you did a number of rounds on August 24, 2012, right?

A. Correct.

Q. So would it have been appropriate on August 24, 2012, for you to have been the person who completed the round sheet?

A. I was working in upper housing, which is where this round sheet is from.

Q. Yes, sir.

A. And I could have. I already answered the question that I didn't fill this one out.

Q. I understand.

A. But I could have filled it out.

Q. Right.

A. But I did not fill this one out.

Q. Yes. What I'm trying to determine is how is it determined on any given day which officer is responsible for completing the rounds sheet?

Page 8

A. It's not. It's whoever is working in that area can fill it out.

Q. Okay.

A. It's not determined. We don't sit down and say, okay, it's your turn to fill this out today. Each round it could be a different person filling it out.

Q. Do you recognize the signature on Exhibit 1?

A. I recognize the names.

Q. Please tell me what the names are.

A. I don't know. If you're asking me if I recognize the signature as to matching it with the person that signed it, no, I don't know, but what are you asking for?

Q. Okay. It says the first shift officer in charge is sergeant -- what does that say? Is it Van Hoesen?

A. Yep, that's what it is. Elmer Van Hoesen, yep.

Q. Does he still work here?

A. No.

Q. And then the next signature, the second shift officer in command is you?

Page 9

A. Yes.

Q. Correct?

A. Yes.

Q. And then third shift officer in command is corporal -- do you know who that is?

A. Hartshorn (ph).

Q. Sorry.

A. Hartshorn.

Q. Okay. And over on the right-hand side, what does SEC lieutenant stand for?

A. Security lieutenant.

Q. And whose name is there?

A. John Masse. I don't know if he was -- looks like lieutenant. He was a sergeant, then lieutenant. I don't know what he was at that time. Looks like lieutenant.

Q. Would it have been one of those people who completed the rounds sheet?

    MR. FREDERICKS: Object to form. Go ahead.

Q. BY MR. KING: If you know.

    THE WITNESS: Answer or --

    MR. FREDERICKS: Yes.

A. It could have been.

Page 10

1 Q. BY MR. KING: Okay. Could it have been
2 anyone else?
3 A. Yes.
4 Q. Are you able to tell me the universe of
5 people that it could have been who filled out this
6 rounds sheet?
7 A. What do you mean by the universe of people?
8 Q. I mean is there a group of people from which
9 one of them must have been the person who completed
10 this rounds sheet?
11 A. Well, I thought I answered that earlier.
12 Anybody that worked in that area on that post that day
13 could have filled it out.
14 Q. All right.
15 A. So if you have a list of who worked in that
16 area, then --
17 Q. Okay.
18 A. -- it would be one of those people.
19 Q. All right.
20 A. Which I don't have that list in front of me
21 so I can't tell you. Can't narrow it down for you.
22 Q. I understand. But if the area rounds log
23 states, for example, that you, Officer Dube, and

Page 11

1 Officer Bergeron did a round at a certain time, would
2 it have been one of you who filled that out on the
3 round log, or could it have been someone else?
4 A. It could have been someone else.
5 Q. Okay. And how would that person have known
6 what time to enter for the log?
7 A. I can only give you an example.
8 Q. Please.
9 A. If Officer Duchesne and I -- Duchesne you
10 know is Bergeron?
11 Q. Yes.
12 A. She is been married since.
13 Q. Okay.
14 A. Officer Bergeron and I were getting up to
15 leave for a round and there was somebody sitting in
16 the office, we could have said, "Hey, could you mark
17 this round down for me?" Whoever was there would just
18 write it.
19 Q. Understood. All right. Now, I will
20 represent to you that we have video of F Block on
21 August 24, 2012, that depicts you and Officer Bergeron
22 entering F Block at about 3:40 p.m. on August 24,
23 2012, and Officer Bergeron starts doing rounds on the

