1

Volume: 1
Pages: 1-27
Exhibits: 1-2

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Case No. 15-CV-00280-PB

- - - - - - - - - - - - - - - - - - - - - x

JONATHAN LEITE,

                    Plaintiff,

     v.

MATTHEW GOULET, et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - x


DEPOSITION OF DWANE SWEATT

August 30, 2017

2:09 p.m. to 2:39 p.m.

NORTHERN NH CORRECTIONAL FACILITY

138 East Milan Road

Berlin, New Hampshire



Reporter:  Celeste A. Quimby, LCR No. 17

Page 2

1           I N D E X

2

3   WITNESS:    Dwane Sweatt

4

5   EXAMINATION:                              Page

6         By Mr. King                          4

7

8

9

10  EXHIBITS FOR IDENTIFICATION:

11  Sweatt       Description              Page

12  Exhibit 1    Incident Report           6

13  Exhibit 2    Dwane Sweatt Answers to
                 Interrogatories          22
14

15

16

17

18

19

20
    (Exhibits scanned/e-mailed to counsel; originals
21  returned to Mr. King.)

22

23

Page 3

1  A P P E A R A N C E S

2   For the Plaintiff:

3      DOUGLAS, LEONARD & GARVEY, P.C.
       By: Benjamin T. King, Esq.
4      14 South Street, Suite 5
       Concord, NH  03301
5      (603) 224-1988
       benjamin@nhlawoffice.com
6      mdouglass@nhlawoffice.com

7   For the Defendant:

8      NEW HAMPSHIRE DEPARTMENT OF JUSTICE
       OFFICE OF THE ATTORNEY GENERAL
9      By: Lynmarie C. Cusack, Esq.
          Francis K. Fredericks Jr., Esq.
10     33 Capitol Street
       Concord, NH  03301
11     (603) 271-3658
       lynmarie.cusack@doj.nh.gov
12     francis.fredericksjr@doj.nh.gov

13

14           STIPULATIONS

15      It is agreed that the deposition shall be
    taken in the first instance in stenotype and when
16  transcribed may be used for all purposes for which
    depositions are competent under the Federal Rules
17  of Civil Procedure.

18      Notice, filing, caption, and all other
    formalities are waived.  All objections except as
19  to form are reserved until the time of trial.

20      It is further agreed that if the deposition
    is not signed within thirty (30) days after
21  submission to counsel, the signature of the
    deponent is waived.

22

23

Page 4

1    DWANE SWEATT

2    having been duly sworn by the reporter,

3    was deposed and testified as follows:

4    **EXAMINATION**

5    **BY MR. KING:**

6    Q.  Sir, on August -- state your name for the

7    record, please.

8    A.  **Dwane Sweatt.  Sergeant.  Been here since**

9    **2001, October.**

10       MS. CUSACK: Let me -- before you get

11   started with asking him questions, I just want--

12   for the record, I sent you an e-mail yesterday

13   indicating when we were reviewing these

14   interrogatories, we saw that there was an error

15   made, and I think I might have said Question

16   Number 6 in the e-mail, but it's Question Number 7

17   where he referred to count as it occurs today,

18   which is at 6:30 --

19       **THE WITNESS:** No, it's --

20       MS. CUSACK: I'm sorry, between 3 --

21       **THE WITNESS:** 1530.

22       MS. CUSACK: 1530.

23       **THE WITNESS:** It used to be at 1700,

Page 5

1    which is 5:00.

2        MS. CUSACK: And so we just want to

3    correct that particular interrogatory.

4        **MR. KING:** That's fine.  That's fine.

5        MS. CUSACK: So it should read 1700.

6        **MR. KING:** Yeah.

7        MS. CUSACK: Or 5 p.m.

8        **MR. KING:** Yup.

9        MS. CUSACK: Thank you.  That's it.

10   Q.  BY MR. KING:  So on August 24th, 2012,

11   you were employed as -- were you a sergeant at

12   that time?

13   A.  **I believe so, yes.**

14   Q.  As a sergeant at the Northern New

15   Hampshire Correctional Facility, right?

16   A.  **Yes.**

17   Q.  And you were responsible for count at

18   5:00?

