Volume: 1
Pages: 1-31
Exhibit: 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Case No. 15-CV-00280-PB

- - - - - - - - - - - - - - - - - - - x

JONATHAN LEITE,

        Plaintiff,

  v.

MATTHEW GOULET, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - x

DEPOSITION OF YAIR BALDERRAMA

August 30, 2017

12:50 p.m. to 1:24 p.m.

NORTHERN NH CORRECTIONAL FACILITY

138 East Milan Road

Berlin, New Hampshire


Reporter: Celeste A. Quimby, LCR No. 17

Page 2

```
                    I N D E X

WITNESS:       Yair Balderrama

EXAMINATION:                              Page
        By Mr. King                         4


EXHIBITS FOR IDENTIFICATION:
Balderrama     Description                Page
Exhibit 1      Yair Balderrama Answers
               to Interrogatories           21




(Exhibit scanned/e-mailed to counsel; original
returned to Mr. King.)
```

Page 3

```
A P P E A R A N C E S
For the Plaintiff:

    DOUGLAS, LEONARD & GARVEY, P.C.
    By: Benjamin T. King, Esq.
    14 South Street, Suite 5
    Concord, NH  03301
    (603) 224-1988
    benjamin@nhlawoffice.com
    mdouglass@nhlawoffice.com

For the Defendant:

    NEW HAMPSHIRE DEPARTMENT OF JUSTICE
    OFFICE OF THE ATTORNEY GENERAL
    By: Lynmarie C. Cusack, Esq.
        Francis X. Fredericks Jr., Esq.
    33 Capitol Street
    Concord, NH  03301
    (603) 271-3658
    lynmarie.cusack@doj.nh.gov
    francis.fredericksjr@doj.nh.gov

            STIPULATIONS
    It is agreed that the deposition shall be
taken in the first instance in stenotype and when
transcribed may be used for all purposes for which
depositions are competent under the Federal Rules
of Civil Procedure.

    Notice, filing, caption, and all other
formalities are waived.  All objections except as
to form are reserved until the time of trial.

    It is further agreed that if the deposition
is not signed within thirty (30) days after
submission to counsel, the signature of the
deponent is waived.
```

Page 4

1  YAIR BALDERRAMA
2  having been duly sworn by the reporter,
3  was deposed and testified as follows:
4  **EXAMINATION**
5  **BY MR. KING:**
6  Q. Please state your name for the record.
7  A. Yair Alonzo Balderrama.
8  Q. Who is your employer?
9  A. New Hampshire Department of Corrections.
10 Q. And you are currently employed at the
11 Northern New Hampshire Correctional Facility,
12 correct?
13 A. Correct.
14 Q. How long have you been employed here?
15 A. It's going to be 19 years in October,
16 October 8th of this year.
17 Q. And can you tell me the position titles
18 that you've held through the years?
19 A. Well, after I graduated the academy, I
20 went to -- I was assigned to the Concord facility
21 second shift, South Unit, and I got promoted to
22 corporal to third shift and — at the men's prison
23 in Concord two years, two-and-a-half years after.

Page 5

1  Then three years later, in 2003, I move up to NCF
2  onto third shift, then as a corporal. And five,
3  six years after that, I got promoted to sergeant,
4  second shift. And then about seven years, eight
5  years ago I got promoted -- while sergeant, I took
6  over the transportation team on first shift up at
7  NCF, and that's where I'm currently a supervisor
8  of, yeah.
9  Q. So what's your current position, if I can
10 understand that?
11 A. Transportation sergeant. I'm in charge
12 of the fleet of transports that go in and out of
13 here.
14 Q. Okay. How long has that been the case?
15 A. It's been eight years maybe, seven years.
16 I can't remember the exact date.
17 Q. Well, on August 24th, 2012, you were
18 working in the main control room, right?
19 A. If that's what it says, yes, I was.
20    MR. FREDERICKS: Don't guess.
21 A. Yes, I was. On second shift I was
22 volunteered for overtime that day.
23 Q. Right.

Page 6

1 A. It was not my assigned -- it wasn't my
2 assignment. It was actually something that I
3 volunteered for after working my eight hours.
4 Q. I see. So as of August 24, 2012, how
5 many times had you been assigned to work in the
6 main control room before that?
7 A. Can't tell you the amount. That --
8 Q. Was working in the main control room
9 something that you had done several times before?
10 A. Yes.
11 Q. Okay. When did you first work in the
12 main control room?
13 A. I couldn't tell you that. I was -- even
14 back when I started and when I transferred from
15 Concord, I was -- me and one of the senior
16 sergeant or corporal back then, that was usually
17 where they put you in so that you -- because
18 there's so many things that can go in that place
19 that you take care of, that they want a supervisor
20 with experience most of the time.
21 Q. Okay.
22 A. So I've done it a lot. I've done it
23 quite a few times.

