1

Volume: 1
Pages: 1-90
Exhibits: 1-2

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Case No. 15-CV-00280-PB

- - - - - - - - - - - - - - - - - - - - - - - x

JONATHAN LEITE,

Plaintiff,

v.

MATTHEW GOULET, et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x


DEPOSITION OF SCOTT LAMBERTSON

September 15, 2017

9:13 a.m. to 11:28 a.m.

NEW HAMPSHIRE STATE PRISON FOR MEN

281 North State Street

Concord, New Hampshire


Reporter: Celeste A. Quimby, LCR No. 17

Page 2

```
1              I N D E X
2
3   WITNESS:    Scott Lambertson
4
5   EXAMINATION:                              Page
6              By Ms. Douglass                  4
7              By Mr. Fredericks               85
8
9
    EXHIBITS FOR IDENTIFICATION:
10
    Lambertson    Description                  Page
11
    Exhibit 1   8/24/12 NCF Upper Housing
12              Shift Change Briefing           53
13  Exhibit 2   8/24/12 Upper Housing
                Shift Log                       56
14
15
16
17
18
19
20
    (Exhibits scanned/e-mailed to counsel; originals
21  returned to Ms. Douglass.)
22
23
```

Page 3

```
1   A P P E A R A N C E S
2   For the Plaintiff:
3       DOUGLAS, LEONARD & GARVEY, P.C.
        By:  Benjamin T. King, Esq.
4            Megan E. Douglass, Esq.
        14 South Street, Suite 5
5       Concord, NH  03301
        (603) 224-1988
6       benjamin@nhlawoffice.com
        mdouglass@nhlawoffice.com
7
    For the Defendants:
8
        NEW HAMPSHIRE DEPARTMENT OF JUSTICE
9       OFFICE OF THE ATTORNEY GENERAL
        By:  Lynmarie C. Cusack, Esq.
10           Francis K. Fredericks Jr., Esq.
        33 Capitol Street
11      Concord, NH  03301
        (603) 271-3658
12      lynmarie.cusack@doj.nh.gov
        francis.fredericksjr@doj.nh.gov
13
```

```
14
15              STIPULATIONS
16      It is agreed that the deposition shall be
    taken in the first instance in stenotype and when
17  transcribed may be used for all purposes for which
    depositions are competent under the Federal Rules
18  of Civil Procedure.

19      Notice, filing, caption, and all other
    formalities are waived.  All objections except as
20  to form are reserved until the time of trial.

21      It is further agreed that if the deposition
    is not signed within thirty (30) days after
22  submission to counsel, the signature of the
    deponent is waived.
23
```

Page 4

1    MS. DOUGLASS: Are we agreeing to all the
2  usual stipulations?
3    MR. FREDERICKS: Yes.
4    MS. DOUGLASS: Okay. Mr. Lambertson, can
5  you --
6    MR. FREDERICKS: Make sure he's sworn in.
7  Did you swear him in?
8    SCOTT LAMBERTSON
9    having been duly sworn by the reporter,
10   was deposed and testified as follows:
11   **EXAMINATION**
12   **BY MS. DOUGLASS:**
13 Q.  Thank you. Would you state your full
14   name for the record, please?
15 A.  Scott Gordon Lambertson.
16 Q.  Mr. Lambertson, where do you work?
17 A.  I currently work at New Hampshire
18   Homeland Security and Emergency Management in
19   Concord.
20 Q.  Okay. And have you ever worked at the
21   New Hampshire Department of Corrections' Northern
22   Correctional Facility?
23 A.  Yes.

Page 5

1 Q.  Okay. And what was -- from when to when
2   did you work there?
3 A.  I worked there in 2000 and retired in
4   December 2015.
5 Q.  Okay.
6 A.  I had a break in there where I went to
7   the Lakes Region facility from 2008 to 2009.
8 Q.  Okay.
9 A.  And then I returned after that.
10 Q.  Can you take us through your background,
11   educational background, training which would
12   prepare you for work at --
13 A.  Corrections?
14 Q.  Yup.
15 A.  Well, I was with the U.S. Army for four
16   years out of high school, a military police
17   officer; and after that was hired with the
18   Department of Corrections; corrections academy and
19   whatever training the department provided for me
20   along those lines.
21 Q.  Do you hold any criminal justice degrees?
22 A.  I do have one. I didn't get that when I
23   was with Corrections, but I have it. It's a human

Page 6

1  services degree. It's not criminal justice. So I
2  have a Bachelor's in human services from
3  Springfield College.
4  Q.  Okay.  And what position -- to what
5  position were you hired with the New Hampshire
6  Department of Corrections?
7  A.  Corrections officer.
8  Q.  Okay.  And how long were you a
9  corrections officer?
10  A.  Not counting corporal, just corrections
11  officer, would be from '93 to '98.
12  Q.  And were you promoted from that position?
13  A.  Yes, from a correctional officer to
14  corrections corporal in 2008.
15  Q.  And --
16  A.  I'm sorry. 1998. Sorry. Right. So
17  from '93 to '98 I was a CO, and then from CO to
18  corporal in '98.
19  Q.  And in '98 you were promoted to security
20  officer?
21      MR. FREDERICKS: Objection to form.  Go
22  ahead.  You can answer.
23  A.  Corrections corporal.

Page 7

1  Q.  Okay.
2  A.  So I'm still a corrections officer.
3  Q.  Okay.
4  A.  But promoted to the rank of corrections
5  corporal in 1998.
6  Q.  And what's your current title?  Your
7  current title -- what was your most recent title?
8  A.  With Corrections?
9  Q.  Strike that.  In August of 2012 what was
10  your position held with New Hampshire Department
11  of Corrections?
12  A.  Corrections captain, chief of security.
13  Q.  Okay.  And what did that position entail?
14  A.  So I had a lot of responsibilities in
15  that position.  Supervising the shift commanders
16  along with the operations sergeants.  Attending
17  meetings for -- with the warden as the warden's
18  designee.  Meetings with Programs.  Reviewing
19  reports.  Reviewing inmate job changes.  Rounds.
20  Emergency management coordinator for the facility.
21  A PREA coordinator for the facility.  Reviewing
22  and answering inmate request slips.  Inmate
23  disciplinary appeals, I would review those.

Page 8

1  Inmate claims, property claims.  Warden's
2  designee, so whatever the warden needed me to fill
3  in or do in the warden's absence.
4  Q.  Was one of your responsibilities to
5  oversee monitoring of cameras or video in the
6  Northern Correctional Facility?
7      MR. FREDERICKS: Objection to form.  You
8  can answer.
9  A.  It wasn't my job to review cameras or
10  monitor cameras.
11  Q.  Were you required -- was one of your
12  responsibilities to oversee correctional officers
13  in monitoring cameras at the Northern Correctional
14  Facility?
15  A.  Well, one of the jobs of a correctional
16  officer is to monitor cameras, so -- and I
17  supervised officers.
18  Q.  Okay.  Was one of your responsibilities
19  to discipline officers who performed poorly in
20  their officer's responsibilities?
21  A.  The only person who can issue discipline
22  is the warden of the facility.
23  Q.  Okay.  Was one of your responsibilities

Page 9

1  to evaluate officers in the performance of their
2  work?
3  A.  Yes.
4  Q.  You mentioned that one of your
5  responsibilities as a correctional officer was
6  rounds.
7      MR. FREDERICKS: Objection to form.  You
8  can answer whenever I object, unless I say
9  otherwise.
10  Q.  What in your mind was the proper way to
11  conduct rounds?
12  A.  Well, the officer's responsibilities to
13  conduct rounds is, to whatever area that may be,
14  wherever they're assigned to for the day, is they
15  observe the environment.  They observe the
16  atmosphere.  You know, if they smell anything, see
17  anything, any sanitation issues, any suspicious
18  activity and, you know, it's just their job to
19  address any issues that they may see during those
20  rounds.
21  Q.  What in your mind constitutes suspicious
22  activity?
23  A.  Cell-hopping, inmates in and out of

1  cells. That's -- anything that would be against a
2  rule or anything that the officer -- may seem not
3  right.
4  Q.  How would an officer ordinarily identify
5  cell-hopping?
6  A.  More than one inmate in the cell.
7  Q.  And how would an officer know that an
8  inmate -- well, strike that.
9      Aren't cells assigned to more than one
10  inmate?
11  A.  Two inmates, unless they live in the
12  dayroom. Obviously they don't have a cell, but...
13  Q.  Okay.
14  A.  So two inmates per cell, yes.
15  Q.  So if an officer sees two inmates in a
16  cell, that identifies cell-hopping?
17  A.  No, that's not what I said. What I said
18  was more than one inmate in the cell, multiple.
19  So there's two that are assigned. If there's
20  three or four, five inmates in there, obviously
21  somebody is cell-hopping.
22  Q.  Okay. Is there any other way to identify
23  cell-hopping?

