Volume: 1
Pages: 1-33
Exhibits: None

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Case No. 15-CV-00280-PB

- - - - - - - - - - - - - - - - - - - - - - - - x

JONATHAN LEITE,

            Plaintiff,

   v.

MATTHEW GOULET, et al.,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF EJIKE ESOBE

September 20, 2017

10:23 a.m. to 11:05 a.m.

NORTHERN NH CORRECTIONAL FACILITY

138 East Milan Road

Berlin, New Hampshire

Reporter: Celeste A. Quimby, LCR No. 17

Page 2

1  I N D E X
2
3  WITNESS:    Ejike Esobe
4
5  EXAMINATION:                                Page
6            By Mr. King                          4
7
8
9
10
11 EXHIBITS FOR IDENTIFICATION:
12            None.
13

Page 3

1  A P P E A R A N C E S
2  For the Plaintiff:
3         DOUGLAS, LEONARD & GARVEY, P.C.
          By: Benjamin T. King, Esq.
4             Megan E. Douglass, Esq.
          14 South Street, Suite 5
5         Concord, NH   03301
          (603) 224-1988
6         benjamin@nhlawoffice.com
          mdouglass@nhlawoffice.com
7
   For the Defendants:
8
          NEW HAMPSHIRE DEPARTMENT OF JUSTICE
9         OFFICE OF THE ATTORNEY GENERAL
          By: Lynmarie C. Cusack, Esq.
10            Francis X. Fredericks Jr., Esq.
          33 Capitol Street
11        Concord, NH   03301
          (603) 271-3658
12        lynmarie.cusack@doj.nh.gov
          francis.fredericksjr@doj.nh.gov
13
14                  STIPULATIONS
15       It is agreed that the deposition shall be
16 taken in the first instance in stenotype and when
   transcribed may be used for all purposes for which
17 depositions are competent under the Federal Rules
   of Civil Procedure.
18
        Notice, filing, caption, and all other
19 formalities are waived.  All objections except as
   to form are reserved until the time of trial.
20
        It is further agreed that if the deposition
21 is not signed within thirty (30) days after
   submission to counsel, the signature of the
22 deponent is waived.
23

Page 4

1  EJIKE ESOBE
2  having been duly sworn by the reporter,
3  was deposed and testified as follows:
4  EXAMINATION
5  BY MR. KING:
6  Q.  Okay.  Please state your name for the
7  record.
8  A.  My name is Mr. Ejike Esobe.
9  Q.  And who is your current employer?
10 A.  Now?
11 Q.  Yes.
12 A.  Well, I have my own business.  I do
13 vacation rentals.
14 Q.  For a period of time were you employed at
15 the Northern New Hampshire Correctional Facility?
16 A.  For a period of what?
17 Q.  Time.
18 A.  That is less than a year.
19 Q.  When were you employed at the Northern
20 New Hampshire Correctional Facility?
21 A.  2012, if I remember.  I don't remember
22 everything.  It's been a long time.  I --
23 sometimes I need papers to remember.  So for I

Page 5

1  think 2012.
2  Q.  Have you ever worked at any other
3  correctional facility?
4  A.  No.
5  Q.  When you began working at the Northern
6  New Hampshire Correctional Facility, what was your
7  title?
8  A.  Correctional officer.
9  Q.  Do you remember to whom you reported?
10 A.  No, I don't remember people's names.
11 It's been a very long time, so...
12 Q.  Did you receive any training in
13 performing correctional officer duties?
14 A.  Yes.
15 Q.  Where did you receive that training?
16 A.  Concord, and I received a little bit of
17 training here before getting training in Concord.
18 Q.  Did you attend something called a
19 corrections academy in Concord?
20 A.  Yes, that's what -- the one I'm talking
21 about, the academy.
22 Q.  Do you remember when you attended the
23 academy?

