UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * *
                                    *
JONATHAN LEITE,                     * Case No.
                   Plaintiff,       * 1:15-cv-00280-PB
                                    *
        v.                          * Volume: 1
                                    * Pages: 1-42
CORRECTIONS OFFICERS MATTHEW GOULET,* Exhibit: 1
ELMER VAN HOESEN, MICHAEL BEATON,   *
LYNN MCLAIN, HEATHER MARQUIS,       *
TREVOR DUBE, RHIANNE SNYDER, EDDY   *
L'HEUREUX, JEFFREY SMITH, DWANE     *
SWEATT, YAIR BALDERRAMA, BOB MORIN, *
EJIKE ESOBE, AND KATHY BERGERON,    *
                   Defendants.      *
                                    *
* * * * * * * * * * * * *
```

DEPOSITION OF KATHLEEN DUCHESNE

Deposition taken by counsel at the
Northern Correctional Facility, 138
East Milan Road, Berlin, New Hampshire,
on Friday, September 1, 2017, from
1:40 p.m. to 2:49 p.m.

Court Reporter:
Karen L. Leach, LCR No. 38
(RSA 310-A:179)

**Page 2**

```
                    I N D E X

WITNESS:    Kathleen Duchesne


EXAMINATION BY:                              Page
        Mr. King                              4
        Ms. Cusack                           38



            INDEX TO EXHIBITS*
Description                                  Page
Duchesne
Exhibit 1    Diagram                         27




NOTE:  Exhibit returned to Attorney King.
```

**Page 3**

APPEARANCES:

For the Plaintiff:
  DOUGLAS, LEONARD & GARVEY, P.C.
  By: Benjamin King, Esq.
   -and-
  Megan E. Douglass, Esq.
  14 South Street, Suite 5
  Concord, NH 03301
  Phone: 603.224.1988
  E-Mail: Benjamin@nhlawoffice.com
          Mdouglass@nhlawoffice.com

For the Defendant:
  NEW HAMPSHIRE DEPARTMENT OF JUSTICE
  OFFICE OF THE ATTORNEY GENERAL
  By: Francis K. Fredericks, Jr., Esq.
   -and-
  Lynmarie C. Cusack, Esq.
  33 Capitol Street
  Concord, NH 03301
  Phone: 603.271.3658
  E-Mail: Francis.fredericksjr@doj.nh.gov
          Lynmarie.cusack@doj.nh.gov

STIPULATIONS

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed may be used for all purposes for which depositions are competent under the Federal Rules of Civil Procedure.

Notice, filing, caption and all other formalities are waived. All objections except as to form are reserved and may be taken in court at time of trial.

It is further agreed that if the deposition is not signed within thirty (30) days after submission to counsel, the signature of the deponent is waived.

**Page 4**

1  KATHLEEN DUCHESNE,
2  having been duly sworn by Ms. Leach,
3  was deposed and testified as follows:
4  EXAMINATION
5  BY MR. KING:
6  Q. Please state your full name for the record.
7  A. Kathleen Duchesne.
8  Q. Okay. And as of August 24, 2012, was your
9    name Kathleen Bergeron?
10 A. Yes.
11 Q. Okay. What is your -- strike that.
12    Who is your current employer, Officer
13    Duchesne?
14 A. NCF. DOC.
15 Q. Okay. You're employed here at the Northern
16    New Hampshire Correctional Facility?
17 A. Yes.
18 Q. Okay. How long have you been employed at
19    the Northern New Hampshire Correctional Facility?
20 A. Nine years on July 18 of this year.
21 Q. Since -- since 2008 have you held any other
22    title here other than corrections officer?
23 A. No.

**Page 5**

1  Q. What are your job responsibilities as a
2    corrections officer?
3  A. **Safety, security, sanitation within the**
4    **facility and also to protect the public.**
5  Q. And what daily job responsibilities do you
6    have to effect safety, security and sanitation and
7    protect the public?
8  A. **Doing rounds, conducting count. If any**
9    **inmates are in fear for their safety, they can come to**
10   **me and tell me and they're PAR'd.**
11 Q. Okay.
12 A. **Protective custody.**
13 Q. Okay.
14 A. **I'm also here to protect my coworkers.**
15 Q. I don't want to interrupt you so let me know
16    when you're through with your answer.
17 A. **Okay. I'm through.**
18 Q. All right. What do you do when you're
19    conducting rounds?
20 A. **I look throughout the unit. I look for**
21    **sanitation. I look to make sure the inmates appear**
22    **safe. I -- I just look for the safety of all the unit**
23    **-- the unit and for the safety of the inmates when I'm**

Page 6

1  doing a round.
2  Q. Okay.
3  A. And -- and also my coworker that I'm on the
4  unit with.
5  Q. Okay. When you're doing a round of a
6  housing block, do you look into every cell?
