1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * *

| | |
|---|---|
| JONATHAN LEITE | No. 1:15-CV-00280-PB |
| v. | Volume: 1 |
| | Pages: 1-56 |
| CORRECTIONS OFFICERS | Exhibits: 1-2 |
| MATTHEW GOULET, ET AL. | |

* * * * * * * * * * * * * *

DEPOSITION OF JEFFREY R. SMITH

Deposition taken at the Office of the Attorney General, 33 Capitol Street, Concord, New Hampshire, on Monday, December 4, 2017, from 10:47 a.m. to 12:18 p.m.

Court Reporter:

Pamela A. Nostrand, LCR, No. 82
(RSA 310-A:179)

Page 2

```
 1            I N D E X
 2
   WITNESS:     Jeffrey R. Smith
 3
 4
   EXAMINATION BY:                    Page  Line
 5
 6    Mr. King                          4    20
 7    Ms. Cusack                       50     9
 8
 9
           INDEX TO PLAINTIFF'S EXHIBITS*
10
11 Description                         Page  Line
12 Smith
13
   Exhibit 1   Notice of Deposition      4    8
14             Pursuant to Fed.R.Civ.P.
               30(b)(6)
15
   Exhibit 2   N.H. Department of        4   11
16             Corrections Policy and
               Procedure Directive,
17             effective 12/15/11
18
19
20
21
22
23 *   Original exhibits returned to Attorney King
```

Page 3

```
 1 A P P E A R A N C E S:
 2
 3 DOUGLAS, LEONARD & GARVEY, P.C.
      Attorneys for Plaintiff
 4    14 South Street
      Concord, New Hampshire 03301
 5 BY: BENJAMIN T. KING, ESQ.
         -and-
 6    MEGAN E. DOUGLASS, ESQ.
      Tel: (603) 224-1988
 7    E-mail: Benjamin@nhlawoffice.com
              mdouglass@nhlawoffice.com
 8
 9
10 DEPARTMENT OF JUSTICE
      Attorneys for Defendants
11    Office of the Attorney General
      33 Capitol Street
12    Concord, New Hampshire 03301
13 BY: LYNMARIE C. CUSACK, ESQ.
         -and-
14    FRANCIS X. FREDERICKS, JR.
      Tel: (603) 271-3650
15    E-mail: Lynmarie.cusack@doj.nh.gov
              stephanie.duquette@doj.nh.gov
16
17              STIPULATIONS
18    It is agreed that the deposition shall be taken
19 in the first instance in stenotype and when
20 transcribed may be used for all purposes for which
21 depositions are competent under the Federal Rules
22 of Civil Procedure.
23    Notice, filing, caption and all other
```

Page 4

```
 1 formalities are waived. All objections except as
 2 to form are reserved and may be taken in court at
 3 time of trial.
 4    It is further agreed that if the deposition is
 5 not signed within thirty (30) days after submission
 6 to counsel, the signature of the deponent is
 7 waived.
 8    (Smith Exhibit 1, Notice of Deposition
 9 Pursuant to Fed.R.Civ.P. 30(b)(6), was marked
10 for identification.)
11    (Smith Exhibit 2, N.H. Department of
12 Corrections Policy and Procedure Directive,
13 effective 12/15/11, was marked for
14 identification.
15    JEFFREY R. SMITH,
16 having been duly sworn by Ms. Nostrand,
17 was deposed and testified as follows:
18    EXAMINATION
19    BY MR. KING:
20 Q. Good morning, Captain Smith.
21 A. Good morning.
22 Q. You and I have met before. I deposed you
23 before as a defendant in this case brought by
```

Page 5

```
 1 Jonathan Leite, correct?
 2 A. Yes.
 3 Q. Today I am deposing you because the
 4 Northern New Hampshire Correctional Facility has
 5 designated you as a 30(b)(6) witness to testify
 6 with knowledge about certain topics; is that your
 7 understanding?
 8 A. Yes.
 9 Q. Okay. I'm going to show you what we
10 marked as Exhibit 1 (handing.) That's the 30(b)(6)
11 deposition notice and subpoena. I would direct
12 your attention to Page 3 of Exhibit 1. You are
13 here to testify regarding topic 3, correct?
14 A. Yes.
15 Q. And you are here to testify regarding
16 topics 6, 7, 8, 9 and 10; is that also correct?
17 A. Is that --
18    MS. CUSACK: So 6, yes, and then I think
19 what the court -- if I recall the discussion at
20 the court, that 6, 8 and 9 were blended
21 together sort of as a broader subject, and 10,
22 yes, but 7, I thought that we -- that was
23 not -- well, yes, 6 through 10.
```

Page 6

1  MR. KING: Okay.
2  Q. So we're in agreement that the topics that
3  you're here to testify regarding today, Captain,
4  include topics 3, 6, 7, 8, 9, and 10 in Exhibit A
5  of the 30(b)(6) deposition subpoena which we've
6  marked as Exhibit 1 here today.
7  A. Correct.
8  Q. Okay. In August of 2012, what, if
9  anything, would a corrections officer at the
10 Northern New Hampshire Correctional Facility, which
11 I'll refer to as NCF, what, if anything, would a
12 corrections officer at NCF do to prepare an inmate
13 for a visit?
14 A. To prepare an inmate for a visit?
15 Q. Yes.
16 A. The procedure is, there's an officer at
17 the front door who signs in visitors as they come
18 into the facility. Once they're checked in the
19 computer to make sure that they're on the approved
20 visitor list for the inmate they're visiting, they
21 go through the procedure at the front door, the
22 officer then calls to the control room to let them
23 make an all-call over the unit, pretty much to

Page 7

1  locate the inmate.
2     So an all-call announcement would be
3  broadcast over the unit; if the inmate was at work
4  or somewhere else they would locate him, but
5  getting the inmate's attention that he has a visit.
6  So then he walks down the main corridor and enters
7  the visit room through the area that you get strip
8  searched, by himself, and then approach the desk
9  where there's a visiting room officer. He goes up
10 to the desk, hands over his I.D., and the officer
11 assigns a seat and the inmate sits down.
12 Q. So if I understand correctly, the inmate
13 isn't stripped out or strip searched or anything
14 like that before the visit.
15 A. No.
16 Q. Is that correct?
17 A. Correct.
18 Q. Okay. What, if anything, did a
19 corrections officer at NCF do in the August 2012
20 time period after an inmate had a visit after the
21 visit was over?
22 A. After the visit, the inmates are strip
23 searched, every one of them, that's standard

