UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE

*********************************************
Jonathan Leite,

      Plaintiff

v.

Corrections Officers Matthew Goulet,
Elmer Van Hoesen, Michael Beaton, Lynn McLain,
Heather Marquis, Trevor Dube, Rhianne Snyder,
Eddy L'Heureux, Jeffrey Smith, Dwane Sweatt,
Yair Balderrama, Bob Morin, Ejike Esobe, and
Kathy Bergeron

      Defendants

Case No. 1:15-cv-00280-PB

*********************************************

## MEMORANDUM IN REPLY TO OBJECTION TO MOTION TO AMEND

**I.    The Plaintiff <u>has</u> shown substantial and convincing evidence that the newly named Defendants were deliberately indifferent to the prison condition of frequent inmates assaults in cells at NNHCF; to wit, the Plaintiff has shown clear evidence that, with knowledge of serious assaults regularly occurring, the defendants <u>ignored and did not follow their own policy requiring them to be *attentive* to serious inmate assaults</u> and to fix their supervisory policies and equipment so that inmate assaults did not continue to occur.**

It cannot be emphasized enough that the newly named Defendants ["new Defendants"] in this case <u>knew</u> that they were subject to a policy requiring them to pay particular attention to serious inmate assaults and to take steps to change their policies to prevent such assaults, and they <u>knew</u> that serious inmate assaults were regularly occurring in the cells at NNHCF, but they nevertheless <u>failed</u> to follow their <u>own policy</u> mandating examination of inmate supervision policies and equipment and therefore <u>failed</u> to take <u>any</u> steps to even consider increasing *almost non-existent* measures for monitoring inmate activity in cells, so as to prevent life-threatening assaults like the one to which the Plaintiff was the victim. The Plaintiff agrees with the originally named defendants ["original Defendants"] in so far as they assert in objection that the instant case is distinct from those cited by the Plaintiff in his Motion to

1

Amend. The distinction lies where, in *this* case, the evidence of prison administrator, indifferent abdication of their known, personal duty to protect inmates from the threat of physical harm by inmate abuse is <u>even more stark and compelling</u> than in the extra-jurisdictional cases cited by the Plaintiff. In the other cases, there was no discussed evidence of a policy covering prison officials, <u>expressly prioritizing serious injury of inmates</u> (e.g. due to assault) and <u>expressly mandating</u> that officials respond with careful consideration and thoughtful supervisory policy changes. In the other cases, there certainly was no evidence of defendant prison officials' <u>blatant admission</u> that they simply ignored such a policy. Nevertheless, the presiding Courts in Plaintiff's cited cases *still* found substantial evidence of administrator actual knowledge of a seriously harmful condition and deliberate indifference to it, as the Court should certainly find here with the evidence of PPD 1.33 and prison official deposition admissions that the Plaintiff has presented.

In this circuit, when a supervisory official is placed on actual notice of a prisoner's need for physical protection, administrative negligence can rise to the level of deliberate indifference to or reckless disregard for that prisoner's safety, actionable under 42 U.S.C. § 1983. <u>See Pinto v. Nettleship</u>, 737 F.2d 130, 132 (1st. Cir. 1986). To sustain such a claim, the Plaintiff must show that the conditions giving rise to his need for protection were within the "personal control" of the Defendants. <u>See id.</u> Contrary to the original Defendants' assertion in their objection, <u>see Obj. Memo.,</u> page 6, the foregoing showing of the newly named Defendants' knowing abdication of their control under Quality Assurance Serious Incident Review PPD 1.33, in light of a known serious safety risk, is <u>all</u> that is required to sustain a claim of administrative "deliberate indifference." The test for whether a defendant's knowledge of the risk may be inferred is whether the condition is sufficiently "dangerous" to infer knowledge of the risk, not whether the condition is sufficiently "appalling" or shockingly barbaric as is suggested in the Objection. <u>See id</u>., <u>but see Cortes-Quinones</u> ("courts have described 'deliberate

indifference' in various ways, but, at least, that term encompasses acts or omissions so **dangerous** in respect to health or safety that a defendant's 'knowledge of [a large] ... risk can be inferred.'")(emphasis added). Where, as here, prison officials <u>knew</u> that activity in inmate cells was going entirely unmonitored for 23 1/2 hours a day, and that, due to this, assaults <u>were regularly taking place in cells</u> as opposed to elsewhere, the lack of officer monitoring of inmate cells is a patently "dangerous" condition to which officials would also be patently indifferent, under the circumstance of a policy mandating officials' examination and correction of inmate-supervision deficits and officials knowingly failing to do so.

