Page 38

1  MS. CUSACK: And I just want to clarify,
2  it did not exist in upper housing.
3  MR. KING: I think that's been made
4  abundantly clear.
5  Q. You just saw or read the deposition
6  testimony of Officer Bergeron where she says at
7  Page 32 of her deposition she didn't recall seeing
8  the 3:45 p.m. round until the day of her
9  deposition, right?
10 A. Correct.
11 Q. I'm now going to turn to topics 6, 7 and 8
12 on Exhibit A to the deposition subpoena. Was any
13 quality assurance serious incident review done in
14 connection with the assault on Jonathan Leite?
15 A. There was a review, but not a quality
16 assurance review; per the PPD, there's no record of
17 one.
18 Q. I'm going to show you what we've marked as
19 Smith Exhibit 2 (handing.) Smith Exhibit 2 is the
20 New Hampshire Department of Corrections Policy and
21 Procedure Directive relating to quality assurance
22 serious incident reviews that was in effect on
23 August 24, 2012; is that right?

Page 39

1  A. Correct.
2  Q. And the August 24, 2012 incident qualifies
3  as a serious incident within the meaning of section
4  3B of the policy, right?
5  A. Let me review this.
6     (Reviewed the document.)
7  Q. I can try that another way. Jonathan
8  Leite suffered a serious injury as a result of the
9  August 24, 2012 assault, right?
10 A. Yes, it qualifies for the first one,
11 serious injury or death, yes.
12 Q. Have you ever been part of a quality
13 assurance serious incident review?
14 A. No, not myself.
15 Q. My question may have been a little vague.
16 I take it from your testimony that you've never
17 been on a serious incident review board; is that
18 right?
19 A. Yeah. These are done at, like, a
20 commissioner's level down at headquarters in
21 Concord and I've never had to sit on one of those
22 committees before.
23 Q. Have you ever been interviewed in

Page 40

1  connection with a quality assurance serious
2  incident review?
3  A. Not interviewed, but my work has gone into
4  one.
5  Q. Well, have you ever participated in any
6  communications with respect to a quality assurance
7  serious incident review?
8     MS. CUSACK: Objection to form. Go ahead.
9  A. Yes.
10 Q. What would the nature of those
11 communications be?
12    MS. CUSACK: I'm going to object; if it's
13 not related to this case and it's quality
14 assurance, quality assurance is protected.
15    MR. KING: I'm not asking him about a
16 specific serious incident review and topic 7
17 has to do with NCF's policies and procedures on
18 conducting reviews of serious incidents and
19 he's the -- Captain Smith is the 30(b)(6)
20 designee so I think I am entitled to ask him
21 about what happens during a quality assurance
22 serious incident review at NCF and that would
23 entail the nature of the communications in

Page 41

1  which he's participated in.
2     MS. CUSACK: As long as we're not getting
3  into any specifics about any quality assurance.
4  A. I can answer that without -- I can explain
5  the process.
6     The incidents that occur are summarized
7  into an administrative briefing every night by the
8  third-shift shift commander and those are
9  distributed to the chief of security and the warden
10 and the director of security in training and
11 various other people that need to know on a need to
12 know basis. So immediately, the next morning, the
13 chief of security would do an initial review of a
14 serious incident. There's weekly warden meetings
15 where all the shift commanders and housing
16 lieutenants and someone from the investigations
17 department and the administrator of programs and
18 the wardens, we all sit together and do a weekly
19 review of incidents that have occurred over the
20 week and so a serious incident would be reviewed
21 again in that format.
22    For quality assurance, the one I've been
23 involved in just involved myself and the warden and

Page 42

1 the investigations bureau going over a criminal
2 case and discussing any outlying issues, any,
3 like -- I'm trying to not use any specifics. Like,
4 kind of like how did this occur, you know, is there
5 anything we could have done to prevent it, is there
6 anything that we need to change, more cameras to be
7 installed, kind of looking at it, it's a prison,
8 was it a matter of the inmates just waiting for the
9 right time or is it something that the department
10 could do to be better, is there budget constraints
11 that prevent us from doing that, like, all the
12 obstacles.
13   So that information, outside of a criminal
14 case because the investigations are dealing with
15 the criminal side, then the warden would then bring
16 that to headquarters for the actual quality
17 assurance review and that would be discussed
18 further. I haven't actually been part of one at
19 that level.
20 Q. As of August 2012, who would have made the
21 decision to initiate a quality assurance serious
22 incident review in connection with the assault on
23 Jonathan Leite?

Page 43

1 A. I would say it would be between the warden
2 and, I would say, either the director of security
3 and training or the commissioner himself at the
4 time. It's one of those where the commissioner is
5 briefed and the director is briefed on what's going
6 on at each facility, and I'm assuming one of those
7 positions would be, like, we need to do a quality
8 assurance review, let's schedule one.
9 Q. As of August 2012, Scott Lambertson was
10 the chief of security, right?
11 A. Yes.
12 Q. So we were speaking generally earlier.
13 I'd like now to speak specific to Jonathan Leite's
14 case. On the third shift on August 24, 2012, Chief
15 of Security Lambertson would have been briefed on
16 the assault that happened; is that right?
17 A. I called him myself. I was the shift
18 commander on the second shift so I talked to him
19 myself.
20 Q. Do you recall what you told him?
21 A. Not exactly, but it would have been, I
22 remember when I first called him he -- I'm trying
23 to think now, actually. Mr. Leite was at the

Page 44

1 hospital and I don't believe he had been diagnosed,
2 like, he hadn't been -- he was flown to Dartmouth
3 and I don't believe at that point that had happened
4 yet, but it was just part of our protocol of, like,
5 initially, you need to call the chief of security
6 so it was just telling him that we had a serious
7 assault and that we had someone going to the
8 hospital to be treated for that assault and that
9 always triggers a standard phone call. I believe I
10 talked to him twice, if I remember, that night.
11 Q. So as a shift commander, that was the
12 extent of your responsibility, you're not
13 responsible for, or weren't as of August 24, 2012,
14 for recommending or initiating the quality
15 assurance serious incident review; is that right?
16 A. No, the shift commander wouldn't do that,
17 but my role would be to do as much follow-up as
18 possible, to gather the data to provide to the
19 chief of security so they could bring that up the
20 chain and make that decision.
21 Q. As of August 24, 2012 or --
22   MR. KING: Strike that.
23 Q. As of August 2012, would Chief of Security

Page 45

1 Lambertson have been the person to recommend a
2 quality assurance serious incident review in the
3 first instance?
4   MS. CUSACK: I'm going to object to form.
5 Go ahead.
6 A. I would say it would be a joint decision
7 between himself and the warden, one of those two, I
8 would say would -- like I said, they have a weekly
9 meeting and I'm sure they would have decided at a
10 point.
11 Q. Who was the warden on August 24, 2012?
12 A. Edward Riley. I believe it was Edward
13 Riley, yeah. I believe he started at the end of
14 2011 or the beginning of 2012.
15 Q. Do you know how Mr. Riley is employed now?
16 A. No, I'm not sure.
17 Q. How long was he the warden at NCF?
18 A. Approximately three years.
19 Q. I just have in my head from one of the
20 other depositions that at this point in time there
21 may have been a temporary warden. Does that ring a
22 bell?
23 A. In Scott Lambertson's -- that's where my