**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>**Jonathan Leite**</u>

   v.                                 Case No. 15-cv-280-PB
                                               Opinion No. 2018 DNH 118
<u>**Matthew Goulet, et al.**</u>


<u>**MEMORANDUM AND ORDER**</u>


     Jonathan Leite, a former inmate at Northern New Hampshire Correctional Facility ("NCF"), brings suit against several NCF corrections officers alleging violations of his Eighth and Fourteenth Amendment rights. Leite's claims arise from an inmate-on-inmate assault during his incarceration that caused him to suffer a traumatic brain injury. He alleges that the defendants were deliberately indifferent to his health and safety by both failing to protect him from the assault to begin with and failing to provide him with timely medical attention in its aftermath. With discovery closed, the defendants now move for summary judgment on all of Leite's claims. For the reasons discussed herein, I grant defendants' motion in full.

# I. __BACKGROUND__

On Friday, August 24, 2012, at or around 2:40 p.m., Leite was severely beaten inside Cell 9 of NCF's "F-block" by several other inmates. The beating left him dazed and debilitated. He suffered skull and facial fractures, intracranial bleeding, and residual cognitive and psychiatric effects as a result. Following the assault, inmates kept Leite hidden inside the cell, which was not his own, until 4:20 p.m. when the inmates moved him back to his bunk in the open cellblock. He thereafter lay motionless in his bed for almost an hour. Leite did not receive medical attention until 5:10 p.m., shortly after corrections officers claim they first discovered his injuries.

Leite seeks damages from four corrections officers who were on duty when he was attacked or shortly thereafter: Lynn McLain, Kathy Bergeron, Trevor Dube, and Ejike Esobe.[1] In the sections that follow, I describe the scene of the assault and discuss relevant NCF security procedures. I then examine the events surrounding Leite's assault in greater detail. Other than what each defendant saw or knew, the material facts are largely uncontested.

---

[1] Leite named ten additional corrections officers as defendants, but he abandoned his claims against those officers in his opposition to defendants' motion for summary judgment.

**A.** __NCF F-Block & Relevant Security Procedures__

F-block is one of NCF's eight housing units. At the time of the assault it housed 69 inmates, including Leite. Doc. No. 38-3 at 3; Doc. No. 38-4. The rectangular cellblock consists of a large, open room with a mezzanine level. It holds 30 cells, split between the two levels. The cells surround an 80-by-29 foot common area known as the "dayroom" on three sides. The dayroom contains tables, a laundry machine, and a workout station. It is used by all F-block inmates throughout any given day and is connected to the mezzanine by an open staircase in the middle of the cellblock. Adjacent to the staircase, along the cell-less fourth wall of the block, is a row of five bunkbeds known as the "dayroom bunks" that serve as temporary housing for inmates newly assigned to F-block. On the date of the assault, Leite was assigned to "Bunk 1T," the top bunk closest to the base of the staircase. Jason Gelinas, who helped plan the attack on Leite, was assigned to Cell 9, also on the floor level and fifteen-to-twenty yards across from Bunk 1T.

Corrections officers did not maintain a constant physical presence on F-block in August 2012. Doc. No. 38-3 at 8. Instead, as with other housing units, F-block was monitored by periodic physical "checks" and security cameras. Corrections

officers monitored the blocks over the course of three eight-
hour shifts.  See id. at 8-9.  Physical checks were
predominantly conducted using "counts" and "rounds."  During
counts, officers were required to physically identify and
account for each inmate housed on the cellblock.  See Doc. No.
42 at 2; Doc. No. 50-3 at 20.  Counts were primarily meant to
ensure that each inmate was both physically present and "alive
and well."  Doc. No. 42 at 3.  "Formal" scheduled counts were
required at least four times per 24-hour period, see Doc. No. 42
at 2, but were typically conducted five to six times daily, or
about twice per eight-hour shift.  See Doc. No. 38-3 at 8; Doc.
No. 38-26 at 3; Doc. No. 50-3 at 20.  With the exception of the
11:00 p.m. and 2:30 a.m. counts, all counts required inmates to
be out of bed and standing.  Doc. No. 38-26 at 3; Doc. No. 50-3
at 20.  To ensure accurate identification and each inmate's
well-being, officers conducting counts were required to "see
movement of bare skin or talk with (hear from) the inmate."
Doc. No. 42 at 3.

Rounds required corrections officers to periodically walk
through the cellblocks to "evaluate safety, security, and
sanitation."  Doc. No. 42 at 3.  Rounds were conducted at least
once an hour on a staggered basis to prevent the detection of

predictable patterns.  See id. at 2; Doc. No. 38-3 at 8-9.
Officers conducting rounds, typically two at a time, were
required to "gauge" the "attitude" of the inmates as they walked
through the cellblock to ensure that no infractions were
occurring and that all inmates were safe.  Doc. No. 50-3 at 4.
Officers were also "supposed to" look through the five-by-20
inch, open-air window on every cell door as they surveyed the
cell rows, see, e.g., Doc. No. 50-3 at 4; Doc. No. 38-33 at 14;
see also Doc. No. 50-2 at 8, and to "check the bunks" in the day
room, see Doc. No. 50-13 at 3, 5; "to make sure everything[ was]
normal on the unit."  Doc. No. 50-3 at 10.  If an inmate
appeared to be sleeping during rounds, some, but not all,
officers routinely approached the inmate to ensure that he was
breathing, or to look for blood, see Doc. No. 50-9 at 2-3; Doc.
No. 50-13 at 5, but there is no evidence that the practice was
mandatory.  Other officers regularly conducted rounds quickly,
without checking bathrooms, closets, or cells.  See Doc. No. 38-
2 at 59.

