# United States Court of Appeals
## For the First Circuit

No. 18-1682

JONATHAN LEITE,

Plaintiff, Appellant,

v.

KATHY BERGERON, Corrections Officer,

Defendant, Appellee,

MATTHEW GOULET, Corrections Officer; ELMER VAN HOESEN,
Corrections Officer; MICHAEL BEATON, Corrections Officer; LYNN
MCLAIN, Corrections Officer; RHIANNE SNYDER, Corrections
Officer; TREVOR DUBE, Corrections Officer; EDDY L'HEUREUX,
Corrections Officer; HEATHER MARQUIS, Corrections Officer;
JEFFREY SMITH, Corrections Officer; DWANE SWEATT, Corrections
Officer; YAIR BALDERRAMA, Corrections Officer; BOB MORIN,
Corrections Officer; EJIKE ESOBE, Corrections Officer,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

Benjamin T. King, with whom Douglas, Leonard & Garvey, P.C.
was on brief, for appellant.
Francis C. Fredericks, Jr., Senior Assistant Attorney
General, Civil Bureau, with whom Gordon J. MacDonald, Attorney

General of New Hampshire, was on brief, for appellee.

---

December 19, 2018

---

**LYNCH**, **Circuit Judge**.    This appeal is from the rejection of a claim of unconstitutional deliberate indifference by a corrections officer to the health and safety of an inmate, Jonathan Leite.    Leite v. Goulet, No. 15-CV-280-PB, 2018 WL 3057740 (D.N.H. June 20, 2018).    Leite was badly beaten by other inmates in a cell at a New Hampshire medium-security prison on August 24, 2012.    Leite alleges that a corrections officer, Kathy Bergeron, was deliberately indifferent while doing a round that day, leading to a delay in his being provided with medical treatment, which in turn exacerbated his injuries, including brain injuries.

The district court granted the motion for summary judgment of the many original defendants in this 42 U.S.C § 1983 case, and Leite appeals only as to Bergeron.    Leite bases his claim against Bergeron on evidence tending to show that when Bergeron conducted a round at 3:40 p.m., she did not look in the cells (as she should have done), and so did not see that Leite was lying on a bed in a cell assigned to others, and on looking further, would have seen he was injured.    Leite was observed at 5:08 p.m. during a count (different from a round), injured in his own bed (not in that cell), and that led to his getting medical attention.

We affirm on the basis that no reasonable juror could conclude that Bergeron was deliberately indifferent under the Eighth Amendment based on the facts presented by Leite.

I.

A.  Facts

As always on appellate review of grants of summary judgment, we recite the facts "'in the light most favorable to the nonmoving party' to the extent that they are supported by competent evidence." Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 3 (1st Cir. 2018) (quoting Walsh v. TelTech Sys., Inc., 821 F.3d 155, 157-58 (1st Cir. 2016)).  Leite was an inmate at the Northern New Hampshire Correctional Facility (NCF) on August 24, 2012.  NCF's F-block, where Leite was housed from the time he became incarcerated about one month earlier, had thirty cells, located on two floors, and housed between sixty and eighty inmates.  The cells surrounded a common area, or "dayroom," on the first floor.  The dayroom also had several bunk beds where new inmates sometimes slept.  Leite was assigned to one of the dayroom bunk beds, and not to a cell.

In August 2012, the F-block was a general-population, medium-security area with no inmates with maximum-security classifications.[1]  The corrections officers did not have any

---

[1]  NCF segregated inmates based on propensity for violence.  Leite does not argue that the inmates who attacked

orders to keep Leite separate from other inmates. Leite had never expressed any concerns for his own safety, nor had Leite requested to be put in protective custody.

Corrections officers monitored the F-block with security cameras and periodic rounds and counts. Two cameras streamed live footage of the dayroom into a control room operated by corrections officers. Many of the facts and the timing of events recited came from those tapes and are not disputed. The cameras had a fixed angle and did not capture the inside of individual cells, closets, or bathrooms. Inmate-on-inmate violence typically occurred in cells or other areas that were out of the security cameras' view.

Rules required officers to conduct at least four counts per day. During counts, officers identified and accounted for each inmate, making sure they were present, alive, and well. Before counts, corrections officers were given documents listing inmates and their cell or bunk assignments. During counts (except for the 11:00 p.m. and 2:30 a.m. counts), inmates had to be out of bed and standing. The officers were required to "see movement of bare skin or talk with (hear from) the inmate." Leite makes no claim that counts were not done properly.