Page 12

1 lower tier of F Block, and you go up to the upper
2 tier. Do you -- do you remember having done rounds in
3 that fashion?
4 A. No. On that day, no.
5 Q. Okay.
6 A. That was five years ago. We do numerous
7 rounds every day. I can't remember what I did that
8 hour of that day.
9     MR. KING: All right. So why don't we show
10 him the video.
11 Q. BY MR. KING: Okay. We're about to begin
12 watching video of F Block from Camera Angle 29 on
13 August 24, 2012, beginning at 3:40 p.m.
14     (Video played.)
15 Q. BY MR. KING: I am pausing the video at
16 3:40:27.
17     Sir, did you just observe you and Officer
18 Bergeron enter F Block?
19 A. This -- that's pretty blurred video, but
20 yes.
21 Q. All right. We'll keep watching.
22     (Video played.)
23 Q. BY MR. KING: Can you tell if that's you

Page 13

1 mounting the stairs to the second tier of F Block at
2 3:40:40 on August 24, 2012?
3 A. That would be.
4 Q. Pardon me.
5 A. I would think it's me.
6 Q. Okay.
7     (Video played.)
8 Q. BY MR. KING: So we are now at 3:40:51, and
9 you have ascended the stairs to the second tier of F
10 Block, right?
11 A. Yeah.
12     MS. CUSACK: Could you keep your voice up?
13 He's blocking you now.
14     THE WITNESS: Sorry.
15 Q. BY MR. KING: Is that in the -- sorry. I
16 just missed something here.
17     MR. KING: Can we rewind about --
18     MS. CUSACK: See this image? Just pull it
19 back.
20     MR. KING: I'm way --
21     MS. CUSACK: You have gone too far. You're
22 at 41 at the top.
23     (Video played.)

Page 14

1 Q. BY MR. KING: All right. Now, we are at
2 3:40:48, and you, sir, have ascended the stairs to the
3 second tier of F Block, right?
4 A. Right. Yes.
5 Q. Now, I'd ask you to direct your attention to
6 the lower left-hand side of the screen and tell me if
7 you see Officer Bergeron approaching the direction of
8 Cell 7, 8 or 9. Okay.
9     (Video played.)
10 A. Okay.
11 Q. BY MR. KING: Is that Officer Bergeron?
12 A. From this angle, it's hard to tell, but when
13 we walked in, it looks like her.
14 Q. And the -- the area rounds log indicated
15 that it was you and she who did the rounds at this
16 point in time F Block, right?
17 A. Right.
18 Q. And you've seen a corrections officer who we
19 believe is Officer Bergeron approaching alongside
20 certain cells?
21 A. Correct.
22 Q. Do you know which cells those are?
23 A. Offhand, no.

Page 15

1 Q. I'm going to ask you to resume watching the
2 video, and I'm going to ask you to direct your
3 attention to the -- the interaction between Officer
4 Bergeron and an inmate.
5     (Video played.)
6 Q. BY MR. KING: Do you know what cell that
7 inmate entered?
8 A. No.
9 Q. You can't tell if it's Cell 8?
10 A. No.
11 Q. Okay. Okay. So on this round would you
12 have covered the upper tier of the block and Officer
13 Bergeron covered the lower tier of the block?
14 A. Yes.
15 Q. Okay. Now, when you were working rounds
16 with Officer Bergeron on August 24, 2012, and the --
17 the area round log reflects that you did -- well, how
18 many -- how many rounds does the area rounds log
19 reflect that you did with Officer Bergeron on August
20 24, 2012?
21     MR. FREDERICKS: Referring to Exhibit 1?
22     MR. KING: Yes.
23 A. Between what times?

Page 16

1 Q. BY MR. KING: I didn't ask you for times. I
2 asked you how many rounds --
3 A. On the log?
4 Q. -- you did with her -- with her on August
5 24, 2012.
6 A. Okay. It looks like seven that we did
7 together.
8 Q. Yep. And did all of those involve doing
9 rounds of F Block?
10 A. Yes.
11 Q. Would --
12 A. To the best of my knowledge.
13 Q. Okay.
14 A. I mean --
15 Q. All right.
16 A. Occasionally -- I mean I'm going to
17 volunteer this -- there's something that happens that
18 creates a circumstance where we can't hit all the
19 blocks. Let's say, a response. If there's a response
20 and we are in the middle of rounds, we go to the
21 response. That comes first.
22 Q. Yes. Yep. But if you -- if you'd gone to a
23 response and you hadn't done a round as a result,