19   A.  **Responsible for helping with count, yes.**

20   Q.  Okay.  Who was responsible for count on

21   that day?

22   A.  **I really don't know how to answer that**

23   **question.**

Page 6

1 Q. Fair enough. Look, I'm just going to
2 give you your incident report and maybe that will
3 help.
4     MR. KING: Mark that.
5     (Discussion off the record.)
6     (Sweatt Exhibit 1 marked
7     for identification.)
8 A. Okay. What do you want me to look at?
9 Q. Were you performing count with Officer
10 Bergeron --
11 A. Yes.
12 Q. -- on August 24th, 2012?
13 A. Yes.
14     MS. CUSACK: Just wait until he finishes.
15     THE WITNESS: Okay. Fine.
16     MS. CUSACK: Even though you know what he
17 wants to -- what's he's asking.
18     THE WITNESS: I know where he's going.
19     MS. CUSACK: Yup, so --
20     THE WITNESS: Sure. Okay.
21 Q. BY MR. KING: Was anyone else involved in
22 performing count on F block on August 24th, 2012,
23 at 5 p.m. other than you and Officer Bergeron?

Page 7

1 A. Just us two.
2 Q. And tell me what's involved in performing
3 count.
4 A. Well, at 1700 the facility all-call
5 announces count, standing count. At that time the
6 inmates walk into the units. And when we go on
7 the units, they stand, so we can take a look at
8 them, make sure they're okay.
9     So you go to each cell, make sure the
10 inmates are in there, the proper ones; check them
11 off and you go on. On you go. All depends on if
12 you're up top or bottom.
13 Q. How frequently was count done in August
14 of 2012?
15 A. Are you talking for the facility or
16 for --
17 Q. For F block.
18 A. F block? I believe it's five times a
19 day.
20 Q. And if I understand you correctly, it
21 basically involves having all the inmates stand,
22 making sure everyone is capable of standing and
23 therefore healthy?

Page 8

1 A. No.
2 Q. No?
3 A. At 2:00 -- 2 a.m. in the morning and at
4 2300 when they come -- when third shift comes on,
5 they don't have to stand.
6 Q. Okay. Let's just talk about the purpose
7 of the count that happened at 5:00.
8 A. They have to be standing, yes.
9 Q. And the purpose of that is to ensure that
10 the inmate is capable of standing?
11 A. Capable, healthy.
12 Q. Yup.
13 A. Yeah.
14 Q. Now, have you reviewed your incident
15 report recently?
16 A. Two days ago.
17 Q. Okay. Is it an accurate description of
18 what you observed on August 24th, 2012?
19 A. To be honest with you, if you'd asked me
20 that statement before I read it, it would have
21 been a little different. I couldn't really recall
22 just that -- just what happened. And, like, times
23 and all that and who was involved, I wouldn't have

Page 9

1 been able to tell you.
2 Q. Right. What do you remember of what
3 happened on August 24th, 2012, with Jonathan
4 Leite?
5 A. Doing count. Get to Fox block. We were
6 coming from the back side, so we were going the
7 opposite way of numbers of the cell. I don't know
8 if it was numerical order or whatever. And I was
9 working right to left, and so wasn't Officer
10 Bergeron. I got to the top part and I got past
11 the stairs, and I heard her asking Inmate Leite or
12 Leite -- I call him Leite.
13 Q. Yeah.
14 A. -- to get up. I finished my count,
15 turned around, and I heard her keep saying, Leite,
16 you got to get up; get up.
17     And he wasn't getting up. And when I
18 took a look at him, there was blood or something
19 coming out of his mouth, and I said, I don't think
20 he can get up.
21     So we went down and we tried to get him
22 up. He just wasn't coherent. He just wasn't --
23 he just wasn't -- I don't know what the word is,