Page 7

1 Q. So as of August 2012 you had years of
2 experience working in the main control room; is
3 that right?
4 A. Not years. It's sporadic. It's not like
5 every -- not an everyday assignment, you know what
6 I'm saying?
7 Q. But to use I guess your word, as of
8 August of 2012 you had a lot of experience working
9 in the main control room; is that right?
10 A. Yes, you can say that.
11 Q. And what are the job responsibilities of
12 someone working in the main control room?
13 A. Oh, as -- do you want me to do it by
14 shift or do you want me to just do it how -- how
15 do you want me to like --
16 Q. No, I can narrow it. What were the job
17 responsibilities -- what were your job
18 responsibilities working in the main control room
19 on August 24th, 2012?
20 A. It starts from you get briefed. That's
21 the main thing. You see what happens to the shift
22 prior, and then you start by -- the shift change
23 is a very busy time of the day. So it's the body

Page 8

1 alarms, like you have one, and the yellow tags
2 that you get.
3 Q. Yeah.
4 A. We give those out to all the non-uniform
5 and uniform staff that need them. Also all the
6 keys for the entire facility, whoever got the
7 assignments, all those keys, you have to retrieve
8 their chip or their phone numbers. Everybody gets
9 assigned one of them, and then you have to give
10 those to retrieve keys, and then you sign them
11 out.
12   Vehicle fleet handouts. Weapon
13 inventories. I'm trying to do it kind of
14 chronologically. But obviously the IDs of the
15 employees. Every time you come in, you have to
16 give your ID, so we take care of that too. We
17 also have a little thing where we hang it, each
18 one of them.
19   And then we do count times. We take all
20 the units' counts, and then we're the ones that
21 keep track of that, of all the -- which takes me
22 to the next responsibility, which is the transport
23 in and out of the facility. We keep track, of

Page 9

1 course, about who comes in and out. We start the
2 transports. We end the transports. We call
3 Concord with our -- once our count is completed,
4 we take care of that. We have to communicate. My
5 count is only the beginning. We have to send it
6 to Concord and make sure that it jives with their
7 numbers. So in case there's some discrepancy, we
8 need to find out where that inmate is, so forth,
9 so forth.
10   So it's -- I mean it's a lot of -- we
11 have the fire and Simplex alarm system that we
12 have, which is the fire alarm system for the whole
13 facility. Any time that a fire detector goes off,
14 a smoke detector, even a water valve alarm goes
15 off, we have to take care of them, which takes me
16 to the maintenance notifications. Incident
17 reports for each individual alarm. Log-in
18 information as far as when these type of
19 occurrences happen, when it doesn't, or if -- who
20 you notified, made connections or calls to people
21 that need to be notified. Oh, there's still...
22 Q. I don't want to -- just let me know when
23 you're finished with your answer.

Page 10

1  A. Yeah. Safety/sanitation of the place.
2  Like, that goes with that. Also notifications on
3  that area too. If there's a big thing happening,
4  we need to be the ones notifying people, or try to
5  help out as much as we can, on top of having to
6  scan and -- the cameras and doors and contest
7  every door that rings in the facility in my area,
8  in that area. Like if you push this button right
9  here, you will hear somebody, hello? Who is it?
10 So that's called a contest; like who's on the
11 other side? You just don't want to open any door.
12 So once you get an answer, you got to open it and,
13 you know, so forth, so forth.
14     Plus central control room takes care
15 of -- it's got the capability of taking care of
16 every single door in the facility, but for the
17 most part we take care of Alpha and Bravo and some
18 of Charlie building's doors, which -- I think
19 that's good. We also take care of the body alarm
20 system, which is a whole entity on its own, which
21 is --
22 Q. I think you have mentioned that.
23 A. But I can -- do you want me to touch a