1  A.  During a count, if they do count and they
2  go by their count sheet and it's not that inmate
3  that's in the cell.
4  Q.  Okay. Can you tell me how count is
5  conducted?
6  A.  So the officers will go into the unit.
7  They'll go cell to cell or dayroom and confirm
8  against their count sheet who is in the cell.
9  Inmate ID. The inmates are made to stand. Unless
10  it's the third shift, and then all they need to do
11  is see/scan they're living, breathing; to make
12  sure that the inmate, you know, is living and
13  breathing and okay. But standing counts, they'll
14  have their ID and they confirm with their count
15  sheet.
16  Q.  Does the count sheet show an inmate's
17  cell assignment?
18  A.  Yes.
19  Q.  Okay. How often is count conducted per
20  day?
21  A.  I forget what the policy is on it, but —
22  you know, I don't recall.
23      MR. FREDERICKS: Do you want to try to

1  narrow it to the time frame at issue?
2  A.  Three different counts, usually done at
3  shift change.
4  Q.  Is this as of August 2012?
5  A.  Good question. Well, we have a policy
6  on conducting counts, so they're to be done per
7  policy.
8  Q.  Okay. And to the best of your
9  recollection, it was three counts per shift did
10  you say?
11  A.  No, not per shift. In a 24-hour period.
12  Q.  Okay.
13  A.  So...
14  Q.  That would be at least one count per
15  shift?
16  A.  Right. Yeah. I can't recall. It
17  changed -- it didn't change. The rounds changed
18  when they got another warden, doing more rounds
19  per hour. But as far as the count goes, that's
20  policy, so I can't remember off the top of my
21  head.
22  Q.  Okay. So when a correctional officer is
23  conducting count, you would expect a correctional

1  officer to notice if an inmate is out of place?
2  A.  Absolutely, during count, yes.
3  Q.  Okay. And through performing count,
4  would correctional officers become familiar with
5  where -- which cells inmates were assigned to?
6      MR. FREDERICKS: Objection to form.
7  A.  Hard to say. Maybe there's an officer
8  who is not really familiar with the unit or works
9  in other areas. It's hard to say if an officer's
10  going to walk in there and know every inmate face
11  to every cell and, you know, be able to identify
12  that, so...
13  Q.  If an officer worked full time for a
14  number of years in the same facility, would you
15  expect that the officer would become familiar with
16  inmate cell assignments?
17  A.  Cell assignments, no. They become
18  familiar with inmates. But inmates move. They
19  change housing units. It doesn't matter how long
20  the officer works there. I mean if they have --
21  like whatever we had, 500 inmates in the facility.
22  If they work down in D building in the housing
23  units, upper and lower, I mean inmates move all

Page 14

1 the time. So to be --
2 Q. Well, what's "all the time," within --
3 how often do inmates move?
4 A. Oh, I don't know. It's frequently. It
5 all depends on what's happening. They request
6 cell changes. They might go out to court. After
7 a period of time they come back, they get
8 reassigned to another cell. I mean it's just --
9 cell changes happen pretty regularly. And it's
10 not unusual for officers -- if an inmate's been,
11 you know, in cells for a while, that, you know,
12 change of scenery would happen also.
13 Q. So it would be difficult -- are you
14 saying it would be difficult for a correctional
15 officer to identify cell-hopping?
16    MR. FREDERICKS: Objection to form.
17 A. No.
18 Q. Okay. So --
19 A. So as I explained with the cell-hopping,
20 two inmates in a cell, three, four or whatever, if
21 they're hanging out in there watching a football
22 game or something, that's cell-hopping. The
23 officer would come up and say, hey, you know,

Page 15

1 who's supposed to be in here; find out the room
2 assignments, who's not supposed to be in here, and
3 then the officer would handle that however,
4 whether they'd write D reports or give them
5 warnings and, you know, tell them to get out of
6 the cell. So I don't know how that's related
7 to...
8 Q. But if there's only two inmates -- if
9 there are two inmates in a cell.
10 A. Assigned to that cell, yes.
11 Q. Right.
12 A. Yeah.
13 Q. You wouldn't be able to identify
14 cell-hopping? Is that what you're saying?
15 A. If I'm an officer and I walk into the
16 unit and I see five inmates in a cell.
17 Q. Yup.
18 A. Somebody's cell-hopping.
19 Q. Right. But that's the only way that you
20 can identify cell-hopping, if there's just more
21 than two?
22 A. Right.
23 Q. Okay. When an officer's conducting

Page 16

1 rounds, is an officer expected to look inside a
2 cell?
3 A. I'm sorry, could you repeat that?
4 Q. When an officer is conducting rounds, is
5 the officer expected to look inside cells?
6 A. Cells, yes.
7 Q. Okay. And what are they looking for?
8 What are they expected to look for when they look
9 inside cells?
10 A. They're looking for safety, security,
11 anything that may look unusual, cell-hopping. Any
12 inmate behavior that would be a violation of
13 institutional rules.
14 Q. You mentioned that you're the PREA
15 coordinator. Can you tell us what PREA is?
16 A. That's the Prison Rape Elimination Act.
17 So basically that falls under my area of
18 responsibility as far as reviewing the procedures
19 and the policies.
20 Q. And what procedure and policies are in
21 place --
22 A. We have --
23 Q. -- to advance the goals of the Prison

Page 17

1 Rape Elimination Act?
2 A. We have a policy on PREA. There's a
3 department policy on the Prison Rape Elimination
4 Act.
5 Q. Okay. So what specifically are officers
6 required to do in order to comply with PREA?
7    MR. FREDERICKS: Objection to form. Go
8 ahead.
9 A. Well, the officers -- part of the PREA
10 policy is a scanning. So when inmates come into
11 the prison, they get -- there's a questionnaire
12 that they fill out when they come into the
13 reception area of the prison when they come in.
14    So they follow that checklist, and then
15 if there's any of those questions that -- a yes or
16 no question, if there's a yes, they are to notify
17 the mental health and health services, and it's a
18 duty to report for any -- if an inmate comes up to
19 an officer and says, I've been sexually assaulted,
20 and then it's the officer's responsibility to
21 follow that PREA checklist and notify the shift
22 commander, and they have a checklist that they
23 follow as far as securing the inmate and making

1 sure they're safe, and it's a pretty detailed
2 checklist on how they're supposed to respond to
3 that.
4 Q. Are there any policies or procedures that
5 are designed to prevent assaults?
6 A. Well, part of that policy is that in
7 processing piece, and that's where those -- any of
8 those questions that get answered, that's a
9 preventative measure. So if an inmate has been
10 assaulted before or something to that effect, then
11 that's where they get a form to mental health, and
12 then a review of the inmate's case happens, so --
13 and then at that point it could be, you know, is
14 there a housing issue or do they need a program or
15 do they need to be housed somewhere specifically.
16 Q. Okay. So is it fair to say that the PREA
17 policies are designed to remediate assaults after
18 they happen?
19      MR. FREDERICKS: Wait. Can I jump in?
20 Are you talking about sexual assaults? That's
21 implied by PREA. I just wanted to make sure we're
22 clear.
23      MS. DOUGLASS: Yeah. Yes, sexual

1 assaults.
2 A. Prison rape — yeah, PREA, Prison Rape
3 Elimination Act. So yup.
4 Q. Okay. So the PREA policies are designed
5 to remediate sexual -- remediate sexual assaults
6 that have already happened, right?
7      MR. FREDERICKS: Objection to form. Go
8 ahead.
9 A. Well, if an inmate admits to being
10 assaulted when they were a child, they weren't in
11 the prison system, but that is something that is a
12 red flag, and then it still requires a
13 notification. So it's a screening process when
14 the inmate comes into the prison.
15 Q. Okay. So prisoners are asked for their
16 assault history, and when a prisoner responds --
17 reports a sexual assault, certain measures are
18 taken?
19 A. Correct.
20 Q. Is there anything else that's done in
21 order to prevent sexual assaults in prison?
22      MR. FREDERICKS: Objection to form. Go
23 ahead.

1 A. (Shakes head negatively.)
2 Q. Okay.
3 A. Not to my knowledge.
4 Q. How about just physical assaults? What
5 measures are correctional officers expected to
6 take to prevent inmate-upon-inmate physical
7 assaults?
8 A. The officers can't prevent that from
9 happening. They do rounds, you know, and they
10 can -- you know, during their rounds, if they can
11 note anything suspicious or that type of thing.
12 But I mean assaults happen in the prison. I mean
13 the inmates know when to assault each other. They
14 know when officers are around. They know
15 movements, med calls.
16      So to specifically identify inmates
17 assaulting each other and what preventative
18 measures are in place for that, we're in a prison,
19 and we have officers who do rounds and do counts
20 and officers are in place to hopefully mitigate
21 those things, but it's not going to get prevented.
22 Q. How -- are officers trained in certain
23 indicators of an assault occurring upon an inmate?

1 A. Indicators like a black eye or blood,
2 that would be an indicator.
3 Q. Okay.
4 A. I don't know if you need training for
5 that.
6 Q. Okay.
7 A. But officers go through the academy and
8 the field training officer program, and those
9 things are covered as far as doing rounds and
10 those type of things. But, you know, they're not
11 investigators. They're not walking up to inmates
12 and, did you get assaulted today?
13 Q. Okay. Well, how about monitoring the
14 cameras that are directed towards the common areas
15 in the units? What would an officer -- is an
16 officer trained to look for anything in particular
17 to identify inmate-upon-inmate assaults?
18 A. I don't know about trained. But they
19 monitor the units by using the cameras. So, you
20 know, a lot comes with that also. But they are --
21 one of their responsibilities is to monitor the
22 units through the cameras, you know. So -- I
23 guess I got lost in your question. But, yes, that

Page 22

1   is one of their jobs, is to monitor the units
2   through the cameras.
3   Q.   Okay.
4   A.   Maybe I lost your question there.
5   Q.   If a correctional officer saw a number
6   of inmates going in and out of a cell in a short
7   period of time, would that be something that you
8   would expect a correctional officer to flag as a
9   potential --
10      MR. FREDERICKS: Objection to form.
11  Q.   -- assault issue?
12      MR. FREDERICKS: I'm sorry. Objection
13  to form.
14  A.   Relating that to an assault issue?
15  Q.   Um-hum.
16  A.   I don't know if they would relate that to
17  an assault issue. Inmates go in and out of each
18  other's cells all day. They get canteen. They
19  watch TV. You know, that's not something where
20  the officer — like in Berlin, they have four
21  units downstairs and four units upstairs. So that
22  officer watching the four units -- unless there's
23  no officer that's assigned upstairs, and then that

Page 23

1   downstairs officer has all eight units that they
2   need to monitor. So I think it makes it very
3   difficult, and the officers don't have time to
4   stare at the units. They have other
5   responsibilities. So, you know, they will glance,
6   but it depends on the time of day and, you know,
7   things that are going on. Because those units can
8   become very busy also. If it's mail call, you'll
9   have a lot of inmates that are on the -- that are
10  in the dayroom. You know, movements, yard time,
11  getting ready for program. Chows, the chow
12  schedule, the inmates are backed up, you know.
13      So I mean it's kind of hard to say
14  that -- because inmates will go out of each
15  other's rooms all day. You can't stop it. The
16  officers aren't assigned on the units to stop
17  that, and to rely on the officer in the control
18  room to be able to monitor that and stop it from
19  happening is -- it's not likely. You can't do it.
20  Q.   Was there a point in time when in --
21  during your tenure at Northern New Hampshire
22  Correctional Facility when there was an officer
23  stationed on the unit full time whose job it was