## Page 6

1  A. Can't. Not good with dates because it's
2  very, very -- it's been a long time.
3  Q. Certainly.
4  A. But, yeah, it's 2012.
5  Q. For how long did you attend corrections
6  academy?
7  A. Nine weeks.
8  Q. Nine weeks?
9  A. Sure.
10 Q. When you attended corrections academy,
11 did you receive any training on doing rounds?
12 A. Yes.
13 Q. Tell me what you recall of the training
14 that you received in doing rounds.
15 A. When I started, I started with following
16 an officer here that showed me how to do it. I
17 asked questions as well. And we look out for
18 something that is not supposed to be there. Maybe
19 if we can see blood droppings or anything that is
20 wrong, then we can take care of it. It's usually
21 short rounds. There's no -- you know.
22 Q. I'm sorry, I missed what you said.
23 Usually what?

## Page 7

1  A. Short rounds, like is the rounds like we
2  go every day, every -- every one hour or
3  something. I don't know how -- it might have
4  changed now. But we do it every one hour, is
5  like, yeah, we do a round, yes. That's what we do
6  for rounds.
7  Q. Okay.
8  A. It's kind of like patrol.
9  Q. When you received training in doing
10 rounds, did you learn that while doing rounds you
11 should look in every single cell?
12 A. We do that as well. I might not remember
13 all of it now because I'm not in that field now.
14 But, yeah, it comes to me, you know, as we go
15 as -- if I -- yeah, if somebody can mention it,
16 then I will remember, yeah.
17 Q. When you attended the corrections
18 academy, Mr. Esobe, were you provided any written
19 materials as part of your training?
20 A. In the academy?
21 Q. Yes.
22 A. Yes. We had written materials and
23 everything. Walked right in. I received the

## Page 8

1  whole training as a correctional officer.
2  Q. Now, when you were employed as a
3  corrections officer here at the Northern New
4  Hampshire Corrections Facility, did you do rounds
5  as part of your job duties?
6  A. Yes, just for a very short time because
7  I stayed here -- I worked here for like less than
8  a year. Perhaps most of the time I followed some
9  officers, so I was learning how to do it.
10 Q. In the blocks in which you did rounds,
11 some inmates were assigned to cells and some
12 inmates were assigned to bunks in the dayroom; is
13 that correct?
14 A. Yeah, that's correct.
15 Q. When you were doing rounds during the
16 day, would you check the bunks in the dayroom?
17 A. Yes, we do look into the bunks and, yeah,
18 we check the bunks, and what we look for is if --
19 like I said before, if something is not right,
20 then we can take care of it. That's what we do
21 when we do rounds.
22 Q. When you were doing rounds during the
23 day, how would you go about checking the upper

## Page 9

1  bunks in the dayroom?
2  A. You just -- because you're just walking
3  by it, you just look through it and observe, and
4  if something is wrong, like I said before, then
5  you take care of it.
6  Q. Where there were bunks in the dayroom,
7  there were -- strike that. Where there were bunks
8  in the dayroom, there was an upper bunk and a
9  lower bunk joined together; is that correct?
10 A. If I can remember. I don't remember that
11 now. It's been very, very long.
12 Q. All right. When you were doing rounds of
13 blocks where there were bunks in the dayroom, were
14 you able to see what was on the upper bunk?
15 A. Yeah. As an officer, yeah, that's what
16 we do. We look, check upper one, down one; look
17 into the cells. We look pretty much everywhere,
18 looking for stuff that is wrong, so we can take
19 care of it. That's why we're doing rounds.
20 Q. When you were a corrections officer
21 working here at the Northern New Hampshire
22 Correctional Facility, did you ever do rounds of
23 F block?