7  A. Typically, yes, I do. Yep. We walk through
8  and we look in.
9  Q. Are there any circumstances when you're
10  doing a round of a housing block when you will not
11  look into every cell?
12  A. No. I -- I always aim to look into every
13  single cell, but sometimes there can be a distraction
14  if an inmate comes up and tries to talk to me, you
15  know, or whatnot. I may miss a cell.
16  Q. Uh-huh.
17  A. But that is not what I look to ever do. I
18  look to look in every cell.
19  Q. Okay. And when you look in the cells, what
20  are you looking for?
21  A. I'm looking to make sure that the inmates
22  are well, and I look to make sure there's only two
23  inmates if it's two-inmate cell. There are some

Page 7

1  four-inmate cells. If I see a third inmate in the
2  cell, I do tell them that someone obviously does not
3  belong here. Who is it? But I don't know who lives
4  in every single cell. So there are times when maybe
5  an inmate is in a cell that doesn't belong in that
6  cell that I might not be aware of unless, you know,
7  I'm doing count.
8  Q. All right. So do you when you're doing
9  rounds ever look to see that the right inmates are in
10  the right cell?
11  A. That is what I -- that is what I do, yes.
12  Q. All right. Okay.
13  A. But as I explained, there are a lot of units
14  and there are a lot of inmates, and sometimes I work
15  downstairs a lot, and I know more of the ones that,
16  you know, live downstairs, and sometimes if I work
17  upstairs, and I don't work up there very often, then
18  I'm not aware of every inmate and that he lives in
19  that cell.
20  Q. Okay.
21  A. Inmates are also moving often, you know.
22  Sometimes I'm believing they live in Cell 3, and then
23  you know, they end up getting moved to another one.

Page 8

1  Q. Okay. If you think back to August 24, 2012,
2  did you know at that time that Johnathan Gelinas and
3  Ryan Elliot, those two inmates, resided in Cell 9 of F
4  Block?
5  A. I did not know that for sure, no. I don't
6  recall that they were the two that would have lived
7  there.
8  Q. Okay. Do you recall who did reside in Cell
9  9 as of August 24, 2012?
10  A. No, I do not. I mean based on my
11  conversation with the AG's office, I know that they
12  reside there now but at that time --
13  Q. Okay.
14  A. -- when I was doing the round, I would not
15  have known.
16  Q. And you're not supposed to tell me what your
17  communications were with the Attorney General's Office
18  but just telling you that for going forward.
19     But why do you say you would not have known
20  on August 24, 2012, that Johnathan Gelinas and Ryan
21  Elliot inhabited Cell 9?
22  A. It was five years ago, and I would not
23  remember that.

Page 9

1  Q. That's fair enough. But I interrupted your
2  answer to me and perhaps I misinterpreted it.
3     Are you saying on August 24, 2012, you would
4  not have known that Ryan Elliot and Johnathan Gelinas
5  were the inhabitants of the Cell 9?
6  A. I don't remember five years ago who lived
7  there.
8  Q. All right. All right. Let's talk about when
9  you were doing count on August 24, 2012, the 5:00
10  count. Do you recall going to say or yelling -- I
11  don't know what form of voice you used -- but yelling
12  at Jonathan Leite, "Hey, Leite. Don't you get up for
13  count anymore?"
14     MS. CUSACK: I'm going to object to the
15  form. Go ahead. You can answer.
16     THE WITNESS: I can answer?
17     MS. CUSACK: Yes.
18  A. Yes. When I got there, everyone else was
19  standing for count.
20  Q. BY MR. KING: Yes.
21  A. So I didn't even yell it. I said, "Leite,
22  what? You don't stand for count anymore?" Like that,
23  and he jumped off his bunk, got to the floor and then

Page 10

1    he swayed. At that point, the sergeant -- my Sergeant
2    Sweat was behind me, and we both knew that there was
3    something wrong with Leite. So Sergeant Sweat called
4    for first responders, and that's what I remember.
5 Q. Okay. Do you remember seeing blood running
6    out of Mr. Leite's mouth?
7 A. I don't remember seeing blood running out of
8    his mouth. I do not.
9 Q. Was Sergeant Sweat closer to Jonathan Leite
10   than you were?
11 A. No, I was standing right in front of him,
12   right in front of him. I remember -- what I remember
13   is seeing him sway. I have looked at my report, and I
14   do know that I said there was a little bit of blood on
15   his mouth, but what I remember is seeing him sway.
16 Q. All right.
17 A. And knowing something was not right.
18 Q. Okay.
19 A. I also can tell you that we looked at his
20   bunk and saw like puke on the top of his bunk and that
21   may have been the little bit of blood or whatever that
22   I had stated in my report.
23 Q. Okay. You saw vomit on his bunk in the

Page 11

1    dayroom; is that right?
2 A. Yes, after first responders were called.
3      MR. KING: Off the record.
4      (Discussion off the record.)