Page 8

1  procedure.
2  Q. Do you know who strip searched Jonathan
3  Leite after the visit he had with Ashley Peters on
4  August 24, 2012?
5  A. No, there's no record of exactly who strip
6  searched that particular inmate. There's no log of
7  that.
8  Q. Why not?
9  A. It's not something that we record. It's
10 considered a routine search. Only ones that are
11 abnormal would be announced to the shift commander
12 which would possibly then be logged. At the end of
13 a visit room session, all the inmates are strip
14 searched and that's considered routine because
15 that's standard procedure and it's not logged
16 exactly who did each strip search.
17 Q. Understanding that there's no log of who
18 strip searched Mr. Leite after his visit with
19 Ashley Peters on August 24, 2012, have you made any
20 inquiry in preparation for your deposition today as
21 to who, more likely than not, strip searched
22 Jonathan after his visit with Ashley Peters on
23 August 24, 2012?

Page 9

1  A. Yes; looking at the roster for the day, it
2  was Officer Osgood at the front door and Officer
3  Westberry in the visit room, and the normal
4  procedure when there's a visit, when the visit room
5  session sends, the two of them work together to do
6  the strip searches and keep an eye on the inmates
7  that aren't being strip searched yet. They have,
8  like, a waiting area where they wait for their
9  turn. So everyone has to be monitored, so between
10 the two of them, one of them did that strip search.
11 Q. What is Officer Osgood's first name?
12 A. Jason.
13 Q. Does he remain employed with the Northern
14 New Hampshire Correctional Facility?
15 A. Yes.
16 Q. What title does he presently hold?
17 A. He's a corporal at the moment.
18 Q. What title did he hold in August of 2012?
19 A. Officer.
20 Q. Have you spoken with Corporal Osgood
21 regarding whether he recalls strip searching
22 Jonathan Leite on August 24, 2012?
23 A. Yes.

Page 10

1 Q. What was his response?
2 A. I asked him about the night before, kind
3 of pointing out that, you know, when I first
4 brought up the incident, his first reaction was, I
5 think I was home that day, I don't think I was even
6 working that day, and I corrected him and said,
7 actually, you were, you were on the schedule as
8 working, do you remember that night at all, and he
9 didn't. He didn't recall the time he spent in
10 either the front door or the visit room, and when I
11 said -- when I described, you know, what happened
12 afterwards and that there was a chance that
13 Mr. Leite had told him information during the strip
14 search, his response was, well, I would have -- I
15 would have immediately reported that, I would have
16 written that down, and knowing his character, I
17 believe it when he says that that's definitely --
18 knowing Jason, he would have taken that information
19 and would have followed up for sure. That's one of
20 those things where -- and I don't know if I'm going
21 too far as far as referring to what Mr. Leite said
22 because I can't actually come up exactly with what
23 Leite was claiming. I don't know if I'm supposed

Page 11

1 to refer to that.
2    MS. CUSACK: I think you've answered his
3 question.
4    THE WITNESS: Okay.
5 Q. I agree. Just -- you already said it, but
6 Corporal Osgood was working where on the afternoon
7 of August 24, 2012, one of them was in the visit
8 room and one of them was somewhere else?
9 A. As far as I recall, he was at the front
10 door, that was his assignment.
11 Q. And then Officer Westberry was working the
12 visit room?
13 A. Yes.
14 Q. What is Officer Westberry's first name?
15 A. Walter, I believe.
16 Q. Does Walter Westberry remain employed with
17 NCF?
18 A. No.
19 Q. When did his employment end, if you know?
20 A. I'm not sure. I'd be guessing.
21 Q. Okay. Do you know his current address?
22 A. No. I know he was a former state trooper
23 and he worked in corrections for a while and now

Page 12

1 he's, like, completely retired, as far as I know,
2 so he could be anywhere.
3 Q. Have you communicated with Officer
4 Westberry regarding -- let me finish the question.
5 Have you communicated with Officer Westberry
6 regarding whether he stripped out Mr. Leite after
7 Mr. Leite's visit with Ashley Peters on August 24,
8 2012?
9 A. No.
10 Q. Is that because you don't know how to
11 communicate with Officer Westberry?
12 A. Correct.
13 Q. Is Officer Westberry no longer at the last
14 known address to NCF?
15 A. I have no idea.
16 Q. So did you not try to correspond with
17 Officer Westberry at his last known address?
18 A. I didn't make an attempt, no.
19 Q. I'm going to move now to topic 9. Have
20 you read Kathleen Deschene's deposition testimony
21 in preparation for your testimony today?
22 A. Yes.
23 Q. So you're aware that she testified that

Page 13

1 approximately a week after the August 24, 2012
2 incident, she saw footage of herself walking by
3 Jonathan Leite's bunk for the 4:50 p.m. round?
4 A. I read that, yes.
5 Q. She testified that she observed Mr. Leite
6 getting helped get up on top of his bunk and then
7 she observed herself come in and do a round and
8 walked past Mr. Leite's day room bunk. Do you
9 recall that testimony?
10 A. Yes.
11 Q. Do you know who showed Ms. Deschene that
12 video footage?
13 A. No, I don't know exactly who did that.
14 Q. You didn't show her the video footage of
15 her doing the 4:50 p.m. round?
16 A. It's a possibility, but I don't recall
17 that at all, if it's okay to explain.
18 Q. Yes.
19 A. The videos, anyone a sergeant and above
20 had access to the videos so it could be -- I was a
21 sergeant at the time so it could have been me, it
22 could have been another sergeant working with her.
23 Q. You did the review of the video footage of

Page 14

1 F block on August 24, 2012 in connection with the
2 assault on Jonathan Leite?
3 A. I reviewed the video, yes.
4 Q. Do you recall, yourself, reviewing video
5 footage depicting then Kathy Bergeron walking past
6 Jonathan Leite's bunk at approximately 4:50 p.m. on
7 August 24, 2012?
8 A. I don't recall anything other than the
9 video clips that you've had access to. Like, I've
10 seen her on those video clips, but I don't recall
11 any other -- it's been five years. I don't recall
12 anything much else.
13 Q. Well, you did write in your incident
14 report that you observed footage of Jonathan
15 vomiting over the bunk onto the floor, correct?
16 A. Yes.
17 Q. So you don't recall if, in that video
18 footage where Jonathan was shown vomiting over the
19 bunk onto the floor, whether that footage also
20 depicted Kathy Bergeron walking past the bunk,
21 doing the 4:50 p.m. round?
22 A. No.
23    MS. CUSACK: I'm going to object to the