### A. The new Defendants had knowledge of the dangerous condition giving rise to the need for the Plaintiff's protection: that of almost entirely unsupervised cells and assaults occurring frequently in cells accordingly.

Contrary to the original defendants' assertion that the Plaintiff cannot show "knowledge" of the dangerous condition on the part of the newly-named defendants, Commissioner Wrenn <u>had</u> knowledge of the lack of supervision of activity in inmate cells at NNHCF in 2012 and a correspondingly high rate of inmate assault in cells, where he had ultimate operational control over the NNHCF facility, including its cell design (doors with small openings) and very limited camera monitoring capabilities, and he further had duties under RSA 21-H: to create procedures for operation of NNHCF, including for "humane treatment of inmates"; to "develop an annual comprehensive plan" noting "current conditions and needs" at NNHCF; and to create "written standards for the behavior of inmates" at NNHCF. All of the foregoing suggest the Commissioner had knowledge in 2012 of NNHCF facility limitations, inmate behavioral conditions, and the procedures in place for monitoring inmate behavior in cells. Commissioner Wrenn (and Director Kench) further created and disseminated a policy speaking specifically to his requirement that correctional officers exert "direct supervision" over any gathering of inmates, evidencing his consideration of supervision levels at NNHCF. <u>See</u> Exhibit 1 (confidential filed

3

under seal). Commissioner Wrenn also referenced the potential impact of 2012 staffing cuts on safety and security, i.e. inmate supervision, at NNHCF, in his 2012 annual plan, and he simultaneously included in the plan a noted increase in the number of inmate assaults from prior years, and an increase in the number of inmates who reported threats to their safety. <u>See Motion to Amend.</u> These inclusions in the plan demonstrate the Commissioner's knowledge of limited inmate supervision in cells versus increased inmate assaults in cells at NNHCF as of 2012.

     Meanwhile, Security and Training Director Kench was appointed by and worked closely with the Commissioner and he was responsible for: all security and safety operations at NNHCF and ensuring the consistency of operations there; reviewing complaints and grievances from inmates regarding safety; ensuring the proper functioning of the NNHCF security program; and overseeing and ensuring the proper training and development of staff. <u>See</u> 21-H:4 and 6. All of these responsibilities and his relationship with the Commissioner evidence his knowledge of supervisory mechanisms and rates of inmate assault in cells at NNHCF in 2012. Warden Reilly was similarly responsible, per NH Administrative Rule COR 102.02 (d)(e), for "the operation of the northern New Hampshire correctional facility, [including] the care, custody, safety and treatment of its inmates," and therefore was charged with knowing inmate-supervisory means, practices, and procedures at NNHCF in 2012 and the safety condition and needs of inmates. 30(b)(6) designee for NNHCF, the facility for which Wrenn, Kench, and Reilly were responsible in regard to inmate safety, admitted under oath that inmate assaults occurred regularly and most often in the cells of the prison. <u>See Motion to Amend </u>(referenced throughout). The Plaintiff has not yet deposed Commissioner Wrenn, Director Kench, and Warden Reilly, for the purpose of obtaining even more information about their knowledge of supervision of inmate activity in cells and inmate assaults at NNHCF because he has been in the unenviable position of having to make a substantial evidentiary showing, to sustain amendment of his complaint, while simultaneously not

delaying his motion for amendment for so long as to prejudice original defendants.  Due to the latter concern, the Plaintiff t moved for amendment without conducting further deposition, just weeks after learning of both administrators' knowledge of a serious problem concerning inmate assaults cells <u>and</u> that administrators were <u>not</u> conducting internal reviews of this problem (despite a policy mandate to do so).