　　　Rounds differed from counts in that rounds did not require
officers to confirm the identity and physical location of each
individual inmate, but were meant to ensure that no prohibited
behavior was occurring.  See Doc. No. 50-3 at 21; Doc. No. 50-9

at 2-3.  Typical infractions identified during rounds included inmates tattooing one another, using drugs, fighting, or "cell hopping," which refers to inmates visiting cells to which they were not assigned.  <u>See</u> Doc. No. 50-3 at 10-11.  Officers conducting rounds also frequently fielded questions from inmates as they arose.  On average, a properly conducted round took three to four minutes to complete, barring some occurrence requiring further attention.  <u>See</u> Doc. No. 53-3 at 10.

In addition to counts and rounds, corrections officers monitored inmates' housing units through a closed-circuit video surveillance system.  Each housing unit had two cameras that streamed live visual feeds of each cellblock's dayroom to control rooms operated by corrections officers.  Doc. No. 50-3 at 14.  F-block's two cameras, feeding channels 29 and 30, were positioned on opposite ends of the cellblock, mounted high near the ceiling.  Together, they provided views of the entire F-block dayroom, except for limited blind spots, most floor-level cell doors, the staircase, the dayroom bunks, and parts of the mezzanine.  Each camera provided one fixed angle, with no audio. Neither captured the inside of any individual cell, closet, or bathroom.

The two F-block cameras streamed to monitors in a control room known as "control point 5," or "CP5," operated by a single corrections officer.  Doc. No. 50-3 at 13.  The CP5 officer was tasked with operating all doors within the "upper housing and industries area[s]," monitoring those areas, answering calls from other areas in the facility, and paging inmates to come to health services, hearings, or other appointments as the need arose.  Doc. No. 38-20 at 1-2; Doc. No. 50-6 at 3, 11.  The upper housing and industries areas included F-block, three other housing units, offices, industrial shops, a long corridor, and a stairwell.  Doc. No. 38-20 at 1-2; Doc. No. 50-6 at 3, 11.  The industries area, which was visible from the CP5 station itself, was positioned behind the CP5 officer's chair, opposite the control panel.  Doc. No. 50-6 at 10.  All other areas were monitored with security cameras, of which there were at least 12, whose views were accessible on either of two video monitors. Doc. No. 38-20 at 1-2.

The views on both monitors could be switched by using a touch screen at the CP5 officer's control.  Doc. No. 38-20 at 1-2.  On one of the screens, CP5 officers would typically leave a view of the corridor displayed due to that area's frequent traffic.  See Doc. No. 38-1 at 6; Doc. No. 38-20 at 2.  On the

other screen, CP5 officers would typically toggle through views
of the four upper-housing units, one at a time, to monitor
inmate activity.  <u>See</u> Doc. No. 38-20 at 3.  If an inmate or
staff member in any one of the four housing units pressed a
"call button" to contact CP5, the screen typically showing the
hallway temporarily switched to a view of that person.  <u>See</u> Doc.
No. 38-20 at 2; Doc. No. 50-6 at 10.  After the CP5 operator
responded to the call by opening the relevant set of doors, the
screen returned to a view of the hall, making it "hard to not
have it [fixed] on the hall all the time."  Doc. No. 50-6 at 3.

**B.    <u>The Assault</u>**

On August 24, 2012, Corrections Officer Lynn McLain was
stationed in CP5 for "first shift," covering 9:00 a.m. to 3:00
p.m.  The F-block video footage recovered from CP5 on that date
showed that Leite entered F-block at 2:34 p.m. and proceeded to
his bed, Bunk 1T.  <u>See</u> Doc. No. 38-11.[2]  While changing his shirt
and tidying his bunk, Leite was approached by inmate Gelinas,[3]

---

[2] Both F-block camera angles, channel 29 and channel 30, provide
unobstructed views of Bunk 1T, which appears towards the middle
of both frames.  <u>See</u> Doc. No. 38-11.

[3] The video footage is lightly pixelated and individual faces are
virtually undiscernible.  But, other characteristics, such as
prominent tattoos, hair, and body type, can be reasonably
identified.  As they appeared in the F-block video footage, the
inmates involved in Leite's assault were identified by Sergeant

and the two conversed unremarkably.  At approximately 2:38 p.m.,
Gelinas stepped away from Leite to attend to some laundry at a
nearby bin.  With Leite's back turned to Gelinas, Gelinas subtly
made a slashing motion across his neck from left to right.  <u>See</u>
Doc. No. 50-7 at 13.  He repeated the gesture seconds later.

At 2:39 p.m., Leite walked over to Cell 9 and entered.
Shortly thereafter, at 2:41 p.m., two other inmates entered Cell
9 in a hurried sequence, separated by only a few seconds.
Neither of the two men, later determined to be Matthew Garcia
and Sean Lavallee, were assigned to Cell 9.  All the while,
Gelinas walked somewhat aimlessly around the day room and was
eventually lost in the crowd.

Beginning at 2:42 p.m., several inmates began to crowd
around Cell 9.  Some appeared to be looking inside the cell
through the door window, some leaned against the exterior wall,
and others generally loitered or walked past the cell.  Those
inmates eventually dispersed at approximately 2:46 p.m.  At that
time, one of the inmates emerged from cell 9, wiped his brow,
and swiftly walked up the staircase to the upper level.  Seconds

---

Jeffery Smith, acting shift commander during second shift at NCF
on August 24, 2012.  Sergeant Smith reviewed the footage on the
night of the assault in order to identify Leite's assailants.
<u>See</u> Doc. No. 38-3.  His descriptions were largely corroborated
by those involved.

later, another shirtless inmate emerged from Cell 9, quickly walked over to Bunk 1T, retrieved clothing from below the bunk, and returned to the cell. He repeated this exercise twice more over the next two minutes. At 2:49 p.m., he reemerged and started for Bunk 1T for the fourth time, but hesitated. Before reaching the bunk, he slowed and pointed toward it, arm fully extended as he looked back at the cell. He then grabbed a pillow from the top bunk, collected more clothing, and returned to Cell 9. From 2:50 p.m. to 2:57 p.m., different inmates continued to enter and exit Cell 9 at intervals ranging from ten to forty seconds, with others stopping occasionally to peer into the cell through the door's window.