---

him were known by NCF officials to be violent or to attack others.

Rounds, by contrast to counts, were less thorough and had different purposes. During rounds, the officers walked through the cellblock to evaluate safety, security, and sanitation. Rounds took place at least once an hour, on a staggered basis so that inmates could not anticipate them. Rounds differed from counts in that rounds did not require officers to confirm the identity or physical location of each individual inmate. Rounds were meant to ensure that no prohibited behavior was occurring. The officers were supposed to see that inmates were not tattooing one another, using drugs, fighting, or "cell-hopping" (visiting cells other than the ones to which they were assigned). A properly conducted round took a corrections officer, on average, three or four minutes to complete.

Corrections officers were supposed to look through the window on every cell door during rounds, but typically did not enter the cells unless they saw a problem or emergency. It was not unusual for inmates to be asleep or on a bed during the day. If an inmate was sleeping during rounds, some officers would approach to make sure the inmate was breathing and uninjured, but this was not required. Assignments for counts and rounds were given to corrections officers on a day-to-day basis, and often changed.

On August 24, 2012, Leite re-entered the F-block at 2:34 p.m. and walked to his bunk bed. Another inmate, Jonathan Gelinas, approached Leite, and the two spoke briefly. At 2:38 p.m., Gelinas walked away. When Leite was not looking, Gelinas twice made a slashing motion across his own neck, apparently as a signal.

A minute later, at 2:39 p.m., Leite left his bunk bed and walked diagonally over to Cell 9, which was fifteen to twenty yards away, and entered. Cell 9 was assigned to Gelinas and another inmate, Ryan Elliot. Two other inmates, Sean Lavallee and Matthew Garcia, entered Cell 9 after Leite did. Lavallee and Garcia severely beat Leite inside the cell. Gelinas had helped plan the attack, which lasted between two and ten minutes.

The attack left Leite disoriented and vomiting. Inmates could press a call button to contact the control room, operated by a corrections officer, but there is no assertion that Leite did that. Gelinas and other inmates initially kept Leite in Cell 9 so that the corrections officers would not notice his condition. Gelinas put Leite in the bottom bunk and "made it look like he was sleeping." Gelinas and other inmates cleaned up Leite's blood and vomit in Cell 9 and kept ice on Leite's head, to hide the assault.

- 7 -

About ten minutes before the 3:40 p.m. round, a number of inmates from the F-block went out for yard time.  At 3:40 p.m., Officers Kathy Bergeron and Trevor Dube entered the F-block to conduct a round.  Because many inmates were outside in the yard, few were inside the F-block.  Dube surveyed the second floor cells while Bergeron surveyed the first floor area and cells, including Cell 9.  Bergeron knew Leite by sight and also knew he was not assigned to Cell 9.  There is no claim that Bergeron was aware of any evidence that an assault had recently occurred inside Cell 9 or that whoever was inside Cell 9 was injured.

Video surveillance footage of this round does not establish whether or not Bergeron turned her head to look in Cell 9 or any of the other cells.[2]  Bergeron, after passing Cell 9, did check the bathroom and closet.  Both officers conducted the round in less than one minute, and then stated that all was "clear."  Bergeron did not return by the way she had come.  There is no assertion by Bergeron that some exigency distracted her during that round.

At 4:20 p.m., after the round, Leite walked out of Cell 9 and collapsed on the floor of the dayroom.  Gelinas

---

[2]    In the video footage, the second floor balcony mostly covers Bergeron's head as she walks along the cells.  Cell 9 is off-screen.  Bergeron appears to pause and shift her body at one point as she walks along the cells, but this is not conclusive.

grabbed Leite by the arm, walked Leite to his own bunk bed, and
then walked away.  Leite climbed to the top bunk and lay face-
down on the bed, assisted by another inmate.  Leite then lay
motionless, except for when he leaned over the side of the bed
to vomit onto the floor.[3]  An inmate cleaned up the vomit
sometime before Bergeron and Dube conducted their next round at
4:50 p.m.

During the 4:50 p.m. round, Bergeron again walked
through the first floor and Dube walked through the second
floor.  The officers again reported that everything was "clear."
On appeal, Leite does not argue that this 4:50 p.m. round, when
Leite was back in his own bed, evidenced deliberate indifference
by Bergeron.