Page 17

1 would that be reflected on the area rounds log?
2 A. Maybe. Maybe not. Probably not.
3 Q. Okay.
4 A. We would try -- we would try to go back and
5 complete the round once the response is done.
6 Q. Okay.
7 A. So the time obviously wouldn't be the same,
8 but the round was completed.
9 Q. Okay. Of those seven rounds that you did
10 with Officer Bergeron, would you have alternated which
11 officer was responsible for doing the round on which
12 tier of the block?
13 A. It's random. Completely random.
14 Q. So to ask the question in a different way,
15 we know that on the round that began round -- strike
16 that.
17     We know that on the round of F Block that
18 began at 3:40 you did the upper tier and Officer
19 Bergeron did the lower tier, right?
20 A. Yes.
21 Q. On the round that's denoted to have occurred
22 at 4:50, would you have done the upper tier again and
23 Officer Bergeron the lower tier, or would you have

Page 18

1 alternated?
2 A. It's completely random.
3 Q. Okay.
4 A. If I felt like getting exercise, then I
5 would have done the upper tier every time. If I'm
6 feeling lazy, I'd have tried to get the lower tier.
7 Q. I have to ask you this, although I suspect I
8 know the answer. Do you remember whether you did the
9 upper tier or the lower tier on the 4:50 round on
10 August 24, 2012?
11 A. No, I don't remember.
12 Q. When you do rounds, what do you do?
13 A. We make sure the inmates are safe, make sure
14 we look in each cell to make sure the inmates -- to
15 the best of our ability the inmates that are in there
16 are the right inmates. If there's three inmates
17 standing in one cell, we find out who the inmate is
18 that doesn't belong there and get him out of there.
19 We make sure that the place is clean. We make sure
20 everybody's safe and any numerous things that an
21 inmate may approach us for. They approach us all the
22 time when we are on the units and ask us questions.
23 Q. All right.

Page 19

1 A. That's -- we're there to answer the question
2 for them as best we can.
3 Q. Okay. So when you're doing a round, you
4 look in every cell, right?
5 A. Yes.
6 Q. Okay.
7 A. Round -- let me rephrase that.
8 Q. Yes.
9 A. I don't look in every cell because obviously
10 I don't do one tier of the --
11 Q. Fair enough.
12   So, for example, on the -- the round that
13 began -- began at 3:40 on August 24, 2012, you assumed
14 responsibility for the upper tier of F Block. So you
15 would have looked in every cell on the upper tier of F
16 Block; is that correct?
17 A. Correct.
18 Q. Okay. And you would have looked to see if
19 there were more than two inmates in -- in a cell,
20 which would have indicated potentially cell hopping,
21 correct?
22 A. Correct.
23 Q. And you told me you would look to see that

Page 20

1 the inmates in the cell were the right inmates, right?
2 A. Correct.
3 Q. Yes. How would you do that?
4 A. Now, we don't always know who lives where
5 because over time they change. Sometimes they change
6 daily, but to the best of our ability, if we see an
7 inmate that doesn't belong in a cell in a certain
8 cell, we'll tell them to get out of there, give them a
9 verbal warning, or if it's numerous infractions, we'll
10 give them a disciplinary report.
11 Q. Okay. What would have -- on August 24,
12 2012, what would have been the range of consequences
13 to an inmate if you had detected the inmate was
14 engaged in cell hopping?
15 A. Well, as I just stated, if I've never seen
16 them cell hopping before, I'd give him a verbal
17 warning, tell him not to do it again and get him out
18 of that cell. Tell him not to do again.
19 Q. Right.
20 A. If it's somebody that I knew had done it
21 previously numerous times, I would have told him
22 you're getting a discipline report, a D report.
23 Q. Okay. As of August 2012, were you aware of

Page 21

1 any policies or procedures that the Northern New
2 Hampshire Correctional Facility had in place designed
3 to prevent inmate violence upon other inmates?
4 A. I'm not sure of the specific policy.
5 Q. Well, I'm not -- I'm not asking -- well, if
6 you were able to identify the name of the policies,
7 I'd love you to do that, but if -- even if you aren't
8 aware of the -- the names of the policies, are you
9 aware of any procedures or activities that you were
10 supposed to do as a corrections officer that were
11 designed to prevent inmate violence upon other
12 inmates?
13 A. One of the things we do is those rounds.
14 Officer presence is one of the key things that we do.
15 Q. Right.
16 A. And we do counts. One of the reasons we do
17 count is to make sure that everyone is safe. We check
18 everybody. They have to stand for count. They have
19 to be able to stand for count. They have to look us
20 in the face so we can see if there's any marks on
21 their physical, if they got in a fight.
22 Q. If you're doing rounds and you look into a
23 cell and you see an inmate lying down during the