Page 10

1  but he just wasn't with it. So we called the
2  first responders.
3  Q. Now, Jonathan Leite, where you found him
4  was on top of a day bunk?
5  A. Correct.
6  Q. A bunk in the dayroom?
7     MS. CUSACK: Objection to form, but you
8  fixed it.
9     MR. KING: Okay.
10     MS. CUSACK: You said a day bunk, and I
11  objected to that. But then you said a bunk in the
12  dayroom, and go ahead and answer.
13  A. Yes.
14  Q. So how did you make visual contact with
15  him? Did you go up beside the bunk?
16  A. Well, I could see him right from the top
17  mezzanine. I can look right down at him. But I
18  did physically go down there and ask him a few
19  questions.
20  Q. Okay.
21  A. You know, if he was all right, what was
22  going on. And I -- according to this, I believe I
23  asked him if he had lost consciousness. And when

Page 11

1  he said that, I made it a medical emergency.
2  Q. Now, when you made -- you went down to
3  the lower tier and you went up to the bunk in the
4  dayroom where Jonathan Leite was?
5  A. I went between the bunk and to; right up,
6  right up.
7  Q. You observed him up close, right?
8  A. He was actually getting down. He was
9  making his way down when I got to him. He just --
10  he just couldn't stand. He just didn't have any
11  balance.
12  Q. Okay. So did you have to help him up, or
13  what did you do?
14  A. I don't remember exactly. I think I had
15  him sit down. I had him sit down on the bottom
16  bunk.
17  Q. Okay. And you saw blood on his face?
18  A. Yes, coming out of his right side of his
19  mouth I believe.
20  Q. All right. Was blood seeping out of the
21  right side of the mouth? Is that -- or was it
22  dried blood, or was blood coming out of his mouth?
23     MS. CUSACK: I'm going to object to the

Page 12

1  form, but go ahead and answer.
2  A. It looked like it was just running out
3  down across his face (indicating), because he was
4  laying on his back.
5  Q. So when you saw him, there was blood
6  running down his face; is that right?
7  A. There was something on his face. It
8  looked like blood to me.
9  Q. You write in your statement that we
10  marked as Exhibit blood --
11     MS. CUSACK: As Exhibit 1?
12  Q. Exhibit -- "blood." Exhibit 1, yes. "I
13  noticed that there was blood or appeared to be
14  blood coming out the right side of his mouth and
15  running down his face."
16  A. Yes.
17     MS. CUSACK: There's no question.
18  Q. Did I read that accurately?
19     MS. CUSACK: Now you can answer.
20  A. Yes.
21     THE WITNESS: Sorry.
22  Q. Did he stand at all, if you remember?
23  A. He was standing but supporting himself,

Page 13

1  holding on to the bunk.
2  Q. Okay. And then you called for a medical
3  emergency?
4  A. I called for the first responders.
5  Q. All right. Now, did you originally
6  suspect that Jonathan had a drug overdose?
7  A. Yes.
8  Q. Why did you suspect that?
9  A. Because I didn't see any marks on his
10  face or anything. He looked normal. And other
11  drug stuff that's happened here, he looked just
12  like it.
13  Q. Before August 24th, 2012, had you had any
14  interactions with Jonathan Leite?
15  A. Yes.
16  Q. What types of interactions have you had
17  with him?
18  A. I don't really know how to answer that.
19  I mean I work here. I see everybody every day.
20  You know, I correct people every day. It could be
21  his shirt was untucked and I've told him to tuck
22  it; where is his ID. But I've had interactions
23  with him. I knew who he is.

Page 14

1  Q.  Were there any other incidents of
2  violence involving Jonathan Leite before August of
3  2012?
4  A.  Not that I know of.
5  Q.  Okay.
6  A.  Or can recall.
7  Q.  As of August 2012, had you had any
8  interactions with Johnathan Gelinas?
9      MS. CUSACK:  Objection to form.  Go
10 ahead.
11 A.  Yes, same thing.  I work these units, so
12 I see these inmates all the time.  I've been here
13 since 2001, so...
14 Q.  Okay.  Had you been involved before
15 August of 2012 with any incidents of violence
16 involving Johnathan Gelinas?
17 A.  Not that I can recall.
18 Q.  Okay.  Before August 24th of 2012, had
19 you been involved in any incidents of violence
20 involving an inmate named Matthew Garcia?
21 A.  That name is not even familiar to me.
22 Q.  Okay.  Before August 24th, 2012, had you
23 been involved in any incidents of violence