Page 11

1  little on what it entails too? Because every
2  single time an alarm, the lanyard on the alarm is
3  pushed or pulled, we're the ones that get the
4  alarm. So we're dealing with that too.
5  Somebody -- even by mistake if something happens,
6  we have to send somebody and make sure that that
7  person is taken care of, and we need to have -- if
8  that alarm is assigned to you and you go off, you
9  have to personally call me and tell me that you're
10 all set.
11     So it takes -- you know what I mean? It
12 takes -- it's a lot of involvement, a lot of
13 things that happen. That also takes me -- talking
14 alarms is the fence alarm system that we have
15 around the perimeter and the -- you can see that
16 in there. Every time one alarm, the fence alarm
17 goes off, it beeps up in central control. We have
18 to send a 206 unit over to check, make sure
19 there's nobody trying to escape or on the fence.
20 We have three different set of fence alarms.
21 There's the buried cable; the microwave they call,
22 which is the sensor; and the fence wire alarm. So
23 that's three different types of alarms that are

Page 12

1  constantly going off on that.
2      Did I mention the fleet? We give in and
3  out cars, trying to keep track of what cars do we
4  have available. In case of an emergency, we can
5  give them out quickly.
6      Counts? Did I mention counts?
7      MS. CUSACK: Yes.
8  Q. Yes.
9  A. I think -- for the most part, I think
10 that's...
11 Q. Do any part of your job responsibilities
12 involve video monitoring of the housing blocks at
13 the facility when you're working in the main
14 control room?
15 A. No. Not entirely, no. It's like I said.
16 It's a -- it's almost something like you -- I
17 don't know how to explain it. You could spend
18 time doing that, like, but scan, it's impossible
19 to look through every single camera and through
20 every single -- you know what I mean, every single
21 monitor we have in there. That's why I'm saying
22 that. So is it -- yes, if I had to be -- like if
23 it was down time, yeah, you go and scan through

Page 13

1  the video cameras, through the monitors, yes.
2  Q. Okay. How many people -- as of August of
3  2012 how many people worked in the main control
4  room at a given time?
5  A. Two.
6  Q. And when you're in the main control room,
7  you have the capability of watching video
8  monitoring of activities in the housing blocks,
9  correct?
10     MR. FREDERICKS: Objection to form.
11     MR. KING: What's the basis for the
12 objection?
13     MR. FREDERICKS: You said have access to
14 watching video monitoring, and I just thought that
15 was vague as to whether you're watching someone
16 watching video or -- I was just unclear.
17 Q. Okay. I thought I -- when a -- when
18 Northern New Hampshire Correctional Facility
19 personnel are in the main control room, those
20 personnel have the capability of viewing video
21 monitoring of activities occurring in the housing
22 blocks at the facility, right?
23 A. They have the ability, yes.

Page 14

1 Q. Is that something that people working in
2 the main control room do during their shifts;
3 watch the video of what's occurring in the housing
4 blocks?
5 A. Like I stated, it's part of something
6 that if you have down time, like if -- especially
7 within that area, because it's so busy, like if
8 you were like -- you know, in the middle of the
9 day and there's nothing going on at that
10 particular moment, it's like -- it's more likely
11 that people will grab a joystick and move around,
12 yes.
13 Q. Now, you were in the main control room
14 between 3:00 and 7:00 on August 24th, 2012; is
15 that right?
16 A. Yes.
17 Q. Do you have any recollection of what
18 happened during that time period on your shift?
19 A. Vaguely. I'm really -- a lot of the
20 things that I memorized were brought up to me by,
21 you know, reviewing the paperwork and stuff with
22 my lawyers.
23 Q. All right. I don't want you to tell me

Page 15

1 the conversations you had with the attorneys
2 general.
3 A. I'm just saying it's not that I don't
4 remember. I vaguely remember.
5 Q. Tell me what you remember of your
6 activities between 3:00 and 7:00 p.m. on August
7 24th, 2012, when you were working in the central
8 control room.
9 A. I think what I'm going to state, and I
10 don't know if -- it's based upon the things that
11 I'm used to doing. I'm not thinking of
12 remembering that day exactly how it happened,
13 because it's like -- I do it enough that it's
14 almost like a routine for me.
15 Q. Yes.
16 A. So I don't want to be -- I don't know if
17 taking -- you know what I mean? Like, it's almost
18 like I remember that -- you know, it's like saying
19 that, oh, I did this, this, and that; I did this.
20     It's what I do every time I work in
21 there. So did that happen exactly that day? I'm
22 not sure. I vaguely remember about the incident
23 that happened. But like I said, we have no hands