Page 24

1   to monitor the inmates in person?
2   A.   Yes, direct supervision officer. That's
3   the way we opened the prison.
4   Q.   And do you have any understanding of why
5   there was a direct supervisory officer placed on
6   the unit when the prison opened?
7   A.   Well, it was a new prison being built.
8   So direct supervision is a philosophy that a lot
9   of prisons have in the nation. So the powers to
10  be, I don't know, decided that we were going to
11  make this facility a direct supervision facility
12  and have officers actually assigned to the pods.
13  Q.   Do you know if inmate safety was one of
14  the reasons for having a direct supervisory
15  officer on the unit?
16  A.   Well, safety is always an issue, whether
17  you have an officer assigned in the unit or not.
18  So those debate go back and forth. You have
19  prisons that have direct supervision, and you have
20  prisons that have the roving patrols.
21      So, you know, whoever decided to have
22  direct supervision up there, I believe in the
23  beginning stages there was a lot of talk of

Page 25

1   programming, and there was going to be a
2   programming facility and there was going to be a
3   lot of community type program stuff going on with
4   the units, and that would require an officer to be
5   more involved with community meetings and those
6   type of things. So that might have been some
7   thought process behind that also as far as the
8   direct supervision, but...
9   Q.   As a security officer, which do you
10  think -- which model is more effective, direct
11  supervision or no direct supervision?
12      MR. FREDERICKS: Objection to form. Go
13  ahead.
14  A.   So I've witnessed both. I've seen the
15  direct supervision officers. I was there for
16  that. And I was there for the turnover with the
17  roving patrols. In my opinion, I've seen -- I've
18  seen incidents happen with direct supervision
19  and -- bad incidents, and there's been incidents
20  that happened with roving patrols also.
21      So ideally, I would love an officer to an
22  inmate one-on-one, right? So that's a perfect
23  world. We don't have that and that's not reality.

1 So I've seen it both ways. To have the officer in
2 the unit, one would think it's going to be more
3 safer, but it's hard to say when you compare
4 statistics across the nation, because just because
5 you have an officer inside that unit, there's
6 times when inmates, they just get more creative
7 with how they're going to do what they do.
8 Q. Since you've seen both models, which
9 model allows for a quicker response time by
10 officers in the event that an assault does happen?
11 A. Definitely direct supervision would allow
12 for a quicker response, normally. You have an
13 officer in the unit. But like I said, there are
14 times where the officer could be in the office
15 doing a med call, and sometimes on those units
16 those med calls could take up to 45 minutes. So
17 we found that there was a lot of times that's
18 where inmates would do whether it was assaults,
19 tattooing, cell-hopping, because you have one
20 officer that's distracted during that time. So
21 something could happen during that time very
22 easily when the officer is not paying attention.
23 Q. Have you ever had to discipline an

1 officer who wasn't paying attention?
2 MR. FREDERICKS: Objection to form.
3 A. So I don't discipline. We covered that
4 in the beginning. I don't issue discipline. Only
5 the warden can issue discipline. And I -- I
6 supervised mostly the shift commanders, my time
7 when I was in Berlin. So the officers, I didn't
8 deal with counseling them. I dealt with the shift
9 commanders.
10 Q. But you evaluated work performance of
11 officers, right?
12 A. So shift commanders would evaluate their
13 people, and I would see their performance
14 evaluations that the shift commanders or the
15 sergeants did. But I didn't supervise officers
16 directly when I was the chief of security.
17 Q. Okay. So you've never signed a
18 correctional officer's performance evaluation?
19 A. I sign off that I have seen it and
20 reviewed it, but I'm not the one who did the
21 evaluation. So -- but yes. So I see the
22 performance evaluations. I'll read them and
23 we'll -- I have a signature block on those, yup.

1 Q. Okay. Have you ever signed off on an
2 evaluation showing that an officer was
3 inattentive?
4 A. Not to my recollection. Nothing jumps
5 out at me like that.
6 Q. Okay. Have you ever signed off on an
7 evaluation showing that an officer failed to
8 conduct rounds properly?
9 A. Not to -- not from what I can remember.
10 Q. Okay.
11 A. No.
12 Q. Have you ever signed off on an evaluation
13 showing that an officer failed to monitor video
14 properly?
15 A. You're talking about some real specific
16 stuff there. It's hard for me to recall. I've
17 seen so many performance evaluations. So nothing
18 like that jumps out at me. If I did, I can't
19 recall.
20 Q. So what kinds of things -- what kind of
21 mistakes do officers make?
22 MR. FREDERICKS: Objection to form. Go
23 ahead.

1 A. What kind of mistakes do correctional
2 officers make?
3 Q. Um-hum.
4 A. Well, we have personnel rules and we have
5 PPD 2.39 that govern staff behavior. So if you
6 look those up, those are some of the things that
7 are covered and officers can be held responsible
8 for.
9 Q. So the universe of correctional officer
10 responsibilities is covered by PPD 2.39?
11 MR. FREDERICKS: Objection to form.
12 A. That's one of the policies. State
13 personnel rules also cover disciplinary for staff.
14 Q. Okay. So all an officer's
15 responsibilities are covered by PPD 2.39?
16 MR. FREDERICKS: Objection to form.
17 A. They have post orders also that are
18 signed off by the warden.
19 Q. Sorry, what was --
20 A. Post orders --
21 Q. Post orders.
22 A. -- that are signed off by the warden.
23 Q. Have you ever signed an evaluation for

Page 30

1 an Officer McLain in the Northern New Hampshire
2 Correctional Facility?
3 A. I would imagine. I must have if she was
4 an officer at the facility.
5 Q. Okay. Do you have any recollection of
6 any negative performance criticisms for Officer
7 McLain?
8 A. No, I don't recall anything like that.
9 Q. Okay. How about for an Officer Esobe?
10 Do you remember --
11 A. Esobe?
12 Q. Yup. Do you remember signing any
13 performance evaluations for Officer Esobe?
14 A. That name doesn't even ring a bell to me,
15 yeah.
16 Q. Officer Dube? Do you recall signing any
17 performance evaluations for Trevor Dube?
18 A. There's a couple Dubes up there.
19 Q. Yeah.
20 A. Do you know which one you're referring
21 to?
22 Q. Yup. I believe it's Trevor. Or Tim.
23 MR. KING: No, it's Trevor.

Page 31

1 MS. DOUGLASS: Was it Trevor?
2 MR. KING: Yeah.
3 A. I suppose I did. If they were an officer
4 at the facility within -- from the time I was --
5 if they were in the time frame from 2011 to 2015
6 and I was the chief of security, I probably saw
7 their evaluation at some point.
8 Q. Okay. Do you remember any performance
9 criticism issue for Trevor Dube, anything
10 specific?
11 A. No.
12 Q. Okay. And how about an Officer Kathy
13 Bergeron? Any -- did you sign an evaluation for
14 Kathy Bergeron; do you remember specifically?
15 A. Not specifically.
16 Q. Okay.
17 A. Yeah.
18 Q. Were you -- do you know who Investigator
19 Coulombe is?
20 A. Yes.
21 Q. Okay. And how do you -- how are you
22 familiar with Investigator Coulombe?
23 A. He's an investigator at the Northern

Page 32

1 Correctional Facility.
2 Q. Okay. Were you involved in any way in
3 his investigation into the assault that occurred
4 on August 24th, 2012, on Cellblock F?
5 A. I don't get involved with their
6 investigations.
7 Q. Okay. So Officer Coulombe never notified
8 you that the -- he was investigating who committed
9 an assault that day on F block?
10 MR. FREDERICKS: Objection to form. Go
11 ahead.
12 A. I don't remember specific conversation of
13 him coming to me or telling me that there was an
14 investigation with that. But any time there's a
15 serious assault like that, there's an
16 investigation, so...
17 Q. Okay.
18 A. I'm sure I had knowledge that there was
19 an investigation, but I don't recall a specific
20 conversation with him or him coming to me saying
21 that he's investigating. They do their
22 investigations and...
23 Q. Were there any changes to security

Page 33

1 policies that happened as a result of the assault
2 on F block on August 24th, 2012?
3 A. Not to my knowledge.
4 Q. Okay. Did you meet with any of the
5 officers who worked first or second shift on that
6 day, August 24th, 2012?
7 A. I don't recall. I don't know why I would
8 have.
9 Q. Okay. Well, did it occur to you that
10 maybe there was a security concern where an inmate
11 had been so badly beaten?
12 A. That happens. So it's probably not the
13 first time that's ever happened. So those
14 incidents go to Investigations, and they get
15 reviewed and, you know, they take their course.
16 So I'm not oblivious to those things happening in
17 the prison. So I'm not sure what you mean by
18 that, but...
19 Q. Did you ask Officer Coulombe -- did at
20 some point -- strike that.
21 Did you at some point learn that Officer
22 Coulombe had reviewed a video recording of F block
23 showing the time of the assault?

Page 34

1 A. I don't know. Their investigations,
2 whatever they do when they're reviewing videos or
3 during their investigations, I'm not involved with
4 that. I don't get a play-by-play of how they do
5 their investigations and when they review what.
6 They're their separate entity I mean.
7 Q. So you -- all right. I don't want to --
8 I just want to make sure I understand what you're
9 saying.
10 A. Okay.
11 Q. So you -- you simply just didn't ask
12 about his investigation or anything about it?
13 A. I don't usually ask. The investigators
14 will do their investigation, and then they usually
15 bring any findings or anything like that to the
16 warden or anything at the completion of the
17 investigation. But throughout the process, I
18 don't get involved.
19 Q. Have you ever talked -- did you ever talk
20 to Jeff Smith about the assault that occurred that
21 day, Sergeant Jeff Smith, the shift commander for
22 second shift?
23 A. I don't remember any specifics. But if

Page 35

1 he was the shift commander that day, I'm sure I
2 spoke to him about the incident.
3 Q. Okay. Do you remember any -- you don't
4 remember any specifics about what you talked
5 about?
6 A. I imagine we discussed the incident and
7 what happened, you know, but...
8 Q. Okay. Did you discuss whether or not
9 correctional officers responded appropriately to
10 discovering the inmate who was assaulted?
11 A. Well, usually that information is in the
12 report. So I probably read it through the
13 incident report. If I had a question on it or
14 something, I would follow up with the shift
15 commander on that if I needed clarification on any
16 of the reports.
17 Q. Do you remember reviewing at all
18 correctional officers' job performance on August
19 24th, 2012?
20 A. I don't. Not specifically.
21 Q. Okay. Would that be something that you
22 would normally do in the aftermath of an assault,
23 an identified assault?