1  A.  We -- yeah.  Yes, I did rounds in F block
2  with some other officers.
3  Q.  Now, if you walked into F block through
4  the door through which correctional officers
5  entered onto the block.
6  A.  Yeah.
7  Q.  To your right there was a public -- or
8  there was a common bathroom and there was a mop
9  closet; is that right?
10     MS. CUSACK: Objection to form.  Go
11  ahead.
12  A.  I don't remember all that.  I don't even
13  remember how the cells look like now.  It's been
14  very long.
15  Q.  That's fine.  Do you remember when you
16  were doing rounds here at the Northern New
17  Hampshire Correction Facility looking into common
18  bathrooms and mop closets?
19     MS. CUSACK: Objection to form.  Go
20  ahead.
21  A.  Like I said before, we checked
22  everything.  We checked everything when we do
23  rounds, making sure everything -- leaving that

1  facility in good hands, to come back in one hour
2  time to do the same thing.
3  Q.  When you were a corrections officer
4  working here at the Northern New Hampshire
5  Correctional Facility, did you ever detect fights
6  or assaults that needed to be broken up?
7  A.  No.
8  Q.  No?
9  A.  Something like that happen, but I was --
10  wasn't in a position to dictate it.  So, yeah, I
11  wasn't -- probably different, how do you say it,
12  department.  But I will hear it when it happens,
13  but I didn't dictate to any.
14  Q.  Okay.  Okay.
15  A.  I didn't dictate to any since I worked
16  here.
17  Q.  Now, in addition to doing rounds when you
18  worked here as a corrections officer at the
19  Northern New Hampshire Correctional Facility, did
20  you also work in CP-5 monitoring video screens?
21     MS. CUSACK: Objection to form.  Go
22  ahead.
23  A.  I worked in some bubbles.  You know, they

1  were training me about how to do the control
2  rooms, how to work the control rooms, yeah.
3  Q.  Okay.  When you were assigned to work in
4  the control room, what would you do?
5  A.  There's a lot in control rooms.  There's
6  more responsibilities in there.  You pop the doors
7  like open, and sometimes calls comes in and you
8  answer calls, and you make announcements.  And
9  then you watch through the camera.  And each
10  facility have bunch of cameras you play with, like
11  camera one, camera two, camera three.  You have to
12  make sure you look on those cameras every few
13  seconds, looking for stuff.  That's what we do in
14  the control room.
15  Q.  So when you were working in CP-5, you had
16  a monitor screen on which you could observe
17  activity in E block, F block, G block or H block,
18  right?
19  A.  Sorry, I didn't hear that.  Come back --
20  I didn't understand the question.
21  Q.  When you were working in CP-5.
22  A.  Yeah.
23  Q.  One of your job responsibilities was to

1  watch a monitor screen --
2  A.  Yeah.
3  Q.  -- that showed activity in one of four
4  different housing blocks: E block, F block, G
5  block or H block.  Right?
6     MS. CUSACK: Objection to form.  Go
7  ahead.
8  A.  I can't remember that.  But, yeah, we
9  watch -- we watch monitor cameras, yes.  I can't
10  remember how many, how it's connected now, but --
11  Q.  Certainly.
12  A.  -- we watch cameras, yes.  Yeah.
13  Q.  And if I understand your testimony
14  correctly, every few seconds you were to change
15  the video screen so you were watching activity in
16  a different housing block; is that right?
17  A.  Yes, correct.  That way, you can see
18  other things going.  You can't just stay or pause
19  the camera in one place for so long because you're
20  going to miss something, if something happening on
21  camera two while you were busy for a person on
22  camera one.  So you just have to move it around.
23  That's how I was trained, to move it around.  That

Page 14

1 way, you can catch something happening by accident
2 or by, yeah, checking through it, yeah.
3 Q. And who provided you that training?
4 A. Every day there is -- there will be the
5 officer assigned to me as the officer that I will
6 follow around that will train me on some stuff.
7 And after, they can swap me with a different
8 officer, so I don't really know who assigned those
9 officers to me.
10 Q. Fair enough.
11 A. I couldn't remember.
12 Q. Did you receive training on monitoring
13 inmates via video when you attended the
14 corrections academy?
15 A. I received all kinds of training there at
16 the academy. And I'm sure, if I remember
17 correctly, as one of them, we watched monitor
18 cameras and stuff, all kinds of -- before we start
19 the job here, we did all kinds of stuff in
20 academy.
21     MR. KING: Okay. Why don't we show Mr.
22 Esobe the video.
23     MS. DOUGLASS: Okay. Do you want this