5 Q. BY MR. KING: Officer Duchesne, I'm going to
6    show you a document that we've marked as Dube Exhibit
7    1.
8 A. Yes.
9 Q. This is the area rounds log for August 24,
10   2012.
11 A. Yes.
12 Q. And this reflects that you and Officer Dube
13   did rounds that included rounds of F Block at 3:45
14   p.m. and 4:50 p.m. on August 24, 2012; is that right?
15 A. Yes.
16 Q. Did you complete this area rounds log?
17 A. Yes, that's my handwriting.
18 Q. Okay.
19 A. For 15 -- yep, for the 15:45 and the 16:45.
20   Yep, I did.
21 Q. For the 15:45 and the 16:50 do you mean?
22 A. Actually the handwriting all appears to be
23   mine with the exception of possibly 20:30.

Page 12

1 Q. All right. So does the -- do the 3:45 --
2    does the 3:45 notation reflect that the rounds began
3    on or end at 3:45; do you know?
4 A. Well, what happens is after we have done the
5    rounds, it gets written down. So there is four units,
6    and the time cannot be exact because we go into one
7    side, go through it and come out the other, and then
8    go to the other side.
9 Q. Okay.
10 A. So --
11 Q. So when you write 3:45 on the area rounds
12   log, what does that time denote?
13 A. I'm saying that the -- that it is
14   approximate. I may have been in Fox Block at a
15   different time than the 3:45.
16 Q. All right.
17 A. It's for the whole four units.
18 Q. Okay. So let's watch the video.
19      MS. CUSACK: Can you pull it forward?
20      MR. KING: Yes.
21 Q. BY MR. KING: So we are about to watch a
22   video from Camera Angle 29 taken at F Block on August
23   24, 2012, beginning at 3:45 and 14 seconds p.m.

Page 13

1 A. Okay.
2      (Video played.)
3 Q. BY MR. KING: Now, I have stopped the video
4    at 3:40 and 23 seconds p.m., and have we just observed
5    you and Officer Dube enter F Block?
6 A. Yes.
7 Q. And Officer Dube is walking in the direction
8    of the stairs that lead to the upper tier of F Block;
9    is that correct?
10 A. It appears to be so, yes.
11 Q. And you and Officer Dube have entered the
12   door, and your -- you've taken a right, and you're
13   walking towards the cells that line the wall on the
14   right of the door that enters into F Block; is that
15   correct?
16 A. Yes.
17 Q. All right. So is it true that you had
18   responsibility for doing rounds of the lower tier F
19   Block and Officer Dube had responsibility for doing
20   rounds of the upper tier in F Block for this round
21   that you're doing beginning at 3:40 p.m.?
22 A. For this round it appears to be so.
23 Q. Okay. I ask you to pay particular attention

Page 14

1 to your movements when you go -- come into the field
2 of view.
3 A. Yes.
4 (Video played.)
5 Q. BY MR. KING: Do you know what happened
6 there where we stopped the video at 3:41 and one
7 second p.m., and it appears that you're walking along
8 the row of cells to the right of the door that enters
9 F Block and an inmate was in your way, right?
10 MS. CUSACK: I'm going to object to form.
11 Go ahead and answer.
12 A. Yes. The inmates typically when they see
13 officers doing rounds --
14 Q. BY MR. KING: Yes.
15 A. -- will back up if they're in the way so
16 that we can look inside.
17 Q. Okay. And that's what it appears he was
18 doing.
19 A. I don't even know who that inmate is. I
20 can't tell from the camera.
21 MS. CUSACK: You went probably too far. You
22 probably went too far. 40 something there, but we can
23 see 3:49. If you're only going a couple seconds, it's

Page 15

1 a tiny movement. You're starting at 15:40 and 33.
2 MR. KING: Yep.
3 Q. BY MR. KING: Please play particular
4 attention to you when you come into the field of view.
5 A. Yes.
6 (Video played.)
7 Q. BY MR. KING: So we just watched from
8 3:40:23 to 3:41:05, and that's about 42 seconds of
9 footage, right?
10 A. Seems to be.
11 Q. Okay. And in that time, how many cells did
12 you walk past?
13 A. Looks like maybe seven. I can't tell from
14 that view.
15 Q. Okay.
16 A. I'm not sure if there's two back there.
17 Two, four, five.
18 Q. Why don't we go back again and watch it.
19 (Video played.)
20 Q. BY MR. KING: All right. Didn't look as if
21 you're in the field of view yet. We are at 3:40 and
22 28 seconds.
23 MS. CUSACK: I'm just going to object to

Page 16

1 that, but go ahead.
2 MR. KING: Off the record.
3 (Discussion off the record.)
4 Q. BY MR. KING: So we are at 3:40:28, and we
5 can see you in the footage behind the stairwell,
6 right?