Page 15

1 form, but go ahead.
2 A. I don't recall that.
3 Q. Okay. What, if anything, did you do to
4 prepare to testify as to topic 9?
5 A. I talked to Kathy.
6 Q. And what did Kathy tell you?
7 A. Pretty much the same that was in the
8 testimony. I just had her go over it again because
9 she had a memory of watching herself and then the
10 same kind of questions that you're asking as far
11 as, like, do you remember, like, who showed you and
12 she didn't recall.
13    I explained to her, because I don't know
14 if the officers knew at the time of how the videos
15 got distributed, but I explained to her, like, at
16 the time it was normal for the video clips to be
17 accessible for sergeants and above. So, yes, I
18 guess someone could have shown you in the upper
19 housing office so I was referring to her testimony
20 saying, you know, that is correct that you would
21 have seen that, it is possible that you would have
22 seen that in upper housing, but, yeah, it was just
23 kind of going over her deposition and just

Page 16

1 verifying what she had said.
2 Q. You've told me that anyone sergeant or
3 above has access to video footage on August 24,
4 2012, in that time period, right?
5    MS. CUSACK: Objection to form, but go
6 ahead.
7 A. The video footage that I downloaded and
8 put on a specific folder that could be seen, not
9 the full DVR access.
10 Q. How many people held the rank of sergeant
11 or above with access to video on August 24, 2012,
12 or thereabouts?
13 A. Give me a second. It would be
14 approximately between 20 and 25.
15 Q. Of those 20 to 25 people, how many remain
16 employed at NCF?
17 A. I'd say all but maybe five of those.
18 There's been some retirements, but most of them
19 remain.
20 Q. Did you speak with any of the 15 to 20
21 people who remain, who held the rank of sergeant or
22 above on August 24, 2012, with regard to whether
23 they showed video footage to Kathy Bergeron in

Page 17

1 approximately the week following the August 24,
2 2012 incident?
3 A. No, I haven't.
4 Q. Why not?
5 A. I'm not sure. As far as finding out who
6 exactly showed her the video?
7 Q. Yes.
8 A. There's no specific reason.
9 Q. Okay. We would want to know who showed
10 her the video and why she was shown the video.
11    I'll direct your attention to topic 10,
12 please. Before we get there, let me just ask you,
13 did you ask Kathy Bergeron, now Kathy Deschene,
14 what her understanding was of the purpose she was
15 shown the video footage of the 4:50 p.m. round
16 approximately a week after the August 24, 2012
17 incident?
18 A. The only thing I remember her mentioning
19 to me is that she was just curious as to her role,
20 like, she logged -- she went to double check to
21 make sure that everything was done correctly
22 because they don't want to have that feeling of
23 guilt, like, I could have prevented that type of

Page 18

1 feeling.
2    I remember her telling me that she felt
3 relieved after watching herself do rounds and catch
4 him at count time. Like, that's the time to catch
5 that kind of incident is at count, and they, you
6 know, successfully noticed that there was something
7 amiss with Mr. Leite at count time and she felt
8 satisfied after watching the video clips that were
9 on the S drive.
10 Q. Now I'll direct your attention to topic
11 10. Was any discipline given to any employee of
12 NCF relating in any way to the August 24, 2012
13 incident resulting in injury to Jonathan Leite?
14 A. I wouldn't have that information.
15    MS. CUSACK: Well, hold on for a second.
16 I'm going to take him out.
17    MR. KING: Okay.
18    (A short recess was taken.)
19    MS. CUSACK: Go ahead. Do you want to
20 just ask your question again, the same one that
21 you just asked?
22 Q. Before I move onto that, when you spoke
23 with Kathy Bergeron about the video footage that

Page 19

1 she viewed approximately one week after the
2 August 24, 2012 incident, did she describe for you
3 the video footage that she viewed?
4 A. She said that she remembers seeing herself
5 do a round and that matches to what the video clips
6 that you have access to that there is video. I'm
7 not sure off the top of my head which round that
8 was, but there is video of her walking through,
9 doing a round so, to me, that was -- you know,
10 that's what she was referring to when she described
11 that watching herself on the video, seeing herself
12 walk through the unit.
13 Q. Well, there's video footage that you
14 downloaded and that's been produced in discovery of
15 Officer Bergeron doing a round at approximately
16 3:41 p.m., where she walks by the cells that are on
17 the lower tier of cell block F, correct?
18 A. Correct.
19 Q. Okay. But topic 9 on the 30(b)(6)
20 subpoena deals with other video footage. Let me
21 just -- on Page 31 of Defendant Bergeron's
22 deposition, I asked her, as of August 24, 2012, did
23 you have access to the video footage of what

Page 20

1 happened in F block, and she responded, I think it
2 was a week later that I, I had seen me walking by
3 the bunk for the 1650 and I just remember seeing it
4 in upper housing, I don't recall seeing the 1545
5 round until today.
6    We don't have the video footage of Officer
7 Bergeron doing the 4:50 round, correct?
8    MS. CUSACK: I'm going to object to the
9 form, but go ahead.
10 A. I don't want to get the times wrong
11 because I don't have the list of the video clips in
12 front of me, but 4:50 is, like, he was discovered
13 at the five o'clock count, as far as I believe,
14 right?
15 Q. He was discovered at 5:08, yes.
16 A. No, we don't have that video, that video
17 clip saved.
18 Q. I proceeded to ask Officer Bergeron on
19 Page 32 of her deposition, who showed you the
20 footage of you doing rounds at 1650, and she said,
21 I'm not going to remember that, there were some
22 people in upper housing that had access to the
23 video and I don't know who showed me, and I asked