Despite the original Defendants' characterization, that the Plaintiff inaccurately framed Chief Security Officer Lambertson's deposition testimony, <u>see Obj. Memo.</u> 13, Officer Lambertson's repeated statements in his deposition regarding the regularity of serious inmate assaults at NNHCF and further that they simply were "not going to be prevented," Depo. Lambertson 21[1], speak for themselves.  Mr. Lambertson is responsible for his choice of words and they certainly rang as showing both his knowledge of regular inmate assaults occurring in cells at NNHCF and his administrative indifference to them.  <u>See Hale v. Tallapoosa County</u>, 50 F.3d 1579, 1583 (11th Cir. 1995)( official's admission in deposition as to knowledge is sufficient).  Notwithstanding these repeated admissions as to his knowledge of the dangerous condition, Lambertson also testified to his job responsibilities evidencing his knowledge of the level of inmate supervision in cells at NNHCF and the frequency of assaults in cells.  Lambertson testified he was responsible for working with the Warden to implement NNHCF security practices and was responsible for supervising shift commanders in their implementation.  See Depo. Lambertson 7.  Lambertson was specifically responsible for ensuring shift commanders' supervision of officers conducting rounds and supervising inmates.  <u>Id.</u>  He further testified that he was PREA (Prison Rape Enforcement Act) coordinator for NNHCF and that he was responsible for responding to inmate grievances, suggesting that he was privy to the inmate complaints of assault and threats to safety referenced in the "PREA" section of the 2012 annual plan.  <u>Id.</u>  Lambertson additionally testified that he was supposed to be responsible for participation in quality assurance "serious incident

---

[1] See Depo. Lambertson excerpts attached to Motion to Amend.

reviews" of incidents involving serious injury to inmates, which review did not occur pursuant to the Plaintiff's assault. See Exhibit 2, Depo. Lambertson 67.

**B. The conditions giving rise to the need for the Plaintiff's protection were within the personal control of the new Defendants where there was a policy mechanism, PPD 1.33, for remediating the conditions but the new Defendants knowingly failed to invoke it.**

PPD 1.33, at Exhibit 3 to Motion to Amend, states as its purpose to "review serious incidents…in anticipation of litigation…to make a report of the review and recommendations." In other words, the purpose of the "Quality Assurance" policy is to examine serious incidents to identity potential liability and make changes to avoid continued liability. Notably the policy applies to "all employees and persons under Departmental supervision," including Commissioner Wrenn, Security Director Kench, and Chief Security Officer Lambertson, and it specifies that a triggering serious incident, for a "quality assurance" review is "a situation involving serious injury." At 30(b)(6) deposition, NNHCF designee admitted that the assault upon the Plaintiff was a situation involving "serious injury" within the meaning of the policy, and that the assault should have triggered a "quality assurance review," wherein NNHCF policies, practices, procedures would have been examined "to see if there [was] anything we could have done to prevent it,….anything we need to change, more cameras to be installed….something the department could do to be better." [2] See Exhibit 3, Depo. Smith. The designee further conceded that the review was not done in the Plaintiff's case of inmate upon inmate assault resulting in serious injury. See id. By inference (and the new Defendants have made no contrary argument) the new Defendants similarly did not initiate quality assurance reviews in cases of inmate upon inmate assaults in cells *preceding* the Plaintiff's injury[3] for the purpose of changing cell supervision policies and equipment such that the assault upon the Plaintiff might have been avoided.

---

[2] The designee further endorsed that goals of the quality assurance review were to "determine if correctional staff could have done anything to prevent the assault or mitigate the damages" and "determine if whether any policies of the institution contributed to the assault and whether any policy changes needed to be made."

[3] NNHCF designee in 30(b)(6) deposition confirmed Lambertson deposition testimony, that inmate upon inmate assaults occurred frequently in the cells at NNHCF.

For example, the simple and reasonable addition of three video screens in CP-5 would have permitted constant monitoring of cell doors for the purpose of noticing and intervening when multiple inmates entered cells to commit assault,[4] but no such remedy was identified via quality assurance review prior to the assault upon the Plaintiff.