After an investigation, the officers learned that Leite was attacked in Cell 9 by Garcia and Lavallee shortly after he entered the cell at 2:39 p.m. Gelinas was involved in orchestrating the assault, which lasted anywhere from two to ten minutes.[4]   Doc. No. 38-27 at 3; see Doc. No. 50-7 at 14; see

---

[4] The record does not reveal the reason for the assault. One investigator suggested that the assault was a ploy to steal drugs believed to be in Leite's possession. See Doc. No. 38-34 at 7. Leite himself thinks that it was due to his attempt to interfere with a prison gang's planned extortion of a younger inmate with whom he was friendly. See 38-2 at 38. In any event, Leite believed that an attack on the younger inmate was imminent. Looking out for the younger inmate, Leite told an unidentified corrections officer that the corrections staff

also Doc. 38-34 at 6.[5]  Because the assault left Leite "disoriented," vomiting, and generally "[un]aware of his surroundings," Gelinas and other inmates kept Leite inside Cell 9 until 4:20 p.m. to conceal him from corrections officers. Doc. No. 38-27 at 3-4.  Gelinas put Leite in the bottom bunk in Cell 9 and "made it look like he was sleeping."  Doc. No. 38-27 at 3.  Gelinas and other inmates cleaned the area of any blood and vomit, kept ice on Leite's head to keep him "cool" and "awake," and "flushed" much of the remaining evidence.  Id. at 4.  As Gelinas admits, they did this for the specific purpose of evading detection.

At 3:00 p.m. there was a shift change from first shift to second.  Corrections Officer Ejike Esobe, another defendant,

_____

"should keep [their] eyes on" F-block because he had been "hearing some things," without providing further detail. Doc. No. 38-2 at 26-27.  This interaction took place minutes before Leite re-entered F-block at 2:34 p.m.  Id.  Leite, however, makes clear that he was not in fear for his own personal safety at the time. See Doc. No. 38-2 at 39-40.  Nor does he contend that he made similar representations to any of the defendants and there is no other evidence in the record that any of the four defendants were aware of Leite's concern that another inmate might be attacked.

[5] Investigators were unable to precisely determine how long the assault lasted.  Doc. 38-34 at 6.  Some witnesses claimed it lasted only two-to-three minutes, whereas others maintained that it lasted ten.  Id.  As discussed below, I assume for the purposes of analysis that it lasted ten minutes.

took over the CP5 post from Officer McLain.  At 3:40 p.m.,
Corrections Officers Kathy Bergeron and Trevor Dube, who are
also defendants, entered F-block to conduct rounds.  Officer
Dube, the "officer in charge" for that shift, <u>see</u> Doc. No. 38-28
at 1, surveyed the mezzanine, while Officer Bergeron surveyed
the floor-level cells.  Both officers entered the cellblock on
the floor level from the same door.  Officer Dube proceeded
through the back half of the dayroom to the staircase, climbed
the stairs, surveyed the mezzanine cell row, and exited the
cellblock.  Officer Bergeron walked along the floor-level cells,
eventually reaching and passing Cell 9, checked the bathroom and
closet, and exited through a different door on the floor level.
The rounds were conducted briskly, with both officers making
their way through the cellblock in a minute or less.  Both
officers reported that all was "clear" on F-block at that time.
The video evidence does not clearly depict whether Officer
Bergeron looked into Cell 9 as she passed, but she now claims
that she did and saw nothing amiss.  Doc. No. 38-16 at 3.

Video footage showed that Gelinas finally released Leite
from Cell 9 at 4:20 p.m.  Leite emerged from the cell, initially
on his feet, shirtless, and barefoot.  His legs gave out almost
instantly as he took his second step away from the cell.  He

fell hard to the ground, landing on his backside, with his legs split apart.  He then slowly shifted around in an attempt to stand back up.  Gelinas then emerged from Cell 9, stepped toward Leite as he struggled on the floor, but hesitated and returned to the cell.  Seconds later, Gelinas re-emerged and grabbed Leite by the arm to help him to his feet.  Gelinas then hurriedly walked Leite over to Bunk 1T, arm-in-arm, as Leite hobbled along, hunched forward.  Once at the foot of Bunk 1T, Leite began to slowly climb up the bunk and Gelinas began to walk away.

As Leite's waist reached the top crossbar of the bunk, he began to wobble.  Gelinas, seeing this, quickly turned around and started back toward the bunk.  As he neared, it appeared that Leite was in better control, and Gelinas adjusted his course to walk past the bunk.  Then, as Leite hoisted himself up over the top rung, his leg slipped out, and he again appeared unsteady.  An inmate descending the staircase nearby saw this and rushed to Leite's aid.  He grabbed Leite's extended leg and pushed him into the bed.  Leite repositioned himself on the mattress and lay flat, face down, with no pillow, with his arms either under his chest or folded at his side.  The bed was made up with a white sheet, but Leite made no attempt to cover

himself with an additional top sheet or blanket.  Gelinas
quickly retreated to Cell 9, only to return to Bunk 1T seconds
later to drop off a ball of clothing at the base of the bunk.