Officers discovered Leite's condition shortly
thereafter, during a count.  At 5:00 p.m., Bergeron and Sergeant
Dwane Sweatt announced a count and ordered the inmates to stand
in their cells or by their bunk beds.  Bergeron walked through
the first floor and Sweatt walked through the second floor.
Bergeron approached Leite's bunk, saw that he was still in bed,
and told him to stand.  Leite did not get up, and Bergeron
repeatedly called his name.  Sweatt came near, having finished
the count upstairs.  Sweatt saw Leite lying on his back, with

---

[3]    The record does not state at what time Leite vomited
onto the floor.

blood coming out of his mouth and running down his face. Eventually, Leite climbed down from his bunk bed, but he needed to support himself on the bed in order to stand.

Sweatt had Leite lie down. Leite was incoherent and blood continued to run down his face, and his bed was soiled. At 5:08 p.m., Sweatt summoned first responders. At 5:11 p.m., Leite told the officers that he had lost consciousness earlier, so Sweatt declared a medical emergency and summoned nursing staff and local Emergency Medical Services. Leite was taken to a hospital, where he remained for two weeks.

Leite was treated for contusions, skull and facial fractures, intracranial bleeding, and residual cognitive deficits. He now suffers from post-traumatic stress disorder and mild neurocognitive disorder due to the attack. The attack also aggravated Leite's pre-existing anxiety, depression, and personality disorders. Leite offered expert testimony that the delay in treating his injuries "resulted in a lost opportunity for mitigating the extent of his damage."

B.   Procedural History

On July 14, 2015, Leite filed a one-count complaint in the U.S. District Court for the District of New Hampshire, under 42 U.S.C. § 1983, against fifty-two corrections officers. On August 26, 2015, Leite amended his complaint to name as defendants only the fourteen officers on shift during or shortly

after the attack.  On October 13, 2017, all defendants moved for summary judgment.  Leite opposed the motion only as to four defendants, including Bergeron.  The district court granted the four remaining defendants' motions for summary judgment on June 20, 2018.  Leite, 2018 WL 3057740, at *1.

Leite timely appealed, challenging the district court's grant of summary judgment only as to Bergeron, and only as to the round she conducted at 3:40 p.m.

II.

We review a district court's grant of summary judgment de novo.  Perry v. Roy, 782 F.3d 73, 77 (1st Cir. 2015).  A movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue is genuine if it can be resolved in favor of either party, and a fact is material if it has the potential of affecting the outcome of the case."  Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016) (internal quotation marks omitted) (quoting Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)).

The lead Supreme Court decision on Eighth Amendment protections in prisons is Farmer v. Brennan, 511 U.S. 825 (1994).  Prison officials must provide "humane conditions of confinement," including adequate medical care.  Id. at 832.

"[A] prison official violates the Eighth Amendment only when two requirements are met." Id. at 834. First, "the deprivation [of care] alleged must be, objectively, 'sufficiently serious.'" Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). For claims based on inadequate medical care, "[a] medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990).

Second, a prison official must have a "sufficiently culpable state of mind" such that the official shows "'deliberate indifference' to inmate health or safety." Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 297, 302-03). A prison official is deliberately indifferent where she "knows of and disregards an excessive risk to inmate health or safety." Id. at 837. This requirement is subjective. See Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018). Deliberate indifference is characterized by "obduracy and wantonness, not inadvertence or error in good faith." Whitley v. Albers, 475 U.S. 312, 319 (1986). "To show such a state of mind, the plaintiff must provide evidence that the defendant had 'actual knowledge of impending harm, easily preventable,' and yet failed to take the steps that would have easily prevented that harm."

Zingg, 907 F.3d at 635 (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)).  "[D]eliberate indifference entails something more than mere negligence," but is "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Calderón-Ortiz v. LaBoy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002) (quoting Farmer, 511 U.S. at 835).  "This standard, requiring an actual, subjective appreciation of risk, has been likened to the standard for determining criminal recklessness." Giroux v. Somerset Cty., 178 F.3d 28, 32 (1st Cir. 1999).

We assume arguendo that Leite's medical needs were sufficiently serious, and that he has provided sufficient evidence to withstand summary judgment as to causation.  The issue on appeal is whether Leite has produced enough evidence for a jury to conclude that Bergeron had the requisite culpable state of mind.