Page 22

1 daytime, do you make any further inquiry to make sure
2 the inmate is okay?
3 A. Well, we make sure they're alive, which is a
4 visual check. We look in each cell. As you saw in
5 the video, we look in each cell. They move when we
6 talk. Our keys jingle. If they don't move, we knock
7 on the door, and if we don't see them breathing, then
8 -- when we knock, they move their arm. They turn and
9 look at us so we make sure that they are all okay.
10 Q. Okay. Now, you claimed we saw the -- we saw
11 the officer looking into every cell on the video.
12     MR. FREDERICKS: Object to form. You can
13 answer.
14     THE WITNESS: I can answer?
15     MR. FREDERICKS: Yes.
16 A. I'm not claiming that. I didn't watch the
17 whole video.
18 Q. BY MR. KING: All right. All right.
19     (Dube Exhibit 2 was
20     marked for identification.)
21 Q. BY MR. KING: Sir, I have shown you an
22 incident report from August 24, 2012, and if we look
23 at the second page of the incident report, did you

Page 23

1 complete this incident report?
2 A. Yes.
3 Q. And this indicates that at 5:07 p.m. on
4 August 24, 2012, at the direction of Sergeant Smith,
5 you called inmate Gelinas to the housing office,
6 directed inmate Gelinas to turn around, applied
7 handcuffs to inmate Gelinas's wrist, double locked the
8 handcuffs; is that correct?
9 A. 19:07 would be seven -- 7:07 p.m. You said
10    5:07.
11 Q. Oh, I'm sorry.
12 A. Other than that, that's correct.
13 Q. All right. You then escorted inmate Gelinas
14 to reception with Sergeant Sweat; is that right?
15 A. According to the incident report, yes.
16 Q. What is reception?
17 A. It's an area of the facility where we escort
18 inmates to put them in a holding cell. It's a dry
19 tank it's called. It's not -- it's just -- it's a
20 cell basically with no sink, no toilet, no water.
21 Four cement walls and the floor. That's one of the
22 things. That's where he went.
23 Q. All right. Okay.

Page 24

1 A. But there is -- there is numerous operations
2 that go on in reception. That's just one of them. I
3 don't think you wanted to know -- that's what you were
4 looking for.
5 Q. Right. Right. Do you remember escorting
6 inmate Gelinas on August 24, 2012, as narrated on
7 Exhibit 2?
8 A. No.
9 Q. No. Okay. So you don't remember whether
10 inmate Gelinas said anything to you --
11 A. No.
12 Q. -- during -- okay.
13    Have you ever had any conversations with any
14 inmate regarding the events of August 24, 2012, as
15 they pertain to the assault on Jonathan Leite?
16 A. Not that I can recall.
17 Q. Okay. Have you ever had any conversations
18 with any other corrections officers or Northern New
19 Hampshire Correctional Facility personnel outside of
20 the presence of members of the Attorney General's
21 Office pertaining in any way to the assault on
22 Jonathan Leite?
23 A. Pertaining to in any way?

Page 25

1 Q. Yes.
2 A. Yeah.
3 Q. What such conversations have you had?
4 A. Well, numerous. For one --
5 Q. Yep.
6 A. -- my fiancee is Rhianne Snyder. I don't
7 know if you recognize that name or not, but she was on
8 the first sheet. She was supposed to give a
9 deposition also. So she's my fiancee, and of course,
10 we talked about it. We live in the same household.
11 Q. Uh-huh. What did you talk about?
12 A. Mostly how nervous she was for it because
13 she's never encountered something like this.
14 Q. Well, if she hasn't already been told, she
15 got off before -- that day before this incident
16 happened.
17 A. She has been told.
18 Q. She is not going to be involved in this
19 anymore. Have you ever had any conversation with
20 anyone else?
21 A. Yes.
22 Q. With whom?
23 A. I can't remember. I can't recall everybody