Page 15

1  involving an inmate named Sean Lavallee?
2  A.  Not that I can recall.
3  Q.  Okay.  Now, on August 24th, 2012, you
4  were not personally responsible for doing rounds,
5  were you?
6  A.  No.
7  Q.  Okay.  But have you in your career in the
8  Department of Corrections been responsible at
9  points in time for doing rounds?
10 A.  Every day.
11 Q.  Tell me what's involved in doing a round
12 of a housing block.
13 A.  You go in and just check to make sure
14 everybody's being safe and — safety, sanitation,
15 and security.  That's what's involved.
16 Q.  Do you look inside every cell?
17 A.  I do.
18 Q.  What do you look for in the cells?
19 A.  Cleanliness, just make sure stuff ain't
20 on the walls.  If there's people in there, that
21 they're breathing.  Necessarily don't have to be
22 standing, you know.  Sometimes it's a little
23 difficult, because they prop up their bunk —

Page 16

1  their mattresses, so they're hard to see.
2  Q.  If you're doing a round during the
3  daytime and someone is in the cell but not
4  upright, do you go into the cell and look to see
5  if they're breathing, look to see if they're okay?
6  A.  I watch for the breathing from outside
7  the cell.  I don't necessarily go in.
8  Q.  Okay.  If you're doing rounds and you
9  look in a cell and you see more than two people
10 occupying the cell, do you take any action?
11 A.  Yes.
12 Q.  What do you do?
13 A.  Find out the inmates who don't belong in
14 there and they get a write-up.
15 Q.  When you're doing rounds and -- during
16 the daytime and you look in the cell, do you take
17 any steps to ensure that the people who are in the
18 cell are the people who belong in the cell?
19 A.  I'm going to say no.
20 Q.  I'll ask you why you phrased the answer
21 that way, "I'm going to say no."
22 A.  Because I'm in charge of housing units.
23 I move inmates every day, all day long; for

Page 17

1  security reasons, could be medical reasons, mental
2  health reasons, safety reasons, or they just don't
3  get along with their roommate.  So it's impossible
4  for staff to really know exactly who's in that
5  cell, unless they really go searching for them.
6  Q.  Okay.  If we wanted to find out, would
7  there be a record of how long Johnathan Gelinas
8  and his cellmate had been cellmates in Cell 9 on F
9  block as of August 24th, 2012?
10 A.  That's hard to answer, because time
11 flies.  When I first started, everything was done
12 by paper.  Now it's done by computers.  So if
13 you're asking for the last like three years, I
14 could do that.  At that time, I don't know.
15 Q.  Okay.  As of 2012, if an inmate were
16 found to have been engaged in cell-hopping, what
17 were the possible consequences of that
18 determination?
19 A.  Basically a disciplinary report.  It's a
20 certain charge.  The charges changed over the
21 years.  It's like if they get so many, they get
22 upgraded.  I guess that's the best way I can
23 answer it.

1 Q. Is it possible that the first time an
2 inmate were found to have engaged in cell-hopping,
3 the inmate would get nothing more than a warning?
4 A. Yes.
5 Q. There's a prohibition on cell-hopping
6 that's in the inmate manual; is that right?
7 A. Yes.
8 Q. And it was in the inmate manual back in
9 2012; is that right? If you know.
10 A. I don't know.
11 Q. Okay. Is cell-hopping something that
12 happens relatively frequently at the Northern New
13 Hampshire Correctional Facility?
14 A. Yes.
15 Q. As a sergeant at the Northern New
16 Hampshire Correctional Facility, have you ever
17 been responsible for video monitoring of housing
18 blocks?
19     MS. CUSACK: I'm going to object to the
20 form, but go ahead.
21 A. Occasionally I give relief. Sometimes I
22 work central control. So yes.
23 Q. Have you ever worked in CP-5?