Page 16

1 on with that as far as the actual incident. What
2 my job and title, if I remember correctly, is --
3 let me explain something to you. If somebody --
4 something happens in the prison, whatever it is,
5 the responders are called, right, by the site
6 person.
7 Q. Yes.
8 A. So I get the call on the radio, and what
9 I do is call for the responders and close the net,
10 meaning all radio communications. And then we
11 focus on that particular specific unit or a
12 specific place, if we can, or we have the ability
13 to do so.
14     So the only thing I remember is calling
15 the response to the block, closing the net, and
16 then after that basically waiting for the
17 ambulance to get there or whatever happened. I
18 can't even tell you if there was an ambulance
19 activated. It's been that long.
20 Q. Okay. So you remember calling a response
21 team?
22 A. I do. I do remember, and focus on that
23 unit. And then meanwhile, everything else is

Page 17

1 happening around the area.
2 Q. Right.
3 A. It could be from, you know, somebody
4 having difficulty breathing, you know,
5 something -- it's something simple. It's hard to
6 explain, because I don't have the hands-on. I
7 don't have the ability with saying what happened,
8 you know what I mean? It's more of the
9 recollection of having a regular day in central.
10 Q. What triggered you to call a response to
11 F block?
12 A. The response team, whoever was on the
13 site is who calls the response. Nothing triggered
14 me. It was that's how everything initializes here
15 at the prison.
16 Q. Has there ever been a circumstance,
17 Sergeant, where you have observed something on
18 video monitoring while you were stationed in the
19 central control room and contacted someone to look
20 into what was going on?
21 A. If I'm scanning the video, some of the
22 back end of PTZ cameras that we had here, if I
23 happen to come across something that catches my

Page 18

1 eyes, yes, I will do that, yeah.
2 Q. Has there been a circumstance when you
3 have done that?
4 A. Yes.
5 Q. Okay. What happened?
6 A. From people going into like different
7 units. They don't belong to -- you know, in the
8 unit, to people in the yard, when people -- we
9 have -- you know, in the summertime we have
10 anything from 15 inmates to a hundred-and-
11 something inmates out there. So if you're
12 scanning and you happen to catch somebody, you
13 know, like doing something they're not supposed to
14 do -- most of the time it's like taking their
15 shirt off when they're not supposed to. You know,
16 you send a guy officer over to tell him to put the
17 shirt back on.
18     I have on occasions -- people that are on
19 yard restriction, we send them back to the unit,
20 you know what I mean? Things like that.
21 Q. Okay. In your history working for the
22 Department of Corrections, have you ever been a
23 corrections officer doing rounds?

Page 19

1 A. Oh, yeah.
2 Q. When you did rounds, what would you do?
3 A. Would you want me to be more specific
4 in -- as far as up here in NCF or down in Concord?
5 Q. No, here would be helpful.
6 A. Well, every hour --
7 Q. Would you -- yes, go ahead. I didn't
8 mean to interrupt you. You were about to say?
9 A. No, just every hour you go into the unit
10 and make sure they -- initially go by twos, one
11 upstairs and one downstairs. You walk inside the
12 unit, look inside the -- every single block, make
13 sure that everything is good.
14     When you go in there, you got to take
15 care of -- usually that's when the inmates try to
16 approach you with questions about when you going
17 to do mail, things like that. So you try to
18 answer those questions. When you going to do
19 this, when you going to do that. Can I get the
20 cleaning supplies, things like that.
21     At the same time, you got to try to just
22 go through and looking inside their cells and make
23 sure that all the garbage and -- we call it

Page 20

1 safety/sanitation rounds too, for reasons you're
2 going in to make sure there's no water spill on
3 the floor, make sure you get that taken care of;
4 make sure the garbage is taken care of for the
5 day. You know, you got the crews going, do
6 like -- if you have extra duty. And that's every
7 hour, because you have to -- every time they come
8 out, you got to think of something, I mean like,
9 oh, we need to keep them...
10 Q. So I think you told me that when you did
11 rounds, you were supposed to look into every cell;
12 is that right?
13 A. Yeah, you're supposed to.
14 Q. And because it's a safety/sanitation
15 round, if you found vomit on the floor, you would
16 want to look into how that came to be there,
17 right?
18 A. Yeah, and to clean it up.
19 Q. Do you recall an incident in which you
20 were involved back on November 24th, 2011?
21 A. I do not.
22 Q. Maybe I can refresh your recollection.
23    MR. KING: Would you mark this.