Page 36

1 A. Right. Usually if there's a serious
2 incident in the prison, there's a review of the
3 incident, so whether that involves the shift
4 commander. The warden may want to review it,
5 review the reports, and discuss the incident and
6 what happened, how it all played out. Yeah, it
7 would be reviewed.
8 Q. Okay. So do you remember meeting with
9 Kathy Bergeron to review video of the cellblock
10 taken on August 24th, 2012?
11 A. I don't know why I would review that with
12 the officer, uh-uh.
13 Q. Okay. You don't -- do you remember
14 specifically reviewing the video with anyone?
15 A. I remember seeing the video.
16 Q. Okay.
17 A. And I'm unsure at what point. I'm not
18 sure if it was with the warden, but I can't
19 recollect exactly how I saw it. I do remember
20 seeing the video.
21 Q. Any policies change with regard to you
22 viewing that video --
23 MR. FREDERICKS: Objection to form.

Page 37

1 Q. Any security --
2 MR. FREDERICKS: Sorry.
3 MS. DOUGLASS: It's okay. I think it was
4 a poorly worded question.
5 Q. Did any security policies change as a
6 result of you viewing that video?
7 A. As a result of me viewing the video?
8 Q. Um-hum.
9 A. Not that I can recall.
10 Q. Okay. And when we refer to the video,
11 what video do you remember seeing? Do you
12 remember a specific time period?
13 A. I don't remember a specific time period.
14 The only thing that I can remember from that video
15 is the inmate being placed back into his bunk. I
16 remember that part of the video, where he was
17 either helped or assisted into his bunk.
18 Q. Okay.
19 A. I do remember that part of the video. I
20 mean I don't -- that was a while ago. I don't
21 remember -- that's all I can remember today from
22 that video.
23 Q. Sure. Do you remember seeing video

Page 38

1  showing inmates going in and out of a cell on F
2  unit that day?
3  A.  I don't.  I don't.  I may have.  But
4  today I can't say I remember seeing something like
5  that on the video.
6  Q.  Okay.  After a serious incident occurs on
7  a unit and video is reviewed, what happens to the
8  video?  Is it preserved?
9  A.  I'm honestly not real knowledgeable on
10  that video system.  I know it's recorded on the
11  DVR.  I know it will go a period of time before it
12  gets run over.  But there's no policy or procedure
13  on the video system.
14  Q.  Okay.  That you're aware of?
15  A.  That I'm aware of.
16  Q.  Okay.  And you said that the video goes
17  a period of time before it gets run over?  Do you
18  mean --
19  A.  I can't remember.
20  Q.  Do you mean recorded over?
21  A.  Right.  Recorded over, yup.  Right.  It
22  will go -- I can't remember how many days it is,
23  and if you don't get whatever information you're

Page 39

1  looking for, you can only go back so far to
2  retrieve information from the system.  I can't
3  remember how many days that is.
4  Q.  How long would you -- do you expect
5  rounds of a unit to take?
6      MR. FREDERICKS: Objection to form.
7  A.  How long do they take?
8  Q.  Um-hum.
9  A.  I don't know.  I don't set an expectation
10  on how long the officers conduct their rounds.
11  Q.  Okay.  Well, would, you know, 30 seconds
12  be too brief?
13      MR. FREDERICKS: Objection to form.
14  A.  30 seconds?  I don't know.  To me, as a
15  chief of security, obviously I want the officers
16  in the units longer than 30 seconds.
17  Q.  Okay.
18  A.  Situations may dictate where they only
19  have time to go in and do a quick walk-through and
20  move on to something else, depending on what else
21  is going on in the prison.  So they could be
22  short, and they could be longer.  But I would love
23  for them to spend all kinds of time in the units.

Page 40

1  Q.  Okay.
2  A.  But obviously that can't happen,
3  depending on, you know, what's going on in the
4  prison at that time, so...
5  Q.  Do you know of any situations occurring
6  during first or second shift on August 24th, 2012,
7  that would have kept -- that would have pulled
8  correctional officers away from rounds?
9  A.  2012?
10  Q.  I have to ask.
11  A.  I understand.  But that's -- it's kind of
12  an unrealistic question.  I mean I can't -- I'm
13  going to say, no, I can't remember anything
14  happening in 2012 at a specific time of day.
15  Q.  Okay.  But you did meet with the warden
16  to discuss the video, right?
17      MR. FREDERICKS: Objection to form.  Go
18  ahead.
19  A.  Again, I don't recall that when we're
20  talking about the video.  I mentioned the warden
21  because at times that's usually when those things
22  happen.  The warden and I will review a serious
23  incident.  But I can't remember actually

Page 41

1  specifically sitting down with the warden.  I
2  believe it was Chris Kench at the time maybe in
3  the interim.  But I can't remember specifically
4  sitting down with, you know, him and reviewing
5  that video.  That's the only time I could think of
6  in my head where that might happen.
7  Q.  When an officer is conducting rounds, do
8  you encourage officers to switch tiers, meaning
9  encourage one officer to do lower tier on one
10  round and then the next time they perform rounds,
11  to take the top tier?
12  A.  So just so I understand, an officer does
13  a round, and they only go downstairs and then
14  leave without going upstairs?  That's an
15  expectation?  Is that what your question is?
16  Q.  Yeah.  My question is, are there any --
17  are there any protocols for conducting rounds
18  that -- for variety of you or perspective?
19  A.  Officers are trained --
20      MR. FREDERICKS: Objection to form.
21  Sorry.  Go ahead.
22  A.  Yeah.  Officers are trained to do rounds
23  and to be sporadic and unpredictable in their --

Page 42

1   and not be a routine.  So they may come in and go
2   do a round on the upstairs and then come down and
3   do downstairs and then leave, or they might come
4   in and reverse that.  They might come in and --
5   you know, whatever they can do to disrupt the
6   routine so they're not predictable.
7   Q.  Okay.  And is it usual for the same two
8   officers to conduct all the rounds during a shift?
9   A.  For the same two officers to conduct all
10  the rounds in a shift?  It might start out that
11  way that that's the expectation, but it may not
12  end up that way if there's a response or a med run
13  or somebody gets pulled.  But they start off
14  assigned to the housing unit.  There's three
15  people in the housing team.  So two of them would
16  go.  And if there's an OIC in the unit, the OIC
17  might say, okay, officer such-and-such, I'm going
18  to go do a round with you this time.  So depending
19  on how many people you assign, I think they have a
20  minimum of three on those housing units, so they
21  may rotate when they go to do the rounds.  So the
22  likelihood of all eight hours the same two
23  officers doing rounds is probably not likely to

Page 43

1   happen.
2   Q.  Okay.  Which one is more desirable in
3   your mind as a security officer; variety in rounds
4   or the same consistency, the same officers
5   performing every time?
6   A.  I really don't have a preference.
7   There's an argument for both ways.  There's an
8   argument for fresh eyes.  And the same two all the
9   time, there could be complacency.  There's always
10  an encouragement to mix it up.  So -- but there is
11  something to be said for familiarity.  If the
12  officers are doing rounds, the same two all the
13  time, maybe the last time they didn't see
14  something and they come in and see something this
15  time.  But there's an argument for both sides.  I
16  really don't have a preference to that.
17  Q.  When an officer is looking into an
18  inmate's cell conducting rounds, is he or she
19  expected to open the cell door?
20  A.  No.
21  Q.  Okay.  Is --
22  A.  On rounds you're -- sorry.  On rounds
23  you're talking about?

Page 44

1   Q.  Yes.
2   A.  No, there's not an expectation to open
3   the doors.
4   Q.  Okay.  Is there a -- is, you know,
5   walking past the cell door and, you know, just
6   glancing at a window sufficient for an officer --
7   A.  Yes.
8   Q.  -- conducting rounds?
9   A.  Sure.  Yeah.
10  Q.  Okay.  I'm going to show you some video.
11  A.  Okay.
12      MR. FREDERICKS:  Can I move this out of
13  the way?
14      MS. DOUGLASS:  Yeah.
15      MR. KING:  Before we show the video, can
16  we take a break?
17      MR. FREDERICKS:  Sure.  I mean five
18  minutes?
19      MS. DOUGLASS:  Sure.
20      MS. CUSACK:  Do you want us to step out
21  of the room?
22      MR. KING:  Yeah, please.
23      (Recess taken.)

Page 45

1   Q.  BY MS. DOUGLASS:  We're back on the
2   record.  Mr. Lambertson, the assault on Jonathan
3   Leite was a serious incident, right?
4   A.  Yes.
5   Q.  And you testified that there was a review
6   after this serious incident, correct?
7   A.  Right.
8   Q.  And who was involved in the review?
9   A.  I don't remember specifically sitting
10  with people reviewing.  So all I can tell you is
11  what routinely happens is incident reports are
12  done.  The shift commander reviews the reports.
13  They come to me.  I review the incident reports.
14      Serious things happen in the prison all
15  the time, so not to make light of this one, but
16  it's not that uncommon, because serious things
17  happen.  So you review it just like any other, and
18  Investigations takes their role with that, if
19  there's an investigation, and anything that may
20  need to get reviewed or reviewed with the warden
21  happens.
22      But I can't specifically remember sitting
23  down and doing this incident, you know,

Page 46

1 specifically in my mind. I can't recall doing it
2 or who was there. I'm sure I read the reports.
3 I'm sure I met with the warden. That's the
4 regular routine.
5 Q. So as chief security officer, you recall
6 meeting with the warden, but you don't recall
7 meeting with anybody else to review this serious
8 incident?
9     MR. FREDERICKS: Objection to form.
10 A. So what I said earlier — again, 2012,
11 ma'am, so I'd just like to remind you of that.
12 Q. Um-hum.
13 A. But all I can let you know is that -- the
14 process and that incidents like this happen quite
15 a bit. For me to sit here and have this one
16 incident so outlined in my mind, asking me that
17 today I think is pretty unfair. These incidents
18 happen, and all I can really tell you is the
19 process of the way that we review these incidents,
20 and ultimately on a serious incident is usually
21 sat down with the warden to review.
22     So do I remember specifically sitting
23 down with the warden reviewing this case? No.