Page 15

1 perspective or the other one?
2     MR. KING: Off the record.
3     (Discussion off the record.)
4 Q. Mr. Esobe, I'm going to come around
5 behind you.
6 A. That's okay. That's fine.
7     MS. CUSACK: Can you see that?
8     THE WITNESS: Yeah.
9 Q. Now, I represent to you, sir, that this
10 still frame is from video monitoring of F block at
11 the Northern New Hampshire Correctional Facility
12 at 4:20 and 19 seconds on August 24th, 2012.
13     MS. CUSACK: And the camera is Channel
14 30 --
15     MR. KING: Yes.
16     MS. CUSACK: -- for the record.
17     MR. KING: Yes.
18     THE WITNESS: Channel 30.
19 Q. BY MR. KING: Now, on the left-hand side
20 of the screen (indicating) you will see a line of
21 bunks.
22 A. Um-hum.
23 Q. Is that correct?

Page 16

1 A. All right.
2 Q. And each set of bunks contains an upper
3 bunk and a lower bunk; is that right?
4 A. Yeah, correct. The one I'm seeing like
5 is not very -- I can't say if he's up and down.
6 Looks like one. But, yeah, you are right.
7 Q. All right. And when you were working at
8 the correctional facility in 2012, was it the case
9 that for each of these sets of bunks, one inmate
10 would be assigned to the lower bunk and another
11 inmate would be assigned to the upper bunk?
12     MS. CUSACK: Objection to form. Go
13 ahead.
14 A. Sometimes there's only one inmate.
15 Sometimes there's two of them.
16 Q. Understood. And when you were doing
17 rounds of such a block as this F block, is it your
18 testimony that by walking past the -- strike that.
19     When you were doing rounds of a block
20 such as this in 2012, would you walk past bunks
21 such as these in the dayroom?
22 A. Yeah. Not just walking past it. We
23 check and we look in it. Yeah, we look in it

Page 17

1 just, like I said earlier, looking for something
2 that is not right so we can correct it, because --
3     (Reporter interrupts.)
4 A. Looking for something that is not right,
5 to correct it, to make it right.
6 Q. Okay. And when you would walk past bunks
7 such as these in the dayroom, you could see any
8 activity on the upper bunk; is that right?
9 A. Yeah, you can see it.
10 Q. Okay.
11 A. If there is any activity going on, yeah.
12 But if there is not, then there's nothing to look.
13 There is nothing to see.
14 Q. If you were to detect an inmate sleeping
15 on a bunk in the dayroom during the day, would you
16 take any steps to make sure the inmate was okay?
17 A. If the inmate is sleeping, I will walk
18 around him. What am I checking? I'm checking
19 bloodstain, blood. If he's okay, if he's looking
20 like he's sleeping sound, then I will walk by him
21 because -- yeah.
22 Q. Okay. Okay. I'm going to start showing
23 you the video.

Page 18

1  A. Oh, this is a video of --
2  Q. Yes. Yes. And this is again video taken
3  of F block on August 24th, 2012, from Camera 30
4  beginning at 4:20 p.m. and 19 seconds.
5  A. Okay.
6     (Video played.)
7  Q. Now I've stopped the video at 4:20 and 28
8  seconds.
9  A. Yeah.
10 Q. Did you see, Mr. Esobe, an inmate just
11 emerge from a cell and collapse to the ground?
12 A. Yeah. I just saw that now, yeah.
13 Q. Okay. If you had seen such activity
14 while you were monitoring F block in CP-5 on
15 August 24th, 2012, --
16 A. Yeah.
17 Q. -- what, if anything, would you have
18 done?
19 A. If my camera was pointing there, like I
20 was in Channel 30 looking at it and I see that, I
21 will call the first responders. But if my camera
22 is different channel, for example, Channel -- a
23 different channel from Channel 30, I would have