7 A. Yes.
8 Q. All right. So we'll start watching again.
9 (Video played.)
10 Q. BY MR. KING: Okay. And I've stopped it at
11 3:41:04. So we've watched 36 seconds of footage. In
12 those 36 seconds, how many cells do you pass?
13 A. I told you I can't tell from this view, but
14 it appears to be -- could be seven. Could be nine. I
15 cannot tell from the footage.
16 Q. All right. Seven to nine cells. Can you
17 tell what numbers these cells on the left is,
18 specifically the cell where the inmate is pictured
19 being in front of it at 3:41:04?
20 A. How could I tell that because it's covered?
21 Q. I don't know. I'm asking you. If you
22 can't --
23 A. Yes, I'm telling you I can't because the

Page 17

1 number is at the top of the door.
2 Q. All right.
3 A. It's showing half it of just like my -- my
4 head is covered by this as well.
5 Q. Okay.
6 A. So you can't -- you can't even see me
7 looking inside the cells as I walk and look in the
8 windows of the doors.
9 Q. Do you know if this footage depicts you
10 walking in front of Cell No. 9?
11 A. I do not. I can't tell from that.
12 Q. All right. But we did establish that over a
13 36-second span, you walked past seven to nine cells;
14 is that right?
15 A. That's what it appears from what I see
16 there.
17 Q. All right. Beyond looking to see if there
18 are more than two inmates in a cell when you look into
19 the cell during a round, if you do look into the cell,
20 what are you looking for?
21 A. I am looking for the safety of the inmate.
22 I am looking to make sure that everything appears fine
23 within the cell. I am looking to make sure no one's

Page 18

1 hanging up. I am looking to make sure that there is
2 only two in the cell.
3 Q. Right.
4 A. I am looking to make sure no one's on the
5 floor.
6 Q. Yep. Okay. If you -- if you look into a
7 cell during a round during the daytime and you see an
8 inmate lying down, do you make any further inquiry to
9 make sure the inmate's all right?
10     MS. CUSACK: I'm going to object to the
11 form, but go ahead.
12 A. There are inmates that are sleeping in the
13 cells all day sometimes. Often -- you know, do I walk
14 into every single cell? No, unless I feel that there
15 appears there is a problem.
16     MS. CUSACK: And my objection was when you
17 say lying down. I don't know if you meant on a bed,
18 on a floor. It was just unclear as to where you --
19     MR. KING: Certainly.
20 Q. BY MR. KING: If -- if you see -- if you
21 look into a cell while doing rounds during the
22 daytime --
23 A. Yes.

Page 19

1 Q. -- and you see an inmate lying down in a
2 bed, do you make any further inquiry to make sure the
3 inmate is all right?
4 A. Yes. You're -- you're looking to make sure
5 that they are breathing, yes.
6 Q. Okay. Do you usually walk past the cells
7 while doing a round at the rate of speed that you
8 walked past them as depicted in this video?
9     MS. CUSACK: I'm going to object to the
10 form. Go ahead.
11 A. I was doing a routine round. That's all I
12 can tell you. I was walking by each and every cell
13 looking inside, and it appeared all was well on that
14 unit.
15 Q. BY MR. KING: Okay. You say it appeared all
16 is well -- all was well on that unit. Do you have a
17 recollection sitting here today of doing the round on
18 August 24, 2012, at 3:40 p.m.?
19 A. I recall that day nothing seemed out of the
20 ordinary on that unit until I did count.
21 Q. Okay. For the round that you marked as
22 occurring at 4:50 p.m., do you know whether you did
23 rounds on the upper tier or the lower tier of F Block?

Page 20

1 A. I do not recall.
2 Q. Now, in our prior deposition with your --
3 with your colleague Officer Dube, we determined that
4 you and he did seven rounds together that day on
5 August 24, 2012, and you can look at the document
6 yourself, but that's just what we determined.
7 A. Okay.
8 Q. Okay. And I was just wondering if on a day
9 such as this when you and another corrections officer
10 do several rounds together, is it customary for you
11 and the other corrections officer to handle the same
12 tier of a block each round, or is it customary to
13 alternate, or is there any custom?
14     MS. CUSACK: I'm going to object to the
15 form. Go ahead.
16 A. Out of respect for each -- other officers,
17 it gets to be tiring always climbing the stairs if the
18 same person was climbing the stairs every time. So
19 sometimes when you walk in a unit I'll say, "I'll go
20 up this time." And then the next time when you're
21 doing a round say, you know, he will say, "I'll go up
22 this time," but that day I don't recall how many times
23 I had gone upstairs and done the rounds downstairs.

Page 21

1 Q. A few moments ago we looked at video footage
2 depicting you walking past seven to nine cells, right?
3 A. I told you it appears to be seven to nine.
4 Q. Okay. What is the distance in feet between
5 the first cell that we saw you walking past and the
6 last cell?