Page 21

1 her, all right, but did you have access to the
2 video without someone showing it to you, and she
3 answered, no.
4    So topic 9 deals with this instance where
5 Officer Bergeron was shown video evidence showing
6 activities occurring August 24, 2012 on F block.
7 So when you spoke with Officer Bergeron, did you
8 ask her about what video footage she reviewed
9 pertaining to the 4:50 round?
10 A. Well, it was very common to review video
11 for officers -- for sergeants to show video to
12 officers of any incident that occurred the prior
13 day or the prior shift. That's what -- speaking
14 for myself, that's what I did when I downloaded the
15 video and preserved it is, there was a specific
16 folder on the network drive that we specifically
17 named all the sergeants and lieutenants who could
18 have access to that and it didn't even show up on
19 their computer if you weren't of that rank.
20    The video clips -- a copy of the video
21 clips were put in that folder so if there was a
22 fight or, you know, if two inmates were fighting or
23 if there was a use of force event, anything, it was

Page 22

1 put there for training and review purposes so
2 staff -- you know, staff that worked the night
3 shift that don't see as much, don't have as much
4 experience, can see what goes on in their own
5 prison to review it, learn from it, you know,
6 review the positioning of staff positioning when
7 you're entering an area. So it was -- it was for
8 the staff that worked there, the security staff, it
9 was common to review video. You didn't have to go
10 out of your way to ask a sergeant, hey, can I see
11 the video from yesterday. So that explains how she
12 would have seen it because it was common, you know,
13 it was, like, a common review process that staff
14 would do to educate themselves.
15     As far as the specific video clips, I'm
16 the one that put it there and I supplied everything
17 to our investigations bureau when they're doing a
18 criminal case which was then forwarded for this
19 case. So any video that she refers to in her
20 deposition, if it's not in the video that you have,
21 then it doesn't exist.
22 Q. I know that. Did Officer Bergeron tell
23 you the substance of the video footage she was

Page 23

1 shown pertaining to the 4:50 p.m. round on
2 August 24, 2012?
3 A. No, because she provided the same sort of
4 answer as far as she doesn't remember the times,
5 but she remembers seeing herself walk through the
6 unit and she remembers seeing the footage of him
7 being lifted up into the bunk.
8 Q. Did she tell you that she remembers seeing
9 footage of her walking by the area of the bunk when
10 Jonathan Leite was in it?
11 A. That video doesn't exist. I don't think
12 there's a video of anyone doing a round after he
13 got in the bunk.
14 Q. Well, I submit to you that the video
15 existed as of August 31, 2012, or thereabouts.
16     MS. CUSACK: I'm going to object to that
17 characterization.
18 Q. I'm going to hand you my copy of the
19 deposition of Kathleen Deschene and ask you to read
20 from line 19 on Page 31 through line nine of Page
21 33, not aloud, just to yourself (handing.)
22 A. Repeat that.
23 Q. Line 19 on Page 31 through line nine of

Page 24

1 Page 33.
2 A. (Perused the document.)
3    Okay.
4 Q. Are you all set?
5 A. Yep (handing.)
6 Q. So according to Kathy Bergeron's
7 deposition testimony approximately one week after
8 the incident, video footage existed depicting her
9 doing the 4:50 p.m. round and walking past the day
10 room bunk where Jonathan Leite lay; is that
11 correct?
12     MS. CUSACK: Objection to form. Go ahead.
13 A. The question is, did I read that or is it
14 true?
15 Q. That's what Officer Bergeron testified to,
16 correct?
17 A. Yes, that's what I just read, yes.
18 Q. When you spoke with Officer Bergeron in
19 preparation for giving your 30(b)(6) deposition
20 testimony today, did you ask her about her review
21 of that video footage in the 4:50 p.m. round on
22 August 24, 2012?
23 A. Yes. Yeah.

Page 25

1 Q. And what did she tell you about her review
2 of that video footage of the 4:50 p.m. round?
3 A. I told her, I said, Kathy, you couldn't
4 have seen that because it doesn't exist, and her
5 response was, well, it was five years ago and I
6 don't remember the times, I just remember seeing
7 myself walk through the unit. So, to me, that was
8 in reference to a previous hour's round where there
9 is video footage of her walking through the unit.
10 She's mistaken with the times.
11 Q. How can she be mistaken if she remembers
12 seeing the inmate help Jonathan Leite up into the
13 bunk?
14 A. Yes, that video exists.
15 Q. And then she remembers herself coming in
16 and walking past that day room bunk.
17     MS. CUSACK: Objection to form. Go ahead.
18 A. She remembers walking through the unit,
19 yeah, she walks through the unit doing a round, but
20 it was prior to him being in the bunk.
21 Q. The video footage that we have of her
22 doing the walkthrough at 3:41 doesn't show her
23 walking past the day room bunk.

Page 26

1 A. I didn't look at it. She was doing a
2 round.
3 Q. How do you know that the video footage she
4 describes at Pages 31 through 33 of her deposition
5 testimony didn't exist as of August 31, 2012?
6 A. Because I was the only one that downloaded
7 the video and preserved it and I did not preserve
8 that section of time.
9 Q. Isn't it possible that it's because you
10 didn't download the video that the video of the
11 4:50 p.m. round has been lost?
12 MS. CUSACK: Objection to form. I don't
13 know what that question means.
14 A. Could you clarify?
15 Q. Video evidence, if not downloaded in the
16 August 2012 time period, is overwritten
17 approximately 15 days after it's recorded; is that
18 correct?
19 A. Correct.
20 Q. So as of August 31, 2012, video evidence
21 of the occurrences on cell block F on August 24,
22 2012 had not yet been overwritten, right?
23 MS. CUSACK: Objection to form. Go ahead.

Page 27

1 A. Well, 15 days after the 12th would be the
2 27th and you said the 31st.
3 Q. Perhaps I misspoke. The incident occurred
4 on August 24, 2012, right?
5 A. Sorry. Yes.
6 Q. So seven days later, video footage of F
7 block on August 24, 2012 had not yet been
8 overwritten, right?
9 A. Most likely correct, yes.
10 Q. So as of August 31, 2012, video footage of
11 the 4:50 p.m. round would still have existed,
12 correct?
13 A. Yes, on the DVRs, not where she said she
14 watched the video.
15 Q. If Officer Bergeron hadn't watched a video
16 of the 4:50 p.m. round, how would she know that
17 inmates had to help Jonathan Leite get back up into
18 the bunk?
19 A. Because she watched that video of the
20 inmates helping him into the bunk.
21 Q. When did she watch that video?
22 A. I don't know myself, but going by the
23 deposition, she watched it a week later after the