PPD 1.33 was within the new Defendants' personal control. The PPD at "D" states that "all serious incidents shall be reported immediately as reportable incidents in accordance with the requirements of PPD 5.07." At 30(b)(6) deposition, the NNHCF designee explained the reporting requirements as follows. In response to the question as of August 2012, who "would have made the decision to initiate a quality assurance serious incident review?" the designee responded "it would be between the warden and I would say either the director of security and training or the commissioner at the time." See Exhibit 3, Depo. Smith. Later in testimony, the 30(b)6) designee added that it would be "a joint decision" between Scott Lambertson and the Warden, to make the decision to initiate a quality assurance review by reporting the serious incident to Director of Security and Training and/or the Commissioner. Id. Accordingly, each of the new Defendants Wrenn, Kench, Reilly and Lambertson had a role to play in advancing the policy for review and change of ineffective supervision policies resulting in serious injury to inmates from other inmate abuse, and all new defendants potentially were indifferent to the power they had to effect change and remediate the dangerous condition.

**II.    The relation-back doctrine applies to the Plaintiff's claim against the new Defendants, under both the New Hampshire and Federal rules, because the Plaintiff can show: that the new Defendants had notice, within 120 days of service of his July 2015 complaint, of his deliberate-indifference-to-dangerous-condition claim founded on a lack of supervision of inmates; that the Plaintiff merely misidentified in his July 2015 complaint the officers who acted with *deliberate indifference* to supervision of inmates creating the dangerous condition in cells; and that the new Defendants, who had personal control over the lack of supervision of inmates and the dangerous condition resulting therefrom, should have known the claim in the July 2015 complaint applied to them.**

---

[4] See Tafoya v. Salazar, 516 F.3d 912 (10th Cir. 2008)(demonstrated deliberate indifference where prison administrator installed four additional cameras in identified risk areas, but aware of a risk in unmonitored kitchen area, failed to install a camera there).

**A. The Plaintiff's amendment relates-back under FRCP Rule 15(c)(1)(A) because 508:4 and 514:9, as interpreted by New Hampshire and this Court's caselaw, permit relation back where the Plaintiff can show timely notice of the original complaint to the new Defendants.**

Where a plaintiff seeks to add a new defendant, he may rely upon either Rule 15(c)(1)(A) or Rule 15(c)(1)(C). See Coons, 620 F.3d at 42. The former provision permits amendment to relate back where "the law that provides the applicable statute of limitations allows relation back." New Hampshire law provides the statute of limitations for the claim asserted at bar. See Conjugal P'ship Acevado–Príncipe v. United States, 768 F.3d 51, 56 (1st Cir.2014) ("it is well-established that § 1983 claims borrow the forum state's statute of limitations"). The applicable laws for the purpose of applying Rule 15(c)(1)(A) are therefore RSA 508:4 and RSA 514:9. See Dupuis v. Smith Properties, Inc., 114 NH 625, 627-28 (1974). According to Dupuis, the approach to allowing amendments under New Hampshire law "is a liberal one which reflects the desire not to permit procedural error or omission to frustrate the maintenance of a valid action." Id. at 628. This Court, interpreting the liberal standard announced in Dupuis, therefore barred amendment to name an additional, third party defendant only where the Plaintiff offered *nothing* to show notice of the original complaint to the proposed new defendant. See Graham v. Church, Civil No. 14-cv-171-LM (D.N.H. January 20, 2015). The instant case is different from Graham.

Here, the Attorney General's Office has professed throughout discovery, and including <u>in the weeks immediately following service of the July 2015</u> complaint, to have been "working with the Department of Corrections" (and by inference with its Commissioner, Director of Security, and Warden) for the purpose of contacting the originally named, 52 correctional officer defendants, all of whom were working for the Department of Corrections and under Warden Edward Reilly NNHCF on August 24, 2012, the day of the Plaintiff's assault. See Attached Exhibit 4 (counsel admissions to discussing the July 2015 lawsuit with the Department of Corrections); see also Attached Exhibit 5 (different counsel insisting that she prepared a 30(b)(6) designee for the "New Hampshire Department of Corrections"

8

because this was the way she interpreted the Plaintiff's subpoena despite that the subpoena was limited to NNHCF.) Additionally, distinct from the non-showing in Graham is that, in this case, the Plaintiff has presented evidence of a policy <u>mandating</u> the involvement of new Defendants Wrenn, Kench, Reilly, and Lambertson in specifically an inquiry concerning inmate injury "litigation" precisely of the type asserted in the July 2015 lawsuit. Certainly in light of this policy mandating the new Defendants involvement in issues of liability and "litigation," and where every single officer (numbering 52) who was employed under the new Defendants on the day of the Plaintiff's injury was sued pursuant to the subject that they were supposed to have been investigating, per policy, a preliminary question of counsel to the new Defendants should have been "what did you do, if anything, to investigate, pursuant to PPD 1.33 the subject of this lawsuit?" [5] Additionally, unlike the plaintiff in Graham, the Plaintiff attempted to notify the new Defendants of his claim. See Exhibit 6.