The footage described above was preserved by Sergeant
Smith, acting shift commander at the time of the incident, to
assist investigators in attempting to identify Leite's
assailants. Doc. No. 38-13 at 8-10.  The recording ends,
however, at 4:22 p.m.[6]  Leite was last seen as described: lying
on his stomach, with his face pressed against the mattress, arms
at his side or under his chest, and unobstructed by any sheet or
blanket.  Sergeant Smith also viewed additional video footage
covering the period between 4:22 p.m. and 5:08 p.m., when Leite
was discovered, but did not keep this footage because it was not
pertinent to his investigation.[7]  See Doc. No. 50-18 at 13.

---

[6] Sergeant Smith preserved the footage by downloading it from the
system's digital video recorder ("DVR") sometime after the
assault.  See Doc. No. 38-13 at 9-10.  The DVR preserves footage
for approximately 14 days, after which time it begins to
overwrite itself.  Id. at 10.  Footage not preserved by Sergeant
Smith was apparently overwritten and is not in evidence.

[7] Sergeant Smith's purpose in reviewing the footage was to
identify Leite's assailants.  Thus, he was more interested in
footage of Leite's interactions with other inmates, rather than
that of Leite lying motionless in his bed.  See Doc. No. 38-13
at 10 ("[V]ideo of him laying on the bunk wouldn't solve who did
it. . . [I]t wasn't really relevant to me to download that
portion.").

14

Although he did not preserve this additional footage, Sergeant Smith noted in a contemporaneous report that the video depicted Leite lying "motionless" in his bunk during the forty-six minute period that preceded the officers' discovery of his injuries. See Doc. No. 38-13 at 9. The only significant movement from Leite that Sergeant Smith observed during this period was one instance in which Leite leaned over the side of the bunk and vomited onto the floor. Id. Gelinas confirmed that this happened sometime before the next set of rounds occurred at 4:50 p.m. and that another inmate cleaned up the vomit from the floor. Doc. No. 38-27 at 4.

At 4:50 p.m., Officers Bergeron and Dube conducted a second set of rounds. Once again, Officer Dube surveyed the upper level while Bergeron surveyed the lower level. See Doc. No. 38-29 at 5-6. Both reported everything to be clear. Id. at 9-10. Officer Bergeron recalled reviewing video of this second set of rounds following the incident and seeing herself "walk[] by" Bunk 1. Doc. No. 50-14 at 9. She also testified that she remembered thinking that "everything appeared fine" during the rounds. Doc. No. 50-14 at 9. Officer Dube has no memory of the round and was never shown the video.

Leite's injuries were finally discovered at 5:08 p.m.

during a count conducted by Officer Bergeron and Sergeant Dwane
Sweatt.  The count was announced at 5:00 p.m., signaling inmates
to stand in their cells or beside their bunks.  Sergeant Sweatt
surveyed the mezzanine cells while Officer Bergeron took the
floor-level cells and dayroom bunks.  See Doc. No. 38-26 at 3-4.
When Officer Bergeron reached Bunk 1T, Leite was still lying on
his bed.  Officer Bergeron directed him to stand, but Leite did
not respond.  Officer Bergeron continued to call to him as
seconds passed, and Sergeant Sweatt overheard her calls from the
mezzanine.  When Sergeant Sweatt finished his own count, he
turned and looked down at Officer Bergeron addressing Leite.
Sergeant Sweatt observed Leite lying on his back in his bunk,
with blood "coming out of his mouth," and running down the right
side of his face.  Doc. No. 38-26 at 3-4.  Sergeant Sweatt then
descended the stairs and approached Bunk 1T, as Officer Bergeron
continued to call to Leite.  Eventually Leite climbed down to
the floor from his bed, but appeared unsteady, needing support
from the bunk in order to stand.  See Doc. No. 38-19 at 3-4;
Doc. No. 38-26 at 4.

Sergeant Sweatt sat Leite down, again observed blood
"running out down across his face," and found Leite to be
incoherent.  Doc. No. 38-26 at 4.  Officers discovered that

Leite's bed contained vomit, see Doc. No. 38-19 at 4, 7, and loose clothing on the bed was soiled with feces and urine. See Doc. No. 38-31 at 2. At 5:08 p.m., Sergeant Sweatt summoned first responders to F-block, initially suspecting a drug overdose. At 5:11 p.m., Sweatt declared a medical emergency once Leite confirmed that he had lost consciousness. See Doc. No. 38-26 at 6; Doc. No. 50-20 at 1. Nursing staff and local EMS were then summoned to F-block to assist Leite. See Doc. No. 38-26 at 6-7. Leite received immediate attention from NCF nursing staff, and was transported to Androscoggin Valley Hospital by EMS shortly thereafter. From there he was airlifted to Dartmouth Hitchcock Medical Center, where he remained in treatment for two weeks.

As a result of the assault, Leite suffered numerous contusions, several skull and facial fractures, intracranial bleeding, and residual cognitive deficits. See Doc. No. 50-5 at 2. He currently suffers from PTSD and Mild Neurocognitive Disorder due to the assault. Doc. No. 50-5 at 22. His pre-existing anxiety, depressive, and personality disorders were also substantially aggravated as a result of the incident. Doc. No. 50-5 at 22. Leite further offers expert opinion that the delay in treating his injuries "resulted in a lost opportunity

for mitigating the extent of his damage."  Doc. No. 50-22 at 2.
Since his release in January 2014, Leite has been unable to
return to his previous career as a residential contractor.