Leite argues that Bergeron had a culpable state of mind of deliberate indifference to his need for medical care, based on the cursory manner in which Bergeron conducted the 3:40 p.m. round.  His theory is that a jury could reasonably infer that "if the defendant Bergeron had done her job and had looked in the cells during the 3:40 p.m. round, she would have found Mr. Leite in the wrong cell, would have confronted him regarding prohibited 'cell hopping,' and would have immediately discovered

that Mr. Leite was seriously injured and in need of medical care."[4]

"It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834. Under Farmer, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment" under the Eighth Amendment. Id. at 837. The district court found that Leite "present[ed] no evidence that Bergeron was actually aware of any specific evidence that Leite faced a heightened risk of assault or that he or anyone else in Cell 9 had been assaulted and was in need of medical treatment."[5] Leite, 2018 WL 3057740, at *8. The district court found on this basis and on this record that Bergeron's "awareness of a general risk facing all inmates at all times, without more, is simply

---

[4]    To be clear, Leite makes no argument that Bergeron knew that he (or any other inmate) was injured, had been attacked, or was in a cell that was not his own, when she conducted the 3:40 p.m. round.

[5]    We have stated that "[u]nder Farmer . . . it is irrelevant 'whether the prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.'" Calderón-Ortiz, 300 F.3d at 65 (quoting Farmer, 511 U.S. at 843).

not enough to establish the subjective knowledge required for the deliberate indifference standard."  Id.

Given that Leite's claim is based on Bergeron's conduct during one round, the district court correctly held that the plaintiff needed to produce evidence that Bergeron knew of a risk specific to Leite.  There is no such evidence, as our recitation of the facts makes clear.

Leite also argues Bergeron need not have been aware of Leite's condition, because it is enough that she showed willful blindness to the risk he faced.  Farmer did recognize that an officer "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist."  511 U.S. at 843 n.8.  But there is no evidence that Bergeron had any suspicion that an inmate needed medical attention when she conducted the 3:40 p.m. round.  Other inmates had concealed Leite's condition for as long as possible, moving him from one bed to another to avoid detection, and cleaning up his blood and vomit.[6]

---

[6]    We bypass a potential dispute of fact and assume Bergeron did not look in Cell 9 during the 3:40 p.m. round.  At deposition, Bergeron testified that "I always aim to look into every single cell," and she acknowledged that she understood the safety and security reasons for doing so.  She also stated that when she did rounds, she was "looking to make sure that everything appear[ed] fine within the cell" and that there were "only two [inmates] in the cell."

There is no developed argument that the prison or indeed Bergeron had a policy, or even had adopted a practice, of never looking at inmates in cells or bunk beds during rounds, thus arguably increasing generalized risk. So that precise question is not presented by the case before us.[7] It is true that Leite cites his deposition testimony to state that Bergeron's "normal practice" was to "hurry through rounds without looking into cells."[8] But he relies on this testimony

----

[7]     Calderón-Ortiz, cited by Leite, does not support his argument. There, a claim survived a motion to dismiss where a correctional facility was alleged to have no policies or procedures in place to protect against known risks of sexual assault. See 300 F.3d at 65-66.

[8]     Leite quotes his deposition testimony:

Q.  What do you remember of your observations of [the defendant Bergeron] doing rounds?

A.  I mean I guess you could say the quicker you can get off the block, the better would be my opinion . . . . Literally walking by cells and not even looking in . . . .

Q.  . . . So you observed Corrections Officer Bergeron doing rounds without looking in the cells; is that correct?

A.  Yes.

Q.  How frequently would you observe her doing rounds without looking in the cells?

A.  I mean it's really hard to remember, but it was -- it was a normal practice.  I

----

- 16 -

only to support an inference that Bergeron failed to look in Cell 9 during the 3:40 p.m. round on the day Leite was attacked. Leite does not develop any argument that Bergeron's "normal practice" demonstrated deliberate indifference to the health and safety of the inmates, nor does he argue that this "normal practice" was her or the prison's policy.  See Valdez v. Lynch, 813 F.3d 407, 411 n.1 (1st Cir. 2016) (finding an argument is waived where the petitioner "throws in a couple references" to it, but "fails to develop" it).

The district court's grant of summary judgment is affirmed.[9]

---

can't say if it was every day or -- but it was regularly.

[9] Bergeron also argues that she is entitled to qualified immunity.  We do not reach this issue, since we hold that Bergeron is entitled to summary judgment on Leite's deliberate indifference claim.