Page 26

1 that I've had conversations with about it. I have
2 talked about it telling them that I've got a
3 deposition today and trying to recall what -- what
4 happened in the incident, and I don't recall very
5 well. That's basically what I have been saying. I
6 don't even remember that.
7 Q. All right. All right.
8 A. Five years ago and --
9 Q. Have you had any conversations with other
10 corrections officers or Northern New Hampshire
11 Correctional Facility personnel pertaining to the
12 assault on Jonathan Leite that have to do with the
13 assault but don't have to do with the litigation case?
14 A. No.
15 Q. Oh, all right. As of August 2012, how long
16 had you been doing rounds on F Block?
17 A. Can you ask that again? I missed it.
18 Q. Certainly. As you have been a corrections
19 officer since 2006, right?
20 A. Correct.
21 Q. I was asking as of August of 2012, how long
22 had your job responsibilities required you to do
23 rounds on F Block?

Page 27

1 A. The first few years I worked here we were
2 DSOs. Do you know what that means?
3 Q. No idea.
4 A. Direct supervisor officer, which we were at
5 that time right on the unit. An officer was on the
6 unit at all times. At some point, I'm not -- I'm
7 thinking it was about four years into my career, they
8 went to this rounds thing where we took -- they took
9 officers off the unit and we went to doing rounds. So
10 as DSO if I was -- if F Block was my post, then I
11 would have done rounds on there, but I could have been
12 assigned to any unit.
13 Q. Sure.
14 A. And then since then since we were doing
15 rounds, I may or may not have been assigned there.
16 I'm assigned to different posts every day. So the
17 days I was assigned to upper housing I did rounds on
18 Fox.
19 Q. Okay.
20 A. Days I was assigned to the kitchen, I didn't
21 do rounds on Fox. I don't know if that answers your
22 question but that's --
23 Q. Okay. Before August 24, 2012, were you

Page 28

1 aware of other incidents of violence involving inmate
2 violence on other inmates in F Block?
3 A. Specifically F Block?
4 Q. Uh-huh.
5 A. Not that I can recall.
6 Q. Okay. As of August of 2012, were you
7 involved -- strike that.
8 As of August of 2012, were you aware of
9 other incidents of inmate violence on other inmates in
10 the other housing blocks?
11 A. Specifically, no, but in general, yes. I am
12 aware that this is -- this has a potential to be a
13 dangerous place.
14 Q. Okay. And what information have you
15 acquired or had you acquired as of August 2012 that
16 led you to conclude that this has the potential to be
17 a dangerous place?
18 A. What information have I acquired?
19 Q. Yes.
20 A. Just prior experiences.
21 Q. Okay.
22 A. Inmates come up to us and tell us that they
23 have been beat up, and it's obvious when they do

Page 29

1 usually, and occasionally we see inmates that were
2 beat up on a round or a count or sometimes we follow a
3 blood trail and come to an inmate that got beat up.
4 Q. Okay. Are there any particular areas of the
5 housing blocks where inmate violence upon other
6 inmates is more likely to occur?
7    MR. FREDERICKS: Objection to form. You can
8 answer.
9 A. Not to my knowledge.
10 Q. BY MR. KING: Is inmate violence on other
11 inmates more likely to occur within a cell than in a
12 common area?
13 A. I don't have statistics on that. I have
14 seen both.
15 Q. You have. All right. Tell me what you've
16 seen in terms of having seen both.
17 A. I've seen -- as a DSO, I've seen fights
18 occur right in front of me right in the dayroom right
19 on camera right in front of the officers, and I have
20 also seen inmates go in hidden places to beat each
21 other up or to fight in a cell or in a mop closet or
22 somewhere out of sight.
23 Q. Okay.