1 A. Yes, sir.
2 Q. Has there ever been a circumstance where
3 you're working in CP-5, watching the video
4 monitoring of one of the cell blocks, and you see
5 activity that causes you concern and prompts you
6 to do something?
7 A. Yes.
8 Q. What such activity have you observed
9 while working in CP-5 that's caused you concern
10 and prompted you to do something?
11 A. Seeing a fight, seeing somebody going
12 from a different unit to another one.
13 Q. Have you ever seen several inmates
14 entering and exiting a cell over a period of just
15 a few minutes?
16     MS. CUSACK: Objection to the form, but
17 go ahead.
18 A. Yes.
19 Q. Would an observation of such activity
20 cause you concern and prompt you to respond?
21 A. Yes.
22 Q. All right. Have you ever seen an inmate
23 here at this facility make a slicing motion across

1 his throat from left to right (indicating) like
2 that?
3     MS. CUSACK: I'm going to object to the
4 form, but go ahead.
5 A. I'm going to say, no, not that I can
6 recall.
7 Q. Not that you can recall?
8 A. No.
9     MR. KING: Are these yours (indicating
10 exhibit copies)?
11     MS. CUSACK: Yeah.
12     MR. KING: Oh, okay. Sorry.
13 Q. Have there been other incidents in which
14 you're aware -- of which you're aware in the past
15 five years in which an inmate has suffered a
16 traumatic brain injury as a result of an assault
17 occurring at the facility?
18 A. No.
19 Q. When you were interviewing Mr. Leite, you
20 asked him if he'd lost consciousness and he said
21 yes, correct?
22 A. That's correct.
23 Q. And when he said he'd lost consciousness,

1 that prompts you to determine that there's been a
2 medical emergency and you call central control,
3 right?
4 A. Yes.
5 Q. From the time you called central control,
6 tell me what happened after that.
7 A. When the first responders come in, the
8 dayroom gets locked in automatically. And when he
9 told me that he was unconscious, he had lost
10 consciousness, in our -- as we're taught, that's
11 not one of them, but I've been in incidents in the
12 yard where a nurse told me if someone loses
13 consciousness, I want you to call a medical
14 emergency. So that's what I did.
15     So then they came, picked him -- I don't
16 know if they put him in a wheelchair or what.
17 They got him out of there, brought him to Medical.
18 Q. The response team came?
19 A. That's correct, and the nursing staff.
20 When I call medical emergency, the nursing staff
21 has to respond.
22 Q. And how much time elapsed between the
23 time you called central control and the time the

Page 22

1  response team arrived?
2  A. I'm going to say minutes.
3     MR. KING: Let's mark this if you would.
4     (Sweatt Exhibit 2 marked
5     for identification.)
6  Q. This is a copy of your -- what we've
7  marked as Exhibit 2 is a copy of your
8  interrogatory answers in this matter. And you
9  have told me that the answer to Interrogatory 7 is
10 in part incorrect; that 3:30 p.m. should instead
11 read 5 p.m., correct?
12 A. Yes.
13 Q. Are your interrogatory answers otherwise
14 correct?
15 A. (Brief pause.)
16 Q. Have you reviewed them recently?
17 A. No, I haven't.
18 Q. Oh, well, please do so.
19 A. (Peruses document.) Okay, sir.
20 Q. Yup. So aside from that 3:30 p.m.
21 should have been 5 p.m. in the answer to
22 Interrogatory 7, the answers are otherwise
23 correct?

Page 23

1  A. Well, I noticed that my incident report
2  and a little thing here is a little bit different.
3  Because I was going off memory when I wrote this.
4  Q. Okay. What are you referring to?
5  A. The medical emergency. The first
6  responders were called first before I made it a
7  medical emergency. I think it's Section 12. Is
8  that right? 12? No, that's not it. Let me
9  just — should have stopped right there. There's
10 one in here where I wrote and I put that I called
11 a medical emergency. Okay. And let me see. Oh,
12 it's Number 7 actually; I found inmate --
13    (Reporter interrupts.)
14 A. It states in here that Officer Bergeron
15 and I discovered that Mr. Leite had been injured.
16 I called a medical emergency to central control.
17 First I called first responders, and then when he
18 told me that he was unconscious, I turned it into
19 a medical emergency. Yes.
20 Q. And that's what you state in your
21 incident report, right?
22 A. Correct, but it's not in that
23 (indicating).