Page 21

1    (Balderrama Exhibit 1 marked
2    for identification.)
3 Q. We've shown you what we've marked as
4 Balderrama Exhibit 1. These are your
5 interrogatory answers in this matter. You've seen
6 these before, right?
7 A. Yes.
8 Q. And is that your signature on the last
9 page, page 8?
10 A. Yup.
11 Q. Now, if you look at Interrogatory 10
12 which begins on page 5, and your answer happens on
13 page 6. I'm just going to be asking you about a
14 statement you have on the top of page 6. You say
15 here: I was personally involved in responding to
16 two inmate-on-inmate assaults resulting in injury
17 that required treatment at a hospital during the
18 relevant time period.
19    Which I think was August 24, 2007,
20 through August 23, 2012. And then you refer us to
21 some documents.
22 A. I don't -- this is not -- I never -- I
23 would never have done that, because I don't even

### Page 22

1  know where to get those numbers (indicating), sir.
2  Q. Okay. So --
3     MS. CUSACK: So we put the Bates --
4     MR. KING: Wait. Wait.
5     MS. CUSACK: Go ahead.
6  Q. What are you saying you would never have
7  done?
8  A. I mean it's not something that I would
9  have -- like, I was personally involved in
10 responding to inmate-on-inmate assault resulting
11 in injury that required treatment at a hospital
12 during relevant time period, that does not sound
13 like something that I would answer.
14 Q. All right. Did you -- did you review
15 these -- did you write these interrogatory
16 answers?
17 A. I remember answering something online and
18 returning it to the Attorney General's Office,
19 yes.
20 Q. Okay. And have you seen this document
21 that we've marked as Exhibit 1 in your deposition
22 before?
23 A. I have it. I've seen it. It's just that

### Page 23

1  answer, I don't know -- I don't know if you can
2  tell me how it is, because I don't -- if
3  somebody...
4  Q. Okay. I'm going to ask you some more
5  questions.
6     MS. CUSACK: So just for the record, we
7  would put in the Bates numbers and the individual
8  might not know -- understand those Bates
9  numbers --
10    MR. KING: Yes.
11    MS. CUSACK: -- when we're answering the
12 interrogatories. So they're what we have
13 disclosed --
14    THE WITNESS: Okay.
15    MS. CUSACK: -- in document form, and we
16 put numbers on the bottom of them.
17    THE WITNESS: Okay.
18 Q. BY MR. KING: Now, unfortunately, I don't
19 have copies of this document, but I'm going to --
20 do you mind if I come around, sir?
21 A. No.
22    MS. CUSACK: Which Bates numbers are you
23 looking at?

### Page 24

1     MR. KING: 480 through 484, right here
2  (indicating).
3  Q. And we're looking at 480 is the first
4  page of an incident report for an incident that
5  occurred November 24th, 2011.
6  A. Yup.
7  Q. Right?
8  A. Yup.
9  Q. Is this your writing?
10 A. Yup, it is.
11 Q. Now, there's a description here at 481.
12 Is this your writing?
13 A. Yup. It looks like it, yeah.
14 Q. Okay. Could you just read what you've
15 written here?
16 A. Absolutely. (Reading.) After reviewing
17 the video recording on Charlie block, section
18 11/24 from 1850 to 1854, it was determined that
19 shown punching in the face, what caused inmate
20 blank to go to AVH for stitches. Along with the
21 first team --
22    (Reporter interrupts.)
23 A. Okay. (Reading.) I, along with the

### Page 25

1  first team, went inside Charlie block, and
2  handcuffed and was escorted to reception. Was
3  placed on PAR status for the assault.
4     And the follow-up states: Blank was
5  placed in Cell 5 in reception.
6     And then Lieutenant Newton's follow-up:
7  Transported to AVH. Later returned. Due to his
8  injuries, inmate was housed in Health Services for
9  observational. Inmate blank pleaded guilty to 3-A
10 and 43-B.
11    MR. FREDERICKS: And just for the record,
12 when he's saying "inmate blank" there's a
13 redaction and that's why he's saying "blank."
14 Q. BY MR. KING: Do you recall this
15 incident, sir?
16 A. No, not off the top of my head. But,
17 yeah, obviously it's mine, yeah.
18 Q. Yes. I just wanted to ask you, did you
19 discover that the assault had occurred by watching
20 video recording in this incident?
21 A. After the fact, yeah, when some -- in
22 this case I'm not sure how -- obviously I can't
23 remember. But if somebody gets assaulted and they

Page 26

1  come to me as the housing sergeant, then I will be
2  able to go into the video room and then retrieve
3  the video and then review it and see if we can
4  observe something, bad doing, something happening,
5  and then we make the determination, and this is
6  what I -- I'm 110 percent sure that's what
7  happened.
8  Q. Okay. Thank you. Now, in the answer to
9  Number 12, if you just read Interrogatory 12 and
10 your answer to it, please.
11 A. So the answer, sir?
12 Q. The question and answer, if you don't
13 mind.
14 A. Do you --
15 Q. No, no, no, to yourself.
16    MS. CUSACK: To yourself. To yourself.
17 Q. Yes.
18 A. Oh. (Peruses document.) Yup.
19 Q. In 2012 up through August, how was the
20 fact that cell-hopping was prohibited communicated
21 to inmates at this facility?
22 A. It's a known violation I believe in the
23 inmate manual, being out of place or cell-hopping.