Page 47

1 I'm sure I did, because that's the process. So --
2 Q. Okay.
3 A. -- did I talk with Jeff Smith during that
4 process? I can't remember a specific conversation
5 with him. But that is the process when reports
6 are reviewed.
7 Q. Okay. And who else would be included if
8 the ordinary process was being followed?
9 A. If I had any questions, I would meet with
10 the shift commander.
11 Q. Okay. And the shift commander was Jeff
12 Smith?
13 A. If that's what you're telling me that day
14 of the incident, okay.
15 Q. When you were a corrections officer
16 performing rounds, did you look in every cell?
17     MR. FREDERICKS: Objection to form. Go
18 ahead.
19 A. I don't know. That was '93 to '98 when
20 I was a correctional officer. We didn't have
21 cells at the Lakes Region facility. We had rooms
22 and dorms. So it was a lot different.
23 Q. Okay.

Page 48

1 A. It's hard to put my personal experience
2 when I never worked in Concord or Berlin as a
3 correctional officer.
4 Q. Okay. So what did -- what did you do
5 when you were conducting rounds as a correctional
6 officer?
7 A. Okay. So --
8     MR. FREDERICKS: He just explained that
9 it was a different building. Maybe you could ask
10 him what it was like there or what rounds were
11 done there. He said it was a different setup
12 without cells.
13     MS. DOUGLASS: I'd just like him to
14 describe his process in -- personally in rounding.
15 Q. What specifically did you do?
16 A. Safety and security of the building. I
17 would walk, look, observe, smell, see.
18 Q. You look -- you mentioned that the
19 inmates were housed differently where you
20 performed rounds. Can you tell us, you know, what
21 the differences were in housing?
22 A. Okay. So when I was a correctional
23 officer at the Lakes Region facility, we had

Page 49

1 buildings. There was no cells. So you would walk
2 through hallways, and there was either two, four,
3 six-man rooms and — with doors with windows. It
4 was just like a college dorm, because they were
5 all minimum security inmates there.
6 Q. Okay. So would you look into the --
7 A. Of course.
8 Q. -- inmates' room?
9 A. Yeah. But to sit here and say that I
10 looked in every single room is probably an
11 inaccurate statement.
12 Q. Okay. But did you --
13 A. The dynamics were a little different.
14 They're small buildings. You know, some buildings
15 only had, you know, 20 inmates. So I mean it's
16 really hard to compare that to the prison or
17 correctional officers, you know, in a unit of, I
18 don't know, 50 or, you know, all those cells and
19 stuff in that area. It's a little hard to
20 compare, doing rounds in a building such as that
21 versus doing rounds in a prison, but I'm not
22 really sure of that.
23 Q. But did you make an effort to look in

Page 50

1 every --
2 A. Yeah. Of course.
3 Q. -- room?
4 A. Yeah. I made a point to be observant, so
5 whether that -- I mean did I look in every single
6 room on every single round, it's hard for me to
7 say that.
8     MR. KING: I'm going to caution the two
9 of you to please let Megan finish her question
10 before you jump in with your answer, and I'm sure
11 that she will let you finish your answer before
12 you --
13     THE WITNESS: Oh, okay. I didn't realize
14 I was doing that. Yeah. Sorry about that.
15     MR. KING: Okay.
16 Q. BY MS. DOUGLASS: When you were
17 looking -- when you were a correctional officer
18 and you were looking into rooms, as you've just
19 said that you made it a point to do.
20 A. Um-hum.
21 Q. How much time did you spend looking into
22 each room?
23 A. I don't know. I don't know. It's hard

Page 51

1 to put a time on that. It could be a glance. It
2 could be I could go in the room. I mean rounds
3 are all, you know, conducted differently. Is
4 there anybody in the unit? Is it empty? Are they
5 all out? You know, I mean it's hard to say how
6 much time is spent. You know, it could be a look
7 in and a look around, you know, and it could be
8 just a glance. If there's nobody in there, I keep
9 on moving on. It's kind of hard to say how much
10 time is spent looking in.
11 Q. Have you ever been physically on F unit
12 at the Northern New Hampshire Correctional
13 Facility?
14 A. Yes.
15 Q. Okay. So do you have an understanding of
16 the dimensions of the unit, how big it is?
17 A. (Nods head affirmatively.)
18 Q. Okay. About how much time --
19     MR. KING: Could we have a verbal --
20     MR. FREDERICKS: Yeah, you have to
21 answer. You have to --
22     MS. DOUGLASS: I don't know that there
23 was a question.

Page 52

1     MR. FREDERICKS: Oh, no, I don't know if
2 she was finished.
3     MS. CUSACK: She wasn't finished her
4 question. You just cautioned them not to talk
5 over one another. She hadn't finished her
6 question, so he was waiting for her to finish.
7     MR. KING: The question was what's your
8 understanding of the dimensions of F block and --
9     THE WITNESS: I was just waiting for her
10 to finish. Yes.
11     MS. DOUGLASS: Okay.
12     MS. CUSACK: He did answer that one.
13 Q. BY MS. DOUGLASS: Have you ever walked
14 from one end to the other -- from one side of F
15 unit to the other side?
16 A. Yes.
17 Q. Okay. And about how long does it take --
18 A. I don't know.
19 Q. -- to get from one end to the other?
20 A. I have no idea. Never timed it.
21 Q. Okay. If an officer was conducting
22 rounds, how long would you expect it to take?
23     MR. FREDERICKS: Objection to form.

Page 53

1 A. I don't know. I don't know. I can't put
2 a time frame on that. I think I might have
3 mentioned that earlier. It's hard to put a time
4 frame on the expectations of the officers doing
5 the rounds and how long they do them, because of
6 it's sporadic. It's not routine. You can't put a
7 time on that. You're looking for a specific time
8 from me, and you just can't do it.
9 Q. Well, I think you mentioned that, you
10 know, you would expect an officer to spend an
11 appreciable amount of time on the unit unless
12 there's an emergency that occurs elsewhere in the
13 facility, right?
14     MR. FREDERICKS: Objection to form. Go
15 ahead. You can answer that.
16 A. Well, I would love that. I would love
17 the officers to spend as much time as they can in
18 the unit. You know, that would be ideal. But
19 that's just not reality.
20     MS. DOUGLASS: I want to show you what
21 we'll mark as Exhibit 1.
22     (Discussion off the record.)
23     (Lambertson Exhibit 1 marked

Page 54

1     for identification.)
2  Q.  Does this document look familiar to you?
3  A.  Yes.
4  Q.  All right.  Can you identify it?
5  A.  This is a briefing log.
6  Q.  Okay.  For what date?
7  A.  According to this document, it is
8     8/24/12.
9  Q.  Okay.  And what does this document say
10    about the -- about the activity occurring during
11    the shifts on 8/12 -- 8/24/2012?
12 A.  On third shift, "Quiet night."  On first
13    shift, "Quiet shift.  No moves done.  Unit shake
14    on Alpha K-2 and tobacco" was "found."
15        On second shift, "Inmate Leite 86003
16    taken to AVH, assaulted."
17        "Inmate Gelinas and" blocked out "Cell 9
18    in Fox PAR'd for assaulting Inmate Leite.  Off
19    count at this time."
20        "Key AF4 on key set #7 broke."
21 Q.  So for the first and second shifts it's
22    noted that things were quiet, right?
23 A.  Yes.

Page 55

1  Q.  So there were no emergencies occurring
2     during first or second shift on 8/24, --
3        MR. FREDERICKS: Objection to form.
4  Q.  -- 2012?
5        MR. FREDERICKS: I'm sorry.
6  A.  According to this, yes.
7  Q.  Okay.  So you would expect a correctional
8     officer to have plenty of time to conduct rounds
9     on this day or during those two shifts, right,
10    first and second shift?
11 A.  Not necessarily.  So this document is
12    not going to dictate everything that happens on a
13    shift.  You're using a general document here
14    that --
15 Q.  Okay.
16 A.  You know, so it's -- all the activities
17    that go on within the prison is not going to go on
18    here.
19 Q.  Okay.  Well, I'll show you another
20    document.
21        MS. DOUGLASS: We'll mark this one as
22    Exhibit 2.
23        (Discussion off the record.)

Page 56

1     (Lambertson Exhibit 2 marked
2     for identification.)
3  Q.  So do you recognize this document?
4  A.  Yes.
5  Q.  Okay.  What is it?
6  A.  Upper Housing, Echo, Fox, Golf, Hotel and
7     Industries Shift Log.
8  Q.  And what is a shift log designed to do?
9  A.  It documents activities that happens
10    during the shift.
11 Q.  Do you see the code 10-79 there?
12 A.  Yes, in a few places.
13 Q.  Okay.  And can you tell us where you see
14    10-79?
15 A.  0015, 0125, 0330, 0510, 0630, 1545, 1650,
16    1805 and 1900.
17 Q.  And 10-79 is code for "all clear," right?
18 A.  I believe so.
19 Q.  You supervise correctional officers in,
20    you know, completing these documents, do you not?
21 A.  So I do not supervise these documents,
22    no.
23 Q.  Okay.  You supervise the shift commander?