Page 19

1  missed that. And it's not really something that
2  would get officer's attention. You know, like
3  when you're watching on the camera, that thing
4  happened really fast there. So it's like, yeah,
5  you move cameras every seconds.
6  Q. Okay.
7  A. So if my camera is right there, I would
8  have seen it, and I would have sent some officers
9  to go check what is going on.
10    (Video played.)
11 Q. Now, we've stopped the video at 4:21 and
12 13 seconds. Can you tell us what you observed on
13 the segment of video that we just watched?
14 A. Just right now?
15 Q. Yes.
16 A. Well, the -- I see some -- the inmate's
17 laying down on the bed there (indicating), right?
18 Q. Yes.
19 A. Some other inmates are around it, but
20 there's nothing like a physical fight or anything.
21 Just almost not too bad.
22 Q. Okay.
23 A. Yeah.

Page 20

1  Q. Okay. Well, when you were watching the
2  segment of video that you just saw, did you see --
3  strike that.
4     When you were watching the segment of
5  video that we just saw, the segment began with an
6  inmate collapsed on the floor, correct?
7     MS. CUSACK: Objection to form. Go
8  ahead.
9  A. I saw that.
10 Q. Yes.
11 A. But that happened -- like I said before,
12 it happened really quick, yeah. If I was like and
13 probably watching --
14    MS. CUSACK: Can I just stop for a
15 second, Ben? You're going to need to move,
16 because she needs to watch his lips too --
17    MR. KING: Oh, okay.
18    MS. CUSACK: -- to see what he's saying.
19 So she can't get down what he's saying if you're
20 standing in between them.
21    MR. KING: Okay.
22    MS. CUSACK: Thank you. I think he
23 finished, yeah.

Page 21

1  Q. BY MR. KING: And then did you see
2  another inmate help up the inmate who had
3  collapsed to the floor?
4  A. Yeah, I saw that.
5  Q. And then --
6  A. Well, what I -- you mean I saw that now?
7  Q. Yes.
8  A. Yes. I saw that now on this video, yup.
9  Q. Okay. And then you saw that inmate, who
10 helped the inmate who collapsed up, guide that
11 inmate to the bunk, right?
12 A. Yes, I saw that.
13 Q. Okay. And you saw the inmate who had
14 collapsed try to get up on the upper bunk and then
15 be pushed onto the upper bunk by another inmate,
16 correct?
17 A. Yes.
18    MS. CUSACK: Objection to form. Go
19 ahead.
20 A. I saw that. But he didn't really push
21 him. But, yeah, sort of like happened and the
22 inmate probably didn't really push him. I don't
23 know. Maybe I saw different. I don't know.

### Page 22

1  Q.  Now, I know that you were not doing
2  rounds on this particular day.  But if you had
3  been doing rounds, you would have checked on the
4  inmate lying in the upper bunk; is that correct?
5  A.  Yes.  It depends what you mean by
6  checking.  Well, what we do, we don't really go
7  pushing them around when they are sleeping.  We
8  walk around them, check for blood drippings and --
9  yeah, that's what we check.  And if it seems like
10 he's okay, then he's good.  If he didn't --
11 Q.  But you would have checked -- I didn't
12 mean to cut you off.
13 A.  Yeah, I would have checked.  Yeah, I
14 would have checked.
15 Q.  You would have checked for things like
16 blood and vomit and feces, right?
17 A.  Yeah, we will check that.  But if it's
18 okay, then we are good.
19 Q.  Okay.  Now, if you had been viewing this
20 video screen in CP-5 and you had seen one inmate
21 pushing another inmate into a bunk, would you have
22 done anything in response to seeing that?
23     MS. CUSACK:  Objection to form.  Go

### Page 23

1  ahead.
2  A.  Yes.  Like I said before, if my camera
3  was focused on that, yeah, then I will send some
4  officers to check, check it, make sure everything
5  is good.
6  Q.  Okay.
7  A.  Because I can't leave bubble.  I can't
8  leave control room.  I have to do med calls and
9  send some officers to, you know, take a look, see
10 what is going on.  That's what we do.
11 Q.  All right.  Thank you.
12     MS. CUSACK:  Are you through with this?
13     MR. KING:  Yes.
14     MS. DOUGLASS:  Mr. Esobe, can you just --
15 thank you.
16     MS. CUSACK:  You need this?
17     THE WITNESS:  Sorry.
18     (Laptop proffered.)
19 Q.  BY MR. KING:  Now, Mr. Esobe, when you
20 were working in CP-5 and you were monitoring
21 activity in housing blocks, you had the
22 opportunity to view each housing block from one of
23 two camera angles; is that right?