7 A. I would have no idea how many feet. I
8 couldn't even guess. I don't know.
9 Q. Okay. Do you know what the distance in feet
10 is from the far end of F Block as depicted on the
11 video to the near end?
12 A. I do not.
13 Q. Now, when you do rounds, you're doing rounds
14 of four different housing blocks, right?
15 A. Yes.
16 Q. How long does it take you to do a round of
17 the housing blocks?
18 A. It's different all the time. It depends if
19 an inmate stops to talk to you and ask you questions,
20 but it can be anywhere from five to 20 minutes. It's
21 hard to say, and also I just want to say sometimes two
22 officers do one side and two officers do the other.
23 So it's not always all four units.

Page 22

1 Q. All right. When you say two officers do one
2 side and two officers do the other, what -- what do
3 you mean exactly?
4 A. I just mean I'm trying to explain to you
5 that sometimes -- sometimes if there are more than two
6 officers in upper housing or lower housing, two will
7 take care of one side and two will take care of the
8 other side.
9 Q. Okay.
10 A. On that day I don't know if Officer Dube and
11 myself did all four or the two.
12 Q. If you'd only done the two, which two would
13 those be?
14 A. Echo and Fox.
15 Q. Okay.
16 A. Actually, yeah, it shows on here like even
17 when count was done, there were four officers at that
18 time. So there were two officers. Now, that I look
19 at this again, it was Officer Dube and myself 15:40
20 and the 16:50, and then four of us for count.
21 Q. When you were in the area of Mr. Leite's
22 bunk on August 24, 2012, after he had come down and
23 attempted to stand, did you find any vomit in the area

Page 23

1 of Mr. Leite's bunk? You told me -- you told me about
2 the vomit on the bunk. I'm asking you whether you
3 found any vomit on the floor in the area of Mr.
4 Leite's bunk?
5 A. I didn't. I did not see any. I do not
6 recall seeing any.
7 Q. All right.
8 A. What I remember is seeing it on the bunk.
9 Q. All right. And you've seen that the -- the
10 round that you reported as occurring at 3:45 actually
11 began earlier than 3:45 because we have you in F Block
12 at 3:41, right?
13 A. Right.
14 Q. So would you think that the round that you
15 reported as happening at 4:50 would have been begun
16 earlier than 4:50?
17 A. I can't say that.
18 Q. Why not?
19 A. Because I don't know.
20 Q. You didn't have any consistent practice with
21 respect to recording the times that rounds occurred in
22 your filling out the round sheet?
23 A. I told you that when we do rounds, we can be

Page 24

1 on another side. So every single round that I do if I
2 go into Fox Block, I'm not going to look and see it's
3 exactly 3:40 and then when I go into Echo and say,
4 okay, it's 3:47 or then when we go across to Hotel,
5 another time. I mean this was the best -- I mean when
6 I got done with the rounds, we get in. We look at the
7 clock. The clock that's on the wall is not always
8 exactly the same as what those cameras are.
9 Q. Uh-huh.
10 A. So it is my best and most accurate when I
11 put it on here. I am doing the very best I can, but
12 it's not perfect.
13 Q. Is it recording -- on the area rounds log,
14 are you recording the time that the round ends?
15 A. I'm not recording when it begins or when it
16 ends. I'm getting back from the round and looking at
17 the clock and giving an approximate time as to when I
18 was on the unit.
19 Q. Okay. All right.
20 A. The fact that that says 3:40 and I have 3:45
21 here to me is pretty accurate.
22 Q. All right. Did you -- Dube Exhibit 1
23 reflects when rounds were done for all -- all four of

Page 25

1 the housing blocks, right?
2 A. Yes, it appears to be so.
3 Q. Can you describe for me the window --
4 describe for me the cell door if you would on F Block?
5 A. Can I describe it, or can I just show you?
6 Q. Please, either one.
7 A. Okay. Well, let me take this off here, and
8 I will show you. I'm assuming it's about the same
9 size. It's a little wider than that one. So I'm not
10 going with measurements. I can tell you it's wider
11 than that one right there.
12 Q. All right.
13     MS. CUSACK: For the record, she looked at
14 the entrance door to hearing room in NCF.
15 Q. BY MR. KING: Okay. Would you mind drawing
16 me what a cell door looks like in F Block?
17     (Witness did as directed.)
18 A. It's rectangular.
19 Q. BY MR. KING: Does it have a window on it?
20 A. Explaining what again? What was the
21 question?
22 Q. Does the door have a window on it?
23 A. Yes.

Page 26

1 Q. Could you depict what the window looks like,
2 please?
3 A. That is what the window looks like. Oh, so
4 you want me to draw the door and then the window?
5 Q. Yes, please.
6 A. My apologies.
7    (Witness did as directed.)
8 A. It is something like that.
9 Q. BY MR. KING: All right. And if you
10 wouldn't mind, if you could just label what is the
11 cell door and label what is the window.