Page 28

1 incident.
2 Q. The inmates pushed Jonathan up into the
3 top day room bunk at approximately 4:20 or
4 4:21 p.m.; is that right?
5 A. Yes.
6 MS. CUSACK: Objection to form.
7 A. Yes, approximately.
8 Q. And then there was a 4:50 p.m. round after
9 Jonathan was placed in the upper bunk, right?
10 A. Yes.
11 Q. And Kathy Bergeron and Trevor Dube did the
12 4:50 p.m. round?
13 A. That's what the log says, yes.
14 Q. And the video footage of the 3:45 round
15 does not depict Officer Bergeron walking past
16 Jonathan Leite's day room bunk, right?
17 A. Oh, boy, off the top of my head, I just
18 remember seeing her on the video, her exact path
19 through the unit, I don't recall off the top of my
20 head.
21 Q. Well, I will represent to you that the
22 video footage of the 3:45 p.m. round does not
23 depict Officer Bergeron walking past the day room

Page 29

1 bunk where Jonathan Leite was assigned.
2 MS. CUSACK: I'm going to object to the
3 characterization.
4 Q. Are you contending that the video footage
5 produced in discovery does depict Officer Bergeron
6 walking past Jonathan Leite's day room bunk at any
7 time?
8 MS. CUSACK: One could interpret her
9 answer as, I walked by that bunk, how far away
10 from that bunk she was, I don't know, so as
11 she's walking through the unit, she walks past
12 that bunk.
13 A. Yep, you walk past all the bunks when you
14 do a round.
15 Q. Doesn't the video footage depict her
16 entering cell block F and walking immediately
17 towards the bathroom?
18 A. Oh, boy, I don't have that in front of me.
19 If that's truthful with what the video shows, then
20 I agree with that.
21 Q. Okay. What if the video evidence depicts
22 Officer Bergeron entering cell block F, walking in
23 the direction of the bathroom and then walking past

Leite v.
Corrections Officers
Jeffrey Smith
December 04, 2017

Page 30

1 the cells and she doesn't walk past the day room
2 bunk?
3    MS. CUSACK: Objection to form. Go ahead.
4 A. The same sort of argument that she was
5 walking past all the bunks on her left and her
6 right, the ones in the cells and the ones in the
7 day room. As far as how far away, are you talking
8 about the left side of the staircase, the right
9 side of the staircase?
10 Q. If she is walking -- if Officer Bergeron
11 is walking past the cells directly in front of the
12 cells, that is not walking by the day room bunk, is
13 it?
14 A. Not next to them, yes.
15 Q. So beginning at approximately 4:20 p.m.,
16 there is a sequence of events where Jonathan Leite
17 first emerges from cell nine, correct?
18 A. Correct.
19 Q. He then stumbles and falls to the ground,
20 correct?
21 A. Correct.
22 Q. Jonathan Gelinas then picks him up and
23 walks him to his day room bunk, right?

Page 31

1    MS. CUSACK: Objection to form. Go ahead.
2 A. If that's the name of the inmate that
3 helped him, yes, I remember an inmate helping him.
4 Q. And then with inmates pushing him,
5 Jonathan Leite gets up on his bunk, correct?
6    MS. CUSACK: Objection to form. Go ahead.
7 Q. Correct?
8 A. Correct.
9 Q. And approximately 25, 30 minutes later,
10 Officer Bergeron and Officer Dube do a round of
11 cell block F, right?
12 A. Correct.
13 Q. And at the time of the 4:50 p.m. round,
14 Jonathan Leite is in his bunk, right?
15 A. That's where he was found at 1708 so I'm
16 going to assume that he stayed in his bunk the
17 entire time. I remember I reviewed the video that
18 night of the incident and I don't recall him
19 getting up and moving around once he got up in his
20 bunk.
21 Q. Isn't it consistent with the sequence of
22 events that we have just gone over that Officer
23 Bergeron saw video footage of, first, inmate Leite

Page 32

1 being helped up onto the bunk and then her doing
2 the 4:50 p.m. round and walking past the day room
3 bunk?
4 A. That's not possible.
5 Q. Why is it not possible?
6 A. So either she's incorrect in her location,
7 either she was brought to education where the DVRs
8 are located and someone reviewed them, like, helped
9 her watch the entire thing because, like you said,
10 the video still existed, or she's incorrect with
11 her times and she was actually watching another
12 hour's round and when she testified or did her
13 deposition, she misspoke the time.
14 Q. So one error, you believe, that Officer
15 Bergeron could be making is that she was shown the
16 video in upper housing; is that right?
17 A. Correct. If she's -- I'm sorry. Just to
18 clarify, if she's adamant, even five years later,
19 that she saw that specific round, that was only
20 possible in education where the DVRs are located.
21 Q. What video evidence could be viewed in
22 upper housing?
23 A. The clips that you have access to right

Page 33

1 now, just those.
2 Q. So in order for a video to be viewed in
3 upper housing, it has to be downloaded; is that
4 correct?
5 A. Yes.
6 Q. But any video footage of August 24, 2012
7 could have been viewed in education a week later
8 because it hadn't been overwritten yet; is that
9 right?
10 A. Correct.
11 Q. So if Officer Bergeron did see the video
12 footage she describes at Pages 31 through 33 of her
13 deposition testimony, she had to have viewed that
14 video footage in education; is that right?
15 A. Correct. Specific to the 1450, or was it
16 the 1650 round, that's the only one that throws me
17 off as far as that's only possible if she went to
18 education.
19 Q. Who had access to view a video at
20 education as of August 2012?
21 A. Supervisors, corporals and above.
22 Q. So the same 20 to 25 people that you were
23 talking about earlier?