> **B.     The Plaintiff's amendment relates-back under FRCP Rule 15(c)(1)(C) because he provided adequate timely notice of his lawsuit to the new Defendants and he made a "mistake in identity" therein as defined by Leonard v. Parry.**

To satisfy the third criterion of 15(c)(1)(C), "mistake in identity," the amendment's proponent must show that he made a mistake as to the proper party's identity and that the later-named party, within the prescribed time limit, knew or should have known that, but for this mistake, the action would have been brought against him. See Leonard v. Parry, 219 F.3d 25, 28 (1st. Cir. 2000). What the plaintiff knew (or thought he knew) at the time of the original pleading generally is the only relevant datum in respect to the question of whether a mistake concerning identity actually took place. See id. Where the Plaintiff sues A for conduct causing him injury and B actually engaged in the alleged conduct causing injury, "mistaken identity" occurs, permitting relation back for the purpose of naming B as a defendant. See id. at 31 (permitting amendment relation back to name a different negligent-driver defendant than

---

[5] Wrenn, Kench, and Lambertson were all employed as Commissioner, Director of Security, and Chief of Security, respectively, for New Hampshire Department of Corrections, as of July 2015 when the original lawsuit against 52 of their supervisees was served. See Exhibits 2 and 7 (confirming employment).

originally named, even where the proponent of the amendment knew he had named the wrong negligent driver in the original complaint and failed to amend prior to the expiration of the statute of limitations).

Such is the case at bar. In his original complaint, the Plaintiff alleged he was injured due to the harmful condition of risk of assault (and subsequent unattended injuries) that was generated by the defendants' "**deliberate indifference** towards prisoners …. by abdicating their dut[ies] to monitor video screens and conducting walk-throughs of the cell block… to monitor inmate activity to ensure inmates were safe." See July 2015 complaint, ¶ 21 (emphasis added). In doing so, the Plaintiff mistook that it was the 52 named, front line correctional officers who were *deliberately indifferent* to the risks associated with their inadequate inmate supervision and who had it within there "personal control" to change the harmful condition created thereby, by increasing supervision in their video monitoring and performance of walk-throughs. This was a mistake of identity where instead it was the officers' *supervisors and administrative policy-makers* who, from a position of knowledge, power, and "personal control," with *deliberate indifference,* directed the officers' inadequate video screen monitoring and walk-throughs and who, with deliberate indifference, abdicated *their* duty to ensure adequate supervision through video screen monitoring and unit walk-throughs. The new Defendants should have been aware that it was *their* video-monitoring and walk-through policies that caused the Plaintiff's injuries when Department of Corrections conducted a review of correctional officers' compliance, during the shifts in which the Plaintiff was injured, and they concluded that no disciplinary action or training should be taken with respect to the officers to prevent such serious assault and injury from happening again in the future. See Exhibit 8 (30(b)(6) designee for NNHCF deposition testimony).

WHEREFORE, the plaintiff Jonathan Leite respectfully prays this Honorable Court:
    A.    Grant his Motion to Amend; and
    B.    Grant such other and further relief as is just and equitable.

Respectfully submitted,
                                        JONATHAN LEITE
                                        By his attorneys,
                                        DOUGLAS, LEONARD & GARVEY, P.C.

Date: January 24, 2018        By:    /s/ Megan Douglass
                                     Megan Douglass, NH Bar #19501
                                     14 South Street, Suite 5
                                     Concord, NH 03301
                                     (603) 224-1988
                                     mdouglass@nhlawoffice.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date the foregoing was filed electronically via the CM/ECF system and will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

                                     /s/Megan Douglass
                                     Megan Douglass