## II.  <u>**STANDARD OF REVIEW**</u>

Summary judgment is appropriate when the record reveals "no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a); Xiaoyan Tang v. Citizens Bank, N.A., 821 F. 3d 206, 215
(1st Cir. 2016).  A dispute is "genuine" if the evidence "is
such that a reasonable jury could resolve the point in favor of
the nonmoving party." Ellis v. Fidelity Mgmt Trust Co., 883 F.
3d 1, 7 (1st Cir. 2018) (citations omitted).  A fact is
"material" if it has the "potential to affect the outcome of the
suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir.
2017) (citations omitted).  I must examine the evidence in the
light most favorable to the nonmoving party, "indulging all
reasonable inferences in that party's favor." Winslow v.
Aroostook Cty., 736 F. 3d 23, 29 (1st Cir. 2013) (citations
omitted); see Tolan v. Cotton, 134 S. Ct. 1861, 1868 (2014).
But I will not consider "any conclusory allegations, improbable
inferences, [or] unsupported speculation." McGrath v. Tavares,

757 F.3d 20, 25 (1st Cir. 2014) (citations omitted).  Although I
may not make credibility determinations, I also "cannot allow
conjecture to substitute for the evidence necessary to survive
summary judgment." Town of Westport v. Monsanto Co., 877 F.3d
58, 66 (1st Cir. 2017) (citations omitted).

The movant bears the initial burden to identify the
"absence of any genuine issue of material fact." Flovac, Inc.
v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016).  In
response, the nonmoving party must then "designate specific
facts showing that there is a genuine issue for trial," Celotex
Corp. v. Catrett, 477 U.S. 317, 324 (1986))(citations omitted),
and "demonstrate that a trier of fact could reasonably resolve
that issue in its favor." Flovac, 817 F. 3d at 853 (citations
omitted).  This burden shifting requires the nonmovant to
identify "definite, competent evidence," Town of Westport, 877
F.3d at 66 (citations omitted), that is "'significantly
probative,'" or "more than 'merely colorable.'" Flovac, 817 F.
3d at 853 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 249 (1986)).  "The nonmovant's failure to adduce such a
quantum of evidence entitles the [movant] to summary judgment."
Flovac, 817 F. 3d at 853.

###           III.   **ANALYSIS**

Leite asserts that the defendants violated his Eighth
Amendment rights by failing to prevent the August 2012 assault
and failing to obtain timely medical treatment for his resulting
injuries.  I examine Leite's claims by first sketching the
Eighth Amendment law on which his claims are based and then
applying the relevant law to his claims against each defendant.

### A.   **The Eighth Amendment**

The Eighth Amendment's prohibition on "cruel and unusual
punishments" has been construed to impose certain duties on
prison officials to "provide humane conditions of confinement."
U.S. Const. amend. VIII; Farmer v. Brennan, 511 U.S. 825, 832
(1994); Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014).
This includes the "duty to protect prisoners from violence at
the hands of other prisoners," Lakin v. Barnhart, 758 F.3d 66,
70 (1st Cir. 2014) (quotations and citations omitted), and the
duty to provide prisoners with adequate medical care.  See Perry
v. Roy, 782 F.3d 73, 78 (1st. Cir. 2015).  But not every injury
from inmate-on-inmate violence, or every deficiency in medical
care "translates into constitutional liability."  Lakin, 758
F.3d at 70 (citations omitted); see Kosilek, 774 F.3d at 82
("The [Eighth] Amendment's focus on punishment means that not

all shortages or failures in care exhibit the intent and harmfulness required to fall within its ambit."). Rather, the Eighth Amendment requires only that prison officials not act with "deliberate indifference" to a "substantial risk" of violence or an inmate's serious medical need. Lakin, 758 F.3d at 70; Perry, 782 F.3d at 78; Burrell v. Hampshire Cty., 307 F.3d 1, 7-8 (1st Cir. 2002)).

The "deliberate indifference" standard asks whether the defendant-official had a "sufficiently culpable state of mind." Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (citing Burrell, 307 F.3d at 8). An official cannot be held liable for an Eighth Amendment violation under this standard unless "the official knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. At the outset, this requires actual knowledge of the substantial risk or serious medical need at the time in question. See Farmer, 511 U.S. 840-44; Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998). It is not enough to prove that "a reasonable person would have known, or that the defendant should have known" that an inmate was at risk or in need. Farmer, 511 U.S. at 843 n.8. Instead, "a prison official subjectively 'must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Burrell, 307 F.3d at 8 (quoting Farmer, 511 U.S. at 837). A finder of fact may conclude that a defendant in fact drew the inference that the plaintiff was facing a substantial health or safety risk from evidence that the risk is obvious. Farmer, 511 U.S. at 840, 842. But in such cases, the plaintiff must prove that the defendant was actually aware of the facts that made the risk obvious. See, e.g., Spruce v. Sargent, 149 F.3d 783, 786 (8th Cir. 1998) (rejecting Eighth Amendment claim against co-defendant because evidence failed to show that co-defendant was aware of the facts that gave rise to risk of assault).

**B.    Officer McLain**

Leite asserts that Officer McLain is liable for failing to prevent Leite's assault and failing to obtain timely medical attention for his resulting injuries. As I have explained, to prove the deliberate indifference component of either claim, Leite must prove that McLain failed to act to protect him even though she had actual knowledge of either the substantial risk of Leite's impending assault or his serious medical needs that arose thereafter. Because Leite has uncovered no direct evidence to prove McLain possessed actual knowledge of the risk

or need, he attempts to fill the gap with circumstantial evidence that Leite's plight was obvious to her at some unspecified time during her shift.  In particular, he points to evidence that: (1) McLain was aware of a generalized risk that inmates can be assaulted while in prison cells; (2) one of the 12 camera feeds in CP5 (channel 30) depicted  "suspicious" inmate conduct[8] occurring near Cell 9 over an 18-minute period that encompassed the moments before, during, and after the assault; (3) McLain must have viewed some portion of that activity due to her practice of toggling through cellblock video feeds at two-minute intervals; and (4) McLain acknowledged that the activity depicted on the channel 30 video footage would have prompted her to send corrections officers to the area if she had noticed it.  Doc. No. 50-1 at 6-7, 32-34.