Page 30

1 A. So I've seen both.
2 Q. Okay. Do you have any understanding of what
3 precipitated the abandonment of the direct supervisor
4 officer position?
5 MR. FREDERICKS: Objection to form.
6 THE WITNESS: Answer?
7 MR. FREDERICKS: Yes.
8 A. I can't say for sure, no.
9 Q. BY MR. KING: All right.
10 A. I don't know. I don't know the exact --
11 it's not nothing we are privy to.
12 Q. That's fine.
13 A. I could only guess.
14 Q. That's fine. I don't want you to guess.
15 MR. KING: Let me just talk to Megan.
16 (Short recess was taken.)
17 MR. KING: Back on the record.
18 Q. BY MR. KING: For the -- for the rounds that
19 are -- that are referenced on Exhibit 1 here,
20 officers -- for example, the rounds denoted as having
21 occurred at 3:45, what areas would you and Officer
22 Bergeron have covered during that round?
23 A. It would have been the four upper housing

Page 31

1 units, which would be Echo, Fox, Golf and Hotel.
2 Q. Okay. How long does it customarily take to
3 do a round of Echo, Fox, Golf and Hotel?
4 A. I never timed it. I don't know.
5 Q. Can you give me an estimate?
6 A. Between five and ten minutes I would guess.
7 It depends on what happens during the rounds also.
8 Q. Certainly. So five to ten minutes to do
9 rounds on all four housing blocks; is that right?
10 A. That would be my guess, yeah. You asked me
11 to give you an estimate.
12 Q. Yes, I did.
13 What job activities are you engaging in as a
14 corrections officer or were you engaged in as a
15 corrections officer on August 24, 2012, when you were
16 not doing rounds?
17 A. Well, I have seen paperwork on this, and I
18 was the OIC that day. So I could have been doing
19 moves, moving an inmate from one housing unit to
20 another or one cell to another and putting it in the
21 computer. We watch the chow halls while they're
22 serving dinner. We pat out inmates in different areas
23 of the facility anywhere that they may need assistance

Page 32

1 doing so. We'd have -- inmates have movements. I
2 think at this time I think they were every hour at 20
3 past the hour I believe, and we had to be in the
4 office for that to get the inmates whatever they
5 needed for paperwork or things like that.
6 Q. Okay. Now, you worked a 16-hour shift on
7 August 24, 2012; is that correct?
8 A. I don't have that paper in front of me, but
9 I have seen the paperwork saying that I did so -- so I
10 would have to say yes, I did.
11 Q. Are there any scheduled break times during a
12 shift that long?
13 A. No.
14 Q. So during a shift that -- that long, 16-hour
15 shift, is there any for lack of a better term
16 downtime, time when you're not dedicated to a, you
17 know, specific activity, such as rounds?
18 A. Yes.
19 Q. Okay. How often does such downtime arise?
20 A. It can be different from day-to-day.
21 Q. Okay.
22 A. Sometimes we don't get downtime, you know.
23 There is -- there is occasions where we don't even get

Page 33

1 the downtime. We are just busy --
2 Q. Right.
3 A. -- for the whole time.
4 Q. Right.
5 A. And sometimes it's more so.
6 Q. And what -- what did you do during the
7 downtime?
8 A. Have lunch.
9 Q. Okay.
10 A. Eat a snack.
11 Q. Yeah.
12 A. Take a drink.
13 Q. Yeah. All right. We don't need to mark
14 this again, but this is -- I'm going to show you a
15 document we marked in Lynn McLain's deposition as
16 McLain Exhibit 1, and just direct your attention to
17 the rounds that are indicated to have occurred at 3:45
18 and 4:50. Do you see that?
19 A. The rounds on this?
20 Q. Yes, on McLain 1.
21 A. Okay. Yeah.
22 Q. And next to each round, the 3:45 round and
23 4:50 round, there is a designation 10-79, right?

Page 34

1  A.  Yep.
2  Q.  And 10-79 means all clear, right?
3  A.  Correct.
4  Q.  Who was responsible for making the
5      determination that it was all clear?
6  A.  I can't answer that. I didn't write that.
7  Q.  Okay.
8  A.  I didn't fill out that because I don't put
9      my rounds on this log. Somebody filled this -- filled
10     this form out. I mean if you can see throughout the
11     day of it included movements and don't put rounds.
12     Round rounds are put on the round sheet.
13 Q.  Okay.
14 A.  In my opinion, they are not put here. Why
15     would you duplicate where we put under rounds, and I
16     don't see it. Somebody filled out this round sheet.
17     I must have been got -- got us doing something else
18     that day. Somebody saw that the round sheet or this
19     log was not caught up so they just caught it up for
20     me.
21 Q.  Okay.
22 A.  So I don't put that on my sheet. So I don't
23     know who would determine other than whoever -- whoever