Page 24

1  Q. Understood. So your incident report is
2  a more accurate description of what you did on
3  August 24th, 2012, when you discovered that --
4  A. Yes.
5  Q. -- something was wrong with Jonathan
6  Leite?
7     MS. CUSACK: Just wait until he finishes.
8     THE WITNESS: Okay. I'm sorry.
9  A. Yes, sir. I had to write that that day.
10 Q. Yes.
11 A. So it was fresh in my memory.
12    MR. KING: I have nothing further. Thank
13 you.
14    THE WITNESS: Okay.
15    MS. CUSACK: Thank you.
16    (Deposition concluded at 2:39 p.m.)
17
18
19
20
21
22
23

Page 25

1     CERTIFICATE OF WITNESS
2
3  I, Dwane Sweatt, have read the foregoing
4  transcript of deposition taken on Wednesday,
5  August 30, 2017, at the Northern NH Correctional
6  Facility, Berlin, New Hampshire, and do hereby
7  swear/affirm it is an accurate and complete record
8  of my testimony given under oath in the matter of
9  Leite v. Goulet, et al., including any and all
10 corrections that may appear on those pages denoted
11 as "Corrections."
12
13 _____
14    Dwane Sweatt
15 STATE OF _____
16 COUNTY OF _____
17
18 Subscribed and sworn to before me this _____ day
19 of _____, 2017.
20
21 _____
22 Notary Public_____J.P._____
23 My Commission Expires:_____

Page 26

```
1    CORRECTION AND SIGNATURE PAGE
2    DEPOSITION: Dwane Sweatt
3    DATE OF DEPOSITION: August 30, 2017
4    PAGE LINE    NOW READS        SHOULD READ
5    ____ ____  _____  _____
6    ____ ____  _____  _____
7    ____ ____  _____  _____
8    ____ ____  _____  _____
9    ____ ____  _____  _____
10   ____ ____  _____  _____
11   ____ ____  _____  _____
12   ____ ____  _____  _____
13   ____ ____  _____  _____
14   ____ ____  _____  _____
15   ____ ____  _____  _____
16   ____ ____  _____  _____
17   ____ ____  _____  _____
18   ____ ____  _____  _____
19
20   Dated this _____ day of _____, 2017.
21
22        _____
23   Dwane Sweatt
```

Page 27

```
1              C E R T I F I C A T E
2        I, Celeste A. Quimby, a Licensed Court
3    Reporter of the State of New Hampshire, do hereby
4    certify that the foregoing is a true and accurate
5    transcript of my stenographic notes of the
6    deposition of Dwane Sweatt, who was first duly
7    sworn, taken at the place and on the date
8    hereinbefore set forth.
9        I further certify that I am neither attorney
10   nor counsel for, nor related to or employed by any
11   of the parties to the action in which this
12   deposition was taken, and further that I am not a
13   relative or employee of any attorney or counsel
14   employed in this case, nor am I financially
15   interested in this action.
16       THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
17   DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
18   ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
19   DIRECTION OF THE CERTIFYING REPORTER.
20
21
22
23           CELESTE A. QUIMBY, LCR No. 17
```

**PLEASE CHECK EVERY ITEM THAT APPLIES** — ONLY ONE INCIDENT REPORT PER INCIDENT IS REQUIRED

## STATE OF NEW HAMPSHIRE
### Department of Corrections
### Incident Report
Side 1 of 2

ADM-34

☑ Initial Report ☐ Follow-up Report

**GENERAL CATEGORY**
- ☐ 10 Reportable Observation
- ☐ 11 Assault/Disturbance
- ☑ 12 Injury/Accident
- ☐ 13 Use of Force
- ☑ 14 Med/Dent/Mental Health
- ☐ 15 Escape/Escape Activity
- ☐ 16 Arrest
- ☐ 17 Alleged Crime, Offender or Employee
- ☐ 18 Hostage Situation
- ☐ 19 Haz-mat Situation
- ☐ 20 Lost Tool
- ☐ 21 Fire Alarm/Drill
- ☐ 22 Policy Variance
- ☐ 23 Safety Issue or Other Hazard
- ☐ 25 Employee Injury
- ☐ 26 Other