Page 27

1  Q. It's in the inmate manual?
2  A. Yes, sir. They all get one when they get
3  incarcerated I believe, yeah.
4  Q. All right. You write here: I am also
5  aware that Mr. Leite failed to promptly seek
6  medical attention for his injuries.
7     What's the basis for that statement?
8  A. It's just very vague. I can't -- how
9  long ago since I filled this out? It's been a
10 while, but...
11 Q. Did you even write that statement, sir?
12 A. I -- yeah, I did. I remember that.
13 Q. All right.
14 A. I just can't -- I can't remember why I
15 would say that, but...
16 Q. All right. If you can't remember, you
17 can't remember.
18    So was -- the extent of your involvement
19 in responding to the assault on Jonathan Leite was
20 calling the response team to Cellblock F; is that
21 true?
22 A. Yes, that's what I would have done.
23 Q. Do you know who was working with you in

Page 28

1  the video control room on August 24th, 2012?
2     MR. FREDERICKS: Objection to form.
3     MR. KING: What's the basis of the
4  objection?
5     MR. FREDERICKS: He's never referred to
6  it as a video control room. I don't think that's
7  accurate.
8  Q. Do you know who was working with you in
9  the central control room on August 24th, 2012,
10 between 3 and 7 p.m.?
11 A. No.
12 Q. No?
13 A. I can't remember.
14    MR. KING: Okay. All right. I have
15 nothing further. Thank you.
16    THE WITNESS: Okay.
17    MR. FREDERICKS: Nothing from us. You're
18 all set.
19    (Deposition concluded at 1:24 p.m.)

Page 29

1  CERTIFICATE OF WITNESS
2  
3  I, Yair Balderrama, have read the foregoing
4  transcript of deposition taken on Wednesday,
5  August 30, 2017, at the Northern NH Correctional
6  Facility, Berlin, New Hampshire, and do hereby
7  swear/affirm it is an accurate and complete record
8  of my testimony given under oath in the matter of
9  Leite v. Goulet, et al., including any and all
10 corrections that may appear on those pages denoted
11 as "Corrections."
12
13 _____
14 Yair Balderrama
15 STATE OF _____
16 COUNTY OF _____
17
18 Subscribed and sworn to before me this _____ day
19 of _____, 2017.
20
21
22 Notary Public_____J.P._____
23 My Commission Expires:_____

Page 30

1   CORRECTION AND SIGNATURE PAGE
2   **DEPOSITION:** Yair Balderrama
3   **DATE OF DEPOSITION:** August 30, 2017
4   PAGE LINE     NOW READS        SHOULD READ
5   _____   _____   _____
6   _____   _____   _____
7   _____   _____   _____
8   _____   _____   _____
9   _____   _____   _____
10  _____   _____   _____
11  _____   _____   _____
12  _____   _____   _____
13  _____   _____   _____
14  _____   _____   _____
15  _____   _____   _____
16  _____   _____   _____
17  _____   _____   _____
18  _____   _____   _____
19
20  Dated this _____ day of _____, 2017.
21
22      _____
23      Yair Balderrama

Page 31

1                C E R T I F I C A T E
2       I, Celeste A. Quimby, a Licensed Court
3   Reporter of the State of New Hampshire, do hereby
4   certify that the foregoing is a true and accurate
5   transcript of my stenographic notes of the
6   deposition of Yair Balderrama, who was first duly
7   sworn, taken at the place and on the date
8   hereinbefore set forth.
9       I further certify that I am neither attorney
10  nor counsel for, nor related to or employed by any
11  of the parties to the action in which this
12  deposition was taken, and further that I am not a
13  relative or employee of any attorney or counsel
14  employed in this case, nor am I financially
15  interested in this action.
16      THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
17  DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
18  ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
19  DIRECTION OF THE CERTIFYING REPORTER.
20
21
22
23          CELESTE A. QUIMBY, LCR No. 17