Page 57

1  A.  Correct.
2  Q.  Who in turn supervises correctional
3     officers in completing these documents?
4  A.  Correct.
5  Q.  Okay.  But you have no -- no
6     understanding that 10-79 means "all clear"?
7        MR. FREDERICKS: Objection to form.
8  A.  I don't know the specific wording on
9     10-79, but usually it means everything's okay, all
10    clear, yes, something to that effect.
11 Q.  Okay.
12 A.  I don't know the specific wording.
13 Q.  Okay.  So in multiple places on
14    8/24/2012 --
15 A.  Yup.
16 Q.  -- things are noted as being all clear?
17 A.  Yes.
18 Q.  Or everything fine, as you put it?
19 A.  Correct.
20 Q.  So there was no emergency on 8/24/2012
21    that would have detracted from rounds, right?
22 A.  It doesn't have to be an emergency that
23    takes away from the rounds.  I think that's the

Page 58

1  point we're missing here. It doesn't have to be
2  an emergency to take away from the round. There's
3  other activities that happen within the prison.
4  An officer might get pulled to go do a transport
5  or they may need assistance down at the canteen
6  line because there's too many inmates down there,
7  or at med call there's too many people or, you
8  know, they ask for assistance in the yard patting
9  out inmates. So it doesn't have to be an
10  emergency to take away from the activities of the
11  prison and how busy it is.
12  Q. What is an officer's primary
13  responsibility? Is it to monitor activity on the
14  unit or is it to perform other functions?
15      MR. FREDERICKS: Objection to form. Go
16  ahead.
17  A. All of the above. That's what a
18  correctional officer does. They work the prison
19  and whatever is asked of them to do, so whether
20  it's doing rounds on a unit, it's doing cell
21  shakes, it's covering the med line, it's going out
22  to the yard to help with pat shakes. They're an
23  officer in the correctional facility. So when

Page 59

1  there's only so many officers to go around and
2  there's so many things that are happening within
3  that prison, that officers get pulled and they get
4  used, and there's different things that happen
5  that, you know, warrant supervision in other
6  places. It's not that cookie-cutter.
7  Q. You're not aware of any situation,
8  emergency or non-emergency, on 8/24/2012 which
9  would have caused Kathy Bergeron and Trevor Dube
10  to rush through rounds that day?
11  A. I'm not aware of anything like that, no.
12  Q. I want to return to the topic of
13  cell-hopping again. If a CO has been doing rounds
14  in a cellblock for, say, a week and a certain
15  inmate has been assigned to a bunk in the dayroom
16  for the entire week and the inmate -- and that
17  inmate is in another inmate's cell during rounds,
18  these facts should lead the CO to conclude that
19  cell-hopping is going on, right?
20      MR. FREDERICKS: Objection to form. Go
21  ahead.
22  A. Not necessarily.
23  Q. So if a CO has been doing rounds for a

Page 60

1  week in a particular unit and a certain inmate has
2  been assigned to a particular bunk --
3  A. Okay.
4  Q. -- for that entire week, you wouldn't
5  expect a CO to note or recall or remember where
6  that inmate was assigned?
7  A. It would be great if they could. I want
8  them to know every inmate and where they live and
9  every bunk that they live in, and that would be
10  great. But that's just a high expectation for
11  these officers. You know, they should be familiar
12  with the units. But to sit there and say, you
13  know, to know every inmate and what bunk that they
14  live in and, you know, where they live, I mean
15  familiarity is one thing, but to know, you know,
16  that face to the rack, and who's to say that
17  officer's been working there for a week? That's
18  not a guarantee.
19  Q. Well, in the question, the question is
20  if a CO has been working in a particular unit for
21  a week.
22  A. Okay.
23  Q. And the inmate has been assigned to a

Page 61

1  particular place for a week. Wouldn't you expect
2  the CO to remember where the inmate is assigned?
3  A. But are we -- is this the facts of the
4  incident, or are we talking about a what-if
5  scenario? Because it's if a what-if scenario, the
6  likelihood of an officer walking -- working, it's
7  hard to -- I mean if you're telling me that's the
8  facts of the incident and you had an officer in
9  there every day, every shift, and walking through
10  to that point, still the point of would I expect
11  them to be able to walk in -- if it's an officer,
12  been working there every day, walking through, and
13  the first thing they see is the first top bunk and
14  they know that it's, you know, a specific inmate
15  in there and then they walk in and then they look
16  and they see that inmate in another cell, then,
17  yes, I would expect them to say you're cell-
18  hopping.
19  Q. Did you receive training in doing rounds
20  specifically?
21  A. Me specifically?
22  Q. Um-hum. In doing rounds. Did you
23  specifically receive training in doing rounds

1 specifically?
2 A. I was assigned to a field training
3 officer who showed me how to do rounds, yes.
4 Q. Okay. When?
5 A. 1993 when I started.
6 Q. Do you recall the name of that field
7 training officer?
8 A. I think we had a couple back then. I
9 believe it was Officer John Bolla. And there was
10 another officer, John Pinker, and it was one of
11 those, I'm sure.
12 Q. Did you receive any documents related to
13 rounding as part of your training?
14 A. No, not back then. I think the field
15 training officer program nowadays is more detailed
16 specific, but back then it was here you are and
17 here's your officer. And I don't even think they
18 called them field training officers back then. I
19 think it was the officer you were assigned to that
20 day, and they were expected to show you what to
21 do. So there was nothing formal in place at all,
22 not compared to the way they do it today.
23 Q. Were there rounds-specific PPDs or policy

1 documents in existence in August of 2012?
2 A. PPDs on doing rounds?
3 Q. Um-hum.
4 A. There is a policy on rounds and counts,
5 yup.
6 Q. There is?
7 A. Yes.
8 Q. Do you recall the numbers?
9 A. Oh, God. I don't. But if you search it
10 on the DOC website, you could probably find out
11 what policy it is. But there is safety/
12 sanitation rounds, and there's a — I believe it's
13 in Chapter 5 that covers rounds and counts for
14 correctional officers. I don't know the number
15 specifically.
16 Q. Have you ever participated in training
17 correctional officers in doing rounds?
18 A. Have I been involved with the officer
19 training?
20 Q. Have you trained other officers?
21 A. No.
22 Q. As chief of security on August 24th,
23 2012, what exactly were your responsibilities

1 related to keeping Northern New Hampshire
2 Correctional Facility safe?
3 MR. FREDERICKS: Objection to form.
4 A. So, I'm sorry, could you repeat that
5 again?
6 Q. Sure. As chief of security, on August
7 24th, 2012, what exactly were your
8 responsibilities related to keeping Northern New
9 Hampshire Correctional Facility safe?
10 MR. FREDERICKS: Objection again.
11 A. So my normal routine is to come in and --
12 I don't know the details of that day, if there was
13 meetings or whatever. But a regular routine is to
14 come in and read e-mails and review incidents from
15 the last 24 hours, meet with the shift commanders,
16 check on the overtime, review staffing numbers.
17 That really kind of sets up my morning. And then
18 from there, the rest of the day dictates,
19 depending if there's any meetings or anything
20 that's been pending or inmate request slips would
21 get addressed, so...
22 Q. Anything else?
23 A. Pretty much all my duties I explained in

1 the beginning all encompasses my job. So, you
2 know, not to say those all happen in one day, but,
3 you know, those are all part of my job. So I
4 don't know on that day if something else came up
5 that led me to do something else, but...
6 Q. Did you take any steps to preserve the
7 video evidence of August 24th, 2012?
8 A. No.
9 Q. No?
10 A. No.
11 Q. This was a serious incident, right?
12 A. Yes.
13 Q. You testified this was a serious
14 incident?
15 A. Yes.
16 Q. So you didn't think it was important to
17 preserve the video?
18 MR. FREDERICKS: Objection to form. Go
19 ahead.
20 A. It's not my job to preserve the video.
21 So when I review the reports and it's written on
22 there that, you know, the video was forwarded to
23 Investigations or, you know, the process that the

1  shift commander follows with the video, then
2  that's what happened, so...
3  Q.  Whose job is it to preserve the video?
4  A.  Whose job is it to preserve the video?
5  So there's no policy or procedure on the process
6  for preserving the video.  So in a case where
7  there's a serious incident like this, the shift
8  commander would review the video, and then that
9  video gets -- and honestly, I'm not even sure how
10  it gets to Investigations, whether it's downloaded
11  and forwarded or there's an e-mail to
12  Investigations to say, you know, this block of
13  time on the video is the time for the incident.  I
14  can't remember specifically.  I'm not sure how
15  that actually goes to them for review.
16  Q.  So it's the shift commander's
17  responsibility --
18  A.  Yes.
19  Q.  -- to preserve the video?
20  A.  If there's an incident on the shift, the
21  shift commander is responsible for all evidence
22  and for any incident.  So whether it's a bloody
23  inmate sock or if -- anything related like that,

1  it's the shift commander's responsibility to make
2  sure that stuff is secured, yes.
3  Q.  Isn't it your responsibility to supervise
4  the shift commander?
5  A.  Yes.
6  Q.  Okay.  So ultimately, isn't it your
7  responsibility to preserve the video if the shift
8  commander does not?
9  A.  If the shift commander doesn't secure it?
10  Q.  Right.  Isn't it ultimately your
11  responsibility?  If you supervise the shift
12  commander.
13  A.  Okay.
14  Q.  And the shift commander doesn't do his
15  job in preserving the video, isn't that ultimately
16  your failure in supervision?
17  A.  So if I observe -- if I read in the
18  report that there was a serious incident that
19  happened and there's no mention in there anywhere
20  of a video or a video whatsoever, yes, it's my job
21  to go back to the shift commander and say, where's
22  the video?  Was there video?  Was there any video
23  reviewed?  Was there any video taken?  Does

1  Investigations know?  All to those things.
2  So, you know, yes, I would question if
3  there was an incident and there was no video, and
4  I would go back to the shift commander and say,
5  where's the video?  Oh, I forwarded it to
6  Investigations.  Why is that not in your report?
7  Oh, I forgot to put it.  That could be a scenario
8  also.
9  Q.  Right.  So it was your job to ensure that
10  the video was preserved then?
11  MR. FREDERICKS:  Objection to form.  Go
12  ahead.
13  A.  So -- so ultimately, the review of the
14  incident and if there was a video and it was not
15  secured, then, yes, I would go back to say,
16  where's the video, where's the footage and, you
17  know, what happened?
18  Q.  Okay.
19  A.  So, yeah, my follow-up to that would be.
20  But if I see in the report that the video was
21  provided to Investigations, I don't go back to
22  make sure that every little step to that was
23  followed.  So I take it at the shift commander's,

1  you know, writing that he forwarded that video to
2  the Investigations and we're moving on.  Okay.
3  Good.  The video went to Investigations.  That's
4  great.  If there was one available.
5  Q.  And after the video is transferred to the
6  investigator, you're hands off in terms of video?
7  A.  Yeah.  Yup.
8  Q.  Are you aware of what training
9  correctional officers working at New Hampshire --
10  Northern New Hampshire Correctional Facility on
11  August 24th, 2012, received in doing rounds?
12  A.  The training that they received in doing
13  rounds?
14  Q.  Um-hum.
15  A.  Not to my knowledge.  If they received
16  any training, I don't know what training that
17  would be.  I wouldn't be aware of it.  If there
18  was a trainee on that day assigned to a field
19  training officer and then they got trained, then
20  that would be that scenario.  So I don't know of
21  any regularly badged officers that received
22  training on rounds that day or any other day after
23  their appeal program or...