### Page 24

1  A.  Correct.
2  Q.  Okay.  So you and I just finished
3  reviewing video footage of F block beginning at
4  approximately 4:20 p.m. from Camera Angle 30.
5  A.  Um-hum.
6  Q.  Now we are going to view video footage
7  of the same housing block, same day, same time,
8  from the other camera angle, Channel 29.
9     (Video played.)
10 Q.  What did you see in the footage from
11 Camera Angle 29, sir?
12 A.  I think is the same thing; is just, you
13 know, another different angle.  It's the same
14 thing we just reviewed, yup.
15 Q.  And if you had observed the footage that
16 we just viewed from Camera Angle 29 when you were
17 working in CP-5 on August 24th, 2012, what, if
18 anything, would you have done?
19 A.  Like I said, if my camera was on that 29
20 or 30 and I see that, I would have sent in some
21 officers to check it.  But if my camera is
22 somewhere else or maybe my boss is talking to me
23 on the phone, I wasn't -- I'm just paying

### Page 25

1  attention but answering calls.  Because my boss
2  sometimes calls me.  There's meds going on.
3  There's all kinds of stuff, phone ringing for us,
4  yeah.  So if I'm watching it and I saw that on
5  some camera, I would send in some officers to
6  check.
7  Q.  Okay.  Sir, when did your employment at
8  the Northern New Hampshire Correctional Facility
9  end?
10 A.  When what?  Sorry.
11 Q.  When did your employment here at the
12 Northern New Hampshire Correctional Facility end?
13 A.  That would be in 2013 I believe.  Can't
14 remember dates very well.  It's been very long.
15 Q.  Yeah.  Did you leave employment here
16 voluntarily or were you terminated?
17     MS. CUSACK:  Objection to form.  Go
18 ahead.
19 A.  Yeah, I just -- I left on my own my
20 position.
21 Q.  Why did you leave employment here?
22 A.  Personal reasons.
23 Q.  The video clips that we've watched

together here at this deposition, did you ever see them before today?
A. Yeah, I saw them with my attorneys.
Q. And when you say your attorneys, are you referring to Attorney Cusack and Attorney Fredericks?
A. Yes.
Q. So you saw the video clips relatively recently?
A. Yes.
Q. Did anyone go over video evidence of what happened in F block on August 24th, 2012, with you in 2012?
A. No.
Q. Back in 2012 were you ever interviewed by anyone as part of a review of the assault that happened here on Jonathan Leite on August 24th, 2012?
A. No.
Q. Sir, I believe you said earlier in your testimony that when you were doing rounds, if you saw something wrong, you would take care of it; is that right?

A. Yes.
Q. What exactly would you do if you saw something improper when you were doing rounds?
    MS. CUSACK: I'm going to object to the form, but go ahead.
A. I will — I will call first responders if it's serious case like physical fights or — yeah, I will call first responders. But if it's, you know, not serious case, I will send in some officers to check it out first.
Q. Was there ever an incident while you were doing rounds as a corrections officer here where you called first responders?
A. No, but there was an incident where some other officers called for first responders, not me. But I was doing rounds with them, and they saw something that is not right. They called first responders. That time I was being trained, like following them, learning from them. I couldn't do anything on my own that time.
Q. Understood.
A. Yeah.
Q. Understood. When was it that you were

being trained here?
A. I got a little bit of training before here for like, I can't remember, few months before I went to the academy. And after the academy I came back out with new COs, not just me. Like three of us from the academy that made it, they placed us in training as well, like supervising kind of with somebody, learning how to do the job.
Q. Was that incident you were just recalling where correctional officers who were training you called first responders during rounds, did that happen here?
A. It happened here, yeah.
Q. So that would have happened sometime in 2012?
A. Sometime, but not this case you're talking about now.
Q. I see.
A. Different — different thing. Because in prison, all kinds of stuff happen similar to that.
Q. The incident that you're thinking of would have happened earlier in time than August of 2012, right?