12    MS. CUSACK: Write cell door and then an
13 arrow to it. Then window and arrow to it.
14    (The witness did as directed.)
15 Q. BY MR. KING: Okay. Thank you. Oh, if you
16 could just put your name on it and date it if you
17 wouldn't mind.
18    (Witness did as directed.)
19 A. I'm not an artist.
20 Q. BY MR. KING: Neither am I.
21 A. That window may be a little bit bigger even.
22    MR. KING: Can you mark that, please?
23

Page 27

1    (Duchesne Exhibit 1 was
2    marked for identification.)
3 Q. BY MR. KING: So on the video from Camera
4 Angle 29, we observed you walking up the row of cells
5 on the wall to the right of the door where you enter F
6 Block. Where would you have gone after you walked up
7 that row of cells?
8 A. I would imagine that I went through the back
9 door of the unit.
10 Q. Would you have walked over by the dayroom
11 bunks or not?
12 A. Sometimes I do and sometimes I do not. I do
13 not recall if I did that day.
14 Q. So you may have just walked up the row of
15 cells where we observed you walking -- walking and you
16 may have exited through a door?
17 A. The back door of Fox Block.
18 Q. Okay. What determines whether you walk over
19 by the dayroom bunks during a round or not?
20 A. Every round is different. I can't say I do
21 it exactly the same way every time, but when I walked
22 on the unit, if everything appeared well, the dayroom
23 is right there, I can see when I am walking by the

Page 28

1 cells if everything appears fine in the dayroom.
2 Q. Okay. How high is the top bunk off the
3 ground in the dayroom; do you know?
4 A. I do not know exact height.
5 Q. Is it taller than a person?
6    MS. CUSACK: I am going to object to form.
7    MR. KING: Yeah, let me try that again.
8 Q. BY MR. KING: Is it higher than six feet?
9 A. I -- I couldn't -- I couldn't answer that.
10 I don't know if it's higher than six feet. I don't
11 even want to guess.
12 Q. Don't guess.
13 A. I'm not going to.
14 Q. Okay. On or before August 24, 2012, were
15 you familiar with inmate Gelinas?
16 A. Familiar, no. I mean I know he was an
17 inmate. How do -- you know, I don't know what you
18 mean by familiar.
19 Q. Well, had you had any sort of interactions
20 with him?
21 A. I don't recall having any interactions. Do
22 you mean reports? D reports? Because I don't know.
23 Q. All right. Had you had any interaction with

Page 29

1 inmate Elliot?
2 A. Not that I recall.
3 Q. Okay. How tall are you if I may ask?
4 A. I am five six.
5 Q. Okay. Were you familiar with Jonathan Leite
6 as of August 24, 2012?
7 A. I did know inmate Leite just because I used
8 to work in visits a lot. Because I worked in visits,
9 I would see him in there.
10 Q. Okay. He would get visits from Ashley
11 Peters?
12 A. That was one person.
13 Q. Yes. All right.
14 A. He had several others on his visiting list.
15 Q. Oh, he did?
16 A. Yes. Yes.
17 Q. Is there anything noteworthy about his
18 visits?
19 A. I don't know what you mean by that.
20 Q. Well, what do you recall about inmate
21 Leite's visits?
22 A. I just recall his kids coming in to see him.
23 I recall a few different women coming in to see him.

Page 30

1 I'm not sure what else you're looking for.
2 Q. Who were the women who came to see him?
3 A. I would not remember their names.
4 Q. All right. On August 24, 2012, do you know
5 where -- did you know where inmate Leite slept?
6 A. Did I know where he slept? Did I know that
7 he was dayroom?
8 Q. Yes.
9 A. I don't even recall that. There are so many
10 inmates here, and they move so periodically. Can I
11 say that I recall that he was dayroom bunk at that
12 time? I don't know.
13 Q. Okay.
14 A. But doing count I knew because the count
15 sheet said Leite.
16 Q. Yep. When you look into the window of a
17 cell, can you see the entirety of the cell or not?
18 A. That's kind of hard to answer. I mean you'd
19 have to put your head right up to the cell and cell
20 door, and I have done counts sometimes and missed an
21 inmate that was standing behind the door. So can you
22 see all of what -- everything in the cell? I mean you
23 almost would have to put your head in through the

Page 31

1 window or to the window. Sometimes they're standing
2 even against the wall and I was like, you know, I
3 could have missed you during count, you know. You got
4 to stand so I can see you for count.
5 Q. Is there glass on the window?
6 A. No.
7 Q. No. Okay. So the window is open air?
8 A. Yes.
9 Q. Would -- were there any policies or
10 procedures in place at the Northern New Hampshire
11 Correctional Facility that you were aware of as of
12 August 2012 that were designed to prevent inmate
13 violence upon other inmate?
14 A. Were there policies? That's why we had the
15 rounds that we did once an hour.