1  A. More than that; add corporals onto that
2  and that would be another 15 or so people. That
3  area was -- generally, there was no written
4  procedure, but generally, we wanted a supervisor
5  present. We didn't want just officers going into
6  that room and viewing video alone, so as long as
7  they had a supervisor present, they can draw the
8  keys and access the DVR room.
9  Q. As of August of 2012, was it possible for
10 someone watching video in education to delete any
11 video footage?
12 A. No, no, that's impossible. The system is
13 designed that way that you can't -- that someone
14 couldn't sabotage the DVR system and cause it to
15 delete anything.
16 Q. Turning to topic 10, was any discipline
17 given to any NCF employee as a result of the
18 August 2012 incident resulting in injuries to
19 Jonathan Leite?
20 A. So to correct myself before we -- before I
21 had to step out, speaking as a chief of security, I
22 don't have access to that information, but speaking
23 on behalf of the New Hampshire Department of

1  Corrections, there was a file review done by the
2  human resources department and there was no
3  discipline, counseling or coaching given to any
4  officer or staff member from that date.
5  Q. How do you know that one of the 35 to 40
6  people who had access to the video in education as
7  of August 2012 didn't show Officer Bergeron footage
8  of the 4:50 p.m. round for counseling or coaching
9  purposes, if not disciplinary purposes?
10 A. Just speaking hypothetically, if that did
11 occur, it was on -- it wasn't written down anywhere
12 that that occurred.
13 Q. Okay. Did you make any inquiry as to the
14 35 to 40 people who had access to video in
15 education in August of 2012 whether they showed
16 Kathy Bergeron footage of the 4:50 p.m. round
17 approximately a week after the August 24, 2012
18 incident?
19 A. No, I haven't.
20 Q. When you were talking to Officer Bergeron
21 recently in preparation for your 30(b)(6)
22 deposition, did you tell her that she was mistaken
23 in her deposition testimony?

1  A. Yes. Like I had mentioned earlier, I said
2  I -- I told her, Kathy, that isn't possible that
3  you saw that round, we don't have that video
4  downloaded, and then that's where she said, you
5  know, it was five years ago, I probably got the
6  times wrong, I'm sorry, but she just -- what she
7  was sure about was that she saw herself do a round,
8  she saw herself on the video do a round and then
9  she saw the footage of Mr. Leite being lifted back
10 into the bunk.
11 Q. When you were spoking with Officer
12 Bergeron in preparation for your 30(b)(6)
13 testimony, did you explain to her that there was a
14 possibility that she had seen video footage of the
15    4:50 p.m. round, but saw it in education rather
16 than in upper housing?
17 A. My impression when I talked to her was
18 that she was in upper housing when she saw the
19 video.
20    MR. KING: Read back my question, please.
21    (The requested portion was read back by
22 the reporter.)
23 A. Yes, that's an obvious -- staff knew where

1  the DVRs were located, that's definitely --
2  Q. So you told Officer Bergeron, in your
3  recent conversation with her to prepare for your
4  deposition today, that she could have seen the
5  footage of the 4:50 p.m. round in education?
6  A. No.
7  Q. That's what I was asking. You just told
8  her that she was mistaken, that it was impossible
9  that she could have seen the 4:50 p.m. footage?
10    MS. CUSACK: Objection to form. Go ahead.
11 A. I told her that if you watched it -- like
12 I said, she gave the impression that there were
13 other people around and it was in the upper housing
14 office and someone showed her the video, and I told
15 her, like, what you said in your deposition, that's
16 not possible because that video clip doesn't exist
17 of the 1650 round, and that's where she explained
18 that, you know, it's five years ago, I probably got
19 the times wrong.
20 Q. So you told her it didn't exist, even
21 though the video footage did, in fact, exist on
22 August 31, 2012, right?
23 A. Correct.

Page 38

1  MS. CUSACK: And I just want to clarify,
2  it did not exist in upper housing.
3  MR. KING: I think that's been made
4  abundantly clear.
5  Q. You just saw or read the deposition
6  testimony of Officer Bergeron where she says at
7  Page 32 of her deposition she didn't recall seeing
8  the 3:45 p.m. round until the day of her
9  deposition, right?
10 A. Correct.
11 Q. I'm now going to turn to topics 6, 7 and 8
12 on Exhibit A to the deposition subpoena. Was any
13 quality assurance serious incident review done in
14 connection with the assault on Jonathan Leite?
15 A. There was a review, but not a quality
16 assurance review; per the PPD, there's no record of
17 one.
18 Q. I'm going to show you what we've marked as
19 Smith Exhibit 2 (handing.) Smith Exhibit 2 is the
20 New Hampshire Department of Corrections Policy and
21 Procedure Directive relating to quality assurance
22 serious incident reviews that was in effect on
23 August 24, 2012; is that right?

Page 39

1  A. Correct.
2  Q. And the August 24, 2012 incident qualifies
3  as a serious incident within the meaning of section
4  3B of the policy, right?
5  A. Let me review this.
6     (Reviewed the document.)
7  Q. I can try that another way. Jonathan
8  Leite suffered a serious injury as a result of the
9  August 24, 2012 assault, right?
10 A. Yes, it qualifies for the first one,
11 serious injury or death, yes.
12 Q. Have you ever been part of a quality
13 assurance serious incident review?
14 A. No, not myself.
15 Q. My question may have been a little vague.
16 I take it from your testimony that you've never
17 been on a serious incident review board; is that
18 right?
19 A. Yeah. These are done at, like, a
20 commissioner's level down at headquarters in
21 Concord and I've never had to sit on one of those
22 committees before.
23 Q. Have you ever been interviewed in

Page 40

1  connection with a quality assurance serious
2  incident review?
3  A. Not interviewed, but my work has gone into
4  one.
5  Q. Well, have you ever participated in any
6  communications with respect to a quality assurance
7  serious incident review?
8  MS. CUSACK: Objection to form. Go ahead.
9  A. Yes.
10 Q. What would the nature of those
11 communications be?
12 MS. CUSACK: I'm going to object; if it's
13 not related to this case and it's quality
14 assurance, quality assurance is protected.
15 MR. KING: I'm not asking him about a
16 specific serious incident review and topic 7
17 has to do with NCF's policies and procedures on
18 conducting reviews of serious incidents and
19 he's the -- Captain Smith is the 30(b)(6)
20 designee so I think I am entitled to ask him
21 about what happens during a quality assurance
22 serious incident review at NCF and that would
23 entail the nature of the communications in

Page 41

1  which he's participated in.
2  MS. CUSACK: As long as we're not getting
3  into any specifics about any quality assurance.
4  A. I can answer that without -- I can explain
5  the process.
6     The incidents that occur are summarized
7  into an administrative briefing every night by the
8  third-shift shift commander and those are
9  distributed to the chief of security and the warden
10 and the director of security in training and
11 various other people that need to know on a need to
12 know basis. So immediately, the next morning, the
13 chief of security would do an initial review of a
14 serious incident. There's weekly warden meetings
15 where all the shift commanders and housing
16 lieutenants and someone from the investigations
17 department and the administrator of programs and
18 the wardens, we all sit together and do a weekly
19 review of incidents that have occurred over the
20 week and so a serious incident would be reviewed
21 again in that format.
22    For quality assurance, the one I've been
23 involved in just involved myself and the warden and

the investigations bureau going over a criminal case and discussing any outlying issues, any, like -- I'm trying to not use any specifics. Like, kind of like how did this occur, you know, is there anything we could have done to prevent it, is there anything that we need to change, more cameras to be installed, kind of looking at it, it's a prison, was it a matter of the inmates just waiting for the right time or is it something that the department could do to be better, is there budget constraints that prevent us from doing that, like, all the obstacles.