---

[8] The "suspicious activity" consists of the scene previously discussed: inmate-conduct captured on CP5's channel 30 between 2:39 p.m. and 2:57 p.m., Doc. No. 50-1 at 5-7. It includes footage of Leite entering Cell 9 at 2:39 p.m.; his would-be attackers entering shortly thereafter in quick succession; "inmates milling around Cell 9" between 2:41 p.m. and 2:45 p.m., see Doc. No. 50-1 at 6-7; inmates periodically coming and going from Cell 9 over the course of the next ten minutes; and one inmate repeatedly retrieving items from Leite's bunk and returning to Cell 9.  Although McLain denies noticing any of this during her shift, see Doc. No. 38-20 at 4, she was shown the described footage at her deposition in this case.  At her depoisition, she conceded that she "should have" and "would have" directed officers to F-block to investigate if she had noticed the activity captured on channel 30 as it was happening.

I reject Leite's argument because the record does not contain sufficient evidence to permit a reasonable juror to conclude that McLain actually viewed enough of the camera footage of Cell 9 to alert her to an obvious substantial risk that Leite was about to be attacked or needed medical treatment. To start, Leite's argument is based on an assumption that McLain "must have" had her attention focused on the channel 30 camera view (the only view from which Cell 9 was visible) at some point that coincided with one or more of the suspicious events previously discussed. It further assumes that she "must have" actually noticed and appreciated the suspicious character of the activity captured on channel 30, which appeared mostly in the far, upper-right corner of the screen amidst the backdrop of an otherwise busy cellblock. The record, however, does not support either assumption.

First, undisputed evidence in the record demonstrates that McLain could not possibly have devoted all of her attention to the channel 30 camera view during the relevant period, as Leite assumes she did. As I have noted, McLain was responsible for monitoring 12 camera views displayed one at a time on two screens. In customary practice, only one of those screens was used to toggle through cellblock views. McLain would typically

watch each view for about two minutes before toggling on to the next, but she would remain on one view for longer if she noticed something outside of the "norm." Doc. No. 50-6 at 4-5. Only one of those 12 views, however, depicted Cell 9. McLain's responsibilities in CP5 also were not limited solely to viewing the cell-block dayroom feeds. Rather, she was concurrently responsible for opening cellblock and hallway doors, turning in her chair to monitor the industries area through the glass behind her, <u>see</u> Doc. No. 50-6 at 10-11, answering phone calls, and paging inmates called to other areas of the facility. In light of this evidence, any conclusion that McLain was able to devote more than minimal attention to the channel 30 camera view during the relevant time period would necessarily be based on pure speculation.

Further, even if McLain had been able to devote all of her attention to the channel 30 camera view, it would not have been obvious to her that an inmate was at risk of assault or needed medical treatment. The 18-minute span of relevant footage, even upon close inspection, is reminiscent of a game of three-card Monte; one must intensely focus on specific characters and track their movements to really appreciate the mischief afoot. At no point amongst the shuffle of inmates around Cell 9 is there any

overt, objective indication of violence.  Thus, given McLain's

other concurrent responsibilities in CP5, no factfinder could

reasonably infer from the evidence cited that McLain "must have"

had actual knowledge of the planned attack, the assault itself,

or Leite's resulting need for medical treatment.  See, e.g.,

Godfrey v. Russell, No. 7:14-cv-476, 2015 WL 5657037, *19-*20

(W.D. Va. Sept. 24, 2015) (security-camera evidence of inmates

crowding outside plaintiff's cell door, peeking in, with

assailant shouting, yanking, and pounding at plaintiff's cell

door insufficient to support inference that control-booth

operator actually knew of the threat to plaintiff).

Accordingly, I grant summary judgment for McLain on Leite's

claims against her.

## C.    **Officer Bergeron**

Leite claims that Officer Bergeron violated his Eighth

Amendment rights by failing to obtain medical treatment for him

after the assault.  He argues that Bergeron is liable both

because she failed to look into Cell 9 and discover that he

needed medical treatment during her first round and because she

failed to obtain treatment for him as he lay in his bunk during

her second round.

1. <u>First Round, 3:40 p.m.</u>

Leite does not allege that Bergeron was aware of any specific evidence that an assault had recently occurred inside Cell 9 when she passed by the cell on her first round. Instead, he bases his deliberate indifference claim against her solely on evidence suggesting that she well understood that all inmates faced a generalized risk of violence at NCF and might need medical attention following an assault. Because this risk was obvious, Leite argues, Bergeron acted with deliberate indifference when, as he claims, she passed by Cell 9 without looking inside.[9] I disagree.

It is, of course, true that an Eighth Amendment plaintiff need not show that a defendant-official actually knew that the plaintiff "was especially likely to be assaulted by [a] *specific prisoner*" or for a *specific reason*. See Farmer, 511 U.S. at 843 (emphasis added). But this does not obviate the need to prove that the defendant knew of a risk *specific to the plaintiff.* See, e.g., Grieveson v. Anderson, 538 F.3d 763, 777 (7th Cir. 2008) (Eighth Amendment liability requires actual knowledge of specific "threats to [plaintiff's] safety"); Carter v. Galloway,

---

[9] Although Bergeron claims that she looked into Cell 9 during her first round, I will assume for purposes of analysis that she passed by the cell without looking inside, as Leite claims.

352 F.3d 1346, 1349-50 (11th Cir. 2003) (absent actual awareness of "particularized threat" to plaintiff, awareness of cellmate-assailant's "generally problematic nature" insufficient to establish subjective knowledge of the risk).  Beyond the obvious case of a clear, explicit threat to a particular plaintiff, knowledge of a distinct risk may be inferred from knowledge of the plaintiff's trait, situation, or particular vulnerability (whether individually or as part of an identifiable group), or from knowledge of a particularly pervasive or severe risk.  See Farmer, 511 U.S. at 842-43; Westmoreland v. Brown, 883 F. Supp. 67, 74 (E.D. Va. 1995); see also Brown v. Budz, 398 F.3d 904, 915 (7th Cir. 2005) ("[D]eliberate indifference can be predicated upon knowledge of a victim's particular vulnerability . . . or, in the alternative, an assailant's predatory nature.").