Page 35

1  wrote it.
2  Q.  All right. Is there another document that
3      you complete that we haven't looked at today where you
4      would have logged your finding -- findings or
5      observations of what you observed during the August
6      24, 2012, rounds?
7  A.  Yes.
8  Q.  What is that called?
9  A.  A shift briefing.
10 Q.  Okay. If --
11 A.  I didn't mean to stump you.
12 Q.  No. No.
13 A.  Sorry.
14     MR. KING: Off the record.
15     (Discussion off the record.)
16 Q.  BY MR. KING: Do you mind if I come around?
17 A.  I don't mind. That's fine.
18 Q.  Okay. I'm going to show you a document that
19     was Bates stamped 4 in the defendants' document
20     production in this case. Is this the type of form,
21     central shift change briefing, that you were just
22     making reference to?
23 A.  It's that type of form, yes.

Page 36

1  Q.  Okay.
2  A.  We have a post briefing though. Each
3      individual post would have same type of form.
4  Q.  All right. And four isn't anything that you
5      completed, right?
6  A.  What is that? No.
7  Q.  We have another shift change briefing for
8      August 24 that's Bates stamped 8, and you didn't have
9      anything to do with this document?
10 A.  No, that would be the shift commander's
11     briefing.
12 Q.  And we have another shift change briefing
13     document for August 24, 2012. It's Bates stamped 9,
14     and did you have anything to do with this document?
15 A.  No, that's also the shift commander.
16 Q.  Now, we have another shift change briefing
17     form for August 24, 2012, that's Bates stamped 10.
18     Did you have anything to do with this form?
19 A.  No.
20     MR. KING: Off the record.
21     (Discussion off the record.)
22     MR. FREDERICKS: All right. I'll just give
23     you the document in exchange of your nonsuiting CO

Page 37

1  Dube.
2      MR. KING: I can't.
3      MR. FREDERICKS: Never give up something for
4  nothing.
5      MR. KING: All right. Did you write that?
6      THE REPORTER: Yes.
7      MR. KING: Well, I then have to put on the
8  record that unfortunately I can't do that, but I do
9  appreciate the -- the courtesy. All right.
10 Q.  BY MR. KING: So I'm showing you a document
11     that's Bates stamped 1 in the defendants' production.
12     Is this the shift change briefing form that you were
13     making reference to?
14 A.  Yes.
15 Q.  And this pertains to both first shift and
16     second shift, right?
17 A.  Correct.
18 Q.  So on first shift was -- went from seven
19     a.m. to 3:00 p.m., and you note there was a quiet
20     shift and no moves were done, right?
21 A.  Correct.
22 Q.  And then for the second shift you note that
23     inmate Leite was taken to Androscoggin Valley Hospital

Page 38

1  because he was assaulted, right?
2  A. Correct.
3  Q. And then you write that inmates Gelinas and
4  Elliot in Cell 9 were put on pending administrative
5  review for assaulting inmate Leite, correct?
6  A. Correct.
7  Q. And then what is -- is this other notation?
8  A. Apparently there was a broken key that day.
9  Q. Okay. If any moves had been done during the
10 second shift, would that have been noted here?
11 A. Possibly, but not definitely.
12 Q. All right. So on the shift change briefing,
13 you note the significant activity that happened during
14 the shift; is that true?
15 A. Correct.
16 Q. Thank you again.
17     Now, what I'd like to do, sir, is show you
18 video of F Block from a different F Block -- F Block
19 from a different angle than we observed before.
20 A. I'm going to move this cup if you don't
21 mind.
22 Q. Sure. Now, we are looking at F Block from
23 Camera Angle 30 on August 24, 2012, and we are looking

Page 39

1  at a moment frozen in time at 2:34 and four seconds,
2  and I'm just going to ask you, sir, if looking at F
3  Block from this angle you're able to identify the
4  cells by number on the lower tier?
5  A. No.
6  Q. No. You cannot tell, for example, that this
7  cell directly below the zero in the 40 slightly to the
8  right and to left of the -- where there are some
9  people standing in front, you can't tell that's Cell
10 9?
11 A. I can't read the number on the door.
12 Q. You don't know the orientation of the cells
13 so as to know which number corresponds to which cell
14 from this angle?
15 A. No.
16     MR. KING: Okay. All right. I don't think
17 I have anything further. Thank you.
18     MR. FREDERICKS: I did jot down one -- just
19 one question.
20
21     EXAMINATION
22     BY MR. FREDERICKS:
23 Q. Aside from rounds and counts, how else do