**ORIGINATING DIVISION**
- ☐ 50 Headquarters
- ☐ 51 NHSP-M
- ☐ 52 NHSP-W
- ☐ 53 LRF
- ☐ 54 Medical/Forensic Services
- ☐ 55 Community Corrections
- ☐ 56 Field Services
- D.O.: _____
- ☑ 57 NCF

**Date / Time of Incident:** 8/24/12 1708
**Specific Location:** F-Block DAY Room

### PERSONS INVOLVED

| # | Last Name | First Name | Type |
|---|-----------|------------|------|
| 1. | Leite | Jonathan | ☑ Resident: # 81605 ☐ Staff ☐ Probationer ☐ Parolee ☐ Visitor ☐ Other |
| 2. | Bergeron | K | ☑ Resident: # ___ ☐ Staff ☐ Probationer ☐ Parolee ☐ Visitor ☐ Other |
| 3. | | | ☐ Resident: # ___ ☐ Staff ☐ Probationer ☐ Parolee ☐ Visitor ☐ Other |
| 4. | | | ☐ Resident: # ___ ☐ Staff ☐ Probationer ☐ Parolee ☐ Visitor ☐ Other |
| 5. | | | ☐ Resident: # ___ ☐ Staff ☐ Probationer ☐ Parolee ☐ Visitor ☐ Other |

### PERSONS NOTIFIED

| | Name | By Whom | Time | How Notified |
|---|------|---------|------|--------------|
| 6. | Central Control | Myself | | Radio |
| 7. | | | | |
| 8. | | | | |

**Rpt Obs**
- ☐ 101 Suspected/Actual Breach of Security
- ☐ 102 Suspected/Actual Drug/Alcohol Activity
- ☐ 103 Suspected/Actual Gang Activity
- ☑ 104 Newsworthy Events
- ☐ 105 Allegation of Misconduct by Employee
- ☐ 106 Unusual Events, Circumstances
- ☐ 107 Event which if ongoing will result in more serious events

**Use of Force**
Type Force:
- ☐ 401 Deadly
- ☐ 402 Chemical
- ☐ 403 Physical
- ☐ 404 Impact Weapon

Medical Attention:
- Offered: ☐ Yes ☐ No
- Requested: ☐ Yes ☐ No
- Received: ☐ Yes ☐ No
- Declined: ☐ Yes ☐ No

● Clearly describe in narrative circumstances requiring force.
● List all individuals involved in the use of force in the section above, "Persons involved" or in the narrative and attach statements from each to this report.
By whom, when: _____
How declined: _____

**Medical / Dent / M.H.**
Medical Treatment:
- ☑ 201 Assault—Injury
- ☐ 202 Assault—No Injury
- ☑ 203 Emergency Resp., Life Threatening
- ☐ 204 Medical Tx, Non-life Threatening
- ☐ 205 Hunger Strike
- ☐ 206 Suicide or Attempt
- ☐ 207 Missing Medical Record
- ☐ 208 Inmate Non-Compliance with Diet
- ☐ 209 Other Dietary Issue
- ☐ 210 Death
- ☐ 211 Self-Harm
- ☐ 212 Unusual/Bizarre Inmate Behavior
- ☐ 213 Needlestick

Pharmacy/Medication Issues:
- ☐ 214 Patient Drug Misuse
- ☐ 215 Overdose
- ☐ 216 Drug Reaction
- ☐ 217 Expiration Date
- ☐ 218 Incorrect Dosage
- ☐ 219 Incorrect Amount
- ☐ 220 Incorrect Route
- ☐ 221 Incorrect Medication
- ☐ 222 Incorrect Patient

**Employee Injury**
● Provide in narrative section a full description of the incident (how injury occurred, including what the employee was doing at the time of the injury).