Page 70

1  Q.  So you don't know -- the question was,
2  what training had Correctional Officers Trevor
3  Dube and Kathy Bergeron received, you know, prior
4  to doing -- in regard to performing rounds prior
5  to performing rounds on August 24th, 2012?
6      MR. FREDERICKS: Objection to form.
7  A.  So correctional officers go through the
8  correctional academy, and then they're assigned to
9  a field training officer who trains them on all --
10  whatever policy the training department has set up
11  for new officers to receive for training.  So that
12  would be the field training officer's
13  responsibility if they went through an FTO
14  program.  I don't know if they did or not.  I can
15  only assume that they did, but...
16  Q.  Are you aware of any documents related
17  to round training for Officers Kathy Bergeron and
18  Trevor Dube?
19  A.  No, I don't know.
20  Q.  You mentioned before that incidents such
21  as the one that happened -- assaults such as the
22  one that happened upon Jonathan Leite are not that
23  uncommon.  What other incidents happened during

Page 71

1  your tenure as chief of security?
2      MR. FREDERICKS: Objection to form.
3  Q.  Do you recall?
4  A.  I don't know.  There's things that happen
5  in prisons all the time.  I don't know specific
6  incidents.  We can go through the disciplinary log
7  for the prison and we can easily get that
8  information of all the incidents that happened
9  within the prison, if there's fights, assaults,
10  tattooing, rapes.  I'm sure things like that have
11  happened, but I don't know off the top of my head
12  without, you know, looking at a disciplinary log
13  or something like that of the history from 2012 to
14  2015 of all the incidents that happened, but I'm
15  sure there were some serious ones.
16  Q.  Do you recall any that resulted in a
17  permanently disabling traumatic brain injury?
18  A.  Boy, nothing like that jumps out at me.
19  Q.  I believe you mentioned this earlier.
20  In case you didn't, do you recall the name of the
21  warden on August 24th, 2012?
22  A.  During that time I believe it was Interim
23  Warden Christopher Kench, who was the director of

Page 72

1  security and training for the department, but I
2  believe he was the interim at that time.
3  Q.  Do you know where Mr. Kench works now?
4  A.  Last I knew when I retired in 2015, he
5  was still the director of security and training at
6  headquarters on Pleasant Street in Concord, DOC
7  headquarters, fourth floor.
8      MS. DOUGLASS: Okay.  Want to take
9  another quick break?
10     MR. KING: Sure.
11     (Recess taken.)
12  Q.  So we're back on the record.  Mr.
13  Lambertson, I'm going to show you a bit of video
14  and I want --
15  A.  Okay.
16  Q.  -- you to watch it and I'll ask you
17  questions about it.  I'm going to have to -- so
18  for the record, we're watching video date stamped
19  8/24/2012, time stamped 15:40:19.  Channel 29 is
20  the camera angle.  And, Mr. Lambertson, do you
21  recognize the area shown in this videotape?
22  A.  That looks like one of the units.  I'm
23  not sure which one it is.  But it's a housing unit

Page 73

1  at NCF.  That's what they look like, yup.
2  Q.  Okay.  And for the record, we're
3  beginning the video at 15:40:19.
4      (Video played.)
5  Q.  We're pausing the video at 15:41:06.
6      So in viewing that video clip, Mr.
7  Lambertson, is there anything about it that gives
8  you concern as a chief security officer?
9  A.  I don't like the way the inmate stood in
10  the way of the officer when she was walking down
11  the floor, almost kind of challenging her.  But
12  other than that, --
13  Q.  But did the --
14  A.  -- nothing else stood out to me, no.
15  Q.  Yup.  Did the officer to your mind
16  address that behavior appropriately?
17  A.  The inmate stepped back, so I don't know
18  what was said or if that was by the inmate or if
19  the officer said anything to the inmate.  I don't
20  know.  The inmate stepped back.  So whether it was
21  on his own or by her, then I'm not sure.
22  Q.  Okay.  Focusing on that inmate -- that
23  officer on the lower tier --

1   A.  Um-hum.
2   Q.  -- walking towards the camera in the
3   footage, did anything about the way in which she
4   moved through the space concern you at all?
5   A.  Well, I only saw the small --
6   Q.  Would you like to watch it again?
7   A.  I can, yeah.  I only saw the small clip
8   where she came past the staircase, so...
9       MR. FREDERICKS:  Are you asking him to
10  focus on her?
11      MS. DOUGLASS:  Yes.
12      THE WITNESS:  Okay.  All right.
13  Q.  Okay.  So I'm beginning the tape again at
14      15:40:01.
15      (Video played.)
16  Q.  About how long did that -- did it take
17  for that correctional officer walking toward us on
18  the lower tier of the unit, about how long did it
19  take for her to walk past the row of cells on the
20  left side of the unit?
21  A.  I didn't watch the meter.  I'm not sure
22  how long that took.
23  Q.  Okay.  Well, we started at 15:40.

1   A.  Okay.
2   Q.  And it's now 15:41:06.
3   A.  Okay.
4   Q.  So the difference would be?
5   A.  A minute and six seconds.
6   Q.  Right.
7   A.  Okay.
8   Q.  Is that sufficient time, do you think as
9   a chief security officer, for that correctional
10  officer to assess the safety and/or suspicious
11  activity on the unit?
12      MR. FREDERICKS:  Objection to form.  Go
13  ahead.
14  A.  So the unit looks pretty empty.  Now, by
15  her walking down through there, I don't know where
16  all the inmates are.  So, you know, I didn't see
17  anything wrong with the way she did the round.
18  Q.  Did you see her look into the cells?
19  Would you like to look at it again?
20  A.  Sure.
21  Q.  And we're beginning the video at
22      15:40:15, which is prior to when the officers
23  entered the unit.

1       (Video played.)
2   Q.  I'm going to pause the video at 15:40:21,
3   which is where the officers entered the unit from
4   a door in the rear of the unit.
5       I'm going to continue the footage.
6       (Video played.)
7   Q.  Okay.  Did you note the officer looking
8   into any of the cells?
9   A.  There's no way of telling if the officer
10  looked into that cell or not, any of those cells.
11  The mezzanine is blocking her head half the way.
12  I can't see what she's looking at or doing.  We
13  don't know what she did down there on that end
14  (indicating), if she looked in any cells or not.
15  So it's hard to say if -- I can't answer that yes
16  or no, because her head's blocked off through most
17  of the mezzanine.  I've watched it three times.
18  It's hard to -- you can't tell if she's looking in
19  those cells or not.
20      MR. FREDERICKS:  Can we know what time
21  it's paused, just for the record?
22      MS. DOUGLASS:  Yup.  For the record, we
23  paused at 15:41:04.

1   Q.  I'd like to take you back to where we
2   can see the correctional officer come out from
3   under the --
4   A.  Okay.
5   Q.  -- stairway here.  I'm rewinding the
6   video.  I'm going to play the video until we can
7   get to that point and then freeze it --
8   A.  Okay.
9   Q.  -- for the record.
10      (Video played.)
11  Q.  So I've stopped the video at 15:40:47.
12  And, Mr. Lambertson, can you see the correctional
13  officer just peeking out --
14  A.  Yeah.
15  Q.  -- from behind the --
16  A.  I see her pants, yup.
17  Q.  -- the stairway?
18  A.  Yup.  Yeah, it looks like her.  Yup.
19      MR. FREDERICKS:  Let her finish the
20  question.
21      THE WITNESS:  Oh.
22      MR. FREDERICKS:  Just wait.  If it
23  overlaps, it's confusing on the record.

Page 78

1    THE WITNESS: Yeah.
2  Q.  BY MS. DOUGLASS: And about how many --
3    or how many cells do you see along the left side
4    of the unit there that she's about to walk past?
5  A.  I'm guessing three.
6  Q.  Are each of those -- do each of these
7    (indicating) green or dark-colored marks here
8    represent cell doors?
9  A.  I guess they do.  Okay.  I thought they
10   were towels hanging down.  Okay.  So two, four --
11   looks like four.
12 Q.  And back here (indicating) where her
13   pants are, there's two more, right?
14 A.  Oh, okay.  Yup.  Six.
15 Q.  That's six?
16 A.  If you count those, yeah.
17 Q.  Okay.  Well, she has to count those,
18   doesn't she?  That's her job?
19 A.  Counting doors?
20 Q.  Well, she has to address those doors,
21   does she not?
22    MR. FREDERICKS: Objection to form.  Go
23   ahead.