    MS. CUSACK: Objection to form. Go ahead.
A. I can't remember very much. It's been very long time. But, yeah, sometimes, yeah, they do -- do drills too, so we can see how it's done, some who are on training, for training purposes.
Q. Okay.
A. Yeah.
Q. I see.
    MR. KING: All right. Off the record for a moment.
    (Discussion off the record.)
    MR. KING: Back on the record. We just had a discussion on the record -- off the record rather about assuring Mr. Esobe's attendance at trial, given that he is a former employee of the Northern New Hampshire Correctional Facility and given that I am not asking him to reveal his address on the record for security purposes. And Attorney Cusack has represented that if we need Mr. Esobe's attendance at trial, we can serve a subpoena upon the Attorney General's Office, and the Attorney General's Office will accept service

Page 30

1  on behalf of Mr. Esobe. Is that accurate?
2         MS. CUSACK: That is accurate.
3         MR. KING: Okay. I have nothing further.
4         MS. CUSACK: I have nothing.
5         (Deposition concluded at 11:05 a.m.)

Page 31

1                CERTIFICATE OF WITNESS
2
3         I, Ejike Esobe, have read the foregoing
4  transcript of deposition taken on Wednesday,
5  September 20, 2017, at the Northern NH
6  Correctional Facility, Berlin, New Hampshire, and
7  do hereby swear/affirm it is an accurate and
8  complete record of my testimony given under oath
9  in the matter of Leite v. Goulet, et al.,
10 including any and all corrections that may appear
11 on those pages denoted as "Corrections."
12
13 _____
14                Ejike Esobe
15 STATE OF _____
16 COUNTY OF _____
17
18 Subscribed and sworn to before me this _____ day
19 of _____, 2017.
20
21 _____
22         Notary Public_____J.P._____
23         My Commission Expires:_____

Page 32

1            CORRECTION AND SIGNATURE PAGE
2  DEPOSITION:  Ejike Esobe
3  DATE OF DEPOSITION:  September 20, 2017
4  PAGE LINE       NOW READS           SHOULD READ
5  ___ ___  _____   _____
6  ___ ___  _____   _____
7  ___ ___  _____   _____
8  ___ ___  _____   _____
9  ___ ___  _____   _____
10 ___ ___  _____   _____
11 ___ ___  _____   _____
12 ___ ___  _____   _____
13 ___ ___  _____   _____
14 ___ ___  _____   _____
15 ___ ___  _____   _____
16 ___ ___  _____   _____
17 ___ ___  _____   _____
18 ___ ___  _____   _____
19
20 Dated this _____ day of _____, 2017.
21
22                      _____
23                                Ejike Esobe

Page 33

1                  C E R T I F I C A T E
2         I, Celeste A. Quimby, a Licensed Court
3  Reporter of the State of New Hampshire, do hereby
4  certify that the foregoing is a true and accurate
5  transcript of my stenographic notes of the
6  deposition of Ejike Esobe, who was first duly
7  sworn, taken at the place and on the date
8  hereinbefore set forth.
9         I further certify that I am neither attorney
10 nor counsel for, nor related to or employed by any
11 of the parties to the action in which this
12 deposition was taken, and further that I am not a
13 relative or employee of any attorney or counsel
14 employed in this case, nor am I financially
15 interested in this action.
16       THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
17 DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
18 ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
19 DIRECTION OF THE CERTIFYING REPORTER.
20
21
22
23            CELESTE A. QUIMBY, LCR No. 17