16    MR. KING: Why don't we take a short break.
17 I'm just going to confer with Attorney Douglass.
18    (Short recess was taken.)
19 Q. BY MR. KING: As of August 24, 2012, did you
20 have access to the video footage of what happened in F
21 Block?
22 A. I think it was a week later that I -- I had
23 seen me walking by the bunk for the 16:50, and I just

Page 32

1 remember seeing it in upper housing. I don't recall
2 seeing the 15:45 round until today.
3 Q. Okay. Who showed you the footage of you
4 doing rounds at 16:50?
5 A. I'm not going to remember that. There were
6 some people in upper housing that had access to the
7 video, and I don't know who showed me.
8 Q. All right. But did you have access to the
9 video without someone showing it to you?
10 A. No.
11 Q. Okay. Who had access to the video at -- at
12 -- in August of 2012?
13 A. Who had access to it?
14 Q. Yes.
15 A. I know I can't just pull up videos. So I
16 don't know. Sometimes corporals have access.
17 Sometimes sergeants, lieutenants.
18 Q. So what do you recall the -- the video of
19 doing rounds at 4:50 depicted?
20 A. What do I recall from that?
21 Q. Yes, please.
22 A. All that I remember, and like I said this
23 was five years ago, I don't know who the inmates were,

Page 33

1 but prior to me doing a round, two inmates came out of
2 a cell with inmate Leite and like helped him get up on
3 top of his bunk, and then I came in and do a round and
4 walked by that dayroom bunk. Again everything
5 appeared fine when I walked in, you know.
6 Q. So you remember that the video footage that
7 you reviewed showed you walking past the dayroom bunk
8 in the 4:50 round?
9 A. Yes.
10    MR. KING: All right. Off the record.
11    (Discussion off the record.)
12    MS. CUSACK: Can you see that okay?
13    THE WITNESS: Well, the video footage isn't
14 that great.
15 Q. BY MR. KING: All right. So we are going to
16 begin watching video footage of F Block on August 24,
17 2012, taken from Camera Angle 30 beginning at 4:20 and
18 21 seconds.
19 A. Okay.
20    (Video played.)
21 A. I don't even remember seeing that.
22 Q. BY MR. KING: So you just watched Jonathan
23 Leite emerging from Cell No. 9 and collapse to the

Page 34

1  floor, correct?
2  A. Well, you're telling me that's Jonathan
3  Leite, but I don't know that it's him. I can't see
4  that it's him.
5  Q. You -- you just watched an inmate emerge
6  from Cell No. 9 and collapse to the floor, correct?
7  A. Yes.
8  Q. All right.
9  A. I was wrong.
10 Q. You just said you were wrong. What were you
11 wrong about?
12 A. I -- again it was five years ago when I saw
13 it. I thought it was two inmates that helped him up.
14 You're showing me the video now, and I see that it was
15 one.
16 Q. Well, if you -- you will see more -- there
17 were two inmates.
18 A. Oh, that's all I remember seeing from that.
19    (Video played.)
20 Q. BY MR. KING: Stopping the video at 4:21:09,
21 but you recall seeing other video footage of you doing
22 the rounds that occurred at or about 4:50?
23 A. Yes.

Page 35

1  Q. With you walking past the --
2  A. Yeah. I don't even know if I was coming
3  downstairs. I just recall seeing video where I walked
4  by here right here.
5  Q. Can you describe that better?
6  A. When I walked by the dayroom bottom one.
7  Q. Okay. And you recall seeing that video
8  footage approximately a week after the incident?
9  A. Approximately.
10 Q. And again you don't recall who showed it to
11 you?
12 A. No, sir.
13 Q. All right. Do you mind if I come around?
14 A. Feel free, yes.
15 Q. I'm going to show you a document that's
16 Bates stamped 6 in the defendants' document
17 production. Do you recognize what this form is?
18 A. Oh, that's a count sheet.
19 Q. And what is a count sheet?
20 A. It's a sheet with all the inmates' names on
21 it and the cells and the cell numbers for when we do
22 count.
23 Q. Okay. So the count sheet tells you where

Page 36

1  the inmates are supposed to be in terms of what cell
2  or bunk they're assigned to, right?
3  A. Yes.
4  Q. And this sheet for August 24, 2012, Bates
5  stamped 6 tells you that Jonathan Leite was assigned
6  to the dayroom, right?
7  A. Yes.
8  Q. And would you have -- strike that.
9     Would you have had access to this sheet on
10 August 24, 2012?
11 A. Would I have had access?
12 Q. Yes.
13 A. Well, if I didn't do count, I would not have
14 had access.
15 Q. But you did do count, right?
16 A. Sir, this 20:30, and that is not my
17 signature.
18 Q. All right. All right. So this is a count
19 sheet?
20 A. From 20:30. Inmate was not there. Leite
21 was not there because the count says he was at the
22 hospital.