So that information, outside of a criminal case because the investigations are dealing with the criminal side, then the warden would then bring that to headquarters for the actual quality assurance review and that would be discussed further. I haven't actually been part of one at that level.

Q. As of August 2012, who would have made the decision to initiate a quality assurance serious incident review in connection with the assault on Jonathan Leite?

A. I would say it would be between the warden and, I would say, either the director of security and training or the commissioner himself at the time. It's one of those where the commissioner is briefed and the director is briefed on what's going on at each facility, and I'm assuming one of those positions would be, like, we need to do a quality assurance review, let's schedule one.

Q. As of August 2012, Scott Lambertson was the chief of security, right?

A. Yes.

Q. So we were speaking generally earlier. I'd like now to speak specific to Jonathan Leite's case. On the third shift on August 24, 2012, Chief of Security Lambertson would have been briefed on the assault that happened; is that right?

A. I called him myself. I was the shift commander on the second shift so I talked to him myself.

Q. Do you recall what you told him?

A. Not exactly, but it would have been, I remember when I first called him he -- I'm trying to think now, actually. Mr. Leite was at the

hospital and I don't believe he had been diagnosed, like, he hadn't been -- he was flown to Dartmouth and I don't believe at that point that had happened yet, but it was just part of our protocol of, like, initially, you need to call the chief of security so it was just telling him that we had a serious assault and that we had someone going to the hospital to be treated for that assault and that always triggers a standard phone call. I believe I talked to him twice, if I remember, that night.

Q. So as a shift commander, that was the extent of your responsibility, you're not responsible for, or weren't as of August 24, 2012, for recommending or initiating the quality assurance serious incident review; is that right?

A. No, the shift commander wouldn't do that, but my role would be to do as much follow-up as possible, to gather the data to provide to the chief of security so they could bring that up the chain and make that decision.

Q. As of August 24, 2012 or --

MR. KING: Strike that.

Q. As of August 2012, would Chief of Security

Lambertson have been the person to recommend a quality assurance serious incident review in the first instance?

MS. CUSACK: I'm going to object to form. Go ahead.

A. I would say it would be a joint decision between himself and the warden, one of those two, I would say would -- like I said, they have a weekly meeting and I'm sure they would have decided at a point.

Q. Who was the warden on August 24, 2012?

A. Edward Riley. I believe it was Edward Riley, yeah. I believe he started at the end of 2011 or the beginning of 2012.

Q. Do you know how Mr. Riley is employed now?

A. No, I'm not sure.

Q. How long was he the warden at NCF?

A. Approximately three years.

Q. I just have in my head from one of the other depositions that at this point in time there may have been a temporary warden. Does that ring a bell?

A. In Scott Lambertson's -- that's where my

Page 46

1 memory is a little foggy. It was either Riley or
2 the director of security and training, Chris Kench.
3 Before Riley was hired there was a period of
4 transition where he was the temporary warden. He
5 came from headquarters so I would have to look at
6 the timeline, but I guess that's possible that
7 Chris Kench was our acting warden if it was a
8 period before Edward Riley was hired.
9 Q. How long was Chris Kench the acting
10 warden?
11 A. It was, I'd say, approximately six months
12 or so. I remember there was a period where it took
13 a while for them to fill the position.
14 Q. Now, in the event of an incident such as
15 the assault upon Jonathan Leite, if a quality
16 assurance serious incident review had been done,
17 one of the goals of such a review would have been
18 to determine if correctional staff could have done
19 anything to prevent the assault or mitigate the
20 damages to Jonathan; is that fair to say?
21 A. Yeah.
22 Q. And in the event of an incident such as
23 the assault upon Jonathan Leite, if a quality

Page 47

1 assurance serious incident review had been done,
2 another goal of the review would have been to
3 determine whether any policies of the institution
4 contributed to the assault and whether any policy
5 changes needed be to made?
6   MS. CUSACK: Objection to form. Go ahead.
7 A. Yes, that would be fair to say.
8   MR. KING: Let me step outside and confer
9 with Megan.
10   (A short recess was taken.)
11 Q. BY MR. KING: When you were doing your
12 review of the DVRs depicting the activity on F
13 block on August 24, 2012, do you recall seeing
14 footage of the 4:50 p.m. round?
15 A. I don't recall it, but I would have seen
16 it.
17 Q. In doing your review, you would have
18 continued watching beyond the point where Jonathan
19 is pushed back up into the day room bunk?
20 A. I would have worked backwards so it would
21 be a little tricky, but I would have started from
22 the moment he was discovered and start reviewing
23 the video backwards, and then the minute he exited

Page 48

1 cell nine, I would have, like, stopped there and
2 started playing forward again just to see -- I was
3 trying to figure out what happened so I wanted to
4 see what time did he enter that cell so I would
5 have went further backwards so it's kind of
6 watching everyone walk backwards around, but, yeah,
7 I would have seen the rounds, I would have seen
8 everything that occurred.
9 Q. And you would have been the person to make
10 the decision as to whether to download footage of
11 the 4:50 p.m. round, right?
12 A. That's where in the last deposition, I
13 remember kind of explaining that, that I went back
14 a week later and downloaded clips because of my own
15 intuition, not intuition, my own initiative because
16 I was trying to help the investigations with the
17 criminal case. I didn't have to do that. I chose
18 not to do that. I'm not sure who would have
19 downloaded the video for the criminal case, but
20 that was -- no one told me to do that and it wasn't
21 a procedure or a policy I was following, that was
22 just my own initiative.
23   MR. KING: Can you read back my question.