Leite, however, presents no evidence that Bergeron was actually aware of any specific evidence that Leite faced a heightened risk of assault or that he or anyone else in Cell 9 had been assaulted and was in need of medical treatment.  Under these circumstances, her awareness of a general risk facing all inmates at all times, without more, is simply not enough to establish the subjective knowledge required for the deliberate

indifference standard.  See Shields v. Dart, 664 F.3d 178, 181 (7th Cir. 2011) ("[A] general risk of violence in a maximum security unit does not by itself establish knowledge of a substantial risk of harm.") (citation omitted); Rich v. Bruce, 129 F.3d 336, 339 (4th Cir. 1997) (prisoner must demonstrate that defendant-officer knew of "specific risk distinct from the general risks of violence from other inmates . . . to which [he] was always exposed," and of which the officer was aware); see also Berry v. Oswalt, 143 F.3d 1127, 1131 (8th Cir. 1998) (prison director's "general concern about men guarding women" and vague memory of sexual abuse in the past did not establish actual awareness that male guards at his own prison posed a "substantial risk" to female inmates or plaintiff specifically). Accordingly, I grant defendants' motion for summary judgment to the extent that it seeks to hold Bergeron liable for failing to obtain medical treatment for Leite during her first round.

    2.  Second Round, 4:50 p.m.

    Leite next claims that Bergeron violated his Eighth Amendment rights by failing to obtain medical treatment for him during her second round.

    Again, Leite does not point to any direct evidence to support his claim that Bergeron deliberately ignored his need

for medical treatment.  Instead, he argues that a jury could find that Bergeron must have known that Leite needed medical attention because his injuries would have been obvious to her when she passed by his bunk on her second round.

I reject Leite's argument because the evidence he cites cannot support his contention that Bergeron actually became aware of his injuries during her second round.  Viewing the evidence in the light most favorable to Leite, a reasonable juror could conclude that: (1) Leite was seen lying face down in his bunk at 4:22 p.m.; (2) unpreserved video footage depicted Leite laying motionless on his bed during the period between 4:22 p.m. and 5:08 p.m., except for one point when he leaned over the side of his bunk and vomited;[10] (3) Bergeron, following an unspecified path, passed by Leite's bunk at 4:50 p.m., during her second round; (4) Sergeant Sweatt looked down from the mezzanine at 5:08 p.m., during the count, and saw Leite laying face up on his bunk with an unspecified amount of blood coming from his mouth; and (5) other officers discovered an unspecified amount of blood and vomit on Leite's bed, along with an unspecified amount of soiled clothing, after they discovered his

---

[10] Although the precise time of the vomiting is unknown, it is undisputed that Bergeron was not present in F-block when it occurred.

need for treatment during the 5:00 p.m. count.

The problems with this evidence are legion.  First, I
cannot discern from the record whether Bergeron was ever in a
position to observe Leite's injuries.  The only evidence that
Bergeron passed anywhere near Leite's bunk is her vague
admission that she "walked by" it.  There is no evidence of what
direction Bergeron was traveling when she walked by the bunk, or
of how close she got to it, or of whether she walked by the
foot, the head, or down along the right or left side of the
bunk.[11]  Without such evidence, a reasonable juror could not
determine whether Bergeron would have been able to discover
Leite's injuries as she passed by his bunk.

Second, although blood on Leite's face, blood and vomit on
his bunk, and urine and feces on his clothes was discovered
during the 5:00 p.m. count, the record is devoid of evidence
that the blood, vomit, urine, or feces would have been visible
to Bergeron during her 4:50 p.m. round.  A juror could not

_____

[11] Although Bergeron, at her deposition, may have physically
identified this location by reference to the CP5 video, as she
testified that she "walked by here[,] right here," see Doc. No.
50-14 at 10, nothing in the record indicates where "here" refers
to.  There was no follow-up question or clarification at the
time, nor any indication of what, if anything, she was pointing
to.

conclude from this record whether Leite was lying face up or face down when Bergeron passed by his bunk.  Nor could a juror make any judgment from this record as to the amount, location, or appearance of the blood, vomit, urine, or feces to be able to do anything more than speculate as to whether Leite's need for medical treatment would have been obvious to Bergeron had she looked in his direction during her round.  With so many gaps in the evidence, a jury simply could not make that inference that Bergeron became aware during her second round that Leite needed medical attention without either rank speculation or further evidentiary development.

Of course, Leite could hope that Bergeron clarifies her testimony at trial.  For example, she could clarify that she walked by the head of his bunk during her 4:50 p.m. round.  But with nothing more than speculation to support his argument, Leite will not get the chance to ask.  Such "a vague supposition that something might turn up at the trial" is not an appropriate basis for denying an otherwise persuasive motion for summary judgment.  Soar v. Nat'l Football League Players' Ass'n, 550 F.2d 1287, 1289 n.4 (1st Cir. 1977) (citation and quotation omitted); see Taylor v. Gallagher, 737 F.2d 134, 137 (1st Cir. 1984) (nonmovant "may not create the possibility of conflicting

inferences through wishful thinking . . .”); In re Joint E. & S. Dist. Asbestos Litig., 774 F. Supp. 113, 114 (S.D.N.Y. 1991) (nonmovant not entitled to "to beneficial inferences concerning additional evidence she might present at trial"); see also 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2727.2 (4th ed. 2018) ("The nonmovant is not entitled to a trial on the basis of a hope that he can produce some evidence at that time."). In sum, without direct or circumstantial proof that Bergeron actually saw blood, vomit, urine, or feces during her 4:50 p.m. round, Leite cannot demonstrate that she possessed the requisite subjective knowledge for deliberate indifference. Accordingly, I grant summary judgment in Bergeron's favor for this second claim as well.