Page 40

1  you corrections officers keep inmates safe from one
2  another?
3  A. Well, if an inmate feels he is in danger, he
4  can come to us and vocalize he feels in danger or at
5  risk.
6  Q. You're answering in general.
7  A. Okay. If he feels in danger, he can come to
8  any officer and tell us that he feels he's in danger
9  and we'll get him out of the area. PC. We call it
10 protective custody we put him on, which wouldn't be
11 done by us. We wouldn't put him in protective
12 custody. We would get him off the area. Then he
13 would be in PC review where they would review it, his
14 situation, and they would decide whether he needs to
15 be -- stay away from that area or not, which is out of
16 our hands at that point, but they would do different
17 things depending upon the situation.
18     They could just keep him out of that block.
19 They could keep him -- if it was somebody on upper
20 tier, they could put -- like an upper housing, they
21 could put him in lower housing like, or if it's bad
22 enough, they could ship him to Concord. Put him
23 there. If he can't live in Concord, they ship them

Page 41

1  out of state. So they could come to us if they feel
2  they're in danger. They come to us, and they'll be
3  safe. We will keep them safe. And let's see. What
4  else?
5      We can -- well, there again not us, but I
6  have seen it done a lieutenant can administratively PC
7  somebody where they might get intel from somebody
8  saying that this guy might be in danger. They'll
9  remove him from the block whether the inmate knows
10 anything about it or not. They'll just remove him
11 from the block and put him in administrative PC.
12     And jeez, I just had something else in my
13 head too that -- oh, we can have -- keep separates on
14 an inmate. So if an inmate has had an encounter with
15 another inmate, we would definitely keep them away
16 from that inmate whether it be tier to tier or
17 different facilities.
18 Q. Okay. Are you through?
19 A. Yep.
20     MS. FREDERICKS: Okay. That's it.
21     MR. KING: You're all set.
22     (The deposition was concluded
23     at 1:20 p.m.)

Page 42

1   CERTIFICATE OF WITNESS
2
3   I, TREVOR DUBE, have read the foregoing
4   transcript of the deposition taken on Friday,
5   September 1, 2017, at the NORTHERN NEW HAMPSHIRE
6   CORRECTIONAL FACILITY, Berlin, New Hampshire, and do
7   hereby swear/affirm it is an accurate and complete
8   record of my testimony given under oath in the matter
9   of LEITE v. GOULET, including any and all corrections
10  that may appear on those pages so denoted as
11  "Corrections."
12
13
14  TREVOR DUBE
15  STATE OF
16  COUNTY OF
17
18  Subscribed and sworn to before me this      day
19  of            , 2017.
20
21
22  Notary Public     J.P.
23  My Commission Expires:

Page 43

1   CORRECTION AND SIGNATURE PAGE
2   **DEPOSITION OF:** TREVOR DUBE
3   **DATE OF DEPOSITION:** September 1, 2017
4   PAGE   LINE      NOW READS      SHOULD READ
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20  Signed this ____ day of _____, 2017.
21
22  _____
23  TREVOR DUBE

Page 44

1              C E R T I F I C A T E
2
3           I, Karen L. Leach, a Licensed Court
4   Reporter, Shorthand and Notary Public of the State of
5   New Hampshire, do hereby certify that the foregoing is
6   a true and accurate transcript of my stenographic
7   notes of the deposition of TREVOR DUBE, who was first
8   duly sworn, taken at the place and on the date
9   hereinbefore set forth.
10          I further certify that I am neither attorney
11  nor counsel for, nor related to or employed by any of
12  the parties to the action in which this deposition was
13  taken, and further that I am not a relative or
14  employee of any attorney or counsel employed in this
15  case, nor am I financially interested in this action.
16          THE FOREGOING CERTIFICATION OF THIS
17  TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE
18  SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
19  AND/OR DIRECTION OF THE CERTIFYING REPORTER.
20
21
22
23          KAREN L. LEACH, LCR NH #38