Date and Name of supervisor notified of injury: _____

Description of injury: _____

Was medical attention sought? ☐ No ☐ Yes, on Date: _____  Treatment Provider: _____

TIME LOST FROM WORK:

How many days of work were missed as a result of the injury? _____

Is the employee expected to be on extended disability (more than 14 days)? ☐ No ☐ Yes, probable length of disability is: _____

RETURN TO WORK:

Has the injured employee returned to work? ☐ No ☐ Yes, date and time of return: _____

Has sick leave time slip been submitted? ☐ No ☐ Yes

REMINDER: SUPERVISOR MUST COMPLETE SUPERVISOR ACCIDENT INVESTIGATION FORM

Δ π EXHIBIT ___
SWEATT
Deponent _____
8-30-17
Date _____ Rptr CO
WWW.DEPOBOOK.COM

CONFIDENTIAL          000017

**Fire**

**Property Damage:**
- ☐ 301 Prison Cell, Male
- ☐ 302 Prison Cell, Female
- ☐ 303 Minimum Security Facility
- ☐ 304 Psychiatric Facility
- ☐ 305 Vocational Training Area
- ☐ 306 Industries
- ☐ 307 Common Area
- ☐ 308 Trash Can
- ☐ 309 Office Space
- ☐ 310 Open Land, Field, Etc.
- ☐ 311 Other

**Ignition Factor:**
- ☐ 312 Incendiary--not during civil disturbance
- ☐ 313 Incendiary--during civil disturbance
- ☐ 314 Suspicious--not during civil disturbance
- ☐ 315 Suspicious--during civil disturbance
- ☐ 316 Cutting/welding operations
- ☐ 317 Fuel spill
- ☐ 318 Combustible too close to heat of ignition
- ☐ 319 Part failure
- ☐ 320 Short circuit
- ☐ 321 Lack of Maintenance
- ☐ 322 Undetermined
- ☐ 323 Other

**Method of Alarm:**
- ☐ 324 Alarm System
- ☐ 325 Radio Report
- ☐ 326 Verbal Report
- ☐ 327 No Alarm Created

**Suppression:**
- ☐ 328 Self-extinguished
- ☐ 329 Makeshift aid
- ☐ 330 Portable Extinguisher
- ☐ 331 Automatic System
- ☐ 332 Standpipe Hose
- ☐ 333 Other

**Lost Tool**

Describe in Narrative:
- Tool Description
- Tool Classification
- Tool Markings

**Narrative (Who, what, where, when, why, how, contributing factors, action taken, etc.):**

During count in F-Block I had finished the top tier count. As I started to walk down the stairs I heard Officer K. Bergeron say are you going to get up for count. I looked over and observed Inmate Leite laying on his back on the top Bunk of Bunk #1 of the day room. As I was looking at him I noticed that there was blood or appeared to be blood coming out the right side of his mouth and running down his face. I finished coming down the stairs and walk over to his bunk and told him to get up for count. Leite sat up and made his way off the bunk as he turned to look at me I could tell it was blood that was on his face and his skin was very pale when I asked him if he was ok and what had happened. His reply was I'm tired. Leite was very lethargic and was having a hard time to stand. I had him sit down. I left the bunk and called the 1st Responders and had the Dayroom Inmates go in a cell. I walked over to Leite and asked him if he had loss consciousness he said yes. I then called Central Control and told them I had a Medical emergency. The Nurses from HSC arrived and the Barden EMS came in took him to the Hospital.

Follow-up is on next report.

| Reporting Staff Member (PRINT) | Signature | Date Completed | Time Completed |
|---|---|---|---|
| Sgt. Sweat | Sgt. Sweat | 8/04/12 | 2215 |

| Approving Supervisor/O.I.C (PRINT) | Signature | Date Reviewed | Time Reviewed |
|---|---|---|---|
| Sgt. Jeff Smith | Sgt. Smith | 8-24-12 | 8-24-12 |

**Distribution of All Reports (by Reporting Person):**
- ☒ Investigations (Original)
- ☒ Unit / Bureau Copy
- ☒ Shift Commander / Supervisor / Regional Administrator
- ☒ Lieutenant / Division Director

**Distributed to Others As Warranted (by Shift Commander / Supervisor / R.A.):**
1. Commissioner's Office (for database management)
2. _____
3. _____
4. _____

**CONFIDENTIAL**

000018