Page 79

1  A.  She's walking by the doors, yes.
2  Q.  Okay.  I believe you said that you
3    testified that she has to look into those doors,
4    right?  Right?
5  A.  If she's doing a round and walking down
6    there, she should be looking in the cell, sure.
7    But there may be a reason why she doesn't.  What
8    if they guys slammed something down on the table
9    as she's walking by and then she notices something
10   happening over here (indicating)?  Is she going to
11   go back and look in that cell?  No.  So there
12   could be reasons why she's not.  Ideally, yes,
13   walk by, look in every cell.  But human nature,
14   working in a prison, rounds, something happening
15   over here, she may not -- they may say something
16   to her to distract her to keep her from looking in
17   the cell.  There's all kinds of variables to that.
18   It's not that black and white and concrete.
19 Q.  You've watched the video multiple times
20   now?
21 A.  Yes.
22 Q.  It's a short clip.  Did you see any
23   activity in this front table area that, you know,

Page 80

1    would cause alarm?
2    MR. FREDERICKS: Objection to form.
3  A.  Can't tell.  You can't tell that.
4    MR. FREDERICKS: I just want to let the
5    record reflect that the questions had him focusing
6    on the female officer on the first floor.
7    MS. DOUGLASS: Well, we can focus --
8    MR. FREDERICKS: You can watch it again.
9  Q.  BY MS. DOUGLASS: You can watch it again.
10   Now I'd ask you -- rewinding the video back to
11   15:40:01, and ask you to focus on this front table
12   area of the video.
13   (Video played.)
14 Q.  Okay.  Stopping the video at 15:41:05
15   where the correctional officer on the lower tier
16   of F unit has walked off screen.
17   Mr. Lambertson, did you notice any
18   activity occurring amongst the inmates at this
19   front table that should -- could have distracted
20   the officer who walked off screen?
21 A.  Yup.  I see a lot of things there.  I see
22   body language.  We don't know they're verbalizing.
23   What are they saying?  They're playing cards.

Page 81

1    They could have bet slips on the table.  I can't
2    tell from here.  But, yeah, I see things there
3    that could definitely be suspicious.  You know, as
4    well as other parts of the -- you know, we don't
5    know what's over here (indicating).  Are there
6    inmates over there?  You know, what are these
7    inmates doing sitting at the table, so...
8  Q.  If there was a suspicious activity there,
9    you would expect the officer to go over to the
10   inmates and address the situation, would you not?
11 A.  If she heard something or -- you know,
12   not necessarily run right over there.  Maybe she's
13   observing or looked over.  I mean I don't know.  I
14   mean there's --
15 Q.  So as a chief security officer, is it
16   acceptable for you to -- for an officer to
17   potentially view suspicious activity and walk away
18   from it?
19    MR. FREDERICKS: Objection to form.
20 A.  So the officers are observing everything
21   in the environment.  Everything is suspicious when
22   it comes to inmates.  Everything.  So officers are
23   not running up to inmates all day long making --

Page 82

1 you know, checking, you know, every little thing.
2 So everything is suspicious. The officer's job is
3 to take in that environment and to observe
4 everything. Inmates are doing suspicious things
5 all day. So, you know, who knows? Are they
6 gambling right there? If they are, then she's
7 making a note of that. Maybe when she's done
8 walking down, does she come back there? I don't
9 know. We're doing a lot of speculating, a lot of
10 what-ifs here, which, you know --
11 Q. We can watch the remainder of the tape.
12 We'll see if she comes back.
13  (Video played.)
14 Q. I began the tape at 15:41:11,
15 approximately.
16  I'm going to stop the tape at 15:43:33.
17 It's been about three minutes since she walked off
18 camera, approximately.
19  If there was an incident or a suspicious
20 activity that required -- if there was suspicious
21 activity, would you expect the correctional
22 officer to return at this point?
23 A. Not necessarily.

Page 83

1 Q. No?
2 A. (Shakes head negatively.)
3 Q. So you wouldn't expect an officer to
4 address suspicious activity in person on the unit?
5  MR. FREDERICKS: Objection to form.
6 A. I didn't say she wasn't addressing it.
7 I'm saying that she made observations, whether it
8 was something that was said, something she
9 observed. Maybe she's going to document it,
10 report something that was said to Investigations.
11 I don't know.
12 Q. Well, if she saw suspicious activity at
13 this front table, in what amount of time would you
14 expect her to return to address it?
15  MR. FREDERICKS: Objection to form.
16 Q. You can -- you can answer.
17 A. Could you repeat the question? I'm a
18 little distracted.
19  MR. FREDERICKS: I didn't hear the
20 question.
21 Q. If she saw suspicious activity at that
22 front table, in what amount of time would you --
23 within what amount of time would you expect her to

Page 84

1 return?
2  MR. FREDERICKS: Objection to form.
3 A. So sometimes suspicious activity doesn't
4 determine a confrontation with the inmate.
5 Q. And you remember looking at Exhibit 1 and
6 Exhibit 2, which stated that the unit was quiet
7 and all clear, right?
8 A. Yes.
9 Q. And wouldn't suspicious activity or
10 causes for concern be documented here?
11 A. Well, like I told you, there's suspicious
12 activity in a prison all day long. Inmates (sic)
13 aren't going to write down, you know, one sock up,
14 one sock down that they observed on an inmate. A
15 gang sign, they're not going to put that in their
16 report, in their activity log.
17 Q. Okay. So you don't -- all inmate
18 activity is suspicious activity --
19 A. Yes.
20 Q. -- which doesn't -- and so there's no --
21 no distinguishing between certain inmate
22 behaviors? They're all causes for equal -- equal
23 amounts of vigilance?

Page 85

1  MR. FREDERICKS: Objection to form.
2 A. I don't understand what you just asked
3 me. I'm sorry. That was very wordy.
4 Q. You said when -- Officer Bergeron
5 admitted in her testimony that she walked past
6 seven to nine cells in a matter of 36 seconds.
7 That's not sufficient time to look in each cell
8 and assess activity therein, is it?
9 A. Well, as I said on the record before, I
10 didn't have an issue with her doing the round.
11 If -- you know, the unit looks pretty empty. She
12 walked down through there. You know, her
13 statement is her statement. She's observing that
14 unit as she's walking through there. So again, as
15 I stated earlier, I don't have an issue with the
16 way she conducted her round.
17  MS. DOUGLASS: Okay. Nothing further.
18  MR. FREDERICKS: There's no further
19 questions at all?
20  MS. DOUGLASS: No.
21  EXAMINATION
22 BY MR. FREDERICKS:
23 Q. Picture that video in your head briefly.

1   There was one question that was asked that I don't
2   think you ever actually answered, and it was could
3   you in fact tell if --
4       **MS. CUSACK:** You can sit back down.
5       **MR. KING:** I'll stay here. That's all
6   right.
7       **MS. CUSACK:** I'm sorry.
8   Q. BY MR. FREDERICKS: I'm going to start
9   that one over.
10      Watching the video, there was a question
11  that was posed to you that I don't think you ever
12  finished answering and it was, could you in fact
13  tell if the female officer walking through the
14  lower level of the unit did in fact look in the
15  cells on the left-hand side of the screen?
16  **A. I couldn't tell if she looked into every**
17  **cell by watching that video.**
18  Q. Was the female officer running through
19  the unit in the video that we just watched?
20  **A. It didn't appear to be, no.**
21  Q. During a round in a housing unit such as
22  those in the Northern Correctional Facility in
23  Berlin, if an officer's walking past cells and an

1   inmate is in a bunk not facing the officer, must
2   the officer identify the inmate?
3   **A. No.**
4   Q. When do officers identify inmates?
5   **A. During count.**
6   Q. If a cell appears empty, how much time
7   does it take to look into it --
8       **MS. DOUGLASS:** Objection.
9   Q. -- on a round?
10  **A. A second.**
11      **MR. FREDERICKS:** Nothing else.
12      (Deposition concluded at 11:28 a.m.)
13
14
15
16
17
18
19
20
21
22
23

1       CERTIFICATE OF WITNESS
2
3   I, Scott Lambertson, have read the foregoing
4   transcript of deposition taken on Friday,
5   September 15, 2017, at NH State Prison for Men,
6   Concord, New Hampshire, and do hereby swear/affirm
7   it is an accurate and complete record of my
8   testimony given under oath in the matter of Leite
9   v. Goulet, et al., including any and all
10  corrections that may appear on those pages denoted
11  as "Corrections."
12
13      _____
14      Scott Lambertson
15  STATE OF _____
16  COUNTY OF _____
17
18  Subscribed and sworn to before me this _____ day
19  of _____, 2017.
20
21      _____
22  Notary Public_____J.P._____
23  My Commission Expires:_____

1       CORRECTION AND SIGNATURE PAGE
2   **DEPOSITION:** Scott Lambertson
3   **DATE OF DEPOSITION:** September 15, 2017
4   PAGE LINE    NOW READS        SHOULD READ
5   ___  ___  _____  _____
6   ___  ___  _____  _____
7   ___  ___  _____  _____
8   ___  ___  _____  _____
9   ___  ___  _____  _____
10  ___  ___  _____  _____
11  ___  ___  _____  _____
12  ___  ___  _____  _____
13  ___  ___  _____  _____
14  ___  ___  _____  _____
15  ___  ___  _____  _____
16  ___  ___  _____  _____
17  ___  ___  _____  _____
18  ___  ___  _____  _____
19
20  Dated this _____ day of _____, 2017.
21
22      _____
23      Scott Lambertson

```
 1              C E R T I F I C A T E
 2        I, Celeste A. Quimby, a Licensed Court
 3   Reporter of the State of New Hampshire, do hereby
 4   certify that the foregoing is a true and accurate
 5   transcript of my stenographic notes of the
 6   deposition of Scott Lambertson, who was first duly
 7   sworn, taken at the place and on the date
 8   hereinbefore set forth.
 9        I further certify that I am neither attorney
10   nor counsel for, nor related to or employed by any
11   of the parties to the action in which this
12   deposition was taken, and further that I am not a
13   relative or employee of any attorney or counsel
14   employed in this case, nor am I financially
15   interested in this action.
16        THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
17   DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
18   ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
19   DIRECTION OF THE CERTIFYING REPORTER.
20
21
22
23            CELESTE A. QUIMBY, LCR No. 17
```