23 Q. Right. There are count sheets like this

Page 37

1  generated for each count?
2  A. Yes.
3  Q. So there was a count sheet for the count
4  that occurred at every time on August 24, 2012, right?
5  A. Yes.
6  Q. And does each count sheet contain the bed or
7  cell to which the inmate is assigned?
8  A. Yes.
9  Q. Okay. And do you review the count sheet
10 each time you do count, or how are these -- how are
11 count sheets generated?
12 A. Through chorus. Through chorus. So if an
13 inmate lives in Cell 2 of Fox Block, and he requests
14 to move to Cell 5, then the OIC or person in charge,
15 if he says yes to the move, will go into chorus and
16 move him from Cell 2 to Cell 5 so that when the count
17 is done, the count sheet will be accurate.
18 Q. Okay.
19 A. So that means an inmate that lives in Cell 2
20 for the 7:05 count in the morning could have moved to
21 Cell 5 by 20:30. So that count sheet can change from
22 morning to evening.
23 Q. Okay.

Page 38

1 A. So I'm not sure what the question is or if
2 I'm answering it for you to understand, but it's all
3 done through chorus.
4 Q. When you do a count, do you use one of these
5 count sheets?
6 A. Yes. We print them off right before count
7 because if moves have been done, it takes sometimes 15
8 minutes for it to update.
9 Q. All right.
10   MR. KING: All right. Thank you. I don't
11 have anything further.
12   THE WITNESS: Nothing further.
13
14   **EXAMINATION**
15   **BY MS. CUSACK:**
16 Q. Question. If you see an inmate sleeping
17 during a round, how -- how do you -- what do you do?
18 A. If I see them sleeping, I let them sleep
19 because if I walk into every cell when an inmate was
20 sleeping and disturbed them, they would not be happy.
21 Q. So what does it take for you to see -- to go
22 into a cell during a -- a particular round?
23 A. What does it take for me to see -- if I saw

Page 39

1 blood, if I saw them hanging, if I didn't see their --
2 their, you know, chest or stomach moving up and down.
3 You can usually tell if an inmate is sleeping or if
4 there's a problem.
5   MS. CUSACK: Okay. Thank you.
6   MR. KING: All set.
7   (The deposition was concluded
8   at 2:49 p.m.)

Page 40

1 CERTIFICATE OF WITNESS
2
3 I, KATHLEEN DUCHESNE, have read the foregoing
4 transcript of the deposition taken on Friday,
5 September 1, 2017, at the NORTHERN NEW HAMPSHIRE
6 CORRECTIONAL FACILITY, Berlin, New Hampshire, and do
7 hereby swear/affirm it is an accurate and complete
8 record of my testimony given under oath in the matter
9 of LEITE v. GOULET, including any and all corrections
10 that may appear on those pages so denoted as
11 "Corrections."
12
13
14   KATHLEEN DUCHESNE
15 STATE OF
16 COUNTY OF
17
18 Subscribed and sworn to before me this      day
19 of              , 2017.
20
21
22   Notary Public       J.P.
23   My Commission Expires:

Page 41

1 CORRECTION AND SIGNATURE PAGE
2 **DEPOSITION OF:** KATHLEEN DUCHESNE
3 **DATE OF DEPOSITION:** September 1, 2017
4 PAGE   LINE      NOW READS        SHOULD READ
5 ___  ___  _____  _____
6 ___  ___  _____  _____
7 ___  ___  _____  _____
8 ___  ___  _____  _____
9 ___  ___  _____  _____
10 ___  ___  _____  _____
11 ___  ___  _____  _____
12 ___  ___  _____  _____
13 ___  ___  _____  _____
14 ___  ___  _____  _____
15 ___  ___  _____  _____
16 ___  ___  _____  _____
17 ___  ___  _____  _____
18 ___  ___  _____  _____
19
20 Signed this ____ day of _____, 2017.
21
22   _____
23   KATHLEEN DUCHESNE

1            C E R T I F I C A T E
2
3        I, Karen L. Leach, a Licensed Court
4   Reporter, Shorthand and Notary Public of the State of
5   New Hampshire, do hereby certify that the foregoing is
6   a true and accurate transcript of my stenographic
7   notes of the deposition of KATHLEEN DUCHESNE, who was
8   first duly sworn, taken at the place and on the date
9   hereinbefore set forth.
10       I further certify that I am neither attorney
11  nor counsel for, nor related to or employed by any of
12  the parties to the action in which this deposition was
13  taken, and further that I am not a relative or
14  employee of any attorney or counsel employed in this
15  case, nor am I financially interested in this action.
16       THE FOREGOING CERTIFICATION OF THIS
17  TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE
18  SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
19  AND/OR DIRECTION OF THE CERTIFYING REPORTER.
20
21
22
23              KAREN L. LEACH, LCR NH #38