Page 49

1   (The requested portion was read back by
2 the reporter.)
3 A. No, that wouldn't be my decision.
4 Q. It would not have been your decision to
5 download the footage of the 4:50 p.m. round?
6 A. Are you saying, like, me downloading video
7 was totally of my -- if you're saying, like, I
8 chose myself which clips to download, so myself
9 choosing not to download anything after 20 after
10 four when he got placed into the bunk up until the
11 round, that was my decision. I decided not to
12 download it, but it wasn't -- no one dictated that
13 to me to not download that.
14 Q. I understand. You were the person who
15 made the decision as to which video footage of the
16 occurrences on F block on August 24, 2012 to
17 download, right?
18   MS. CUSACK: Objection to form. Go ahead.
19 A. Right. Yes, that was my own doing of the
20 video that I was clipping.
21 Q. And not to beat a dead horse, sir, but
22 just for purposes of clarification, you decided not
23 to download footage depicting the 4:50 p.m. round,

1 right?
2 A. Correct.
3     MR. KING: Thank you. I think I'm all
4 set.
5     MS. CUSACK: I have a few questions just
6 as a follow-up.
7     EXAMINATION
8     BY MS. CUSACK:
9 Q. On the first topic that we addressed,
10 which is topic number 3, you were given a
11 description that Mr. Leite had provided about what
12 the officer that stripped him out looked like,
13 right?
14 A. Yes.
15 Q. And does Officer Westberry match that
16 description?
17 A. No.
18 Q. Does Officer Osgood more closely match the
19 description?
20 A. Yes, using the description Mr. Leite gave,
21 Osgood, Jason Osgood was the closest match.
22 Q. And topic number 9, there's been
23 discussion about the education room. What is the

1 education room?
2 A. Where the DVRs are located was literally a
3 mechanical closet that you had to draw specific
4 keys to get into. It was in education, but it was
5 off the main corridor of the education wing where
6 the classrooms are. It was actually in the wing
7 that goes towards the Chaplin's office and then
8 there was a mechanical room inside there so you had
9 to go through two locked doors to get into it. And
10 it was like a corner, like, it was just a little
11 tiny closet and they set up a makeshift desk and
12 put a computer there because it was easy due to the
13 wiring of the cameras to run them right down into
14 that mechanical room so it wasn't very formal. It
15 was just a mechanical room closet with a computer.
16 Q. And the education area of the facility is
17 where the inmates go to classes?
18 A. Yes.
19 Q. And they don't have access to that
20 education room?
21 A. No, it's a mechanical closet, no.
22 Q. You were the shift supervisor -- on topic,
23 same topic. You were the shift supervisor --

1 actually, it isn't the same topic, it's topic 10, I
2 believe. Topic 10, you were the shift supervisor
3 on August 24, 2012, and where this incident
4 happened it was on your shift?
5 A. Yes.
6 Q. And you watched all the video from the
7 time that Mr. Leite was found until up to 2:30 when
8 he entered F block, right?
9 A. Yes.
10 Q. Did you need to coach Officer Bergeron
11 about her behavior of that day?
12 A. No. No.
13 Q. Go ahead.
14 A. Like I had stated, my job as shift
15 commander was to collect the facts and as much
16 information as possible that I gathered from my
17 shift to provide on to the warden and the chief of
18 security. I reviewed the video and I have a duty
19 to report and I'm also a sergeant at the time and
20 I'm the shift commander so during my review, if
21 there was anything that was out of the ordinary, if
22 staff had skipped a round, falsified a document,
23 had purposely looked the other way, had missed some

1 obvious sign, anything that would have warranted
2 possible discipline or coaching or counseling that
3 would have been a part of my report because, even
4 though, as a shift commander, my responsibility
5 isn't discipline, my duty is to report that to the
6 people who do handle discipline, and I didn't,
7 obviously, see anything because I didn't put it in
8 my report or else I would have included that.
9     MS. CUSACK: That's all I have.
10    MR. KING: Okay. Thank you.
11    (Deposition concluded at 12:18 p.m.)

Page 54

1  CERTIFICATE OF WITNESS
2  I, JEFFREY R. SMITH, have read the
3  foregoing transcript of deposition taken on
4  Monday, December 4, 2017, at the Office of the
5  Attorney General, 33 Capitol Street, Concord,
6  New Hampshire, and do hereby swear/affirm it is
7  an accurate and complete record of my testimony
8  given under oath in the matter of JONATHAN
9  LEITE V. CORRECTIONS OFFICERS MATTHEW GOULET,
10 ET AL., including any and all corrections that
11 may appear on those pages so denoted as
12 "Corrections."
13
14 _____
15 JEFFREY R. SMITH
16
17 STATE OF _____
18 COUNTY OF _____
19 Subscribed and sworn to before me this
20 _____ day of _____, 20____.
21 _____
22 NOTARY PUBLIC _____ J.P. _____
23 My Commission Expires: _____

Page 55

1  CORRECTION AND SIGNATURE PAGE
2  **DEPOSITION OF:** JEFFREY R. SMITH
3  **DATE OF DEPOSITION:** December 4, 2017
4  PAGE LINE    NOW READS    SHOULD READ
5  ____ ____ _____ _____
6  ____ ____ _____ _____
7  ____ ____ _____ _____
8  ____ ____ _____ _____
9  ____ ____ _____ _____
10 ____ ____ _____ _____
11 ____ ____ _____ _____
12 ____ ____ _____ _____
13 ____ ____ _____ _____
14 ____ ____ _____ _____
15 ____ ____ _____ _____
16 ____ ____ _____ _____
17 ____ ____ _____ _____
18 ____ ____ _____ _____
19 ____ ____ _____ _____
20 Signed this _____ day of _____, 20___.
21
22 _____
23 JEFFREY R. SMITH

Page 56

1           C E R T I F I C A T E
2     I, PAMELA A. NOSTRAND, a Certified Shorthand
3  Court Reporter in the State of New Hampshire, do
4  hereby certify that the foregoing is a true and
5  accurate transcript of my stenographic notes of the
6  deposition of Jeffrey R. Smith, who was first duly
7  sworn, taken at the place and on the date
8  hereinbefore set forth.
9     I further certify that I am neither attorney
10 nor counsel for, nor related to or employed by any
11 of the parties to the action in which this
12 deposition was taken, and further that I am not a
13 relative or employee of any attorney or counsel
14 employed in this case, nor am I financially
15 interested in this action.
16    THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
17 DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
18 ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
19 DIRECTION OF THE CERTIFYING REPORTER.
20
21
22
23           PAMELA A. NOSTRAND, LCR