**D.    Officers Dube & Esobe**

Leite asserts similar medical needs-based claims against officers Dube and Esobe. For reasons that parallel those already discussed, I grant summary judgment for both officers.

1.    Officer Dube

Leite faults Dube for his conduct during the second F-block round at 4:50 p.m. He argues that the fact that Sergeant Sweatt was able to see blood coming out of Leite's mouth from the

mezzanine at 5:08 p.m. is enough to support an inference that Dube must have viewed the same thing at 4:50 p.m. "as he descended the stairs" from the mezzanine during his second round.  See Doc. No. 52 at 4.  Therefore, he contends, Dube's failure to obtain medical attention despite such "obvious" signs of distress constitutes deliberate indifference.

Again, Leite fails to identify evidence that Dube actually knew about his injuries.  The mere fact that Sergeant Sweatt later saw blood coming from Leite's mouth at 5:08 p.m. does not alone establish that Officer Dube must have seen the same thing during his round at 4:50 p.m.  First, there is no evidence that Dube descended the stairs during the 4:50 p.m. round at all.  The only evidence Leite marshals to support that assertion is the simple fact that Dube surveyed the mezzanine level during the second round.[12]  But that evidence, by itself, does not support an inference that Dube must have also descended the stairs at any point.

---

[12] The only evidence that Dube even surveyed the mezzanine, as opposed to the floor level, is Bergeron's testimony that she took the first floor and watched herself walk by Bunk T1, and that she and the other rounds officer typically split up during rounds – one took the lower level whereas the other took the mezzanine.  Doc. No. 38-19 at 4.  Dube himself had no independent memory of the round and no video of it was preserved.  Doc. No. 38-28 at 1.

There is also no evidence from which one could reasonably infer that Dube must have looked specifically at Leite, or even in the general area of Bunk 1T during his round. And there is no evidence that anything during Dube's 4:50 p.m. round would have directed his attention to Leite in particular. By contrast, Sergeant Sweatt's attention was specifically drawn to Bunk 1T during the 5:00 p.m. count because he heard Bergeron calling out for Leite to stand up. Without any specific facts suggesting that Dube's attention was similarly drawn to Leite, the fact that Sergeant Sweatt could see Leite's bloody mouth from the mezzanine, by itself, does not support an inference that Dube must have also seen the same thing. Because there is insufficient evidence demonstrating that Dube was actually aware of Leite's serious medical needs, I grant summary judgment for Dube.

  2. <u>Officer Esobe</u>

Leite also claims that Officer Esobe was deliberately indifferent to his serious medical needs by failing to call for medical attention for him as he lay motionless in Bunk 1T prior to the 5:00 p.m. count. Esobe, who was stationed in CP5 from 3:00 p.m. through 5:00 p.m., moves for summary judgement on the basis that there is no evidence that he was actually aware of

Leite's medical needs at the time.  Leite, in turn, argues that
Esobe must have seen "suspicious activity" during his shift that
"would place a layperson on notice of a potential serious
medical need," including 1) Leite's struggle to stand and climb
up to his bed at 4:20 p.m.; 2) Leite vomiting off the side of
his bed at some time thereafter; and 3) Leite lying motionless
on his bed at all other times prior to his discovery.  See Doc.
No. 50-1 at 32.

Leite's claim against Esobe fails for the same reasons that
doomed his claims against McLain.  There is no direct evidence
in the record that Esobe witnessed the described activity, or
that he was aware of Leite's injuries.  Further, to the extent
Leite argues that Esobe "must have known" about his injuries
because they would have been obvious to anyone viewing the
relevant camera footage, Leite once again fails to marshal
sufficient evidence to plausibly demonstrate that his need for
treatment was obvious to Esobe.  It is far too speculative to
assume, as Leite does, that Esobe actually saw Leite either
stumble out of Cell 9, struggle to climb Bunk T1, or vomit off
of the side of his bed in real time.  The former event spanned a
total of 53 seconds, and the only details of the vomiting event
are vague offerings by Sergeant Smith and Gelinas simply stating

that they saw it happen. Nothing is known about how long

Leite's vomiting lasted, what side of the bed it was on, or how

long the subsequent cleanup carried on. As I have already

noted, when discussing Leite's claims against McLain, it would

be plainly unreasonable to infer that any officer on duty in CP

5 both actually saw an event of short duration in the cell block

and understood its significance based solely on the fact that he

was stationed in CP5 when the event occurred. And that is all

Leite cites to support this claim.

#### IV. CONCLUSION

The problem with this case is that it was built on a faulty

legal foundation. In his amended complaint, and throughout the

early phases of this case, Leite claimed that the defendants

were liable because they failed to protect him even though they

should have known that he was at risk. After defendants

correctly asserted in their summary judgment motion that an

Eighth Amendment claim requires proof that the defendant

disregarded a known risk of harm, Leite made a last ditch

attempt to transform the case from a "should have known" action

into a "must have known" action. Because the record simply will

not support this attempted transformation, I grant defendants'

motion for summary judgment (Doc. No. 38).  The clerk is
instructed to enter judgment for the defendants and close the
case.

SO ORDERED.

/s/ Paul Barbadoro
Paul Barbadoro
United States District Judge

June 20, 2018

cc:  Lynmarie C. Cusack, Esq.
     Megan E. Douglass, Esq.
     Francis Charles Fredericks, Esq.
     Benjamin T. King, Esq.